# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ─────────────────────────────── )<br>)<br>**IN RE: BIOPURE SECURITIES LITIGATION** )<br>)<br>)<br>─────────────────────────────── ) | **CIVIL ACTION**<br>**NO.  03-12628-NG** |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, HOWARD P. RICHMAN, CHARLES A. SANDERS and J. RICHARD CROUT**

By their attorneys,

Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Raquel J. Webster, BBO #658796
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

# TABLE OF CONTENTS

**Page**

THE ALLEGED CLAIMS ................................................................................................ 1

FACTS ............................................................................................................................ 2

    A.    Biopure Corporation ............................................................................ 2

    B.    Hemopure ............................................................................................ 3

    C.    The FDA Trial Process and the Hemopure BLA .................................. 4

        1.    The FDA Trial Process ............................................................ 4

        2.    The Hemopure BLA ................................................................ 6

    D.    Biopure's Disclosures Regarding the Risk of Achieving FDA Approval ............ 7

    E.    Biopure's Filing of a New Protocol for a Possible Trauma Indication and the FDA's Response ............................................................................ 9

SUMMARY OF LEGAL STANDARDS ................................................................... 11

    A.    Plaintiffs Must Meet Strict Pleading Requirements .......................... 11

        1.    The First Circuit Applies Rule 9(b) Strictly to Claims of Securities Fraud. ................................................................ 11

        2.    The PSLRA Sets Strict Pleading Requirements. ................... 12

ARGUMENT ................................................................................................................ 13

I.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THE STATEMENTS ALLEGED TO BE FALSE AND MISLEADING ARE NOT ACTIONABLE AS A MATTER OF LAW. ............................................. 13

    A.    Biopure Had No Duty To Disclose the FDA's Clinical Hold of a Proposed Protocol (Not an Ongoing Trial)......................................... 13

    B.    Biopure's Actual Disclosures About An Intent to Develop A Possible Trauma Indication Were Forward-Looking And Were True............... 16

    C.    The Nondisclosure of the Clinical Hold Was Not Material as a Matter of Law. ........................................................................................... 17

II.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE FALSITY WITH THE PARTICULARITY NECESSITATED BY BOTH THE PSLRA AND FED. R. CIV. P. 9(B). ....................................... 19

    A.    Plaintiffs Fail to Allege With Particularity How and Why Biopure's Statements In Its SEC Filings Were False or Misleading.................... 23

B.     Plaintiffs Fail to Allege With Particularity How and Why Biopure's Statements In Its Press Releases Were False or Misleading. ............................... 26

C.     Plaintiffs Fail to Allege with Particularity the Reasons Why Defendants' Statements In Telephone Conferences and Presentations Were False or Misleading. ........................................................................................................... 29

III.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS CREATING A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER. ...................................................... 32

A.     Plaintiffs' Scienter Allegations Fail to Plead the Requisite Strong Inference of Scienter as to Each Defendant. ....................................................... 34

1.     Plaintiffs' Allegations Concerning Inapposite Legal Reasoning In An Earlier, Failed Class Action, Provide No Legally Cognizable Basis From Which To Draw Any Inference Of Scienter. ........................ 34

2.     Plaintiffs' Allegation That Scienter May Be Inferred From An SEC Staff Recommendation Of Investigation Is Devoid Of The Factual Basis Necessary To Establish Scienter. ................................................... 35

3.     Biopure's Change in Disclosure In Response to Changed Circumstances (and Not the SEC Investigation) Was Not Evidence of Scienter. ............................................................................................... 36

4.     A Single Defendant's Statements About the Likelihood of Another Company's Success with FDA Has Nothing To Do With Any of the Defendants' States of Mind Regarding Hemopure. ........................... 36

5.     Plaintiffs' Conclusory Allegations Concerning Motive and Opportunity Fail to Establish a Strong Inference of Scienter. ................. 37

6.     Plaintiffs' Allegations Of Trading By Insiders Are Not Probative of Scienter. .............................................................................................. 37

B.     Plaintiffs Fail to Allege Any Inference of Scienter For Individual Defendants Crout, Sanders or Rausch. .............................................................. 40

IV.    THE AMENDED COMPLAINT FAILS TO PROPERLY PLEAD A SECTION 20A CLAIM AND THEREFORE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ......................................................................... 41

CONCLUSION. ............................................................................................................ 42

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Aaron v. SEC*, 446 U.S. 680 (1980).............................................................................36

*Anderson v. Abbott Laboratories*, 140 F. Supp. 2d 894 (N.D. Ill. 2001) ....................19

*Backman v. Polaroid*, 910 F.2d 10 (1st Cir. 1990)..................................................13, 17

*In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20 (D. Mass. 2004)...........................18

*Carney v. Cambridge Tech. Partners, Inc.*, , 135 F. Supp. 2d 235 (D. Mass. 2001)....................38

*Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827 (N.D .Ill. 2000) .......................................15

*Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp. 2d 910 (N.D. Tex.
    1998) ....................................................................................................................36, 40

*Colby v. Hologic, Inc.*, 817 F. Supp. 204 (D. Mass. 1993)............................................26

*Columbia Laboratories, Inc. Sec. Litig.*, 144 F. Supp. 2d 1362 (S.D. Fla. 2001) ........22

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..................................................13,33

*Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d 12
    (D. Mass. 2000).............................................................................12, 21, 33, 38

*Friedberg v. Discreet Logic*, 959 F. Supp. 42 (D. Mass. 1997) ....................................33

*Greebel v. FTP Software Inc.*, 194 F.3d 185 (1st Cir. 1999)....................11, 21, 33, 34, 37, 38, 39

*Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir. 1992) ...........................................12

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)....................................................21

*In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319 (D. Mass. 2002)..........................12

*In re Biogen Sec. Litig.*, 179 F.R.D. 37 (D. Mass. 1997)..............................................14

*In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) ....................13, 15, 23

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)....................39

*In re Criimi Mae Inc. Sec. Litig.*, 94 F. Supp. 2d 652 (D. Md. 2000)...........................40

*In re Fidelity/Apple Sec. Litig.*, 986 F. Supp. 42 (D. Mass. 1997) ...............................42

*In re Galileo Corp. Shareholders* Litig., 127 F. Supp. 2d 251 (D. Mass. 2001) ...11, 12, 33, 34, 35

*In Re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995) ...............14, 23, 36

LITDOCS/571774.1

*In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000)...................................37

*In re Nike, Inc. Sec. Litig.*, 181 F. Supp. 2d 1160 (D. Or. 2002) .......................................................40

*In re PLC Systems, Inc. Sec. Litig.*, 41 F. Supp. 2d 106 (D. Mass. 1999) ...............................22, 23

*In re Parametric Technology Corp.*, 300 F. Supp. 2d 206 (D. Mass. 2001) ...............................42

*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001)........................................35, 39, 40

*In re Peritus Software Servs., Inc.*, 52 F. Supp. 2d 211 (D. Mass. 1999).........................34, 35 ,39

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999).............................................39

*In re Sun Healthcare Group Inc. Sec. Litig.*, 181 F. Supp. 2d 1283 (D.N.M. 2002)....................27

*Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268 (D. Mass. 1998)........................................12, 33, 34, 35

*Loan v. Federal Deposit Ins. Corp.*, 717 F. Supp. 964 (D. Mass. 1989).......................................41

*Lucia v. Prospect Street High Income*, 36 F.3d 170 (1st Cir. 1994)..............................................17

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ...........................................................33, 34

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001)................................................................................38

*McNamara v. Bre-X Minerals, Ltd.*, 57 F. Supp. 2d 396 (E.D. Tex. 1999)...................................37

*Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195 (D. Mass. 2002) ...................................................22

*Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d at 685 .......................................40

*Romani v. Shearson Lehman Hutton*, 929 F.2d 875 (1st Cir. 1991)..............................................12

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................12, 21, 26, 35

*Ronconi v. Larkin*, 253 F.2d 423 (9th Cir. 2001)............................................................................39

*Serabian v. Amoskeag Bank Shares*, 24 F.3d 357 (1st Cir. 1994) .....................................12, 20, 23

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) ......................2, 11, 20, 21, 23, 38

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997).......................................................11, 20, 29, 42

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................................17

## STATE CASES

*In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729 (N.D. Cal. 2003).........................41

*In re Hall, Kinion & Assocs. Inc. Sec. Litig.*, 2000 WL 1639503 (N.D. Cal. 2000) ....................26

*In re Stratus Computer, Inc.*, 1992 WL 73555 (D. Mass. 1992) ....................................................41

*Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 1993 WL 464730 (S.D.N.Y. 1993) (2nd Cir. 1994) ........................................................................................................41

*Malozzi v. Zoll Medical Corp.*, 1996 WL 392146 (D. Mass. 1996) ............................................17

## FEDERAL STATUTES

15 U.S.C. § 78u-4 ....................................................................................................1, 11, 12, 13

15 U.S.C. § 78u-5 .............................................................................................................20, 27

15 U.S.C.A. § 78t-1 ................................................................................................................41

## FEDERAL REGULATIONS

21 C.F.R. §§ 312.21 ...................................................................................................4, 5, 6, 18

21 C.F.R. § 312.22(a)..................................................................................................................4, 5

21 C.F.R. § 312.42(e).............................................................................................................10

21 C.F.R. § 312.40 .................................................................................................................10

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 9(b) .....................................................................................................1, 11, 20

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1

LITDOCS/571774.1

Defendants Biopure Corporation ("Biopure" or the "Company"), Thomas A. Moore, Carl W. Rausch, Howard P. Richman, Charles A. Sanders and J. Richard Crout (collectively, the "Defendants" or Messrs. Moore, Rausch, Richman, Sanders and Crout as the "Individual Defendants"), submit this memorandum in support of their Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint" or "A.C."). Defendants move to dismiss the Amended Complaint on the following grounds:

1.    The Amended Complaint fails to plead properly a Section 10(b) claim and, therefore, fails to state a claim upon which relief can be granted because:

- the statements alleged to be false and misleading are not actionable as a matter of law;

- the Amended Complaint fails to allege falsity with the particularity necessitated by the strict pleading requirements of both the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Securities and Exchange Act of 1934 ("Exchange Act") § 21D and 15 U.S.C. § 78u-4, and Fed. R. Civ. P. 9(b); and

- Plaintiffs' "scienter allegations" do not remotely raise a strong inference of scienter as to any of the Defendants, let alone each defendant.

2.    The Amended Complaint fails to plead properly a Section 20(a) claim and therefore fails to state a claim upon which relief can be granted.

The Amended Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## THE ALLEGED CLAIMS

This is a securities class action on behalf of the purchasers of the common stock of Biopure during the period March 17, 2003 through December 24, 2003. The catalyst for the lawsuit was a press release issued by Biopure on December 24, 2003 (attached as Exhibit 1 to Defendants' Appendix of Documents (hereafter, "App.")). That release stated that the Company and two individuals had received Wells Notices from the United States Securities and Exchange Commission (the "SEC") regarding two aspects of the Company's prior public announcements about its communications with the United States Food and Drug Administration (the "FDA").

The press release stated that the Wells Notices notified the Company of a *preliminary decision* by SEC staff attorneys to recommend that the SEC bring a civil injunctive proceeding

against the Company and the individuals.  They were given the opportunity to respond to the Wells Notices and did so, explaining why a civil proceeding was not warranted.  Later, in April 2004, other individuals received Wells Notices and they too responded.  To this day, the SEC has *not* brought any civil proceeding against the Company or any individuals.

The receipt of the Wells Notices and the statements in the December 24, 2003 press release are all Plaintiffs have in terms of pleaded facts.  As established below, the receipt of Wells Notices is not itself a sufficient fact to sustain claims of securities fraud.  The remainder of Plaintiffs' allegations amount to one contention:  that Biopure was required to disclose the clinical hold status of a single proposed protocol for a clinical trial.  Biopure was not required to disclose that as a matter of law.  As a result, Plaintiffs have failed to state a claim and these claims should be dismissed.

## FACTS[1]

### A.  Biopure Corporation

Biopure, founded in 1984 in Cambridge, Massachusetts, is a leading developer of pharmaceuticals called oxygen therapeutics.  (*See* Form 10-Q for quarterly period ended Jan. 31, 2003, dated Mar. 17, 2003, App. Exh. 2 at 8).  Biopure develops, manufactures and markets oxygen therapeutics for both human and veterinary use.  (A.C. ¶ 2).  These oxygen therapeutics were designed to serve as an alternative to red blood cell transfusions in contexts where the body is not sufficiently meeting its own oxygen needs.  (*Id.*)  Biopure's scientists have also worked, primarily preclinically, to show that the properties of oxygen therapeutics may be useful where red blood cells would not be used, such as ischemia and to oxygenate hard cancer tumors to

---

[1] The documents referred to in the Amended Complaint are included in Defendants' Appendix of Documents and may be considered in support of this Motion.  The facts set forth herein originate from the Amended Complaint, documents referenced therein or documents which otherwise may be considered on a motion to dismiss.  *See, e.g., Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1220 (1st Cir. 1996) ("In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the Amended Complaint, even though not attached to the Amended Complaint, without converting the motion into one for summary judgment").

enhance the effect of radiation and chemotherapy.  (*See* Form 10-K for fiscal year ended Oct. 31, 2002, dated Jan. 29, 2003, App. Exh. 3 at 8).

### B.    Hemopure

Biopure's principal product in development is Hemopure® (hemoglobin glutamer-250 (bovine) or HBOC-201).  (*See* Jan. 31, 2003 Form 10-Q, App. Exh. 2 at 10).  Hemopure is an intravenously administered, hemoglobin-based oxygen carrying solution (HBOC) derived from cow hemoglobin that is chemically stabilized and ultra-purified through a patented process.[2] (Sept. 17, 2003 presentation, App. Exh. 4 at 1).  It is a first-in-class product intended to be an oxygen therapeutic, including a "blood substitute," when used instead of red blood cell transfusions.  (App. Exh. 2 at 8).  Hemopure is stable for three years without refrigeration and requires no preparation prior to use because it is compatible with all blood types.  (Oct. 31, 2002 Form 10-K, dated Jan. 29, 2003, App. Exh. 3 at 4).  It is ultra-purified to remove contaminants and infectious agents; hence, it does not carry blood-borne diseases.  (*See* May 30, 2003 press release, App. Ex. 5 at 1).  Donated human blood is screened, but is not purified, and may carry infectious agents.  (*See* Oct. 31, 2003 Form 10-K, App. Exh. 3 at 2).

Hemopure has been in clinical trial use for more than a decade.  Most notably, Hemopure is already approved for human use in severely anemic surgery patients in South Africa.  (A.C. ¶ 2).  Hemopure has been administered to more than 800 human subjects in 22 clinical trials.  (*See* May 30, 2003 press release, App. Exh. 5 at 1).  It has also been administered to approximately 30 patients on a "compassionate use" basis.  (Form 10-K for fiscal year ended Oct. 31, 2003, dated Jan. 29, 2004, App. Exh. 6 at 7).  In December 2003, Biopure initiated in Europe a Phase II clinical trial of Hemopure for elective angioplasty and stent procedures, or percutaneous coronary intervention for the management of ischemia.  (App. Exh. 6 at 3).  That clinical trial continues today.  Biopure submitted a study protocol for in-hospital testing of Hemopure in

---

[2]  Biopure holds dozens of patents, including 24 issued U.S. patents covering ultra-pure, semi-synthetic blood substitutes and their manufacture.  (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 14).

trauma patients to the Medicines Control Council (MCC) in South Africa which approved the protocol after modifications including lowering the maximum dose of Hemopure. (Dec. 24, 2003 press release, App. Exh. 1). This is the first human trial in Biopure's ongoing trauma program. The next is anticipated to be a phase 2/3 for which the U.S. Naval Medical Research Center has taken responsibility. (*See* May 22, 2003 press release, App. Ex. 7 at 2).

Biopure's second manufactured product, Oxyglobin® (hemoglobin glutamer-200 (bovine) or HBOC-301), which is similar to Hemopure, was approved by the FDA in 1998 and in Europe in 1999 for administration to dogs. (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 11). Over 137,000 units of Oxyglobin have been sold, and Biopure believes it has saved many animal lives. (*See* Sept. 17, 2003 presentation, App. Exh. 4 at 4).

Thus, Biopure's products have a long history of documented clinical success. Hemopure has been approved for marketing in one country; it has more than a decade of use in twenty-two clinical trials conducted in the United States, Europe and South Africa (which concluded without being halted) and it is currently being used in Phase II clinical trials in Europe and South Africa. Oxyglobin has been approved and sold to veterinarians in the United States and Europe, proof of the product's concept.

### C.    The FDA Trial Process and the Hemopure BLA

#### 1.    The FDA Trial Process

The process of bringing a new drug or biologic product to market in the United States and elsewhere involves testing and gathering data about the product in its proposed indication to demonstrate two things: safety and efficacy.[3]  *See* 21 CFR §§ 312.21 and 312.22 (App. Exhs. 9 and 10).

---

[3] An article intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease is a "drug." Federal Food Drug, and Cosmetic Act § 201(g)(1)(b). A "biologic" is a specific type of drug that is typically derived from animals or plants. Blood, blood components and derivatives are biologics. Public Health Services Act § 351(i). Hemopure is a biologic because it is derived from bovine hemoglobin.

> FDA's primary objectives in reviewing an IND are…in Phases 2 and 3 to help assure that the quality of the scientific evaluation of drugs is adequate to ***permit an evaluation of the drug's effectiveness and safety***. Therefore, although FDA's review of Phase 1 submissions will focus on assessing the safety of a Phase 1 investigation, FDA's review of Phases 2 and 3 submissions will also include an assessment of the scientific quality of the clinical investigations and the likelihood that the investigations will yield data capable of meeting statutory standards for marketing approval.

21 CFR § 312.22(a) (emphasis added).

In the drug or biologic development process, numerous pre-clinical trials are completed that include laboratory evaluation of the product and animal studies to assess the safety and potential efficacy of the product. (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 12). The discovery/preclinical testing stage generally takes from 3 to 7 years, with only about 1 of every 10,000 compounds evaluated entering human clinical trials. *Inside the FDA, Drug, Discovery & Development*, Drug Discovery and Development, Nov. 1, 2002, Tanuja Koppal, Ph.D. (attached as App. Exh. 11).[4]

The human testing phase is called clinical trials. Phase 1 clinical trials are trials with the product in healthy volunteers to determine metabolism and pharmacologic actions of the drug in humans, side effects associated with increased doses and early evidence of effectiveness. *See* 21 C.F.R. § 312.21(a) (App. Exh. 9). Phase 2 clinical trials examine the safety and effectiveness of the product for a particular indication in patients (not healthy volunteers). *See* 21 C.F.R. § 312.21(b) (App. Exh. 9). Phase 3 clinical trials examine the safety and efficacy of the product in a larger number of patients in order to provide enough information to evaluate statistically the overall benefit-risk relationship of the product and to provide an adequate basis for physician labeling. *See* 21 C.F.R. § 312.21(c) (App. Exh. 9).

Side effects from drugs and biologics, including adverse side effects, are commonplace. Janet Woodcock, MD, an FDA Director, has stated that "[e]very drug has side effects. Even the most widely used drug like acetaminophen, the active ingredient in Tylenol, causes

---

[4] The article looked at data through and including 2001.

hepatotoxicity in some individuals." Accordingly, as a matter of FDA-regulatory terminology, "safe" does not mean harmless; it just means that the benefits of the drug outweigh the risks. *See Inside the FDA* (App. Exh. 11). Dr. Woodcock said that the debate should not be about safe versus unsafe, but about benefits versus risks. *Id.* It follows that when a biologic in the FDA review process is identified as presenting "safety concerns," it means that the FDA is evaluating the risks versus the benefits of the biologic.

On average, it takes approximately fifteen years in the United States to develop a drug from laboratory to marketplace. *Inside the FDA* (App. Exh. 11). Hemopure is a "first-in-class" drug, meaning that no hemoglobin-based oxygen carrier has ever been approved for use in humans. (*See* Jan. 31, 2003 Form 10-Q, App. Exh. 2 at 1) It is taking longer than 15 years to develop. (*See* Sept. 17, 2003 presentation, App. Exh. 4 at 1).

### 2. The Hemopure BLA

The culmination of pre-clinical and clinical testing (when successful) is the filing of an application to market a product. On July 31, 2002, Biopure submitted a biologics license application ("BLA") to the FDA seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery (the "Hemopure BLA").[5] (A.C. ¶ 2). In support of its BLA, Biopure submitted the results of 212 animal toxicology or pharmacology studies. It also submitted information on its clinical trials. Hemopure was administered to more than 800 human subjects in 22 completed clinical trials (many of which took place in the United States) including four advanced, red-blood cell controlled trials in cardiac, vascular, general non-cardiac and orthopedic surgery. (Oct. 31, 2002 Form 10-K, App. Exh. 3 at 5-6; May 30, 2003 press release, App. Exh. 5; Sept. 25, 2003 presentation, App. Exh. 12). These trials have represented a progression expanding the maximum dosing to 10 units. (Oct. 31, 2002 Form 10-

---

[5] The FDA requires separate approval for each proposed indication for any drug or biologic. (Jan. 31, 2003 Form 10-Q, App. Exh. 2 at 16).

K, App. Exh. 3 at 6).  By July 2002, Hemopure had been used in all three phases of completed clinical trials.  (*See id.*).

Moreover, Biopure's U.S. pivotal Phase 3 trial, *met its primary safety and efficacy endpoints*.  (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 9).  The primary safety objective of the trial was a finding that patients treated with Hemopure have an overall medical risk no worse than patients treated with red blood cells, per the statistical methodology defined in the study protocol.  (*Id.* at 8).  The primary efficacy objective was the elimination of red blood cell transfusions in at least 35 percent of the patients who received Hemopure.  (*Id.* at 9).

Thus, the BLA included data from nearly two dozen clinical trials and reported that Hemopure had met its primary safety and efficacy endpoints in its pivotal clinical trial for the orthopedic surgery indication.

Once a BLA is filed, the FDA has 60 days to determine whether it will accept the BLA for review.  *See* FDA's Manual of Operating Procedures and Policies, SOPP 8404 dated Oct. 2, 2002 (App. Exh. 13).  In the case of the Hemopure BLA, FDA accepted it for review on October 1, 2002.  (Form S-3 filed Apr. 11, 2003, App. Exh. 8 at 4).  Once a BLA is accepted, the FDA's own guidelines provide that FDA should complete the review of the BLA within 10 months.  *See* Prescription Drug User Fee Act, Reauthorization Performance Goals and Procedures pursuant to the Food and Drug Administration Modernization Act of 1997 (App. Exh. 14).

### D.    Biopure's Disclosures Regarding the Risk of Achieving FDA Approval

Biopure has repeatedly disclosed to investors the risks and uncertainties associated with trying to obtain FDA approval for Hemopure.  Biopure made the following risk disclosure after the Hemopure BLA was filed in July 2002:

> We believe that our completed Phase III clinical trials are consistent with the FDA's guidance on the design and efficacy and safety endpoints required for approval of products such as Hemopure.  ***However, the FDA could change its view or require additional data or even further clinical trials… prior to approval of Hemopure.***
>
> ***The FDA may delay or deny approval of a biologic license application if applicable regulatory criteria are not satisfied or may require additional testing***

*or information, and/or require postmarketing testing and surveillance to monitor safety, purity or potency of a product.  It may also limit the indicated uses for which an approval is given.*

(Oct. 31, 2002 Form 10-K, App. Exh. 3 at 13) (emphasis added).[6]

In various Forms S-3 filed during the purported class period, Biopure included the following risk disclosure statement:

We will not be able to market Hemopure in the United States unless and until we receive FDA approval.  We have filed an application for approval with the FDA, and the application was accepted for review on October 1, 2002…[T]he FDA could find that our responses do not address its issues adequately and could require additional data or even further clinical trials, including trials for indications other than those for which the pending application seeks approval, prior to approval of Hemopure.  Despite all of our efforts, *the FDA could refuse to grant a marketing authorization.*

(*See* Forms S-3 filed Apr. 16, 2003, App. Exh. 15; June 19, 2003, App. Exh. 16; July 2, 2003, App. Exh. 17; and Aug. 22, 2003, App. Exh. 18) (emphasis added).

In each of its press releases dated March 25, 2003, (App. Exh. 20), April 24, 2003, (App. Exh. 21), May 22, 2003, (App. Exh. 7), May 30, 2003, (App. Exh. 5), August 1, 2003, (App. Exh. 22) and April 30, 2004, (App. Exh. 23), the Company included the following paragraph:

Statements in this press release that are not strictly historical are forward-looking statements.  *There can be no assurance that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained,* that anticipated milestones will be made in the expected timetable, that any clinical trials will be successful, or that any approved

---

[6] Biopure also made the following statements during the purported class period:

- Company risks include the lack of FDA or any other regulatory approvals…  (Oct. 31, 2002 Form 10-K, App. Exh. 3 at 1).

- There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure.  (January 31, 2003 Form 10-Q, App. Exh. 2 at 12).

- The FDA could refuse to grant a marketing authorization.[6]  (Form S-3 filed Apr. 11, 2003, App. Exh. 8 at 4).

- There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure….  (Apr. 30, 2003 Form 10-Q, App. Exh. 19 at 16).

- Company risks include lack of FDA or any other regulatory approval for our human product in a major market.  (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 2).

product will find market acceptance and be sold in the quantities anticipated. Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment. ***These risks include***, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, ***uncertainties and possible delays related to the filing and acceptance of application to the FDA***…the uncertainties of clinical trials and the availability of sufficient financing to support operations. Discussions of Biopure's operations and financial condition, and specific factors that could cause the company's actual performance to differ from current expectations, can be found on the company's Web site at www.biopure.com (emphasis added).

At the beginning of each of its conference calls and presentations, the Company included similar cautionary language.

Biopure did publicly disclose the filing of the BLA for the orthopedic surgery indication. (*See* Mar. 25, 2003 press release, App. Exh. 20). Biopure also disclosed when the FDA accepted the BLA for review. (*See* May 30, 2003 press release, App. Exh. 5). At the same time, Biopure repeatedly disclosed the uncertainties and risks surrounding any ultimate approval for Hemopure.

### E. Biopure's Filing of a New Protocol for a Possible Trauma Indication and the FDA's Response

On March 7, 2003, Biopure submitted to the FDA a protocol proposing a clinical trial using Hemopure in a ***new possible indication***: in-hospital treatment of patients suffering traumatic injury. (*See* A.C. ¶ 28). This was a distinct, potential indication from the orthopedic surgery indication proposed in the BLA. In fact, the proposed trauma protocol was assigned a new investigational new drug application (IND) number by the FDA, distinct from the IND under which the studies included in the BLA for orthopedic surgery patients were conducted. (*See* Oct. 31, 2003 Form 10-K, App. Exh. 6; Form S-3 filed July 2, 2003, App. Exh. 17 at 3 ("The FDA requires a separate approval for each proposed indication for the use of Hemopure in the United States"); Jan. 31, 2003 Form 10-Q, App. Exh. 2 at 16).

Biopure did *not* announce publicly the filing of the proposed trauma trial protocol. (*See* Dec. 24, 2003 press release, App. Exh. 1). Unlike the BLA filing, it was not disclosed because it

was a routine, proposed clinical test for an early phase of data-gathering which was submitted for FDA review and consideration. (*See id.*)

Under applicable FDA statutes and regulations, once a proposed protocol for a clinical trial is submitted in a new IND, ***the FDA must act within 30 day***s to impose a clinical hold on the trial. Federal Food, Drug and Cosmetic Act § 505(i)(2); 21 C.F.R. § 312.40 (App. Exh. 24). Otherwise, the applicant is free to proceed with the proposed trial, as submitted. When a clinical hold is imposed, the IND sponsor, such as Biopure, and the FDA must resolve any outstanding concerns before the trial can proceed. 21 CFR § 312.42(e) (App. Exh. 25). This process may result in modification or redesign of the protocol. (*See id.*)

In April 2003, the FDA notified Biopure that it was placing the proposed trauma trial on clinical hold. (Oct. 31, 2003 Form 10-K, App. Exh. 6 at 2). The FDA cited "safety concerns" based on a preliminary review of data from Biopure's Phase 3 trial in patients undergoing orthopedic surgery. (App. Exh. 6 at F-21; *see also* A.C. ¶ 29). At the very same time, however, the BLA review for the orthopedic surgery indication continued and was unaffected by the clinical hold on the proposed trauma test.

Biopure did not disclose the clinical hold on the proposed trauma trial because it did not consider correspondence with the FDA about *data interpretation* in the development of a protocol to be *material*. (App. Exh. 6 at F-21). The nature of the clinical hold – data interpretation leading to perceived protocol issues – was itself routine communication with the FDA and not a material event. For example, the proposed in-hospital trial suggested a dose of 15 units, when 10 units had been the highest dosage used in any prior clinical trial. (*See* Dec. 24, 2003 press release, App. Exh. 1 at 1). The proposed patients were patients who had suffered traumatic injury, yet had arrived at the hospital and could therefore be treated with red blood cell transfusions. (*See* Oct. 31, 2002 Form 10-K, App. Exh. 3 at 2-4). "Safety concerns" about data include concerns about such things as dosage and targeted patient population. The FDA's reference to "safety issues," compared with Biopure's history of working out protocol designs with the FDA for the twenty-two completed trials, were not material. Moreover, because the

- 10 -

BLA review continued unaffected by the clinical hold, the status was not material to the BLA review. Nor was there a duty to correct any information in the market, as Biopure had not disclosed that it had submitted the protocol to the FDA. (*See* Dec. 24, 2003 press release, App. Exh. 1 at 1).

<u>**SUMMARY OF LEGAL STANDARDS**</u>

Defendants are entitled to challenge the legal sufficiency of a complaint under Rule 12(b)(6). If the complaint fails to state a claim, it must be dismissed. In determining a motion to dismiss, a court will consider only those facts that are well-pleaded; the court "need not credit a complaint's 'bald assertions' or legal conclusions." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996). Here, Rule 9(b) and the PSLRA govern the heightened pleading requirements Plaintiffs must meet. *In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d. 251, 260 (D. Mass. 2001). As set forth below, Plaintiffs have failed to meet these requirements and their claims must therefore be dismissed.

A.   <u>**Plaintiffs Must Meet Strict Pleading Requirements.**</u>

1.   **The First Circuit Applies Rule 9(b) Strictly to Claims of Securities Fraud.**

The First Circuit has been notably strict and rigorous in applying the fraud pleading standards of Fed. R. Civ. P. 9(b) in securities actions -- "congruent and consistent" with the PSLRA, 15 U.S.C. § 78u-4(b)(2). *Greebel v. FTP Software Inc*., 194 F.3d 185, 193 (1st Cir. 1999). Under Rule 9(b), a complaint claiming fraud must:

1.   specify the content of each statement alleged to be fraudulent, identify the speaker and describe where and when it was made;

2.   set forth facts indicating that the statements were false when made; and

3.   set forth facts giving rise to a strong inference that a defendant acted with scienter, that is, an intent to deceive.[7]

---

[7] *See, e.g., Suna v. Bailey Corp.,* 107 F.3d 64, 68-71 (1st Cir. 1997) (affirming dismissal where plaintiffs "fail[ed], on every allegation of fraud, to explain why the statements were fraudulent");

(Footnote Continued on Next Page)

To survive a motion to dismiss, Plaintiffs must demonstrate that the allegations rest on more than mere "information and belief." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 325 (D. Mass. 2002). If the Amended Complaint is plead on "information and belief," it must also set forth all facts that underlie the basis of the claim. *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991) (allegations plead on information and belief "do not satisfy the particularity requirement unless the Amended Complaint sets forth the facts on which the belief is founded"). Courts of this Circuit "have been especially rigorous in demanding such factual support in the securities context." *Romani*, 929 F.2d at 878.

## 2.    The PSLRA Sets Strict Pleading Requirements.

In 1995, concerned about abusive securities class action litigation and so-called "strike suits," Congress enacted the PSLRA, which amended the 1933 Act and the Exchange Act. *See Galileo*, 127 F. Supp.2d at 260. The PSLRA sought to curtail abusive litigation at the pleading stage by establishing uniform and stringent pleading requirements and by providing added protection for "forward-looking" or predictive statements. *See id.* Hence, the PSLRA makes the pleading standard in securities fraud cases even more rigorous than Rule 9(b) traditionally has required. *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp.2d 12, 17-18 (D. Mass. 2000); *Lirette v. Shiva Corp.*, 27 F. Supp.2d 268, 274 (D. Mass. 1998).

Under the PSLRA, a complaint alleging that a statement or omission is misleading must specify each statement alleged to have been misleading and the reasons why the statement is misleading. Exchange Act § 21D(b)(1)(B); 15 U.S.C. § 78u-4(b)(1). *See also Rombach v.*

---

(Footnote Continued from Previous Page)

*Serabian v. Amoskeag Bank Shares*, 24 F.3d 357, 361 (1st Cir. 1994) (stating that complaint must "set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading"); *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992) ("Courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading"). Such a particularity of pleading is required "even when the fraud relates to matters peculiarly within the knowledge of the opposing party").

LITDOCS/571774.1

*Chang,* 355 F.3d 164, 170 (2d Cir. 2004).  In addition, since recovery under § 10(b) of the Exchange Act requires proof of scienter, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), the PSLRA also requires that the Amended Complaint state with particularity facts giving rise to a *strong inference* that the defendant acted with scienter, an "intent to defraud, manipulate or deceive."  *See* Exchange Act § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2) (emphasis added).

## ARGUMENT

## I.  THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THE STATEMENTS ALLEGED TO BE FALSE AND MISLEADING ARE NOT ACTIONABLE AS A MATTER OF LAW.

### A.  Biopure Had No Duty To Disclose the FDA's Clinical Hold of a Proposed Protocol (Not an Ongoing Trial).

The Amended Complaint rests on the theory that Biopure's non-disclosure of the clinical hold status of the proposed trauma trial – the filing of which had not been publicly disclosed – amounted to securities fraud.  Biopure had no duty to disclose the FDA's clinical hold of the separate trauma trial protocol.  Indeed, making such a disclosure itself may have been misleading, causing volatility in Biopure's stock price.  The claims must be dismissed as a matter of law.

As a general matter, the federal securities laws do not require issuers to disclose all nonpublic material information, or even all such information bearing on a particular subject discussed in a public statement.  *See Backman v. Polaroid*, 910 F.2d 10, 16 (1st Cir. 1990) (disclosing that product was being sold below cost did not require disclosure of how much below cost).  Rather, "a duty to disclose arises only when the issuer has made a 'statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information.'"  *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998) (dismissing challenges to statements where there was no duty to disclose omitted information).

Accordingly, courts have held that there simply is no general duty to disclose FDA questions raised in interactions with the FDA.  In fact, doing so may in itself be misleading.  In

- 13 -

*In Re Medimmune, Inc. Sec. Litig.*, 873 F. Supp 953 (D. Md. 1995), for instance, the court held that companies during the review process "as a general proposition ha[ve] no duty to report [their] ongoing discussions with FDA during the review process." *Id.* at 966. The *Medimmune* court's explanation is worth reviewing in full:

> Mere questioning by the FDA imposed no duty upon Defendants either to trim back their opinions as to the efficacy of the drug or to report to the public the FDA staffers' questions as they arose. *Continuous dialogue between the FDA and the proponent of a new drug is the essence of the product license application process. . . . Requiring ongoing disclosure of FDA's questions would not only be disruptive to the review process; it could easily result in misleading the public more than not reporting the questions. Where mere disclosure of a question might cause the company's stock to decline in value, the eventual answer to the question might cause it to rise once again.* Investors who sold that stock when the FDA's question was asked but before the company's answer was given might have legitimate cause for concern when a satisfactory answer came forth and the stock's price began to climb again. As defense counsel cogently argues, Defendants might then find themselves defending the opposite of the present lawsuit.

*Id.* at 966 (emphasis added).

Notably, the *Medimmune* ruling has been applied in the District of Massachusetts with respect to FDA reservations about drug "efficacy," the other criterion that has to be met for FDA approval. In *In re Biogen Sec. Litig.*, 179 F.R.D. 37 (D. Mass. 1997), securities plaintiffs contended that statements discussing the results of a clinical trial were misleading because they failed to disclose that the FDA had concerns about the efficacy of the drug. The Court rejected the argument, holding that the defendants "had no duty to disclose [the FDA] reservations." *Id.* at 37 (quoting *Medimmune*).

Importantly, the FDA communication here was not with regard to the Hemopure BLA, *i.e.,* the communication was not even about regulatory approval of the core indication for the Company's product, as were the undisclosed FDA communications in *Medimmune* and *Biogen*. This was the first step in communications with the FDA concerning the use of Hemopure in a trauma trial. Even if it were part of the BLA review process, Plaintiffs allege nothing here that requires departure from the absence of a duty to disclose routine FDA communications. That the FDA's clinical hold on the trauma trial was based in part on "safety concerns" that, in Plaintiffs'

view, were related to the BLA, did not render the information material thereby causing Biopure's public statements about the BLA to become misleading. A statement is not misleading merely because there is some undisclosed fact bearing "some relation to the subject matter" of the statement. *In re Boston Tech*, 8 F. Supp. 2d at (dismissing challenges to statement where there was no duty to disclose allegedly omitted information).

Even if the FDA's clinical hold for the separate trauma trial was somehow related to the BLA, courts have recognized that the FDA's identification of a problem with a company's application for regulatory approval is not necessarily material. In *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 834 (N.D. Ill. 2000), for instance, a company, Sabratek Corp., made "flush syringes" regulated by the FDA. The FDA changed its classification of the flush syringes from a drug to a medical device, and accordingly requested a 510(k) application in order to approve the syringes within FDA requirements. Sabratek submitted the application, and the FDA issued a number of warnings stating that the company's manufacture of the syringes did not comply with federal regulations. Throughout the period, "Sabratek downplayed the seriousness, or even existence, of its regulatory difficulties. It issued two press releases . . . stating that the company had addressed all of the FDA's concerns and that Sabratek had no reservations about the safety of the syringes." *Id.* at 832. The FDA then denied the company's application (which was later approved). The *Sabratek* court nonetheless held that the company's statements were not actionable, reasoning that "[s]imply receiving a number of letters from the FDA listing regulatory shortcomings does not portend ultimate FDA denial of the recipient's application. *Id.* at 835.

Even more so here than in *Sabratek*, *Medimmune* and *Biogen*, Biopure's non-disclosure of FDA communications about the trauma protocol for Biopure's first, early stage trauma trial is not actionable. Just because the FDA raised "safety concerns" about the proposed trauma protocol did not mean that Biopure was prohibited from making statements concerning its beliefs about progress towards approval regarding the BLA for use in orthopedic surgery patients.

**B.      Biopure's Actual Disclosures About An Intent to Develop A Possible
Trauma Indication Were Forward-Looking And Were True.**

Plaintiffs incorrectly allege that Biopure made multiple false and misleading public statements regarding the proposed trauma clinical trial during the purported class period. (*See, e.g.,* A.C. ¶ 31). In fact, Biopure never disclosed the filing of the trauma protocol until December 24, 2003. Thus, to the extent the Amended Complaint is based on the faulty premise that Biopure made statements concerning the proposed trauma clinical trial without disclosing the FDA's placement of a clinical hold, that allegation is wholly unsupported. To the extent Biopure discussed the potential use of Hemopure in trauma during the class period, it merely made general statements about a forward-looking intent to develop trauma as a possible indication. For example:

- March 25, 2003 press release (App. Exh. 20):

   Hemopure is in earlier states of development for use in cancer, trauma, and ischemic events such as heart attack and stroke.

- Amendment No. 2 to Form S-3 filed April 11, 2003 (App. Exh. 8):

   The Company expects to initiate additional pre-clinical and clinical trials this year to expand the indications for Hemopure beyond surgery. We cannot estimate the expenditures or the timing for this development until we have adequate funding to undertake new projects.

- October 30, 2003 press release (App. Exh. 26):

   Biopure's updated plans continue to include clinical development of Hemopure for other potential indications….a Phase II trauma trial co-sponsored by the U.S. Army and Navy is anticipated in 2004. These new trials are unrelated to the current Hemopure BLA.

These disclosures referred to the Company's forward-looking development plan and were thus protected under the PSLRA's safe harbor provision. (*See* detailed discussion of Biopure's forward-looking statements, *infra*, at 20-32). Furthermore, the Company's statements about its general development of a trauma indication are demonstrably true. Certainly, Plaintiffs have *not* come close to pleading that there was no intent to try to develop a possible trauma indication. Indeed, the proposed protocol shows in and of itself that there were the customary steps being taken as part of a development plan. The filing of the trauma protocol itself was not a step of such magnitude and significance that its disclosure was required, and Plaintiffs do not allege that

- 16 -

it was.  Nor was its hold status determinative of the development plan.  Disclosure of a general plan did not create a duty to disclose every event relevant to the plan.  *See Backman*, 910 F.2d at 16.

### C.    The Nondisclosure of the Clinical Hold Was Not Material as a Matter of Law.

A misrepresentation is "material" to a claim of securities fraud only if the omitted fact was one "likely to be viewed by the reasonable investor as significantly altering the *total mix* of available information."  *Malozzi v. Zoll Medical Corp.*, 1996 WL 392146 at *7 (D. Mass. 1996) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphasis added)).  *See also Lucia v. Prospect Street High Income*, 36 F.3d 170, 175 (1st Cir. 1994) ("The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement.  [I]nformation is 'material' only if disclosure would alter the '*total mix*' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision").

The clinical hold was not material for several reasons.

First, Hemopure had been approved for use in South Africa and used to conclusion in 22 clinical trials.  (It is also currently in use in two other trials.)  (*See* October 31, 2002 Form 10-K, App. Exh. 3 at 5-6; October 31, 2003 Form 10-K, App. Exh. 6 at 3).  A clinical hold of one proposed protocol of a separate indication is *not* material for a product with such a history.

Second, the clinical hold made no statement about the likely outcome of the ongoing Hemopure BLA review or the overall safety of the product.  Plaintiffs' allegation that the clinical hold put Defendants on notice that the FDA Hemopure BLA was in jeopardy and in "serious doubt" (A.C. ¶ 31) is unsupported.  Consideration of the Hemopure BLA was and is a *separate* regulatory review process, addressing a different patient population, with different medical profiles.  The clinical hold referenced "safety issues" in Biopure's orthopedic surgery trial and not safety issues concerning the entire BLA, which notably represented more than 200 preclinical (animal) and 22 completed clinical studies.  A "safety issue" in the orthopedic surgery

trial can mean that a finding that is not serious in the BLA application could have a different degree of seriousness in the trauma trial protocol. Reading anything into a reference to "safety concerns" would be entirely speculative, not for disclosure. Furthermore, a clinical hold in the context of a *new* IND, even citing "safety concerns," is not itself a material event as the FDA typically emphasizes safety in review of a new IND. *See* 21 C.F.R. § 312.21 and 312.22 (App. Exhs. 9, 10). Thus, a safety concern in the case of a new IND could be, for example, based on the need for more data or based on the protocol design, e.g., rate of drug administration or other facts. It is not a finding that the product is unsafe.

Third, Biopure repeatedly and accurately disclosed the risks associated with trying to obtain FDA approval. Biopure never provided any guarantee of product approval. A clinical hold status of a proposed protocol is at most an element of the *early phase* of planning clinical development for an indication and delay in the review process for *one* indication inherent in the overall risk of FDA approval. In other words, Plaintiffs and Biopure's shareholders were repeatedly informed that the Company may *not* obtain FDA approval of its product. (*See* Biopure's cautionary statements, *supra,* at 7-9). The clinical hold status of the proposed protocol is only one event in an FDA review process that investors were told may not end successfully. (*See* discussion of the "bespeaks caution" doctrine, *infra,* at 21). That one event is not material in the "total mix" of the disclosures about uncertainty in the FDA review process.

Fourth, courts have found the failure to disclose certain information concerning a proposed trial to be misleading only when the trial has already been initiated or disclosed (creating the need to update prior disclosures). *C.f., In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp.2d 20 (D. Mass. 2004) (court found that omission of adverse side effects was material where trial had been initiated). Here, Biopure did not disclose its submission of the trauma clinical trial protocol to the FDA for review. It did not begin any testing or clinical trials for the proposed U.S. trauma trials. (Dec. 24, 2003 press release, App. Exh. 1). It did not ship any product under the new IND for trauma clinical trials. (*Id.*) Furthermore, the FDA's safety concerns and clinical hold were not conclusions about the scientific outcome of the trauma

clinical trials, which had not even begun.  Accordingly, Biopure's omission of the clinical hold was not material because this omission did not alter the "total mix" of information available to the investors.

If the omission of a fact would make another statement so incomplete as to be misleading, a company must disclose that fact.  But "omitting smaller details, even if investors might care about them, is not necessarily misleading."  *Anderson v. Abbott Laboratories*, 140 F. Supp. 2d 894, 908-09 (N.D. Ill. 2001) (considering defendant's statements collectively, court dismissed claim that company failed to disclose FDA warning letter identifying quality control violations and threatening enforcement measures because challenged statements were not rendered misleading by omission of FDA issues).  The clinical hold was, at best, a small detail in light of Hemopure's extensive preclinical and clinical history.

## II.   THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE FALSITY WITH THE PARTICULARITY NECESSITATED BY BOTH THE PSLRA AND FED. R. CIV. P. 9(B).

Plaintiffs' allegations amount to one oft-repeated assertion:  that the Company's public announcements during the alleged class period were fraudulent because the Company did not disclose the clinical hold status of the proposed trauma protocol and the "safety concerns" reference.[8]

Biopure's alleged false and misleading statements are listed in the following sixteen paragraphs of the Amended Complaint: ¶¶ 41, 44, 45, 46, 49, 53, 55, 61, 63, 64, 66, 72, 76, 81, 84 and 88.  In these paragraphs, Plaintiffs point to three types of documents that they assert contain false and misleading statements: (1) Biopure's SEC filings; (2) press releases issued by the Company; and (3) statements by Defendants Moore and Richman to securities analysts, investment advisors and other members of the investing public.

---

[8] Plaintiffs repeatedly allege that Defendants' statements were false "in light of the FDA's safety concerns and the Defendants' failure to disclose [these concerns]."  *See* Amended Complaint, ¶¶ 43, 44, 51, 56, 62, 67, 77 and 85.  As shown below, these allegations fall short of the pleading requirements.

Plaintiffs' allegations of falsity are inadequate for the following reasons:

First, Plaintiffs have failed to allege sufficient particularized facts indicating that Defendants' statements were *false when made* and how and why they were false. *See* Fed. R. Civ. P. 9(b); *Suna*, 107 F.3d at 69; *Serabian*, 24 F.3d at 361. Merely quoting a statement with an all-encompassing allegation that the statements were all false or misleading because Defendants omitted to disclose the FDA's clinical hold of the trauma clinical trial protocol categorically fails to meet the stringent requirements of the PSLRA and Rule 9(b) which mandate particularity and specificity as to **each** allegedly false statement.

Second, Plaintiffs have failed to "set forth specific facts that make it reasonable to believe" that Defendants *knew* that their statements were materially false or misleading. *See Serabian*, 24 F.3d at 361.

Third, Biopure's forward-looking statements are protected under the PSLRA "safe harbor" provision and by the "bespeaks caution" doctrine. When assessing claims of fraudulent statements in securities cases, a court will consider a statement or omission in context. *See Shaw*, 82 F.3d at 1213. When making this assessment, courts protect from liability forward-looking statements that are protected by the safe harbor provision of the PSLRA. Under the safe harbor provision, a forward-looking statement[9] is nonactionable if:

(i)     it is identified as forward-looking and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement";

(ii)    it is "immaterial"; *or*

(iii)   plaintiff does not plead (and prove) that the statement was made "with actual knowledge . . . that the statement was false or misleading."

---

[9] The "safe harbor" provision defines "forward-looking" statements to include projections of revenues, income and earnings, statements of management's plans and objectives for future operations (including plans or objectives relating to products of the issuer), statements about future economic performance and disclosure of the issuer's assumptions underlying the foregoing. *See* 15 U.S.C. § 78u-5(i)(1).

15 U.S.C. § 78u-5(c)(1)(A)(i)-(B).  Importantly, the statute is *disjunctive*; therefore, meeting any one of the three criteria is sufficient to merit safe harbor treatment.  *See* 15 U.S.C. § 78u-5(c); *Greebel*, 194 F.3d at 201 (describing safe harbor prongs as "alternative inlets").  Thus, if a forward-looking statement is accompanied by meaningful cautionary language, "the defendants' state of mind is irrelevant," because the statement is not material as a matter of law.  *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999).  *See also Fitzer*, 119 F. Supp.2d at 31 (citing *Shaw*, 82 F.3d at 1213):

> The bespeaks caution doctrine stands for the principle that when statements such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, these so-called "soft" statements may not be materially misleading under the securities laws.

As set forth below, many of Biopure's challenged statements are non-actionable under one or more prongs of the PSLRA's safe harbor provision.

Fourth, the Amended Complaint challenges statements that are non-actionable statements of puffery or expressions of corporate optimism.  Courts are unwilling to hold defendants liable for optimistic statements.  *See Rombach*, 355 F.3d at 175 (expressions of puffery and corporate optimism do not give rise to securities violations); *Shaw*, 82 F.3d at 1217 (courts have found immaterial as a matter of law "rosy affirmation[s] commonly heard from corporate managers and … loosely optimistic statements that are so vague, so lacking in specificity or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").  Courts have held that expressions of corporate optimism do not give rise to securities violations.  *See Rombach*, 355 F.3d at 174 ("[C]ompanies must be permitted to operate with a hopeful outlook: [p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage").  In fact, very similar statements have been held to be non-

actionable.  In *In re PLC Systems, Inc.,* the court held that the following optimistic statements were not actionable:

- We expect that full [FDA] approval could be granted in the summer months.

- PLC believes … its application … is on track for approval this year.

- PLC Systems remain[s] on track for an FDA approval this year.

41 F. Supp.2d at 117-18.  Indeed, these statements (which were not actionable) are *more* specific and optimistic than the statements Plaintiffs are challenging here.  The court held that "[r]ead in conjunction with PLC's standard disclaimer and SEC filings, [these statements] fall within the PSLRA's safe harbor provisions."  *Id.*  In *Columbia Laboratories, Inc. Sec. Litig.*, 144 F. Supp.2d 1362 (S.D. Fla. 2001), the court held non-actionable similar statements to the ones challenged by Plaintiffs.  The plaintiffs in that case challenged defendants' statements that it was "optimistic" that its product would pass a clinical study needed for FDA approval and "believed" it would receive FDA approval within six months.  The court held that because these statements were "consistently accompanied by language indicating that the product and projected results depended on the successful completion of [the] study," and because the necessity of FDA approval was identified as a risk, the statements were protected under the safe harbor.  Similarly, in *Meyer v. Biopure Corp.*, 221 F. Supp.2d 195 (D. Mass. 2002), plaintiffs challenged statements concerning the anticipated timing of filing Biopure's BLA with the FDA.  This Court held that because the press releases at issue (and the SEC filings incorporated by reference) contained cautionary language similar to Biopure's language challenged by the Plaintiffs in this case,[10] the

---

[10] "There can be no assurances that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained, that any clinical trials will be successful, or that any approved product will find market acceptance.  Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment.  These risks include, without limitation, the company's stage of product development, history of operating losses and accumulated deficits, and uncertainties related to clinical trials, regulatory approval, manufacturing and market acceptance."  *Meyer*, 221 F. Supp.2d at 203-04.

LITDOCS/571774.1

safe harbor prevented the plaintiffs from bringing an action based on these forward-looking statements accompanied by meaningful cautionary language." *Id*. at 204. These cases are directly on point and demonstrate that safe harbor treatment should be accorded to Biopure's statements regarding the timing of the FDA's review of its BLA application.

Finally, many of the challenged statements are accurate reports of historical fact which courts have held are not actionable. *See In re Boston Tech.* 8 F. Supp.2d at 67; *Serabian*, 24 F.3d at 361 (defendants "may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy").

### A.    Plaintiffs Fail to Allege With Particularity How and Why Biopure's Statements In Its SEC Filings Were False or Misleading.

Plaintiffs claim that Biopure made false and misleading statements in its SEC filings. The challenged statements are described in paragraphs 41, 44, 45, 46, 63 and 64 of the Amended Complaint. None of these statements is actionable, as detailed below. In addition, the well-established "bespeaks-caution" doctrine affords additional protection to the challenged statements in these paragraphs. *See Shaw*, 82 F.3d at 1213. Biopure's cautionary language adequately warned investors of the risk of *not* obtaining FDA approval of Hemopure. Indeed, the very quotes that Plaintiffs are challenging are replete with such cautionary language and Plaintiffs point to the Company's disclosure of risk factors as misstatements. Yet, no reasonable investor would have interpreted Biopure's statements as *guarantees* of FDA approval. Biopure's optimistic statements that it "believed" its clinical trials were consistent with the FDA's guidance on safety endpoints for approval (A.C. ¶ 41) and that it was "hopeful" that the FDA would act on the BLA (A.C. ¶ 45) are not actionable because these statements, read in context, are not guarantees of approval. *See In re PLC Systems, Inc. Sec. Litig.*, 41 F. Supp.2d 106, 118 (D. Mass. 1999) (quoting *In re Medimmune, Inc.*, 873 F. Supp. at 964) ("While it is true that a 'guarantee' of approval of a product by a federal agency might be actionable, … the key word is 'guarantee.' Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable").

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *January 2003 Form 10-Q filed March 17, 2003; April 11, 2003, April 16, 2003, June 19, 2003 and July 2, 2003 registration statements:*<br><br>41 & 44. *If We Fail to Obtain FDA Approval We Cannot Market Hemopure in the United States.*<br><br>We will not be able to market Hemopure in the United States until we receive FDA approval. We have filed an application for approval with the FDA, and the application was accepted for review on October 1, 2002. **We believe that our completed pivotal phase III clinical trials are consistent with the FDA's most recent guidance on the design and efficacy and safety endpoints required for approval of products such as Hemopure for use in surgical indications.** (emphasis added by Plaintiffs). | • Plaintiffs fail to specify which of these statements is false and misleading or what is false about them.<br><br>• Plaintiffs fail to set forth specific facts making it reasonable to believe that any of the Defendants had actual knowledge that these statements were false when made.<br><br>• These statements are all historical fact or forward-looking statements accompanied by meaningful cautionary language.[11]<br><br>• As Plaintiffs state in footnote 1, this language was accompanied by full disclosure of the risks involved.[12] |

---

[11] The January 2003 Form 10-Q, which contained the statements challenged in paragraphs 41 and 45 of the Amended Complaint, warned investors in part that : "[E]xcept for strictly historical information contained herein, matters discussed in this report constitute forward-looking statements.  When used herein, the words "expects," "estimates," "intends," "plans," "should," "anticipates," and similar expressions are intended to identify such forward-looking statements.  Actual results could differ materially from those set forth in the forward-looking statements.  There can be no assurance that Biopure will be able to commercially develop Hemopure, that necessary regulatory approvals will be obtained, that anticipated milestones sill be met in the expected timetable, that any clinical regulatory approvals will be obtained, that anticipated milestones will be met in the expected timetable, that any clinical trials will be successful, or that any approved product will attain market acceptance and be manufactured and sold in the quantities anticipated.  Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the Company's operations and business environment." (App. Exh. 2).  The April 30, 2003 Form 10-Q, which contained the statements challenged by Plaintiffs in paragraph 63, contained a cautionary statement identical to that used in the January 31, 2003 Form 10-Q.  (*See* App. Exh. 19).

[12] The registration statements contained the following statement:  "However, the FDA could change its view, require a change in study design or require additional data or even further clinical trials, including trials for indications other than those for which the pending applications seeks approval, prior to approval of Hemopure.  The FDA could refuse to grant a marketing authorization.  Trials are expensive and time-consuming.  Obtaining FDA approval generally takes years and consumes substantial capital resources with no assurances of ultimate success."

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *January 2003 Form 10-Q filed March 17, 2003; April 2003 Form 10-Q filed June 16, 2003:*<br><br>45.    Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation.  These BLA support costs were $2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level until the middle of this calendar year, when the Company is hopeful that it will receive action by the FDA on the BLA.<br><br>\*        \*        \*<br><br>**If the FDA were to grant marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.** We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity.    There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure…. (emphasis added by Plaintiffs).[13] | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact and corporate optimism and forward-looking statements accompanied by full disclosure of the risks of not obtaining FDA approval.<br><br>• Biopure explicitly cautioned that even in the event the FDA granted approval, it would not attain profitability.<br><br>• The FDA's BLA review continued right up through July 30, 2003.  The statement of "hope" that FDA would "act" – "act" does not mean "approve" – is not actionable.  The Company is expressing its hope that the FDA will act on its BLA.  The FDA "acting on" the BLA would be either a comment letter or an approval.  Under the PDUFA guidelines, Biopure had every expectation that the FDA would act on the BLA.  (App. Exh. 14).<br><br>• Biopure's expressed hope was not that the FDA would *approve* the BLA and Plaintiffs do not allege otherwise.<br><br>• Biopure expressed no hope concerning the nature of the "action" the FDA would take.<br><br>• Biopure cannot be held liable for being optimistic about the timing of the BLA review. |
| Paragraphs 46 and 64 of the Amended Complaint allege that the certifications signed by Defendants Moore and Richards at the end of Biopure's January 31, 2003 Form 10-Q (App. Exh. 2) and April 30, 2003 Form 10-Q (App. Exh. 11), respectively, were false in stating that the quarterly report did not "omit to state a material fact necessary to make the statements made, in light of the circumstances | • Since the statements in the quarterly reports were not false or misleading, the certifications were also not false or misleading. |

---

[13] The same statement is alleged by Plaintiffs to be false and misleading in Biopure's April 2003 Form 10-Q.  (A.C. ¶ 63).

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| under which such statements were made, not misleading with respect to the period covered by this quarterly report." | |

**B.    Plaintiffs Fail to Allege With Particularity How and Why Biopure's Statements In Its Press Releases Were False or Misleading.**

Plaintiffs also contend that Biopure's statements in its press releases during the purported class period were false and misleading because of Biopure's failure to disclose the FDA's safety concerns.  (A.C. ¶¶ 39-40, 67).  These alleged false statements are detailed in paragraphs 49, 53, 66 and 84.  An examination of these statements demonstrates that Plaintiffs have failed to allege with particularity how and why any of these statements were false or misleading.  In addition, Plaintiffs have failed to allege facts giving rise to a strong inference that Biopure had *actual knowledge* of the falsity of its statements, were they false.

In this case, there was a regulatory pronouncement of when FDA should complete its review of the BLA and take action (within 10 months of when it accepted the BLA on October 1, 2002) per PDUFA guidelines (App. Exh. 14), not Biopure's hope or surmise.  Accordingly, Biopure's expression of the expected timing of the action had a firm basis.  *See Colby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) (dismissing challenge to projection where defendant had basis for it); *In re Hall, Kinion & Assocs. Inc. Sec. Litig.*, 2000 WL 1639503 at *2 (N.D. Cal. 2000) ("Actual knowledge of falsity could be shown only if the internal circumstances were so gloomy that it was unlikely that managers in the shoes of defendants could have reasonably believed the external projections").  Biopure expressed no hope concerning the nature of the "action" the FDA would take.  Plaintiffs have failed to offer facts that make it reasonable to believe that Biopure's calculation of the PDUFA guidelines for FDA action was unreasonable.  Furthermore, Biopure cannot be held liable for being optimistic, if this calculation involved optimism, about the timing of the BLA review.  *See Rombach*, 355 F.3d at 174.

- 26 -

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *March 25, 2003 press release:*<br><br>49.  Hemopure(R) … is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating or reducing the need for allogenic red blood cell transfusion in these patients.  **Biopure's application to market Hemopure in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Administration**…<br>…The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) for clinical trials of Hemopure in trauma are project-specific funds independent from Biopure's reported cash on hand.  **Completion of the pivotal RESUS clinical trial of Hemopure in trauma is contingent upon further funding,** $908,900 of the Army funding is from Grant DMAD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, … is the awarding and administering acquisition office. (emphasis added by Plaintiffs). | • It cannot be disputed that Hemopure is approved in South Africa for the treatment of surgical patients.<br><br>• It cannot be disputed that Biopure's BLA was under review.<br><br>• The reference to the RESUS trial was a completely different trial (different from the proposed trial that was filed in March 2003) which Biopure was and is developing with the U.S. Navy.  That is *not* a reference to the trauma trial that was later placed on clinical hold.<br><br>• These statements were forward-looking and were accompanied by meaningful cautionary language that informed the public of various risk factors that could cause the Company's performance to differ from then current expectations.[14]<br><br>• Plaintiffs failed to allege facts giving rise to a strong inference that Defendants had *actual knowledge* of their falsity.[15]<br><br>• Indeed, they cannot since none of these statements is inaccurate. |
| *May 22, 2003 press release:*<br><br>53.  Based Upon FDA performance goals and guidelines in the Prescription Drug User Free | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• Plaintiffs failed to allege facts giving rise to |

---

[14] The March 25, 2003 press release informed investors that: "Statements in this press release that are not strictly historical are forward-looking statements.  ***There can be no assurance that Biopure Corporation will be able to commercially develop its oxygen therapeutic products, that necessary regulatory approvals will be obtained…***Actual results may differ from those projected in forward-looking statements due to risks and uncertainties that exist in the company's operations and business environment.  These risks include, without limitation…***uncertainties and possible delays related to the filing and acceptance of applications to the FDA…***" (emphasis added).

[15] The PSLRA raises the requisite state of mind for forward-looking statements from recklessness to actual knowledge.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i)-(B);  *In re Sun Healthcare Group Inc. Sec. Litig.*, 181 F. Supp.2d 1283 (D.N.M. 2002) ("Actual knowledge" is a higher level of scienter than the "recklessness" required by the pleading standards of the PSLRA).

LITDOCS/571774.1

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| Act (PDUFA), **Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery**.  As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa. **Biopure has responded to all questions raised by the FDA to date.** (emphasis added by Plaintiffs) | a strong inference that Biopure had *actual knowledge of their falsity*.<br><br>• The first sentence is a statement of corporate optimism.  The FDA's BLA review continued right up through July 30, 2003.<br><br>• The FDA "acting on" the BLA would be either a comment letter or an approval.  Under the PDUFA guidelines, Biopure had, and should have had, every expectation that the FDA would act on the BLA.  (*See* PDUFA guidelines, App. Exh. 14).<br><br>• Biopure's expressed hope was not that the FDA would *approve* the BLA and Plaintiffs do not allege otherwise.  Biopure expressed no hope concerning the nature of the "action" the FDA would take.<br><br>• Plaintiffs have failed to offer facts that make it reasonable to believe that Biopure's calculation of the PDUFA guidelines for FDA action was unreasonable.  Biopure cannot be held liable for being optimistic about the timing of the BLA review.<br><br>• The second and third sentences are mere recitation of historical fact.  Plaintiffs do not contend that the FDA did not inspect the Company's facilities and conduct an audit or that Biopure did not respond to all of the FDA's questions to date. |
| *August 1, 2003 press release announcing the receipt of the FDA's letter about the BLA review:*<br><br>66.    Biopure    Corporation    (BPUR) announced today that the U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) for Hemopure (R) … and issued    a    letter    requesting    additional information.  The letter focused primarily on clarification of clinical and preclinical data and includes some comments on labeling.  It does not request additional clinical trials….<br><br>With 30 days remaining in the original BLA | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• Plaintiffs do not allege that the FDA's letter referred to the trauma clinical hold.  How could the Company be obligated to disclose them when they were not mentioned?<br><br>• Plaintiffs have not alleged a factual basis that this press release was misleading.<br><br>• The first and second paragraphs are accurate statements of historical fact.  Plaintiffs do not contend otherwise.<br><br>• The third paragraph is a statement of corporate optimism which is precisely the |

- 28 -

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| review cycle, the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response.<br><br>"We're encouraged that the FDA has finished its review and provided comprehensive feedback in advance of the formal action due date. By maintaining thirty days on the review clock, the FDA is encouraging us to work with them to complete the approval process as quickly as possible," said Biopure President and CEO Thomas A. Moore. "We'll work with the Agency to address the remaining questions and will provide our answers as expeditiously as possible." | type of corporate optimism that courts have refused to hold actionable. As stated in *Suna*, 107 F.3d 72, "misguided optimism is not a cause of action and does not support an inference of fraud." |
| *October 30, 2003 press release:*<br><br>84. "In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions," said Biopure President and CEO Thomas A. Moore. "We view the agency's questions as a 'roadmap' to approval and we have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the United States as expeditiously as possible." | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These statements are clearly expressions of corporate optimism.<br><br>• Plaintiffs fail to provide any reason why Defendants' reference to the questions as a "roadmap to approval" to be anything other than a statement of belief. Why would the Agency ask questions if the desired responses were not a guide or "roadmap" to approval. That is what the FDA review process is about. |

### C. Plaintiffs Fail to Allege with Particularity the Reasons Why Defendants' Statements In Telephone Conferences and Presentations Were False or Misleading.

In paragraphs 55, 61, 72, 76, 81 and 88 of the Amended Complaint, Plaintiffs describe alleged false and misleading statements made by Defendant Moore. Plaintiffs further contend that because Defendants Richman and Richards participated in the various conference calls in which alleged false and misleading statements were made and did not correct any such

- 29 -

statements, they acquiesced in those statements.  (*See* A.C. ¶¶ 56, 62).[16]  All of the statements in

these six paragraphs concern the BLA.  None concerns the proposed trauma protocol.

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *May 22, 2003 conference call:*<br><br>55.  "…we continue to be very hopeful of an [FDA] response on our [biologic] license application by mid-year or sooner, and **we continue to not be aware of any major issues with that application at this time…**"<br><br>On FDA, I'll just reiterate, I guess, at our last quarter we…had answered all FDA questions and **we were unaware of any major issues. Fundamentally, we're in the same place now.**<br><br>**We continue to say we are not aware of anything that would cause undue delay** [in receiving a response from the FDA to the Hemopure BLA]…(emphasis added by Plaintiffs). | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact and corporate optimism.<br><br>• Mr. Moore did not state that he was hopeful of FDA approval -- he merely stated that he was hopeful of an FDA *response* by mid-year.  Biopure cannot be held liable for being optimistic about the timing of the BLA review.<br><br>• Plaintiffs have not alleged how the nondisclosure of the clinical hold on the trauma trial made these statements false or misleading.<br><br>• Plaintiffs have not alleged facts showing that the clinical hold was directly related to or resulted in a delay on the Hemopure BLA. |
| *May 30, 2003 conference call:*<br><br>61.  (excerpts) This mid-May submission was some additional analysis which we provided on data that was already in the BLA.  At the time, we didn't consider it a major amendment to the BLA but the FDA looked at that as a reason to extend it…<br><br>To be clear, we were simply responding to a new set of questions from FDA.  It did not involve any new data…<br><br>It was a dialogue really about how to look at the clinical data…<br><br>Well, I mean, all the clinical data has to do with the safety and efficacy. | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact.<br><br>• Plaintiffs have not alleged that the FDA's questions involved new data. |

---

[16] Plaintiffs do not make this allegation regarding the statements in paragraphs 72, 76, 81 and 88 of the Amended Complaint which they attribute to Defendant Moore alone.

LITDOCS/571774.1

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| *August 21, 2003 conference call:*<br><br>72.    (excerpts) Subsequent share price performance suggest we're beginning to establish an understanding of the exciting future potential for Hemopure as both a treatment for anemia associated with surgery, and an oxygen therapeutic for use in trauma, surgical ischemias and cancer treatment.<br><br>We've not initiated human clinical trials in trauma with the military or for that matter on the civilian side as yet.  So, we hope to get started on that ASAP…but I don't believe human trials will begin until after we have completed our answers to the BLA. | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br>• These are statements of historical fact and corporate optimism.<br>• Plaintiffs do not allege that Biopure initiated human clinical trials in trauma in the United States. |
| *September 17, 2003 presentation:*<br><br>76.  From a safety standpoint, our agreement with FDA was that the primary safety endpoint would be based on a peak analysis which was a separate analysis of the data done by an independent and blinded medical panel.  That panel concluded that our product was not inferior to red blood cells in respect to overall medical risk.  This is not the only way the agency looks at safety but it is the primary safety endpoint. | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact that are uncontested by Plaintiffs. |
| *September 25, 2003 presentation:*<br><br>81.  From a safety standpoint, in our pivotal trial, we agreed before the trial began with the FDA to use as our primary safety endpoint something called a Seep study.   Which is basically a blinded analysis of all the case report forms by a panel of doctors…After all the patients were rated by at least two blinded doctors, we broke the blind, and compared the accumulative scores between our products and red blood cells and achieved a safety objective which was to confirm that our product was not inferior to red blood cells with respect to overall medical risks. | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact that are uncontested by Plaintiffs. |
| *October 30, 2003 conference call:*<br><br>88.  Our stretch in South Africa has been very positive from the standpoint that we have had good experience with the patients and | • Plaintiffs failed to allege what is false or misleading about these statements and why.<br><br>• These are statements of historical fact that are uncontested by Plaintiffs. |

- 31 -

| Alleged False and Misleading Statement | Reasons Not Actionable |
|---|---|
| developed what we consider **a very good safety record** with the product (emphasis added by Plaintiffs). | |

Plaintiffs have not alleged a single fact to show that Mr. Moore did not believe these statements *or* that the statements about the BLA were even untrue when they were made. In addition, all of the conference calls included the following cautionary standard disclaimer:

> In the conference calls upon which Event Transcripts are based, companies may make presentations or other forward-looking statements regarding a variety of items. Such projections or other forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect, and therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

(*See* transcripts of conference calls dated May 22, 2003, May 30, 2003, Aug. 21, 2003 and Oct. 30, 2003, App. Exhs. 27, 28, 39, 30, respectively). In each presentation, Defendant Moore announced a similar standard disclaimer. (*See* Biopure presentations dated Sept. 17, 2003 and Sept. 25, 2003, App. Exhs. 4, 12, respectively). When read in conjunction with Biopure's standard disclaimer and SEC filings, these challenged statements fall within the PSLRA's safe harbor provision.

Furthermore, none of these statements are properly attributable to Defendants Rausch, Richards, Richman, Sanders or Crout. Accordingly, they certainly cannot sustain any claims as to these individuals. For these reasons, Plaintiffs' allegations of falsity in Defendants' conference calls and presentations fail to state a claim.

## III.    THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS CREATING A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.

Not only have Plaintiffs utterly failed to plead false or misleading statements with particularity, but they also have not raised a strong inference of scienter for *each* defendant as

required.  *See Fitzer*, 119 F. Supp.2d. at 19.  The scienter required by the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud."  *Galileo*, 127 F. Supp.2d at 261. There must be an actual intent to deceive or, at a minimum, there must be recklessness. *Maldonado v. Dominguez*, 137 F.3d 1,9 n. 4 (1st Cir. 1998) ("Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors").  The recklessness required to satisfy the scienter pleading requisite must be "extreme":

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 261 (citing *Ernst & Ernst*, 425 U.S. at 193 n.12; *Greebel*, 194 F.3d at 198).  Each Individual Defendant is entitled to have this test applied to him.  Each Individual Defendant urges that the claim as to him be dismissed because there are insufficient allegations as to each to satisfy the PSLRA or Rule 9(b).

In the First Circuit, a plaintiff alleging fraud must show more than "motive" and "opportunity" to commit fraud.  The PSLRA requires pleading of either *facts* showing directly that a defendant made a statement with knowledge that it was false or misleading, or *circumstances that strongly suggest that each defendant* acted with scienter.  *See Lirette,* 27 F. Supp. 2d at 281 (motive and opportunity are inadequate methods for pleading scienter in securities fraud cases under PSLRA); *accord, Friedberg v. Discreet Logic,* 959 F. Supp. 42, 49-50 (D. Mass. 1997).  A mere reasonable inference of scienter is insufficient to survive a motion to dismiss.  *Greebel,* 194 F.3d at 196-97.  Rather, "[t]o survive a motion to dismiss, the inference of scienter must be both *reasonable* and *strong*."  *Galileo*, 127 F. Supp. 2d at 261 (emphasis added).  In accordance with the above principles, all of the following have been held to be an insufficient pleading of scienter:

(1)    "a general averment that the defendants knew earlier what later turned out badly," *Galileo*, 127 F. Supp.2d at 261 (citing *In re Peritus Software Services, Inc.*, 52 F. Supp.2d 211, 223 (D. Mass. 1999));

(2)    an allegation that a defendant "must have had knowledge of the facts," *Galileo*, 127 F. Supp. 2d at 261; *Maldonado*, 137 F.3d at 9-10;

(3)    an allegation that the defendants must have known the facts solely by virtue of their positions with the issuer of the securities, *Galileo*, 127 F. Supp. 2d at 261; *see also In re Peritus Software Services, Inc.*, 52 F. Supp.2d at 227-28; *Lirette*, 27 F. Supp.2d at 283;

(4)    an allegation that the defendants must have known the facts because they were privy to internal corporate information not specified in the Amended Complaint, *see Galileo*, 127 F. Supp.2d at 261 (citing *In re Peritus Software*, 52 F. Supp.2d at 227-28 ; *Lirette*, 27 F. Supp.2d at 283);

(5)    "catch-all" allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme," *Greebel*, 194 F.3d at 197 (citations omitted); and

(6)    non-specific allegations concerning a defendant's state of mind. *Galileo*, 127 F. Supp. 2d at 262.

The Amended Complaint fails to withstand scrutiny under these requirements.

### A.    Plaintiffs' Scienter Allegations Fail to Plead the Requisite Strong Inference of Scienter as to Each Defendant.

Plaintiffs plead seven highly generalized purported indications of scienter, addressed generically to all seven defendants. (*See* A.C. ¶¶ 106-14). None holds water. In fact, Plaintiffs entirely fail to plead specific allegations demonstrating the scienter of any of the defendants. The Amended Complaint fails to suggest any inference of scienter, let alone the strong inference required by the PSLRA, and must be dismissed.

### 1.    Plaintiffs' Allegations Concerning Inapposite Legal Reasoning In An Earlier, Failed Class Action, Provide No Legally Cognizable Basis From Which To Draw Any Inference Of Scienter.

In paragraphs 106 and 107, Plaintiffs make the novel allegation that Judge Harrington's reasoning in dismissing an earlier securities action somehow establishes a strong inference of scienter in this case. Plaintiffs then leap to the conclusion that, because here the FDA placed a clinical hold on a proposed trauma trial separate and apart from the BLA based on "safety concerns," *i.e.,* preliminary concerns about whether *in that separate proposed indication,* the

risks to the patient – inherent in the trial – could warrant a hold pending further discussion and analysis by the FDA and the sponsor, all of the Defendants must have acted with scienter. This is nothing more than a variation on the insufficient allegation that Defendants "must have known" the facts though not specified in the Amended Complaint. *See Galileo*, 127 F. Supp.2d at 261 (citing *In re Peritus Software*, 52 F. Supp.2d at 227-28); *Lirette*, 27 F. Supp.2d at 283. Who do Plaintiffs allege knew these statements were false? How? The Amended Complaint contains no facts, and the allegation must fail.

In any event, FDA's clinical hold and safety concerns concerning the proposed trauma trial categorically did *not* mean that Hemopure was "unsafe" -- either in the trauma trial or the BLA. In fact, at no time did the FDA reject the trauma clinical trial or the Hemopure BLA. At most, the Plaintiffs have coupled a factual allegation (regarding the clinical hold) with a conclusory allegation of scienter of a non-fact -- that Hemopure was unsafe or that the Hemopure BLA was somehow at risk -- a tactic that must fail under the PSLRA's strict pleading requirements. *See Rombach*, 355 F.3d at 166 (pleading technique that couples factual statement with conclusory allegation of fraudulent intent is insufficient to support inference that defendants acted recklessly or with fraudulent intent); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 315 (D.N.J. 2001) (plaintiff cannot couple factual statements with conclusory allegations of fraudulent intent to adequately plead scienter).

> **2.      Plaintiffs' Allegation That Scienter May Be Inferred From An SEC Staff Recommendation Of Investigation Is Devoid Of The Factual Basis Necessary To Establish Scienter.**

In paragraphs 108 and 109, Plaintiffs allege that scienter may be inferred because the SEC staff recommended civil proceedings (which notably have not to date been initiated). If such an allegation could somehow establish scienter, the PSLRA's pleading requirements would be meaningless. In effect, every occasion that the SEC initiates an investigation, whether it concludes in withdrawal of the investigation or a consent decree which typically neither admits or denies liability, would allow securities plaintiffs to pass the PSLRA's high hurdle. Like

- 35 -

Plaintiffs, the SEC still has the burden of proving that Defendants acted with scienter with respect to 10b-5 claims. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). But importantly, in often relied upon civil injunctive enforcement proceedings under Sections 17(a)(2) and 17(a)(3), the SEC may prevail (unlike the securities plaintiffs) by merely establishing negligence. *Id.* Plaintiffs' reliance on the SEC's investigation shows nothing.[17]

### 3.    Biopure's Change in Disclosure In Response to Changed Circumstances (and Not the SEC Investigation) Was Not Evidence of Scienter.

In paragraphs 110 and 11, Plaintiffs claim that Defendants materially changed their statements about FDA approval of Hemopure *as a result of* the SEC's investigation into Biopure. That investigation had not begun by, and Defendants were not aware of the possibility of an investigation, on August 22, 2003. (*See* Dec. 24, 2003 press release, App. Exh. 1 at 1). These statements were made on August 22, 2003, long before the Wells Notice was issued and more importantly, prior to Defendants having any notice or knowledge of the SEC's investigation. Thus, Plaintiffs' allegation is factually impossible and illogical.

### 4.    A Single Defendant's Statements About the Likelihood of Another Company's Success with FDA Has Nothing To Do With Any of the Defendants' States of Mind Regarding Hemopure.

In paragraph 112, Plaintiffs allege that scienter is proven by a comment made by Defendant Moore on September 17, 2003 with respect to a competitor's product: "Hemosol is now on clinical hold. It is not clear whether it will be able to resume…" and Defendants' alleged failure to make a similar statement about Biopure.[18]    The Hemosol case is entirely

---

[17]  Plaintiffs' allegation that the SEC *responded* to the responses of Defendants Biopure, Moore and Richman by issuing additional Wells Notices is entirely unsupported.

[18]  Although Plaintiffs attribute the statement at the ThinkEquity Conference to Defendant Moore, Plaintiffs attempt to use Moore's statement as indicative of *all* Defendants' scienter. That is clearly inappropriate. This statement cannot be fairly attributed to anyone other than Defendant Moore. *See, e.g., In re Medimmune Inc.*, 873 F. Supp. at 960. *See also Coates v. Heartland Wireless Communications, Inc.*, 26 F. Supp.2d 910, 914 (N.D. Tex. 1998).

distinguishable. That company announced *that a trial had begun* and was ongoing then had to announce when it was halted due to observation of an adverse effect. (*See* Hemosol Inc. press releases dated Nov. 20, 2002 and Aug. 14, 2003, App. Exhs. 31, 32, respectively). Here, no trial began; Biopure did not announce the filing of a proposed protocol; and there was no duty to disclose the clinical hold.

### 5.    Plaintiffs' Conclusory Allegations Concerning Motive and Opportunity Fail to Establish a Strong Inference of Scienter.

Plaintiffs allege in paragraph 113 that Defendants had a so-called "extraordinary motive to deceive the public" because Biopure was dependent financially on its ability to raise money through sales of its shares. Plaintiffs' attempt to plead motive equally fails to establish a strong inference of scienter. The First Circuit has held that an alleged motive and opportunity, without more, cannot establish a strong inference of scienter. *Greebel*, 194 F.3d at 197. Other courts have agreed that generic motives to raise capital and ensure corporate success, which could be imputed to officials of a publicly-owned enterprise, do not raise a strong inference of scienter. *See e.g. In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp.2d 620, 647-48 (E.D. Va. 2000) (alleged motive to ensure success of IPO "adds little to the scienter calculus, because these are motives possessed … by every corporate officer"); *McNamara v. Bre-X Minerals, Ltd.*, 57 F. Supp.2d 396, 405 (E.D. Tex. 1999) (allegations that defendant acted to improve company's financial health or reputation, or to increase capital, are not sufficient). The same holds true here: any attempt by Biopure to obtain financing to continue its existing operations do not give rise to a strong inference of scienter. Accordingly, Plaintiffs' motive and opportunity allegations fail to plead a strong inference of scienter as to any of the Defendants.

### 6.    Plaintiffs' Allegations Of Trading By Insiders Are Not Probative of Scienter.

Plaintiffs allege in paragraph 114 that Defendants Biopure and Rausch sold stock during the purported class period. Plaintiffs do not allege that any other Individual Defendant sold duinr that period. The fact that the *five* other Individual Defendants did *not* sell is a much more

compelling fact that completely undercuts Plaintiffs' contentions.  Indeed, the fact that *five* Individual Defendants did not sell suggests that the officers and directors were *not* acting on a belief that there was material, undisclosed information known to them.  Furthermore, as to Mr. Rausch, there is no allegation *whatsoever* that he made a false public disclosure or controlled the Company's disclosure.  Mr. Rausch's alleged state of mind is not even relevant – because Plaintiffs have entirely failed to link him to any public statement whatsoever or to attribute any individual knowledge particular to him.  In addition, the Amended Complaint alleges that during the purported class period, Biopure sold a total of 12,378,608 shares of Biopure common stock and Rausch sold a total of 276,574 shares of Biopure common stock "while in the possession of non-public material adverse information…"[19]  (*See* A.C. ¶¶ 94-101).

Plaintiffs' allegations of insider trading fail to adequately plead scienter.  First, trading by insiders, by itself, is not probative of scienter.  "[W]hen directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events."  *McCall v. Scott*, 239 F.3d 808, 825 (6th Cir. 2001), *decision amended on other grounds  by*, 250 F.3d 997 (6th Cir. 2001).  S*ee also Shaw*, 82 F.3d at 1224 ("the mere fact that insider stock sales occurred does not suffice to establish scienter").

Second, when examining such insider-trading allegations, courts consider the totality of the circumstances including volume, timing and prior trading history, in determining whether stock sales support a strong inference of scienter.  *See Greebel*, 194 F.3d at 206-07 (examining context of trading by insiders, including timing and amount, and holding that trading did not support a strong inference of scienter *even though the total sum involved was large*);  *Fitzer*, 119 F. Supp.2d at 25 (considering prior trading practices as well as timing and amount).  Thus, Plaintiffs must plead facts which would warrant a finding that there was a suspiciously abnormal amount and/or unusual pattern of trading.  *See e.g. Carney v. Cambridge Tech. Partners, Inc.*,

---

[19] There is no allegation of insider trading by Messrs. Crout, Moore, Richards, Richman or Sanders.

135 F. Supp.2d 235, 256 (D. Mass. 2001); *Greebel*, 194 F.3d at 198 (stating that defendants' trading must be "unusual" and "well-beyond [their] normal patterns of trading").

Third, the analysis of the sales should be in the *aggregate* among defendants and not defendant-by-defendant. *See e.g.*, *In re Party City*, 147 F. Supp. 2d at 313 ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages"); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (considering aggregate sales and retention in deciding that particular defendant's high sales were not probative of scienter).

Finally, when determining whether scienter has been adequately pled, the raw number of shares sold is not a key factor. Rather, the percentage of the defendants' holdings sold versus retained, including exercisable stock options is key. *See e.g. In re Silicon Graphics Inc.*, 183 F.3d at 986-87 (no suspicious sales where small portion of total holdings were traded; total holdings included vested stock options); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997) (allegations insufficient where complaint failed to allege defendants' total stock holdings and only alleged shares traded).

Measured against these criteria, the sales by Biopure and Rausch are not probative of scienter. During the Class Period, as stated by Plaintiffs in their Amended Complaint, Rausch only sold 276,574 shares, or 33.7% of his total holdings of Biopure stock (not including stock previously gifted to family, which would lower the percentage sold). (*See* A.C. ¶ 101). Rausch's sales are not suspicious when measured as a percentage of his total holdings. *See In re Peritus Software Serv. Inc*, 52 F. Supp. 2d at 228 (sale of up to 38% of holdings are not suspicious); *see also, Ronconi v. Larkin*, 253 F.2d 423, 425 (9th Cir. 2001) (CEO's trades of 10% and 17% of stock not suspicious).

Moreover, Plaintiffs have not alleged any irregularity in Biopure and Rausch's selling in terms of timing or pattern. On the contrary, Biopure and Rausch's sales span several months and do not reflect any sporadic selling out of the ordinary. In fact, Biopure's last sale during the Class Period was *five* months prior to the disclosures in the December 24, 2003 press release.

Rausch's last sale was *four* months prior to the December 24, 2003 press release. Thus, the timing of Biopure and Rausch's sales does not raise a strong inference of scienter. *See In re Nike, Inc. Sec. Litig.*, 181 F. Supp.2d 1160, 1169 (D. Or. 2002) (two-month gap between sales and adverse disclosure negates scienter); *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp.2d 671(N.D. Cal. 2002) (no inference of fraud where sales took place two months before negative disclosures); *In re Party City*, 147 F. Supp. 2d at 313 ("A broad temporal distance between stock sales and disclosure of bad news defeats any inference of scienter").

Absent allegations of unusual timing and/or pattern of sales, Plaintiffs' allegations of insider selling establish nothing.

### B.    Plaintiffs Fail to Allege Any Inference of Scienter For Individual Defendants Crout, Sanders or Rausch.

Not a **single** allegation is made in the Amended Complaint that attributes a false or misleading statement to Defendants Crout, Sanders or Rausch despite the fact that both the PSLRA and Rule 9(b) require Plaintiffs to "distinguish among those they sue and **enlighten *each* defendant as to his or her part in the alleged fraud**." *Coates*, 26 F. Supp.2d at 914 (emphasis added). Having failed to adequately plead falsity, scienter becomes irrelevant. Furthermore, even if scienter were relevant, Plaintiffs fail to allege any details of these individuals' knowledge, responsibilities or alleged participation in any purported fraud.[20] Allegations of Crout, Sanders and Rausch's positions within the Company (as made by which Plaintiffs make introductory paragraphs 17, 20 and 21) are insufficient to prove scienter. *See In re Criimi Mae Inc. Sec. Litig.*, 94 F. Supp.2d 652, 661 (D. Md. 2000) (holding that facts that defendants held *positions of control*, were involved in company's day-to-day activities and *signed company's public filings* with SEC, standing alone, were *not sufficient* to raise a strong inference of scienter: "If they were, every corporate executive who participates in the day-to-day management of his

---

[20] As addressed above in section C(1), the paragraphs regarding Rausch's alleged insider trading do not suffice to create a strong inference of Rausch's scienter. (*See* A.C. ¶ 101).

company would be exposed to liability for securities fraud") (emphasis added).  *See also In re Stratus Computer, Inc.,* 1992 WL 73555, *8 (D. Mass. 1992) (dismissing count against directors of company where claims failed under Rule 9(b) and noting that "the danger of holding the individual defendants *in terrorem* and subjecting them to a frivolous suit that might likely injure their reputations is high"); *Loan v. Federal Deposit Ins. Corp.*, 717 F. Supp. 964, 968 (D. Mass. 1989) (holding that defendants' status as officers and directors was not a sufficient basis to impose liability pursuant to § 10(b)).

In short, no information is offered as to how Crout, Sanders or Rausch were involved in making any allegedly false or misleading statement.  Thus, Plaintiffs have wholly and completely failed to meet the pleading requirements of the PSLRA and Rule 9(b) as to Defendants Crout, Sanders and Rausch.  Accordingly, the claims against Defendants Crout, Sanders and Rausch must be dismissed.

## IV.    THE AMENDED COMPLAINT FAILS TO PROPERLY PLEAD A SECTION 20A CLAIM AND THEREFORE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Section 20A of the Securities Exchange Act of 1934, codified as 15 U.S.C.A. § 78t-1, provides a cause of action against any person "who violates any provision of [the 1934 Exchange Act] or the rules and regulations thereunder while in the possession of material, nonpublic information…"  15 U.S.C.A. § 78t-1(a).  Plaintiffs have failed to plead an actionable claim against Defendants Biopure and Rausch for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  As such, Plaintiffs have no actionable claim against Biopure or Rausch for alleged violations of Section 20A.  *See e.g., Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 1993 WL 464730 at *5 (S.D.N.Y. 1993) (citations omitted) ("A defendant is liable under section 20A only where an independent violation of the 1934 Securities Exchange Act or the rules and regulations promulgated thereunder has occurred") *aff'd*, 32 F.3d 697, 703 (2nd Cir. 1994); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729 (N.D. Cal. 2003) (dismissing plaintiffs' section 20A claim where plaintiffs

- 41 -

failed to plead a viable claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5); *In re Parametric Technology Corp.*, 300 F. Supp.2d 206 (D. Mass. 2001) (same); *see also, Suna,* 107 F.3d at 72; *In re Fidelity/Apple Sec. Litig.,* 986 F. Supp. 42, 48 (D. Mass. 1997).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Consolidated Amended Complaint in its entirety.

> **BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, HOWARD P. RICHMAN, CHARLES A. SANDERS and J. RICHARD CROUT**
>
> By their attorneys,
>
> /s/ Robert A. Buhlman
> Robert A. Buhlman, BBO #554393
> Eunice E. Lee, BBO #639856
> Raquel J. Webster, BBO #658796
> BINGHAM MCCUTCHEN LLP
> 150 Federal Street
> Boston, MA 02110
> 617-951-8000

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above pleading was electronically served upon the attorneys of record for all parties on October 6, 2004.

> /s/ Eunice E. Lee
> Eunice E. Lee

- 42 -