Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
United States District Court,N.D. Ohio, Eastern
Division.
In re CENTURY BUSINESS SERVICES
SECURITIES LITIGATION
No. 1:99CV02200.

June 27, 2002.

Dennis R. Lansdowne, Esq., Spangenberg, Shibley, Lancione & Liber, Jack Landskroner, Esq., Landskroner Law Firm, Monica Zunt, Esq., Cleveland, OH, Steven E. Cauley, Esq., Scott E. Poynter, Esq., Cauley Geller Bowman & Coates, Little Rock, AR, for Plaintiff.
Daniel P. Mascaro, Esq., Paul P. Eyre, Esq., Baker & Hostetler, Cleveland, OH, David H. Kistenbroker, Esq., Leah J. Domitrovic, Esq., Pamela G. Smith, Esq., Theresa L. Davis, Esq., Katten, Muchin & Zavis, Chicago, IL, Gregg C. Laswell, Esq., J. Stephen Barrick, Esq., Akin, Gump, Strauss, Hauer & Feld, Houston, TX, for Defendants.

MEMORANDUM OF OPINION AND ORDER

MATIA, Chief J.
*1 The first class action Complaint in this case was filed on September 16, 1999. (ICMS Doc. 1). On August 21, 2001, the Court consolidated the six individual cases and appointed lead plaintiffs and lead counsel pursuant to the PSLRA, 15 U.S.C. § 78u-4.

Plaintiffs filed a Consolidated Complaint ("Complaint") on September 25, 2001 (ICMS Doc. 59). On November 20, 2001, the defendants filed a motion to dismiss the Complaint (ECF Doc. 65) and a motion to strike certain allegations from the Complaint (ECF Doc. 64). [FN1] On January 14, 2002, the plaintiffs opposed both of these motions. (ECF Doc. 78, *amended doc.* 79; ECF Doc. 77).

Defendants filed reply memoranda on February 22, 2002. (ECF Docs. 86, 85). The Court heard oral argument on the dismissal motion on May 8, 2002, and this matter is now ripe for decision. For the reasons set forth below, the Court concludes that the Complaint should be dismissed in its entirety.

> FN1. Defendants voluntarily withdrew the motion to strike on May 7, 2002. (ECF Doc. 98).

I. FACTS

Plaintiffs are a class of persons (excluding the defendants, their immediate families and other entities in which defendants hold controlling interests) who purchased the common stock of Century Business Services ("CBIZ") between February 6, 1998 and January 28, 2000. Plaintiffs sue for alleged violations of section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

Defendants are CBIZ and six former or current officers and/or directors ("the individual defendants "). [FN2] [FN3] Plaintiffs also raise § 20(a) "control person" claims against defendants DeGroote, Hamm and Winkler. In their Consolidated Complaint (ICMS Doc. 59), the plaintiffs essentially allege the following facts. [FN4]

> FN2. Specifically, the plaintiffs have brought suit against Michael G. DeGroote (Chairman of the Board since April 1995, Chief Executive Officer and President from November 1997 to April 1999); Charles D. Hamm, Jr. (Senior Vice President and Chief Financial Officer from December 1998 through the end of the class period); Gregory J. Skoda (Executive Vice President and Director from November 1997 through December 1998);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Keith W. Reeves (Director and Senior Vice President, Business Services from March 1997 through March 1999, President of the Accounting, Tax Valuation and Advisory Services Group from March 1999 through October 1999); Fred M. Winkler (President and Chief Operating Officer from April 1999 to January 2000); and Jerome P. Grisko (Vice President, Mergers and Acquisitions from September to December 1998, Senior Vice President, Mergers and Acquisitions and Legal Affairs from December 1998 to February 2000). Skoda is alleged to have resigned from the company in December 1998. Reeves is alleged to have resigned in October 1999.

FN3. Plaintiffs informed the Court at oral argument that they did not intend to pursue claims against individual defendants Stout, Feighan and Gowland. For that reason, the plaintiffs did not name these individuals as defendants in the Consolidated Complaint. (ICMS Doc. 59). Upon the plaintiffs' representation that these individuals are no longer defendants, the Court hereby dismisses defendants Stout, Feighan and Gowland from the action.

FN4. This section provides a concise outline of the plaintiffs' allegations. The alleged facts will be discussed in more detail in section II, *infra*.

On April 28, 1993, the Ontario Securities Commission ordered that Michael DeGroote pay the amount of $17,500,000 as restitution to shareholders for improper insider trading activity. The Commission also entered an order barring DeGroote from normal securities trading for a period of five years. The payment and trading bar were imposed incident to a settlement of allegations of short-sale trading against DeGroote in his capacity as Chief Executive Officer and Chairman of the Board of Laidlaw, Inc.

By December 1997, DeGroote had established a controlling shareholder position (30.16% of CBIZ

shares in December 1997) and a management position in CBIZ. CBIZ is a company that specializes in providing business services, including accounting and payroll services, tax advising and planning, employee benefits design and administration services. During the relevant time period, CBIZ was listed, and its stock was actively traded, on the NASDAQ stock exchange. CBIZ operated through aggressive acquisitions of small, local accounting firms, which acquisitions were financed in part using CBIZ stock.

DeGroote and the other individual defendants allegedly made material misstatements and omissions of fact, in order artificially to inflate the price of CBIZ stock for use in acquisitions. The alleged misstatements were made in SEC filings, CBIZ press releases, letters to shareholders and in conferences with analysts. These misstatements dealt with (1) DeGroote's background, [FN5] (2) CBIZ's revenue run rates and the amount paid for acquired companies, (3) CBIZ's method of goodwill amortization and (4) CBIZ's operational systems for managing acquired companies.

FN5. Defendants filed a motion to strike the allegations relating to DeGroote's background (ECF Doc. 64), arguing that these allegations were irrelevant to DeGroote's conduct at CBIZ and unduly prejudicial. That motion was withdrawn voluntarily on May 7, 2002. (ECF Doc. 98).

A. Revenue Run Rates and EBIT Multiples

**\*2** With respect to the revenue run rates and amounts paid for companies acquired, the plaintiffs assert that the defendants made misleading statements in their 1997 Form 10-K filed with the SEC, as well as in press releases between February and September 1998. [FN6] (ECF Doc. 79, Exh. D). Allegedly, the defendants inflated their revenue run rates by approximately 15 percent by including predicted annual revenues in the calculation of CBIZ's revenue run rates. According to the plaintiffs, the industry-accepted definition of revenue run rates required the defendants to rely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 3

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

only on historical values in calculating the revenue run rates.

> FN6. The dates of the allegedly misleading press releases are February 16, 1998; April 29, 1998; June 15, 1998; June 30, 1998; July 28, 1998; July 30, 1998; August 26, 1998; and September 24, 1998. (ICMS Doc. 59, Exh. D).

Additionally, the plaintiffs allege that the defendants made at least one statement regarding the amount CBIZ paid for acquired businesses. [FN7] In an April 29, 1998 press release, the defendants claimed that CBIZ was paying approximately six times EBIT for the companies that it acquired. The actual amount, plaintiffs assert, was approximately 11 to 12 times EBIT.

> FN7. The amount paid for acquired businesses was calculated in multiples of " earnings before interest and taxes" ("EBIT multiples").

On November 18, 1998, CBIZ hosted an analyst conference and responded to analyst concerns that the company had not properly accounted for its revenue run rate and acquisition costs. Following the meeting, the defendants mailed to the attending analysts a November 20, 1998 letter, which documented the company's method of calculating revenue run rates. According to the plaintiffs, this letter revealed that the company's revenue run rates were projections and that actual revenues were approximately 15 percent lower than the company's documented revenue run rates. On the basis of this letter, analysts concluded that the EBIT of the acquired companies must be lower than previously calculated, and thus CBIZ must have acquired the companies at higher multiples of EBIT than previously stated. [FN8]

> FN8. This information began to leak to the public prior to the analyst conference, through two separate reports issued by forensic accounting firms. Between

September 23, 1998 and October 12, 1998, CBIZ shares fell from $22.65 per share to $12.50 per share. (ICMS Doc. 59, ¶ 64). After the November 20, 1998 letter was disseminated to the market on November 23, 1998, the price of CBIZ stock fell over 7% in one day. (ICMS Doc. 59, ¶ 68).

### B. Goodwill Amortization

The defendants also allegedly omitted material facts regarding the period of time over which CBIZ was amortizing the goodwill of its acquired companies. CBIZ stated in its 1997 Form 10-K that goodwill was amortized over periods not exceeding 30 years. In its 1998 Form 10-K, CBIZ stated that goodwill was amortized over periods not exceeding 40 years. In December 1999, CBIZ shortened its amortization period to 15 years on a prospective basis. [FN9]

> FN9. The allegedly misleading filings are the 1997 Form 10-K, the 1998 1st Qtr. 10-Q, the 1998 2nd Qtr. 10-Q, the 1998 3rd Qtr. 10-Q, the 1998 10-K, the 1999 1st Qtr. 10-Q, the 1999 2nd Qtr. 10-Q and the 1999 3rd Qtr. 10-Q.

Plaintiffs allege that, although CBIZ disclosed these amortization periods, the defendants failed to disclose several material facts, which were known to the defendants and should have indicated that the longer amortization periods were improper. Specifically, the plaintiffs allege that the company failed to disclose that employment agreements with its personnel were of less than five years' duration, and the payout and option agreements were two years or less in duration. According to the plaintiffs, the existence of these short-term agreements required CBIZ to use a shorter amortization period.

Plaintiffs also allege that the company made misstatements in its December 28, 1999 Form 8-K and its additional Form 8-K on January 27, 2000. These filings disclosed that CBIZ would be shortening its amortization period to 15 years. Plaintiffs claim, however, that the defendants wrongfully attempted to characterize this change as a response to new circumstances, when in fact no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

such change had occurred. Rather, the amortization periods always had been improper based on facts known to the defendants.

### C. Lack of Appropriate Management System

**\*3** Finally, plaintiffs allege that the defendants made misstatements regarding CBIZ's ability to integrate and manage acquired companies, when in fact CBIZ's organizational and financial reporting structures were sadly lacking. The plaintiffs allege that, in press releases issued between April and December 1999, [FN10] the defendants affirmatively characterized management structures as much improved and adequate to meet the needs of a growing organization.

> FN10. The dates of the allegedly misleading press releases are April 27, 1999; July 27, 1999; November 9, 1999; and December 28, 1999.

On October 5, 1999, CBIZ announced that it had retained Merrill Lynch to pursue strategic alternatives. Between October and December 1999, CBIZ management sought to find a partner company willing to acquire CBIZ. On December 28, 1999, the defendants disclosed that this attempt had been unsuccessful. Plaintiffs claim, however, that prior to and during the search for an acquisition partner, the defendants made misleading statements and omitted material facts in their communications to investors.

In a conference call on January 31, 2000, defendants DeGroote and Hamm stated that CBIZ had a deficient financial reporting system, in that monthly financial reports were not available to management until the 20th or 25th day of the following month, and that CBIZ lacked a centralized management group to review whether individual businesses were varying from their budgets. [FN11] In addition, in their February 1, 2000 Form 8-K, the defendants disclosed that the attempt to sell the company or form a strategic alliance had diverted management's attention from core operations and had allowed the company to vary from budget.

> FN11. Following these disclosures and the defendants' admission that profits for the fourth quarter 1999 would be at least $15 million below budget, CBIZ's stock price dropped 45 percent in a single trading day, from $6.92 per share on Friday, January 28, 2000 to $3.71 per share on Monday, January 31, 2000.

### D. Scienter Allegations

Plaintiffs allege that the individual defendants, because of their executive positions and familiarity with company operations, had access to material nonpublic information, which indicated that CBIZ's publicly released statements were false when made. Plaintiffs allege that the individual defendants also had motives to inflate the price of CBIZ stock, in order to enhance their own positions and compensation and raise the value of their own shares.

As evidence of the defendants' scienter, the plaintiffs allege that several individual defendants traded CBIZ stock during the class period. In 1998, defendant DeGroote purchased approximately 959,816 shares of CBIZ stock, at prices from $13.94 to $19.19 per share. In 1999, DeGroote purchased an additional 590,900 shares, at prices ranging from $9.70 to $14.94 per share. These large purchases allegedly were intended to "prop up the market" for CBIZ shares. In addition, on February 6, 1998 (the first day of the class period), defendants Reeves and Skoda sold 19,000 and 29,250 shares, respectively, at approximately $13.25 per share. On or about October 1, 1999, defendant Hamm exercised 30,756 options in CBIZ at strike prices from $3.13 to $3.88 per share.

### II. ANALYSIS

### A. Standards for a Motion to Dismiss Under the Private Securities Litigation Reform Act

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 5

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

In order to grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must find "no set of facts which would entitle the plaintiff to recover. Matters outside the pleadings are not to be considered, and all well-pleaded facts must be taken as true." *Hammond v. Baldwin,* 866 F.2d 172, 175 (6th Cir.1989) (citations omitted). The allegations of the complaint must be taken as true and construed in a light most favorable to the plaintiff. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

**\*4** In evaluating a motion to dismiss a securities fraud claim, a court may consider the full texts of SEC filings, prospectuses, and analysts' reports, as well as statements "integral to the complaint," without converting the motion into one for summary judgment under Rule 56. *See In re Royal Appliance Securities Litigation,* 1995 WL 490131, *2 (6th Cir. Aug.15, 1995) (unpublished disposition). The Court also is free to consider documents referenced in the plaintiffs' Complaint (whether or not attached as exhibits), *see Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997), as well as public records and documents of which the court may take judicial notice. *See Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

Section 10(b) of the Securities Exchange Act ("the Securities Act") provides that it shall be unlawful:
To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated under the Securities Act, states that the statute proscribes " mak[ing] any untrue statement of material fact or ...

omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b-5. In order to state a claim under these sections, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 548 (6th Cir.1999).

Allegations of securities fraud are subject to the same standards as general fraud allegations and must meet the particularity requirements of Fed.R.Civ.P. 9(b). [FN12] In addition, in 1995, Congress amended the Securities Act by passing the Private Securities Litigation Reform Act ("PSLRA" ). *See* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67 (1995). The PSLRA amendments require a plaintiff to state with particularity all facts supporting an allegation made on information and belief, as well as all facts establishing scienter. Section 78u-4(b) states, in relevant part:

> FN12. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant-
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;
**\*5** the complaint shall specify each statement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.


(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
15 U.S.C. § 78u-4(b)(1)-(2).

Thus, plaintiffs must set forth specific facts not only in support of allegations of falsity and fraud but also to support allegations of the requisite state of mind. The Sixth Circuit has held that the minimum state of mind for liability under the PSLRA is recklessness, which is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Helwig v. Vencor, Inc.,* 251 F.3d 540, 550 (6th Cir.2001), *cert. dismissed,* 2002 WL1352425 (Jun, 20, 2002), *citing Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1024 (6th Cir.1979).


B. Scienter Allegations

Defendants argue that the plaintiffs have not set forth, with the specificity required by the PSLRA, facts sufficient to allege that the defendants acted with scienter. The Securities Act requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

This circuit has determined that the requisite state of mind under the PSLRA is that of recklessness, *see Helwig,* 251 F.3d at 550 (recklessness is "highly unreasonable conduct which is an extreme departure

from the standards of ordinary care."). *See also* section II(A), *supra.* Recklessness under the PSLRA is "a mental state apart from negligence and akin to conscious disregard." *Comshare,* 183 F.3d at 550. Thus, this Court must determine whether the plaintiff has alleged facts sufficient to give rise to a strong inference that, when the defendants made alleged misrepresentations or materially misleading omissions, they did so with at least conscious disregard of the falsity of the information.

The inquiry into the defendants' scienter in any given case is fact-specific, and the "plaintiffs are entitled only to the most plausible of competing inferences." *Helwig,* 251 F.3d at 551, 553. Although the Second Circuit's "motive and opportunity" test is relevant to the scienter inquiry, mere allegations of the defendants' motive to defraud and opportunity to do so do not allow the plaintiff to survive a motion to dismiss in the Sixth Circuit. *See Comshare,* 183 F.3d at 551 ("the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter...."). Rather, the Court will look to the totality of the alleged facts and determine whether those facts create a "strong inference of reckless or knowing conduct...." *Id.; see also Helwig,* 251 F.3d at 551.[FN13]


> FN13. The *Helwig* court clarified that, where the plaintiffs set forth detailed facts presenting motive and opportunity, such facts could be sufficient to satisfy the scienter requirement in a particular case. *Helwig,* 251 F.3d at 551. The court clarified, however, that a motive and opportunity analysis is not necessary; rather, the court need only determine whether the facts alleged produce a strong inference of recklessness or knowledge. *Id.*


**\*6** Plaintiffs assert that they have set forth sufficient allegations to create a strong inference of scienter. Specifically, plaintiffs have alleged facts concerning (1) the defendants' motive and opportunity to commit fraud, (2) the defendants' key positions and the importance of the misrepresentations and omissions, (3) divergence between internal reports

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

and external statements, (4) the egregious nature of the GAAP violations and (5) the defendants' later admissions regarding their accounting practices. The Court will address each of these sets of allegations in turn.

### 1. Motive and Opportunity

Plaintiffs allege that they have pleaded facts demonstrating that the defendants had both motive to commit securities fraud and ample opportunity to do so. The defendants do not appear to challenge the "opportunity" prong, nor likely could they, since all of the defendants are current or former officers and/or directors of CBIZ. Rather, the defendants argue that the motives alleged by the plaintiffs are insufficient to give rise to a strong inference of scienter.

In order adequately to plead motive, a plaintiff must allege that the "defendants benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307-08 (2d Cir.2000). Plaintiffs first allege that the defendants were motivated to inflate CBIZ's stock price in order to facilitate CBIZ's aggressive acquisition strategy. [FN14] Maintaining a high stock price would allow the company to complete acquisitions using fewer CBIZ stock shares and thus avoid stock dilution.

> FN14. The Complaint states that:
> Defendants were motivated to conceal the true facts concerning CBIZ's financial condition because the Company was dependant [sic] on its "soaring" stock price to convince independent business service firms to sell out to CBIZ and accept CBIZ's common stock as consideration for the Company's acquisitions.
> ICMS Doc. 59, at ¶ 27.

Plaintiffs allege that CBIZ purchased over 30 companies (identified in the Complaint) during the class period. CBIZ used such a large quantity of stock in these acquisitions that, in August 1998, the company was required to file a shelf registration with the SEC to register 150 million additional shares. These allegations, plaintiffs assert, satisfy the PSLRA pleading requirements for scienter.

Defendants counter that the Complaint fails to allege any motive on the part of the individual defendants to inflate the stock price. The defendants rely on *Piper Jaffray Cos. v. National Union Fire Ins. Co.,* 38 F.Supp.2d 771, 779-80 (D.Minn.1999), for the proposition that a corporation can act only through its agents and cannot possess any motive independent of the scienter of its agents. Thus, if none of the individual defendants are alleged to have a motive to inflate CBIZ's stock price, CBIZ cannot have that motive either. [FN15]

> FN15. Defendants further argue that, to the extent the Complaint alleges motive to inflate CBIZ's stock price, such a "corporate motive" cannot be attributed to the individual defendants. *See In re Twinlab Corp. Securities Litigation,* 103 F.Supp.2d 193, 206-07 (E.D.N.Y.2000). Since the Court declines to adopt the corporate motive theory, it need not address this contention.

The scant authority cited by the plaintiffs to support their scienter allegations fails to bolster the deficient allegations of the Complaint. Plaintiffs rely on *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 270 (2d Cir.1993) and *Rothman v. Gregor,* 220 F.3d 81, 93 (2d Cir.2000), to demonstrate that inflation of stock price in the context of an acquisition or rights offering is sufficient to show the individual defendants' scienter. This line of cases, however, appears to reflect an isolated trend within the Second Circuit. Plaintiffs have cited no cases outside the Second Circuit, and the Court is aware of none, holding that such a "corporate motive" is sufficient to demonstrate scienter. Rather, the weight of cases from other jurisdictions draws on the traditional wisdom that "a corporation . . . must act through its agents." *Piper Jaffray,* 38 F.Supp.2d at 779, *quoting Caterpillar, Inc. v. Great American Insurance Company,* 62 F.3d 955, 963 (7th Cir.1995).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 8

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

*7 Thus, the Court agrees with the legal principles cited by the defendants and agrees that the alleged motive to inflate the share price in order to complete acquisitions is insufficient. The Complaint does not adequately allege that it would be in the interest of the individual defendants for the company to pursue its aggressive acquisition strategy. To the extent that the defendants were motivated by a desire to increase the overall worth of the company, such allegations merely would set forth "motives possessed by virtually all corporate insiders," which are insufficient to demonstrate a particularized motive to commit fraud. *Novak,* 216 F.3d at 307. On the other hand, to the extent that the defendants were motivated by the desire to increase their personal wealth, such a motive would be better shown by evidence of insider trading. [FN16] Thus, the Court turns to the plaintiffs' insider trading allegations.

> FN16. To the extent that the plaintiffs allege that the defendants benefitted by maximizing the amount of cash obtained in its public offering, these allegations also are insufficient. Such an allegation is either an allegation of a motive possessed by all corporate insiders, *see Novak,* 216 F.3d at 307, or it is inadequately shown to have " concretely benefitted" the defendants. *See id.* at 307-08. Moreover, even if defendants intended to benefit, the shareholders themselves also would benefit from a high stock price in the acquisition or public offering context. Such an allegation is insufficient where it does not show an intent to benefit the defendants at the expense of the shareholders. *See Kalnit v. Eichler,* 264 F.3d 131, 140-41 (2d Cir.2001).

Plaintiffs argue that the defendants' insider trading activity presents evidence of motive by the defendants to inflate CBIZ stock prices to increase their personal worth. Several defendants allegedly engaged in such trading activity during the class period. Defendant DeGroote in particular made large purchases of CBIZ shares, allegedly to help maintain the inflated stock price. [FN17] Plaintiffs

also have alleged stock sales by several other individual defendants. Specifically, on February 6, 1998 (the first day of the class period), defendants Reeves and Skoda sold 19,000 and 29,250 shares respectively. (ICMS Doc. 59, ¶ 36). [FN18]

> FN17. The Complaint alleges that, during the class period, DeGroote purchased approximately 1,550,716 shares individually or through his personal holding company, Westbury (Bermuda), Ltd., at prices ranging from $9.70 to $19.19 per share. (ICMS Doc. 59, at ¶¶ 33-34).
> The Complaint also alleges that Defendant Hamm exercised 30,756 options in CBIZ on or about October 1, 1999 at strike prices from $3 .13 to $3.88 per share. (ICMS Doc. 59, ¶ 37). The Court does not consider this purchase because it finds, as with respect to defendant DeGroote, that purchases are not probative of scienter.

> FN18. As additional evidence of scienter, the plaintiffs allege that vice-presidents Stout and Feighan sold 120,000 and 60,000 shares, respectively, on February 6, 1998 (the first day of the class period), and that vice-president Burdick sold 27,000 shares on August 13, 1998. *See id.* Since these individuals all are non-defendants under the Consolidated Complaint, however, the Court does not consider these sales probative of the defendants' scienter.

Defendants respond that the Complaint pleads only vague and generalized motives as to DeGroote, [FN19] and that such motives are insufficient as a matter of law. *See Novak,* 216 F.3d at 307; *see also Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 644 (N.D.Tex.1999) ( " assertions that would almost universally be true ... are inadequate of themselves to plead motive .")

> FN19. For example, the Complaint alleges that DeGroote was motivated to "enlarge his empire" and "increase his worth."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

(ICMS Doc. 59, ¶¶ 16, 17).

Furthermore, the defendants assert, a purchase of stock by a director or officer during the class period undermines rather than supports a finding of scienter. *See Schuster v. Symmetricon, Inc.,* 2000 WL 33115909, *7 (N.D.Cal. Aug.1, 2000) (unpublished disposition) (purchase of stock at allegedly inflated prices undermined a finding of scienter); *see also In re Credit Acceptance Corp. Securities Litigation,* 50 F.Supp.2d 662, 677 (E.D.Mich.1999) (Chief Financial Officer's failure to sell any shares undermined a finding of scienter); *Morse v. McWhorter,* 1998 WL 2001207, *46 (M.D.Tenn. July 28, 2000) (unpublished disposition), *vacated on other grounds,*-F.3d-, 290 F.3d 795, 2002 WL 1008545 (6th Cir. May 20, 2002) (company's decision to reinvest its own stock undermined scienter, since it would make no sense knowingly to purchase at inflated prices). Since DeGroote bought and held stock during the class period, defendants argue that he suffered a massive loss in value when CBIZ's stock price dropped.

*8 In order to allege scienter based on the insider trading of the individual defendants, the plaintiffs must allege that the "trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1424 (3d Cir.1997). "Stock sales by officers [do] not give rise to fraudulent intent unless the sales are unusual or suspicious." *Credit Acceptance,* 50 F.Supp.2d at 677 (E.D.Mich.1999), *citing In re Silicon Graphics, Inc. Securities Litigation,* 970 F.Supp. 746, 767 (N.D.Cal.1997).

Here, none of the insider trades alleged by the plaintiffs are sufficiently unusual or suspicious to give rise to a strong inference of scienter. First, the plaintiffs allege only that two of the six individual defendants (Reeves and Skoda) sold stock during the class period, while two additional defendants (DeGroote and Hamm) purchased stock during the class period. The Court finds that the allegations as to DeGroote's purchases are inconsistent with a finding of DeGroote's scienter. The Court finds it improbable that DeGroote would seek to "increase his wealth" and "enlarge his empire" by means of

purchasing stock at inflated prices. The plaintiffs' theory that DeGroote hoped to find a buyer for CBIZ in order later to recoup his investments is highly speculative. Moreover, even if the Court were to accept the plausibility of this theory, the plaintiffs have alleged no facts indicating that DeGroote's purchases were unusual or suspicious in comparison to his past trading history.

The allegations as to the other individual defendants are equally deficient. Both of these defendants sold stock on February 6, 1998, the first day of the class period, at a price of $13.25. Plaintiffs do not indicate what percentage of their personal holdings these defendants sold, nor do the plaintiffs allege any facts demonstrating that these sales were unusual or suspicious. Finally, the fact that these shares were sold on the first day of the class period [FN20] (and the $13.25 trading price was significantly lower than the subsequent high of $25.38) undermines a finding of scienter. *Cf. Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1254 (N.D.Ill.1997) (where only two of three defendants sold stock, this fact undermines a finding of scienter; the fact that the defendant sold a small number of shares undermines a finding of scienter). [FN21]

> FN20. Defendants appropriately have pointed out that "[i]t seems unlikely that [a defendant] would engage in a scheme to inflate the company's earnings after he sold his stock early on in the class period, and yet fail to sell any of his remaining shares at 'artificially inflated prices." ' ECF Doc. 65, at 10, *quoting Credit Acceptance,* 50 F.Supp.2d at 677.

> FN21. Even in *Rehm,* there was some evidence of the defendants' prior trading history, which indicated that the stock sales might be unusual or suspicious. Here, however, the plaintiffs present no such evidence.

The plaintiffs' insider trading allegations clearly are insufficient to demonstrate motive. Thus, these allegations also fail to raise a strong inference of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

defendants' scienter. Having determined that the plaintiffs have failed to establish that the defendants possessed motive and opportunity to commit fraud, the Court now turns to evaluate whether any of the plaintiffs' other allegations give rise to a strong inference that the defendants acted with scienter.

2. Key Positions and Importance of Misstatements

**\*9** The plaintiffs allege that the key positions of the defendants, in conjunction with the importance of the misstatements made, give rise to the requisite strong inference of scienter. Plaintiffs allege that the defendants were all current or former CBIZ officers and/or directors (ICMS Doc. 59, at ¶ 14), that the defendants were provided with copies of the company's reports and press releases and that, as a result, they had the opportunity to correct these reports or prevent their issuance. (ICMS Doc. 59, at ¶¶ 115, 133). Defendants DeGroote, Hamm and Skoda are alleged to have signed several of the misleading reports. (ICMS Doc. 59, ¶¶ 40, 49, 66, 74, 79, 82, 85).

Plaintiffs also allege that the revenue run rates, the amounts CBIZ paid for acquisition (EBIT multiples) and the amortization periods were issues of central importance to CBIZ. Thus, plaintiffs ask the Court to infer that CBIZ's officers and directors would have known the facts relating to these issues.

In support of their position, the plaintiffs cite case law from various jurisdictions holding that the high positions of defendant officers may allow a court to infer knowledge or recklessness as to the alleged misstatements. *See, e.g., Angres v. Smallworldwide PLC,* 94 F.Supp.2d 1167, 1175-76 (D.Colo.2000) (finding scienter on the part of high-level officers based on their likely knowledge of an important transaction, as well as insider sales); *In re Aetna Securities Litigation,* 34 F.Supp.2d 935, 953-54 (E.D.Pa.1999) (top two corporate officers found to have scienter with respect to misstatements regarding an $8.9 billion acquisition); *In re Ancor Comm., Inc. Securities Litigation,* 22 F.Supp.2d 999, 1004-05 (D.Minn.1998) (finding scienter on the part of key officers where the contract at issue was "undeniably the most significant" in the

company's history).

Defendants do not disagree with the proposition that allegations of the defendants' high positions and importance of the transactions at issue may, in some circumstances, give rise to a finding of scienter. Rather, the defendants argue that the plaintiffs' allegations are more similar to those in *In re Criimi Mae, Inc. Securities Litigation,* 94 F.Supp.2d 652, 662 (D.Md.2000), where bare allegations of the defendant's high position, involvement in day-to-day activities and receipt of confidential proprietary information were insufficient to give rise to a strong inference of scienter. *See also In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 539 (3d Cir.1999) (holding that a "bare inference that a defendant 'must have had knowledge of the facts' " is insufficient to give rise to a strong inference of scienter).

The Court finds that the allegations here are analogous to those in *Advanta* and *Criimi Mae.* As in those cases, the allegations here are nothing more than boilerplate assertions of the defendants' high positions and access to information. (ICMS Doc. 59, at ¶¶ 113, 115, 126, 127). Plaintiffs allege no facts that would allow the Court to infer that the misstatements at issue involved matters of crucial importance to the company. [FN22] Such conclusory allegations are insufficient to allow the Court to infer the defendants' scienter.

> FN22. Moreover, although the plaintiffs' memorandum states that "the [C]omplaint alleges the importance of the revenue run rates, the amounts paid for acquisitions, and amortization periods" (ECF Doc. 78, at 18), the memorandum does not identify the paragraph where such an allegation is made, and the Court is unable to locate any such allegation in the Complaint.

**\*10** Significantly, as discussed below (sections II(B)(3)-(4)), the plaintiffs here have failed to provide any facts other than director status that would indicate the defendants' knowledge or recklessness as to the alleged misstatements. *Cf. Comshare,* 183 F.3d at 553 (holding that plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 11

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

had insufficiently alleged scienter when they " allege[d] no facts to show that [d]efendants knew or could have known of the errors" and had not alleged "specific facts that illustrate[d] 'red flags' ' ); *In re Officemax, Inc. Securities Litigation,* Case No. 1:00CV02432, *27-28 (N.D.Ohio Mar. 26, 2002) (O'Malley, J.) (finding no inconsistent internal reports or other specific facts that would allow the Court to infer scienter). Thus, plaintiffs' conclusory allegations are insufficient to establish scienter.

### 3. Divergence Between Internal Reports and External Statements

Plaintiffs next argue that they adequately have alleged scienter by pleading facts demonstrating a divergence between internal reports and the defendants' external statements. This contention can be disposed of quickly, because the plaintiffs' pleadings are highly conclusory in this regard.

Plaintiffs' Complaint alleges:
Because of their Board memberships and/or executive and managerial positions with CBIZ, each of the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future prospects of CBIZ particularized herein via access to internal corporate documents, conversations or discussions with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

ICMS Doc. 59, at ¶ 113. [FN23] Plaintiffs thus allege that the defendants had access to reports and other documents, without indicating any particular documents to which this allegation refers. Plaintiffs then leap from this allegation to the conclusions that (1) such internal documents were inconsistent with the defendants' public statements, and (2) the defendants were aware of or reckless as to the discrepancy.

FN23. The Complaint also alleges that "

each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports ...
[and each] enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance." ECF Doc. 78, at 19, n. 19; ICMS Doc. 59, ¶ 126.

Even the cases cited by the plaintiffs do not support a finding of scienter based on such unsupported allegations. *Cf. Helwig,* 251 F.3d at 557-58 (finding scienter based on inconsistencies between public statements and specific "red flags" to insiders, including testimony before the Senate Finance Committee and statements made to employees at an internal meeting). [FN24] These conclusory allegations fail to comply with the particularity requirements of the PSLRA and do not give rise to a strong inference of scienter.

> FN24. To the extent that *O'Neil v. Appel,* 897 F.Supp. 995 (W.D.Mich.1995), cited by the plaintiffs, even applies, the Court disregards that case because it was decided prior to the effective date of the PSLRA.

### 4. Egregious GAAP violations

Plaintiffs' next scienter allegation is that, because CBIZ's violation of GAAP principles was egregious, the magnitude of these violations raises a strong inference of the defendants' scienter. It is undisputed that GAAP violations alone do not give rise to an inference of scienter. *See Comshare,* 183 F.3d at 553; *In re SCB Computer Tech, Inc.,* 149 F.Supp.2d 334, 350 (W.D.Tenn.2001) (outlining factors that, in conjunction with GAAP violations, may give rise to a strong inference of scienter).

*11 GAAP violations may, however, be relevant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

the scienter inquiry, in connection with other evidence of the defendants' knowledge or recklessness. Plaintiffs cite numerous cases to support this proposition. *See, e.g., In re The Baan Company, Inc. Securities Litigation,* 103 F.Supp.2d 1, 21 (D.D.C.2000), *citing In re Digi Int'l, Inc. Securities Litigation,* 6 F.Supp.2d 1089, 1099 (D.Minn.1998) ("A violation of GAAP, combined with other circumstances suggesting fraud, may create a strong inference of scienter...."); *In re Miller Industries, Inc. Securities Litigation,* 12 F.Supp.2d 1323, 1332 (D.Ga.1998) ("[a]llegations of GAAP violations, when combined with other circumstances suggesting fraud, may create a strong inference of scienter...."); *Rehm,* 954 F.Supp. at 1256 ("the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors....").

"[T]he Court must determine whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter." *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 234 (D.Mass.1999). The key is whether the plaintiffs have alleged specific "red flags" that should have put the defendants on notice of accounting errors. *See Comshare,* 183 F.3d at 553 . Since plaintiffs have failed to do so here, they have failed to set forth sufficient allegations of the defendants' scienter.

Even assuming that the plaintiffs have alleged accounting violations, [FN25] they have alleged none of the circumstances present in the plaintiffs' cited cases. *Ancor,* 22 F.Supp.2d at 1004-05, and *In re Microstrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 651 (E.D.Va.2000), as well as *Miller,* 12 F.Supp.2d at 1332, and *Baan,* 103 F.Supp.2d at 21, contained allegations of unusual and/or suspicious insider trading in connection with the alleged GAAP violations. The Court has found here that the Complaint contains no credible allegations to that effect. Moreover, the *Microstrategy* and *Rehm* plaintiffs, unlike the plaintiffs here, adequately had alleged the importance of the operational issue on which the alleged misstatements were founded. Thus, even if

the plaintiffs adequately have pleaded any GAAP violations, those violations still are insufficient to raise a strong inference of scienter.

> FN25. Defendants dispute that plaintiffs even have succeeded in alleging any GAAP violations, because if such a violation had occurred, then CBIZ would have been required to restate its previous financial reports. (ECF Doc. 86, Exh. B). *See Officemax,* Case No. 1:00CV02432, *32 (noting that the failure of the defendants to restate income for any of the periods in question undermined the plaintiffs' allegations of GAAP violations). This assertion goes to the particularity prong of the inquiry and, in any case, the Court need not address it, since it finds that the allegations of GAAP violations do not provide facts sufficient to support a strong inference of scienter.

### 5. Other allegations

The Court also briefly disposes of the plaintiffs' other allegations relating to scienter.

First, plaintiffs contend that the defendants, in their letter to shareholders of November 20, 1998, " admitted" that they had artificially inflated revenues of the company, and that such an admission is relevant to scienter. (ICMS Doc. 59, ¶ 71). Plaintiffs argue that defendants made similar " admissions" through the disclosures in January and February 2000 of problems with CBIZ's organizational, management and reporting structure.

*12 Defendants take issue with plaintiffs' characterization of the November 20, 1998 letter as an "admission," since the letter merely sets forth the method used by CBIZ to calculate revenue run rates and makes no representations as to whether this method is appropriate. Defendants contend that neither this letter nor the disclosures relating to mismanagement are "admissions" and that neither gives rise to any inference of scienter. The Court agrees.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 13

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs also raise the conclusory allegation that the individual defendants acted out of motive to " protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby" and "enhance the value of their personal holdings of CBIZ common stock." (ICMS Doc. 59, ¶ 118). While the Sixth Circuit has identified, as one factor to be considered, the defendants' "self-interested motivation ... in the form of saving their salaries or jobs," *Helwig,* 251 F.3d at 552, the *Helwig* court contemplated an evaluation of the totality of the circumstances to determine whether the plaintiffs had raised a " strong inference" of scienter. *See id.*

Although plaintiffs here have alleged motive, they have failed to identify any particularized facts to support that motive, as required by the Sixth Circuit court in *Helwig,* 251 F.3d at 548. For example, the plaintiffs have failed to allege the amount of any individual defendant's compensation, nor have they alleged that compensation or bonuses were tied to the performance of the company. As to several of the individual defendants, the plaintiffs have not alleged that those individuals even owned CBIZ stock. Such conclusory motive allegations are insufficient to give rise to a strong inference of scienter under the PSLRA.

Plaintiffs thus have failed to set forth with particularity any facts giving rise to a strong inference of scienter. In reaching this conclusion, the Court has considered the plaintiffs' allegations both independently and in their entirety. Either way, the scienter allegations are insufficient.

Although the Court concludes that the Complaint must be dismissed for failure adequately to plead scienter, the Court will turn to evaluate the other grounds set forth by the defendants in support of dismissal.

### C. Particularity of Fraud Allegations

Defendants next argue that the Complaint must be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to set forth false or misleading statements made by each defendant with the particularity required by

Fed.R.Civ.P. 9(b) and the PSLRA. As noted above (Section II(A)), the plaintiffs must plead fraud with particularity under Rule 9(b) and also must set forth facts demonstrating the falsity of each statement, who made the statement and why it was false when made. *See* 15 U.S.C. § 78u-4(b)(1); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 550 (6th Cir.2001), *cert. dismissed,* 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800, 2002 WL 1352425 (Jun. 20, 2002); *Gupta v. Terra Nitrogen Corp.,* 10 F.Supp.2d 879, 885 (N.D.Ohio 1998). Under the PSLRA, a plaintiff pleading on information and belief also must allege all facts on which that belief is based. *See In re Telxon Corp. Securities Litigation,* 133 F.Supp.2d 1010, 1025 (N.D.Ohio 2000); *see also* 15 U.S.C. § 78u-4(b)(1). Defendants argue both that the plaintiffs have failed to attribute fraudulent statements to each defendant and that the plaintiffs have failed adequately to allege that each statement by the defendants was false when made.

### 1. Particularity of Fraud Allegations With Respect to Each Defendant

**\*13** The group-published information doctrine is a presumption, applied in some circuits, which allows the plaintiffs to hold a corporation's officers and directors liable for false statements found in collectively published documents:

[I]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the corporate officers...."

*Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987) (citations omitted). Under the doctrine, a plaintiff fulfills the particularity requirement "by pleading the misrepresentations with particularity and where possible the roles of the individual defendants...." *Id.*

Defendants argue that the Sixth Circuit has not adopted the group-published information doctrine at any point after the Reform Act and that, without this doctrine, the plaintiffs have failed to allege particularized facts demonstrating false statements

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

by each defendant. Defendants cite several cases from other jurisdictions that have rejected the group-published information doctrine since the passage of the Reform Act. *See, e.g., Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998) (holding that " [t]he PSLRA codifies a ban against group pleading... ."); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998) ("[t]o permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission... ."). Defendants contend, moreover, that the Complaint falls short of the Reform Act standards even under the group-published information doctrine.

Plaintiffs note that, while the Sixth Circuit has not addressed the applicability of the group-published information doctrine after the passage of the PSLRA, a plethora of district court decisions from within this circuit supports the plaintiffs' position. *See, e .g., In re SmarTalk Teleservices, Inc. Securities Litigation,* 124 F.Supp.2d 527, 545 (S.D.Ohio 2000) (holding that the group-pleading doctrine survived the passage of the PSLRA); *Benedict v. Cooperstock,* 23 F.Supp.2d 754, 762 (E.D.Mich.1998) (accepting group-published information doctrine). Moreover, the vast majority of cases decided nationwide also have recognized this doctrine. [FN26] Plaintiffs thus argue that they need not attribute specific misrepresentations to particular defendants, since they allege that the relevant misstatements and omissions are contained in group-published documents. *See, e.g., In re Digi International,* 6 F.Supp.2d 1089, 1101 (D.Minn.1998).

FN26. *See, e.g., In re Baan Co. Securities Litigation,* 103 F.Supp.2d 1, 17 (D.D.C.2000); *In re Oxford Health Plans,* 187 F.R.D. 133, 142 (S.D.N.Y.1999); *In re Sunbeam Securities Litigation,* 89 F.Supp.2d 1326, 1340-41 (S.D.Fla.1999); *In re Livent, Inc.,* 78 F.Supp.2d 194, 219 (S.D.N.Y.1999); *In re BankAmerica Corp.,* 78 F.Supp.2d 976, 987 (E.D.Mo.1999); *Robertson v. Strassner,* 32 F.Supp.2d 443,

446 (S.D.Tex.1998); *In re Digi International, Inc.,* 6 F.Supp.2d 1089, 1101 (D.Minn.1998); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 627, n. 4 (N.D.Tex.1998); *In re Stratosphere Corp. Securities Litigation,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 208 (E.D.N.Y.1997).

The Court finds that the group-published information doctrine survived the passage of the PSLRA and has continuing viability in the Sixth Circuit. Moreover, the plaintiffs adequately have alleged sufficiently particularized facts as to defendants DeGroote, Skoda and Hamm. DeGroote served as Chief Executive Officer throughout much of the period in question. (ICMS Doc. 59, ¶ 14(a)). Hamm served as Chief Financial Officer throughout most of the class period. (ICMS Doc. 59, ¶ 14(b)). Skoda was Executive Vice President and Director of CBIZ from the beginning of the class period through December 14, 1998. (ICMS Doc. 59, ¶ 14(c)). Additionally, each of these defendants was responsible for signing at least one of the SEC filings. (ICMS Doc. 59, ¶¶ 40, 49, 66, 74, 79, 82, 85). Even without applying the group-published information doctrine, the plaintiffs specifically have attributed statements to these defendants.

**\*14** With respect to Reeves, Grisko and Winkler, the Complaint alleges that these defendants held officer positions in CBIZ for at least a period of time. Reeves was a Director and Senior Vice President of Business Services from the beginning of the class period through March 1999. (ICMS Doc. 59, ¶ 14(d)). Winkler was the President and Chief Operating Officer from April 1999 through the end of the class period. (ICMS Doc. 59, ¶ 14(e)). Grisko served as Vice President, Mergers and Acquisitions beginning in September 1998 and was promoted to Senior Vice President, Mergers and Acquisitions and Legal Affairs in December 1998. (ICMS Doc. 59, ¶ 14(f)). Plaintiffs allege that, because of their positions, all of these defendants "controlled the contents of quarterly and annual reports, press releases and presentations to securities analysts ... and had the ability and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 15

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

opportunity to prevent their issuance or cause them to be corrected." (ICMS Doc. 59, ¶ 115).

Plaintiffs demonstrate that the standards for applying the group-pleading presumption are relatively lenient. *See Benedict,* 23 F.Supp.2d at 762-63 (holding that conclusory allegations were sufficient as to inside directors with involvement in the day-to-day affairs of the corporation). Thus, the plaintiffs argue that allegations of the defendants' officer positions are sufficient to give rise to the application of the group-published information presumption.

The Court agrees that, under the relatively lenient group-pleading standards, the plaintiffs are entitled to the group-published information presumption. The officer positions alleged indicate that the defendants were involved in day-to-day corporate affairs, and thus the collectively published documents of CBIZ can be attributed to these individual defendants. The plaintiffs thus adequately have attributed statements to each of the individual defendants. [FN27]

> FN27. Although the plaintiffs have invoked the group-pleading presumption, the claim must fail, as described above, for failure to plead scienter with sufficient particularity. *See* section II(B), *supra.*

2. Pleading Falsity with Particularity

Defendants also challenge the plaintiffs' Complaint on the ground that it fails to set forth, with the requisite specificity, particularized facts demonstrating that the defendants' statements were false when made. The plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Where these requirements are not met, the Court must dismiss the Complaint. *See* 15 U.S.C. § 78u-4(b)(3)(A). The fraud allegations challenged by the defendants can be distilled essentially to the following:

(1) In specified SEC quarterly and annual filings during fiscal years 1997, 1998 and 1999, CBIZ and the individual defendants overstated CBIZ's earnings and failed to disclose that, based on internal information known to the defendants, its 30- and 40-year periods for goodwill amortization were improper. (ICMS Doc. 59, Exh. F).

(2) In press releases and reports to analysts, CBIZ and the individual defendants made false or misleading statements regarding the revenue run rates for CBIZ's newly acquired businesses and the ratio of earnings to acquisition prices paid for the newly acquired companies ("EBIT ratios"). [FN28]

> FN28. According to the plaintiffs, CBIZ inflated its revenue run rates by approximately 15 percent by including projections rather than simply historical rates. (ICMS Doc. 59, Exh. D). Additionally, CBIZ represented that it had been paying six times EBIT for the acquisition transactions, when in fact it had been paying 11 to 12 times EBIT.

**\*15** According to defendants, the plaintiffs fall short of the requirements of Rule 9(b) and the PSLRA, because they fail to draw any nexus between the allegedly fraudulent statements and the facts on which the fraud allegation is based. *See Havenick v. Network Express,* 981 F.Supp. 480, 526 (E.D.Mich.1997) ("[p]laintiffs must provide a particular factual basis for their belief that a particular statement or omission is false or misleading...."). Rather, defendants characterize the plaintiffs' Complaint as a series of block quotes of SEC filings, analyst statements and press releases. Plaintiffs cannot simply set forth the relevant statements and "summarily characterize the statements as 'materially false and misleading.' " (ECF Doc. 65, at 14). [FN29] In other words, plaintiffs must demonstrate a basis for the claim that the defendants' statements were false at the time they were made, rather than merely erroneous in hindsight.

> FN29. Defendants argue, for example, that the plaintiffs' reference to CBIZ's letter of November 20, 1998 is conclusory, because

Not Reported in F.Supp.2d                                                    Page 16

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

the plaintiffs construe this document as an admission of "deceptive and materially misleading accounting." (ICMS Doc. 59, at ¶¶ 67, 71). A mere characterization of the document as fraudulent, defendants claim, is insufficient to survive a motion to dismiss.

Defendants first contend that the plaintiffs have not pleaded fraud with respect to any revenue run rates, because run rates are mere projections and the plaintiffs have not alleged actual knowledge of falsity, as is required. [FN30] Second, the Complaint contains no facts regarding the amount defendants paid for any particular acquisition, and thus the plaintiffs cannot allege that statements regarding EBIT multiples and acquisition prices were false with respect to any specific transaction. Third, the plaintiffs have not alleged false statements regarding the amortization periods, because the Complaint alleges only that the defendants later decided that the appropriate period was 15 years. Defendants maintain that none of these allegations are sufficient to plead falsity under the stringent PSLRA standards.

FN30. *See* section II(D)(2), *infra.*

Plaintiffs respond that the defendants' position mischaracterizes their allegations and ignores the facts pleaded in the Complaint. Plaintiffs assert that (1) the defendants used the term "revenue run rate," which typically describes historical revenue, to describe projected future income; (2) the defendants' statements about the prices CBIZ was paying to acquire other companies *in the aggregate* were false and misleading; (3) although the defendants disclosed the amortization period used by CBIZ, they failed to disclose facts that indicated that the amortization period was inappropriate. Finally, the plaintiffs support their allegations of falsity by relying on the defendants' later "admissions" that the earlier statements were incorrect.

Defendants argue that the plaintiffs cannot show falsity merely by demonstrating that a statement by a company officer later turned out to be wrong.

Rather, to raise an inference of falsity, the plaintiffs must allege the existence of contemporaneous information inconsistent with the defendants' statements. This would include internal reports indicating that the company's financial condition differed from that represented by the defendants. See *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 985 (9th Cir.1999) ("[w]e would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."). According to the defendants, only this type of information suffices to satisfy the PSLRA standards for pleading falsity.

*16 The Court agrees with the defendants that the Complaint is remarkably devoid of facts contemporaneous with the alleged misstatements that would indicate the statements' falsity. With respect to revenue run rates, for example, the Complaint states that the defendants failed to disclose that they had deviated from the industry-accepted definition of "revenue run rates." The Complaint fails to allege, however, that any such definition was in effect at the time. Moreover, the "industry definitions" attached to the plaintiffs' brief are confusing and contradictory and fail to support the plaintiffs' characterization. (ECF Doc. 79, Exh. E). [FN31]

FN31. The foregoing analysis assumes that the plaintiffs' "industry definitions," attached as an exhibit to the brief in opposition to the defendants' motion to dismiss, even can be considered in the Court's evaluation of a motion to dismiss. Consideration of these definitions is a questionable proposition, given that the definitions were not quoted, or even referenced, in the Complaint. The Court need not reach this issue, however.

A similar situation exists with respect to the plaintiffs' one alleged misstatement regarding EBIT multiples. Plaintiffs contend that the defendants led investors to believe that CBIZ had been paying approximately six times EBIT to acquire smaller

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

companies through its acquisition strategy. (ICMS Doc. 59, ¶ 47-48). Plaintiffs further allege that the actual amount was "revealed" by an unidentified analyst to be 11 to 12 times EBIT. (ICMS Doc. 59, ¶ 71). The Court finds that, without reference to particular transactions, this vague "revelation" cannot demonstrate that the earlier statements were false when made.

With respect to the purportedly improper amortization rates, the question is a closer one. The plaintiffs allege that the defendants were required to disclose the existence of employment contracts of no more than five years' duration, since this information would have indicated that the defendants' 30- and 40-year amortization periods were improper. (ICMS Doc. 59, ¶ 40-41, 44) The plaintiffs do not assert clearly, however, how the existence of employment contracts alone would demonstrate that the amortization period was inappropriate. Furthermore, although the plaintiffs allege the existence of contemporaneous and inconsistent "internal reports" indicating that the defendants knew the appropriate period to be 15 years or less, the Complaint identifies no specific report. The Court finds that the plaintiffs' allegations with respect to goodwill amortization do not plead falsity with the requisite particularity.

Finally, the alleged "hindsight admissions" by the defendants provide little indication that any earlier statements were fraudulent, rather than merely erroneous. *See, e.g.,* ICMS Doc. 59, ¶¶ 67, 93, 95. Thus, the Complaint must fail on particularity grounds for reasons similar to those set forth with respect to scienter: under the PSLRA, the plaintiffs must allege facts sufficient to support managerial fraud, not simply error. A plaintiff cannot "use disclosures after the date of the statement to show that the company knew that problems existed at the earlier date and should have disclosed them." *In re Peritus Software Services, Inc. Securities Litigation,* 52 F.Supp.2d 211, 223 (D.Mass.1999) (citations omitted).

### D. Materiality

**\*17** Under the federal securities laws, a statement is

material if there is a "substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "[M]ateriality depends on the significance the reasonable investor would place on the ... information." *See Basic, Inc. v. Levinson,* 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). A court may rule on questions of materiality as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality...." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281, n. 11 (3d Cir.1992).

Defendants argue, in essence, that even if the plaintiffs adequately allege fraud and scienter with particularity, the plaintiffs' claim must be dismissed, because the alleged misstatements either are immaterial or are not actionable as a matter of law. Defendants assert several categories of immaterial and non-actionable statements: (1) soft, "puffing" statements that simply describe business practices in vague, self-laudatory language (immaterial); (2) forward-looking statements, unless unaccompanied by meaningful cautionary language or made with actual knowledge of falsity (protected by the statutory "safe harbor") and (3) mere " mismanagement" allegations (immaterial as a matter of law).

### 1. Immaterial Puffery

The allegations challenged by the defendants as inactionable "puffery" include statements indicating that CBIZ was "better positioned than ever," and " on a solid footing for continued rapid growth." (ECF Doc. 65, at 17; ICMS Doc. 59, ¶ ¶ 77, 80). Defendants rely on the Sixth Circuit holding that " [a]llegations that a company engaged in general puffery [are] insufficient to claim securities fraud...." *In re Royal Appliance Securities Litigation,* 1995 WL 490131, *3 (6th Cir. Aug.15, 1995) (unpublished disposition) (citations omitted). [FN32] " 'Soft,' 'puffing' statements ... generally lack materiality because the market price of the share is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

not inflated by vague statements.... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." *Id., quoting Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993).

> FN32. *See also In re Federal-Mogul Corp. Securities Litigation,* 166 F.Supp.2d 559, 562-63 (E.D.Mich.2001) (following *Royal* in holding that "vague, optimistic statements" are not material), *Picard Chemical, Inc. v. Perrigo Co.,* 940 F.Supp. 1101, 1122 (W.D.Mich.1996) (following *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993), and reaching the same conclusion); *cf. Helwig,* 251 F.3d at 560 (refusing to characterize defendants' statements as immaterial "puffery").

Plaintiffs respond that the statements challenged by the defendants as "puffery" do not fall within this category, since each, when considered in context, is "inextricably linked and based on factual assertions made by defendants...." (ECF Doc. 79, at 27). Vague statements of opinion or belief may be actionable when the statements are predicated on evidence of provable fact. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) ("high value," a conclusory characterization, was actionable where the factual basis did not justify its accuracy); *see also McCarthy v. C-Cor Electronics, Inc.,* 909 F.Supp. 970, 976 (E.D.Pa.1995) (statements focusing on the present rather than the future are more likely to be material). A Court must determine the materiality of the defendants' statements in a case-by-case inquiry. *See Cione v. Gorr,* 843 F.Supp. 1199, 1204 (N.D.Ohio 1994).

**\*18** In finding the defendants' statements immaterial, the *Cione* court distinguished the statements from those in *Virginia Bankshares,* where the fact that corporate officers recommended a course of action in a proxy vote made their statements material. *See Cione,* 843 F.Supp. at 1204; *Virginia Bankshares,* 501 U.S. at 1093. In *Cione,* the defendants' statements relied only on accurate assertions of historical fact and were immaterial as a

matter of law. 843 F.Supp. at 1204. Similarly, in *Picard Chemical, Inc. v. Perrigo Co.,* 940 F.Supp. 1101, 1122 (W.D.Mich.1996), the court found that statements that did not rely on any specific factual assertions were immaterial puffery.

Of the statements here alleged to be immaterial puffery, none are vague enough to be immaterial as a matter of law. Although the defendants' statements, when taken out of context, do sound like those found in prior cases to be puffery, the surrounding context of these statements renders the representations material. Nearly all of the statements identified by the defendants relate to management commentary on the company's periodic revenue statements. [FN33]

> FN33. For example, paragraphs 77, 80 and 84 all allege statements by DeGroote commenting on the company's quarterly statements of revenue. DeGroote stated that the revenue results indicated that CBIZ was "better positioned than ever to leverage the momentum [it had] built," (ICMS Doc. 59, ¶ 77) and that CBIZ's " initiatives over the past several months ... [had] put CBIZ on a solid footing...." (ICMS Doc. 59, ¶ 80). Plaintiffs allege that these statements are actionable because the revenue results underlying them were materially false.

Such statements, standing alone, would not be actionable. The juxtaposition of these comments with allegedly false financial results, however, presents a different situation. The statements, in context, are characterizations of the present state of the company based on verifiable facts-namely, the quarterly reports. Such statements can be actionable if not honestly believed. *See Virginia Bankshares,* 501 U.S. at 1095.

The fact that the statements in question rest on a provable factual basis, the accuracy of which is disputed by the plaintiffs, distinguishes this case from *Cione,* 843 F.Supp. at 1201 ("[p]laintiff does not take issue with any of the statements ... concerning [the defendant's] past performance ...."),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 19

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

and *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 (6th Cir.1997) ("[t]he sales and earnings data ... are 'hard' numbers, the accuracy of which has never been challenged by the plaintiffs."). The plaintiffs here do challenge the accuracy of the underlying financial reports, and that fact precludes the Court from finding the defendants' characterization of the reports immaterial as a matter of law. The Court will not dismiss these allegations as mere puffery. [FN34]

> FN34. Although the defendants' statements are not immaterial as a matter of law, the claim must fail, as described above, for failure to plead scienter with sufficient particularity. *See* section II(B), *supra.*

### 2. Forward-Looking Statements Protected by the Safe Harbor

Defendants identify several other statements as forward-looking and thus protected by the Securities Act's statutory safe harbor. These challenged statements include assertions such as the amount of revenue that CBIZ anticipated each acquisition to add to its annualized total. *See, e.g.,* ICMS Doc. 59, ¶¶ 59, 70. Defendants also identify as forward-looking several statements involving predictions of growth, such as defendants' statements that the company "expects to maintain rapid growth in revenue and net income," "seeks to achieve long-term success," and is "gradually improving internal growth." (ECF Doc. 65, at 19; ICMS Doc. 59, ¶¶ 60, 77).

**\*19** The Act's safe harbor protects forward-looking statements, which include statements "containing a projection of revenues," "statement of the plans and objectives of management for future operations" and statements of "future economic performance," as well as a statement of any assumption underlying or relating to one of the above statements. 15 U.S.C. § 78u-5(i)(A)-(D). Where material statements are forward-looking and are so identified, and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15

U.S.C. § 78u-5(c)(1)(A)(i), then the safe harbor applies. Even if a statement is material and is not accompanied by cautionary statements, the safe harbor applies unless the plaintiff pleads that the statements were made by an executive officer who had actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1)(B).

Defendants contend that numerous statements in the Complaint refer to the amount of revenue that CBIZ expected its acquisitions to add to the annual total. Since these statements were projections, the CBIZ defendants argue that the plaintiffs must plead that an executive officer of CBIZ made the projections with actual knowledge of their falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B)(ii).

Plaintiffs maintain that the alleged misstatements regarding the revenue run rate were not projections, since the term "revenue run rate" refers to calculations that generally rely only on historical data. Moreover, to the extent that any of the alleged statements are forward-looking, the plaintiffs claim that the Complaint alleges adequate facts to support a conclusion that the speaking defendant had actual knowledge of falsity.

The Court finds that several of the defendants' statements are protected by the statutory safe harbor, while numerous other statements fall outside the scope of this protection. To the extent that the statements relate to revenue run rates (ICMS Doc. 59, ¶¶ 39, 50, 51, 53, 54, 59, 60), these statements fall outside the statutory safe harbor because they are not sufficiently identified as forward-looking. In fact, the defendants' characterization of the revenue run rate as a forward-looking rather than a historical number is exactly the basis on which the plaintiffs challenge the statements. The context in which the statements are presented simply does not make the fact that the statements are predictions clear enough to prevent a reasonable investor from relying on the statements. [FN35]

> FN35. This finding is not inconsistent with the Court's determination, in Section II(C), that the plaintiffs failed to plead these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

allegations with particularity. Although the Court finds that the defendants did not identify the statements as forward-looking (thus precluding the application of the statutory safe harbor), it also finds that the plaintiffs have not pleaded particularized facts under Fed.R.Civ.P. 9(b) and the PSLRA demonstrating that the defendants' use of the term "revenue run rates" was fraudulent at the time the statements were made.

To the extent that the Complaint does allege forward-looking statements by the defendants, however, these statements are protected by the statutory safe harbor, because the plaintiffs have failed adequately to allege actual knowledge of falsity. *See* ICMS Doc. 59, ¶¶ 54 (to the extent it refers to statements of anticipated growth rather than revenue run rates), 62 ("we will continue to pick the leaders in each market we enter"), 64 ("this stock is going to bounce back"). [FN36] It seems clear to the Court that each of these statements indicates a prediction of future results rather than an assertion of present condition. Moreover, for the reasons set forth in section II(B), *supra*, the plaintiffs have not pleaded actual knowledge on the part of any of the defendants. Thus, these statements remain shielded by the statutory safe harbor and, to the extent noted above, should be stricken from the Complaint.

FN36. The Court finds that paragraphs 80 and 84, although alleged to be forward-looking statements, are statements touting the current financial condition of the company and are not shielded by the statutory safe harbor. *See* section II(D)(1), *supra*.

### 3. "Mismanagement" Allegations

**\*20** Defendants challenge the plaintiffs' allegations relating to management's failure to disclose (1) CBIZ's lack of an adequate financial reporting structure and (2) the diversion of management's attention from CBIZ's core operations by the strategic alliance issue. Statements as to these issues, defendants claim, represent nothing more than allegations of corporate mismanagement, which are not actionable under the securities laws.

Although allegations of failure to disclose mismanagement alone are not actionable, the failure to disclose material facts may be actionable. *See In re Craftmatic Securities Litigation,* 890 F.2d 628, 639 (3d Cir.1990). [FN37] Admittedly, the line between a material nondisclosure and a mere failure to disclose mismanagement has been hard to draw. *See id.* at 640; *cf. Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.1981) (directors need not reveal their true motives for entering into a transaction). The "trigger" for an actionable failure to disclose claim is an affirmative statement by management that gives rise to a duty to disclose further.

FN37. *See also Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re Wells Fargo Securities Litigation,* 12 F.3d 922, 927 (9th Cir.1993); *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992); *Jacobs v. Hanson,* 464 F.Supp. 777, 780 (D.Del.1979).

Generally, a director is liable for failure to disclose inadequate management only where the director has "commented on the nature and quality of the management practices." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1992) ("it is not a violation of the securities laws to fail to characterize [management] practices as inadequate, meaningless, out of control, or ineffective.") Nonetheless, when a director characterizes management using a term such as "adequate," "conservative," or "cautious," then the subject comes into play. *See id.* at 282; *cf. Craftmatic,* 890 F.2d at 640 ("the concerns underlying the securities acts are not implicated simply because management has failed to characterize ... itself as 'unfocused' and 'unable to manage' present businesses ... its financial reporting and accounting controls as inadequate and ineffective ... and its 'information systems' as ' wholly inadequate....' "). These cases are consistent with the general rule that once a corporation has spoken about a subject, it must speak accurately,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 21

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

even where it had no original duty to speak at all. *See, e.g., Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir.2001), *cert. dismissed*, 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800, 2002 WL 1352425 (Jun. 20, 2002); *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir.1993).

There are only two statements in the Complaint that directly relate to the quality of management and could give rise to any disclosure duty. ICMS Doc. 59, ¶¶ 80-81 ("CBIZ now has the management structure to run a much larger organization"), 90 (" We're running the Company as we should and we're not letting that [strategic alliance] interfere with our day to day running of the Company"). The Court finds that, assuming falsity and contemporaneous knowledge of mismanagement inconsistent with these assertions, *see Shapiro*, 964 F.2d at 282, the failure to disclose additional facts in connection with these statements could be considered significant by the reasonable investor.

**\*21** The context of these statements indicates that CBIZ made the statements in an attempt to allay shareholder fears regarding management quality. Such assertions do bring the subject of management quality "in play." *Shapiro*, 964 F.2d at 282. Thus, the Court will not strike the allegations of failure to disclose inconsistent facts on the ground that these claims represent mere failure to disclose mismanagement. (ICMS Doc. 59, ¶¶ 26, 66, 111). [FN38]

> FN38. Nonetheless, the claims must fail, because even if the plaintiffs could show falsity, the Complaint fails adequately to allege scienter. *See* section II(B), *supra.*

E. Liability for Third-Party Statements

Defendants next argue that CBIZ and the individual defendants cannot be liable for statements made by analysts and reporters regarding CBIZ. Defendants assert that, to state a viable securities fraud claim with respect to analysts' statements, the plaintiffs must plead facts demonstrating that the defendants adopted or entangled themselves with the statements. *See, e.g., Suna v. Bailey Corp.*, 107

F.3d 64, 73-74 (1st Cir.1997); *Picard Chemical, Inc. v. Perrigo Co.*, 940 F.Supp. 1101, 1126 (W.D.Mich.1996); *Greenberg v. Compuware Corp.*, 889 F.Supp. 1012, 1021 (E.D.Mich.1995).

Plaintiffs counter that current Sixth Circuit law differs from the defendants' cited cases, in that the Sixth Circuit permits liability for statements made to analysts, even where the defendants have not " adopted" or "entangled themselves" with the analysts' reports. *See Helwig*, 251 F.3d at 557, n. 4. *Helwig*, the plaintiffs argue, found liability based only on the defendants' provision of information to analysts. Plaintiffs cite several recent analogous cases, in which defendants used securities analysts as "conduits" to disseminate misleading information to investors. [FN39]

> FN39. *See, e.g., Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997) (defendants may be liable under Rule 10b-5 for providing false or misleading information to analysts); *Anixter v. Home-Stake Products Co.*, 77 F.3d 1215, 1226 (10th Cir.1996) (accountant may be liable for false and misleading representations, where the accountant defendant knew or should have known the representation would be communicated to investors); *In re SmarTalk Teleservices, Inc. Securities Litigation*, 124 F.Supp.2d 527, 544 (S.D.Ohio 2000) (Plaintiffs need not show "entanglement" to hold defendants liable for misrepresentations made to analysts); *Picard*, 940 F.Supp. at 1120 (defendants may be held liable for misinformation where they are alleged to be the "original source" of the misrepresentation); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 1999 WL 33295037, \*6 (W.D.Ky. Aug.16, 1999) (unpublished disposition) (a "two-way flow of information" is not required where the company deliberately or recklessly provides misleading information to the analyst).

Although the Court agrees with plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 22

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

characterization of Sixth Circuit law, it disagrees that the facts alleged here satisfy the standards of Fed.R.Civ.P. 9(b) and the PSLRA. *Helwig* held that the defendants could be liable for their statements to analysts, since those statements satisfied the particularity requirements. 251 F.3d at 557, n. 4 (Plaintiffs' allegation ... attributes the earnings projections to [the individual defendants]. Moreover, the complaint identifies the analysts to whom the statements were made ... as well as the timing and contents of the discussion....").

Thus, the law accepted by the plaintiffs as controlling does not allow the plaintiffs' Complaint to survive here. Even on the occasions where the Complaint attributes the analysts' information to particular defendants (ICMS Doc. 59, ¶¶ 52, 54, 55, 60, 62, 64, 76), it does not provide any facts as to the timing or substance of the discussion. [FN40] Moreover, as set forth above, the Complaint does not allege with particularity that the defendants made specific statements to analysts that were false when made, nor that the defendants provided the false information with the requisite scienter. Thus, for the reasons set forth in this section, as well as in sections II(B) and (C), *supra,* the Complaint must be dismissed.

> FN40. Paragraph 65 is an exception, as that paragraph does set forth some particularized facts. Specifically, it states that defendant DeGroote made statements in a conference call to analysts, the approximate date of which was specified. (ICMS Doc. 59, ¶ 65). That paragraph nonetheless will be dismissed for the reasons set forth in sections II(B) and (C)-namely, that the plaintiffs have not pleaded falsity and scienter with the requisite particularity.

**F. Reliance/Truth on the Market Doctrine**

**\*22** Defendants contend that the plaintiffs fail to show reliance with respect to several of their allegations because, at the time the plaintiffs purchased their shares, the market was fully informed of the relevant information. According to

defendants, the plaintiffs' claims regarding (1) goodwill amortization, (2) DeGroote's insider trading settlement and (3) revenue run rates and EBIT multiples are precluded, at least in part, by the failure to allege facts sufficient to support a finding of reliance.

Plaintiffs assert a "fraud on the market" theory of reliance. Thus, they allege reliance on the stock price established by an "impersonal, efficient" market, rather than individual reliance on the defendants' statements. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 241-242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The "truth on the market" doctrine, however, is a corollary of "fraud on the market." If the market had knowledge of the truth at the time the plaintiffs purchased their shares, then the market price could not have been affected by the defendants' statements. Such a circumstance defeats any showing of reliance. *See id.* at 248 ("[a]ny showing that severs the link between the alleged mis representation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.").

In evaluating whether the plaintiffs have alleged facts sufficient to support a finding of reliance, the Court considers only the allegations set forth in the plaintiffs' Complaint, documents referred to in the Complaint or "integral to the [C]omplaint," *In re Credit Acceptance Corp. Securities Litigation,* 50 F.Supp.2d 662, 669 (E.D.Mich.1999); *see also In re Royal Appliance Securities Litigation,* 1995 WL 490131, at 2 (6th Cir. Aug.15, 1995), as well as public records and documents of which judicial notice may be taken. *See Credit Acceptance,* 50 F.Supp.2d at 669; *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). To the extent that the defendants' arguments are based on evidence outside the scope of the pleadings, such materials are inappropriate for consideration on a motion to dismiss.

With respect to the goodwill amortization rates, the defendants argue that, by November 17, 1997 (the date of its 1997 Form S-4, and before any of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 23

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiffs purchased their shares), [FN41] CBIZ fully disclosed (1) the nature of its business and the nature of the assets it gained during acquisitions, (2) the amortization periods for those assets, (3) that several members of management were required to execute employment and non-compete agreements, and (4) that selling shareholders of the acquired companies were subject to two-year lock-up agreements. Plaintiffs respond that the "truth on the market" defense fails here, because the misrepresented information was not "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided representations." *Provenz v. Miller,* 102 F.3d 1478, 1493 (9th Cir.1996)(internal citations omitted). [FN42] Plaintiffs further urge the Court not to resolve the issue as a matter of law, arguing that the defendants bear a "heavy burden of proof," *see Provenz,* 102 F.3d at 1493, and that proof of reliance is more appropriate for trial than for resolution on a motion to dismiss.

FN41. Plaintiffs' claim must fail if the " truth" was revealed to the market before any of them purchased their shares. *See Greenberg v. Compuware Corp.,* 889 F.Supp. 1012, 1015 (E.D.Mich.1995) (plaintiff must have "traded the shares between the time the misrepresentations were made and the time the truth was revealed"); *Marsh v. Armada Corp.,* 533 F.2d 978, 982, n. 3 (6th Cir.1976)(" standing is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct, or after the alleged fraudulent conduct was exposed....").

FN42. *See also Picard Chemical, Inc. v. Perrigo Co.,* 940 F.Supp. 1101, 1123 (W.D.Mich.1996)(in a fraud on the market case, "the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources"), *quoting In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1115 (9th Cir.1989); *Ballan v. Upjohn Co.,* 814

F.Supp. 1375, 1383 (W.D.Mich.1992).

**\*23** Plaintiffs are correct in asserting that the reliance issue should not be resolved at this stage of the litigation. Determination of this issue would require the Court to consider the Form S-4, which was neither quoted nor referenced in the plaintiffs' Complaint. Nor is the document "integral" to any statement made in the Complaint. *See Credit Acceptance,* 50 F.Supp.2d at 669. The Court will not consider the Form S-4 on evaluation of a motion to dismiss [FN43] and thus will not dismiss the goodwill amortization allegations for failure to demonstrate reliance. [FN44]

FN43. Given the Court's disposition of the case in sections II(B) and (C), *supra,* the Court need not determine whether it might be appropriate to take judicial notice of the Form S-4 as a public record document.

FN44. The claim must fail, however, because as set forth above, the plaintiffs have failed to allege scienter and falsity with the requisite particularity. *See* sections II(B) and (C), *supra.*

A similar analysis applies to the defendants' arguments regarding disclosure of information about defendant DeGroote's background. Although the defendants have presented compelling evidence in support of their contention that DeGroote's background was fully disclosed to the market in 1993 (Doc. 79, Exh. B), the Court declines to take judicial notice of the newspaper articles cited by the defendant [FN45] and declines to consider such articles in evaluating the motion to dismiss. Thus, the plaintiffs' claims regarding failure to disclose information about defendant DeGroote's background will not be dismissed for failure to demonstrate reliance . [FN46]

FN45. The Court understands the relevant law to indicate that it might be able to take judicial notice of the articles for the purpose of finding that the market was aware of the information. *See, e.g.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 24

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

*Heliotrope General, Inc. v. Ford Motor Company,* 189 F.3d 971, 981 (9th Cir.1999)(taking judicial notice of newspaper articles to find that the market was aware of the allegedly omitted information); *cf. Pomeroy v. Schlegel Corporation,* 780 F.Supp. 980, 983 (W.D.N.Y.1991)(finding that press coverage conveyed "inquiry notice" to the plaintiff and commenced the running of the statute of limitations). However, since the Court's ruling in section II(B), *supra,* is dispositive of all issues, the Court need not reach the judicial notice issue.

FN46. Plaintiffs' claims nonetheless must fail, because the plaintiffs have failed to allege scienter with the requisite particularity. *See* section II(B), *supra.*

The Court will, however, consider the defendants' arguments with respect to EBIT multiples and revenue run rates. Defendants' contentions here rely on CBIZ's letter disseminated to analysts on November 23, 1998, which appears in the plaintiffs' Complaint in its full text. (ICMS Doc. 59, ¶ 67). Defendants claim that their letter fully disclosed the facts underlying the revenue rate calculations and EBIT multiples; thus, plaintiffs purchasing CBIZ shares after that date could not have relied on any misrepresentations by the defendants concerning these matters.

The Court must agree with the defendants that information relating to these EBIT multiples and revenue run rates was fully disseminated to the market on or before November 23, 1998, when the defendants released the letter explaining how these numbers were derived. Reliance on any purported misstatements after that date thus would be precluded. [FN47] The plaintiffs do not argue to the contrary and, at any rate, the plaintiffs do not appear to assert claims for misrepresentations as to EBIT multiples and revenue run rates after that date. To the extent any plaintiffs do assert such claims, the Court finds that the plaintiffs have failed to allege facts sufficient to support a finding of reliance.

FN47. The Court finds, in any case, that defendants Grisko, Winkler, Skoda and Reeves cannot be liable for any statements regarding EBIT multiples or revenue run rates during times when those defendants were not employed by CBIZ. The plaintiffs do not argue to the contrary. Thus, Winkler cannot be liable for any statements prior to April 1999 (ICMS Doc. 59, ¶¶ 38-40, 46-47, 49-50, 52-55, 57, 59-67, 74) and Grisko cannot be liable for any misstatements prior to September 1998 (ICMS Doc. 59, ¶¶ 38-40, 46-47, 49-50, 52-55, 57, 59-62). Similarly, Skoda cannot be liable for statements made after December 14, 1998 (ICMS Doc. 59, ¶¶ 74, 76-77, 79, 80, 82-85, 89, 92-95, 97-101) and Reeves cannot be liable for statements made after September 1999 (ICMS Doc. 59, ¶¶ 84-85, 89, 92-95, 97-101), the dates that these defendants, respectively, resigned from CBIZ.

### G. Statute of Limitations

The parties agree that the controlling law governing the statute of limitations is *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf,* the Supreme Court established a limitations period for section 10(b) and section 20(a) claims of one year after discovery of the facts constituting the alleged fraud or three years after the alleged violation. The one-year statutory period commences when the plaintiff discovers evidence suggesting fraud and thus is placed on inquiry notice of the fraud. *See Havenick v. Network Express,* 981 F.Supp. 480, 514 (E.D.Mich.1997).

**\*24** The defendants assert that the Complaint must be dismissed, at least in part, for failure to file within this statutory period. Defendants claim that the filing of CBIZ's 1997 Form S-4 on November 17, 1997, which disclosed several facts relating to its amortization of goodwill, was sufficient to trigger the plaintiffs' duty to inquire. [FN48] *See* section II(F), *supra;* ECF Doc. 65, at 4. According to defendants, the required awareness on plaintiffs' behalf is low-level, and "the clock begins to tick

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 25

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

when a plaintiff senses 'storm warnings,' not when he hears thunder and sees lightning." *Harner v. Prudential Bache Securities, Inc.,* 1994 WL 494871, *4 (6th Cir. Sept.8, 1994) (unpublished disposition), quoting *Jensen v. Snellings,* 636 F.Supp. 1305, 1309 (E.D.La.1986). Thus, defendants maintain that the plaintiffs' Complaint could have been timely only if filed by November 17, 1998. [FN49]

> FN48. Additionally, the defendants contend that information regarding DeGroote's trading history was available to the public as early as 1993 and continuously through the time of filing of the plaintiffs' Complaint. (ECF Doc. 86, at 27). For the same reasons set forth in section II(F), *supra,* the Court declines to determine that information available in the market triggered inquiry notice on the part of the plaintiffs. Since the newspaper articles proffered by the defendants are neither referred to in the Complaint nor integral to the Complaint's allegations, *see Credit Acceptance,* 50 F.Supp.2d at 669, the Court declines to rely on these documents to attribute inquiry notice to the plaintiffs as of the first day that each purchased shares.

> FN49. The first complaint in this case was filed on September 16, 1999. (ICMS Doc. 1).

The Court's analysis of the statute of limitations issue essentially tracks the Court's prior reliance discussion. The Court declined, in section II(F), *supra,* to rely on the Form S-4, a document neither referred to in the Complaint nor integral to its allegations, to determine that the plaintiffs could not show reliance. Similarly, the Court will not rely on that document here to resolve the factual question of inquiry notice. Such an analysis is inappropriate in resolving a motion to dismiss, at least where the facts alleged in the Complaint itself do not reveal that the claim is untimely. *See Great Neck Capital Appreciation Investment Partnership, L.P. v. Pricewaterhouse Coopers, L.L.P.,* 137 F.Supp.2d

1114, 1125-1126 (E.D.Wis.2001) ( "a plaintiff in a securities fraud case is not required to plead facts showing that his suit is timely"), *citing Tregenza v. Great Am. Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993); *cf. Dodds v. Cigna Sec.,* 12 F.3d 346, 352, n. 3 (2d Cir.1993) (where the plaintiff's alleged facts demonstrate that the plaintiff was on inquiry notice of the fraud, resolution of the inquiry notice issue is appropriate on a motion to dismiss); *Hoover v. Langston Equipment Assoc., Inc.,* 958 F.2d 742, 744 (6th Cir.1992) (statute of limitations defense may be raised on a motion to dismiss where it is apparent from the face of the complaint that the claim is untimely). Thus, the Court declines to find that the plaintiffs' claims regarding goodwill accounting are barred by the one-year statute of limitations. [FN50]

> FN50. The plaintiffs' claim fails, however, because of the Court's findings, in sections II(B) and (C), that the Complaint fails to set forth scienter and falsity with particularity.

**H. Section 20(a) "Control Person" Liability**

Finally, plaintiffs assert a "control person" claim under section 20(a) against defendants DeGroote, Hamm and Winkler. [FN51] Defendants argue that this claim must be dismissed for failure to assert a primary violation under section 10(b). Additionally, the defendants contend that the § 20(a) claim must be dismissed for failure adequately to plead § 20(a) control person liability. According to the defendants, § 20(a) liability requires (1) Defendants' control of a primary violator, and (2) Defendants' culpable participation in or inducement of the primary violation. *See In re Telxon Corp. Securities Litigation,* 133 F.Supp.2d 1010, 1032 (N.D.Ohio 2000). Plaintiffs rely on allegations of the defendants' high positions within CBIZ (ICMS Doc. 59, ¶ 14(a)-(c)), access to internal corporate documents (ICMS Doc. 59, ¶ 113), control over company disclosures (ICMS Doc. 59, ¶ 115) and intimate knowledge of company financial performance (ICMS Doc. 59, ¶ 126) to conclude that the defendants were "active and culpable participants in the fraudulent scheme...." (ICMS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 26

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

Doc. 59, ¶ 117).

> FN51. Section 20(a) provides:
> (a) ... Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C. § 78(t).

**\*25** Although plaintiffs dispute that § 20(a) liability requires a showing of culpable participation in the scheme, the plaintiffs have failed to produce any case from within this circuit that does not recognize a participation requirement. In fact, the Sixth Circuit cases cited by the plaintiffs seem to support the defendants' characterization of the law. *See, e.g., In re Envoy Corp. Securities Litigation,* 133 F.Supp.2d 647, 664 (M.D.Tenn.2001). The *Envoy* court dismissed allegations against several executive officers, where the plaintiffs had made only conclusory allegations that the officers had signed SEC filings and participated in company management. *See id.* The Court upheld the claims against the Chief Financial Officer, however, because that claim was based on specific allegations of his participation in the fraud. *See id.*

Under this standard, the Court finds that the plaintiff adequately has alleged control person liability with sufficient particularity as to both DeGroote and Hamm. The Complaint contains more than conclusory allegations of involvement in company management by these two defendants. (ICMS Doc. 59, ¶¶ 39 (statement by DeGroote), 46 (same), 50 (same), 53 (same), 54 (same), 67 (Nov. 20, 1998 letter signed by Hamm), 80 (statement by DeGroote), 84 (same), 90 (same)). FN52 FN53

> FN52. If plaintiffs actually could proceed

on the § 20(a) claim (which they cannot due to failure to plead a primary violation), Hamm's § 20(a) liability would of course be limited to the period of time during which he was employed by CBIZ.

> FN53. Although facts underlying control person liability are attributed to these defendants with sufficient particularity, the claim nonetheless fails because the scienter allegations are not plead with sufficient particularity and no underlying violation can be established. *See* section II(B), *supra.*

The Court reaches the opposite conclusion, however, as to defendant Winkler. The only statement in the complaint attributed to Winkler is a comment allegedly made to an analyst that the company was "running smoothly." (ICMS Doc. 59, ¶ 94). Such an allegation is insufficient to constitute culpable participation under section 20(a).

Nonetheless, the § 20(a) claim must fail here as to all defendants because, as found above, the plaintiffs have failed adequately to allege a primary violation under section 10(b) and Rule 10b-5. A violation of section 20(a) must be premised on an underlying primary violation. *See Telxon,* 133 F.Supp.2d at 1032 ("plaintiffs must show ... a primary violation by a controlled person...."). Therefore, the § 20(a) claim will be dismissed.

### I. Leave to Amend

At oral argument before this Court, counsel for the plaintiffs orally requested leave to amend in the event this Court determined dismissal was appropriate. That request, however, was the first indication of the plaintiffs' desire to amend the Complaint. Plaintiffs filed no written motion to amend, nor did they provide the Court with any proposed amendment to demonstrate what new facts they might allege. The Court finds that allowing leave to amend would be inappropriate here, as amendment would be futile.

The Court recognizes that pursuant to the Federal Rules of Civil Procedure, leave to amend "shall be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 27

Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

freely given when justice so requires." Fed.R.Civ.P. 15(a). Several courts within this Circuit and elsewhere, however, have determined that the PSLRA restricts the application of Rule 15 in securities fraud cases. *See In re Champion Enterprises, Inc. Securities Litigation,* 145 F.Supp.2d 871, 872 (E.D.Mich.2001) ("[t]he plain language of the Reform Act does not contemplate amending complaints...."); *In re Cybershop.com Securities Litigation,* 189 F.Supp.2d 214, 237 (D.N.J.2002) (adopting the reasoning of *Champion Enterprises); In re NAHC, Inc. Securities Litigation,* 2001 WL 1241007, *26 (E.D.Pa. Oct.17, 2001) (unpublished disposition) (same).

**\*26** Moreover, the information currently before the Court indicates that any amendment of the Complaint would be futile. *See In re Champion Enterprises,* 145 F.Supp. at 874 (leave to amend may be denied where amendment is futile), *citing Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). First, the Complaint is deficient on multiple grounds; all claims are subject to dismissal because of the plaintiffs' failure to adequately to plead scienter or falsity with particularity. In addition, several allegations are subject to dismissal because they concern forward-looking statements, which are immaterial as a matter of law. It is unlikely that any amended complaint could address all of these deficiencies. *See, e.g., Lemmer v. Nu-Kote Holding, Inc.,* 2001 WL 112577, *12 (N.D.Tex. Sept. 6, 2001) (unpublished disposition) (denying leave to amend due to the extent of the deficiencies).

Second, the plaintiffs have made only a belated and half-hearted request for leave to amend; they have not provided the Court with any information regarding the allegations they seek to add. Plaintiffs' conduct indicates to the Court that the plaintiffs have no serious belief that their additional allegations could survive a motion to dismiss. *See In re: The Vantive Corporation Securities Litigation,* 283 F.3d 1079, 1098 (9th Cir.2002) (the failure by the plaintiffs to indicate what facts they might plead was "a strong indication that the plaintiffs [had] no additional facts to plead ....").; *see also Weber v. Contempo Colours, Inc.,* 105 F.Supp.2d 769, 774 (W.D.Mich.2000) (leave to

amend denied where the plaintiffs did not articulate the allegations they planned to add). The Court thus concludes that amendment of the Complaint would be futile, and the request for leave to amend is *DENIED.*

### III. CONCLUSION

For the foregoing reasons, specifically the reasons set forth in sections II(B) and (C), the Court *GRANTS* the defendant's motion to dismiss the Complaint. This case will be dismissed with prejudice.

IT IS SO ORDERED.

### CERTIFICATE OF SERVICE

A copy of the foregoing Order was filed electronically this *27th* day of *June, 2002.* Parties may access this filing through the Court's system. A copy of the foregoing Order also has been sent by regular U.S. mail, this *27th* day of *June, 2002,* to J. Stephen Barrick, Esq., Gregg C. Laswell, Esq., 1900 Pennzoil Place, South Tower, 711 Louisiana Street, Houston, TX 77002; Conor R. Crowley, Esq., Burton H. Finkelstein, Esq., Duvall Foundry, 1050 30th Street, N.W., Washington, DC 20007.

N.D.Ohio,2002.
In re Century Business Services Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 32254513 (N.D.Ohio)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.