Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
(Cite as: Not Reported in F.Supp.2d)

▷

United States District Court, S.D. Florida.
Steven CHENEY et. al, individually and on behalf of all others similarly situated, Plaintiffs,
v.
CYBERGUARD CORP., Robert L. Carberry, William D. Murray, Patrick O. Wheeler, Shelton James, and KPMG Peat Marwick, LLP, Defendants.
No. 98-6879-CIV-GOLD.

July 31, 2000.

Abraham Rappaport, Boca Raton, FL, Emily C. Komlossy, Ft. Lauderdale, FL, Michael Pucillo, West Palm Beach, FL, for plaintiffs.
David Pollack, Attorney for Cyberguard & Shelton James, Miami, FL, Richard A. Getty, Attorney for William Murray, Lexington, KY, Dirk Lorenzen, Attorney for Patrick Wheeler, Miami, FL, Richard Critchlow, Attorney for Robert Carberry, Miami, FL, Thomas Tew, Joseph A. DeMaria, Co-Counsel for William Murray, Miami, FL, John A. Chandler, Deena R. Bernstein, and Candice C. Decaire, Sutherland Asbill & Brennan LLP, Attorneys for KPMG LLP, Atlanta, GA; Edward Marod, Attorney for KPMG Peat Marwick, West Palm Beach, FL, for defendants.

ORDER ON MOTIONS TO DISMISS AND ESTABLISHING A CASE MANAGEMENT PROCEDURE

GOLD, J.

*1 **THIS CAUSE** is before the court upon the filing of the following motions to dismiss: (1) Defendants Cyberguard Corp. and Shelton James Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 80); (2) Defendant Robert L. Carberry's Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 78); (3) Defendant William D. Murray Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 79); (4) Defendant Patrick O. Wheeler Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 117); and (5) Defendant KPMG Peat Marwick LLP Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 82). Having read the parties' extensive complaint [FN1] and briefing and having held oral argument on these motions on May 5, 2000, the court makes the following findings set forth below.

   FN1. Plaintiffs' voluminous Consolidated and Amended Class Action complaint filed on August 23, 1999 is 145 pages long with 464 individual allegations.

**I. Background** [FN2]

   FN2. For purposes of this motion to dismiss, the court will accept all facts as alleged in plaintiffs' complaint as true. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir.1994). Those facts are summarized and set forth below.

**A. The Defendants**

CyberGuard ("the Company") is a vendor of software designed to protect the security of computer networks. Complaint at ¶ 39. [FN3] Robert Carberry was the Company's Chairman of the Board, President and CEO until the accounting fraud alleged by the plaintiffs was discovered from June 1996 until he was suspended on August 24, 1998. ¶ 44-45. William D. Murray was the Company's CFO from November 19, 1997 until he was suspended on August 24, 1998. ¶ 46. Patrick O. Wheeler was the Company's CFO from April of 1996 until July of 1997, and between July of 1997 and November 3, 1997, Wheeler served as the company's acting CFO and Vice President of North American Sales. ¶ 47. Shelton James was a CyberGuard director and Chairman of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

Company's Audit Committee at all material times. ¶ 48. KPMG was CyberGuard's auditor. ¶ 59.

> FN3. The court will use the shorthand of ("¶ ____.") to cite to relevant portions of the consolidated and amended class action complaint. The court shall set forth the relevant facts taken from plaintiffs' complaint.

### B. The CyberGuard Fraud

CyberGuard is a publicly traded company on the NASDAQ stock exchange. ¶ 67. Plaintiffs have brought this class action on behalf of all persons who purchased publicly-traded CyberGuard common stock at any point during the Class Period (between November 7, 1996 and August 24, 1998) and suffered damage. ¶¶ 1, 63. Plaintiffs allege that beginning on November 7, 1996, CyberGuard began making material misrepresentations and omissions in its press releases, Form 10-K's, and Form 10-Q's. ¶¶ 72-228. The main source of the misrepresentations stem from a fraudulent revenue recognition scheme that overstated revenues, profits, operating income, and net income, and understated the expenses incurred by the Company. ¶¶ 7-10. In violation of Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"), CyberGuard prematurely recognized revenue from purported "sales" of its software products to large resellers who acted as middlemen in the distribution of the Company's products to end users. ¶¶ 10-13. In connection with the Company's dealings with international resellers, which constituted about 60% of the Company's sales, CyberGuard would recognize a shipment to a reseller as a sale even though the resellers were not obligated to pay for the software until such time as it sold the software to the end user. ¶ 9. The revenue recognition policy violated GAAP and was never disclosed to CyberGuard's investors. ¶ 10. As a result, every statement defendants made during the Class Period concerning the Company's revenues, gross profits, gross margins, operating profit, net profit, accounts receivable, current assets, and total assets were materially misleading. ¶ 10.

*2 Despite these fraudulent accounting procedures, KPMG Peat Marwick ("KPMG"), the company's independent auditors, issued a clean audit opinion with respect to the Company's 1997 fiscal year financial statements. ¶ 11. KPMG knew that its clean audit opinion would be included in CyberGuard's fiscal 1997 SEC Form 10-K and Annual Report. KPMG assured investors that the company's management was complying with GAAP, thereby maintaining the inflated price of the Company's stock. ¶ 11. In issuing its clean audit report in 1997, KPMG failed to comply with GAAS. ¶ 12.

On August 19, 1998, KPMG met with CyberGuard's Audit Committee to discuss the revenue recognition policy and to discuss publicly disclosing CyberGuard's fraud. ¶¶ 243-244. On August 21, 1998, citing their "inability to rely on management's representations" KPMG resigned as CyberGuard's auditor. ¶¶ 29, 246, 248. On August 24, 1998, CyberGuard announced that the company had improperly recognized approximately $2.5 million in revenues during the first three quarters of 1998. ¶¶ 249-51. On August 24, 1998 the Board of Directors suspended the CEO, Robert Carberry, and the CFO, William Murray. ¶ 28, 251. Both were eventually terminated. ¶ 28. Shelly James became Chairman of the Board of Directors. ¶ 48.

When another accounting firm was hired to restate the 1997 accounting audit results, plaintiffs allege the restatement contained "glaring discrepancies between the results that KPMG reported were accurately reflected in the Company's financial statements and the results actually generated by the Company, KPMG's clean audit opinion was-at minimum-the product of a grossly reckless audit." Complaint at ¶¶ 433-438. Indeed gross profit was overstated by 20.07%, net loss was understated by 39.65%, and accounts payable was understated by 84.35%. Complaint at ¶ 437. In the wake of the revelation of the accounting fraud and the suspension of the CEO and CFO, CyberGuard's stock fell sharply and the company was removed from the NASDAQ exchange. ¶ 30-31.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
(Cite as: Not Reported in F.Supp.2d)

### C. Procedural Posture

Plaintiffs filed their first class action complaint on August 25, 1998. On September 28, 1998 and on October 21, 1998, the court accepted transfer of and consolidated several similar actions against Cyberguard and the individual defendants that were filed in the Southern District of Florida. On November 23, 1998, the court approved the appointment of the lead plaintiffs and approved their selection of counsel. On August 23, 1999, the plaintiffs filed their consolidated and amended class action complaint. Plaintiffs' complaint alleges violations of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 against all the defendants with an additional count under § 20(a) against the individual defendants. All the defendants subsequently filed motions to dismiss the consolidated and amended class action complaint. The motions to dismiss require consideration of the traditional standard for motions to dismiss, § 10(b), and Rule 10b-5, Fed.R.Civ.P. 9(b), and the heightened pleading requirements under the Private Securities Litigation Reform Act of 1995.

### II. Motion to Dismiss Standard [FN4]

> FN4. In reciting the applicable standards and analyzing the motions to dismiss, the court has relied extensively on the court's opinion in *In re Sunbeam Securities Litigation,* 89 F.Supp.2d 1326 (S.D.Fla.1999). The *Sunbeam* court was faced with facts similar to those in this case.

*3 For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). It is well-settled that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court should ignore those allegations that contain no more than opinions or legal conclusions. *See South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir.1996).

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.,* 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd,* 84 F.3d 438 (11th Cir.1996), *citing* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299 (1990). Where the plaintiff has referred to certain documents in the complaint that are "central to the plaintiff's claim," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks,* 116 F.3d at 1369. In a securities fraud case, when deciding a motion to dismiss, the court also " may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996); *accord Kramer v. Time Warner Inc.,* 937 F.2d 767 (2nd Cir.1991). Thus, the court shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed including SEC filings. *See Malin v. IVAX Corp.,* 17 F.Supp.2d 1345, 1352 (S.D.Fla.1998) (stating that SEC filings required to be filed and actually filed are appropriate for judicial notice, therefore may be considered in evaluating a motion to dismiss).

### III. Standard for Pleading Violations of Section 10(b) and 20(a)

In the complaint, plaintiffs argue that defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (hereinafter "Section 10(b)"), and 17 C.F.R. § 240.10b-5 (hereinafter "Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

10b-5"), by failing to disclose material facts and making false statements regarding the financial status of CyberGuard.

### A. Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. *See* 17 C.F.R. § 240.10b-5. To successfully state a securities fraud claim under Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999). FN5

> FN5. For purposes of this motion to dismiss, the court shall focus primarily on whether plaintiffs have satisfied element number three, the scienter requirement. In their motions to dismiss, defendants do not argue that plaintiffs have failed to satisfy elements two, four, and five; the court therefore assumes for purposes of the motions to dismiss that those elements have been adequately pled in the complaint. Because KPMG only challenges the scienter element, the court will assume the four other elements have been satisfied as to KPMG. Defendants do argue that they have not made any actionable misstatements or omissions. The actionable misstatements and omissions were pled by the plaintiffs against the individual defendants via the "group pleading doctrine." "[U]nder the group pleading doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in day-to-day management of the corporation." *Sunbeam*, 89 F.Supp.2d at 1340. In this case, plaintiffs allege that the failure to disclose the use of the revenue recognition policy and the misrepresentation of hard facts such as Cyberguard's revenue and profits in publicly filed documents signed by or overseen by the defendants is sufficient to establish actionable misstatements or omissions. Although some of the defendants argue that after the Reform Act, the "group pleading doctrine" can no longer be used, *see Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal.1998), the Eleventh Circuit has not specifically addressed the issue and at least one district court in the circuit has assumed the doctrine's continued viability. *See Sunbeam*, 89 F.Supp.2d at 1341. Plaintiffs have adequately alleged that each of the individual defendants, due to their high ranking positions at Cyberguard were involved in controlling the content of the information released by Cyberguard. Finally, although some of the defendants argue that the statements made were "forward looking statements" or were protected by the "bespeaks caution doctrine," 15 U.S.C. § 78u-5, the court concludes that not all the statements or omissions are protected. Plaintiffs sufficiently alleged actual knowledge of falsity from the individual defendants, ¶ 27, plaintiffs have alleged that the defendants were responsible for or signed the various actionable disclosures, the misstatements regarding historical / hard or current facts are not protected, and there appear to be other misstatements that could be found to be unprotected. *See, e.g.,* ¶¶ 187, 208; *see also Sunbeam*, 89 F.Supp.2d at 1339 (citing *Gross v. Medaphis Corp.*, 977 F.Supp. 1463 (N.D.Ga.1997) (the statutory safe harbor does not protect Defendants from liability based on "statements that misrepresent historical /

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 16

Case 1:03-cv-12628-NG    Document 92-3    Filed 01/23/2006    Page 5 of 15

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

hard or current facts.")). The court therefore assumes, for purposes of the motions to dismiss, that the first element has been satisfied as to each defendant.

### B. Federal Rule of Civil Procedure 9(b)

*4 In order to survive a motion to dismiss, plaintiffs' claim of fraud under Rule 10b-5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the " circumstances constituting fraud ... be stated with particularity." *See, e.g., Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). The Rule 9(b) standard assures fair notice to the defendants of the nature of the federal securities claims and the grounds for the claims, such that defendants have adequate information to frame a response. *See Harvey Jasper Retirement Trust v. IVA Corp.,* 920 F.Supp. 1260, 1265 (S.D.Fla.1995). The Rule will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the plaintiffs; and what the defendant "obtained as a consequence of the fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.), *reh'g denied,* 116 F.3d 1495 (11th Cir.1997).

### C. Heightened Pleading Requirements under the Reform Act

Furthermore, the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194-67, 109 Stat. 743, codified at 15 U.S.C. § 78u-4(b) (hereinafter " Reform Act"), establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the Court must dismiss the action. 15 U.S.C. § 78u-4(b)(3). Section 78u-4(b) imposes two requirements. First, the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. 15 U.S.C. § 78u-4(b)(1). [FN6] This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, and thus is even more specific than the Rule 9(b) standard. *Malin,* 17 F.Supp.2d at 1361.

> FN6. Section 78u-4(b)(1) states:
> In any private action arising under this title in which the plaintiff alleges that the defendant-
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Second, the would-be plaintiff, for each alleged misrepresentation, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). [FN7]

> FN7. Section 78u-4(b)(2), Required State of Mind, states:
> In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

### D. Scienter and the Eleventh Circuit's Decision in Bryant

The predicate question presented is what state of mind is required under the statute. When this is determined, the court can evaluate whether the specific facts alleged in the complaint create a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

strong inference that the defendant possessed that state of mind. The Supreme Court has defined scienter in the Rule 10(b) context as a mental state embracing intent to deceive, manipulate, or defraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court expressly left open the question of whether scienter includes, not only intent, but also recklessness. *See McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989) (quoting *Ernst,* 425 U.S. at 193, n. 12, stating that " [w]e need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5."). Pre-Reform Act, the Circuits that had addressed the question had determined that recklessness met the scienter requirement. *See, e.g., Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568-70 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 44-47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Specifically, the Eleventh Circuit held that scienter was satisfied by a showing of "severe recklessness." [FN8] *McDonald,* 863 F.2d at 814.

> FN8. The court further defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald,* 863 F.2d at 814 (citations omitted) (further noting Seventh and Ninth Circuit cases holding that, rather than being merely a greater degree of ordinary negligence, recklessness is closer to a lesser form of intent).

*5 The Eleventh Circuit in *Bryant v. Avado Brands, Inc.* recently reaffirmed the applicability of the " severe recklessness" standard after the enactment of the Reform Act, holding that a "complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under § 10(b) and Rule 10b-5." *Bryant,* 187 F.3d at 1283. Furthermore, in *Bryant,* the Eleventh Circuit stated that while averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285-86. It is from this point that the court begins its analysis.

### IV. Analysis of Plaintiffs' Allegations on Section 10(b) and Rule 10b-5 Claims [FN9]

> FN9. Because the analysis of the § 20(a) claim against each individual defendant depends, in part, on the disposition of the primary § 10(b) and Rule 10b-5 claims, the court shall address the § 20(a) claims at the end of each individual defendant's section.

### A. Robert Carberry

In order to survive a motion to dismiss, plaintiffs must plead facts, not solely based on motive and opportunity evidence, constituting strong circumstantial evidence or reckless or conscious misconduct. *Sunbeam,* 89 F.Supp.2d at 1337. Carberry argues that plaintiffs have failed to adequately plead facts that give rise to a strong inference of scienter. The court is unpersuaded by defendant's arguments.

Plaintiffs' strongest evidence of scienter as to this defendant is the fact that Frank Gelbart, CyberGuard's former Vice President of North American Sales and Marketing, confirmed that he discussed CyberGuard's improper accounting practices with the Company's senior management, and Carberry in particular. Complaint at ¶ 378-386. Gelbart told Carberry that CyberGuard had improperly recognized between $300,000 and $500,000 in revenues during 1996 in violation of GAAP. ¶ 380. Gelbart also specifically told Carberry that CyberGuard had improperly booked

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 7
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

between $100,000 and $150,000 in revenues from software sales to Choreo of Toronto also in violation of GAAP. ¶ 381. Choreo had been told it would not need to pay for the software until such time as it sold the software to end users. *Id.* Gelbart also told Carberry that CyberGuard improperly booked revenues to software sold to Gtech, although Gtech refused to pay for the software because it did not work properly. ¶ 382. In response to Gelbart's report, Carberry told Gelbart not to worry about CyberGuard's accounting practices because they were none of Gelbart's business. ¶ 383. Gelbart also told CyberGuard director David Proctor of the irregularities. ¶ 384. Nothing was changed in CyberGuard, and shortly thereafter, Gelbart was personally fired by Carberry. ¶ 386.

Carberry raises a couple of arguments challenging the relevance of these allegations. First, Carberry argues that plaintiff's allegation is inadequate because it does not establish whether the conversation took place before or after Carberry made public disclosures that were misleading. The court finds that it is not important whether the conversation took place before or after disclosures were made. If the incident took place before the disclosures were made, then it would support the conclusion that Carberry had actual knowledge of the accounting problems and ignored them or was severely reckless in ignoring them. On the other hand, if the incident occurred after the disclosures were made, the fact that Carberry fired Gelbart shortly after their conversation supports the inference that Carberry actually knew about the accounting problems before the disclosures were made and was attempting to silence any dissent by firing Gelbart.

*6 Second, Carberry argues that he was allowed to reasonably rely on the advice of the Company's auditors which, he claims, sanctioned the accounting practices. Some cases suggest that Carberry was not entitled to rely on KPMG's acceptance of the Company's accounting practices. *See, e.g., Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1313-14 (C.D.Cal.1996) ("The fact that Chantal's independent auditor may have approved the accounting methods will not shield Chantal from liability for deception such methods may have caused.") (citing *In re Chambers Devel. Corp. Sec. Litig.,* 848 F.Supp. 602, 611- 13, 619-621 (W.D.Pa.1994)). Indeed, defendant has cited no cases to this court that suggest that he is absolved from liability if he reasonably relied upon an auditor's advice. Moreover, the complaint suggests that KPMG did not know or officially sanction the improper revenue recognition practices used by CyberGuard, and there is no allegation that Carberry sought out an official opinion from KPMG on this issue.

Additional allegations that create a strong inference of scienter from Carberry include the sheer magnitude of CyberGuard's restatement, [FN10] the circumstances surrounding the termination of Carberry after KPMG revealed the accounting problems to the Board, and Carberry's high position in CyberGuard as the CEO who knew or was reckless in not knowing the degree to which the Company's financial statements were being misrepresented.

> FN10. Gross profit was overstated by 20.07%, net loss was understated by 39.65%, and accounts payable was understated by 84.35%. Complaint at ¶ 437. The court can therefore take into consideration the magnitude of the restatement that was necessary. *See, e.g., Sunbeam,* 1999 WL 1223604 at *17 ("The sheer magnitude of the restatements of Sunbeam's financial statements suggests that Arthur Andersen should have known or was severely reckless not to know that its Unqualified Audit Opinion was misleading."); *Carley Capital Group v. Deloitte & Touche LLP,* 27 F.Supp.2d 1324, 1340 (N.D.Ga.1999) ("the Court concludes that the allegations concerning the totality and magnitude of the Defendant's accounting violations constitute strong circumstantial evidence of reckless or conscious misbehavior"). Defendant cites no cases which suggest that the court should not give the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 8
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

magnitude of the restatement any weight; defendant merely argues that the "massive fraud" was fundamentally a single error of a recognition policy approved by CyberGuard's auditors which was compounded by the consistent application of the policy. First, there is no allegation that the policy was explicitly approved by the auditors-part of the complaint suggest it was intentionally hidden from the auditors. Second, defendant's characterization of the recognition policy as a "single error" understates the effect the "error" had on the Company's financial statements.

Carberry also argues that he did not make any materially misleading representations. Carberry argues that the Company's 10-K's and 10-Q's during the class period made a complete disclosure of the accounting methods the company was using. For example, the February 1997 10-Q read in part, " Revenue is recognized from sales when a product is shipped, from rentals as they accrue, and from services and maintenance when performed." Because, defendant argues, the Company made a full disclosure of its accounting practices, there were no omissions or misrepresentations in the Company's publically disclosed documents. Defendant's reasoning is not persuasive. Even though the 10-Q said revenue is recognized when the product is shipped, the 10-Q omitted to say that when the product is shipped to a reseller, the reseller does not have to pay the Company unless it actually sells the product. The 10-Q also omitted and misrepresented the fact that this practice violates GAAP . [FN11] The court therefore denies defendant's motion to dismiss the § 10(b) and 10b-5 claim against Carberry.

> FN11. GAAP provides that revenue should not be recognized until an exchange has occurred, the earnings process is complete, and the collection of the sales price is reasonably assured. Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 5., ¶ 83.... Complaint at ¶ 234.

Finally, because plaintiffs have adequately alleged the underlying § 10(b) claim against CyberGuard and that Carberry, as CEO, had the power to control corporate policy that resulted in the § 10(b) liability, the court cannot dismiss plaintiffs' control person claim under § 20(a) against Carberry. *Brown v. Enstar Group, Inc.,* 84 F.3d 393 (11th Cir.1996).

### B. CyberGuard and Shelton James

#### 1. Cyberguard

*7 As recognized in *Sunbeam,* 89 F.Supp.2d at 1340, the scienter of a corporation's officers can be imputed to the corporation itself under general principals of agency and corporate law. *See also American Standard Credit, Inc. v. National Cement Co.,* 643 F.2d 248, 270-71 n. 16 (5th Cir.1981) (the knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation). Accordingly, because the court found that the plaintiffs' have pled fraud with the necessary particularity and because the court has found that at least one high ranking corporate officer, defendant Carberry, possessed the requisite scienter, CyberGuard's motion to dismiss must be denied.

#### 2. Shelton James

James was an outside director of the Company and Chairman of the Company's Audit Committee at all material times. Whether the court grants James's motion to dismiss depends on whether plaintiffs' complaint shows that James was an active director familiar with the day-to-day activities of the Company or passive director. *See Sunbeam,* 89 F.Supp.2d at 1342 (dismissing claims against Audit Committee members where the defendants where not involved in the day-to-day operations of Sunbeam). Plaintiffs argue that James's level of involvement was comparable to the level of involvement of the Controller in Sunbeam who was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 9

Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

"responsible for monitoring and managing the company's accounting practices." *See Sunbeam,* 89 F.Supp.2d at 1343-44. In support of plaintiffs' contention, plaintiffs' complaint alleges that James was the Chairman of the Audit Committee, ¶ 25, 48-49; James was responsible for "review [ing] the Company's annual financial statements and the independent auditor's report, including significant reporting or operational issues [,] corporate policies and procedures as they relate to accounting and financial reporting and financial controls," ¶ 49; James signed the Company's fraudulent 1997 Form 10-K and was the person that became Chairman after revelation of the Company's fraud. ¶¶ 48, 142, 151. Plaintiffs also suggest that because the company was small in size, James was more involved in its operations.

The court concludes that plaintiffs' allegations are insufficient to support a strong inference that James acted with scienter. There is no allegation that James was involved in the day to day operations of CyberGuard such that it would have been severely reckless for him to not have caught the accounting problems. *In re Oak Technology Securities,* No. 96-20552-SW, 1997 WL 448168, at * 10-11 (N.D.Cal. Aug.1, 1997) ("Allegations that outside directors merely held positions on committees responsible for the preparation and disclosure of a corporation's finances are insufficient to set forth the circumstances constituting fraud with particularity."). While James may have been negligent, plaintiffs' allegations do not provide a strong inference of severe recklessness. There are also no allegations that James actually knew about the accounting practices. "Absent knowledge, an outside director has no duty to insure that all material adverse information about a corporation is conveyed to prospective purchasers of the corporation's stock." *See Jacobs v. Coopers & Lybrand LLP,* No. 97-CIV-3374(RPP), 1999 WL 101772, at * 16-17 (S.D.N.Y. March 1, 1999) (finding that plaintiffs failed to allege a securities fraud claim against a member of the audit committee). The fact that James signed the 10-K is not sufficient to plead intent. *Id.*

*8 The only specific allegations plaintiffs have against James to raise a strong inference of scienter is that James engaged in insider trading. Plaintiffs allege that each time James sold his stock, it was within weeks or days after the Company announced purportedly "improved" or "record" results. ¶¶ 343-344. James reduced his substantial ownership interest to zero prior to the announcement of defendants' accounting fraud and was thus this biggest beneficiary of the fraud. ¶¶ 345-46. " Allegations of unusual insider trading by a defendant during the class period can support a strong inference of scienter." *Lirette,* 27 F.Supp.2d at 283. The plaintiffs, however, bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing. *Id.* (citing *In re Glenayre Tech. Sec. Litig.,* 982 F.Supp. 294, 298-99 (S.D.N.Y.1997)). One fact necessary to a showing of unusualness is the amount of trading that the insider conducted before or after the class period. *Id.* Plaintiffs have not adequately alleged how James's insider selling was unusual, nor have plaintiffs compared James's selling patterns before the class period to James's selling during the class period. Although the plaintiffs allege that the sales occurred "with a few weeks-and often as little as a few days-after the Company announced purportedly 'improved' or 'record' results," plaintiffs do not correlate the sales to the "announcements" they refer to in the complaint. The court therefore cannot conclude that the insider selling alleged by the plaintiffs is unusual. Accordingly, James's motion to dismiss is granted.

Moreover, because the court dismisses the § 10(b) and 10b-5 claim against him, the court also dismisses his § 20(b) claim. *See Malin v. IVAX Corp.,* 17 F.Supp.2d 1345, (S.D.Fla.1998) ("Of course, without a primary violation of the securities laws, there can be no secondary violation under § 20(a).") (citing *Brown v. Enstar Group Inc.,* 84 F.3d 393, 396-97 (11th Cir.1996)).

**C. Patrick O. Wheeler and William D. Murray**

Wheeler was the Company's CFO from April of 1996 until July of 1997. ¶ 47. Between July of 1997 and November 3, 1997, Wheeler served as the Company's acting CFO and Vice President of North American Sales. *Id.* Murray was CyberGuard's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 10
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

CFO from November 19, 1997 until he was suspended by the Company on August 24, 1998 after the accounting problems became public. ¶ 46. Some time after August 24, 1998, Murray was terminated. *Id.*

The allegations against Murray and Wheeler were pled under the "group pleading" doctrine, with each defendant responsible for the material misrepresentations and omissions made during his tenure as an officer. With the exception of the fact that Murray was terminated by the Company and the fact that Wheeler apparently remains employed by the Company, all allegations against these defendants are the same. Plaintiffs therefore want the court to find scienter as to these defendants based on their position as CFO and their involvement in the day-to-day management of the financial aspects of CyberGuard, the sheer magnitude of the restatement that had to be done after the fraud was uncovered, CyberGuard's admission that it reported false financial results, their access to internal financial information and their responsibility for reports to the SEC, and their motive and opportunity based on their compensation being tied to the Company's performance.

*9 The court concludes that plaintiffs have failed to adequately allege Wheeler's and Murray's scienter, because plaintiffs essentially rely solely on defendants' position as CFO to create a strong inference of scienter. As CFO, Wheeler signed the materially misleading SEC statements: the 10-Q's on November 14, 1996, ¶ 80, February 14, 1997, ¶ 102, and May 1997, ¶ 122, and the September 1997 10-K, ¶ 149. When Murray became CFO, he signed the November 1997 10-Q, ¶ 178, the February 1998 10-Q, ¶ 197, and the May 1998 10-Q, ¶ 214. First, it is well-established that " [a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)." *In re Cendant Corporation Securities Litigation,* 76 F.Supp.2d 539, 547 (D.N.J.1999); *see also Kennilworth Partners L.P. v. Cendant Corp.,* 59 F.Supp.2d 417, 428 (D.N.J.1999) (refusing to find required level of scienter where plaintiff alleged that the CUC directors signed the Cendant 10-K and "had access to facts in their roles as directors or officers of Cendant"); *In re Criimi Mar, Inc. Securities Litigation,* 94 F.Supp.2d 652, 661 (D.Md.2000) (simply because defendants held positions of control, were involved in day-to-day activities, and signed SEC filings are not sufficient, without more, to raise a strong inference of scienter; "if they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud."); *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 (D.Mass.1998) (rejecting attempt to plead scienter by asserting that CEO and CFO "were privy to confidential proprietary information concerning the company and its operations, finances, financial condition, products and business prospects."). In light of these cases holding that position as an insider, without more, is insufficient, the court is faced with the question it specifically asked the parties to address in oral argument: "what is more?"

The court concludes that plaintiffs have failed to make significant additional allegations, aside from Wheeler's and Murray's position as CFO, to raise a strong inference of severe recklessness. First, plaintiffs' allegations are devoid of any suggestion that Wheeler or Murray had actual knowledge or were directly informed of the GAAP or GAAS violations. The inference plaintiffs wish the court to make from the complaint is that by virtue of their positions as CFO, they were severely reckless in not knowing about the violations. As shown above, reliance on their high level position is not enough. Second, while plaintiffs attempt to allege a motive to commit fraud by pointing to defendants' compensation packages, there are no allegations that defendants actually benefitted from the fraud or that defendants took advantage of inflated stock prices to sell their own stock. Finally, the court concludes that the fact that Murray was terminated by CyberGuard after the fraud was uncovered is not sufficient to raise a strong inference of scienter, even when this fact is considered together with plaintiffs' other allegations. The court therefore concludes that plaintiffs have failed to allege that Wheeler or Murray acted with scienter. [FN12] Accordingly, Murray's and Wheeler's motion to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

dismiss is granted. Because plaintiffs have failed to allege an underlying 10(b)-5 claim, plaintiffs' claim under § 20(A) must fail as well. *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1351 (S.D.Fla.1998).

> FN12. Plaintiffs cite to *In re WRT Energy Securities Litigation,* No. 96-CIV-3610(JFK), 96-CIV-3611(JFK), 1999 WL 178749, at *13-14 (S.D.N.Y.1999) to support their argument that a CFO had to have known that financial information submitted to the SEC was erroneous. In *WRT,* the court had more particularized allegations as to the CFO. The court had a bankruptcy examiner's report which noted that in the context of an illegal payment to an outsider, the CFO has aware of the accounting errors and the misleading content of WRT's books. The Complaint also alleged that the Cfo was personally involved in directing improper payments by WRT, and the CFO stated in a press release issued at a time the company was in financial trouble that the company was expecting increases in revenue. Moreover, unlike the Controller in *Sunbeam* who was intimately responsible for monitoring and managing the company's accounting practices, the CyberGuard plaintiffs' complaint does not allege that the CFOs were directly responsible for the accounting practices. *Sunbeam,* 89 F.Supp.2d at 1343-44. Additionally, in *Sunbeam,* the controller ignored a *Barron's* article which alleged accounting improprieties. *Id.* No such allegation was made in this case.

### D. KPMG Peat Marwick LLP

*10 Defendant KPMG Peat Marwick argues that plaintiffs have failed to establish scienter. KPMG reduces plaintiffs' allegations of scienter to KPMG's publication of inaccurate accounting figures and its failure to follow accounting and auditing principles. KPMG does not deny that it violated accounting and auditing principles in reviewing CyberGuard's books. Nor does it deny plaintiffs' allegation that its Unqualified Audit Opinion validating Cyberguard's financial reports proved to be materially false and misleading. KPMG does, however, argue that these allegations are insufficient to establish scienter.

In a section of their amended complaint titled " Additional Facts that Support the Conclusion KPMG Acted with Scienter," as well in other portions of the amended complaint, plaintiffs allege:
[I]n connection with the Company's dealing with its international resellers, CyberGuard adopted and implemented a policy of prematurely recognizing revenues as soon as software was shipped although Defendants knew that Company would be paid for that software only if the resellers were successful in selling it to end users.... Complaint at ¶ 9.
KPMG's audit failed to comply with GAAS because: a) KPMG either failed to communicate with the Company's international resellers in order to determine what the terms of their payment obligations to CyberGuard were or conducted such communications but nevertheless permitted the Company to continue its fraudulent accounting practices; b) KPMG either failed to undertake adequate testing to determine the reasons why accounts receivable attributable to the Company's international resellers were not being paid or recognized that the resellers had no obligations to pay those accounts receivable yet permitted the Company to continue to account for its revenues and accounts receivable in a fraudulent manner.... Complaint at ¶ 13.
Although the CyberGuard Defendants' fraud was widespread, it was by no means sophisticated.... KPMG could ... have discovered the existence of the CyberGuard Defendants' fraud merely by contacting the Company's resellers and making inquiries regarding the terms of their payment obligations to CyberGuard. GAAS required that those precise steps be undertaken.... Complaint at ¶¶ 426-27.
The CyberGuard Defendants' fraud was also easily detectable because it related to transactions involving significant dollar amounts.... Accordingly, because the Company's revenues during the 1997 fiscal year ranged roughly between $2.6 million and $4.9 million per quarter, those revenues were generated with a relatively small number of transactions. Thus, any appropriately-designed audit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 12
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

... would have disclosed that approximately 10% of the revenues recorded by the Company during fiscal year 1997 had not been realized. Complaint at ¶¶ 428-29.
KPMG also was aware that the Individual Defendants possessed financial motives to engage in fraudulent accounting, particularly as a result of the efforts that CyberGuard was undertaking throughout the Class Period to locate an acquirer or merger partner. In such circumstances, the possibility of management utilizing fraudulent accounting practices is particularly strong. As a result, KPMG was required by AU §§ 150.02, 311.07 and 311.06 to give such factors heightened consideration in planning its audit. Complaint at ¶¶ 421-22. Although numerous CyberGuard employees informed the company's senior management that CyberGuard was engaging in improper revenue recognition and improperly reporting accounts receivable (paragraphs 371-393), no steps were undertaken by management to terminate that practice.... Despite the existence of those patent deficiencies in the Company's accounting controls, KPMG issued a clean audit opinion ... without undertaking the fundamental and necessary step of communicating with the Company's non-officer accounting personnel regarding CyberGuard's compliance with GAAP.... Complaint at ¶¶ 415-416, 164(g).

*11 Plaintiff's complaint also alleges that when another accounting firm was hired to restate the 1997 accounting audit results, the restatement contained "glaring discrepancies between the results that KPMG reported were accurately reflected in the Company's financial statements and the results actually generated by the Company, KPMG's clean audit opinion was-at minimum-the product of a grossly reckless audit." Complaint at ¶¶ 433-438. Indeed gross profit was overstated by 20.07%, net loss was understated by 39.65%, and accounts payable was understated by 84.35%. Complaint at ¶ 437.

As outlined above, plaintiffs' primary complaints against KPMG involve violations of GAAP and GAAS. Those violations alone are insufficient. " [Courts uniformly hold that allegations of GAAP and GAAS violations are insufficient, without more, to state a securities fraud claim." *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 362 (1st Cir.1994); *see also Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994) (" boilerplate averments that the accountants violated particular accounting standards are not, without more, sufficient to support inferences of fraud"); *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982) (holding that allegations concerning violations of general accounting principles do not plead securities fraud in conformance with Rule 9(b)); *Greebel v. FTP Software, Inc.,* 182 F.R.D. 370, 375 (D.Mass.1998) (scienter cannot be established by "generalized allegations of GAAP violations"). Indeed, GAAP or GAAS violations may show that an auditor or accountant was grossly negligent, however, without more, there cannot be a strong inference of scienter. *See Reiger v. Altris Software,* No. 98-CV-528-TW-JFS, 1999 WL 540893, at *7 (S.D.Cal. April 30. 1999) ("[A]llegations that an accountant or auditor conducted an inadequate audit by violating accounting or auditing principles do not, without more, adequately plead a strong inference of scienter.").

In order to create the strong inference of scienter required, plaintiffs must show more than the existence of GAAP or GAAS violations. Plaintiffs attempt to show "more" by pointing to "red flags" that plaintiff claim KPMG ignored. [FN13] Courts have found that GAAP or GAAS violations accompanied by ignorance of "red flags" could be sufficient to state a claim for securities fraud against an independent accountant. *See, e.g., In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 203 (E.D.N.Y.1997) (violations of auditing principles coupled with ignorance of "red flags," including an analyst letter warning accounting firm of artificially inflated accounts receivable levels was sufficient to create a "strong inference" of recklessness); *Retsky Family Limited Partnership v. Price Waterhouse, LLP,* No. 97-C-7694, 1998 WL 774678, at * (N.D.Ill. Oct.21, 1998) (where allegations that the accounting firm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d	Page 13

Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

was aware of the financial irregularities, noted in each case the GAAP which barred revenue recognition, and concluded in one case that premature revenue recognition was inappropriate were sufficient to allege scienter). In this case, plaintiffs do not allege that KPMG ever had any actual knowledge of the revenue recognition policy Cyberguard was using. Even though Gelbart expressed his concerns about the policy to Cyberguard management, there is no allegation that KPMG was ever approached by any employee of Cyberguard with the information.

> FN13. *See* discussion of "red flags" on pages 24-25, *infra.*

*12 Plaintiffs raise three examples of red flags that KPMG allegedly ignored. Plaintiffs first point to CyberGuard's lack of internal controls. Plaintiffs claim that KPMG either knew or blinded itself to the fact that CyberGuard lacked internal controls. ¶ 414. In violation of GAAP, CyberGuard failed to communicate with CyberGuard's non-officer accounting personnel about CyberGuard's compliance with GAAP. ¶ 416. Plaintiffs again point to the fact that Gelbart discussed the improper accounting practices with senior management. ¶ 423. The second red flag was that KPMG was aware that CyberGuard was under pressure to raise additional financing to fund money-losing operations, and KPMG was aware that CyberGuard had motives to engage in fraudulent accounting because CyberGuard was attempting to locate an acquirer or merger partner. ¶ 420-22. KPMG was therefore "required to give such factors heightened consideration in planning its audit." ¶ 422. Finally, the plaintiffs point to the basic nature of CyberGuard's fraud and that in violation of GAAP, KPMG failed to directly contact CyberGuard's resellers and make inquiries regarding the terms of their payment obligations to CyberGuard. ¶ 426-29. The fraud was obvious and easily discoverable, and KPMG therefore either knew about it or was reckless in ignoring it. ¶ 430-33.

The court concludes that these "red flags" are insufficient to support a strong inference of scienter. First, these allegations are simply a recitation of additional GAAP violations. As stated above, GAAP violations alone are insufficient to support an inference of scienter. Second, "the flaw in these allegations is that a plaintiff cannot plead scienter by merely alleging that later disclosed information ' would have been' discovered earlier if the auditor had not violated GAAS." *Reiger,* 1999 WL 540893 at *8. "Not only does this type of pleading constitute fraud by hindsight, but it establishes nothing more than ordinary negligence." *Id.* Finally, the magnitude of the restatement does not, without evidence that the auditor was aware of the falsity of the original statements, raise an inference of scienter. *Id.*

Although plaintiffs have sought to mirror the allegations in *Sunbeam,* 89 F.Supp.2d at 1344-1347, that case is distinguishable. The main difference between *Sunbeam* and this case is that in *Sunbeam,* the accounting firm, Arthur Anderson, had been " tipped off" by a Sunbeam employee that Sunbeam had overstated its restructuring reserves and Arthur Anderson ignored the information and issued its Unqualified Audit Opinion. *Id.* In *Sunbeam,* Arthur Anderson failed to follow up on allegations contained in an article in *Barron's* magazine that accused Sunbeam of manipulating its interim financial statements. *Id.* There are no allegations that KPMG was ever told about the revenue recognition policy. In this case, plaintiffs have pled GAAP and GAAS violations that are insufficient to raise a strong inference of scienter. Finally, the court concludes that the fact that KPMG discovered and revealed the revenue recognition policy the following year counters an inference of scienter. Accordingly, KPMG's motion to dismiss is granted, and plaintiff's complaint against KPMG is hereby dismissed with prejudice.

### V. Leave to Amend

*13 All dismissals of complaints against the defendants in this order are with prejudice. No amendments shall be allowed. There was no indication in the plaintiffs' responses or at oral argument that the plaintiffs could file an amended complaint to assert new allegations that would comply with the PSLRA's heightened pleading

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 14
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

standard. Accordingly, no further amendments shall be allowed. *See, e.g., Bryant v. Apple South, Inc.,* 100 F.Supp.2d 1368, 1386 (M.D.Ga.2000).

### VI. Rule 16 Joint Scheduling Report

The remaining parties are directed to confer and file a joint proposed scheduling report by filling out the appendix attached to this order. The appendix shall be due within 10 days of this order.

**WHEREFORE, IT IS ORDERED THAT:**
1) Defendants Cyberguard Corp. and Shelton James Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 80) is GRANTED as to Shelton James and DENIED as to CyberGuard.
2) Defendant Robert L. Carberry's Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 78) is DENIED.
3) Defendant William D. Murray Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 79) is GRANTED.
4) Defendant Patrick O. Wheeler Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 117) is GRANTED.
5) Defendant KPMG Peat Marwick LLP Motion to Dismiss Consolidated Amended Class Action Complaint (DE # 82) is GRANTED.
6) Defendant Murray's motion to exceed page limit for reply to supporting motion to dismiss (DE # 131) is GRANTED *nunc pro tunc.*
7) The parties are directed to file with the court a completed joint scheduling report establishing a proposed case management schedule in accordance with Rule 16 within 10 days of this order.

### APPENDIX I

| **DATE** | **ACTION** |
| --- | --- |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 15
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258
**(Cite as: Not Reported in F.Supp.2d)**

| | |
|---|---|
| By | All non-dispositive pretrial motions (including motions pursuant to Fed.R.Civ.P. 14, 15, 18 through 22, and 42 motions) shall be filed. Any motion to amend or supplement the pleadings filed pursuant to Fed.R.Civ.P. 15(a) or 15(d) shall comport with S.D .Fla.L.R. 15.1 and shall be accompanied by the proposed amended or supplemental pleading and a proposed order as required |
| By | Plaintiff shall furnish opposing counsel with a written list containing the names and addresses of all expert witnesses intended to be called at trial and only those expert witnesses listed shall be permitted to testify. |
| By | Defendant shall furnish opposing counsel with a written list containing the names and addresses of all expert witnesses intended to be called at trial and only those expert witnesses listed shall be permitted to testify. |
| By: | The parties shall comply with S.D.Fla.L.R. 16.1 K concerning the exchange of expert witness summaries and reports. This date shall supercede any other date in local rule 16.1 K. |
| By | All expert discovery shall be completed. |
| By | All non-expert discovery shall be completed. |
| By | All dispositive pretrial motions and memoranda of law must be filed. **If any party moves to strike an expert affidavit filed in support of a motion for summary judgment** [for reasons stated in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company, Ltd. v. Carmichael,* --- U.S. ----, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ], **the motion to strike shall be filed with that party's responsive memorandum.** |
| By | Mediation shall be completed. |
| By | **Pretrial Stipulation and *Motions in Limine.*** The joint pretrial stipulation shall be filed pursuant to S.D.Fla.L.R. 16.1(E). In conjunction with the Joint Pretrial Stipulation, the parties shall file their motions in limine. |
| By | Proposed pretrial conference date |
| By | Proposed trial date |

S.D.Fla.,2000.
Cheney v. Cyberguard Corp.
Not Reported in F.Supp.2d, 2000 WL 1140306 (S.D.Fla.), Fed. Sec. L. Rep. P 91,258

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.