Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, D. New Hampshire.
GROSS
v.
SUMMA FOUR, INC., et al.
**Civil No. C-94-364-B.**

Nov. 8, 1995.

MEMORANDUM AND ORDER

BARBADORO, District Judge.
*1 This is a securities class action brought by David Gross as representative of an uncertified class, against Summa Four, Inc., and certain of its officers and directors [FN1] ("the Defendants"), for claims arising under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78t(a) (West 1981), Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (1994), and related common law. Gross alleges, on behalf of all persons who purchased the common stock of Summa Four from January 18, 1994 through July 5, 1994 ("the Class Period"), that the Defendants perpetrated a fraud-on-the-market. Specifically, he claims the Defendants falsely and recklessly mislead the investing public through statements and omissions made during the Class Period which artificially inflated the market price of the company's common stock. The Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), after plaintiff filed his first amended complaint. For the following reasons, I grant Defendants' Motion to Dismiss.

I. FACTUAL BACKGROUND

Because this case is before me on the Defendants' motion to dismiss, I recite the extensive factual background in the light most favorable to the plaintiff. *Berniger v. Meadow Green-Wildcat Corp.,* 945 F.2d 4, 6 (1st Cir.1991) (court must accept all facts in complaint as true, drawing all reasonable inferences in plaintiff's favor).

A. *Summa Four*

Summa Four is a Delaware corporation with its principle executive offices located in Manchester, New Hampshire. It develops, distributes, and services, both domestically and internationally, switching systems and advanced signaling solutions for telephone companies. ¶¶ 12, 34, 35. [FN2] Sales of its products are directly to end-users of these systems as well as through telecommunications systems integrators, including IBM and Digital Equipment Corporation. ¶ 35. The SDS series of distributed switching systems and the Portico SS-7 internetworking product are its leading products. ¶ 36.

On September 23, 1990, Summa Four completed its initial public offering ("IPO") and provided a prospectus in which it portrayed the company as expanding and "poised for rapid growth." ¶ 38. The individual defendants sold a portion of their common shares into the IPO, but retained a substantial quantity of those shares. ¶ 39. As provided in a "lock-up" agreement, these retained shares could not be sold until 180 days after the date of the IPO prospectus. ¶ 39.

In late 1993, the company, through its officers as well as press releases, touted the progress and prospects of the company. ¶¶ 40-41. Summa Four had regular, extensive, and non-public contact with various stock market professionals, analysts, and money managers, including analysts from Montgomery Securities and Cruttenden & Co. ¶ 42. At least with respect to the analysts from Cruttenden & Co., Summa Four conveyed detailed information regarding its business and operations not available to the public. ¶ 42. As a result of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

these contacts, the analysts released "extremely positive" reports. Newspapers, including the *Manchester Union Leader,* quoted these statements in articles printed during October 1993. ¶ 43.

*2 On November 15, 1993, Summa Four issued a press release indicating that it had entered into a world wide cooperative agreement with IBM, with initial orders over $1 million. ¶ 44. In December, the company issued another press release announcing expansion of its European operations and also highlighting the rapidly growing market share and opportunities of Summa Four. ¶¶ 45-46.

B. *The Class Period*

During the Class Period, the Defendants, as well as market analysts, made numerous positive statements concerning the company's financial position, market potential, and sales. ¶¶ 48-60. Contemporaneously, Summa Four was actually experiencing downward trends evidenced by facts and events not disclosed to the public. ¶¶ 61-98. During the Class Period, on May 27, 1994, Gross purchased 200 shares of Summa Four Common Stock at $27.5625 per share. ¶ 11.

1. *Statements by the Defendants*

On the first day of the Class Period, January 18, 1994, Summa Four issued a press release containing several statements. ¶¶ 48-50. The press release announced the company's results for the end of its third fiscal quarter, stating that its revenues were $7,277,000 and its net income was $1,852,000. In addition, the president of Summa Four stated: "We are also *seeing increased demand* for our SDS distributed switch in a number of international markets." (emphasis added). He continued, "[t]he SDS distributed switch *is becoming* the platform of choice." (emphasis added). Finally, the release noted that Summa Four had received orders from Unisys, Sprint, IBM, DEC, Pacific Bell, US West and AT & T.

The Defendants made several statements in the Spring of 1994. ¶¶ 52-55. On April 25, 1994, they introduced a new product, stating that it was a revolutionary product and would put "carriers in a position to win back [lost] customers by providing flexible cost-effective access to overlay network services." Shortly thereafter, the Defendants reported their fourth quarter, year-end operating results for fiscal 1994, reporting revenues of $8,344,000 and net income of $1,675,000 for the quarter, and revenues of $27,257,000 and net income of $5,287,000 for the year.

In a press release issued the same day, the Defendants stated: "We see the current market continuing to expand over the next several years.... We continue to be enthusiastic about our opportunities to grow over the next several years."
¶ 54. Furthermore, the Defendants stated they had received "significant orders" for "new and existing applications, domestically and internationally," from AT & T, McCaw, Sprint, GTE, Unisys and IBM. ¶ 55.

Finally, the Defendants made statements in the 10-k form submitted to the Securities and Exchange Commission ("SEC") and in a letter to shareholders accompanying the 1994 Annual Report issued June 29, 1994. ¶¶ 59-60. In the 10K form, filed two weeks before the end of the quarter, the Defendants described the company in an optimistic light, stating more than once that it "anticipated growth." Likewise, in its letter to shareholders the tone was optimistic: "We have a ... strong financial position"; "We continue to be enthusiastic about our opportunity to grow over the next several years"; "Our major goal in Fiscal Year 1995 is to continue to further leverage our market leadership position as the telecommunications industry continues to expand worldwide."

2. *Statements by analysts*

*3 Montgomery Securities issued three favorable analyst reports regarding Summa Four, dated January 19, 1994, May 4, 1994, and May 31, 1994, based in large part on the Defendants' public statements and private communications between the individual defendants and analysts at Montgomery.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 3
Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

¶¶ 51, 56, 57. The January report included the following statements: "SUMA [sic] business is very strong"; "We have increased our revenue and EPS estimates"; "For FY:1995 we have increased our revenue and EPS forecasts"; "The company is performing well with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:95 forecast."

The May 4th report expressed similar optimism, stating: "SUMA [sic] business remains strong"; "We have increased our revenue estimates ... and we have also increased our fiscal 1995 revenue estimate "; "The company is performing well, with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:1995 forecast."

Finally, Montgomery issued a report on May 31st stating: "The Company's intermediate to long-term prospects have never looked brighter"; "The VCO [product] is an important product and should result in a greater than doubling of SUMA's [sic] addressable market to more than $300 million." In addition, the report cited a deal with AT & T which Montgomery believed had potential to Summa Four of "perhaps greater than $10 million over an 18-24 month period."

### 3. *Undisclosed, adverse facts*

Plaintiff delineates several facts, relying primarily on internal budgetary reports, which allegedly indicate that the true state of affairs experienced by Summa Four during the Class Period belied the positive statements and optimistic predictions disseminated by the Defendants and analysts. ¶¶ 61-98. Specifically, the company was unable to meet internally budgeted results of operations, the Defendants employed, or authorized, the use of undisclosed or unauthorized accounting procedures which created a false and misleading impression of its growth and prosperity and the company's international operations were "in a state of disarray and ... had a materially negative effect upon the Company's results during the Class Period." ¶ 61.

(a) Summa Four was consistently off-budget during the Class Period

In December 1993, the company made an adjustment for income tax which "enabled the Company to meet or exceed analysts' predictions with regard to the Company's operating results." According to the company's internal reports, dated January 20, 1994, December 1993 revenues were $68,000 below projections, general and administrative expenses were $11,000 over budget, and research and development expenses were $37,000 over budget. Similar results were reported for the quarter ending December 31, 1993. In addition, the report indicated that for the previous nine months the company had experienced " significant cost overruns," totalling $746,000 over budget.

*4 Both Summa Four's Monthly Operating Report and its Revised Flash Report for January 1994, indicated that revenue, gross margin, and net income fell below the forecasted budget. A similar assessment was made of the company's situation in February 1994. The company's president acknowledged to the Board that several major orders were delayed and that he would have to adjust downward the quarterly bookings forecast.
¶ 70. By March 1, 1994, Summa Four was $2,019,000, or 43.66%, behind budgeted revenues for the fourth fiscal quarter. Gross margin as well as research and development expenses were below budget by similar percentages. The February Flash Report stated that projected operating profit for the fiscal year ending March 31, 1994, was $532,000, or 13.51%, under budget. Net income reflected similar shortfalls. These trends continued through March and April of 1994.

(b) Improper recognition of revenue during the Class Period

According to GAAP and FASB, a company must wait in most cases until goods are shipped in order to recognize revenue for accounting purposes. ¶¶ 110-111. In conformance with these principles, Summa Four's 10K form for fiscal 1994 states that " [r]evenue from product sales is recognized

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 4

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

generally on shipment." Nevertheless, plaintiff contends that Summa Four improperly recognized revenue as soon as orders were received. As a result, plaintiff contends that Summa Four materially overstated its revenues during the class period. It supports this assertion with allegations that minutes for Summa Four's June 20, 1994, board meeting state that a draft revenue recognition policy had been prepared for review which "is a more formalized and somewhat more restrictive policy than was previously in place." Plaintiff also cites to a statement allegedly made by defendant Fiedler at a June 19, 1995 board meeting in which Fiedler claimed that Summa Four might be able to generate up to $4.7 million in revenues in two weeks from " orders" which had not yet been received. Since the complaint alleges that Summa Four does not ship goods until long after orders are received, plaintiff contends that this statement is evidence of Summa Four's overstatement of revenues.

(c) International operations in disarray

In its Monthly Operating Report dated January 20, 1994, the company commented that "overall international sales and marketing efforts are currently under review and will be revised." In the February 25, 1994 Operating Report, the company stated that it planned "a major reorganization of sales responsibilities ..." in March. The refocusing of sales and marketing efforts in their international subsidiary was confirmed in the company's March Operating Report. In addition, Summa Four fired its Managing Director of European Operations that month as well as two other management team members. The company appointed a new managing director that same month.

In addition, there were indications of slow-downs with respect to certain international customers as of January 1994. In June 1994, the Board dispatched one individual "to check one more time to see if all international opportunities are abandoned at this time."

4. *The July 5, 1994 Announcement*

*5 As of the June 6, 1994 "Watch Meeting," Summa Four had only shipped $4,298,720 in products, although the quarter was two thirds complete and the predicted revenues were $8.7 million by analysts and $9.025 million by the company for that quarter. The company revised its expectations for the quarter setting an additional $3.6 million in shipments as its goal for the remainder of the quarter.

On June 14, 1994, the Board convened by phone to address the issue again. It was determined at this point in the quarter that revenues would reach only $7.7 to 7.8 million which fell 11.49% and 14.68% behind analysts and company estimates respectively. The below budget prospects were attributed to internal disruptions experienced by regular customers as well as international orders being received at a slower rate than expected.

The Board determined that any insider trading at this point would be inappropriate and further discussed this issue at a meeting on June 20, 1994.
At that meeting the Board also discussed the prospect of making an announcement concerning financial performance and guidelines for such announcements. No decision was reached at that meeting, but further review was undertaken in the subsequent weeks.

In its July 5th announcement the Defendants stated that they anticipated net revenues for the first fiscal quarter 1995 of between $7,400,000 to $7,600,000, and net earnings of $875,000 to $1,000,000. These projected results contrasted with analysts' projections which placed revenue estimates at $8.7 million for that quarter.

Following the announcement, the company's stock experienced a rapid sell-off resulting in a single-day decline of 46.6% in Summa Four's market price.

C. *The Aftermath*

The company reported its earning for the first quarter 1995 on July 19, 1994, which confirmed its announcement made earlier that month. Summa Four replaced its president that month and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 5

Not Reported in F.Supp., 1995 WL 806823 (D.N.H.), Fed. Sec. L. Rep. P 98,999
**(Cite as: Not Reported in F.Supp.)**

attributed its failure to attain projections for that quarter on "longer than anticipated negotiation and procurement processes" of certain major customers. This assessment was echoed by analysts' reports later that month which also contained revised estimates of the company's future prospects. These revisions, even taking into account the delays, showed a 23.91% decrease in estimated projected earnings per share from previous estimates. Estimates of revenue generating EPS were also adjusted downward representing an 8.97% and a 13.79% decrease in revenues and earnings per share respectively.

According to Montgomery Securities, two of the six contracts needed to be closed in order for Summa Four to meet the original projections for that quarter. In contrast, Summa Four closed only one of the six contracts.

Summa Four also attributed its poor first quarter of 1995 to decreased unit shipments of its SDS-1000 product in its Form 10-Q filed with the SEC on August 11, 1994. This statement is in contrast to its statements in December 1993 and March 1994 attributing increased revenues to the sale of its SDS products.

## II. STANDARDS OF REVIEW AND ELEMENTS OF THE CLAIM

**\*6** Defendants argue that the complaint should be dismissed pursuant to Rule 12(b)(6) because it fails to state a claim and pursuant to Rule 9 because it fails to plead fraud with particularity.

### A. *Federal Rules of Civil Procedure 12(b)(6) and 9(b)*

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to review the allegations of the complaint in the light most favorable to the plaintiff, accepting all material allegations as true, with dismissal granted only if no set of facts entitles plaintiff to relief. *E.g., Berniger,* 945 F.2d at 6; *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

In the context of a motion to dismiss a claim of fraud or misrepresentation, however, the claim must also meet the special pleading requirements of Fed.R.Civ.P. 9(b). *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991); *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). While the term "fraud" need not appear in the complaint, Rule 9 requires that the circumstances indicating fraud be stated with particularity. *Simcox v. San Juan Shipyard, Inc.,* <A HREF="http://www.