**Westlaw.**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court,D. Massachusetts.
    Kathleen GUERRA, Individually and on behalf of
        all others similarly situated, Plaintiffs,
                            v.
        TERADYNE INC., et al., Defendants.
                **No. Civ.A. 01-11789-NG.**

                    Jan. 16, 2004.

Nancy F. Gans, Milberg Weiss Bershad &
Schulman LLP, Thomas G. Shapiro, Shapiro Haber
& Urmy LLP, Boston, MA, for Plaintiffs.
Jordan D. Hershman, Testa, Hurwitz & Thibeault,
LLP, Boston, MA, for Defendants.

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED COMPLAINT IN
            ITS ENTIRETY

DEIN, Magistrate J.

### I. INTRODUCTION

*1 This matter is before the court on "Defendants'
Motion to Dismiss the Consolidated Amended Class
Action Complaint in its Entirety" (Docket # 32).
This class action suit is brought pursuant to
Sections 10(b) and 20(a) of the Securities Exchange
Act of 1934 (the "Act"), 15 U.S.C. §§ 78j(b) and
78(t)(a), and Rule 10b-5 promulgated by the
Securities and Exchange Commission, 17 C.F.R. §
240.10b-5. (*See* Consolidated Amended Class
Action Complaint (Docket # 28) (hereinafter "
Compl.") ¶ 14). Plaintiffs consist of all purchasers
of the common stock of Teradyne, Inc. ("Teradyne"
) between July 14, 2000 and October 17, 2000,
inclusive (the "Class Period"). (*Id.* ¶ 1). The
defendants are Teradyne and two individuals:
George Chamillard, who served as Teradyne's

President and Chief Executive Officer, and Michael
A. Bradley, the company's Vice President and Chief
Financial Officer. (*Id.* ¶¶ 20-21). For the reasons
detailed herein, this court recommends to the
District Judge to whom this case is assigned that the
Motion to Dismiss be ALLOWED, except that this
court recommends, contrary to the defendants'
request, that the dismissal be without prejudice.

### II. STATEMENT OF FACTS 1

FN1. This court has ruled on "Plaintiffs'
Motion to Strike Certain Exhibits Included
in Defendants' Appendix" (Docket # 41) in
a separate order issued on this date. This
statement of facts is premised on that order.

In this action, plaintiffs contend that Teradyne made
material misrepresentations of fact and/or failed to
disclose material information, as a result of which
investors during the Class Period were misled as to
the true financial condition of the company. The
plaintiffs are seeking to hold defendants Chamillard
and Bradley liable as "control persons" under § 20
of the Act. The specific challenged statements will
be discussed *infra.* The following facts, taken from
the Complaint, are intended to put the plaintiffs'
claims in context. Where, as here, the court is
addressing a motion to dismiss based on
Fed.R.Civ.P. 12(b)(6), the facts alleged in the
complaint will be viewed in the light most favorable
to the plaintiffs. *In re Cabletron Sys., Inc.,* 311 F.3d
11, 22 (1st Cir.2002), and cases cited.

Teradyne, a Massachusetts corporation, "describes
itself as the largest manufacturer of semiconductor
test systems in the world." (Compl.¶ 36). It is
principally engaged in the design, manufacture and
marketing of automatic test equipment and related
software for the electronics and communications
industries. (*Id.*) The company's principal products
include semiconductor test systems; backplane

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

connection systems; circuit board test systems; telecommunications test systems; and software test systems. (*Id.*) Before and during the Class Period, approximately two-thirds of the company's revenue was derived from semiconductor test systems; the remaining revenue was from backplane assemblies (21%), circuit board test systems (6%), software test systems (3%), and telecommunications test systems (2%). (*Id.* ¶ 38). Before the Class Period, " Teradyne experienced a period of tremendous and unprecedented growth." (*Id.* ¶ 3). On January 18, 2000, Teradyne announced "record" orders for the fourth quarter of 1999 (4Q99) totaling $685 million, as well as "record" sales of $548.5 million and "record" net income of $75.2 million. (*Id.* ¶¶ 3, 39). The following quarter (1Q00), Teradyne again reported "record" results with $1.042 billion in orders, $648.1 million in sales and net income of $109.1 million. (*Id.*) According to the plaintiffs, the growth "was fueled in large part by sales of Teradyne's high margin 'Catalyst' product." (*Id.* ¶ 39). As a result, the price of Teradyne stock soared to a high of $110.00 per share on April 28, 2000. (*Id.*) [FN2]

> FN2. Plaintiffs agree that this court may appropriately take judicial notice of Teradyne's stock prices, which have been submitted by the defendants as Exhibit 22 in the Appendix in Support of Defendants' Motion to Dismiss ("App.") (Docket # 34). (*See* Plaintiffs' Memorandum of Law in Support of Their Motion to Strike Certain Exhibits (Docket # 42) at 7). Although not referenced in the Complaint, this Exhibit shows that stock prices were generally on the decline from May 1, 2000-May 26, 2000, down to $72.750/share. The prices rose for a few days until June 5, 2000, up to approximately $102/share, and then began a fairly steady decline again. On July 14, 2000, the first day of the Class Period, the stock closed at $77.750/share. The high during the Class Period was $79/share on July 17, 2000.

**\*2** This lawsuit arises out of the decline in Teradyne's business following this period of growth. According to the plaintiffs, Teradyne misrepresented the true state of its business and/or failed to disclose material information beginning in the second quarter of 2000. (*See, e.g., id.* ¶¶ 4-5, 7, 46, 52). For example, according to the plaintiffs, after the first quarter of 2000:

> bookings for the "Catalyst" product declined. Nonetheless, defendants reassured investors that bookings in subsequent quarters would be at or near 4Q99 and 1Q00 levels as a result of record orders for other high margin semiconductor test products ( *e.g.,* J973 VLSI test system). However, the demand for these other products also declined because of, among other things, a severe market downturn in the semiconductor industry and undisclosed product problems, which were depressing sales. Teradyne never publicly disclosed these facts, opting to provide investors with false assurances that the Company would remain strong and that its orders would rise.

(*Id.* ¶¶ 40, 4).

The plaintiffs further allege that "two of Teradyne's key semiconductor test products-the J973 VLSI test system and the Flash 750-were plagued with significant design problems" which resulted in customer dissatisfaction and substantially reduced sales. (*Id.* ¶¶ 42-47). According to the plaintiffs, in order to boost declining orders, Teradyne offered customers "significant price concessions and/or payment terms." (*Id.* ¶ 48). Plaintiffs allege that senior management, including defendants Chamillard and Bradley, knew of the declining orders due to internal company reports. (*Id.* ¶ 6). Nevertheless, plaintiffs contend, Teradyne failed to disclose material information to the public and continued to provide false assurances to the public. ( *See, e.g ., id.* ¶¶ 4-5, 7, 108).

Plaintiffs also contend that defendants "had strong motivation to conceal the true state of affairs at Teradyne" because Teradyne announced that it was going to acquire two companies formerly owned by the Herring family, Herco Technology ("Herco") and Synthane Taylor, both of which manufactured printed circuit boards (collectively, the "Herring Companies"). (*Id.* ¶ 8). Teradyne acquired the Herring Companies in August 2000, in exchange for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

$122 million in Teradyne stock. (*Id.*) Therefore, it was important to Teradyne to keep its stock prices high. (*Id.*)

According to the plaintiffs, it was not until September 21, 2000 that the market began to "learn about the significant problems that Teradyne was experiencing." (*Id.* ¶ 9). On that date, a Prudential Securities analyst announced that Teradyne's orders forecast of $850-900 million for the third quarter of 2000 (3Q00) was "significantly at risk," and that the volume of orders for that quarter might only reach $824 million. (*Id.* ¶¶ 9, 86). In response to this disclosure, Teradyne's stock price sharply dropped from $49.215 per share to $36.50, representing a one-day decline of almost 26%, and a decline of approximately 54% from the stock's Class Period high of $79.00. (*Id.* ¶¶ 9, 87; *see also* note 2, *supra* ).

**\*3** On October 17, 2000, the last day of the Class Period, Teradyne announced that it expected orders to fall 2-4% in the quarter (4Q00), and that the company expected to earn between $0.66 and $0.67 per share in the next quarter. (*Id.* ¶¶ 10, 90). This was in "stark contrast to analysts' expectations" of $0.91. (*Id.*) In response, Teradyne's stock fell from $34.4375 to $25.00, representing a one-day decline of 27%, and a total decline of over 68% from the stock's Class Period high of $79.00. (*Id.* ¶¶ 10, 94).

Finally, plaintiffs contend that their "allegations of fraud are strongly corroborated by a related fraud case that was filed against Teradyne by the former owners of Herco and Synthane Taylor." (*Id.* ¶ 11). Thus, on September 5, 2001, the former owners of the Herring Companies filed suit in the California state court, and on October 12, 2001, they filed suit in the United State District Court for the Southern District of California, *Herring v. Teradyne, Inc.,* No. 01 CV 1835 L(JFS) (S.D.Cal.). (App. at Exs. 49, 50). In those actions, according to the instant Complaint, the Herring plaintiffs alleged that " Teradyne committed securities fraud by selling shares of its stock in connection with the Herco/Synthane Taylor acquisitions without disclosing that Teradyne's bookings for its highly profitable semiconductor test division were falling

drastically." (Compl.¶ 11). In the California case, the Herring plaintiffs further alleged that during a meeting in California in October 2000, after the Herco/Synthane Taylor transaction closed, a senior officer at Teradyne admitted to one of the former Herco owners that Teradyne had changed the Herring deal at the last second and insisted on locking in the exchange price at $66.26 because Teradyne was concerned "that the stock price would continue to drop, not rise" if the price was not locked. (*Id.*). On January 28, 2002, the California court granted in part and denied in part Teradyne's Motion to Dismiss. (*See generally* App. at Ex. 51). The court, *inter alia,* dismissed the claims of fraud based on a July 18, 2000 press release and claims that Teradyne failed to disclose a 30% decrease in semiconductor test systems orders, issues also raised in this case, but allowed the case to proceed on claims of oral misrepresentations which are not at issue here. (App. at Ex. 51 at 4-20). In addition, the court allowed a breach of contract claim to proceed. (*Id.* at 22-27).

Additional facts will be provided below.

### III. DISCUSSION

#### A. *Overview of Securities Fraud Claims*

Plaintiffs have alleged a violation of Section 10(b) of the Act and Rule 10b-5 promulgated thereunder, as well as of Section 20(a) of the Act. Section 10(b) makes it unlawful:

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**\*4** 15 U.S.C. § 78j(b). Section 20(a) relates to liability of "controlling persons," and provides that:Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In Count I of their Complaint, plaintiffs allege that " [d]uring the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members ....[;] (ii) enable Teradyne to acquire Herco Technology and Synthane Taylor ... using $122 million of its artificially inflated common stock as currency; and (iii) cause plaintiffs and other members of the Class to purchase Teradyne's securities at artificially inflated prices." ( *Id.* ¶ 107). Plaintiffs challenge various statements made by the defendants. (*Id.* ¶¶ 60-61, 63, 66-67, 72, 74, 84). They also challenge statements made by analysts, which plaintiffs attribute to the defendants. (*Id.* ¶¶ 58, 69-71, 79, 81-82, 88). Thus, plaintiffs contend that the defendants made "untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading [.]" (*Id.* ¶ 108).

In Count II of their Complaint, plaintiffs seek to hold the individual defendants Chamillard and Bradley liable as "controlling persons" under Section 20(a) of the Act. (*Id.* ¶ 118). It is the plaintiffs' contention that these defendants had the power to and "did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading." (*Id.*)

As a general statement, "[t]o state a cause of action under § 10(b) and Rule 10b-5, a plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996), and cases

cited. [FN3] To state a claim under Section 20(a), " plaintiffs first must adequately plead a predicate violation of the Exchange Act or its rules and regulations ." *Carney v. Cambridge Tech, Partners, Inc.,* 135 F.Supp.2d 235, 243 (D.Mass.2001). The next section of this decision will address the heightened pleading requirements applicable to securities fraud cases. Thereafter, these requirements will be applied to the challenged statements and omissions.

> FN3. There is no longer any requirement that "reliance" be directly pleaded in a " fraud on the market" claim in accordance with the Supreme Court's decision in *Basic. Inc. v. Levinson,* 485 U.S. 224, 246-47, 108 S.Ct. 978, 991-92, 99 L.Ed.2d 194 (1988). Rather, reliance is "now presumed and plaintiffs are held entitled to rely upon the 'integrity of the market' and information publicly released by corporations and their agents or employees. " *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 209 n. 7 (D.Mass.1993).

### B. *The Relevant Pleading Standards*

**\*5** In reviewing a motion to dismiss, the court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 988 (1st Cir.1992). The court may grant dismissal "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)).

### *Pleading Fraud*

In a securities fraud action, two additional considerations bear upon the motion to dismiss: Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), codified at 15 U.S.C. 78u-4. *See Fitzer v. Sec. Dynamics*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

*Tech., Inc.,* 119 F.Supp.2d 12, 17 (D.Mass.2000). Rule 9(b) imposes a heightened pleading requirement in connection with claims of fraud, requiring that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b) . Under the PSLRA, a complaint claiming securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "The PSLRA's pleading standard is congruent and consistent with the pre-existing standards" of the First Circuit, which "has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999), and cases cited. Thus, "the plaintiff must not only allege the time, place, and content of the alleged misrepresentations with specificity, but also the 'factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants." ' *Id.* at 193-94 (quoting *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991)).

To be actionable as securities fraud, "the statements alleged to be misleading must be misleading to a material degree." *In re Cabletron Sys., Inc.,* 311 F.3d at 27. A fact is material "if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ' *Id.* at 34 (quoting *Basic Inc. v. Levinson,* 485 U.S. at 231-32, 108 S.Ct. at 983)) (additional citations omitted). Generally, it is up to a jury to decide whether a statement or omission was material. Therefore, on a motion to dismiss, the complaint is reviewed "only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." *In re Cabletron Sys., Inc.,* 311 F.3d at 34.

*The Failure to Disclose*

**\*6** "[A] corporation does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession." *Gross v. Summa Four, Inc.,* 93 F.3d at 992 (citing *Roeder v. Alpha Indus., Inc.,* 814 F.2d at 26) (additional citations omitted). Rather, the corporation must first have a duty to disclose, which "may arise if, *inter alia,* a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Id.* [FN4] However, only such disclosures "that are needed so that what was revealed would not be 'so incomplete as to mislead" ' must be made. *Id.* (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990)) (additional citations omitted). "[A]ccurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse ." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1202 (1st Cir.1996), and cases cited.

> FN4. Other circumstances which have been acknowledged to give rise to a duty to disclose have no application here. They include situations where an insider trades on the basis of material, nonpublic information and when disclosure is required by a statute or regulation. *See Roeder v. Alpha Indus., Inc.,* 814 F.2d at 26-27.

Two other principles are relevant to the instant dispute. First, a claim "based on omissions and erroneous forecasts (rather than direct misstatements) ... must offer factual indications that [the defendants'] omissions violated a duty to make further disclosure ... or that [the defendants'] forecasts were not reasonably based or were not made in good faith." *Colby v. Hologic, Inc.,* 817 F.Supp. at 210. Second, where, as here, "analysts' reports are sought to be imputed to the defendants as part of their scheme, [plaintiffs] must offer allegations that the reports could be fairly attributed to [the company] itself and its officers must be so ' entangled' with the analysts' forecasts such that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 6

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

they assumed a duty to disclose the analysts' errors."
*Id.*

### Pleading Scienter

The "state of mind" requirement for liability under § 10(b) and Rule 10b-5 is known as "scienter" and is "defined as 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Greebel v. FTP Software, Inc.,* 194 F.3d at 194 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). " To win a section 10(b) case, the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 82 (1st Cir.2002). "Reckless," in turn, may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Greebel v. FTP Software, Inc.,* 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)) (additional citations omitted). As the court recently explained in *In re Stone & Webster, Inc., Sec. Litig.,* 253 F.Supp.2d 102, 112 (D.Mass.2003):*7 In this circuit, there is no "particular test to determine scienter ..." *Aldridge,* 284 F.3d at 82. Rather, the First Circuit has adopted a "case by case fact-specific approach." *Id.* A plaintiff may rely on a variety of forms of evidence, both direct and circumstantial. *See id.* "As part of the mix of facts, the plaintiff may allege that the defendants had the motive ... and opportunity ... to commit the fraud." *Id.* However, "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Greebel,* 194 F.3d at 197. The evidence, taken as a whole, must create a strong, and not merely a reasonable, inference of scienter. *Id.* at 195-96; *see also* 15 U.S.C. § 78u-4(b)(2). Yet a "strong" inference need not be an irrefutable one; a plaintiff must show only that "his characterization of the

events and circumstances as showing scienter is highly likely." *Aldridge,* 284 F.3d at 82.

Applying these principles to the instant Complaint compels the conclusion that the Motion to Dismiss should be allowed.

### C. *The Challenged Statements*

In the First Circuit, "securities fraud cases are ' decided by a statement-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement-namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made.' " *Carney v. Cambridge Tech. Partners, Inc.,* 135 F.Supp.2d at 243 (quoting *In re Boston Tech, Inc. Sec. Litig.,* 8 F.Supp.2d 43, 55 (D.Mass.1998)). *Accord In re Peritus Software Servs., Inc.,* 52 F.Supp.2d 211, 219 n. 1 (D.Mass.1999) (rejecting plaintiffs' objections to "an atomistic analysis of each sentence and phrase of [the alleged] false and misleading statements"). Therefore, each statement relied on by the plaintiffs will be discussed individually. In each instance, however, the plaintiffs have alleged that the statements were " materially false and misleading" because they failed to disclose the following materially adverse facts (" Adverse Facts"), which were known to, or recklessly disregarded by, the defendants:
a. that sales were not going to increase over the second, third and fourth quarters of 2000, and were in fact declining;
b. that due to declining orders in its most profitable semiconductor test division, the Company's growth rate would drop from historical levels;
c. that Teradyne was offering significant price concessions and payment terms in a concerted effort to create the appearance of demand for its products;
d. that a significant portion of the orders the Company was receiving was in the backplane connection division, which operates at much lower margins than the semiconductor test division; [and]
e. that the Company was experiencing significant problems with its most important semiconductor test products (*e.g.,* the J973 and the Flash 750),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

which in turn caused the Company's largest customers to postpone or cancel most of their orders for these products[.]

**\*8** (*E.g.,* Compl. ¶ 62). As a result of the failure to disclose these Adverse Facts, according to the plaintiffs, the "defendants' statements concerning the Company's outlook and prospects were lacking in a reasonable basis at all times." (*Id.* ¶ 62(f)).

### 1. *Bloomberg Business News-July 14, 2000 (Compl. ¶¶ 60-61)*

On July 14, 2000, the first day of the Class Period, the defendant Chamillard, Teradyne's President, spoke to *Bloomberg Business News* concerning the demand for semiconductors and the Company's prospects. (Compl.¶ 60). In that publication, he is quoted as saying:
For fundamentals, I think chips and the semiconductor industry is about as good a place as you can get. I do a kind of man-on-the-street testing, and they're willing to spend a lot more of their disposable income on bandwidth and speed. To the man on the street, certainly it's not over. *I don't see any sign that the unit demand is going down. I don't see a downturn.*

(*Id.* (emphasis in Complaint)). He was further quoted as saying:*Sales will probably be up for the next six months. I think we might see order rates have some more noise in them.* Shipments are increasing. You should not look at the order rates; you should look at the actual shipment increases. *We'll increase shipments in second quarter, and we'll probably increase shipments in third quarter.*

(*Id.* ¶ 61 (emphasis in Complaint)). Because each of these statements raise different issues, they will be addressed separately.

Plaintiffs argue that Chamillard's statements that he did not "see any sign that the unit demand is going down. I don't see a downturn" were "directly contrary to the facts known to defendants at the time the statements were made." (*Opp.* (Docket # 40) at 2, 4-5). It is unclear whether the defendants are asserting that Chamillard's statements were true, or

were simply not actionable for other reasons. (*See, e.g., Reply Mem.* (Docket # 51) at 6 ("*many* of Mr. Chamillard's statements are accurate statements of historical fact ....") (emphasis added)). However, this court finds these statements to be non-actionable because such vague, optimistic statements do not rise to the level of material misrepresentations. In addition, the plaintiffs have failed to plead with particularity facts establishing the falsity of these statements.

### *Vague, Optimistic Statements*

Mr. Chamillard's statements reflect his sense, based on an admittedly informal "kind of man-on-the-street testing" that the public is still very interested in purchasing computer equipment, and that "they're willing to spend a lot more of their disposable income on bandwidth and speed." (Compl.¶ 60). These statements seem to relate to the computer industry in general, and not to any specific product manufactured by Teradyne. Thus, it is unclear whether "unit demand" even relates to any Teradyne product. Moreover, it certainly does not identify which Teradyne product might be involved. Under such circumstances, the statements are simply too general to give rise to a claim of securities fraud.[FN5]

> FN5. This court agrees with the plaintiffs that a representation that the defendant has not seen "a decline in unit demand" could be a representation of a present fact if it identified the "unit." *See Fitzer v. Sec. Dynamics Tech., Inc.,* 119 F.Supp.2d at 23 (although "general optimistic statements" cannot "constitute a material fraudulent statement by themselves, if the defendants misrepresented the current extent of product demand in order to make [the company] appear healthier, [plaintiff's] claim may have merit"). However, no such specificity is provided here.

**\*9** As the court held in *Shaw v. Digital Equip. Corp.,* "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace-loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." 82 F.3d at 1217, and cases cited. That is the situation here. The lack of specificity about what the assertion concerning " unit demand" means vis-à-vis Teradyne's business renders the statement virtually meaningless. *See Fitzer v. Sec. Dynamics Tech., Inc.,* 119 F.Supp.2d at 26 (plaintiffs may not base a fraud claim on corporate representation of "continued market demand" that is a "vague, optimistic statement" which "does not specify a particular market demand, a market share figure, or represent that the market demand is static, shrinking or growing"; such claim amounts to mere corporate puffing).

### No Proof of Falsity

Moreover, the plaintiffs have failed to plead with particularity facts which render the representations false. As noted above, there is no explanation as to what was meant by "unit demand" and, therefore, it is impossible to determine whether demand was, in fact, down. For example, as plaintiffs have acknowledged, demand (in the form of bookings) for logic tests and memory tests were at record levels. (Compl.¶ 63). Thus, plaintiffs have failed to establish the falsity of these statements. [FN6] Under such circumstances, a claim of fraud must fail. *See Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 9-10 (1st Cir.1991) (" indisputedly true, and wholly true" statements not actionable).

> FN6. Plaintiffs have alleged that bookings for the "Catalyst" product declined at the beginning of the Class Period (Compl.¶¶ 39-40), but there is no indication that Catalyst was related to the "unit demand" referenced in the challenged statements. Other allegations regarding a decline in demand for other Teradyne products fail to specify the status of the demand as of the

date of the statement (July 14, 2000) or, in some cases, even the product. (*See, e.g., id.* ¶¶ 42, 46-49). Finally, to the extent that the plaintiffs rely on a reduction in orders to establish the falsity of the statements (*see id.* ¶ 42), one of the challenged statements itself acknowledges that "order rates [might] have some more noise in them." (*Id.* ¶ 61).

With respect to the statements challenged in ¶ 61 of the Complaint, the analysis is slightly different but the result is the same-the statements do not rise to the level of actionable misrepresentations.

### *Expressions of Optimism for the Future*

The "courts in the First Circuit generally have declined to impose liability for so-called 'forward looking statements'-that is, broad statements that express optimism about a company's future-because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor." *Carney v. Cambridge Tech. Partners, Inc.,* 135 F.Supp.2d at 245. Thus, it "is the rule that exaggerated, vague, or loosely optimistic statements about a company are not actionable under Rule 10b-5," including "[v]ague predictions about the prospects for a new product ... or for a company in general[.]" *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d at 54 (citations omitted). This rule " covers loose optimism about both an issuer's *current* state of affairs and its *future* prospects." *Id.,* and cases cited (emphasis in original). "There is good reason for the courts to discourage complaints based on allegedly misleading generalized forecasts" since such "forecasts are inherently difficult and unreliable, though necessary, and are not likely to be 'material' to investors." *Colby v. Hologic, Inc.,* 817 F.Supp. at 211.

**\*10** In the instant case, Chamillard's statements about what would "probably" happen to sales and shipments constitute exactly such "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

available." *Shaw v. Digital Equip. Corp.,* 82 F.3d at 1217-19 (statements that company's transition was " going reasonably well," "should show progress quarter over quarter, year over year," and that officer was "pretty optimistic," and the like, found not actionable), and cases cited. Chamillard's statements are, at most, "[s]oft, puffing statements" which "lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Suna v. Bailey Corp.,* 107 F.3d 64, 72 (1st Cir.1997) (internal citation and quotation omitted). *Accord In re Peritus Software Serv., Inc.,* 52 F.Supp.2d at 220 (reference to " unprecedented market demand" for company's product is "mere corporate puffery" and is not actionable), and cases cited; *In re Mobile Telecomm. Tech. Sec. Litig.,* 915 F.Supp. 828, 834 (S.D.Miss.1995) (statements that company " remained highly encouraged," and expected record growth to continue are "statements of optimism [which] are too vague and general to provide the foundation for a securities fraud claim").

### Failure to Disclose Adverse Facts

Plaintiffs allege further that the July 14, 2000 statements were materially false and misleading because they failed to disclose the Adverse Facts. (Compl. ¶ 62). This argument must fail, however, because plaintiffs have failed to allege facts which would establish a duty to disclose. *See Gross v. Summa Four, Inc.,* 93 F.3d at 992, and cases cited.

As an initial matter, "a duty to disclose arises only to correct or update what would otherwise be a materially misleading prior statement by the defendant." *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 213 (D.Mass.1993) (citing *Backman v. Polaroid Corp.,* 910 F.2d at 16-17). The July 14, 2000 statements do not constitute such misleading statements. This should end the analysis.

If further analysis is undertaken, it is clear that the " omissions" were not relevant to the challenged statements. For example, plaintiffs complain that defendants did not disclose "that sales were not going to increase over the second, third and fourth quarters of 2000, and were in fact declining"

(Compl.¶ 62(a)), and that "due to declining orders in its most profitable semiconductor test division, the Company's growth rate would drop from historical levels [.]" *(Id.* ¶ 62(b)). However, Teradyne had no obligation to provide estimates of future performance or forecasts. *See Glassman v. Computervision Corp.,* 90 F.3d 617, 631 (1st Cir.1996), and cases cited. Moreover, the fact that semiconductor test equipment orders were declining was made known to the industry, at the latest, within days of this release, by July 18, 2000, in connection with the next quarterly report. *(See* Compl. ¶ 63; App. Exs. 26, 27 & 31). At that time, as discussed *infra,* hard data was reported. Where accurate historical information is provided, there is no obligation for the company to add that it may have some concerns about the future. *See Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d at 10-11. "A company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock ." *In re Syntex Corp. Sec. Litig.,* [1993-1994 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,747 at 97,569, No. 92-20548 SW, 1993 WL 476646, at * 7 (N.D.Cal. Sept.1, 1993) (unpublished op.) (App.Ex. 64). Thus, "it is well established that the federal securities laws rarely require companies to disparage their own product lines or the skills of their managers.... Nor are companies required to predict that their future operations will fail." *Kane v. Madge Networks N.V.,* No. C-96-20652-RMW, 2000 WL 33208116, at *8 (N.D.Cal. May 26, 2000) (App.Ex. 58), *aff'd sub nom. Kane v. Zisapel,* 32 Fed.App. 905 [2001-2002 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91742, 2002 WL 506286 (9 th Cir. Mar.27, 2002) (unpublished op.) (App.Ex. 59).

**\*11** Plaintiffs also object to Teradyne's failure to disclose that it "was offering significant price concessions and payment terms in a concerted effort to create the appearance of demand for its products[.]" (Compl.¶ 62(c)). As an initial matter, there is no mention of price or terms in the article. Therefore, the omitted information does not render any part of the statement misleading. *See Gross v. Summa Four, Inc.,* 93 F.3d at 992, and cases cited.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Moreover, plaintiffs have failed to allege any facts which would render Teradyne's conduct inappropriate. Rather, plaintiffs have alleged only that:

Defendants also offered significant price discounts and extended payment terms to customers in a concerted effort to boost their orders. In fact, Teradyne's customers often waited until the end of the quarter to order Teradyne products because they knew that the Company would offer them extremely favorable payment terms. Teradyne had to offer these significant price concessions and/or payment terms to maintain the appearance that their orders were not declining.

(Compl.¶ 48). Such allegations do not establish any more than Teradyne did "what every company does-lower its prices in order to sustain demand as technology evolves." *Fitzer v. Security Dynamics Tech., Inc.,* 119 F.Supp.2d at 26 n. 9. "[T]here may be any number of legitimate reasons" for Teradyne to lower its prices at the end of a quarter. *Greebel v. FTP Software, Inc.,* 194 F.3d at 203.

This case differs significantly from *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72 (1st Cir.2002), on which plaintiffs rely. There, Cross failed to disclose price protection commitments which required Cross to reimburse retailers in the event of post-sale price reductions. *Id.* at 79-80. In concluding that the claim of wrongful omission stated a cause of action, the court relied on the fact that the company was obligated to report practices that gave rise to contingent revenues and earnings under generally accepted accounting practices. *Id.* at 79. Moreover, the company had made a number of representations about reductions in the price of products and the effect of such reductions on company earnings without making any comment about the price protection program. *Id.* at 76-83. Under such circumstances, the company's silence rendered the statements made materially incomplete. In the instant case, however, there was no discussion about costing practices or sales terms which were rendered inaccurate by Teradyne's silence. There were no "required or voluntary disclosures" about pricing and sales "that were inaccurate, incomplete, or misleading." *Roeder v. Alpha Indus., Inc.,* 814 F.2d at 26. There simply was no duty to disclose

this information by Teradyne, and, therefore, there can be no liability. *Id.* at 27-28.

Plaintiffs next challenge the statement for failure to disclose that "a significant portion of the orders the Company was receiving was in the backplane connection division, which operates at much lower margins than the semiconductor test division[.]" (Compl.¶ 62(d)). Again, however, the article makes no mention of the performance of any specific divisions or the margins in any division. Thus, this omission does not render the statement made materially misleading either.

**\*12** Finally, plaintiffs object because the article failed to disclose "significant problems with its most important semiconductor test products" which, in turn, "caused the Company's largest customers to postpone or cancel most of their orders for these products[.]" (Compl.¶ 62(e)). Again, however, there was no mention of these products in the article, and therefore Teradyne's silence did not render the statements made materially incomplete. *See Glassman v. Computervision Corp.,* 90 F.3d at 635 ("A duty to disclose technical or developmental problems with a product may arise where a company makes strongly optimistic or concrete statements about that product that are in stark contrast to its internal reports."). As a general rule, the defendants "were under no obligation to disclose technological problems with their products, regardless." *Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d 101, 105 (D.Mass.2000). Thus, plaintiffs have failed to allege facts which establish a duty to disclose or that the omissions rendered the statements made materially misleading.

*Safe Harbor*

Finally, the defendants rely on the PSLRA's "safe harbor" provision which provides immunity for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or where the plaintiff fails to prove that forward-looking statements were made with actual knowledge that the statements were false or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 11

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

misleading. 15 U.S.C. § 78u-5(c)(1). (*See generally Mem.* (Docket # 33) at 16-18 & n.28; *Reply Mem.* at 8). However, this court finds that the challenged statements do not contain sufficient cautionary language to warrant "safe harbor" protection.

The definition of a "forward-looking statement" under the PSLRA includes statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures," or a "statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(A). This "safe harbor" provision is basically a codification of the common-law " bespeaks caution" doctrine which provides, in short, that "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law." *Shaw v. Digital Equip. Corp.,* 82 F.3d at 1213 & n. 23. Thus, the "bespeaks caution" doctrine "embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws." *Id.* at 1213, and cases cited.

**\*13** This court agrees with the plaintiffs that Teradyne's reliance on the "cautionary language" contained in the quoted statements, such as " probably" or "we might," is misplaced. This is because "[t]he cautionary language must be sufficiently related in subject matter and strong in tone to counter the statement made." *In re Boston Tech. Inc. Sec. Litig.,* 8 F.Supp.2d at 53, and cases cited. Here, there are no clear words of warning that sales and shipments may actually decline. *See Shaw v. Digital Equip. Corp.,* 82 F.3d at 1213-14 (warnings given were not of "sufficient clarity to be thought to bespeak caution"). Thus, if Chamillard's statements were found to be of sufficient specificity to be actionable (which this court does not find), the

"bespeaks caution" doctrine should not render the defendants immune from liability.

2. *Press Release-July 18, 2000 (Compl.¶ 63)*

On July 18, 2000, Teradyne issued a press release announcing its financial results for the second quarter of 2000, which ended on July 2, 2000. As alleged in the Complaint:
The Company reported sales of $759 million and net income of $137.6 million. Teradyne also announced that its orders for the quarter were only $826 million. In particular, although bookings for the Company's Catalyst product were down 60%, bookings for logic tests (the J973) and memory tests (the Flash 750) were purportedly at record levels. Management portrayed the decline in bookings for mixed signal test products as an aberration resulting from a handful of large dollar mixed signal test contracts being booked in the last days of the first quarter, rather than the beginning of the second quarter. Without this "lumpiness," management maintained (and analysts agreed) that there would have been steady sequential growth in bookings from 4Q99 through 2Q00.

(Compl.¶ 63). This press release is not actionable, as it appears from the record to be an accurate statement of historical fact.

The plaintiffs do not identify any facts included in the press release that they allege to be false. It is well settled that "[f]actual recitations of past earnings, provided they are accurate, do not create liability under Federal securities laws." *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 457 (D.N.J.2000), and cases cited. Thus, " defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy...." *Suna v. Bailey Corp.,* 107 F.3d at 68 (quoting *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994)). Here, the defendants accurately reported historical information (which was not rosy) for which they may not be held liable. According to the plaintiffs, the market reacted negatively to the (accurate) report of a decline in orders with a resulting decline

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 12

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

in stock value. (Compl.¶ 64). Under such circumstances, there was no actionable fraud.

**\*14** Plaintiffs contend that the press release was false because it failed to disclose the Adverse Facts, which plaintiffs contend would have revealed that things were actually worse than disclosed. (*Id.* ¶ 65). Plaintiffs do not allege, however, that the omissions contradict or call into question any of the hard facts contained in the press release. Nor does the press release address many of the topics plaintiffs complain were not disclosed, such as any pricing practices. (*See id.* ¶ 65(b)). Therefore, for the same reasons as discussed in connection with the July 14, 2000 *Bloomberg Business News* article, there was no duty to disclose the Adverse Facts and their omission did not render the report materially incomplete.

Plaintiffs' assertion that the information was not presented by product or corporate division is also without merit. (*See, e.g* ., *id.* ¶¶ 65(a), (c) & (d)). Rather, Teradyne's published statement about its financial condition "referred to the quarter as a whole, as to which it was entirely correct. It was not misleading not to break it down into parts; nor was defendant obliged to make that further disclosure." *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d at 10.

As to plaintiffs' general argument that there were negative events occurring in the company which were not disclosed, the short answer is that where, as here, the data provided accurately reflected the 2Q00 results which were being reported, there was no duty on Teradyne's part to add for the benefit of market buyers that "[w]e are concerned about the next [quarter]." *Id.* at 8. Teradyne's "accurate reporting of its past results did not then require the company to speculate on the effect that a contract slowdown ... would have on its future earnings." *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4 th Cir.1993). For these reasons, defendants' motion to dismiss the claims of fraud based on the July 18, 2000 press release should be allowed.

3. *Bloomberg Business News-July 19, 2000 (Compl.* ¶¶ *66-67)*

Following the press release on July 18, 2000, Chamillard, according to the plaintiffs, provided an interview "concerning the Company's 2Q00 earnings announcement and its order rate" in an effort to "calm investors and counteract the decline in the price of Teradyne common stock[.]" (Compl. ¶ 66). The plaintiffs challenge the following statements from the interview:
On investor reaction to the decline in orders:
This is as frustrating as can be. You put out earnings well above estimates, you grow shipments to a record level, profits up sequentially 25 percent. Everything's a record. You come in with the second-highest bookings quarter ever, and everybody trashes you. I think it's simple. Look at what we had in orders. We had some real big spikes at the end of Q1. *If you took the bookings in the last week of Q1 and moved them into Q2 number [sic] would have been sequentially up every quarter. That's great news, and that's the story. You do the right thing, make the right operational move and get it booked. You end up with a tremendous spike in Q1 and then a drop in Q2, and you get hammered.*

**\*15** (*Id.* (emphasis in Complaint)).On the outlook for the third quarter:
*Certainly against (second quarter), bookings have a good shot at being sequentially up next quarter for sure. Do I see a record $1 billion? I don't know. We've told everyone we've been increasing shipments at about $100 million a quarter for several quarters in a row. I think we're going to do it again in Q3.*

(*Id.* ¶ 67 (emphasis in Complaint)).

According to the plaintiffs, these statements were false and misleading because they failed to disclose the Adverse Facts. (*Id.* ¶ 68). For the same reasons as discussed above in connection with the July 14, 2000 *Bloomberg* interview and July 18, 2000 press release, the omission of these facts is not actionable.

To the extent that Chamillard's statements of July 19, 2000 reflected the total number of sales in each quarter, plaintiffs do not dispute that they are factually accurate. Again, there is no requirement that Teradyne break down the number of orders of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 13

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

each product or division. To the extent that Chamillard offered his opinion that "bookings have a good shot at being sequentially up next quarter" and that "I think we're going to" be increasing shipments at about $100 million a quarter, these are general statements of opinion which are too vague to be actionable, and do not reach beyond the (non-actionable) level of puffery. *See, e .g., Shaw v. Digital Equip. Corp.,* 82 F.3d at 1219 (statement that company "should show progress quarter over quarter, year over year" not actionable as a matter of law); *Raab v. Gen. Physics Corp.,* 4 F.3d at 289 (statements that company had "an expected annual growth rate of 10% to 30% over the next several years" and was "poised to carry the growth and success of 1991 well into the future" constituted " puffing" and were too vague to be material as a matter of law); *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d at 458 (statements that company was "very pleased with the amount of orders" so far received, and that it "expect[s] even more orders in the ensuing months" constituted mere "puffery" and, even if misleading, were not material as a matter of law); *In re Mobile Telecomm. Tech. Sec. Litig.,* 915 F.Supp. at 834 (declaration that company expected record growth to continue is a statement of optimism which was "too vague and general to provide the foundation for a securities fraud claim").

Plaintiffs contend that Chamillard "falsely attributed the sequential decline in orders in 2Q00 to the timing of bookings as opposed to a decline in demand." (*Opp.* at 5). What Chamillard actually said, however, was "[i]f you took the bookings in the last week of Q1 and moved them into Q2 [the] number would have been sequentially up every quarter." (Compl.¶ 66). That is apparently true. He went on to add that given the low number of bookings in the second quarter, "bookings have a *good shot* at being sequentially up next quarter for sure." (*Id.* ¶ 67) (emphasis added). Not only is this an example of "broad statements that express optimism about a company's future" which are not actionable, *Carney v. Cambridge Tech. Partners,* 135 F.Supp.2d at 245, but there is no indication that Chamillard had information as of July 19, 2000 which made his statement false.

**\*16** The challenged statements of July 19, 2000

were made only five days into the Class Period. Plaintiffs describe the state of Teradyne's knowledge during the Class Period as follows:
Among other things, Teradyne's monthly CPR and CSI reports disclosed to defendants the fact that Teradyne's top customers were reducing or canceling their orders in light of: (i) the Company's severe software problems; and (ii) the declining state of the semiconductor industry. ¶¶ 41, 42. Motorola, for example, only ordered a single J973 unit in 2000. ¶ 45. AMD and Intel (which were Teradyne's largest customers at the time) postponed their orders, taking only one to two machines during the Class Period, and decided to hold off on orders for the next couple of quarters. *Id.* Teradyne's largest customers-including AMD, Siemens, Motorola, Intel and Micron-stopped ordering the Flash 750 during the Class Period because of severe software problems. ¶ 47.

(*Opp.* at 9-10). The plaintiffs have failed to specify the status of the company's affairs when the statements were made, and failed to allege how these facts-which occurred during the Class Period and beyond-rendered Chamillard's statements made early on, at the beginning of the Period, false.

For all these reasons, this court recommends that defendants' motion to dismiss the claims based on the July 19, 2000 *Bloomberg Business News* interview be allowed.

### 4. May 2000 *The Wall Street Transcript Corporation Interview Published August 3, 2000 (Compl.¶ 72)*

On August 3, 2000, *The Wall Street Transcript Corporation* published an interview with Thomas B. Newman, Jr., Teradyne's Vice President of Corporate Relations, which had been conducted three months earlier, in May 2000. (Compl.¶ 72). As an initial matter, although plaintiffs cite this article as part of Teradyne's efforts to "deflect any concerns over its future performance and the level of bookings" following its July 2000 2Q00 earnings announcement (*id.*), they do not allege that Teradyne in any way controlled the date of publication of this interview. Therefore, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

statements made by Newman must be viewed in the context of what was happening at the time the statements were made in May 2000, prior to the Class Period. Moreover, Teradyne has established that some of the language from the interview quoted in the Complaint is incomplete. As stated by the First Circuit:

In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.... Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement.

*17 *Shaw v. Digital Equip. Corp.,* 82 F.3d at 1220 (citations omitted). Therefore, the entirety of the challenged statement will be considered.

In ¶ 72 of their Complaint, plaintiffs challenge the following portions of Newman's interview (with additional language omitted from the Complaint in italics):

*TWIST:* What has happened between [last year] and now to result in that rather spectacular performance?
*MR. NEWMAN:* The semiconductor capital equipment industry and the semiconductor industry that it serves is in an up cycle, and that has certainly helped. I think on top of that, *Teradyne has in general outperformed the industry and our competitors by quite a lot. That has added some extra fuel to our particular upsurge here, as the recognition of the gains that we are making in the marketplace becomes clearer to investors.*

*TWIST:* As we look out over the next year or two, what do you see going on in the industry that is going to have an impact on you?
*MR. NEWMAN:* Well, *we're pretty bullish on the future* because our customers are pretty bullish on the future.... *We don't see anything on the horizon that is going to change that. We're hearing nothing*

*from our customers that will change it at this point. They're pretty bullish, and we're in agreement with them that this should be a pretty sustained cycle.*

*TWIST:* As we look out over the next two or three years, what kind of growth should investors expect from the company.
*MR. NEWMAN: Looking forward,* I think that the billion-dollar quarter in orders that we just had will assure that we're going to beat the current expectations on the Street by about a year.... *I think more growth is certainly the message that seems to be in all the forecasts for the semiconductor industry for 2001 over 2000. In other words, analysts expected an increase from the $1 .8 billion in sales for last year and the $1.04 EPS [sic] for last year to about $2.35 in earnings and $2.4-$2.5 billion in sales for 2000. In 2001 their plan was for revenue in the $2.8-$3.2 billion range, and for $2.90-$3 in earnings. It now appears that we will meet their 2001 model in 2000. In other words, about $3 billion in sales this year, up from $1.8 or about 65%-70% growth, and growth in earnings from $1.04 last year to something close to $3 this year, which is 180%-200% growth.*
*So we're looking at a huge year. All indications are that if the cycle continues-and that's always a big "if " in the business-2001 should be another great growth year. We certainly are not in a position to put any numbers around that at this point, but I think more growth is certainly the message that seems to be in all the forecasts for the semiconductor industry for 2001 over 2000. And if that happens, the companies like Teradyne that support that industry should have similar growth patterns.*

*TWIST:* How do you feel about the value the market is currently putting on your stock:
*18 MR. NEWMAN:* Well, it's never high enough, in one sense. And so, I would have to say that *I think that we're undervalued.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                 Page 15

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

*TWIST:* Is there anything else that we should have touched on?
*MR. NEWMAN:* No. It's a great time to be in this business. *We hope it continues, and all the signs that we see at this point are that it will ....*

(Compl. ¶ 72 (underscored emphasis in Complaint); App. at Ex. 17-complete interview).

For all the reasons detailed above, these statements are not actionable. They are, at most, general statements of optimism which are too vague to be actionable and, even if they were found to be misrepresentations, are not material as a matter of law. *See, e.g., Greebel v. FTP Software, Inc.,* 194 F.3d at 189, 207 (statements to the effect that company is "pleased with our performance," and that "[s]ales continue to be strong" constitute " upbeat statements of optimism and puffing about the company's prospects" which "are not actionable" ); *Fitzer v. Sec. Dynamics Techs., Inc.,* 119 F.Supp.2d at 23 (statement that the company is " well positioned" is nonactionable puffing, the fact that the company "ran into management and technology difficulties that ultimately prevented it from succeeding during the Class Period represents an unfortunate loss of opportunity, but that is precisely the risk that every investor takes when investing in a high-technology company whose new products may not succeed"); *In re Staffmark, Inc. Sec. Litig.,* 123 F.Supp.2d 1160, 1173 (E.D.Ark.2000) (company's statement that it believed its stock was "undervalued" would not, as a matter of law, influence any reasonable investor and is non-actionable "puffing").

Moreover, unlike the earlier quoted statements, these statements are protected by the "bespeaks caution doctrine." Here, the forward-looking statements are clearly tempered by the language that a positive future is always a "big if" and that the company "certainly [is] not in a position to put any numbers around" any projections.

Finally, the plaintiffs have not established that Teradyne had any information when this interview was conducted, at some unspecified date in May 2000, which would have rendered its optimistic statements false. [FN7] For all these reasons, the

motion to dismiss based on the May 2000 interview should be allowed.

> FN7. Similarly, plaintiffs have failed to allege facts which would create a duty to disclose the Adverse Facts.

5. *Teradyne's Form 10-Q for 2Q00 (Compl. ¶ 74)*

Plaintiffs next challenge Teradyne's Form 10-Q, issued on August 16, 2000, for the second quarter of fiscal year 2000 ending on July 2, 2000 in which Teradyne reported the following information:
The Company recorded sales of $759.0 million in the second quarter of 2000, an increase of $358.1 million or 89% from the second quarter of 1999. Semiconductor test systems sales increased 103% from the second quarter of 1999 due to increased orders resulting from capacity expansion by semiconductor manufacturers and subcontractors. Sales of backplane connection systems to unaffiliated customers increased 96% from the second quarter of 1999 as a result of continued growth in demand from networking, data storage, and other high technology customers. Other test systems sales increased 7% from the second quarter of 1999. The Company recorded sales of $1.41 billion in the first six months of 2000, an increase of $661.7 million or 89% over the first six months of 1999. Semiconductor test systems sales and backplane connection systems sales to unaffiliated customers increased 115% and 72%, respectively, when compared to the first six months of 1999. Other test systems sales for the first 6 months of 2000 increased 6% over the corresponding period in 1999. Income before taxes in the second quarter of 2000 increased $145.4 million from the second quarter of 1999 to $196.6 million. For the first six months of 2000, income before taxes increased $275.6 million to $352.4 million when compared to the first six months of 1999.
**\*19** Incoming orders were $826.4 million in the second quarter of 2000 compared to $571.0 million in the second quarter of 1999. The increase in incoming orders was led by a 168% increase in backplane connection systems orders and a 20% increase in semiconductor test systems orders. For the six month periods ended July 2, 2000 and July

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

4, 1999, incoming orders were $1,850.6 million and $1,015.1 million, respectively. The increase in incoming orders was led by a 143% increase in backplane connection systems orders and a 73% increase in semiconductor test systems orders. The Company's backlog was $1,423.0 million at the end of the second quarter of 2000 compared with $849.5 million at the end of the second quarter of 1999.

(Compl.¶ 74). Plaintiffs do not challenge the accuracy of any of the information contained in the Form 10-Q, and, as detailed above, the accurate reporting of historical financial information is not actionable.

Despite the accuracy of the reporting, plaintiffs argue that the Form 10-Q was materially false and misleading because of omitted information. (*Id.* ¶ 75). As also detailed above, to be actionable, the omissions must render the statements made in the Form 10-Q so incomplete as to mislead. *See Backman v. Polaroid,* 910 F.2d at 16. This is simply not the situation here.

As previously stated, having provided accurate historical information, Teradyne was under no obligation to provide estimates of future performance or forecasts. *See, e.g., Glassman v. Computervision Corp.,* 90 F.3d at 631, and cases cited. Moreover, Teradyne had no obligation to comment on its pricing practices where, as here, no pricing methods were discussed. *See, e.g., Gross v. Summa Four, Inc.,* 93 F.3d at 992, and cases cited. To the extent that the plaintiffs complain of a failure to disclose that the most significant rise in orders was in the backplane connection division (Compl.¶ 75(c)), that information is clearly disclosed in the challenged statement. (*Id.* ¶ 74). Finally, the accurate historical report, which was silent as to the workings of any products, did not create a duty to disclose technological problems with any products. *See Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d at 105.

For all these reasons, the claim of fraud based on Teradyne's Form 10-Q should be dismissed.

*6. September 20, 2000 Banc of America Securities Investment Conference (Compl. ¶ 84)*

In ¶ 84 of their Complaint, plaintiffs challenge several statements attributed to Teradyne executives at the Banc of America Securities Investment Conference held at the Ritz-Carlton in San Francisco, California on September 20, 2000. Specifically, plaintiffs allege that (1) "a Teradyne executive expressed comfort with analysts' current earnings estimates," (2) Teradyne's Vice President Thomas Newman was quoted by *Bloomberg* as having stated that he was "optimistic" about orders, and (3) the *Financial Times* reported on September 22, 2000 that "a Teradyne executive indicated at an industry conference earlier this week that the company expected to meet Wall Street's earnings forecast of 84 cents for the current quarter." (Compl. ¶ 84). In fact, the company did meet this target of 84 cents per share for the third quarter of 2000, the period ending October 1, 2000. (*Id.* ¶ 90). Nevertheless, plaintiffs challenge the statements made at the conference as being "materially false and misleading" for failure to disclose the Adverse Facts. (*Id.* ¶ 85).

**\*20** As detailed above, however, generalized statements of optimism are simply not actionable. Similarly, plaintiffs have failed to establish the falsity of any of the statements made. Finally, plaintiffs have not alleged facts which would lead to the conclusion that the failure to disclose the Adverse Facts rendered the statements materially incomplete.

Plaintiffs rely on *In re No. Telecom Ltd. Sec. Litig.,* No. 93-Civ-4384 (MGC), 1994 U.S. Dist. Lexis 11730, Fed. Sec. L. Rep. (CCH) ¶ 98,390 (S.D.N.Y. Aug. 22, 1994), for the proposition that " misrepresentations of existing facts similar to those alleged by plaintiffs have repeatedly been held to be material misrepresentations under the federal securities laws." (*Opp.* at 26). In that case, the following four statements (unlike fourteen others) survived a motion to dismiss: (1) "[o]ur product lines have never been stronger"; (2) the company " will continue to deliver the best of new technologies "; (3) the company "has been cementing relationships with companies"; and (4) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 17

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

acquisition of another company "was already yielding significant benefits." *In re No. Telecom Ltd. Sec. Litig.,* 1994 U.S. Dist. Lexis 11730, at *22. Thus, the court found:

If the allegations in the complaint are true-that [the defendant company's] switching systems had serious problems, that customers were unhappy, and that the company was losing money on [the acquired company]-then these allegations would have been misleading. It would not be true that the company's product lines "have never been stronger," that it offered "the best of new technologies," and that customer relationships were being "cemented." Similarly, it would be misleading to label an acquisition that was costing the company hundreds of millions of dollars a "significant benefit."

*Id.* at *22-23. FN8

FN8. Although the District Court in *Northern Telecom* also found that two other statements properly alleged a claim at the motion to dismiss stage, *id.* at *24-25, the plaintiffs in the instant case do not contend that the defendants made similar misrepresentations. (*See Opp.* at 26-27). Thus, the court will not address these additional statements, which did not survive the summary judgment stage.

There are obvious differences between the factual allegations in the *Northern Telecom* complaint and those in the instant case, especially concerning the content of the challenged statements. However, an extended discussion is not necessary. At the summary judgment stage in *Northern Telecom,* all challenges based on these four statements were dismissed for a number of reasons. *In re No. Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446 (S.D.N.Y.2000) (summary judgment entered in defendant's favor on all counts). In particular, but without limitation, with respect to the first two statements, neither was found to be "sufficiently ' concrete' or 'specific' to be material," rather they were found to be merely "puffery." *Id.* at 466. With respect to the other two statements, they were found to be accurate, and, therefore, not actionable. *Id.* Thus, even though Northern Telecom was having

problems with some customers, the statement that it was "cementing relationships with some telephone companies" was not a misrepresentation of material fact. *Id.* Similarly, even though the acquisition of the new company was not generally a profitable venture, the fact that there were some benefits provided by the acquisition was sufficient to negate the claim of misrepresentation based on the fourth statement. *Id.* at 466-67. In short, it took six years of litigation for the *Northern Telecom* court to dismiss claims on the basis of information which could have been derived from the complaint. *Northern Telecom* merely illustrates that, applying well established principles, the motion to dismiss based on ¶ 84 of the instant Complaint, as well as the other statements discussed herein, should be allowed.

### D. *Third-Party Statements*

**\*21** The plaintiffs allege that certain statements made by market analysts during the Class Period were materially misleading and were based on false and misleading information provided by Teradyne. Therefore, plaintiffs contend, the defendants are liable for these misrepresentations. For the reasons detailed herein, however, these claims should be dismissed.

The parties agree as to the appropriate standard of review. As the court explained in *In re Cabletron Sys., Inc.,* 311 F.3d at 37-38:

"[L]iability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree... . [T]he court will determine whether the complaint contains allegations which, favorably construed and viewed in the context of the entire pleading, could establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue." *Schaffer,* 924 F.Supp. at 1310. Entanglement also includes situations where company officials "intentionally foster a mistaken belief concerning a material fact." *Elkind,* 635 F.2d at 163-64.... Nonetheless, an entanglement claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 18

will be rejected if it merely suggests or assumes that company insiders provided the information on which analysts or other outsiders based their reports.

The plaintiffs' pleadings fall far short of alleging entanglement. Here, it is alleged that "Teradyne was followed by securities analysts employed by brokerage firms that throughout the Class Period reported information provided to them by defendants and made recommendations concerning the Company's common stock based on the information provided by defendants." (Compl.¶ 53). The plaintiffs further allege that Teradyne's " top officers and key members of its management team, including defendants Chamillard and Bradley, " were in regular communication with the analysts to discuss, *inter alia,* "operating results and anticipated orders, and to provide detailed guidance to these analysts with respect to the Company's business and anticipated orders and sales." (*Id.* ¶ 54). While plaintiffs allege conclusively that Teradyne "endorsed the reports of analysts, adopted them as its own, and placed its imprimatur on them as well as on the reports, forecasts, and statements contained therein," they fail to allege any facts to support this conclusion. (*Id.* ¶ 56). Thus, these allegations go no further than establishing that Teradyne provided information on which the analysts then independently relied-an insufficient basis for finding entanglement. *See Suna v. Bailey Corp.,* 107 F.3d at 74 (rejecting conclusory allegation that company "endorsed the contents of [the analysts'] reports, adopted them as its own, and placed its imprimatur on them"). For this reason alone, the challenges to the analysts' reports must fail.

**\*22** Moreover, the heightened pleading requirements of Fed.R.Civ.P. 9(b), apply to allegations that a company made misrepresentations through an analyst. *See In re Number Nine Visual Tech. Corp.,* 51 F.Supp.2d 1, 30-31 (D.Mass.1999). Thus, "a plaintiff is required to allege with particularity the time, place, content and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent." *Id* . at 30 (quoting *In re Boston Tech.,* 8 F.Supp.2d at 55). A review of the specific challenged reports

further supports the conclusion that the plaintiffs have failed to state a claim.

> 1. *Thomas Weisel Report July 14, 2000 (Compl.¶ 58)*

Plaintiffs first challenge a July 14, 2000 report issued by Thomas Weisel Partners LLC. (Compl.¶ 58). Therein, it was reported that at a specific meeting with analysts, Teradyne unveiled its new product line. At the meeting, Teradyne management allegedly "acknowledged order strength across all divisions" and reported it "is still guiding for $750mn in revenues 2Q00, roughly $1bn in bookings and a quarterly EPS between $0.72-$0.75. " (*Id.*). The analyst then concluded that it was " extremely optimistic about Teradyne's long-term fundamental outlook and its ability to perform well during the projected upturn" and reiterated its "BUY " rating. (*Id.*).

Defendants contend that the plaintiffs have failed to plead facts relating to the making of the statements to satisfy the requirement of pleading fraud with particularity. (*See Reply Mem.* at 32). The date of the meeting is identified, the purpose of the meeting, which was to unveil a new product line to analysts, is clear, and the fact that the statements were made by management at the meeting are all alleged. This is sufficient to comport with the Rule 9(b) standard. *See In re Number Nine,* 51 F.Supp.2d at 30-31. Nevertheless, this court concludes that the statements, themselves, are not actionable.

Plaintiffs allege that the statements by management were false and misleading because they failed to disclose the Adverse Facts, as well as that the bookings in the second quarter "were far below the guidance of $1 billion" but, rather, as reported four days later, only reached $826 million. (Compl.¶ 59(a)). With respect to the omission of the Adverse Facts, for the reasons detailed previously, plaintiffs have failed to establish that their omission rendered the statements made materially incomplete. As to the amount of orders, plaintiffs have failed to establish fraud since $826 million may be considered "*roughly* \$1bn in bookings," which makes management's statement true. Moreover,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 19

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiffs have failed to allege how or why the difference between $826 million and "roughly" $1 billion in orders is significant. This failure to " explain why the communications were fraudulent" further mandates dismissal of the claim. *In re Number Nine,* 51 F.Supp.2d at 31.

**\*23** Therefore, even assuming entanglement (which this court does not find), the motion to dismiss based on Thomas Weisel's July 14, 2000 report should be allowed.

### 2. *July 19, 2000 Reports (Compl.¶¶ 69-71)*

Plaintiffs also challenge positive statements made by three analysts on July 19, 2000, Robertson Stephens, Merrill Lynch and Lehman Brothers. (Compl.¶¶ 69-71). Other than reporting what the analysts said, however, the plaintiffs have failed to allege "the time, place, content and speaker of the company's communications with the analysts," nor do they "explain why the communications were fraudulent." *In re Number Nine,* 51 F.Supp.2d at 31 (quoting *Shiva,* 27 F.Supp.2d at 280). Consequently, even assuming entanglement, plaintiffs' claims based on these statements must be dismissed as well.

### 3. *Lehman Brothers August 22, 2000 Report (Compl.¶ 79)*

On August 23, 2000, Lehman Brothers issued a report on Teradyne's "upbeat" presentation at the annual semiconductor conference at the New York Society of Securities Analysts (the "NYSSA") held on or about August 22, 2000. (Compl.¶ 79). Plaintiffs challenge the following statements contained in the report:
*Teradyne's NYSSA presentation was upbeat, and the company repeated its guidance calling for $830-850 mill. in Q3 revenues, and sequentially higher orders.*

*New products, a pickup among test subcontractors, and good momentum in non-semiconductor test*

*businesses are reasons to be optimistic.*
As an important metric of this progress, *Teradyne cited orders for 14 systems that it won in the second quarter against entrenched competition.*
As another metric, management provided data showing rapid growth in the number [of] chip designs for which its testers were selected.

(*Id.*) (emphasis in Complaint).

Assuming, *arguendo,* that plaintiffs have satisfied the requirements for pleading the time, place and content of the company's statements, as well as the maker of the statements, [FN9] this claim must fail as there is no allegation that the statements of historical fact are not true. Plaintiffs again object to the failure to disclose the Adverse Facts, but again fail to establish a duty to disclose such facts in the context of these statements. Therefore, even assuming entanglement, this claim must fail.

> FN9. While the speaker is unknown, the court will assume that it is someone Teradyne designated to speak for it at the conference.

### 4. *September 11, 2000 Statements (Compl.¶¶ 81-82)*

Plaintiffs challenge statements issued by Josephthal and Merrill Lynch on September 11, 2000 following "recent contact with the company" and a " visit" with the company. (Compl.¶¶ 81-82). Again though, plaintiffs' failure to provide details about who provided information, the context in which it was provided, and even what statements were made by Teradyne, mandates dismissal of these claims. Moreover, plaintiffs again fail to establish that any facts reported were false, relying instead on the failure to disclose the Adverse Facts. ( *Id.* ¶ 83). Again, in the absence of any duty to disclose, the claim of fraud must fail, even assuming entanglement.

### 5. *September 22, 2000 William Blair & Co. (Compl. ¶ 88)*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 20

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*24** Finally, plaintiffs challenge a report issued by William Blair & Co. following discussions with its " contacts" inside the company. (Compl.¶ 88). Again, plaintiffs have failed to provide particulars about the company representative who provided information or the information provided. For these reasons alone, the claims based on this report must fail.

Additionally, the report contains accurate historical information such as, without limitation, that orders in the second quarter were $826 million, that orders for system-on-a-chip testers had been disappointing in the last quarter and that backplanes accounted for 23% of second-quarter revenues. (*Id.*). The report also accurately states that new plant openings and the Herco acquisition had significantly increased the capacity for the backplane. (*Id.*). Again, this accurate reporting of historical information cannot sustain a claim of fraud and does not create any duty to provide predictions about a less rosy future.

In their rote refrain, plaintiffs complain of the omission of the Adverse Facts. Again, however, they fail to identify why Teradyne had a duty to disclose such information and, even if it had a duty to disclose, how the failure to disclose rendered the report materially incomplete. The problem with plaintiffs' undifferentiated mantra is made strikingly obvious by the fact that plaintiffs challenge the alleged failure to disclose that "a significant portion of the purported rise in orders was in the Company's backplane connection division" (*Id.* ¶ 89(c)), a fact which is explicitly disclosed in the report. (*See id.* ¶ 88).

For all these reasons, the motion to dismiss the claim of securities fraud based on the analyst report should be allowed, even assuming entanglement.

*E. Scienter*

For the reasons detailed above, this court has concluded that the challenged statements themselves are not actionable. Therefore, this court recommends that the motion to dismiss be allowed on that basis. Even if the court were to conclude, however, that the challenged statements rise to the

level of material misstatements of fact, this court would still recommend dismissal of the Complaint because the plaintiffs have failed to allege facts which present a "strong inference" of scienter. *Greebel v. FTP Software, Inc.,* 194 F.3d at 197. " [T]o satisfy the pleading requirement for scienter, the amended complaint must state with particularity facts giving rise to a strong inference that the defendants acted with intent to deceive, manipulate or defraud or, at the least, acted recklessly." *In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 262 (D.Mass.2001), and cases cited. The plaintiffs have not satisfied this requirement.

*1. Internal Reports*

Plaintiffs rely on the existence of internal company reports in their efforts to establish scienter. (*See Opp.* at 8-10). Thus, as plaintiffs have alleged in their Complaint:

**\*25** 49. Defendants were fully aware that the Company was experiencing a significant decline in orders during the Class Period. For example, the Company prepared "CPR" reports on a monthly basis to identify customer problems that required the highest level of attention. These reports allowed the Company to service customers and identify problems that might lead to a significant loss of business.

50. In addition, each of Teradyne's divisions compiled a "Customer Satisfaction Index" (CSI). The CSI was compiled on a rolling basis, and consisted of all data relevant to measuring the satisfaction of Teradyne's customers. For example, the CSI included information concerning (i) the number of CPRs answered, (ii) the number of CPRs pending, (iii) the number of systems shipped each day and the number shipped each quarter, (iv) the number of systems installed, (v) the number of systems with problems, and (vi) the types of problems involved. The CPIs [sic] were disseminated to senior management, including, defendant Chamillard, and were the subject of discussion at Teradyne's quarterly executive meetings.

51. Each of the Company's divisions also prepared " Results Forecasts" (RF) on a quarterly basis, which were subsequently compiled at Teradyne's corporate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

offices. The RFs included detailed forecasts for the previous quarter and the following quarter concerning sales, revenues, operating expenses, engineering and design expenses, investment projects, cost of goods sold, shipments, and customer order projections (by customer name and dollar amounts). The RFs also compared the forecasts to actual results, and contained detailed explanations for the various problems experienced by the Company. The RFs were also used during management meetings, whose participants included the Individual Defendants.

(Compl.¶¶ 49-51).

It is well established "that merely stating the existence of efficient internal reporting systems in a conclusory fashion will not do much to increase the particularity of a securities fraud pleading." *In re Cabletron Sys. Inc.,* 311 F.3d at 31. Here, plaintiffs have identified the specific types of reports on which they are relying, but have otherwise failed to identify any specific report itself, the information in the reports they deem significant, or how such information rendered the representations at issue misleading. Such "allegations of a 'highly-efficient reporting system' may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual *content* of any single report generated by the alleged reporting system, do not independently provide a factual basis for inferring any such knowledge." *Shaw v. Digital Equip. Corp.,* 82 F.3d at 1224 n. 38 (emphasis in original). *Compare Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 363-65 (1st Cir.1994) (motion to dismiss denied where plaintiffs juxtaposed specific information contained in identified internal reports with specific public statements). Where, as here, the complaint is silent as to "the contents of those documents and defendants' possession of them at the relevant time," plaintiffs cannot satisfy the required level of particularity that the defendants had knowledge of the facts at issue. *In re Boston Tech. Inc. Sec. Litig.,* 8 F.Supp.2d at 57. Since " plaintiffs never specify which reports contained this information, the date of such reports, the exact information in the reports, or who received them," the Complaint cannot withstand a motion to

dismiss. *Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d at 104, and cases cited. Moreover, "the pleading of scienter is insufficient if it merely is a general averment that the defendants 'knew' earlier what later turned out badly." *In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d at 261 (citations and additional quotations omitted). Rather, the plaintiffs must also allege that "the defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Id.* (citations and quotations omitted). This the plaintiffs have failed to do here. For all these reasons, the allegations regarding the internal reports do not support a strong inference of scienter.

### 2. Granting of Price Concessions

**\*26** Plaintiffs further contend that they have provided evidence of scienter by alleging that the defendants adopted "several undisclosed practices designed to boost sales." (*Opp.* at 11). Thus, plaintiffs rely on the following allegation:
Defendants also offered significant price discounts and extended payment terms to customers in a concerted effort to boost their orders. In fact, Teradyne's customers often waited until the end of the quarter to order Teradyne products because they knew that the Company would offer them extremely favorable payment terms. Teradyne had to offer these significant price concessions and/or payment terms to maintain the appearance that their orders were not declining.

(Compl.¶ 48). This allegation, too, however, also fails to raise a strong inference of scienter.

As an initial matter, plaintiffs have failed to plead any specific details about these allegedly inappropriate practices from which scienter may be inferred. *See Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d at 105 (complaint dismissed where allegation that sales were achieved through a "slash and burn" discounting policy did not provide details as to who at the company "provided these discounts, who received them, the amount of the discounts, when they were provided, or which products were discounted"), and cases cited. Moreover, "lowering prices is an ancient and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 22

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

legitimate business tactic used to spur demand." *Fitzer v. Sec. Dynamics Tech., Inc.,* 119 F.Supp.2d at 27. The mere allegation that the products were offered at a "discount" is simply insufficient to state a claim of securities fraud. *See Stone & Webster, Inc., Sec. Litig.,* 253 F.Supp.2d at 124-25. [FN10]

>  FN10. For the reasons discussed earlier in connection with plaintiffs' claim of fraud based on the failure to disclose pricing information, plaintiffs' reliance on *Aldridge v. A.T. Cross Corp.,* 284 F.3d at 82-83, is misplaced.

### 3. The Herco Transaction

Plaintiffs also point to "[t]he facts and circumstances leading to the setting of the exchange price in connection with Teradyne's acquisition of Herco Technology and Synthane Taylor" as further evidence of defendants' scienter. (*Opp.* at 11, 19 (the consummation of the acquisitions was of critical importance to Teradyne)). However, while these facts may be relevant to establishing a motive for Teradyne's statements, they are insufficient to establish a strong inference of scienter. [FN11]

>  FN11. Plaintiffs appropriately challenge the defendants' reference to an e-mail from Charles Herring to Teradyne commenting on Teradyne's handling of the acquisition. (*Opp.* at 12-13; *see also Mem.* at 8-9 & App. Ex. 39). This court has since stricken that exhibit and has not considered it in ruling on the motion to dismiss. Similarly, this court has disregarded defendants' arguments about the motivation for the Herring Litigation, as those assertions are premised on information not properly considered in connection with a motion to dismiss. (*See Mem.* at 9-10).

According to the plaintiffs, on July 29, 2000, Teradyne "insisted that Herco/Synthane Taylor agree to lock in the stock price for the acquisition at $66.26 per share," instead of the "previously agreed-to formula" of the average of the closing

stock price for the 10 days prior to the execution of the final agreement. (Compl.¶ 98). According to the plaintiffs, the reasons given by Teradyne for this change in price were false and Teradyne was, in fact, concerned that the stock price would continue to drop. (*Id.* ¶¶ 98-100). Teradyne announced that it was going to acquire the companies on August 16, 2000. (*Id.* ¶ 8). At that time, it appears that Teradyne's stock was trading in the $60 range, so the locked-in price was consistent with the price Teradyne could have expected to receive at the time of the announcement. (*See id.* ¶ 80 (on August 22, 2000, stock traded at $63.56; on August 23, 2000, stock closed at $67.625)). Plaintiffs offer no arguments as to why or how Teradyne's statements after the price was locked in on July 29, 2000 were affected by the locked-in price. [FN12] Thus, the events leading up to the July 29, 2000 lock-in price cannot establish a strong inference of scienter for events and statements transpiring thereafter.

>  FN12. The closing apparently took place around August 15, 2000. However, it is clear that suit was not filed in the Herring Litigation until September 2001, more than a year after the complained of events and well after the stock price had declined substantially lower than $66/share.

**\*27** Moreover, "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Greebel v. FTP Software, Inc.,* 194 F.3d at 197, and cases cited. "While there may be cases in which allegations of motive and opportunity are enough to permit the drawing of a strong inference of scienter," the mere allegation of a desire to use stock to purchase other businesses is insufficient to make the required showing. *In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d at 270-71 (conclusory allegation that stock was used to acquire a new business insufficient-it is "but a bare pleading of motive and opportunity without allegations of other facts raising a strong inference of scienter"). Simply stated, courts generally conclude that the general motive "of maintaining the stock price in order to maintain the reputation of the company and facilitate mergers and acquisitions" is insufficient to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 23

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

satisfy the scienter requirement since "such motives can be ascribed to virtually all corporate officers and directors[.]" *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1361 (S.D.Fla.1998), *aff'd,* 226 F.3d 647 (11 [th] Cir.2000) (unpublished op.); *accord Coates v. Heartland Wireless Comm., Inc.,* 26 F.Supp.2d 910, 919 (N.D.Tex.1998) (mere allegation that company was motivated to inflate stock price "because it was expanding through acquisition of other systems and companies and was primarily paying for those acquisitions with [the company's] common stock" failed to establish scienter).

In the instant case, plaintiffs admittedly go somewhat beyond such general allegations by linking the motivation to the price in the Herco acquisition, not just any possible transaction. However, given the fact that the price was locked-in so early in the Class Period, the allegations of motive are no more compelling than the general allegations routinely rejected by the courts. Thus, plaintiffs have failed to allege sufficient facts to warrant the conclusion that Teradyne's actions in connection with the Herco transaction gives rise to a strong inference of scienter.

### 4. *The Subject Matter of the Challenged Statements and Omissions*

Plaintiffs argue that "[w]hen a defendant's misstatements and omissions concern the core operations and products of a company or involve issues of a significant and considerable magnitude, courts infer defendants' willful disregard as to the falsity of their statements." (*Opp.* at 14). Even assuming that this broad assertion is an accurate statement of the law, this principle has no application here. As the cases relied on by plaintiffs establish, courts have found scienter when there is an affirmative misrepresentation made about facts relating to significant parts of the company's business such that the defendants' allowance of such misinformation to stand must have been intentional and for the purpose of deceit. *See, e.g., Cosmas v. Hassett,* 886 F.2d 8, 12-13 (2d Cir.1989) (where company represented that the People's Republic of China was an important source of revenue, although Chinese trade restrictions prevented sales to that

country, the complaint "adequately identifie[d] circumstances indicating conscious behavior by the defendants" and there was a strong inference that directors had knowledge of the restrictions "since the restrictions apparently eliminated a potentially significant source of income for the company"). Similarly, the failure to disclose significant information when faced with a clear duty to disclose raises the strong inference that a defendant intended to deceive, manipulate or defraud investors. *See, e.g., Chalverus v. Pegasystems. Inc.,* 59 F.Supp.2d 226, 233-35 (D.Mass.1999) (where company makes representation about value of contract while failing to disclose contractual obligation which greatly reduced its value, and company's accounting practices violated GAAP, scienter properly alleged); *Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir.2000), *cert. denied sub nom. Kasaks v. Novak,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) ( "When managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws.").

**\*28** The statements at issue in the instant case stand in sharp contrast to those in which scienter has been found. Here, there are no direct conflicts between the reality of the situation and the representations made. Rather, the statements are mere corporate puffery and the plaintiffs have not established a duty to disclose the omitted information. Under such circumstances, the conduct complained of does not raise a strong inference of scienter.

### 5. *The Lack of Insider Trading*

The defendants argue, persuasively, that the plaintiffs' claim of scienter must be viewed in light of the fact that the value of the individual defendants' holdings themselves lost millions of dollars during the Class Period. Admittedly, as the plaintiffs correctly assert, "sale of stock by an insider is *not* required to establish motive." (*Opp.* at 18 (emphasis in original) (citing *Aldridge v. A.T. Cross Corp.,* 284 F.3d at 84)). Nevertheless, the substantial losses by individual defendants " undermines any inference of scienter." *Maldonado*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 24

Not Reported in F.Supp.2d, 2004 WL 1467065 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

*v. Dominguez,* 137 F.3d 1, 12 n. 9 (1st Cir.1998).

Records filed with the SEC, which this court may consider in ruling on a motion to dismiss, indicate that on the first day of the Class Period, Chamillard owned 175,580 shares of Teradyne common stock and 241,000 exercisable options. Similarly, Bradley owned 41,745 shares on the first day of the Class Period and 87,000 exercisable options. (*See* App. Ex. 10-13, *Mem.* at 38 n.46). The individual defendants did not sell any of their stock during the Class Period, and plaintiffs do not dispute that the value of Chamillard's and Bradley's stock holdings declined almost $30 million during that time frame. (*See Reply Mem.* at 20; *Opp .* at 18). "This lack of sales by these high-level insiders during the Class Period, while not determinative, certainly weighs against an inference of scienter." *In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1326 (M.D.Fla.2002), and cases cited.

In sum, the facts which have been alleged do not support a strong inference of scienter. For this reason as well, this court recommends that the motion to dismiss be allowed.

### F. *Controlling Person Liability*

Plaintiffs have asserted claims against the individual defendants under Section 20(a) of the Act, "which provides for derivative liability of persons who ' control' others found to be primarily liable under the Exchange Act." *Greebel v. FTP Software, Inc.,* 194 F.3d at 207 (citing 15 U.S.C. § 78t(a)). Where, as here, the complaint fails to allege an underlying violation of the securities laws, the Section 20(a) claims should be dismissed. *Id.*

### G. *Leave to Amend*

Defendants have moved to have the Complaint dismissed with prejudice. (*Mem.* at 54). Plaintiffs, however, assert that if the Complaint is dismissed, they should be given leave to replead. (*Opp.* at 34 n.37). Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). While entitled a "Consolidated Amended Class Action

Complaint" (Docket # 28), the Complaint at issue is the first consolidated class action complaint and the first time a complaint has been substantially reviewed by the court in this case. "Because Plaintiffs have not previously been given an opportunity to amend and because it does not clearly appear to this court that any attempt to amend would necessarily be futile," this court recommends that the dismissal of the Complaint be without prejudice. *In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d at 1339.

### IV. CONCLUSION

**\*29** For all the reasons detailed herein, this court recommends that the "Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint in its Entirety" (Docket # 32) be allowed, except that the dismissal should be without prejudice. [FN13]

> FN13. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia-Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604-605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378-79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Am,* 474 U.S. 140,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.