Westlaw.

Not Reported in F.Supp.2d                                                                             Page 1

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Virginia.
In re PEC SOLUTIONS, INC. SECURITIES LITIGATION
No. 03-CV-331.

May 25, 2004.

John Christopher Pasierb, Cohen, Gettings & Caulkins, PC, Arlington, VA, Conor R. Crowley, Finkelstein, Thompson & Loughran, Washington, DC, for Plaintiffs.
Lyle Roberts, Gregory A. Harris, Wilson, Sonsini, Goodrich & Rosati, Reston, VA, for Defendants.

MEMORANDUM OPINION

LEE, J.
*1 THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint. This case concerns a federal securities class action on behalf of all persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003. The question before the Court is whether the Complaint demonstrates securities fraud in that the Defendants recklessly made false and misleading statements regarding the financial condition of PEC Solutions, Inc. that damaged the Plaintiffs. The Court concludes that the Plaintiffs' securities fraud and control person liability claims must be dismissed because: (1) the Defendants' statements are protected by the safe harbor provision of the Reform Act because they were accompanied by meaningful cautionary language and they were not worded as guarantees; (2) Plaintiffs' fail to plead fraud with particularity because there are insufficient details and the Plaintiffs do not show that many of the statements made were false; (3) Plaintiffs' fail to establish scienter because the Complaint does not show how the Defendants' acted outside the standard of ordinary care; and (4) without facts to support claims of securities fraud, there can be no liability based upon control person liability.

I. BACKGROUND

Plaintiffs are persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003 (the "Class Period"). Defendant PEC Solutions, Inc. (hereinafter "PEC" or the " Company") is a Delaware Corporation with its principal offices in Fairfax, Virginia. PEC is in the business of providing secure, interoperable technology solutions for clients in law enforcement, intelligence, defense, and civilian agencies within the federal government and at state and local levels. Defendants David Karlgaard ("Karlgaard"), Paul Rice ("Rice"), Stuart Lloyd ("Lloyd"), and Alan Harbitter ("Harbitter"), collectively the "Individual Defendants", are the officers and directors of PEC.

This action stems from problems related to PEC's subcontract with NCS/Pearson, Inc., later known as Pearson Government Solutions, Inc. ("Pearson"), a contractor with the U.S. Government responsible for the recruitment, assessment, and selection of federal air travel passenger screeners. The Transportation Security Administration ("TSA") was the government agency that awarded Pearson a general contract. The TSA was created by Congress in the aftermath of September 11, 2001, and was responsible for establishing a federal security workforce to screen air travel passengers in all of the nation's 429 commercial airports. Pearson's responsibilities under the contract with the TSA included finding and assessing qualified candidates and providing the day-to-day servicing in human resource support for the 45,000 federal screeners to be hired and deployed nationwide. Pearson entered into a subcontract with PEC (hereinafter the " Pearson subcontract"), which was responsible for the electronic capture and transfer of the applicants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

fingerprints and the collection of the applicants' biographical information.

*2 The cost of the TSA's contract with Pearson was originally estimated at $104 million. Ultimately, more than $700 million was required to complete the contract. These cost overruns became the subject of an audit by the Defense Contract Audit Agency ("DCAA") and several investigations, including one by the Inspector General of the United States Department of Transportation. Additionally, the government investigated Pearson's performance under the contract because the press reported that several of the people hired as federal airport screeners had criminal records. Pending the completion of the investigations, the government suspended payment under the contract with Pearson.

The Defendants are alleged to have violated the duty to investors to promptly provide accurate and truthful information with respect to PEC's financial condition and performance, growth, and operations. Plaintiffs contend that the Defendants were aware of the problems that Pearson was having in relationship to its contract with the TSA. However, PEC issued several press releases during this period that, Plaintiffs argue, did not accurately reflect how Pearson's problems affected PEC's earnings and financial health. The result of the Defendants' alleged breach is that the Plaintiffs were induced to purchase PEC's common stock at inflated market prices. The Defendants are accused of not only deceiving and defrauding the investing public, but also of selling their personally held shares of PEC common stock in violation of federal securities laws.

II. DISCUSSION

A. Standard of Review

1. *Federal Rule of Civil Procedure 12(b)(6)-Failure to State a Claim Upon Which Relief Can be Granted*

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss for failure to state a claim upon which relief can be granted, a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. See *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 627 (E.D.Va.2000). However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir.1997); *Gasner v. County of Dinwiddie,* 162 F.R.D. 280 (E.D.Va.1995). All reasonable inferences must be made in favor of the nonmoving party. See *In re MicroStrategy,* 115 F.Supp.2d at 627 (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)). A motion to dismiss tests only " the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *Id.*

2. *Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)*

*3 To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages." *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999); see also 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

When proceeding under a fraud on market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) ; *Miller v. Asensio,* 101 F.Supp.2d 395 (D.S.C.2000)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

.

In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstance constituting fraud ... be stated with particularity" in the complaint. Fed.R.Civ.P. 9(b). Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss-the Private Securities Litigation Reform Act.

3. The Private Securities Litigation Reform Act (the "PSLRA" or "Reform Act")

The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement. *Borow v. nView Corp.,* 829 F.Supp. 828, 833 (E.D.Va.1993); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir.1999) (finding that as to scienter, plaintiffs are required to plead who, what, when, where, and how). Additionally, unlike Rule 9(b), which permits scienter to be averred generally, the PSLRA requires that the complaint in a securities fraud case "state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (*emphasis added*). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15 U.S.C. § 78u-4(b)(3)(A).

The Fourth Circuit has chosen not to focus the scienter inquiry on categories of facts such as motive and opportunity. *See Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338 (4th Cir.2003). Rather, courts must conduct a case-specific analysis examining all of the allegations in order to determine whether they collectively establish a strong inference of scienter. *Id.* The Court in *In re MicroStrategy* concluded that in reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind," a court must "(1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by the these allegations, and (3) determine whether these inferences, individually or cumulatively provide a strong-or persuasive and cogent-inference that the defendant possessed the requisite state of mind." 115 F.Supp.2d at 627. While the existence of particular facts demonstrating motive and opportunity to commit fraud may be relevant to the scienter inquiry, the weight accorded to those facts depends upon the circumstances of each case. *Ottmann,* 353 F.3d at 345-46. Accordingly, the totality of the circumstances alleged must demonstrate a strong inference of the requisite state of mind. *In re MicroStrategy,* 115 F.Supp.2d at 627.

*4 The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness. *See Ottmann,* 353 F.3d at 344; *Phillips,* 190 F.3d at 620. Intentional misconduct encompasses deliberate illegal behavior. *See City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1260 (10th Cir.2001). Recklessness is a slightly lesser species of intentional misconduct and must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips,* 190 F.3d at 621; *Ottmann,* 353 F.3d at 343-44; *accord In re MicroStrategy,* 115 F.Supp.2d at 633; *Arnlund v. Deloitte & Touche, LLP,* 199 F.Supp.2d 461, 474 (E.D.Va.2002).

B. Analysis

Plaintiffs' securities fraud claims must be dismissed because the Plaintiffs': (1) fail to plead fraud based upon the Defendants' statements regarding PEC's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

financial condition with the requisite particularity; (2) fail to properly plead loss causation; (3) fail to plead fraud based upon GAAP violations with s ufficient particularity; and (4) fail to allege facts establishing a strong inference of scienter.

1. *Statement-by-Statement Analysis*

Plaintiffs' claims based upon the Individual Defendants' statements regarding PEC's financial condition made in press releases, conference calls, and newspaper articles must be dismissed because the Plaintiffs fail to allege fraud with the particularity required by Rule 9(b) and the Reform Act. Specifically, Plaintiffs do not allege facts that demonstrate how the Individual Defendants' statements are false and/or misleading. Additionally, the Individual Defendants forward-looking statements cannot be a basis for the Plaintiffs' fraud claims because the statements are either: (1) inactionable and immaterial as a matter of law because they are not worded as guarantees or (2) protected by the safe harbor provision of the Reform Act because they are accompanied by meaningful cautionary language.

Courts have employed a statement-by-statement analysis in evaluating whether the complaint " specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b); *see also Arnlund v. Smith*, 210 F.Supp.2d 755, 762-63 (E.D.Va.2002); *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 889 (W.D.N.C.2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. *Borow*, 829 F.Supp. at 833.

Rule 9(b) requires that allegations of fraud be pled with specificity. Fed.R.Civ.P. 9(b). Along these lines, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false. *In re First Union*, 128 F.Supp.2d at 886. Group pleading fails to satisfy the requirement that the who, what, when, where, why, and how be specified. *Id.*

*5 Additionally, actionable false or misleading statements must also be material. *See In re First Union*, 128 F.Supp.2d at 884; *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) (finding optimistic predictions about the future inactionable and immaterial as a matter of law). A fact is a material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.*, 97 F.3d 675, 682-83 (4th Cir.1999). However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether "no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor." *In re MicroStrategy*, 115 F.Supp.2d at 657 (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999)). Furthermore, under the Reform Act, when statements are forward-looking, they are not actionable, even though they may be material, if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ. 15 U.S.C. § 78u-5(c)(1).

a. *Press release and conference call on October 22, 2002.*

In October of 2002, PEC reported its financial results for the third quarter, issued press releases, and held conference calls in order to discuss these results. Plaintiffs' claims based upon these statements must be dismissed because: (1) the Defendants cannot be held liable for failing to disclose facts that did not exist; (2) Plaintiffs do not plead that the statements were false or misleading with the required particularity; and (3) the Defendants' forward-looking statements are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

immaterial and protected by the safe harbor provision of the Reform Act.

On October 22, 2002, the Company issued a press release announcing its financial results for the third quarter of 2002, which was the period ending September 30, 2002. The Company posted an earnings per share of $0.25, which exceeded analysts' projections of $0.17 per share. In this press release, Defendant Rice commented on the results by stating "over the third quarter, PEC experienced significant acceleration in certain engagements related to the federal government's homeland security mission, and in the application of biometric identification technologies to various mission requirements...." Compl. ¶ 48. The press release also quoted Defendant Rice on several key business developments focusing on the Pearson subcontract. " Significant incremental orders were received for PEC's transportable automated fingerprint capture and biometric identification systems (called PACTS)." Compl. ¶ 48.

Also, during a conference call with analysts on October 22, 2002, Defendant Lloyd represented that "the Company's Day Sales Outstanding ("DSO") for the third quarter were 88 days, down from last quarter's 91 days." Compl. ¶ 50. During the same call, Defendant Rice explained that PEC's ongoing business in the current government spending environment by stating that PEC's "ongoing business is not directly impacted by a continuing resolution funding requirement ... because we have largely the long-term engagements that are incrementally authorized and funded on a regular basis." Compl. ¶ 50. In this call, Defendant Karlgaard touted the results for the quarter and stated that based on the growth in the Pearson subcontract, the Company was poised to grow and meet its revenue objectives for the year. For instance, Defendant Karlgaard mentioned revenue growth and that the Company should meet its revenue objectives for the year. Compl. ¶ 50. Defendant Karlgaard stated among other things that "this was truly an exceptional quarter for PEC. We experienced a very strong quarter partly because of quick-response orders for mobile biometric solutions relating to homeland security...." Compl. ¶ 50.

*6 Plaintiffs allege that the statements made by Defendants on October 22, 2002, were false and misleading because they failed to disclose: (1) that Pearson had stopped paying PEC on the Pearson subcontract in August; (2) that by December 2002, PEC was owed $15.6 million on the Pearson subcontract; (3) that Pearson and PEC were the subject of a DCAA audit due to huge cost overruns and wasteful billing; (4) that TSA had stopped paying Pearson pending the completion of the audit; and (5) that PEC might be forced to refund some of their earnings once the audit was completed. Compl ¶¶ 41, 68, 31, and 33. In other words, at base Plaintiffs' allegation is that the statements made in the press release gave the impression that there were no problems with one of the Company's largest sources of revenue, the Pearson subcontract, when indeed there were major problems that ultimately led to substantial losses for the Plaintiffs.

First, the Defendants's statements of October 22, 2002, are not actionable because the Defendants cannot be held liable for failing to disclose facts that did not exist. For instance, Plaintiffs state that the Defendants' October statements are false and misleading because "by December 31, 2002, PEC had a receivable of $15.6 million from Pearson." Compl. ¶ 68. However, Defendants' cannot be held liable based upon a statement made in October when there is no proof that the fact existed until December. Even if PEC had accounts receivable on the Pearson subcontract in August, September, or October, Plaintiffs do not allege the specific amount owed at that time. The Court cannot find that statements regarding the circumstances of Pearson's payments to PEC are false, where there is insufficient information regarding the amount owed. In fact, the Defendants allege that Pearson continued to make payments under the contract, including a $10 million payment in January 2003. Moreover, this payment is important because it demonstrates that Plaintiffs' contention that Pearson would not pay PEC until the conclusion of the audit is false because the DCAA's audit of Pearson began in June 2003 and, as far as Defendants are aware, is still ongoing. Mot. to Dismiss at 10 n. 7.

Moreover, Plaintiffs cannot demonstrate that the DCAA was conducting an audit of PEC at the time

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 6

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

the October statements were made. The Plaintiffs basis for this allegation is the congressional testimony of Mac Curtis, President of Pearson, and Kenneth Mead, Inspector General of the U.S. Department of Transportation. Regarding Mr. Curtis, Plaintiffs' quote him as saying "the DCAA has come in and audited a lot of our subcontractors, starting in August-September [2002] time frame,...." Compl. ¶ 31. However, Mr. Curtis never mentions PEC in the context of an audit. Furthermore, Mr. Mead is quoted as saying that the DCAA " questioned over $124 million of almost $620 million audited." Again, there is no mention of PEC. Given that these two statements are the only support for Plaintiffs' allegations regarding an audit of PEC, there is no basis for Plaintiffs' claims based upon a DCAA audit of PEC. Accordingly, Plaintiffs' claims of fraud based upon allegations of audit must be dismissed.

*7 Second, Plaintiffs do not plead that the Defendants' statements were false and misleading with particularity. With respect to Defendants' statements regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs, Plaintiffs fail to demonstrate how these statements were false. Plaintiffs do not plead facts that demonstrate how PEC's reports regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs are inconsistent or misstated. Furthermore, Plaintiffs do not mention when each of the Individual Defendants learned when each statement was false or how they learned the statement were false. Additionally, Plaintiffs make conclusory statements regarding the misleading nature of the October statements, but do not state with specificity how the statements were misleading.

Third, the Court finds that the statements made on October 22, 2002, inactionable because they are immaterial as a matter of law. When determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips,* 109 F.3d at 615 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The "total mix" of information includes publicly available information. *Id* at 615, 617. As in *Phillips,* Plaintiffs in the instant action rest their Complaint "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statement[s] from [their] context and from the wealth of information publicly available when [they] were made." 4 F.3d at 615. For instance, Plaintiffs allege that PEC failed to disclose that the Pearson subcontract was experiencing problems or no growth. Compl. ¶ 51(a). However, PEC disclosed that "future revenues based on the Pearson contract were uncertain" and that "the Company would have to start speculating more as we talk about the future and what other elements of it [the project] they're [Pearson] going to engage us on." Mot. to Dismiss at 13; 10/22/02 Call. Tr. at 20.

Fourth, to the extent that the Defendants' statements are forward-looking, they are protected by the Safe Harbor provision of the Reform Act. The Reform Act's safe harbor provision shields defendants from liability where the alleged materially false and misleading statements are forward-looking and accompanied by meaningful cautionary language or where the plaintiff fails to plead specific facts showing that the defendants had actual knowledge that each forward-looking statement was false or misleading when made. 15 U.S.C. § 78u-5(c)(1). A statement is forward-looking if it concerns a projection of financial items and if its truth or falsity is discernible only after it is made. 15 U.S.C. § 78u-5(i)(1); *Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 722 (E.D.Va.2003)(citing *Harris v. Ivax Corp.,* 182 F.3d 799, 805 (11th Cir.1999)). Additionally, cautionary language is meaningful if it conveys information about factors that could realistically cause results to materially differ from those projected. *See In re Humphrey Hospitality Trust, Inc. Sec. Litig.,* 219 F.Supp.2d 675, 683-84 (D.Md.2002).

*8 For example, Defendants' statements regarding expected revenue growth, Compl. ¶ 48, and expected earnings per share, *id,* are forward-looking statements because they involve financial projections that will not be determined to be true or false until some point in the future. Moreover, these statements are protected by the safe harbor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

provision because at the beginning of all of PEC's investor calls, including the one in October 2002, investors are given a warning about factors that could materially alter the projections given. The warning states that "we may make forward-looking statements that involve risks and uncertainties. These risks and uncertainties could cause PEC Solutions' results to differ materially from management's current expectations and adversely affect the financial condition of the Company." *See* 10/22/02 Call Tr. at 1; Mot. to Dismiss at 12. Similarly, all press releases state that "This press release may contain forward-looking information ... and is subject to the safe harbor created by [the Reform Act]." *See* Mot. to Dismiss at 12. Accordingly, the Defendants' forward-looking statements are not actionable pursuant to the safe harbor provision of the Reform Act. 15 U.S.C. § 78u-5.

b. *November 14, 2002, quarterly report*

On November 14, 2002, PEC filed its quarterly report for the period ending September 30, 2002. Plaintiffs' claims based upon the statements made in this report must be dismissed because Plaintiffs fail to allege fraud with particularity and the forward-looking statements are protected by the safe harbor provision of the Reform Act. The report reiterated the Company's earnings and accounts receivables published in the October 22, 2002, press release, and stated, among other things, that " Management believes the effect of audit adjustments, if any, on periods not yet audited, will not have a material effect on the financial statements." Compl. ¶ 53.

Plaintiffs allege that the statements contained in the November 2002 quarterly report were false and misleading because the Company failed to disclose: (1) that TSA had stopped paying Pearson; (2) that Pearson had stopped paying PEC; and (3) the true effects of the government's audit on its revenue. Compl. ¶ 51. These statements are forward-looking within the meaning of the safe harbor provision because they are financial projections. Additionally, it is protected by the safe harbor provision of the Reform Act because it is accompanied by meaningful cautionary language that stated "Payments to the Company on contracts with agencies and departments of the U.S. Government are subject to adjustment upon audit by the U .S. Government." Compl. ¶ 53. The language is meaningful because it advises the investor that adjustments may have to be made. Moreover, without facts to support the existence of a DCAA audit, Plaintiffs do not have a basis to state that this statement is false. Furthermore, to the extent that this and other statements in the quarterly report are fraudulent, Plaintiffs' claims based upon these statements nevertheless fail because Plaintiffs do not plead with particularity. For instance, there are no facts alleged that discuss who made these statements. Accordingly, Plaintiffs' claims based upon these statements must be dismissed as inactionable.

c. *February 11, 2003, press release and conference call and February 12, 2003, news article.*

*9 Plaintiffs' claims based upon the statements made in the February press release, conference call, and news article must be dismissed because: (1) the Plaintiffs fail to plead fraud with particularity; (2) the Defendants' forward-looking statements are either immaterial or protected by the safe harbor provision of the Reform Act; and (3) the Defendants cannot be held liable based upon statements made by third parties.

On February 11, 2003, PEC filed its 10-K form, which announced the financial results for the fourth quarter of 2002 and the fiscal year 2002, ending December 31, 2002. The Company reported earnings of $0.20 per share for the quarter and $0.75 per share for the year. Compl. ¶ 55. Additionally, the Company missed its projected revenues because it posted revenues of $48.3 million for the quarter as opposed to the $51 million forecasted.

Defendant Karlgaard commented on the results in a press release dated February 11, 2003. He said " PEC is pleased to report that fiscal year 2002 was a record year in growth and profitability for the company ... We think these numbers demonstrate a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

strong, consistent record of performance...." Compl. ¶ 55. Plaintiffs quote the text of the press release in paragraph 55 and then simply state in paragraph 59 that these statements are false and misleading for the same "reasons set forth in ¶ 49." [FN1] Compl. ¶ 59. Plaintiffs do not specifically state why Defendant Karlgaard's statement was false or how it was misleading. Moreover, Plaintiffs fail to identify the specific statements that are allegedly misleading and to identify how the omitted facts made those statements misleading. *See Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 (4th Cir.1999); *see also Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (duty to disclose facts under the securities laws "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead." ) (internal quotations and citations omitted). Without an explanation as to how these general statements are incomplete or misleading, other than to say that a certain disclosure should have been made, Plaintiffs' claims of fraud based upon Defendant's Karlgaard's February 11, 2003, statement must fail.

>       FN1. Paragraph 49 of the Complaint states that the statements are materially false and misleading because the Defendants failed to disclose: (1) that Pearson and PEC were being investigated and audited; (2) that there were cost overruns on the TSA contract; (3) that as a result of the cost overruns TSA stopped paying Pearson and Pearson stopped paying PEC; (4) that work had halted on the TSA contract and would not continue until the completion of the audit; (5) that PEC might be forced to refund a portion of its fees; (6) that PEC's financial results were materially inflated because of a failure to maintain a proper reserve for uncollectible receivables; and (7) that given the foregoing PEC had no basis for its revenue projections. Compl. ¶ 49.

Plaintiffs' securities fraud claims based upon Defendant Lloyd's statements must fail because these statements are immaterial as a matter of law and protected by the safe harbor provision of the Reform Act. In the same press release dated February 11, 2003, Defendant Lloyd stated that " revenue is expected to be between $48 to $49 million for the first quarter 2003, and diluted EPS should be between 17 and 18 cents for the quarter. Guidance for 2003 is for revenue to grow between 30 percent and 40 percent, resulting in revenue between $240 to $255 million. EPS is estimated to be between 85 to 92 cents for the full year 2003." Compl. ¶ 55. This statement contains financial projections, which are "not actionable under federal securities laws." *Raab,* 4 F.3d at 290 (quoting *Krim v. Banctexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993)). Moreover, statements such as this one lack materiality because "the market price of a share is not inflated by vague statements predicting growth." *Id.*

*10 Additionally, Defendant Lloyd's statements are protected by the safe harbor provision of the Reform Act because the statement was accompanied by meaningful cautionary language. The press release noted that "This press release may contain forward-looking information ... and it subject to the safe harbor created by the [Reform Act]." Compl. ¶ 55. Furthermore, the Company warned investors about certain risks in the 2002 Form 10-K, which is incorporated by reference. *See In re Humphrey Hospitality Trust,* 219 F.Supp.2d at 684 (noting that SEC filings incorporated by reference are adequate to invoke safe harbor protection). For example, PEC disclosed that "if the Federal government does not adopt a budget ... Federal agencies may be forced to suspend our contracts due to a lack of funding." 2002 Form 10-K. This statement constitutes meaningful cautionary language because it warns the investor that PEC's projections may be subject to fluctuation. In the same Form 10-K, PEC disclosed that "An audit could result in a substantial adjustment to our revenues because any costs found to be improperly allocated to a specific contract will not be reimbursed, while improper costs already reimbursed must be refunded." *Id.* Similarly, this disclosure warns investors that audits are routine and that the results can materially affect revenue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 9
Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

projections. Given that Defendant Lloyd's statements were forward-looking financial projections accompanied by meaningful cautionary language, these statements are inactionable as a matter of law because they are protected by the safe harbor provision of the Reform Act. *See* 15 U.S.C. § 78u-5.

Also, PEC's conference call conducted on February 11, 2003, cannot be a basis for Plaintiffs' claims of securities fraud because Plaintiffs fail to plead fraud with specificity. PEC's Director of Corporate Communications, John McNeilly, stated towards the beginning of the phone call that PEC's revenue for the fourth quarter "was down 3% under planned departments." Compl. ¶ 56. He also said that PEC was experiencing "temporary discontinuity" in one of its biometric contracts. Compl. ¶ 56. Defendant Rice expounded on that point and indicated that the Company's shortfall was "related to [the] biometrics program and sort of spinning one phase of that effort down and not spinning up the next phase of that effort in the manner that we expected...." Compl. ¶ 56. Plaintiffs assert that these statements were false and misleading because the Defendants did not disclose the problems associated with the Pearson subcontract.

Plaintiffs do not specify how the exclusion of additional information about the biometrics contract renders the Company's statements misleading or false. Simply mentioning biometrics products does not trigger a duty to disclose "every tangentially related fact that might interest investors" about the biometrics contract. *See Anderson v. Abbott Labs.,* 140 F.Supp.2d 894, 903 (N.D.Ill.2001), *aff'd, Gallagher v. Abbott Labs.,* 269 F.3d 806 (7th Cir.2001). Moreover, the Company disclosed in its 2002 Form 10-K that future revenues based upon the Pearson subcontract were uncertain noting that "if any ... prime contractors eliminate or reduce their engagements with us, or have their engagements eliminated or reduced by their end-clients, we will lose a source of revenues, which if not replaced, will adversely affect our operating results." 2002 Form 10-K at 10. PEC also noted that following termination, "if the client requires further services of the type provided in the contract, there is frequently a competitive rebidding process ... Even if we do win the rebid, we may experience revenue shortfalls ... [which] could harm operating results for those periods." *Id.* Plaintiffs do not present facts that demonstrate that PEC's statements were false and misleading despite the Defendants' disclosure warning investors that the figures associated with the biometrics contract were subject to change. Without specific facts demonstrating how the statements in the February 2003 conference calls were false or misleading, Plaintiffs securities fraud claims based upon these statements must be dismissed.

*11 The statements discussed in the February 11, 2003, press release and conference call were analyzed in an article published by the Dow Jones Business News on February 12, 2003. This article also mentioned several analysts' opinions that PEC's projections would be difficult to meet. The Individual Defendants cannot be held liable for securities fraud based upon the article published by the Dow Jones Business News because the Individual Defendants do not control what is published by this third party.

Plaintiffs argue that the statements made in the Dow Jones Business News were false and misleading because the Defendants misrepresented that the Pearson contract would continue to contribute to the company's future earnings. The issue is whether companies can be held liable based upon statements contained in articles published by the news media or other third-parties. It is well settled that companies cannot be held liable for the independent statement of a third party, where the company does not exercise control over the third party. *See Raab,* 4 F.3d at 288. Without control over the third party publication, the company's statements can be taken out of context, misquoted, or stripped of important qualifiers. *Id.* Accordingly, the Plaintiffs' allegations with respect to the February 12, 2003, article published by the Dow Jones Business News are insufficient to establish liability.

### 2. *Failure to allege loss causation*

Plaintiffs do not show that the Defendants' alleged misrepresentations caused their damages.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

Specifically, Plaintiffs do not sufficiently allege that the price of the stock was artificially inflated due to a fraudulent misrepresentation. In order to establish loss causation for a securities fraud claim, the plaintiff must allege: (1) that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation and (2) that the artificial inflation was actually lost due to the alleged fraud. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir.2003). In other words, the Plaintiffs must show that the stock decline occurred as a result of the disclosure of the misrepresentations. *Id.*

Plaintiffs' single statement regarding loss causation is in response to the Defendants' guidance that the revenue for the fourth quarter, the fiscal year, and earnings per share would be lower than expected. This guidance was stated in a press release dated March 14, 2003, where PEC announced that its financial projections would be lower than expected due to "anticipated delays in new government awards stemming from the unusually late passing of the 2003 Federal civilian agency budget." Compl. ¶ 60. Plaintiffs aver that this announcement "shocked the market, causing the stock to lose over 40% of its market value by dropping more than $6 per share on 17-times its average daily volume, falling to a fraction of its $37.25 Class Period high and causing damage to Plaintiff and the Class." Compl. ¶ 61. However, Plaintiffs never mention how the Defendants' alleged misrepresentations led to the fall of the stock price. A conclusory statement that the stock price fell as a result of a company's guidance is not enough to show that the decline in the stock price was due to a defendant's fraud or misstatements.

3. *Failure to sufficiently allege Generally Accepted Accounting Principles (GAAP) violations*

*12 Similar to Plaintiffs' general allegations of securities fraud, Plaintiffs' claims of accounting fraud are not sufficiently particular as required by Rule 9(b) and the Reform Act. *See* Fed.R.Civ.P. 9(b); 15 U.S.C. § 78u-4(b)(1). For instance, Plaintiffs cite Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Compl. ¶ 63. Also, Plaintiffs mention that "GAAP requires that financial statements account for existing uncertainties as to probable losses." Compl. ¶ 64. Then, Plaintiffs allege PEC's reported earnings during the quarter ending September 30, 2002, were materially understated because "Defendants knew, or recklessly disregarded, that PEC Solutions' reserve for uncollectible receivables at September 30, 2002 was materially understated...." Compl. ¶ 64. In addition, during this quarter, PEC's "accounts receivables increased by more than 38% ... However, during this same period, PEC Solutions' reserve for uncollectible accounts actually declined, to $322,000 from $325,000." Compl. ¶ 64. Based upon these facts and given that (1) PEC had egregious billing practices; (2) the DCAA commenced an audit of PEC's billing practices; and (3) PEC was not receiving payment on Pearson subcontract, Plaintiffs allege that PEC failed to reserve for its uncollectible accounts.

Plaintiffs cite the language of the applicable standard, then make conclusory allegations regarding the Defendants' violations of the standard without supporting their claims with documentation or statements regarding how the Company violated the standard. However, Plaintiffs fail to allege why PEC's reports are violations of GAAP and how the reports violated the rules. These details are necessary to adequately plead a fraud claim based upon GAAP violations. *See In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 893 (8th Cir.2002) (finding that in order to plead a violation of FAS 5, plaintiffs must identify the contracts in question, the terms of the contracts, the approximate amount of any misstatement, and the source for the misstated amount); *Smith,* 286 F.Supp.2d at 718 (finding no violation of GAAP where Plaintiffs failed to cite documents, meetings, or individuals in support of their GAAP claim).

First, Plaintiffs state no facts to support their claims that PEC had egregious billing practices, that DCAA was conducting an audit of PEC, or that PEC had not been paid by Pearson at the time the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 11
Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

figures were reported to the SEC. Second, Plaintiffs do not state how PEC's reported uncollectible reserve amount is fraudulent or misleading. There are no documents, meetings, or individuals cited to back up Plaintiffs' claims. On the other hand, Defendants' financial statements were reviewed by independent auditors, who provided an opinion that the Company's financial statements were fairly prepared in accordance with GAAP. Plaintiffs do not challenge this opinion and "a failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP." *Smith,* 286 F.Supp.2d at 719. Given that Plaintiffs do not provide sufficiently particular information regarding how PEC's financial statements violated GAAP, Plaintiffs' claims based upon allegations of accounting fraud must be dismissed.

### 4. *Failure to allege facts establishing a strong inference of scienter*

*13 The Reform Act requires that, with respect to each allegation, the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *See Ottmann,* 353 F.3d at 344; 15 U.S.C. § 78u-4(b)(2). A plaintiff may allege the required state of mind, or scienter, by pleading either intentional misconduct or recklessness. *See Ottmann,* 353 F.3d at 344. Intentional misconduct encompasses deliberate illegal behavior. *See Fleming,* 264 F.3d at 1260. On the other hand, recklessness must be based upon highly unreasonable acts that the defendant knew or obviously must have known would present a danger of misleading the plaintiff. *See Phillips,* 190 F.3d at 321. Additionally, "allegations of scienter must be based on a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required state of mind." *Phillips,* 190 F.3d at 621 (quoting *Zeid v. Kimberley,* 973 F.Supp. 910, 918 (N.D.Cal.1997)). Moreover, "a court should not consider each relevant factual allegation solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint." *In re MicroStrategy,* 115 F.Supp.2d at 631; *see also Ottmann,* 353 F.3d at 345 (finding that in each case the court should examine all of the allegations to determine whether they collectively establish a strong inference of scienter). Specific facts demonstrating motive and opportunity may be relevant, but are typically insufficient to establish a strong inference of scienter by themselves. *See Ottmann,* 353 F.3d at 345-46; *Fleming,* 264 F.3d at 1262.

Plaintiffs allege that the Individual Defendants, by virtue of their association with and control over PEC, received information reflecting the "true facts" regarding PEC's business operations such that they (1) knew the public documents and statements were materially false and misleading and (2) knowingly participated in the issuance of these statements to the public in violation of federal securities laws. Compl. ¶ 76. Additionally, Plaintiffs allege that the Defendants knew or recklessly disregarded material facts including: (1) the DCAA's audit and investigation of PEC; (2) substantial cost overruns associated with the contract with the TSA; (3) Pearson stopped paying PEC under the subcontract; (4) PEC might be forced to refund a portion of the fees that it received for its work on the Pearson subcontract; (5) and PEC's accounts receivables were materially understated.

First, Plaintiffs fail to establish the existence of fraud and where there is no fraud, there can be no state of mind for fraud. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.,* 75 F.3d 801, 813-14 (2d Cir.1996). As stated above, Plaintiffs present no facts that demonstrate that PEC was the subject of a DCAA audit at the time the alleged false and misleading statements were made. Furthermore, Plaintiffs do not allege how the Defendants' statements are false and misleading based upon the alleged overbilling. Similarly, with respect to Pearson's nonpayment of PEC, Plaintiffs do not state with particularity why the Defendants' alleged non-disclosure of this fact renders all of the Defendants' statements about PEC's financial condition false or misleading. Plaintiffs cannot show that the Defendants' statements are false and misleading based upon the failure to disclose information regarding the possibility of being required to refund money to the TSA because the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 12

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

Defendants did disclose that the refunding of fees earned was a possibility in PEC's financial statements. Lastly, Plaintiffs do not provide sufficiently particular information regarding how the alleged material understatement of accounts receivables is false or misleading. Therefore, Plaintiffs fail to demonstrate a strong inference of scienter because Plaintiffs' allegations of fraud have been shown to be insufficiently supported by factual information.

*14 Second, Plaintiffs' allegations of scienter fail because the Court cannot simply infer or imply knowledge of material facts based upon conclusory allegations. See *Fleming*, 264 F.3d at 1264; *In re Criimi Mae, Inc. Sec. Litig.*, 94 F.Supp.2d 652, 661 (D.Md.2000) (noting that merely implying the Defendants must have known of false and misleading statements regarding the financial condition of the company is insufficient to raise a strong inference of scienter). The mere fact that a defendant occupied a senior position in the company is not sufficient to impart knowledge of the specific fact of materiality. See *Fleming*, 264 F.3d at 1264. Plaintiffs simply state that the Defendants knew or recklessly disregarded material facts based upon their positions in the Company. Compl. ¶ 76. Plaintiffs do not show how the Defendants deliberately engaged in illegal behavior or knew, or obviously should have known, that facts not disclosed by PEC regarding PEC's financial condition during the periods it was actively working on the Pearson subcontract were material. Allegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *Fleming*, 264 F.3d at 1364 (quoting *In re Advanta*, 180 F.3d at 539). Without particularized facts giving rise to a strong inference of scienter, Plaintiffs' claims of securities fraud must be dismissed.

Third, Plaintiffs fail to demonstrate the existence of a motive and opportunity to commit fraud. Although the presence of facts demonstrating motive and opportunity alone may not be sufficient to give rise to a strong inference of scienter, such facts are nonetheless relevant to the question of whether the required state of mind exists. See *Ottmann*, 353 F.3d at 345-46.

Plaintiffs allege that the Individual Defendants were motivated to overstate PEC's costs on the Pearson subcontract because the Company's accounting policies allow the Company to "recognize revenues on cost reimbursement contracts as services are provided," which "are equal to the costs incurred in providing these services plus a proportionate amount of [the] fee earned." Compl. ¶ 78. In other words, Plaintiffs allege that the Individual Defendants were "motivated to overbill on the Pearson Subcontract so that PEC Solutions could inflate the amount of its reported revenues and profits during the Class Period." Compl. ¶ 78.

The first issue with Plaintiffs' allegation regarding overbilling is that the Plaintiffs fail to plead with particularity the facts creating a strong inference that *each* of the Individual Defendants had the motive and opportunity to commit fraud or consciously or recklessly made material statements or failed to disclose material information. *In re Trex Co. Sec. Litig.*, 212 F.Supp.2d 596 (W.D.Va.2002). Without information regarding how each of the Individual Defendants had the required state of mind, Plaintiffs allegations of scienter cannot be a basis for Plaintiffs' claims of securities fraud. *Id.* Second, the general motive that the Individual Defendants were motivated to inflate the amount of revenues and profits is an insufficient motive for fraud under the circumstances. See *id* at 607 (finding that the general motive of a corporation or its officers to increase share price and to paint a favorable business picture of the corporation are not sufficient motives for fraud). Consequently, Plaintiffs have not shown a sufficient motive for the Individual Defendants to have committed fraud based upon the overstatement of costs and overbilling.

*15 Fourth, Plaintiffs' principal allegations regarding scienter refer to the Individual Defendants' alleged insider trading; however, these allegations are insufficient because Plaintiffs fail to show that the insider trading was unusual or suspicious. A plaintiff attempting to show the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 13

Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

required state of mind based upon allegations of insider trading must show that (1) the individual defendants were engaged in insider trading and (2) the trading was unusual or suspicious. *See In re MicroStrategy,* 115 F.Supp.2d at 643 (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir.1999)). As a part of this inquiry, courts consider several factors, including the insider's previous trading history, the amount and percentage of shares sold by insiders, and the timing of the sale. *See, e.g., Roncini v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001) ("Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (internal quotations and citations omitted).

Plaintiffs simply list the dates trades were made, the number of shares sold, the price per share, and the value of the shares, and then make the conclusory statement that the timing was unusual and suspicious because the Individual Defendants knew about the problems associated with the Pearson subcontract. *See* Compl. ¶ 47. Plaintiffs do not mention the Individual Defendants previous trading history or the percentage of stock sold. Accordingly, these allegations are insufficient to support an inference of scienter because Plaintiffs do not allege the context or the scope of the Individual Defendants' trading. *See In re Advanta,* 180 F.3d at 540 ("If the stock sales were unusual in scope or timing, they may support an inference of scienter.").

Similarly, in order to survive a motion to dismiss, Plaintiffs must allege, for *each* Defendant, facts regarding overall stock holdings, the percentage of stock sold, how the proceeds compared to their overall compensation, and how these sales compare to their previous trading history. *See Glaser v. Enzo Biochem, Inc.,* 303 F.Supp.2d 724, 747 (E.D.Va.2003). Since Plaintiffs do not allege facts with respect to the how the Individual Defendants engaged in unusual or suspicious insider trading, Plaintiffs allegations of insider trading are insufficient to demonstrate the required state of mind.

In fact, a closer look at the scope and context of the Individual Defendants' trades actually negates the inference of scienter. With the exception of Defendant Lloyd, the amount of stock sold during the Class Period constituted less than two percent of the total holdings of the Individual Defendants. *See* Mot. to Dismiss at 15. With respect to Defendant Lloyd, the percentage of stock sold was 13 percent of his total holdings. *See id.* These percentages are not of the sort usually considered suspicious by courts. *See, e.g., In re First Union,* 128 F.Supp.2d at 898 (finding disposal by corporate officers of less than 5% of total holdings insufficient to plead scienter as "such a trivial amount of trading affirmatively demonstrates the absence of scienter."); *In re E. spire Communs., Inc. Sec. Litig.,* 127 F.Supp.2d 734, 743 (D.Md.2001) ( "fact that an individual defendant sold so little stock can be construed as negating the inference that there was fraud."); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1094 (9th Cir.2002) (finding sale of 13 percent not suspicious). The Individual Defendants' failure to significantly profit from allegedly fraudulent insider trading negates the idea that they had a motive to commit fraud.

*16 Moreover, the fact that three of the four Individual Defendants acquired PEC stock during the class period, further negates any idea that the Individual Defendants had a motive to commit fraud. On February 13, 2003, Defendants Karlgaard and Rice exercised options for 32,046 shares of PEC stock. *See* Mot. to Dismiss at 25. On the same date, Defendant Lloyd exercised options for 48,978 shares of PEC stock. These exercises of stock options took place less than one month before the stock price declined as a result of the guidance announcement of May 14, 2003. Defendants Karlgaard, Rice, and Lloyd made no sales between the time period when they exercised options in February and the May announcement. Without factual support to negate the inference that the Individual Defendants did not have a motive to inflate the price of the stock given that they purchased the stock just before the guidance was revised, Plaintiffs' claims based upon the allegation of insider trading must be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:03-cv-12628-NG   Document 92-8   Filed 01/23/2006   Page 14 of 14

Page 15 of 15

Not Reported in F.Supp.2d                                                                                                          Page 14
Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

*5. Plaintiffs' claim pursuant to Section 20(a) of the Exchange Act must be dismissed*

Where claims pursuant to Rule 10b-5 do not lie, nor may claims pursuant to Section 20(a). *See Longman,* 197 F.3d at 686. Given that Plaintiffs' claims based upon securities fraud fail, there is insufficient evidence upon which to base Plaintiffs' Section 20(a) claim for "control person" liability; accordingly, this claim shall be dismissed.

### III. CONCLUSION

Plaintiffs' claims of securities fraud must be dismissed because the complaint fails to: (1) plead fraud with the requisite particularity and specificity; (2) properly allege loss causation; and (3) demonstrate that the Defendants' forward-looking statements are actionable given that they are immaterial either because they are not worded as guarantees or because they are protected by the safe harbor provision of the Reform Act. Additionally, Plaintiffs' claim based upon control person liability must be dismissed because where there is no claim based upon securities fraud, a claim for control person liability cannot lie.

Furthermore, Plaintiffs Motion for Leave to Amend the Consolidated Class Action Complaint is denied because Plaintiffs have had opportunities to plead a proper cause of action and the Court finds that further amendment would be futile for the reasons stated above.

A separate judgment order pursuant to Rule 58 of the Federal Rules of Civil Procedure will issue shortly.

The Clerk is directed to forward this Opinion to the counsel of record.

E.D.Va.,2004.
In Re PEC Solutions Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 1854202 (E.D.Va.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00331 (Docket) (Mar. 18, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.