Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents

United States District Court, N.D. California.
SCHUSTER
v.
SYMMETRICON, INC.,[FN1] et al.

FN1. Symmetricom was previously known as Silicon General, Inc. For simplicity's sake, the court uses the current corporate name throughout.

No. C9420024RMW.

Aug. 1, 2000.

William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, California, Richard S. Schiffrin, Schriffin & Barroway, Bala Cynwood, Pennsylvania, and Mark C. Rifkin, Rifkin & Assoc. LLC, Paoli, Pennsylvania, for the plaintiffs.
David S. Steuer, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for the defendants.

Opinion

WHYTE, J.
*1 The motion of defendants for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure was heard by the court on July 14, 2000. The court has read the moving and responding papers and heard the argument of counsel. For the reasons set forth below, the court grants defendants' motion for summary judgment.

I. BACKGROUND

This is a securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Defendants are Symmetricom, Inc. ("Symmetricom" or "the company") and four of its officers and directors. Plaintiff Bernard Shuster is an investor who purchased 1,000 shares of Symmetricom. (Third Amend. Compl. ("TAC") ¶ 9.) The class period extends roughly seven months from April 1993 through November 1993. (TAC ¶ 1.) Defendant Rasdal served as the company's Chairman of the Board and CEO during the class period. Defendant Duren served as President and Chief Operating Officer, defendant Kamsler as Chief Financial Officer, and defendant Austin as an Executive Vice President.

Plaintiff alleges that defendants "issued a steady stream" of false and misleading statements about Symmetricom's business during the class period, particularly regarding the performance of the Integrated Digital Services Terminal ("IDST"), the company's key new product during the class period. (Pl.'s Opp'n at 1:4-6.) The IDST is a device marketed to telephone companies. (Ex. 101 at 3.) Two functions of the IDST-Signaling System Seven ("SS7") and Local Services Offices ("LSO")-are of particular interest in this litigation. The SS7 functionality allows a phone company to monitor its network for problems and to redirect traffic around problem areas. (Rasdal Decl. ¶ 4.) The LSO functionality involves use of the IDST as a digital switching terminal in a phone company's Local Services Office. (*Id.*)

The complaint alleges that the officer defendants repeatedly made upbeat statements about anticipated sales of the IDST product when they knew that the product was experiencing severe difficulties. According to plaintiff, the fraud was revealed when the company announced that AT & T had called off an anticipated deal that could have resulted in sales of hundreds of units, each priced at $150,000.

Defendants now move for summary judgment.

II. LEGAL STANDARD

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court may grant summary judgment as to entire causes of action, or summary adjudication as to specific issues only.

A party seeking summary judgment must first meet an initial of production and show that there are no genuine disputes of material fact. If the movant does not bear the ultimate burden of persuasion, it need only point to the record and note the absence of material facts that the nonmovant would need to prove at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If the movant meets its initial burden, the burden then shifts to the other party to produce admissible evidence that would allow a reasonable finder of fact to reach a verdict in his favor, as viewed under the appropriate burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 254 (1986). The admissible evidence that the nonmovant produces must be evidence of "specific facts." Fed.R.Civ.P. 56(e). The court construes all evidence, and draws all logical inferences therefrom, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). If, however, "the factual context renders [the nonmovant's] claim implausible-if the claim is one that simply makes no economic sense-[he] must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Id.* at 587.

### III. ANALYSIS

*2 Defendants move for summary judgment, arguing that (1) there is no proof that defendants made many of the alleged misstatements; (2) many of the alleged misstatements were true; (3) the alleged accounting fraud was immaterial; and (4) there is no proof that any of the 56 alleged misstatements [FN2] were made with scienter. The court addresses these contentions in turn.

FN2. Plaintiff apparently did not accept defendants' proposal to narrow the issues remaining in this case, thereby requiring defendants to bring a motion attacking all 56 statements identified in the Third Amended Complaint. (Defs.' Mot. at 1 n.1.) Even in his opposition papers, defendant eschews a statement-by-statement analysis in favor of broad-brush discussions of Symmetricom's corporate woes, This practice makes the court's task at the summary judgment stage almost impossible; the court and parties need to direct their attention at summary judgment to "specific facts." Fed.R.Civ.P. 56(e). This court has previously emphasized the need for clear statement-by-statement analysis in cases of securities fraud. *See Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1243-44 (N.D.Cal.1998) (noting that prolixity often substitutes for specificity in complaints of securities fraud).

The court was similarly unimpressed with plaintiff's practice of citing entire exhibits and expert reports without identification of specific pages. The court has little duty "to scour the record in search of a genuine issue of triable fact. [The court] rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996). Although plaintiff argued at the hearing that page limitations precluded him from identifying specific pages in exhibits, his demonstrative materials provided for the hearing similarly failed to provide specific page references.

### A. PROOF THAT DEFENDANTS ACTUALLY MADE ALLEGED MISSTATEMENTS

Many of the alleged misstatements are contained in analysts' reports. There are two basic ways in which analysis' reports can give rise to insiders' liability for securities fraud. In one scenario, defendants plant false or misleading information to analysts to influence the market. *See Wenger v. Lumisys, Inc.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

2 F.Supp.2d 1231, 1249 (N.D.Cal.1998). In the other scenario, defendants speak truthfully to analysts (or do not speak to them at all), but adopt or otherwise "entangle" themselves in analysts' reports that erroneously put the company in a favorable light. *Id.* Plaintiff proceeds on the first theory-that defendants planted false information with the one analyst who was tracking Symmetricom at the time, Allen Strand.

To show that analysts' reports contain planted information, it is not enough to show a general pattern of conversations between insiders and analysts. Instead, plaintiffs must identify the dates and contents of specific conversations and link them to specific analysts' reports containing false information.

Here, plaintiff has failed to adduce any admissible evidence linking specific comments by defendants with specific statements in analysts' reports. It is well settled that the published reports are not proof of the contents of conversations between analysts and corporate insiders. *See In re Cypress Semiconductor Sec. Litig.,* 891 F.Supp. 1369, 1376 (N.D.Cal.1995), *aff'd sub nom. Eisenstadt v. Allen,* 113 F.3d 1240 (9th Cir.1997) (table opinion). Plaintiff does not rely on the published reports, but instead states that seven handwritten minutes of conversations between Strand and the insider defendants provide this information. (Pl.'s Opp'n at 24:18-25:1.)

These exhibits are not admissible, because they are hearsay offered for the purpose of showing that defendants actually made the statements contained therein. The notes might fall within one of several hearsay exceptions, but only if appropriate indicia of reliability are present. *See In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1469 (N.D.Cal.1996) (examining, and ultimately rejecting, applicability of present sense impression, business records, and "catch all" exceptions to analysts's contemporaneous notes of conversations in light of reliability concerns). The record here reveals that the notes are not reliable transcriptions of conversations. Strand testified that his notes "might be a reaction, like-much like when you read a book or watch a movie and you're putting your reaction on the side."

(Strand Dep. at 33:14-26 .) Moreover, the notes do not always correspond with Strand's own reports. One set of notes refers to $4-10 million in potential sales, but the report apparently generated from the same conversation bullishly predicts more than $30 million in sales. (Exs.228, 232.) The court therefore excludes consideration of these minutes on hearsay grounds.

*3 The court therefore holds that there is insufficient evidence that specific statements identified in the complaint as being made to Strand were ever made. [FN3] The sole exception is the publically distributed "Red Stripe" report, issued September 20, 1993. The record indicates that defendants reviewed a draft of that report before publication, raising at least a triable issue of fact regarding their entanglement with the contents of that report.

> FN3. However, in the interest of a complete record, the court considers the alleged statements to analysts in the sections that follow. Even with the statements included, the court finds that summary judgment is required.

B. PROOF THAT ALLEGED MISSTATEMENTS WERE FALSE

Defendants assert that their alleged misrepresentations were actually true. Their arguments focus on two basic types of information: (1) statements regarding anticipated sales to key customers, specifically AT & T, Bell South, and Pacific Bell; and (2) general statements of corporate optimism. Because the alleged misstatements are largely statements of optimism, rather than statements of historical fact, they are actionable only if the speaker (1) did not genuinely believe the truth of his prediction; (2) did not have a reasonable basis for making the prediction; or (3) knew undisclosed facts that would seriously undermine the accuracy of his prediction. *See Cypress Semiconductor,* 891 F.Supp. at 1375. A plaintiff will not succeed in demonstrating simply by showing that the optimistic statements proved unfounded; to the contrary, a defendant is entitled to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 4
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

summary judgment as long as he can show "at least a reasonable basis for the various representations, even though in hindsight they may appear a little too rosy." *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1158-59 (9th Cir.1996). Moreover, in the specific context of order projections, reasonable investors know that predicting future purchases is more art than a science. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir.1995); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir.1996) (stating that "customer resistance to purchasing a product in anticipation of newer products is precisely the sort of market awareness that we have held to defeat claims of fraud on the market.").

1. *Statements Regarding Potential AT & T Sales*

Both parties devote substantial discussion to the alleged falsity of various statements (many of which appeared in analysts' reports) concerning the prospective deployment of the IDST by AT & T. These statements indicated a potential deployment of hundreds of IDST units for use as SS7 monitors. These statements also revealed that AT & T was testing ISDT at a location in Birmingham, Alabama.

Although plaintiff agrees that AT & T was actively considering acquiring Symmetricom ISDT units at the beginning of the class period, he argues that AT & T's experience with the Birmingham testing was so negative that AT & T quickly lost interest in the product, even though it continued testing it. Plaintiff further argues that defendants knew that the product was bugprone in general, and that it was failing testing in Birmingham in particular. This knowledge, plaintiff asserts, made Symmetricom's upbeat statements about the AT & T sales knowingly or recklessly false.

*4 Because the parties' narration of events differs so significantly, the court has carefully reviewed the exhibits cited in the parties' moving papers and has reconstructed the following time line of undisputed f acts:

In a February 1993 Symmetricom's sales representative met with Larry Hudson from AT & T, who confirmed AT & T planned on testing IDST for future use. (Ex. 133.) AT & T subsequently purchased three IDST units for testing in Birmingham. (*Id.*) On May 7, 1993 William Rasdal met with AT & T, and reported positive feelings and feedback regarding the IDST program. (Ex. 246.) In a June 7, 1993 memorandum, Rasdal stated the long range IDST program with AT & T was "moving along nicely." (Ex. 280.)

In August 1993, AT & T began field testing of IDST, which resulted in various field problems. (Ex. 176.) A September 1993 report by Symmetricom's chief engineer noted that in August the "Birmingham Failures" had been quantified and solutions were in progress. (*Id*.) At a September 30, 1993 meeting between Symmetricom representatives and AT & T, the concerns over the Birmingham failures were discussed. (Ex. 407.) An internal memo from Symmetricom's sales manager (who is not alleged to have participated in the fraud) reported that the meeting participants concluded that any "open items (Bugs) ... have been identified as nuisances but not service effecting." (Ex. 407.) The same memo reported that IDST would be up and running for use in live communications by October 8, 1993. (*Id*.) These statements were echoed in the company's October 1993 quarterly planning report, which was distributed to senior management. (Ex. 16 at SYM340775.)

On October 7, 1993, Symmetricom's sales department anticipated news regarding the AT & T product order within "two weeks to two months." (Ex. 60.) A little more than a week later, a memorandum from Rasdal indicated the IDST application in Birmingham was successful and the system was carrying live traffic. (Ex. 246.)

During the weeks of October 18 and October 25, 1993, Symmetricom conducted IDST training sessions for AT & T. Only at the end of October did the company learn that AT & T was not planning on implementing the IDST program in 1994. (Ex. 265; Rasdal Decl. ¶ 15). In a November 15, 1993 memorandum (after the public disclosure that the AT & T deal would not come through), Rasdal reported that the "AT & T working level people say

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

the need for IDST is as strong as ever." (Ex. 265.)

Properly put in sequence, the facts do not reveal a pattern of lying or reckless disregard for the truth. At worst, the facts show that defendants misjudged acceptance of IDST by a key customer. Even late in the class period, Symmetricom was training AT & T's employees how to use the product, which is completely inconsistent with defendants' alleged knowledge that IDST was an unsuitable product for AT & T. [FN4] The internal communications speak of problems and even periodic "failures" (or in one case a "debacle" during the Birmingham testing [FN5]), but nowhere do they indicate a sense that the project would not ultimately come through. This is not a case where internal sales forecasts said one thing while the company's executives said another. *Cf. Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir.1996) (company was "constantly cutting sales forecasts" while telling investors that demand was strong). To the contrary, the company in late September/early October was internally forecasting $6.95 million in fiscal 1994 bookings from AT & T. (Ex. 16 at SYM340779.) Thus, the message at Symmetricom was internally and externally consistent: defendants expected the AT & T deal to go through. While hindsight reveals that this optimism may have been foolish, defendants had "at least a reasonable basis" for their optimism, given that other customers continued to order IDST throughout the class period and that AT & T continued to evince interest in the product. [FN6] Accordingly, the claims based on the anticipated AT & T sales must be dismissed.

>FN4. Plaintiff's reliance on Exhibit 171, an internal AT & T memorandum written in 1994, is misplaced. The memorandum nowhere indicates that AT & T's concerns were actually communicated to Symmetricom. Moreover, the document is inadmissible hearsay not falling with any exception to the hearsay rule. (In particular, the document is not a business record, because it was authored several months after the events described took place.)

>FN5. An internal report that apparently dates to late September 1993 speaks of the "Birmingham Debacle" (the problems with the field testing in Birmingham) as one topic for discussion among many. (Ex. 16, at SYM 340765 [dating based on running header on page following quoted passage].) Plaintiff juxtaposes this statement (apparently made by a non-defendant) with statements made more than a month *earlier* by defendants. (Pl.'s Opp'n at 16:11-15.) This is insufficient to show that the statements were false when made. Tellingly, the "Birmingham Debacle" statement was made *after* all class-period statements specifically relating to AT & T. The same document (at the same page) also reports that Symmetricom had "managed AT & T Birmingham trial difficulties and moved to next step, live traffic." (Ex. 16. at SYM 340765.) This directly contradicts plaintiff's assertion that the company's management knew that the Birmingham "debacle" had doomed the AT & T deal.

>FN6. As defendants point out, there is no evidence that any Symmetricom customers returned IDST product during the class period, further undermining plaintiff's claims that defendants know that IDST was fatally flawed.

### 2. *Statements Regarding BellSouth Contract*

**\*5** Plaintiff charges that defendants falsely characterized a contract with BellSouth for IDST product. This claim lacks any evidentiary basis, and must be dismissed. Symmetricom and BellSouth entered into a contract for IDST sales in March 1993. (Ex. 93; Ex. 98 at SYM001875; Ex. 506 at BSSY 001571-83.) The company's statements regarding the contract were of a general nature: " The addition of BellSouth to the IDST customer list, which already includes Pacific Bell and others, is very important to Telecom Solutions' future": " Now in addition to BellSouth, the customer list includes Pacific Bell, Lincoln Telephone, and others "; "BellSouth awarded Telecom Solutions a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

contract for IDSTs." (TAC ¶¶ 25, 27.) These statements include no projections of amount or timing. Further, when the company announced the contract, it warned investors that orders would have to be submitted before any revenue could be earned. (Ex. 93; Ex. 98 at SYM001875.)

Plaintiff's principal complaint is that the contract was a nullity, because BellSouth was not legally bound to purchase any product unless it chose to. It is true that BellSouth was not bound to purchase any IDST at the moment the contract was signed. (Badgett Dep. at 73:21-74:1.) It is also true that a BellSouth task force and senior management both had yet to approve the orders. (Badgett Dep. at 83:20-84:10; 90:19-92:19.) However, the real question is not whether the contract had full legal effect, but whether defendants' optimistic statements were without "at least some reasonable basis." The document executed between Bell South and Symmetricom was 81 pages in length (exclusive of appendices) and referred throughout to Bell South as "Buyer" and Symmetricom as "Seller." (Ex. 506.) A BellSouth purchasing manager testified:
Q. In the regular course of business at BellSouth, would a contract such as this have been executed in anticipation of subsequently placing orders?
A. Yes.

(Bladgett Dep. 35:23-36:1.) BellSouth representatives twice told Rasdal that an IDST deal would result in purchases of "a lot" of product. (Rasdal Dep. at 58:22-59:11; 80:14-81:8.) Symmetricom's sales department internally projected delivery of more than 80 units as a result of the contract. (Ex. 12.) This optimism was well founded: BellSouth management authorized purchases under the agreement before the class period even ended. [FN7] The court therefore holds that no triable issue of fact exists as to the BellSouth statements.

FN7. As defendants note, even if there were a fraudulent representation about the lack of executive approvals at BellSouth, it would be immaterial, because it was corrected before the end of the class period, and before the purported fraud was ever revealed. *See Binder v. Gillespie,* 184 F.3d 1059, 1065-66 (9th Cir.1999) (dismissing Section 10(b) claim for lack of loss causation). However, defendants raised this argument for the first time in their reply papers; the court therefore does not rest its decision on this ground.

3. *Statements Regarding Pacific Bell Contract*

Plaintiff also alleges that several of defendants' statements relating to anticipated purchases by Pacific Bell were false.

Plaintiff's allegations regarding Pacific Bell sales are not easy to follow. In large part, plaintiff's theory appears to be that the IDST had numerous reliability and compatibility problems that made Pacific Bell reluctant to deploy additional IDST product. However, plaintiff presents no evidence that defendant knew that Pacific Bell would not deploy any more IDST product, contrary to the company's predictions. Indeed, Pacific Bell continued to test Symmetricom IDST for LSO applications at its Southern California facility until well after the class period, providing a more than reasonable basis for defendants' continued belief that Pacific Bell was interested in the IDST product. Even if defendants' optimism ultimately proved unfounded, that does not render the optimistic statements reckless or deliberately false.

*6 Plaintiff also alleges that defendants lied when they stated that they were shipping Pacific Bell IDST units for use in an LSO. However, defendants did ship Pacific Bell seven IDST units for LSO use during the class period. (Exs. 16 at SYM340753; 255; 280.)

Moreover, it is undisputed that defendants did not learn of Pacific Bell's decision to remove anticipated IDST orders from its 1994 capital budget until shortly before the November 10, 1993 press release. (Rasdal Decl. ¶ 19; Yapp Dep, at 348:5-349:2.) It is also undisputed that Pacific Bell explained that it was holding off on planned orders because it was shifting capital investments to building a fiber optic network. (*Id.*) Indeed, Pacific Bell's successor, Pacific Telesis, has continued to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 7
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

purchase IDST units. (Reedick Decl. ¶¶ 6-9, 11.)

In light of the foregoing, plaintiff fails to raise any triable issues of fact regarding the truth of defendants' statements about Pacific Bell. [FN8]

> FN8. At the hearing, plaintiff argued that defendants' also lied about Pacific Bell when they characterized shipping of $600,000 in demo units as a sale. The court discusses this alleged accounting fraud separately. See infra Section III.C.

4. *General Statements of Optimism*

Plaintiffs claim that defendants made numerous false statements about the performance capabilities of the IDST in general. As plaintiff admits, the claims attacking these statements largely depend on the claims regarding deals with specific customers. (Pl.'s Opp'n at 21 n.38:27 ["There were only a few potential customers who defendants might have interested in purchasing the IDST during the class period."].) Given that plaintiff has failed to produce evidence that defendants lied or were reckless to the truth of their statements about specific customers, the claims based on the general statements of optimism fail as well. [FN9]

> FN9. Plaintiff argues that the specific statement that the IDST was "compatible with current embedded networks" was false. According to plaintiff, IDST was in fact "unable to perform necessary functions or to the standards and levels demanded by critical customers." (Pl.'s Opp'n at 21:11-13.) Plaintiff offers no evidence to support this proposition, citing only an expert report totaling up sales for the IDST. (Pl.'s Opp'n at 21 n.38:27-28.) This is plainly insufficient to create a genuine issue of material fact regarding the alleged misstatements.

Indeed, many of the general statements identified in the complaint do not even relate specifically to the IDST. (TAC ¶¶ 25 [higher quarterly earnings for entire company]; 27 [strong shipments and profits for entire telecommunications division]; 35 [higher revenues for entire company]; 43 ["fundamentals are getting better" for entire company]; 53 [sales "continue at a brisk pace for all products in all our markets"; "good progress both our sales and new product introduction programs"]. Thus, plaintiff's contemporaneous "facts" regarding poor IDST sales (and even a preclass period decision to slash forecasted IDST sales) do not disprove general statements of corporate success. [FN10] Many of these statements are also immaterial puffery as a matter of law. See *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 63 (D.Mass.1998) (deciding that insider's public statement that "fundamentals are fine" was too vague to be actionable).

> FN10. IDST sales represented little more than 10% of sales for Symmetricom's Telecom Solutions division. (Reedick Decl. ¶ 5.)

This case is distinguishable from the product-development cases cited by plaintiffs, in which courts have found actionable claims of false optimism. These cases involved substantially more disastrous problems with the new products, which usually doomed the product. See *Provenz*, 102 F.3d at 1488 (severe production delays and performance problems resulted in internal sales projections being slashed); *Kaplan v. Rose*, 49 F.3d 1363, 1371-72 (9th Cir.1994) (dismal results from clinical trials guaranteed that FDA would not approve drug); *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir.1992); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989) (delayed introduction of computer model because disk drive was defective). Indeed, two of these cases-*Kaplan* and *Apple* -involved products that had not yet even been launched. Once a company has begun to distribute a new product, the market is presumed to possess basic information about customer demand for the product, thereby raising the bar for a securities fraud claim based on predictions of increased demand. See *Stac*, 89 F.3d at 1410 (holding that market is presumed to know that customer resistance to new technology products may be significant); see also *In re Websecure, Inc.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

Sec. Litig., 182 F.R.D. 364, 369-70 (D.Mass.1998) ( "there is no duty to predict the future"); *In re Syntex Corp. Sec. Litig.,* [1993 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,747, at 97,569, 1993 WL 476646 (N.D.Cal. Sep. 1, 1993) ("A company has no duty to disparage its own competitive position in the market ..."). In this case, the product in question has been marketed continuously since 1991. (Ex. 101.) Given that fact, only information indicating that management actually believed that demand for the product would drop would render the optimistic predictions false when made. However, the record contains scant evidence that defendants held such a belief. To the contrary, it is undisputed that the company ordered $5 million worth of additional component materials for the product during the class period. (Rasdal Decl. ¶ 12; Rorabaugh Dep. at 156:14-24; Ex. 16 at SYM340753; Ex. 99 at SYM001945).

*7 The court accordingly holds that defendants have failed to create a triable issue of fact as to any of the general optimistic statements attributed to defendants.

### C. MATERIALITY OF ALLEGED ACCOUNTING FRAUD

Although the Third Amended Complaint alleges multiple instances of accounting fraud, plaintiff offers evidence of only one alleged deviation from accounting standards. Specifically, plaintiff offers evidence that a $600,000 transaction was improperly recorded as a sale when it was in fact contingent on acceptance by Pacific Bell.

The court dismissed this claim previously, stating:
When plaintiff initially pleaded this [he] only plead[ed] the monetary amount of one transaction which is not material as a matter of law ($600,000 represented only 2% of Symmetricom's September 1993 quarter revenue). *See In re Convergent Technologies Second Half 1984 Sec. Litig.,* No. 85-20130 SW, slip op. at pp. 22-23.

(Order of Feb. 25, 1997, *available in* 1997 WL 269490, at *8.) Plaintiff presents no new law or facts that would convince the court otherwise.

Indeed, recent authority accords with the court's earlier order. *See Ganino v. Citizens Utils. Co.,* 56 F.Supp.2d 222, 226 (D.Conn.1999) (citing this court's earlier order); *In re Anchor Gaming Sec. Litig.,* 33 F.Supp.2d 889, 895 (D.Nev.1999). [FN11] The court therefore holds that the sole accounting fraud allegation is immaterial as a matter of law. (The court does not reach defendants' argument that plaintiff has failed to raise a genuine issue of fact as to the substance of the alleged accounting improprieties.)

> FN11. Even if the alleged accounting variance is material, it is still too minor to support a reasonable inference of scienter. *See In re Evans Sys., Inc. Sec. Litig.,* No. H-99-2182 (S.D.Tex. May 31, 2000) (unpublished opinion at 6-7), *available in* Menon Decl. Ex. G (dismissing claim based on alleged GAAP violation that resulted in overstatement in one quarter and equal understatement in subsequent quarter because it was too minor to establish scienter in absence of any motive for fraud).

### D. PROOF OF SCIENTER

Scienter is the state of mind required to sustain a claim of fraud. Under federal securities law, it consists of (1) actual knowledge that a statement being made is false, or (2) intentional recklessness to the truth of a statement at the time it is made. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 977 (9th Cir.1999); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). A motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 107, at 741 ("ultimate purpose, as to benefit the speaker, or to cause harm to the one addressed .... is of no importance") (5th ed.1984). However, courts do not presume that corporate officers make false statements simply out of spite or to impress others. *See Melder v. Morris,* 27 F.3d 1097, 1002-03 (5th Cir.1994) (affirming district court's rejection of "nihilist approach" to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 9
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

pleading scienter and refusing to "indulge irrational inferences of ... fraudulent intent"). Thus, a plaintiff who makes no meaningful allegations of motive faces "a tougher standard" for establishing scienter. *Id.* at 1002. Indeed, undisputed evidence that defendants were actually *harmed* by their alleged fraud often negates an inference of scienter and supports entry of summary judgment for defendants. *See In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1427-28 (9th Cir.1994) (adopting district court's holding that no reasonable jury could find scienter in case where defendants "sold only a minuscule fraction of their holdings ... and ended up reaping the same large losses as did Plaintiffs"). [FN12]

> FN12. Of course, there may be cases where lack of personal gain is not dispositive. For instance, if corrective disclosures are not made by the defendants themselves, it is possible that defendants were acting pursuant to a fraudulent scheme but were exposed before they could reap a profit. Even if defendants made the corrective disclosures themselves, they might have done so only because they knew they would be caught or because they suffered from remorse. However, plaintiff would have to show significant probative evidence to support such a scenario, which could otherwise be hypothesized for every case of alleged securities fraud.

*8 The court agrees with defendants that no reasonable jury in this case could find that any of the alleged misstatements were made with scienter.

First, as already noted, there is abundant evidence that defendants believed their optimistic statements and acted in good faith-indeed, that many of the alleged misstatements were entirely truthful. Though obviously self-serving, defendants' declarations of good faith bear out the obvious: their predictions of strong demand, increased sales, and customer acceptance were not made with deliberate recklessness, and were reasonable in light of the facts available to them. [FN13]

> FN13. In this respect, plaintiff's expert reports regarding the alleged poor performance of Symmetricom and the supposed failings of its business model are largely irrelevant.

Second, there is almost no plausible motive for the alleged securities fraud. Only one defendant is alleged to have engaged in any insider trading during the class period. That insider, Robert Austin, was an Executive Vice President of the company, who is not alleged to have made any false or misleading statements. (Austin Decl. ¶ 2.) [FN14] (Perhaps coincidentally, Austin is the only Executive Vice President named as a defendant in the case.) Sales of 20% of holdings by the lowest-ranking insider defendant in the case, who did not himself disseminate any of the allegedly false or misleading statements, are not significant evidence of motive. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir.1997) (holding that retention of stock by two highest-ranking defendants negated inference of scienter); *cf. Provenz,* 102 F.3d at 1491 (reversing summary judgment when company's CEO sold 20% of his holdings when in possession of acutely material non-public information that directly contradicted corporate statements).

> FN14. The only allegation that Austin was directly involved in the purported fraud is that Austin reviewed and approved an SEC filing in September 1993. Austin denies this allegation, and plaintiff provides no evidence to the contrary. (Austin Decl. ¶ 3.)

Plaintiff's only other proposed motive is that defendants "dreaded" the effect of disclosing the company's problems, and therefore lied to cover up their poor performance. (Pl.'s Opp'n at 16 n.29:20-22.) This is merely a variation on the theme, rejected by numerous courts, that corporate officers routinely lie in order to boost their own careers. *See Melder,* 27 F.3d at 1102 (rejecting incentive compensation as motive for fraud, because this theory of scienter "would effectively eliminate the state of mind requirement as to all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206
**(Cite as: Not Reported in F.Supp.2d)**

corporate officers and defendants."); *accord In re Software Toolworks, Inc. Sec. Litig.,* 789 F.Supp. 1489, 1499 n.16 (N.D.Cal.1992), *aff'd in relevant part,* 50 F.3d 615 (9th Cir.1994) (rejecting as unpersuasive allegation that underwriter committed fraud "in order to obtain professional fees").

Third, and perhaps most persuasively, the key insiders-the highest ranking executives who actually made the allegedly false or misleading statements-did not sell their Symmetricom holdings, which exceeded 440,000 shares of common stock. (Duren Decl. ¶ 11; Rasdal Decl. ¶ 25; Kamsler Decl. ¶ 17.) During the class period, the defendants all acquired new stock options, which were keyed to prices that plaintiff alleges were artificially inflated. (Rasdal Decl. ¶ 26; Duren Decl. ¶ 10; Austin Decl. ¶ 8; Kamsler Decl. ¶ 15.) Not only were these stock options impaired by the alleged fraud, but the individual defendants were penalized for the company's poor performance by having their bonuses taken away. (Rasdal Decl. ¶ 27; Duren Decl. ¶ 12; Austin Decl. ¶ 9; Kamsler Decl. ¶ 18.) This evidence negates any reasonable inference of scienter, and requires entry of summary judgment in favor of defendants.

## IV. ORDER

*9 For the foregoing reasons, the court grants defendants' motion for summary judgment.

N.D.Cal.,2000.
Schuster v. Symmetricon, Inc.
Not Reported in F.Supp.2d, 2000 WL 33115909 (N.D.Cal.), Fed. Sec. L. Rep. P 91,206

Briefs and Other Related Documents (Back to top)

• 5:94cv20024 (Docket) (Jan. 11, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.