**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE BIOPURE CORPORATION SECURITIES LITIGATION | Civ. No. 03-12628 -NG |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR CLASS CERTIFICATION**

**PRELIMINARY STATEMENT**

Lead Plaintiff Ronald Erickson and Plaintiffs Stuart Gottlieb and John G. Esposito, Jr. (collectively referred to herein as "Plaintiffs") submit this Memorandum of Law in Support of their Motion for Class Certification seeking entry by the Court of an Order: (i) certifying this action as a class action; (ii) certifying a class (the "Class") consisting of all purchasers of Biopure Corporation, Inc. (hereinafter, "Biopure" or the "Company") common stock during the period from April 9, 2003 to December 24, 2003, inclusive, (the "Class Period"); (iii) appointing Lead Plaintiff Ronald Erickson as Representative for the Class; (iv) certifying a subclass consisting of all persons who purchased Biopure common stock contemporaneously with the sales of Biopure's stock by the Defendants Biopure and Rausch during the Class Period (the "Sub-Class"); (v) appointing plaintiffs Stuart Gottlieb and John G. Esposito as representatives of the Sub-Class; and (vi) appointing Shapiro Haber & Urmy and Stull, Stull & Brody as Class Counsel.[1]

---

[1] Excluded from both the Class and the Sub-Class are Defendants; members of the individual defendant's immediate family; any past or present director, officer, subsidiary, or affiliate of Biopure; any entity in which any excluded person or entity has a controlling interest; and their legal representatives, heirs, successors and assigns.

## FACTUAL BACKGROUND

This action arises from Defendants' numerous deceptive public statements during the Class Period regarding the status of Defendants' ongoing efforts to obtain regulatory approval from the U.S. Food and Drug Administration (hereinafter, the "FDA") for Biopure's Hemopure – 250 (bovine) product (hereinafter, "Hemopure"). Hemopure is an oxygen therapeutic, designed to serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. Since its inception over 20 years ago, Biopure's sole pursuit has been to get FDA approval to market Hemopure.

However, Hemopure has never been approved for use on humans in the United States. On July 31, 2002, Biopure submitted a biologic license application to the FDA seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery (the "BLA"). As part of the BLA, Biopure submitted adverse event data which arose during its Phase III orthopedic surgery trials for Hemopure.

In March 2003, Biopure notified the FDA of its intent to perform Phase III clinical trials of Hemopure on human trauma victims in hospitals, a vulnerable patient population with a strong demand for blood transfusions (the "Trauma Clinical Trials").

On or about April 9, 2003, the FDA informed Defendant Biopure that it was placing a clinical hold on the Trauma Clinical Trials, due to the FDA's serious safety concerns which arose from the adverse event data (from the orthopedic surgery trials) previously submitted by Biopure to the FDA in conjunction with the Hemopure BLA. This hold constituted a refusal by the FDA, based on safety concerns regarding Hemopure, to permit Biopure to conduct its proposed clinical trials testing the use of Hemopure in trauma victims.

Biopure promptly requested that the FDA lift the clinical hold on the Trauma Clinical

Trials. On or about May 30, 2003, the FDA denied Biopure's request. Shortly thereafter, Biopure again requested that the FDA lift the clinical hold.

On or about July 30, 2003, the FDA transmitted two long, detailed letters to Biopure conveying still further negative developments with respect to Biopure's efforts at gaining regulatory approval of Hemopure. One letter (the "Trauma Clinical Trials Letter") refused once again to permit Biopure's clinical trials to proceed because, in the FDA's words, **"human subjects are or would be exposed to an unreasonable and significant risk of illness or injury."** The other letter constituted FDA's complete response letter to the BLA (the "Complete Response Letter"). Defendants all knew of the contents of these letters on or about the date of their transmission by the FDA.

The Complete Response Letter informed Biopure that the FDA was not approving the Hemopure BLA due to extensive, significant deficiencies in Biopure's BLA. Its opening sentences set forth FDA's unambiguous rejection of the Hemopure BLA, stating:

> The Center for Biologics Evaluation and Research (CBER) has completed the review of all submissions made relating to your Biologics License Application. **Our review finds that the information and data submitted are inadequate for final approval action at this time because on the deficiencies outlined below**.

Id. at 1 (emphasis added).

The FDA set forth over **220** individual deficiencies and questions in the Complete Response letter (which it reiterated in the Trauma Clinical Trials Letter) concerning Biopure's orthopedic clinical trials, data submitted in support of the Hemopure BLA, and the safety and efficacy of Hemopure. Significantly, it also stated formally that the review clock regarding Hemopure was suspended as of the Complete Response Letter's issuance. In essence,

transmission of the Complete Response Letter signified formally that FDA had completed its review of the Hemopure BLA and that Biopure had a six-month period within which it could resubmit the BLA in a form that addressed **all** of FDA's 220 or so concerns. The importance of Biopure's receipt, on July 30, 2003, of the Complete Response Letter and the Trauma Clinical Trials Letter cannot be overstated. The letters were lengthy, detailed, and together spelled out an insurmountable array of deficiencies in the Hemopure BLA which essentially signaled the death knell for Biopure's chances of **ever** gaining FDA approval of the Hemopure BLA. This defeat was especially pronounced given that as of July 30, 2003, Biopure had already made two substantial submissions to the FDA requesting that it lift the clinical hold on the Trauma Clinical Trials, each of which failed to adequately address the FDA's safety concerns.

In fact, to this day, Biopure has never been able to address all of the deficiencies, problems, and concerns set forth by the FDA in the Complete Response Letter. Instead, Biopure shifted its focus to developing Hemopure for entirely different applications.

The Class Period begins on April 9, 2003, when Biopure first learned of FDA's clinical hold on the Trauma Clinical Trials, due to the FDA's safety concerns about Hemopure, arising from data submitted with the Hemopure BLA. The Class Period ends on December 24, 2003, when Biopure issued a Press Release publicly disclosing for the first time the FDA's clinical hold and the Defendants' receipt of Wells Notices from the United States Securities and Exchange Commission ("SEC").

During the Class Period, the Defendants concealed from investors the FDA's clinical hold on Hemopure trials, due to the FDA's safety concerns about Hemopure; the true

substance and import of the FDA's Complete Response Letter; and the true extent and nature of the deficiencies of the BLA outlined by the FDA in the Complete Response Letter.

Throughout the Class Period Defendants spoke optimistically about the prospects for FDA approval of the BLA and falsely and deceptively continued to tout the potential use of Hemopure in the treatment of trauma victims in multiple securities offerings, public filings, press releases, and conference calls for investors.

For example, Biopure issued a particularly egregious press release on August 1, 2003 - just **two days** after Biopure received the Complete Response Letter - which, incredibly, sought to create the false impression that Biopure had actually received **positive** news from the FDA regarding its pending BLA. Among other things, the August, 1, 2003 press release said:

> Biopure Corporation (BPUR) announced today that the U.S. Food and Drug Administration (FDA) has completed its review of the company's biologic license application (BLA) for Hemopure® ... and issued a letter requesting additional information. The letter focuses primarily on clarification of clinical and preclinical data and includes some comments on labeling. It does not request additional clinical trials. ...
>
> With 30 days remaining in the original BLA review cycle, the issuance of the letter has suspended the FDA review clock until Biopure submits a complete response.
>
> "**We're encouraged** that the FDA has finished its review and provided comprehensive feedback in advance of the formal action due date. By maintaining thirty days on the review clock, **the FDA is encouraging us to work with them to complete the approval process as quickly as possible**," said Biopure President and CEO Thomas A. Moore. "We'll work with the Agency to address the remaining questions and will provide our answers as expeditiously as possible."

The market understood the Defendants' August 1, 2003 Press Release to be

5

reflecting that Biopure had received "good news" from the FDA. That day, Biopure's publicly traded stock closed at seven dollars and thirty cents ($7.30) per share, a twenty-two percent (22%) increase over its previous day close.

As detailed in the Second Amended Class Action Complaint, additional false or misleading statements were made by Defendants throughout the Class Period, including in registration statements or amendments, prospectuses or prospectus supplements filed with the SEC on April 11, April 16, May 6, June 19, July 2, July 3, July 18, August 22, September 12, and September 15, 2003; in Form 8-Ks filed with the SEC on May 14, July 17, August 1, September 15, October 20, and December 11, 2003; in Form 10-Qs filed with the SEC on June 16 and September 15, 2003; in press releases dated April 24, May 22, May 30, August 21, October 30, and December 11, 2003; in conference calls for analysts and investors held on May 22, May 30, August 21, and October 30, 2003; and in conference presentations given on September 17 and September 25, 2003.

During the Class Period, and while in possession of material, adverse, nonpublic information about Biopure, Hemopure, the BLA, the FDA's safety concerns, and the Trauma Clinical Trials, Defendants Biopure and Rausch made millions of dollars through sales of Biopure stock.

The Class Period ends on December 24, 2003. On that date, after the close of trading, Biopure issued a press release (the "December 24, 2003 Press Release") in which it disclosed to the investing public, for the first time, the FDA's communication to Biopure, in April 2003, of the FDA's safety concerns regarding Hemopure and the FDA's imposition of a clinical hold barring the Company from conducting the Trauma Clinical Trials because of those safety concerns.

Significantly, in that December 24, 2003 Press Release, it was also disclosed that the Defendants Biopure, Moore and Richman had received a "Wells Notice" from the SEC advising them that SEC staff had preliminarily determined to recommend to the SEC that it bring civil proceedings against them, because, during the time period relevant to this litigation, they had made deceptive statements regarding Biopure, Hemopure, the BLA, and the Trauma Clinical Trials and they had not disclosed that in April 2003, the FDA had expressed safety concerns about Biopure which led to the imposition by FDA of a clinical hold on the Trauma Clinical Trials.

Defendants' false, misleading and deceptive public statements regarding Biopure, Hemopure, the BLA, the FDA's safety concerns, and the Trauma Clinical Trials throughout the Class Period significantly and artificially inflated the price of Biopure stock throughout the Class Period and caused Plaintiffs and the members of the Class to be damaged.

Plaintiffs' Motion for Class Certification should be granted because this litigation meets each of the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. First, the numerosity requirement of Fed. R. Civ. P. 23(a)(1) is met because there are at least thousands of Class Members, who, like the Plaintiffs, purchased Biopure common stock during the Class Period, and have suffered financial losses as a result. Second, there are common questions of law and fact under Fed. R. Civ. P. 23(a)(2) because the SAC alleges that all Class Members were harmed by the same or similar conduct, i.e., Defendants' alleged violations of the Securities Exchange Act of 1934 through material false or misleading representations. Third, Plaintiffs' claims are "typical" of the claims of the Class under Fed. R. Civ. P. 23(a)(3) because they, like all Class Members, purchased shares of Biopure stock at artificially inflated prices due to Defendants' securities law violations, and

suffered damages as a result thereof. Fourth, Plaintiffs will fairly and adequately represent the interests of the Class under Fed. R. Civ. P. 23(a)(4) because their claims are not antagonistic to the claims of the Class, and they have retained experienced, competent counsel. Finally, the litigation also meets the requirements of Fed. R. Civ. P. 23(b) because common issues predominate over any individual issues, and because a class action is superior to other methods of adjudication in that a class action is the only realistic opportunity for Class Members to recover damages for Defendants' wrongdoing.

## ARGUMENT

### I. General Legal Principles Applicable to Class Certification

To obtain class certification, the plaintiffs must establish the four requirements of Rule 23(a) and one of several elements of Rule 23(b). *Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). First, plaintiffs must satisfy the requirements of Fed. R. Civ. P. 23(a)(1)-(4), commonly known as "numerosity," "commonality," "typicality" and "adequacy." *Smilow,* 323 F.3d at 38 (citing *Amchem*, 521 U.S. at 613; *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (Gertner, J.). Second, plaintiffs must establish one of the three elements of Fed. R. Civ. P. 23(b), which may be satisfied by establishing that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Payne*, 216 F.R.D. at 25.

In approaching the class certification analysis, the court should "bear in mind the

underlying purposes of class certification both generally and in the context of securities litigation specifically." *Swack v. Credit Suisse First Boston,* 230 F.R.D. 250, 257-58 (D.Mass. 2005) (citing *Smilow,* 323 F.3d at 41). Class actions have long been considered a necessary and effective vehicle for resolution of securities law claims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class actions allow the "plaintiff to pool claims which would be uneconomical to litigate individually . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available"). "Courts have expressed a general preference for class certification in securities fraud cases, based on a policy favoring enforcement of the federal securities laws, and recognition of the fact that class actions may be the only practicable means of enforcing investors' rights." *Priest v. Zayre Corp.,* 118 F.R.D. 552, 553-54 (D. Mass. 1988) (citations omitted). Due to the importance of the class action device in securities fraud suits, courts have uniformly held that Fed. R. Civ. P. 23 is to be construed liberally in such cases. *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.").

As discussed below, class certification is appropriate in this case and the motion for class certification should be granted.

**II.    Each of the Requirements Contained in Fed. R. Civ. P. 23(a) Has Been Satisfied In This Action.**

### A. The Class Is So Numerous That Joinder Of All Members Is Impracticable

The "numerosity" requirement under Fed. R. Civ. P. 23(a)(1) has been met here because the number and diverse location of putative class members renders it impractical to join all of the Class Members in one lawsuit. "With respect to numerosity, in the context of securities litigation, often the 'exact number of Class members is unknown . . . and can only be ascertained through appropriate discovery.'" *In re Transkaryotic Therapies, Inc. Securities Litigation,* 2005 WL 3178162, *2 (D. Mass. Nov. 28, 2005) (citing *Swack*, 230 F.R.D. at 258). Therefore, in determining whether a proposed class meets the numerosity requirement, "courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *Swack*, 230 F.R.D. at 258.

Courts generally assume that the numerosity requirement is met in cases involving nationally traded securities. *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 306 (D. Mass. 1987). In this case, although the exact size of the Class is not yet known, the SAC alleges that there are thousands of members of the Class located throughout the United States, and that during the Class Period, Biopure stock was actively traded on the National Association of Securities Dealers Automated Quotation (NASDAQ). From these factual allegations, it can be strongly inferred that the size of the Class is sufficiently numerous that it would be impractical to join all of the claims of Class members in one lawsuit. *See Transkaryotic*, *supra,* at *2; *Swack*, 230 F.R.D. at 258-59; *Payne*, 216 F.R.D. at 25.

### B. There Are Common Issues of Law and Fact

The "commonality" requirement under Fed. R. Civ. P. 23(a)(2) has also been satisfied. "The threshold of commonality is not a difficult one to meet," particularly where, as here, "there are a number of common issues of fact and law that the class members would be required to establish to prove the defendants' liability, as well as their entitlement to damages." *In Re Relafen Antitrust Litig.,* 231 F.R.D. 52, 69 (D. Mass. 2005). "It does not require that class members' claims be identical. A single common legal or factual issue can suffice." See *Payne*, 216 F.R.D. at 25(quotations and internal citations omitted).

Here, the SAC alleges the following common questions of law and fact, among others, that exist as to all members of the Class:

(i) whether Defendants' statements concerning Biopure contained false or misleading statements and/or failed to disclose material facts;

(ii) whether Defendants' conduct constitutes a "scheme" and/or "course of business" under Rule 10b-5(a) and (c);

(iii) whether Defendants acted with scienter;

(iv) whether Defendants' conduct caused the class members losses; and

(v) whether the Class has sustained damages, and the measure of such damages.

For the Sub-Class, the SAC alleges the following common questions: whether when defendants Biopure and Rausch sold shares of Biopure during the Class Period, they were in possession of material, adverse, non-public information regarding Biopure, including in particular, *inter alia*, information regarding the FDA's safety concerns, the clinical hold on the Trauma Clinical Trials, and Biopure's receipt of the Complete Response Letter and adverse information contained therein.

Such common questions have previously been found sufficient to establish commonality in this district. See *Priest*, 118 F.R.D. at 554; *Kirby*, 116 F.R.D. at 306.

### C. Plaintiffs' Claims Are Typical of the Claims of the Class and Sub-Class

Plaintiffs have also met the typicality requirement of Fed. R. Civ. P. 23(a)(3), as their claims are typical of the claims of the absent Class members. In general, "a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005). Plaintiffs, like the absent Class members, purchased Biopure stock during the Class Period at prices that were artificially inflated due to Defendants' material misrepresentations, and suffered losses as a result thereof. In addition, Plaintiffs's claims are based upon the same facts and legal theories as the rest of the Class.

The "typicality" requirement goes hand in hand with "commonality" and is focused on the congruence between particular claims of the named class representatives and the generalized claims that are common to the class. *Payne*, 216 F.R.D. at 26. "'The typicality requirement is not highly demanding' because 'the claims only need to share the same essential characteristics, and need not be identical.'" *Id.* (citing 5 Moore's Federal Practice § 23.24[4]). So long as there is a nexus between the class representative's claims and the common questions of fact or law that unite the class, typicality is satisfied. *Priest*, 118 F.R.D. at 555 ("With respect to typicality under Rule 23(a)(3), plaintiffs need not show substantial identity between their claims and those of absent class members, but need only show that their claims arise from the same course of conduct that gave rise to the claims of

12

the absent members.") (citation omitted). Factual differences do not render a claim atypical if the claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory. *Swack*, 230 F.R.D. at 263-64.

### D. Plaintiffs Will Fairly and Adequately Represent the Interests of the Class and Sub-Class

The "adequacy of representation" element "requires that Plaintiff demonstrate that their interests will not conflict with those of the class members and that their counsel is qualified, experienced, and able to vigorously conduct the proposed litigation." *Payne*, 216 F.R.D. at 26; see also *Priest*, 118 F.R.D. at 556 ("Inquiries into the adequacy of representation should focus on the named plaintiffs' ability to prosecute the action vigorously through qualified counsel and their lack of conflicting interest with unnamed class members.").

Lead Plaintiff Erickson will fairly and adequately represent the interests of the Class. First, his interests are perfectly aligned with the interests of the Class. Like all Class Members, he purchased Biopure stock at prices that were inflated by Defendants' securities law violations and the same wrongdoing that caused him damages also caused the damages suffered by the Class. Plaintiffs Stuart Gottlieb and John G. Esposito, Jr. will fairly and adequately represent the interests of the Sub-Class. Like the other members of the proposed Sub-Class, they purchased Biopure stock contemporaneously with the sales of Biopure stock by defendants Rausch and Biopure while these defendants were in possession of adverse material non-public information about Biopure.

Plaintiffs have retained counsel with substantial expertise in class action litigation,

thereby insuring that the litigation will be vigorously prosecuted. Indeed, counsel selected by the Plaintiffs were appointed Co-Lead Counsel by this Court and have already vigorously prosecuted this case for several years.

## III.    The Requirements Of Fed. R. Civ. P. 23(b)(3) Have Been Met

The requirements of Fed. R. Civ. P. 23(b)(3) have also been satisfied because common questions of law and fact predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A.    Common Issues Predominate

It is well-established that in determining whether common questions predominate, the Court's inquiry should be directed primarily toward the issue of liability. Indeed, "[w]here, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied." *Smilow*, 323 F.3d at 40; *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 345 (D. Mass. 2003) (quoting same). When common questions represent a significant aspect of a case and they can be resolved in a single action, class action status is appropriate. *See* 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d, § 1788 at 528 (1986). The common questions, however, need not be dispositive of the entire action, because "predominate" as used in Fed. R. Civ. P. 23(b)(3) should not be equated with "determinative." *See Smilow*, 323 F.3d at 39 ("Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class"). A single, central issue as to the defendant's conduct *vis a vis* class members can satisfy the predominance requirement. *Payne*, 216 F.R.D. at 27.

With respect to the Class, common issues predominate over individual questions. The litigation will be focused on whether Defendants' statements were false or misleading, whether Defendants acted with *scienter,* and whether Class Members suffered damages and how damages should be measured. These issues of liability and damages are common for all Class Members.

With respect to the Sub-Class, common issues also predominate, because the focus will be upon whether, when defendants Biopure and Rausch sold shares of Biopure during the Class Period, they were in possession of material, adverse, non-public information regarding Biopure, including information regarding the FDA's safety concerns, the clinical hold on the Trauma Clinical Trials, and Biopure's receipt of the Complete Response Letter and adverse information contained therein.

This case illustrates the principle that the predominance requirement is "readily met" in many securities fraud actions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 592, 625, 117 S.Ct. 2231 (1997).

### B. A Class Action Is Superior To Individual Actions

"The final hurdle that plaintiffs must clear under *Rule 23* is the requirement to demonstrate that 'a class action is a fair and efficient method of adjudicating the controversy and would be superior to other methods.'" *Payne*, 216 F.R.D. at 29 (quoting *Mack v. Suffolk County*, 191 F.R.D. 16, 25 (D. Mass. 2000)). A finding by the Court that the proposed Class and Sub-Class meet all of the other *Rule 23* criteria strongly suggests that a class action is desirable as a matter of judicial economy, that joinder is impracticable and that common issues predominate. *Id.*

Additionally, a class action is superior to other available methods for the fair and

efficient adjudication of this controversy because, absent a class action, this Court would be faced with the task of potentially litigating numerous lawsuits:

> [T]he benefits to the large number of class members, many of whose claims are so small that their size does not provide the impetus to bring individual actions, clearly outweigh any problems which may arise in the management of the class action. Economy will undoubtedly be achieved. Not only economy which will benefit members of the class, but economy which will benefit the judicial system as well.

*Kirby*, 116 F.R.D. at 311 (quoting *Berenson v. Faneuil Hall*, 100 F.R.D. 468, 471 (D. Mass. 1984)); *see also Smilow*, 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) is to vindicate the claims of ... groups of people whose individual claims would be too small to warrant litigation."); *Amchem,* 521 U.S. at 617 ("While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.").

### IV.    Shapiro, Haber & Urmy and Stull, Stull & Brody Should be Appointed Counsel for the Class and Sub-Class

The 2003 amendment to Rule 23(c) provides that any order certifying a class action must appoint class counsel under Rule 23(g). Rule 23(g)(1)(C) sets forth several factors that

the Court must consider in appointing class counsel. Each of these factors warrants appointment of Shapiro Haber & Urmy and Stull, Stull & Brody as Class Counsel.

The first factor to be considered is "the work counsel has done in identifying or investigating potential claims in the action." Fed. R. Civ. P. 23(g)(1)(C)(i). Stull, Stull & Brody was retained by plaintiff John G. Esposito, Jr.. at the outset of the litigation. Furthermore, this Court has already approved Lead Plaintiff Erickson's selection of both Stull Stull & Brody and Shapiro Haber & Urmy to serve as Co-Lead Counsel in this action. Co-Lead Counsel identified and investigated the claims asserted in this action and prepared and filed an initial complaint, an amended consolidated complaint and a second amended consolidated complaint in this action. The second factor under Rule 23(g)(1)(C)(i) is "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action." Shapiro Haber & Urmy and Stull, Stull & Brody have extensive experience and expertise in class action litigation, and particularly in prosecuting securities fraud class actions. In addition, both firms have been appointed lead counsel in numerous cases.

The third factor is "counsel's knowledge of the applicable law." Fed. R. Civ. P. 23(g)(1)(C)(i). As noted, both firms have substantial experience with securities fraud class actions, and they have demonstrated their knowledge of the applicable law by their representation of the Plaintiffs before this Court in this action.

The fourth factor under Rule 23(g)(1)(C)(i) is "the resources counsel will commit to representing the class." Shapiro Haber & Urmy and Stull, Stull & Brody have already demonstrated their willingness and ability to commit the necessary resources to prosecute this action. Moreover, both firms have litigated numerous cases as large and complex, or

17

larger, than the instant case.

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that this Court grant their motion for an order pursuant to Rule 23(c):

(i)     certifying this action as a class action;

(ii)    certifying the Class consisting of all purchasers of Biopure common stock from April 9, 2003 to December 4, 2003, inclusive;

(iii)   certifying a Sub-Class consisting of all persons who purchased Biopure common stock contemporaneously with the sales of Biopure's stock by the Defendants Biopure and Rausch (the "Sub-Class") during the Class Period;

(iv)    appointing Lead Plaintiff Ronald Erickson as representative of the Class and Stuart Gottlieb and John G. Esposito, Jr. as representatives of the Sub-Class; and

(v)     appointing Shapiro Haber & Urmy and Stull, Stull & Brody as Class Counsel.

Dated:     May 5, 2006              Respectfully submitted,

**SHAPIRO HABER & URMY LLP**


**/s/ Edward F. Haber**
Edward F. Haber BBO # 215620
Theodore M. Hess-Mahan BBO # 557109
Matthew L. Tuccillo BBO # 643336
53 State Street
Boston, MA 02109
(617) 439-3939


**STULL, STULL & BRODY**
Jules Brody (*pro hac vice*)
Howard T. Longman (*pro hac vice*)
6 East 45th Street
New York, New York 10017
(212) 687-7230

**Co-Lead Counsel For
Lead Plaintiff and The Class**


## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as nonregistered participants on the 5th day of May, 2006.


**/s/ Edward F. Haber**
Edward F. Haber