# EXHIBIT D

```
                                                              Page 1
 1            UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3              Civil Action No. 03-12628-NG

 4   ***********************************

 5   IN RE: BIOPURE CORPORATION

 6   SECURITIES LITIGATION

 7   ***********************************

 8               DEPOSITION OF RONALD W. ERICKSON,

 9   a witness called on behalf of the Defendants,

10   taken pursuant to the Federal Rules of Civil

11   Procedure, before Maureen O'Connor Pollard, RPR,

12   CLR, and Notary Public within and for the

13   Commonwealth of Massachusetts, at the offices of

14   Bingham McCutchen LLP, 150 Federal Street,

15   Boston, Massachusetts, on the 30th of May, 2006,

16   commencing at 1:09 o'clock p.m.

17
18
19
20
21
22
23
24
```

Page 70

1    MR. LONGMAN: Correct.
2        BY MR. BLANCHARD:
3    Q. Okay.
4    A. Now, the thing is also, I'm looking at
5  going ahead, and I purchased the stock for
6  approximately five point -- $5.70 a share, say,
7  it got up to eight and a quarter in August
8  because of everything that was said about it,
9  there was no negativity at all, no nothing, that
10 was going up. If I had known what was there, I
11 would have sold the stock then and there and I
12 would have made a profit, and it would have been
13 a large profit, but I didn't because the fact
14 that I held on to it, and at that point.
15      So as far as my loss could be from
16 what I purchased it for along with the gain,
17 then along with what I had to sell it for. So
18 there's two losses, if I want to go ahead and
19 look at it as far as going ahead and taking the
20 portion of loss of the $250,000 that I lost or
21 the $400,000 that I lost, so I can look at it in
22 two different ways.
23   Q. Okay. And apart from that loss that
24 you just described, would you be seeking money

Page 71

1  damages, money payment for any other loss you
2  incurred, like the stress?
3        MR. LONGMAN: Asked and answered. I
4  think he answered that question. I think he
5  answered the question.
6    A. Any additional, I don't -- I don't
7  foresee that. I mean it's a matter of going
8  ahead with -- it comes down to a monetary loss
9  in that sense, whatever stress or anything else
10 losses which is minute to the amount of loss
11 that I took monetarily.
12       BY MR. BLANCHARD:
13   Q. I get that, and I'm just trying to be
14 precise.
15      But are you seeking compensation for
16 anything in addition to that monetary loss?
17       MR. LONGMAN: Can I just say I think
18 what you're asking is are you seeking damages
19 for pain and suffering or mental suffering?
20       MR. BLANCHARD: However he describes
21 it, sure.
22       MR. LONGMAN: Whatever you want to
23 call the stress.
24       THE WITNESS: Okay.

Page 72

1       MR. LONGMAN: But I think he answered
2  that.
3       But if you can answer it again.
4    A. I think if I was I would have done it
5  personally, not through the class action suit.
6       MR. BLANCHARD: .
7    Q. So the answer is no?
8    A. Yes.
9    Q. Yes, the answer is no?
10      MR. LONGMAN: He answered the
11 question. You can't --
12      MR. BLANCHARD: I can when I don't
13 have an answer yet.
14      MR. LONGMAN: He said no.
15      MR. BLANCHARD: He said yes.
16      MR. LONGMAN: No.
17      MR. BLANCHARD: He said just yes. I'm
18 not going to argue about what he said.
19      BY MR. BLANCHARD:
20   Q. Are you not --
21   A. Okay. As far as that, I'll leave that
22 open.
23   Q. Okay. Now, what do you mean by "leave
24 that open"? I'm not trying to --

Page 73

1       MR. TUCCILLO: Mike, if I may --
2    A. Monetarily, yes, I am, I mean that's
3  what I want to go after.
4       BY MR. BLANCHARD:
5    Q. Okay.
6    A. As far as anything above and beyond
7  that through pain and anguish, mental exhaustion
8  or whatever else you want to call it, I want to
9  leave that open, I don't want to close the door
10 on that.
11   Q. Okay. Are you leaving that open on
12 behalf of the class?
13   A. Yes.
14   Q. Okay. I'm doing my best so that none
15 of that pain and anguish arises from this day,
16 okay?
17   A. Okay.
18   Q. We started on this before; do you know
19 what it means to be a class representative or a
20 lead Plaintiff?
21   A. Yes.
22   Q. What, in your words, what does it mean
23 to be a lead Plaintiff?
24   A. Well, you take responsibility to go

Page 114

1  I was going to go ahead and sell some stock
2  options and so forth, I went ahead and ended up
3  starting to look at some different things as far
4  as what I'd do with it. And so then I ended up
5  going ahead and going into stock, and I ended up
6  going up -- there was a thing on AOL on eight
7  top stocks to go ahead and look at that would be
8  a good purchase. Biopure was one of them.
9         It had a caption in there and I went
10 ahead into it and looked it up, and saw it was a
11 company in Cambridge, and close by, and did the
12 research on it.
13     Q. So did you read this document at the
14 time?
15     A. Yes.
16     Q. Was there anything about -- was there
17 any information contained therein that motivated
18 you to purchase Biopure securities?
19         MR. LONGMAN: In this document right
20 here?
21         MR. BLANCHARD: Yes.
22     A. In this document. Well, first of all,
23 that they raised $13,000,000 through sale of
24 common stock, so there might have been quite a

Page 115

1  few people that were researching and interested
2  in the stock at the time as far as where it
3  would go. So it was one of the things. This
4  was not the driving force of it, but it was one
5  that I had looked up on.
6         BY MR. BLANCHARD:
7      Q. Was there any information about the
8  company other than their issuing 13,000,000 in
9  stock that motivated you to purchase Biopure
10 securities?
11         MR. LONGMAN: I'm going to object to
12 the form of the question. "Motivated you to
13 purchase," it's vague.
14         BY MR. BLANCHARD:
15     Q. Influenced your decision.
16     A. I would say it was a piece of what was
17 there as far as going ahead, and had approval in
18 South Africa, I mean whatever, you know, it's to
19 the point at that time I read the article and
20 looked into it more.
21         As far as the Defense Department, I
22 mean that's what was a big influence, as far as
23 them being interested in it.
24     Q. And are you referring to something in

Page 116

1  this document when you talk about the Defense
2  Department? You can just point the page out to
3  me if you'd like.
4      A. You can go to page two of three, this
5  content of "this press release does not
6  necessarily reflect the position or policy of
7  the government or the Department of Defense, and
8  no official endorsement should be inferred.
9  Statements in this press release are not
10 strictly historical, at that point, but actual
11 results may differ from those projected in the
12 forwarding looking statements."
13        The thing is other than that, then
14 everything else that showed as far as the
15 Hemopure in South Africa, they had -- I checked
16 into that as far as going ahead, and it was
17 approved in South Africa, treatment and
18 everything else for adults, searching for
19 patients that are anemic or for the purpose of
20 eliminating reducing allogenic, etcetera. So
21 that's what I checked into and looked into it.
22 It was one of the many --
23        MR. TUCCILLO: Perhaps he ought to
24 read the whole thing. It's several pages long,

Page 117

1  and he looked at it obviously three years ago,
2  so I don't know --
3         MR. BLANCHARD: If the witness feels
4  like he needs to read the thing, then let me
5  know what motivated or didn't motivate his
6  decision.
7      A. This didn't motivate me. This is a
8  portion of, piecemeal of what I went ahead and
9  researched on it to go ahead that way.
10        If you're trying to narrow it down to
11 this document or this piece, whatever you want
12 to call it, this was minute compared to what I
13 looked at or researched to make a decision.
14        (Whereupon, Exhibit 17 was marked for
15        identification.)
16        MR. LONGMAN: If you're going to ask
17 some questions on the documents, just give him
18 time to read the whole document.
19        MR. BLANCHARD: Oh, sure.
20        MR. LONGMAN: This is several
21 articles, by the way.
22        MR. BLANCHARD: They're attached
23 together.
24        MR. LONGMAN: Yes.

Page 142

1  ask that question.
2       MR. BLANCHARD: That's fair enough.
3       BY MR. BLANCHARD:
4  Q.  Are you aware that Biopure was seeking
5  FDA approval in orthopedic surgery -- I'm sorry.
6       Were you aware at the time you
7  purchased Biopure securities that Biopure was
8  seeking FDA approval to use Hemopure in
9  orthopedic surgery?
10 A.  Yes.
11 Q.  Were you aware that they were seeking
12 FDA approval in any other setting?
13 A.  I'm not sure.
14 Q.  Are you aware today whether Biopure is
15 seeking FDA approval in any other setting?
16      MR. LONGMAN: Objection.
17 A.  At this point in time, I'm not sure.
18 I haven't looked into it since I sold the stock.
19      BY MR. BLANCHARD:
20 Q.  Are you aware of whether Biopure ever,
21 since the time they were seeking approval for
22 orthopedic surgery, are you aware of whether
23 they ever sought FDA approval to use Hemopure in
24 any setting other than orthopedic surgery?

Page 143

1  A.  I was aware of the fact in a
2  conference call that I went on that there was a
3  case where a daughter that was thirteen years
4  old, and the father tried everything, and ended
5  up using Biopure to go ahead and cure her
6  cancer, and went through thirteen transfusions
7  at that point in time to go ahead, and her color
8  changed drastically, but it was saving her life,
9  that's it.
10      So I mean there were other things,
11 that I forgot more than what I could remember at
12 this point in time, but I knew there were other
13 alternatives to that other than just orthopedic.
14 Q.  You mentioned before something about a
15 hold.
16 A.  Mm-hmm.
17 Q.  What is a hold, or the hold that you
18 were referring to earlier in your testimony?
19 A.  Going ahead and getting approval from
20 the FDA.
21 Q.  What was put on hold exactly, do you
22 know?
23 A.  Their application.
24 Q.  Their entire application?

Page 144

1  A.  Their -- from what I gathered it was
2  their entire application on hold until they go
3  ahead and get the approvals. As far as how they
4  researched and how they had their issues, I
5  don't know specifically if there was an approval
6  on one sector of it and another and a hold on a
7  portion. I was assuming that it was the whole
8  application that was put on hold until they go
9  ahead.
10      I don't know the process, if they
11 approve a portion of the application and then
12 you have to follow through on other sectors of
13 it. I'm not up on the FDA approval process.
14 Q.  Can you tell me who Thomas Moore is?
15 A.  He's one of the entities that we filed
16 against, and he's one of the controlling
17 entities in the company.
18 Q.  What do you mean by "entity"?
19 A.  Okay. He's one of the -- when I look
20 at a company I look at the people who have
21 control, and he's one of them.
22 Q.  Okay. I got you.
23      What about Abdu Alayash?
24      MR. LONGMAN: Who?

Page 145

1       BY MR. BLANCHARD:
2  Q.  Abdu Alayash?
3  A.  That doesn't sound familiar.
4  Q.  Are you familiar with Charles Sanders?
5  A.  I believe he's on there also.
6  Q.  Who is he?
7  A.  He's -- I'd have to look up the names
8  to see on that. Do you have, that doesn't sound
9  -- Sanders?
10 Q.  Yes, Sanders.
11 A.  I'd have to look at the information.
12 Q.  Are you familiar with J. Richard
13 Crout?
14 A.  Yes.
15 Q.  And who is J. Richard Crout?
16 A.  He's one of the controlling people of
17 the company.
18 Q.  Is he a Defendant in this action?
19 A.  No.
20 Q.  Is Charles Sanders a Defendant in the
21 action?
22 A.  I believe so, yes.
23 Q.  Is Thomas Moore a Defendant in the
24 action?

Page 158

1  Q. Is that it from that paragraph?
2     MR. LONGMAN: Have you seen any of the
3  other?
4     THE WITNESS: No.
5     BY MR. BLANCHARD:
6  Q. Okay. Is there anything that you view
7  as false or misleading about the sentences you
8  just read?
9     MR. LONGMAN: Objection.
10  A. No, not for what I just read.
11    BY MR. BLANCHARD:
12  Q. Do you believe that --
13  A. I mean it's --
14    BY MR. BLANCHARD:
15  Q. Do you believe --
16    MR. LONGMAN: Are you through with
17  your answer?
18    THE WITNESS: Yes.
19    BY MR. BLANCHARD:
20  Q. Do you believe that the company should
21  have said anything that it didn't in here in
22  light of what it did say in those sentences you
23  just read?
24  A. Yes. I think when the trials were put

Page 159

1  on hold in April, in that sense, they led it to
2  believe that they were not -- that they were
3  just normal function, and everything was going
4  to be smooth. I was not aware of that at that
5  point.
6     So as far as what I read just from the
7  second sentence to probably the second and third
8  sentence there or whatever, I mean I've read
9  that elsewhere, fine, the bottom portion I have
10 not.
11    MR. LONGMAN: I don't know if you're
12 responding to a question.
13    Can you read his question back?
14    (Whereupon, the reporter read back the
15 pending question.)
16    MR. LONGMAN: Okay. And then you
17 answered, I think.
18    MR. BLANCHARD: Can I hear the answer
19 back?
20    (Whereupon, the reporter read back the
21 above answer.)
22    BY MR. BLANCHARD:
23  Q. When you said the trials were put on
24 hold, do you know why the trials were put on

Page 160

1  hold?
2  A. I would say, you know, I didn't go
3  in-depth into it, I would say that for the
4  trials they were having problems with the
5  trials, with the patients and everything, and
6  that's why they were probably put on hold by the
7  FDA.
8  Q. Was it more than one trial that was
9  put on hold?
10 A. It was clinical trials that were put
11 on hold.
12 Q. Was it more than one?
13 A. Yes. Well, I mean if you're going to
14 go ahead, one clinical trial or further clinical
15 trials, what are you saying? They have to do
16 more than one trial, it's not just one patient
17 or so.
18 Q. Okay. Right. I mean it could be more
19 patients, but what's your understanding of what
20 a clinical trial is?
21 A. I mean if you're going to go ahead and
22 say clinical trial, which encompasses a lot of
23 patients, then yes, it's one clinical trial for
24 the Hemopure.

Page 161

1  Q. Okay. Do you know, was that clinical
2  trial, did it involve a particular use for
3  Hemopure?
4  A. It was for more so the orthopedic part
5  as far as doing, I mean like knee replacements
6  or anything like that, or in service to go ahead
7  and end up having damage with joints where they
8  need to go ahead and have a blood supply where
9  there was a lot of loss of blood or something
10 like that, that's what they'd use it for, my
11 understanding.
12 Q. And that clinical trial was put on
13 hold?
14 A. To the best of my knowledge, yes.
15 Q. Pardon me if I already asked this, I
16 don't know if I asked it exactly the same, but
17 do you know why FDA put a clinical trial on
18 hold?
19    MR. LONGMAN: He just answered the
20 question.
21 A. Because they thought it wasn't
22 working.
23    BY MR. BLANCHARD:
24 Q. Okay. Did FDA communicate anything

Page 162

```
 1  specific about the clinical trial?
 2        MR. LONGMAN:  I just want to point --
 3     A.  I think the patients were, the
 4  patients were at risk.  That's probably why they
 5  put it on hold.
 6        BY MR. BLANCHARD:
 7     Q.  Okay.
 8     A.  They weren't having a lot of success
 9  with it was my understanding.
10     Q.  Okay.  So you -- when you say that's
11  probably why they put it on hold, I just
12  question whether you're speculating or telling
13  me if you know from some source.
14        MR. LONGMAN:  He gave you an answer.
15  You can ask him the basis.
16     A.  I don't have definitive --
17        MR. LONGMAN:  Wait, I talk, then you
18  talk.
19        You asked him a question, he gave you
20  an answer, and now you say I don't know if
21  you're speculating.  Where does that come from?
22        MR. BLANCHARD:  The raising of your
23  tone is noted for the record, I don't appreciate
24  it.
```

Page 163

```
 1        It comes from the ambiguity of the
 2  answer.
 3        MR. LONGMAN:  I raised my tone?
 4        MR. BLANCHARD:  Yes, you did.  And I
 5  don't appreciate it.  Thank you.
 6        I will do my best, it is getting late
 7  in the day, to ask the clearest questions
 8  possible.  If my question isn't clear, then
 9  please make an objection, but otherwise please
10  just limit your statements to objections.
11        MR. LONGMAN:  Okay.  Was your
12  testimony speculation, is that what you're
13  asking him?
14        MR. BLANCHARD:  I was asking if he was
15  speculating as to whether or not --
16     A.  It was my interpretation of what I've
17  heard as far as read on the Internet and in the
18  claims that were made.
19        BY MR. BLANCHARD:
20     Q.  At what point did you learn that a
21  clinical trial was put on hold?
22     A.  I would say not for -- not for quite a
23  while.  I think it was probably, it was later,
24  third or fourth quarter, 2003.
```

Page 164

```
 1     Q.  Can you be more specific as to when it
 2  was?  Third or fourth quarter is a six month
 3  period.
 4     A.  Well, I knew it wasn't, and I knew it
 5  wasn't in -- I knew it wasn't up until August
 6  because August -- remember the stock going up
 7  quite a bit, September, October, somewhere in
 8  there, October, November, December, somewhere in
 9  there that I ended up hearing about it.
10     Q.  Okay.  Do you recall how you heard
11  that a clinical trial was put on hold?
12     A.  I started reading information on it
13  through either the Internet or whatever.  I
14  didn't -- I didn't get anything from the company
15  saying that, that I can remember.
16        (Whereupon, Exhibit 28 was marked for
17        identification.)
18        BY MR. BLANCHARD:
19     Q.  Do you have Exhibit 28 in front of
20  you?
21        (Witness reviewing document.)
22        BY MR. BLANCHARD:
23     Q.  Do you have Exhibit 28 in front of
24  you?  I'm sorry.
```

Page 165

```
 1     A.  Yes.
 2     Q.  It is a post-effective amendment
 3  number one to Form S-3 registration statement
 4  under the Securities Act of 1933 filed with the
 5  SEC on April 16th, 2003 by Biopure, correct?
 6  I'm just reading that off the first page.
 7     A.  Yes.
 8     Q.  Do you recall ever reading this
 9  document, maybe not in exactly this form?
10        MR. LONGMAN:  You're going to have to
11  give him a minute to look at the document.
12        MR. BLANCHARD:  Sure.  Yes.
13        BY MR. BLANCHARD:
14     Q.  When I ask that question, I'm sorry, I
15  mean for you to look it over.
16        (Witness reviewing document.)
17     A.  I don't honestly remember.
18        BY MR. BLANCHARD:
19     Q.  Okay.
20        (Whereupon, Exhibit 29 was marked for
21        identification.)
22        BY MR. BLANCHARD:
23     Q.  Do you have Exhibit 29 in front of
24  you?
```

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 166

1   A.  Yes.
2   Q.  Actually I'm sorry, I marked the wrong
3   one.  Can we give you a new 29 and make that 30?
4       (Whereupon, Exhibit 30 was marked for
5       identification.)
6       MR. LONGMAN:  What did you just hand
7   me, 29 or 30?
8       MR. BLANCHARD:  The April 1st should
9   be 29, and May should be 30.
10      BY MR. BLANCHARD:
11  Q.  I'll make sure we're on the same page,
12  I'm sorry for the confusion.
13      Do you have Exhibit 29 before you?
14  A.  Yes.
15  Q.  And is Exhibit 29 a document entitled
16  "Biopure Awards Public Relations and Medical
17  Education Accounts in Support of Hemopure"?
18  A.  Yes.
19  Q.  Have you ever read Exhibit 29 before,
20  or any part of it?
21  A.  I might have.
22  Q.  Do you recall when you would have, you
23  might have read it?
24      MR. LONGMAN:  That would be

Page 167

1   speculation, if he might have.  I'm not sure if
2   he read it or not.
3       MR. BLANCHARD:  I'm asking when he
4   might have read it, if he might have read it
5   when might he have read it.
6   A.  Around the time it was released.
7       BY MR. BLANCHARD:
8   Q.  Okay.  But you don't know whether or
9   not you read it?
10  A.  I mean I might have read something
11  similar or I might have read this, one or --
12      MR. TUCCILLO:  Mike, for the record,
13  the 5-26-06 is the access date that you printed
14  it, right?
15      MR. BLANCHARD:  Yes.
16      MR. TUCCILLO:  That's obviously not
17  part of what you're asking if he read it, this
18  is something you printed out?
19      MR. BLANCHARD:  Yes, in substance, in
20  substance.
21      BY MR. BLANCHARD:
22  Q.  If we can turn to Exhibit 30.  And if
23  we've got the right Exhibit 30 it should be
24  "Biopure Announces 2003 Second Quarter Financial

Page 168

1   Results"?
2   A.  Yes.
3   Q.  Take a moment to review that document,
4   please.
5       (Witness reviewing document.)
6   A.  Okay.
7       BY MR. BLANCHARD:
8   Q.  Is there anything in Exhibit 30 that
9   you contend is false or misleading?
10  A.  Not that I can --
11      MR. LONGMAN:  Take your time to look
12  through it.
13      (Witness reviewing document.)
14  A.  Okay.  So this release was done in May
15  22nd, 2003, correct?
16      BY MR. BLANCHARD:
17  Q.  Correct.  That's what's indicated on
18  the first page at the top.
19      (Witness reviewing document.)
20  A.  On the second paragraph where it's
21  bull's eyed and it says "based on FDA
22  performance goals and guidelines, the
23  prescription drug," it says "Biopure is hopeful
24  that in mid 2003 the FDA will complete its

Page 169

1   review and act on Biopure's biological license
2   application."
3       It doesn't say -- it leads you to
4   believe that everything is fine at that point in
5   time, that they didn't put a hold on any of the
6   clinical trials at all or anything.  I'd say
7   that that is misleading in that sense to me for
8   not going ahead and at least having something in
9   there in regard -- they lead it to believe that
10  it's going to be -- they're going to complete
11  their review by 2003 when they've already done a
12  portion of the review and already put a hold on
13  the clinical trials.
14  Q.  And --
15  A.  And this is in May, and they did that
16  in April.
17  Q.  It mentions Prescription Drug User Fee
18  Act, also referred to as PDUFA.
19      Are you familiar with PDUFA at all?
20  A.  No, not completely.
21  Q.  Are you partially?
22  A.  I've read it, I've -- a little bit,
23  but not -- it wasn't their main product.
24  Hemopure was more what I was interested in.

Page 170

1  Q. You read PDUFA or parts of it?
2  A. I've read of it a little bit and
3 that's it. I just passed over it because the
4 Hemopure is what I was looking at.
5  Q. Do you know when the FDA completed its
6 review of Biopure's biologics license
7 application?
8  A. No, I don't remember.
9  Q. Do you remember what year? Do you
10 remember if they did at all?
11   MR. LONGMAN: Objection. I was going
12 to say no foundation for the question.
13   BY MR. BLANCHARD:
14  Q. Do you know whether they completed
15 their review of the BLA, biologics license
16 application, at all?
17  A. For Hemopure?
18  Q. Let me just re-ask it.
19   Do you know whether the FDA completed
20 their review or its review of the biologics
21 license application for Hemopure for Biopure at
22 all?
23   MR. LONGMAN: I think he testified
24 earlier he wasn't sure what biologics

Page 171

1 application was.
2   MR. BLANCHARD: Please let him answer.
3   MR. LONGMAN: Do you want an answer to
4 the question or do you want to confuse the
5 witness?
6   MR. BLANCHARD: Are you going to
7 testify, or are you going to let him answer?
8   MR. LONGMAN: No, I want to get clear
9 answers, and we're going to walk out of here if
10 you insist on trying to muddy the record.
11   He testified earlier today he did not
12 know what a biological license, so ask it in a
13 way that's comprehensible.
14   BY MR. BLANCHARD:
15  Q. Based on what you just read to me that
16 you contend is false and misleading in this
17 application and you sued my client for which
18 refers to a biologics license --
19  A. That refers --
20  Q. Please just let me finish the
21 question.
22  A. Okay.
23  Q. -- which refers to a biologics license
24 application, do you know whether FDA ever

Page 172

1 completed its review of that biologics license
2 application?
3   And if my question is asking something
4 that you don't understand, then please tell me.
5   MR. LONGMAN: Objection.
6  A. Okay. I don't understand. As far as
7 the Prescription Drug User Fee Act, the PDUFA, I
8 might have that confused with the Hemopure in
9 that sense. And if it's got nothing to do with
10 the Hemopure, then that's different from what I
11 was thinking.
12   MR. LONGMAN: He's asking you a
13 question. Repeat the --
14  A. I'm not sure what -- I don't
15 understand the question.
16   MR. LONGMAN: Can you repeat the
17 question?
18   (Whereupon, the reporter read back the
19 pending question.)
20   MR. LONGMAN: Do you understand the
21 question?
22  A. Have they fulfilled on the
23 application?
24   BY MR. BLANCHARD:

Page 173

1  Q. I'm sorry, what did you say?
2  A. Okay, what was --
3  Q. Have they what? I just misheard.
4  A. I'm not sure what you're getting at.
5  Q. Let's just back up and take it from
6 the beginning.
7   You indicated that, I thought you
8 indicated, tell me if I'm wrong, that based on
9 FDA performance, goals and guidelines in the
10 PDUFA "Biopure is hopeful that mid-2003 the FDA
11 will complete its review and act on Biopure's
12 biologics license application, BLA, to market
13 Hemopure in the United States for treatment of
14 acutely anemic adult patients undergoing
15 orthopedic surgery." And I believe you
16 indicated that that statement was false or
17 misleading because there was a clinical hold.
18  A. No, I was incorrect on that.
19  Q. Okay. I apologize for the whole line
20 of questioning.
21   So is there anything in that statement
22 that is false or misleading in your view?
23   MR. LONGMAN: He's answered this
24 question before.

Page 174

1    MR. BLANCHARD: He just told me --
2    MR. LONGMAN: Now you're trying --
3    MR. HUANG: He just changed his
4  response.
5    MR. BLANCHARD: He changed his
6  response.
7    A.  That has to do with in a sense for
8  acute anemic adult patients, and that was the
9  portion where I was -- I read over quickly, and
10 go ahead. So there's a difference there. So
11 I'd say no, as far as I'm not aware of any at
12 this point on this.
13   MR. LONGMAN: On what?
14   THE WITNESS: As far as this document.
15   MR. LONGMAN: I don't understand what
16 your answer is.
17   MR. BLANCHARD: I don't either, I'm
18 sorry.
19   A.  Okay. Ask the question again.
20   BY MR. BLANCHARD:
21   Q.  Is there anything false or misleading
22 in that sentence that we've just been reading?
23   A.  Not that I can see.
24   Q.  Now, you've testified earlier that

Page 175

1  you're aware that Biopure has submitted an
2  application for FDA approval of Hemopure,
3  correct?
4    A.  Mm-hmm.
5    Q.  That application was pending in 2003,
6  correct?
7    A.  Yes.
8    Q.  Are you aware of whether the FDA ever
9  completed its review of that application?
10   MR. LONGMAN: Objection.
11   A.  I don't believe they have. I don't
12 believe they've answered the 200 some odd
13 questions, to the best of my knowledge, to go
14 ahead and have the review finished. I think
15 they either put it on hold or denied it, because
16 they have not gone ahead and answered all the
17 questions.
18   BY MR. BLANCHARD:
19   Q.  Okay.
20      (Whereupon, Exhibit 31 was marked for
21      identification.)
22   BY MR. BLANCHARD:
23   Q.  Do you have Exhibit 31 in front of
24 you?

Page 176

1    A.  Yes.
2    Q.  It's labeled on the first page "Final
3  Transcript CCBN Street Events, Event Transcript,
4  BPUR or Biopure Q-2, 2003, Corporation Earnings
5  Conference Call, May 22nd, 2003."
6       In substance is that correct, that's
7  what it is?
8    A.  Yes.
9    Q.  Okay. This appears to be a transcript
10 of a conference call that the company had May
11 22nd, correct?
12   A.  It appears to be.
13   Q.  Okay. You mentioned that you had
14 listened in on a Biopure call at some point.
15 Was this the call you listened to?
16   A.  I'm not sure if this was the one I
17 listened to. I'd have to read through it to
18 find out.
19   Q.  Do you recall when --
20   MR. LONGMAN: Let him -- do you need
21 to read through it to find out?
22   A.  I'm not sure if this was the one, or I
23 mean I listened to a couple.
24   BY MR. BLANCHARD:

Page 177

1    Q.  Okay.
2    MR. LONGMAN: If by reading through
3  it, can you find out if this was the one?
4    THE WITNESS: I might be able to.
5    MR. LONGMAN: Read through it.
6    BY MR. BLANCHARD:
7    Q.  Go right ahead and read through it.
8       (Witness reviewing document.)
9    A.  I might have listened to this, because
10 there's some segments here that I remember.
11   BY MR. BLANCHARD:
12   Q.  What segments?
13   A.  Either I read it or I went ahead and
14 ended up listening to it or whatever.
15   Q.  Okay. I guess just to figure out how
16 relevant it is, did you read it, you know, in
17 2003 or sometime after, or did you --
18   A.  I'd say it was in 2003.
19   Q.  Okay. After, you know, reviewing this
20 briefly I recognize, the segments that you
21 recognize, what are they?
22   A.  Well, as far as going ahead in the
23 first paragraph, that portion. As far as the
24 third paragraph.

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 178

1  Q. I'm sorry, if you could identify the
2  paragraph, just read me the first couple words?
3  A. First paragraph, "at this call last
4  quarter I was asked to give a rough estimate on
5  how much we would ship in this quarter, and I
6  estimated between one and eight quarters, and in
7  two, and a quarter million."
8      Then the third paragraph, "last
9  quarter I also indicated that we anticipated
10 additional military support beyond then the then
11 4.9 million that had been appropriated."
12     Those two.
13 Q. Is there anything false or misleading
14 in your view in any of those statements?
15 A. No.
16     (Whereupon, Exhibit 32 was marked for
17     identification.)
18     BY MR. BLANCHARD:
19 Q. You have Exhibit 32 in front of you?
20 A. Yes.
21 Q. And it's a transcript of a May 30th
22 conference call, correct, for Biopure?
23 A. That's what it says.
24 Q. If you could take a moment to review

Page 179

1  the document, I'll ask you a few questions.
2      (Witness reviewing document.)
3  A. Okay.
4      BY MR. BLANCHARD:
5  Q. Do you recall whether you listened in
6  on this investor call?
7  A. I think I might have missed this one.
8  Q. You might have missed it?
9  A. Yes.
10     (Whereupon, Exhibit 33 was marked for
11     identification.)
12     BY MR. BLANCHARD:
13 Q. Do you have Exhibit 33 before you?
14 A. Yes.
15 Q. And that is a press release, correct?
16 A. It looks that way, yes.
17 Q. It's titled "U.S. FDA Finalizes
18 Response Date For Biopure's Marketing
19 Application of Hemopure," correct?
20 A. Mm-hmm.
21 Q. Do you recall whether you've ever seen
22 this document before? Please take all the time
23 you need to review it.
24     (Witness reviewing document.)

Page 180

1  A. I think I might have missed this with
2  the conference call. It was the same day as
3  this talking about the same day. I might have
4  read this later on.
5      BY MR. BLANCHARD:
6  Q. Okay.
7  A. Other than the May 30th.
8  Q. Do you recall ever learning that the
9  FDA took an extension on the amount of time it
10 was going to take to review the Biopure
11 application for approval of Hemopure during
12 2003?
13 A. I remember them filing, that they were
14 filing for an extension or whatever, something
15 like that.
16 Q. I don't --
17     MR. LONGMAN: Let him finish.
18 A. Biopure was going for a filing an
19 extension for the application.
20     BY MR. BLANCHARD:
21 Q. Are you --
22 A. Is that what you were asking?
23 Q. Well, okay. If you're done with your
24 answer, I just don't want to interrupt. Are you

Page 181

1  done?
2  A. Mm-hmm.
3  Q. When you say they were filing for an
4  extension, who was filing for an extension?
5  A. Biopure was.
6  Q. And they sought an extension of the
7  amount of time for FDA to complete its review of
8  the application?
9  A. I believe so.
10 Q. Do you know whether Biopure's request
11 for an extension was ever granted?
12 A. I don't know.
13 Q. Do you know if the amount of time the
14 FDA was going to take to review Biopure's
15 application for approval of Hemopure -- wow,
16 it's getting late, I'm sorry. Can you read back
17 -- I'll try to ask the question again, I lost it
18 in midstream.
19     Do you know whether the FDA ever
20 extended the time that it was going to take to
21 review, to complete its review of Biopure's
22 application of Hemopure?
23     MR. LONGMAN: Isn't that what you
24 just --

Page 182

1      MR. BLANCHARD: Maybe it is, but I'm
2  not sure.
3      A. And I -- I'm not sure.
4      BY MR. BLANCHARD:
5      Q. Okay. Great. Thank you. I
6  apologize.
7      (Off the record discussion.)
8      (Whereupon, Exhibit 34 was marked for
9      identification.)
10     BY MR. BLANCHARD:
11     Q. Do you have Exhibit 34 before you?
12     A. Yes.
13     Q. Take a moment and review it, please.
14     (Witness reviewing document.)
15     A. Okay.
16     BY MR. BLANCHARD:
17     Q. You've reviewed it?
18     A. Most of it.
19     Q. Let me know when you're ready, I'm
20 sorry.
21     (Witness reviewing document.)
22     A. Okay.
23     BY MR. BLANCHARD:
24     Q. Okay. Have you ever seen Exhibit 34

Page 183

1  before?
2      A. I believe I have.
3      Q. Do you recall when you saw it?
4      A. I would have seen it in probably
5  somewhere in August, 2003.
6      Q. Did you read it?
7      A. Yes.
8      Q. In your view, is there anything false
9  or misleading about what's contained in Exhibit
10 34?
11     A. No, at that point, no.
12     Q. Say that again?
13     A. No.
14     (Whereupon, the witness and his
15 counsel conferred.)
16     MR. BLANCHARD: Does counsel need to
17 take a break with the witness? Do you need to
18 take a break?
19     MR. LONGMAN: There's no question
20 pending, is there?
21     MR. BLANCHARD: No, but if you want to
22 take a break, take a break.
23     (Whereupon, the witness and his
24 counsel conferred.)

Page 184

1      BY MR. BLANCHARD:
2      Q. Have you ever heard the term "complete
3  response letter" before?
4      A. I don't believe so.
5      Q. So that term doesn't have any
6  significance for you?
7      A. Well, complete response letter as far
8  as divulging everything that I had? I mean --
9      Q. It's not really a fair question to ask
10 you what the significance is if you never really
11 heard it before. I'm just making sure that when
12 someone says "complete response letter" it
13 doesn't mean anything particular to you.
14     MR. LONGMAN: You mean in the context
15 of an FDA? I mean --
16     MR. BLANCHARD: Sure, in any context.
17     MR. LONGMAN: Any complete response
18 letter in the world? You have to put it in
19 context.
20     BY MR. BLANCHARD:
21     Q. Well, in the context of FDA
22 regulations, have you ever heard the term
23 "complete response letter"?
24     A. I might have. I mean as far as going

Page 185

1  ahead with the terminology, might have. But I
2  mean as far as going ahead, I have probably a
3  different view of what it is than what you do or
4  whatever else.
5      Q. Well, do you have a view of what a
6  complete response letter is in the context of
7  FDA terminology?
8      A. No.
9      Q. Have you ever heard the term complete
10 response letter in connection with this
11 litigation?
12     A. I might have. I'm trying to -- it's
13 been a long day, I'm going ahead and kind of
14 trying to remember, it's a little cloudy.
15     Q. Understood.
16     But you're not sure?
17     A. Right.
18     Q. And the term doesn't carry any
19 significance for you in the context of this
20 litigation?
21     MR. LONGMAN: I think he just answered
22 that.
23     A. I mean in the context, I mean what
24 comes to mind, okay, in a sense as far as to me

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 186

1  would be in July when they had the 200 questions
2  that they had to answer, I assume that that
3  would be what would be sent out, and that's what
4  they'd have to do to go ahead and complete it.
5  But I don't know if that's what you're getting
6  at or what, so I'm saying that I'm kind of brain
7  dead right at the moment.
8       BY MR. BLANCHARD:
9    Q.  I get you. I'm just trying to get
10 whatever your understanding of a complete
11 response letter is both in the FDA context and
12 this litigation, what your understanding is, and
13 I think you've answered both those.
14      MR. LONGMAN: Okay. Do you want to
15 take a break? Are you tired?
16      THE WITNESS: I'm okay. I'll be more
17 tired if we take a break and come back.
18      (Whereupon, Exhibit 35 was marked for
19      identification.)
20      BY MR. BLANCHARD:
21   Q.  Do you have Exhibit 35 in front of
22 you?
23   A.  Yes.
24   Q.  Please take all the time you need to

Page 187

1  review it.
2       (Witness reviewing document.)
3    A.  Okay.
4       BY MR. BLANCHARD:
5    Q.  You've had time to review it?
6    A.  Yes.
7    Q.  Exhibit 35. Have you ever seen it
8  before?
9       MR. LONGMAN: What did you say?
10      BY MR. BLANCHARD:
11   Q.  Have you ever seen it before, Exhibit
12 35?
13   A.  I believe so.
14   Q.  I'm sorry, did you say I don't believe
15 so?
16   A.  I believe so.
17   Q.  You believe so.
18      Do you recall when you've seen it?
19   A.  It would have been in August sometime.
20   Q.  Did you read it?
21      I'm sorry, when you say August,
22 August, 2003?
23   A.  Yes.
24   Q.  Did you read it at that time?

Page 188

1    A.  I believe so.
2    Q.  Is there anything in Exhibit 35 that
3  you believe is false or misleading?
4    A.  No. I'd say that's -- recent
5  corporate events is more so that ended up --
6  that I remember in that paragraph and so forth.
7  As far as, yes, I'd say that just more so
8  stating what they came out with at that point in
9  time.
10   Q.  Is there anything in that recent
11 corporate events paragraph that you believe is
12 false or misleading?
13   A.  I think they're stating it at that
14 point in time where they didn't have the -- you
15 know, up until then as far as they didn't
16 divulge what -- no, I'd say that's fine.
17   Q.  I'm sorry, that just got a little
18 jumbled on me there.
19   A.  Yes, I'm jumbling.
20      MR. TUCCILLO: Could you read back his
21 answer, please?
22      (Whereupon, the reporter read back the
23      above answer.)
24      BY MR. BLANCHARD:

Page 189

1    Q.  Go ahead.
2       MR. LONGMAN: He's asking you if
3  there's anything false or misleading.
4    A.  No, I think it's fine.
5       BY MR. BLANCHARD:
6    Q.  Okay. Thank you.
7       MR. LONGMAN: Can we take a short
8  break?
9       MR. BLANCHARD: Sure.
10      (Whereupon, a recess was taken from
11      6:52 p.m. to 7:03 p.m.)
12      BY MR. BLANCHARD:
13   Q.  I'm sorry, I didn't give you the
14 August 21st conference call yet, did I? No, I
15 did not.
16      (Whereupon, Exhibit 36 was marked for
17      identification.)
18      BY MR. BLANCHARD:
19   Q.  Do you have Exhibit 36 in front of
20 you?
21   A.  Yes.
22   Q.  If you could take a moment to review
23 it, please.
24      (Witness reviewing document.)