# EXHIBIT E

John G. Esposito, Jr.

05/31/2006

Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                    Civil Action No. 03-12628-NG

4    **********************************

5    IN RE:  BIOPURE CORPORATION

6    SECURITIES LITIGATION

7    **********************************

8                    DEPOSITION OF JOHN G. ESPOSITO,

9    JR., a witness called on behalf of the

10   Defendants, taken pursuant to the Federal Rules

11   of Civil Procedure, before Maureen O'Connor

12   Pollard, RPR, CLR, and Notary Public within and

13   for the Commonwealth of Massachusetts, at the

14   offices of Bingham McCutchen LLP, 150 Federal

15   Street, Boston, Massachusetts, on the 31st of

16   May, 2006, commencing at 11:06 o'clock a.m.

17

18

19

20                                          .

21

22

23

24

John G. Esposito, Jr.                                                      05/31/2006

Page 98

1    Q.   And as you sit here, you cannot say
2  one way or the other whether you sold shares of
3  Biopure on August 5th, 2003?
4    A.   No.
5    Q.   Okay.  And you can't say one way or
6  the other whether you purchased Biopure prior to
7  August 5th, 2003, is that fair?
8    A.   Correct.  My recall was everything was
9  done in August, so I don't -- this is -- I don't
10  recall this.  Why wouldn't he have that in my --
11       MR. LONGMAN:  Don't.
12       THE WITNESS:  I'm sorry, I'm talking
13  to myself.
14       BY MR. SAVERY:
15    Q.   Is this transaction here that's
16  listed, this third one, the sale of Biopure
17  shares on August 5th, 2003, is this something
18  that you're complaining about in this action?
19       MR. LONGMAN:  Objection.  Vague and
20  ambiguous.
21    A.   I would say no.
22       BY MR. SAVERY:
23    Q.   Okay.
24    A.   Because, first of all, I don't have

Page 99

1  the recall of the sale, and no, that would not
2  be in the complaint, it would be the purchasing.
3    Q.   Okay.  Regarding the August 12th
4  purchase of Biopure shares, and again I'll refer
5  back to Exhibit 46, do you see on page two of
6  this exhibit it looks like there are two entries
7  in this list relating to a purchase on August
8  12th.
9       Do you see that?
10    A.   Yes.
11    Q.   What I'd like to focus on is the word
12  "solicited."  Do you see that after "Biopure
13  Corp. Class A" the word "solicited" appears?
14    A.   Yes.
15    Q.   Do you have an understanding of what
16  that word means?
17    A.   No.
18    Q.   Okay.  But it's your recollection that
19  Mr. Harris didn't contact you to recommend that
20  you buy Biopure?
21       MR. LONGMAN:  Objection.  Asked and
22  answered.
23    A.   I contacted him first, is that what
24  you mean?

Page 100

1       BY MR. SAVERY:
2    Q.   Right.
3    A.   Right.
4    Q.   Before you purchased Biopure, did Mr.
5  Harris actually recommend that you buy it?
6       MR. LONGMAN:  Objection.  Asked and
7  answered.
8    A.   No.
9       BY MR. SAVERY:
10    Q.   Okay.
11    A.   The reason why I remember that vividly
12  is because it's rare that I bring something to
13  him, so the two were that I remember were Merck
14  and this that I brought to him, because again
15  I'm not that interested or involved with it.
16    Q.   Do you know what the price of the
17  Biopure shares was that you bought on August
18  12th?
19    A.   It says $7.01 per share.
20    Q.   I'd like to turn to Exhibit 46.  Do
21  you see what the purchase price is in that
22  exhibit?
23    A.   Yes.
24    Q.   Can you tell me what it was?

Page 101

1    A.   $7.01.
2    Q.   For how many shares?
3    A.   Quantity, I think it was 100 shares.
4    Q.   Okay.  And how many did you buy on the
5  12th?
6    A.   Apparently I bought 600 in all, 500 on
7  the top and 100 on the bottom.
8    Q.   And what was the price of the 500?
9    A.   $700 -- I mean $7 a share.
10    Q.   $7 per share?
11    A.   Mm-hmm.
12    Q.   And again turning to Exhibit 47 then,
13  your certification.
14    A.   Yes.
15    Q.   Am I correct the certification says
16  you purchased on August 12th, 2003 600 shares at
17  $7.01?
18    A.   Yes.
19    Q.   But in truth it was $7.01 for 100 of
20  the shares and $7.00 even for 500, is that
21  right?
22       MR. LONGMAN:  According to this
23  document.
24    A.   Apparently.

26 (Pages 98 to 101)

John G. Esposito, Jr.                                                                                              05/31/2006

Page 106

1    to this case, are you aware of the term IND?
2        A.   No.
3        Q.   Who is Carl Rausch?
4        A.   He is one of the principals of the
5    company, I believe he was the technical head.
6        Q.   Okay.  Do you have any other
7    understanding of his role at Biopure?
8        A.   No, just that he was one of the
9    principals.
10       Q.   Okay.  And when you say "principals,"
11   what do you mean by "principals"?
12       A.   High ranking, high ranking
13   involvement.
14       Q.   Is he a Defendant in this case?
15       A.   Yes.
16       Q.   How about Ronald Richards?
17       A.   Yes.
18       Q.   Is he a Defendant in this case?
19       A.   Yes.
20       Q.   Is he associated with Biopure, or was
21   he at the time of the underlying conduct?
22       A.   I understand that he was, yes.
23       Q.   And what was his role at Biopure?
24       A.   I believe CFO.

Page 107

1        Q.   Have you heard the name Howard
2    Richman?
3        A.   Yes.
4        Q.   Is he associated with Biopure, or was
5    he?
6        A.   Richman was -- yes, I believe he was
7    on the board of directors.
8        Q.   Any other role relative to Biopure?
9        A.   I don't -- I don't know.
10       Q.   Have you heard of C. Everett Koop?
11       A.   Koop, yes.
12       Q.   Who was he?
13       A.   He was the past Secretary of Health.
14       Q.   Does he have any connection with
15   Biopure?
16       A.   I have no idea.
17       Q.   Have you heard of Thomas Moore?
18       A.   Yes.
19       Q.   Who was he?
20       A.   He was again a higher ranking official
21   at Biopure.  I don't know if he was CEO or
22   president.
23       Q.   Have you heard the term "PDUFA"?
24       A.   No.

Page 108

1        Q.   Do you know what the name of this case
2    is, this litigation, the title of the case?
3        A.   The title of the case, no.
4        Q.   Do you know in what court the case is
5    pending?
6        A.   No.
7        Q.   Okay.  In what state?
8        A.   Massachusetts, I believe.
9        Q.   What is a class period?
10       A.   It is the period of time where the
11   Plaintiffs have purchased stock.
12       Q.   Okay.  And what is the class period in
13   this case?
14       A.   From April, I think April 9th of '03
15   to December 24th.
16       Q.   Okay.  Have you heard the term
17   "complete response letter"?
18       A.   Yes.
19       Q.   What's a complete response letter?
20       A.   That's when the FDA will send a final
21   notice with their concerns to a company.  In
22   this case I could further answer that.
23       Q.   Sure.
24       A.   I think it was in July they sent one

Page 109

1    to Biopure with, I think, 200 questions that
2    they needed to be answered where they had
3    concerns.
4        Q.   Okay.  Have you ever seen the complete
5    response letter?
6        A.   No.
7        Q.   The document that you assert is a
8    complete response letter?
9        A.   No, I have not.
10       Q.   Have you seen any written documents in
11   the form of correspondence between Biopure and
12   FDA?
13       A.   Between Biopure and FDA?  I don't
14   believe so.
15       Q.   Who is Stuart Gottlieb?
16       A.   He's one of the Plaintiffs.
17       Q.   Have you heard the term "clinical
18   hold"?
19       A.   Yes.
20       Q.   What's a clinical hold?
21       A.   I believe it means that the company is
22   no longer able to conduct any further clinical
23   trials of the drug.
24       Q.   Okay.  Does that term have any

Page 118

```
 1    Q.  Yes.  Sure.
 2    A.  You asked me if it was more risky than
 3  Merck, and I said yes.
 4    Q.  Okay.
 5    A.  That was the context of what I
 6  thought.
 7    Q.  Did you consider it to be one of your
 8  more risky investments?
 9    A.  No, I've had some -- although just
10  playing with stock.  No, I've had more that I
11  thought were more risky, not many, because I
12  don't invest that much.
13    Q.  Can you give me an example of a stock
14  that you've invested in that was more risky?
15    A.  Stocks that are very cheap, penny
16  stocks.  One, the most recent one is named
17  Schram, I believe, and a friend said this
18  company has possibilities in the tech market,
19  and it was like, you know, $.50 a share or
20  something like that, so that I consider just a
21  crap shoot, and I don't do that very frequently.
22    Q.  Okay.  Have there been other penny
23  stocks you've invested in?
24    A.  Maybe one other, which I don't
```

Page 119

```
 1  remember.
 2    Q.  Okay.  Apart from the penny stocks,
 3  have there been any stocks that you consider to
 4  be more risky than Biopure that you invested in?
 5    A.  I don't recall.
 6    Q.  Turning back to Exhibit 46 in front of
 7  you, turn to the second page, there's a
 8  reference there to a buy on August 21st.
 9      Do you see that?
10    A.  Yes.
11    Q.  Did you, in fact, purchase 600 more
12  shares on August 21st?
13    A.  Yes.
14    Q.  And at that point the price was $8.22?
15    A.  Yes.
16    Q.  So in the nine days since you had
17  purchased your first shares, the stock had risen
18  over a dollar, is that right?
19    A.  Yes.
20    Q.  You were aware, it's fair to say, that
21  there were fluctuations in the price of Biopure
22  stock?
23    A.  Yes.
24    Q.  Did you make this purchase through Mr.
```

Page 120

```
 1  Harris?
 2    A.  Yes.
 3    Q.  And how did that purchase come about?
 4    A.  Again just verbally, phone call, and
 5  then mail a check, that kind of thing.
 6    Q.  Who first came up with the idea of an
 7  additional --
 8    A.  I did.
 9    Q.  -- position?
10      And why did you decide you wanted to
11  buy?
12    A.  I thought I wanted to be in a position
13  of about around that figure, nine, 10,000, but I
14  decided to do a little bit conservatively first,
15  half first and then see what happened.  And then
16  sure enough, in a week or so the stock went up,
17  so I thought well, gee, this would be warranted,
18  so I purchased more.
19    Q.  Okay.
20    A.  And that was as much as I wanted to
21  purchase.
22    Q.  Okay.  So when you first bought on
23  August 12th, you had in mind that you'd possibly
24  go up to the $9,000 range?
```

Page 121

```
 1    A.  Right.  And apparently I must have
 2  again, because if the other thing was correct, I
 3  must have had prior experience of a buy and a
 4  sell according to this thing here in early
 5  August, so that might have been --
 6      MR. LONGMAN:  Could I hear his
 7  question again?
 8      (Whereupon, the reporter read back the
 9  pending question.)
10    A.  The answer is yes.
11      BY MR. SAVERY:
12    Q.  Okay.  And you mentioned in your
13  answer, your prior answer to that, that's the
14  sale that's reflected in your certification,
15  right?
16    A.  Yes.
17    Q.  But again as you sit here, you have no
18  recollection of that sale, correct?
19    A.  Right.
20    Q.  And you have no recollection of
21  holding Biopure prior to August 12th?
22    A.  Correct.
23    Q.  And you can't say as you sit here if
24  you did hold prior to August 12th when you
```

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 122

1  bought?
2      A.  Correct.
3      Q.  Okay.  Now, between your purchase of
4  Biopure stock on August 12th and your next
5  purchase on August 21st, did you receive any
6  information from any sources regarding Biopure?
7      A.  Just when I -- we checked with Mr.
8  Harris he said -- he quoted a price, that it had
9  gone up, and that's when I decided to buy more.
10     Q.  Okay.  So was that your first
11 conversation with Mr. Harris regarding Biopure
12 after you had bought on August 12th?
13     A.  Yes.
14     Q.  Okay.  And was that conversation then
15 on August 21st, is that when you would have
16 spoken to him?
17     A.  Yes, probably.
18     Q.  Okay.  So just to be clear, you didn't
19 talk to Harris regarding Biopure between the
20 12th and the 21st?
21     A.  I can't remember exactly, but I would
22 guess yes, that is correct.  Because that's when
23 I bought it.  So classically if we discuss it
24 and I'm impressed by the results, I would order

Page 123

1  it at that time.
2      Q.  So just to be clear, there's no
3  recollection of any interim report coming in?
4      A.  Right.
5      Q.  And did you check the market price of
6  Biopure between the 12th and when you next spoke
7  to Harris regarding Biopure?
8      A.  Yes, that's why -- yes.  The fact that
9  it went up from seven to eight?
10     Q.  Yes, sorry.
11         Just so it's clear, did you yourself
12 go and try to look up the market price or did
13 you -- was it not until you spoke to Harris?
14     A.  That I could do --
15     MR. LONGMAN:  Mr. Harris.
16     A.  Mr. Harris, yes, I could look it up on
17 the computer and find that it was going up, and
18 that's probably what prompted my call.
19     BY MR. SAVERY:
20     Q.  Okay.  So as you sit here, do you
21 recall that you monitored the price of Biopure
22 stock after you first bought it on the 12th?
23     A.  I can't exactly recall.  It was either
24 one way or the other I found out, either from

Page 124

1  on-line, the Internet, or Mr. Harris, and
2  ultimately Mr. Harris, and that's when I decided
3  to buy more.
4      Q.  When you spoke to Mr. Harris prior to
5  your second purchase, what did he say to you
6  regarding Biopure, if anything?
7      MR. LONGMAN:  Asked and answered.
8      Answer it again.
9      A.  Just that it went up.
10     BY MR. SAVERY:
11     Q.  Anything else?
12     A.  No, he didn't have any further
13 information other than the prior information
14 from before I bought the first on the 12th.  He
15 didn't add anything.
16     Q.  Okay.  Fine.
17         And did you comment to him regarding
18 Biopure during your conversation, apart from the
19 fact that you wanted to buy more?
20     A.  Just that it seemed like it was on the
21 rise, so I thought that, well, yes, maybe this
22 is a good stock, because again we were still
23 quite impressed by the potential.
24     Q.  Okay.  And again to be clear, before

Page 125

1  you bought your second holding in Biopure from
2  the time you bought your first, that period of
3  time now, you didn't go out and do any of your
4  own research?
5      A.  No.
6      MR. LONGMAN:  Objection.  It is clear
7  already.
8      MR. SAVERY:  If you have an objection,
9  state it.  I'm not here to answer your
10 questions.
11     MR. LONGMAN:  Then stop repeating the
12 same questions.  We want to get out of here, we
13 don't want to stay here for repetitive
14 questions.
15     MR. SAVERY:  Fine.
16         Did I get an answer to that question?
17     (Whereupon, the reporter read back the
18 above answer.)
19     BY MR. SAVERY:
20     Q.  As of August 21st, was your
21 understanding, regarding the status of Biopure's
22 effort to obtain FDA approval, was your
23 understanding the same as what the status was as
24 of August 12th when you first bought?

32 (Pages 122 to 125)

John G. Esposito, Jr.

---

Page 158

1    A.   When Harris referred me to him a
2   couple years before that.
3    Q.   Why did you decide to bring your
4   claims in a class action?
5    A.   I really felt that what they did was
6   not really right, to tell you the truth.  I
7   really felt that it was kind of misleading --
8   not misleading, it was really, by omission it
9   was really not playing fair.  The fact that
10  those two significant events were withheld, and
11  the fact that they were selling while other
12  people were buying, I thought that was really
13  not fair for those principals to do.
14   Q.   Are you familiar at all with the
15  requirements for bringing a suit as a class
16  action?
17   A.   No.
18       MR. LONGMAN:  Objection.
19       BY MR. SAVERY:
20   Q.   Do you have an understanding as to
21  what it means to be a representative of a class
22  or a sub-class?
23   A.   Yes.
24   Q.   What does it mean?

---

Page 159

1    A.   My job is to oversee, although it's of
2   course as a layman, what happens legally, what
3   the lawyers are doing, and to let -- make sure
4   that the rest of the class knows what's
5   happening through them, and participate in any
6   like decisions, if there's an offer or something
7   of that sort.
8    Q.   Okay.  And are you willing to testify
9   at trial if the case goes to trial?
10   A.   Yes.
11   Q.   Do you have a fee agreement with Mr.
12  Longman's firm?
13   A.   No.
14   Q.   Do you have any written agreement at
15  all with Mr. Longman?
16   A.   No.  He just mentioned that --
17       MR. LONGMAN:  Objection.  I'm going to
18  object to disclosing attorney/client
19  communications.
20       THE WITNESS:  Okay.
21       MR. LONGMAN:  I want you to be able to
22  answer the question as to whether there's an
23  agreement or not, but I don't want you to
24  disclose our communications.

---

Page 160

1        MR. TUCCILLO:  Can you read the last
2   question and answer?
3        (Whereupon, the reporter read back the
4   above question and answer.)
5        BY MR. SAVERY:
6    Q.   Apart from any written agreement, do
7   you have any verbal agreement regarding your
8   engagement of Mr. Longman as your attorney?
9    A.   My expenses.
10   Q.   What is the agreement relative to your
11  expenses?
12   A.   Travelling, travelling expenses to
13  get -- schlep from New York to here.
14   Q.   I'm wondering what the agreement is
15  relative to those expenses.
16   A.   That he would reimburse those
17  expenses.
18   Q.   Okay.  Have you paid any money to any
19  lawyers representing you in this case?
20   A.   No.
21   Q.   Have you agreed to pay any costs for
22  bringing this action?
23   A.   Yes.  But as I understand it, if
24  there's -- there's a contingency fee, of course,

---

Page 161

1   that the lawyers get.  If they lose I would be
2   responsible for my percentage of their fee,
3   which is going to be relatively small since I'm
4   a small shareholder.
5    Q.   When you say you'd be responsible for
6   your percentage of the fees, is that the
7   attorney fees?
8    A.   Yes.
9        MR. LONGMAN:  Objection.
10       BY MR. SAVERY:
11   Q.   What about expenses?
12   A.   What expenses?
13   Q.   To the extent there are any additional
14  expenses such as you flying up here.
15   A.   Oh, oh, I don't know the exact nature
16  of the -- you know, those numbers.
17   Q.   Do you know who's responsible for
18  paying those expenses?
19   A.   The expenses of?
20   Q.   For instance, flying up here, or any
21  travel the lawyers have to do.
22   A.   My expenses now I was told would be
23  reimbursed by the -- because that becomes their
24  expenses.  Now, if there's a -- if they lose the

41 (Pages 158 to 161)

John G. Esposito, Jr.

Page 162

1  case, we all have to pay them, reimburse them.
2  My portion would be commensurate with the
3  percentage of stock that I have.
4      Q.  Okay.  So it's your understanding,
5  then, that all holders of Biopure stock who fall
6  within the class in this case would be
7  responsible for --
8      A.  Yes, if they're in the suit, yes.
9      Q.  Sorry, so I can finish the question.
10        -- would be responsible for
11  compensating Mr. Longman's firm for his fees and
12  expenses?
13        MR. LONGMAN:  Objection.
14     A.  Yes.
15        BY MR. SAVERY:
16     Q.  You mentioned the term "contingency
17  fee."
18     A.  Right.
19     Q.  What is a contingency fee?
20     A.  It means that the attorney gets paid,
21  upon winning a case he gets paid a percentage of
22  what is won of the settlement or whatever.
23     Q.  Okay.  Do you have an understanding of
24  what the contingency fee percentage is for your

Page 163

1  engagement of Mr. Longman?
2      A.  My -- I may have assumed this, that
3  it's a third.  So I really can't say.
4      Q.  Has anyone promised you a certain
5  amount of money if the case settles?
6      A.  Certain amount of money?  No.
7      Q.  Has anyone suggested to you that you
8  will recover more than any of the other class
9  members in this case on a percentage basis?
10     A.  No, but that's a damn good idea.
11     Q.  But it hasn't been suggested?
12     A.  No.
13     Q.  Okay.  Just for the benefit of
14  counsel.
15     A.  Do you want to change lawyers?
16     Q.  I don't think you want to do that.
17        MR. LONGMAN:  Do you want to take a
18  quick break?
19        MR. SAVERY:  Sure.
20        (Whereupon, a recess was taken from
21  2:52 p.m. to 3:08 p.m.)
22        BY MR. SAVERY:
23     Q.  Dr. Esposito, I'm going to be going
24  through a number of documents that were marked

Page 164

1  at yesterday's deposition, showing them to you
2  and just asking you one or two questions about
3  each.
4        Showing you now what's been marked
5  Exhibit 26 (handing).  And with respect to any
6  of these, take as much time as you need to look
7  through them.
8        My first question concerning each is
9  going to be; have you seen this document before?
10     A.  No.
11     Q.  Okay.  That's all for that one.
12        Next one, 27 (handing).
13     A.  I haven't seen this one either.
14     Q.  Okay.  That's Exhibit 27?  Yes, that's
15  Exhibit 27?
16     A.  Yes.  I'm sorry.
17     Q.  I'm showing you now what's been marked
18  as 28 (handing).  And for each of these what I'm
19  wondering is if you've seen that specific
20  document or one that's in a similar form.
21     A.  Yes, I understand that it's either
22  this or something like it.
23     Q.  Similar, it could have been in a
24  different form.

Page 165

1      A.  The answer is no to this one as well.
2      Q.  Okay.  I show you the next document.
3  It's been marked Exhibit 29 (handing).  Have you
4  seen this before today?
5      A.  No.
6      Q.  Okay.  The next document, Exhibit 30
7  (handing).  Have you seen that document before?
8      A.  No.
9      Q.  Okay.  I'm showing you now what's been
10  marked Exhibit 31 (handing).  Have you seen that
11  document before?
12     A.  No.
13     Q.  Showing you what's been marked Exhibit
14  32 (handing).  Have you seen that document
15  before?
16     A.  No.
17     Q.  Showing you what's been marked Exhibit
18  33 (handing).  Have you seen that document
19  before?
20     A.  No.
21     Q.  Showing you what's been marked Exhibit
22  34 (handing).  Have you seen that document
23  before?
24     A.  No.

42 (Pages 162 to 165)