# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **IN RE BIOPURE CORPORATION SECURITIES LITIGATION** | ) ) ) ) ) ) ) ) ) ) ) |

**Civ. No. 03-12628-NG**

# DEFENDANTS' MEMORANDUM OF LAW
# IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, CHARLES A. SANDERS, J. RICHARD CROUT, RONALD F. RICHARDS AND HOWARD P. RICHMAN**

By their attorneys,

Robert A. Buhlman, BBO #554393
Donald J. Savery, BBO #564975
Michael D. Blanchard, BBO #636860
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

SEYFARTH SHAW, LLP

Christopher Robertson (BBO# 642094)
Jodi D. Luster (BBO # 657853)
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028

*Attorney for Defendant Ronald F. Richards*

EDWARDS ANGELL PALMER & DODGE
LLP

John D. Hughes (BBO# 243660)
John J. Tumilty (BBO # 560017)
Mary P. Cormier (BBO# 635756)
101 Federal Street
Boston, MA 02110
(617) 439-4444

Cathy A. Fleming (*pro hac vice*)
750 Lexington Avenue
New York, NY 10022
(212) 308-4411

*Attorneys for Defendant Howard P. Richman*

McDERMOTT WILL & EMERY, LLP

Edward P. Leibensperger (BBO# 292620)
Jeffrey S. Huang (BBO# 651854)
28 State Street
Boston, MA 02109
(617) 535-4000

*Attorneys for Defendant Thomas Moore*

July 25, 2006

TABLE OF CONTENTS

I.   BACKGROUND ..................................................................................................4

    A.   Biopure ...................................................................................................4

    B.   Mr. Erickson's Biopure Trading ...........................................................5

    C.   Dr. Esposito's Biopure Trading ............................................................5

    D.   Plaintiffs' Allegations ...........................................................................6

    E.   The Putative Class And Subclass...........................................................7

    F.   Appointment of Lead Plaintiff ..............................................................7

    G.   Plaintiffs' Motion And Amended Motion For Class Certification .........8

II.  ARGUMENT .....................................................................................................9

    A.   Plaintiffs' Burden For Obtaining Class Certification .............................9

    B.   The Putative Class Fails To Satisfy Rule 23 Because The Claims
        Of The Proposed Class Representatives Are Not Typical Of Those
        Of The Putative Class And The Proposed Class Representatives
        Will Not Fairly And Adequately Protect The Interests Of The Class .................11

        1.   Moving Plaintiffs Have Vested Counsel With Unfettered Control Of This
            Litigation And Are Accordingly Inadequate As A Matter Of Law ...........12

        2.   Mr. Erickson Lacks Standing To Represent Class Members Who
            Purchased Biopure After The August 1, 2003 Press Release And His
            Interests Are Antagonistic To These Class Members, Subjecting Him To
            Unique Defenses. ...................................................................................23

        3.   Dr. Esposito Is Inadequate Because Of His Utter Failure To Offer
            Credible Testimony Concerning His Trading History In Biopure.............28

        4.   Dr. Esposito Cannot Adequately Represent The Interests
            Of Class Members Who No Longer Hold Their Biopure Stock...............33

    C.   Plaintiffs May Not End-Run The PSLRA'S Requirements For Determining The
        Most Adequate Lead Plaintiff By Offering Dr. Esposito As Representative For
        The Entire Class, For The First Time, Only After His Deposition Was Taken.....34

    D.   The Putative Subclass Fails to Satisfy Rule 23 Because Dr. Esposito's Claims Are
        Not Typical of Those Of The Putative Subclass....................................................36

III. CONCLUSION..................................................................................................38

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re AST Research Sec. Litigation, 887 F. Supp. 231 (C.D. Cal. 1995) .........................37

Adair v. Sorenson, 134 F.R.D. 13 (D. Mass. 1991)...............................................23, 24, 27

Advertising Specialty National Associate v. Federal Trading Commission,
238 F.2d 108 (1st Cir. 1956)......................................................................................27

In re Aldus Sec. Litigation, No. C92-885C, 1993 WL 121478
(W.D. Wash. Mar. 1, 1993) .......................................................................................37

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997) ..............................................9

Amswiss International Corp. v Heublein, Inc., 69 F.R.D. 663 (N.D. Ga. 1975)...............28

Backman v. Polaroid Corp., 540 F. Supp. 667 (D. Mass. 1982) ................................36, 37

In re Bank of Boston Corp. Sec. Litigation, 762 F. Supp. 1525 (D. Mass. 1991).............11

Berger v. Compaq Comp. Corp., 257 F.3d 475 (5th Cir. 2001)
reh'g denied, 279 F.3d 313 (5th Cir. 2002)............................................................1, 11, 12,

Blades v. Monsanto Co., 400 F.3d 562 (8th Cir. 2004)....................................................10

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)..................................23, 27

Bovee v. Coopers & Lybrand, 216 F.R.D. 596 (S.D. Ohio 2003)....................................16

Buban v. O'Brien, No. C 94-0331 FMS, 1994 WL 324093 (N.D. Cal. 1994) .................37

Butterworth v. Quick & Reilly, Inc., 171 F.R.D. 319 (M.D. Fla. 1997) ..........................20

Buzoiu v. Risk Management Alternatives, Inc., 2004 WL 1505061
(E.D. Pa. June 14, 2004) ...........................................................................................31

In re Carbon Black Antitrust Litigation, 2005 WL 102966
(D. Mass. Jan. 18, 2005) .......................................................................................9, 10

Carney v. Cambridge Technology Partners, Inc., 135 F. Supp. 2d 235
(D. Mass. 2001)........................................................................................................37

In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001),
cert. denied, 535 U.S. 929 (2002) .......................................................................21

In re Clearly Canadian Sec. Litigation, 875 F. Supp. 1410 (N.D. Cal. 1995) ...................33

Cohen v. Laiti, 98 F.R.D. 581 (E.D.N.Y. 1983) ..................................................31

Colby v. Hologic, Inc., 817 F. Supp. 204 (D. Mass. 1993) ................................37

Copland v. Grumet, 88 F. Supp. 2d 326 (D.N.J. 1999) .......................................37

In re Cornerstone Propane Partners Sec Litigation, 2006 WL 1180267
(N.D. Cal. May 3, 2006) .......................................................................................23

Darvin v. International Harvester Co., 610 F. Supp. 255 (S.D.N.Y. 1985).......................31

Dierks v. Thompson, 414 F.2d 453 (1st Cir. 1969) ............................................27

Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627 (2005) .......................................26

In re Eaton Vance Corp. Sec. Litigation, 219 F.R.D. 38 (D. Mass. 2003) ........................38

Efros v. Nationwide Corp., 98 F.R.D. 703 (S.D. Ohio 1983)............................................16

Gariety v. Grant Thornton, LLP, 368 F.3d 356 (4th Cir. 2004) ........................................10

In re General Motors Class E Stock Buyout Sec. Litigation,
694 F. Supp. 1119 (D. Del. 1988).........................................................................24

Greenway v. International Paper Co., 144 F.R.D. 322 (W.D. La. 1992)..............................2

Griffin v. GK Intelligent System, Inc., 196 F.R.D. 298 (S.D. Tex. 2000)........................15

Hively v. Northlake Food, Inc., 191 F.R.D. 661 (M.D. Fla. 2000) ...................................31

Johnston v. HBO Film Management, Inc., 265 F.3d 178 (3d Cir. 2001) .........................10

Kase v. Salomon Smith Barney, Inc., 218 F.R.D. 149 (S.D. Tex. 2003) ..........................16

Kassover v. Computer Depot, Inc., 691 F. Supp. 1205 (D. Minn. 1987),
aff'd, 902 F.2d 1571 (8th Cir. 1990) ..............................................................16, 31

Kelly v. Mid-America Racing Stables, Inc., 139 F.R.D. 405 (W.D. Okla. 1990).............15

Key v. Gillette Co., 782 F.2d 5 (1st Cir. 1986)..................................................11

Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11th Cir. 1987) ...............................17

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983) .....................................................................31

Koenig v. Benson, 117 F.R.D. 330 (E.D.N.Y. 1987) ..................................................16, 31

Konstantinakos v. FDIC, 719 F. Supp. 35 (D. Mass. 1989) ............................................24

Krim v. pcOrder.com, Inc., 212 F.R.D. 329 (W.D. Tex. 2002)........................................32

Lubin v. Sybedon Corp., 688 F. Supp. 1425 (S.D. Cal. 1988) .........................................31

In re Lucent Tech., Inc. Sec. Litigation, 194 F.R.D. 137 (D.N.J. 2000)...........................21

Lugtig v. Thomas, 89 F.R.D. 639 (N.D. Ill. 1981) ............................................................1

Merrill Lynch,  Pierce, Fenner & Smith, Inc. v. Dabit,
126 S. Ct. 1503 (2006).................................................................................................22, 27

Michaels v. Ambassador Group Inc., 110 F.R.D. 84 (E.D.N.Y. 1986) ...........................28

In re Microstrategy, Inc. Securities Litigation, 115 F. Supp. 2d 620
(E.D. Va. 2000)................................................................................................................37

In re Milestone Scientific Sec. Litigation, 187 F.R.D. 165 (D.N.J. 1999) .......................21

In re Network Associate, Inc., Sec. Litigation, 76 F. Supp. 2d 1017
(N.D. Cal. 1999)...............................................................................................................1

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154
(3d Cir. 2001)..................................................................................................................10

O'Neil v. Appel, 165 F.R.D. 479 (W.D. Mich. 1996)......................................................34

People United For Children, Inc. v. The City of New York, 214 F.R.D. 252
(S.D.N.Y. 2003)................................................................................................................20

In re Pharmaceutical Industrial Average Wholesale Price Litigation,
230 F.R.D. 61 (D. Mass. 2005)........................................................................................10

Podell v. Citicorp Diners Club, Inc., 112 F.3d 98 (2d Cir. 1997).......................................1

In re Polymedica Corp. Sec. Litigation, 432 F.3d 1 (1st Cir. 2005)...................................9

In re Quintus Sec. Litigation, 201 F.R.D. 475 (N.D. Cal. 2001) .....................................22

Rolex Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658
(D. Or. 1991)...........................................................................................15, 16

Schwartz v. Novo Industri, A/S, 658 F. Supp. 795 (S.D.N.Y. 1987) ...............................24

Scott v. New York City District Council of Carpenters Pension Plan,
224 F.R.D. 353 (S.D.N.Y. 2004) .......................................................................16

Seagate Tech. II Sec. Litigation, 843 F. Supp. 1341 (N.D. Cal. 1994) ...........................33

Smilow v. Southwestern Bell Mobile System, Inc., 323 F.3d 32 (1st Cir. 2003) ..............9

Smyth v. Carter, 168 F.R.D. 28 (W.D. Va. 1996) ......................................................16, 28

In re Sonus Networks, Inc. Sec. Litigation,
229 F.R.D. 339 (D. Mass. 2005)....................................................1, 12, 28, 32

In re Stratus Comp., Inc. Sec. Litigation, 1992 WL 73555
(D. Mass. Mar. 27, 1992)...................................................................................36

Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001),
cert. denied, 534 U.S. 951 (2001) ....................................................................10

Tardiff v. Knox County, 365 F.3d 1 (1st Cir. 2004)........................................................9

Unger v. Amedisys Inc., 401 F.3d 316 (5th Cir. 2005) ...................................................10

Wagner v. Lehman Brothers Kuhn Loeb Inc., 646 F. Supp. 643 (N.D. Ill. 1986) ...........31

Warth v. Seldin, 422 U.S. 490 (1975)...............................................................................24

Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000)................10

Weinstein v. American Biomaterials Corp., 123 F.R.D. 442 (S.D.N.Y. 1988)................28

Weisman v. Darneille, 78 F.R.D. 669, (S.D.N.Y. 1978) .................................................16

White v. Enserch Corp., 78 F.R.D. 547 (N.D. Tex. 1978) ...............................................16

## FEDERAL STATUTES AND RULES

15 U.S.C. § 78t-1(a)........................................................................................................36

15 U.S.C. § 78u-4(a)(3) ...................................................................................................34

Fed. R. Civ. P. 23(a) ..........................................................................9, 10, 11, 12

Fed. R. Civ. P. 23(b)(3).............................................................................................9

# PRELIMINARY STATEMENT[1]

"The [Private Securities Litigation Reform Act of 1995] mandate[s] that class representatives, and not lawyers, must direct and control the litigation."[2] This case, by contrast, has been "initiated and controlled by plaintiff[s'] counsel, bark to core, start to finish."[3] In this extreme case of lawyer-driven litigation, Plaintiffs' counsel are vested with unfettered control, reflected most recently by their extraordinary step of attempting to rewrite the Moving Plaintiffs' deposition testimony where the pesky "facts" -- as testified to by the proposed class representatives (or "Moving Plaintiffs")[4] -- would get in the way of counsel's (and clearly not Plaintiffs') allegations.[5] Unsurprisingly, these Plaintiffs fail to meet the Rule 23 requirements of typicality and adequacy, and the law does not permit counsel to substitute themselves for Plaintiffs, as attempted here.

---

[1] Defendants Biopure Corporation ("Biopure"), Thomas A. Moore, Carl W. Rausch, Charles A. Sanders, J. Richard Crout, Ronald F. Richards and Howard P. Richman (collectively, the "Defendants") submit this memorandum of law in opposition to Plaintiffs' Motion for Class Certification (the "Certification Motion").

[2] In re Sonus Networks, Inc. Sec. Litig., 229 F.R.D. 339, 342 (D. Mass. 2005) (quoting Berger v. Compaq Comp. Corp., 257 F.3d 475, 481 (5th Cir. 2001)).

[3] In re Network Assoc., Inc., Sec. Litig., 76 F. Supp. 2d 1017, 1020 (N.D. Cal. 1999) ( "The PSLRA was provoked by a widespread perception that securities class actions had become 'lawyer driven,' [and]… Congress found that the named plaintiffs, while ostensibly in charge of the litigation as fiduciaries for all similarly situated, were, in reality, token figureheads with no actual control over their cases.").

[4] The Moving Plaintiffs are the Lead Plaintiff Ronald Erickson ("Mr. Erickson" or "Lead Plaintiff"), and Dr. John Esposito ("Dr. Esposito"), both of whom seek to be appointed as class representatives. Mr. Erickson's and Dr. Esposito's deposition transcripts are located in the Appendix of Exhibits to Defendants' Memorandum of Law In Opposition To Plaintiffs' Motion For Class Certification (hereafter "App. Exh.") at App. Exh. A and App. Exh. B, respectively.

[5] Defendants have moved to strike the improper errata sheets served by Plaintiffs. In all events, Moving Plaintiffs' original, unadulterated testimony – clearly most relevant for present purposes – may still be referenced and relied upon. See, e.g., Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997) ("when a party amends his testimony under Rule 30(e), '[t]he original answer to the deposition questions will remain part of the record and can be read at the trial.'") (quoting Lugtig v. Thomas, 89 F.R.D. 639, 641 (N.D. Ill. 1981)).

Rule 23 and the PSLRA do not permit lawyer driven litigation for good reason. Where the proposed class representatives offer little more than the use of their name in a caption, the danger of harming -- as opposed to serving -- the interests of the class, materializes through the inadequacy of the proposed class representatives and the atypicality of their claims. This case is a textbook example. Take for instance the Moving Plaintiffs' complete lack of understanding concerning the allegations that their counsel has asserted on their behalf -- a glaring indicium of inadequacy. According to the Second Amended Complaint, this is a case about Biopure allegedly issuing misleading statements by failing to disclose a "clinical hold" on an "indication" for Hemopure, and allegedly failing to disclose, in an August 1, 2003 press release, its receipt of an alleged "complete response letter" with ramifications for timing of approval of its Biologics License Application ("BLA") under the Prescription Drug User Fee Act ("PDUFA"). Every version of the complaint in this case has been replete with the terms "BLA," "clinical hold," "complete response letter" and "indication." The Moving Plaintiffs, however, testified as to their near-complete ignorance of these basic terms. Mr. Erickson's ignorance is especially striking, as he testified that PDUFA, (federal legislation concerning the FDA) is, in his understanding, a Biopure <u>product</u>.

More critically, however, Mr. Erickson testified that there was <u>nothing</u> <u>misleading</u> about (among several other disclosures) Biopure's August 1, 2003 press release -- the epicenter of Plaintiffs' Second Amended Complaint (the "Complaint").[6] That testimony, which is reflective

---

[6] As referenced above, six weeks after his deposition, Mr. Erickson's counsel submitted an errata sheet for Mr. Erickson's testimony, changing the substance of Mr. Erickson's testimony to say that the press release was misleading after all (presumably after his counsel told him so). "**A deposition is not a take home examination**." <u>Greenway v. Int'l Paper Co.</u>, 144 F.R.D. 322, 325 (W.D. La. 1992) (emphasis added). These and other changes to the substance of Mr. Erickson's and Dr. Esposito's testimony are just further evidence of how the Moving Plaintiffs are simply pawns in a class action dominated by their counsel.

of the Complaint's lack of merit, dooms the claims of a substantial portion of the putative class. And it illustrates the reasons why Mr. Erickson, whose last purchase of Biopure stock was in May 2003, lacks standing to pursue claims arising from disclosures thereafter as a matter of law. Courts (including the District of Massachusetts) have held that a securities plaintiff may not pursue claims based on disclosures following his or her purchases of stock, and Mr. Erickson's testimony concerning alleged disclosures post-dating his purchases demonstrates the wisdom of such decisions. In a word, this circumstance creates a <u>conflict</u> between Mr. Erickson and the class he seeks to represent, rendering his claims atypical of those of the putative class, and rendering him an inadequate representative.

Dr. Esposito, the other proposed class representative, hardly fares better. To start, the operative pleading (Second Consolidated Amended Complaint) does not even propose him as a class representative; rather it proposes only Mr. Erickson (whom the Court appointed to serve as Lead Plaintiff pursuant to the PSLRA) as representative and Dr. Esposito merely as representative of the putative subclass. It was only after they moved for class certification (and after Mr. Erickson's deposition performance) that Plaintiffs' counsel filed, without leave of court and without amendment of their pleadings, their "amended" certification motion proposing Dr. Esposito as class representative. This tactic, which undermines the PSLRA class action requirements and further illustrates the control Plaintiffs' counsel wield over this case, alone justifies rejection of Dr. Esposito as class representative.

If that were not enough to reject Dr. Esposito as representative, his utter lack of knowledge of the case certainly is. Dr. Esposito's "vivid" -- yet <u>demonstrably false</u> -- testimony

concerning his trading history in Biopure illustrates a fatal lack of credibility and knowledge.[7] Dr. Esposito was unaware of the most basic details of his own Biopure holdings.  For instance, he testified that he first held Biopure in 2003, but in fact he first purchased Biopure on July 31, 2000. Remarkably, he also testified that he had sold all of his Biopure holdings in 2005, but account statements subsequently obtained by Defendants show that he in fact still holds Biopure stock to this day.  These and other examples of Dr. Esposito's lack of credibility render him subject to unique defenses that would ultimately derail this litigation.  In any event, Dr. Esposito, who holds de minimus amounts of Biopure stock purchased halfway through the class period, cannot serve as a class representative for the entire class and subclass under the PSLRA and governing law.

Compounding their inadequacy as described above, even at this stage of the litigation, Moving Plaintiffs have made no effort to negotiate a fee agreement with class counsel -- a fundamental Rule 23 requirement, viewed as a prima facie litmus test for determining adequacy of class representatives.

In short, the Certification Motion must be denied because the Moving Plaintiffs have repeatedly and "vividly" illustrated their inability to represent the purported class in conformity with the protections required by Rule 23 and the mandates of the PSLRA.

## I.    BACKGROUND

### A.    Biopure

Biopure, founded in 1984 in Cambridge, Massachusetts, is a leading developer of

---

[7] Here again, several weeks after his deposition, Dr. Esposito's counsel attempted to correct the record concerning Dr. Esposito's inconsistent testimony, but these subsequent statements directly conflict with both Dr. Esposito's signed certification and the documents produced by Dr. Esposito's brokerage firms in response to the Defendants' subpoenas.

pharmaceuticals called oxygen therapeutics. (*See* Form 10-Q for quarterly period ended Jan. 31, 2003, dated Mar. 17, 2003). Biopure develops, manufactures and markets oxygen therapeutics for both human and veterinary use. (Complaint ¶ 2). These oxygen therapeutics were designed to serve as an alternative to red blood cell transfusions in contexts where the body is not sufficiently meeting its own oxygen needs. (*Id.*) Biopure's scientists have also worked, primarily pre-clinically, to show that the properties of oxygen therapeutics may be useful where red blood cells would not be used, such as ischemia and to oxygenate hard cancer tumors to enhance the effect of radiation and chemotherapy. (*See* Form 10-K for fiscal year ended Oct. 31, 2002, dated Jan. 29, 2003).

## B.    Mr. Erickson's Biopure Trading

Between May 16, 2003 and May 30, 2003, Mr. Erickson purchased 75,000 shares of Biopure stock. Mr. Erickson sold 20,000 of these shares in January 2004, 30,000 in February 2004, and the rest in August 2005.[8] Mr. Erickson did not purchase any shares of Biopure after May 2003.[9]

## C.    Dr. Esposito's Biopure Trading

According to his brokerage records, Dr. Esposito purchased 520 shares of Biopure stock on July 31, 2000 (purchase of 500 shares) and September 17, 2001 (purchase of 20 shares) and

---

[8] However Mr. Erickson testified during the deposition that he sold the remaining 25,000 in March 2004. Erickson Dep. at 131-32. Only after the issuance of multiple third party subpoenas did the Defendants learn that he actually sold the shares in August 2005, 17 months later then what he testified to. Copies of Mr. Erickson's account statements showing his sales of Biopure stock are located at App. Exh. C.

[9] Mr. Erickson's Certification reflecting his Biopure purchases is located at App. Exh. D. Mr. Erickson testified that his certification reflecting purchases of Biopure on May 16, May 29, and May 30, 2003 reflect all of the shares of Biopure that he ever purchased.

held all of these shares at the beginning of the class period.[10]  He sold these shares on August 5, 2003, when the stock was trading near its class period zenith.[11]  Dr. Esposito then purchased 1,200 shares of Biopure between August 12, 2003 and August 21, 2003.[12]  As of at least May 2006, Dr. Esposito continues to hold these shares.[13]

## D.     Plaintiffs' Allegations

In this lawsuit, Lead Plaintiff Mr. Erickson and Dr. Esposito (collectively, "Moving Plaintiffs," or "Plaintiffs", or "the proposed class representatives"), have lent their names to allegations by their counsel to the effect that the Defendants made misleading statements by failing to disclose, on April 9, 2003 and thereafter through the end of the purported class period, that the Food and Drug Administration (the "FDA") placed a clinical hold on Biopure's proposed clinical trials of Biopure's product, Hemopure.  This clinical hold was instituted in response to Biopure's recently submitted investigational new drug application ("IND") concerning the use of Hemopure on human trauma victims in hospitals.[14]  Plaintiffs also allege that Biopure issued misleading statements beginning on August 1, 2003 and ending on December 11, 2003 because Biopure failed to disclose that, on July 30, 2003, it received an alleged "complete response letter" from the FDA concerning its biologic license application ("BLA") for approval to market

---

[10] Copies of Dr. Esposito's account statements showing his purchases of 520 shares of Biopure stock in July 2000 and September 2001 are located at App. Exh. E.

[11] A copy of Dr. Esposito's August 5, 2003 confirmation statement showing his sale of 520 shares of Biopure stock is located at App. Exh. F.

[12] Copies of Dr. Esposito's August 12 and August 21, 2003 confirmations are located at App. Exh. G.

[13] A copy of Dr. Esposito's May 2006 account statement reflecting his split adjusted holdings of Biopure stock is located at App. Exh. H.

[14] Certification Motion at 2; Complaint at ¶¶ 45-50.

Hemopure for patients undergoing orthopedic surgery.[15]  Plaintiffs also allege that Biopure's August 1, 2003 press release concerning the July 30, 2003 FDA correspondence "sought to create the false impression that Biopure had actually received positive news from the FDA regarding its pending BLA.[16]

Plaintiffs also make a claim for insider trading pursuant to Section 20A of the Exchange Act concerning alleged sales of Biopure stock by Biopure and Defendant Rausch.  (Complaint at ¶ 1).

**E.    The Putative Class And Subclass**

Plaintiffs have moved to certify a class of "all purchasers of [Biopure] common stock during the period from April 9, 2003 to December 24, 2003, inclusive," and a proposed subclass consisting of "all persons who purchased Biopure common stock contemporaneously with the sales of Biopure's stock by the defendants Biopure and Rausch during the Class Period."[17]

**F.    Appointment of Lead Plaintiff**

Between March 1, 2004 and May 14, 2004, multiple competing class members, Mr. Erickson among them, litigated the appointment of lead plaintiff as required by the PSLRA.  On May 14, 2004, this Court appointed Mr. Erickson (and not Dr. Esposito) as Lead Plaintiff on behalf of the class in this action.[18]

---

[15] Certification Motion at 3 and 5; Complaint at 108-114.

[16] Certification Motion at 5.

[17] Certification Motion at 2.  The proposed class and subclass exclude: "Defendants; members of the individual defendant's immediate family; any past or present director, officer, subsidiary, or affiliate of Biopure; any entity in which any excluded person or entity has a controlling interest; and legal representatives, heirs, successors and assigns."  Id.

[18] Dr. Esposito filed a class action complaint against Biopure on January 6, 2004.  However, Dr. Esposito never moved to be appointed Lead Plaintiff.

G.    **Plaintiffs' Motion And Amended Motion For Class Certification**

The Second Consolidated Amended Complaint named Mr. Erickson as class representative and Dr. Esposito, Emily A. Bittman ("Ms. Bittman") and Stuart Gottlieb ("Mr. Gottlieb") as representatives of the putative subclass. Defendants, accordingly, issued requests for written discovery to all four named Plaintiffs.

Thereafter, on May 5, 2006, Plaintiffs moved for class certification. In their Motion for Class Certification, Plaintiffs asked that the court appoint Lead Plaintiff Mr. Erickson as representative of the entire class, and appoint Mr. Gottlieb and Dr. Esposito as representatives of the subclass. Plaintiffs' counsel apparently decided not to propose Ms. Bittman as a subclass representative. On May 23, 2006, Plaintiffs notified Defendants (after the Defendants had noticed depositions of the named plaintiffs) that Mr. Gottlieb would also be withdrawn as a proposed subclass representative.[19]

Defendants took the depositions of Mr. Erickson as class representative and Dr. Esposito as subclass representative on May 30 and May 31, 2006 respectively. Late during Dr. Esposito's deposition (in fact, 150 pages into the 178 page transcript) Plaintiffs' counsel intimated for the first time ever that they "may" offer Dr. Esposito as representative of the entire class, and instructed counsel for defendants to question accordingly, over objection.[20] While Plaintiffs' counsel were undecided at that time as to whether they would in fact offer Dr. Esposito as a representative of the entire class, they later (on June 5, 2006) filed (without seeking leave) an Amended Motion For Class Certification, proposing both Mr. Erickson and Dr. Esposito as representatives of the entire class.

---

[19] Plaintiffs' Amended Motion to Certify Class, Appendix A, Docket 131, June 5, 2006

[20] Esposito Dep. at 150-52.

All of these tactical moves made by Plaintiffs' counsel have been done without any effort to amend the allegations of the Complaint that concern the roles of the four named Plaintiffs.

## II.    ARGUMENT

### A.    Plaintiffs' Burden For Obtaining Class Certification

A plaintiff seeking certification must establish all four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, a class principally seeking money damages, such as the one proposed here, can be certified only if "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  This includes an assessment of "the difficulties likely to be encountered in the management of a class action."  Id.

In deciding whether to certify a class, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23."  Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003); In re Carbon Black Antitrust Litig., 2005 WL 102966, at *9 (D. Mass. Jan. 18, 2005) (quoting Smilow).  Notably, Plaintiffs bear the burden of proof for all elements of Rule 23.  Smilow, 323 F.3d at 38 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)); In re Carbon Black, 2005 WL 102966, at *9 (burden of proof for Rule 23

elements "rests squarely on the plaintiffs").  The First Circuit has stated that, at the class

certification stage, the "court has the power to test disputed premises," and should "proceed

based on its reasonable best guess as to what will happen."  Tardiff v. Knox County, 365 F.3d 1,

4, 6 (1st Cir. 2004).  See also, In re Polymedica Corp. Sec. Litig., 432 F.3d 1, 6 (1st Cir. 2005)

("in light of our prior precedent, we conclude that the district court was entitled to look beyond

the pleadings in its evaluation of the applicability of the fraud-on-the-market presumption of

reliance, and its resolution of the class-certification question").[21]  Indeed, the majority of Circuits

to address the issue hold that simply accepting the plaintiffs' allegations as true is reversible

error.[22]

Plaintiffs' generic Certification Motion fails to satisfy Plaintiffs' burden of showing that

the requirements of Rule 23 are satisfied.  Indeed, as a matter of law, the record before the Court

---

[21]  See also Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 297-98 (1st Cir. 2000) ("it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question… a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case"); Unger v. Amedisys, 401 F.3d 316, 322 (5th Cir. 2005) ([b]ecause [the market efficiency determination, which is an essential element of the fraud on the market theory,] can prove decisive for class certification, and because, given the realities of litigation costs, certification can compel settlements without trial, courts have frequently applied rigorous, though preliminary, standards of proof to the market efficiency determination"); Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir. 2004) ("in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case"); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167-68 (3d Cir. 2001) ("Irrespective of the merits, certification decisions may have a decisive effect on litigation…. [G]ranting certification may generate unwarranted pressure to settle nonmeritorious or marginal claims…. In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action.  This is such an instance.  We must probe beyond the surface of plaintiffs' allegations in performing our review to assess whether plaintiffs' securities claims satisfy Fed. R. Civ. P. 23's requirements."); In re Pharmaceutical Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 90 (D. Mass. 2005) (noting that the class certification inquiry is "whether after a sneak preview of the issues," plaintiffs have satisfied their burden of proving that class certification is appropriate); In re Carbon Black Antitrust Litig., No. Civ. A. 03-10191-DPW, 2005 WL 102966, at *9 n.10 (D. Mass. Jan. 18, 2005) (court may assess the entire record when ruling on a class certification motion).  All unreported authorities cited herein are located in the Defendants' Compendium of Unreported Authorities In Support of The Defendants' Opposition To Plaintiffs' Motion For Class Certification.

[22]  See Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004); Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 186-89 (3d Cir. 2001); Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 675-76 (7th Cir. 2001), cert. denied, 534 U.S. 951 (2001).

requires that any motion to certify the putative class and subclass with the proposed representatives be denied.

**B.     The Putative Class Fails To Satisfy Rule 23 Because The Claims Of The Proposed Class Representatives Are Not Typical Of Those Of The Putative Class And The Proposed Class Representatives Will Not Fairly And Adequately Protect The Interests Of The Class.**

Under Rule 23, class representatives must be "adequate" representatives of the putative class whose claims are "typical" of those of the class. Fed. R. Civ. P. 23(a).  To assess Rule 23(a)(4)'s adequacy requirement, "[t]he court must determine, first whether any potential conflicts exist between named plaintiffs and the prospective class members and, second, whether the named plaintiffs and their counsel will prosecute the case vigorously." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1534 (D. Mass. 1991).  The adequacy inquiry is one of the most important requirements of Rule 23(a) because, once a court certifies a class, the class representatives will represent not only their own interests, but the interests of all absent class members.[23]

In addition, to certify a class under Rule 23(a)(3), this Court must also find that the claims or defenses of the representative parties are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "[W]here a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class." In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. at 1532 (citation omitted).

---

[23] See Key v. Gillette Co., 782 F.2d 5, 7 (1st Cir. 1986) ("One of the most important of [the Rule 23(a)] requirements is that the representative party fairly and adequately represent the interests of the class.  This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff.") (citation omitted).

It is the <u>Moving Plaintiffs'</u> <u>burden</u> to prove that Rule 23(a)'s requirements are satisfied.[24] As demonstrated below, Moving Plaintiffs cannot do so here.

> **1.** **Moving Plaintiffs Have Vested Counsel With Unfettered Control Of This Litigation And Are Accordingly Inadequate As A Matter Of Law.**

As recently recognized by now-Chief Judge Wolf, to satisfy the requirements of Rule 23(a)(3) and (4), a plaintiff in a securities class action must be "qualified to perform the crucial responsibility required of a class representative, directing and controlling the litigation rather than unduly deferring to lead counsel." <u>In re Sonus Networks Sec. Litig.</u>, 229 F.R.D. 339, 342 (D. Mass. 2005). In this case, as in <u>Sonus</u>, the Moving Plaintiffs serve as nothing more than pawns for class counsel "who [are] actually controlling this litigation." <u>Id.</u> at 340.

> **a.** **Moving Plaintiffs Have Not Taken An Active Role In The Litigation And Have Left The Major Litigation Decisions Completely In The Hands Of Their Counsel.**

In vacating a district court order certifying a plaintiff class and appointing class representatives, the court in <u>Berger v. Compaq Comp. Corp.</u>, 257 F.3d 475, 479 (5th Cir. 2001) , noted that "[t]he adequacy requirement mandates an inquiry into… **the willingness and ability** of the representative[s] **to take an active role in and control the litigation** and to protect the interests of absentees." (emphasis added). The court further noted that the PSLRA "mandate[s] that class representatives, and not lawyers, must direct and control litigation[,]" and "require[s] that securities class actions be managed by active, able class representatives who are informed

---

[24] <u>See, e.g.</u>, <u>Berger v. Compaq Comp. Corp.</u>, 257 F.3d 475, 481 (5th Cir. 2001), <u>reh'g denied</u>, 279 F.3d 313 (5th Cir. 2002) ("Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy."); 35A C.J.S. Federal Civil Procedure §99 (2005) ("The adequacy of putative class representatives, and of such representatives' counsel, is not presumed in the absence of specific proof to the contrary. Rather, the party seeking class certification bears the burden of establishing that all the requirements for certification, including the adequacy requirement, have been satisfied.").

and can demonstrate they are directing the litigation." Id. at 483.  The Moving Plaintiffs here fail this requirement.

In their deposition testimony, the Moving Plaintiffs made it clear that, rather than taking an active role in the litigation, they have left and would continue to leave the most important litigation decisions exclusively in the hands of class counsel, abdicating their responsibility to actively participate in the litigation.  For example, Dr. Esposito testified that he played no role in deciding what claims to bring and who to sue in this action:

> Question:  Dr. Esposito, did you have any role in deciding what claims were to be made in any version of the complaint that you've seen?
> Answer:    No.
> Question:  Okay.  Did you have any role in deciding what individuals were to be named as Defendants in any version of the complaint you've seen?
>            MR. LONGMAN:  I'm going to object. It's vague.
>            MR. SAVERY: Go ahead.
> Answer:    No.

Esposito Dep. at 153.

Likewise, Mr. Erickson apparently had no role in preparing the Complaint.  When asked whether he "participate[d] in drafting" the Complaint, Mr. Erickson testified, simply, that he is "not a legal entity, so I didn't draft the document." Erickson Dep. at 13.

As further evidence of Moving Plaintiffs' lack of input into their pleadings (and their general lack of involvement), Dr. Esposito testified that he only "scanned" the initial complaint his attorneys filed in this case and was not certain if he even did that prior to the complaint being filed.[25]  As for the Second Amended Complaint – the operative version of the pleading – Dr. Esposito testified that he first saw the document approximately one month after it was filed.[26]

---

[25] Esposito Dep. at 141.

[26] Id. at 149.

13

Moving Plaintiffs' lack of involvement continued past the preparation of the pleadings. For instance, Dr. Esposito was not even aware that the Defendants had filed a motion to dismiss in this case.[27]  In addition, he was not aware whether he was being offered as a representative of the class, or (consistent with the Complaint) merely of the subclass.  Apparently he could not keep up with the shell game Plaintiffs' counsel were playing – even after their initial certification motion was filed – in identifying which named plaintiffs were serving in which representative capacity, if any:

Question:  Okay.  And am I correct that you are a representative of the subclass?

Answer:   Yes.

Question:  Are there any other representatives of the subclass?

Answer:   I don't know if these other folks are representatives of the subclass.  I know that they're representatives of the class, Erickson being the lead Plaintiff.  I don't know about Gottlieb and Bittman.  I think they may have been.  I don't know --

Question:  Okay.

Answer:   -- who's who.

**Question:  Are you a representative of the class as well, or merely with the subclass?**

**Answer:  I believe the subclass, but possibly the class as well.  I'm not sure about that.  That's again a legal thing.**

MR. TUCCILLO:  Just one second.

(Pause.)

MR. LONGMAN:  I just wanted to say something for the record in-between.

***

**MR. LONGMAN:  It's possible that Dr. Esposito will also be -- is also a proposed representative of the class as well as the subclass.  We may amend our motion.**

MR. TUCCILLO:  Just so you know.

MR. LONGMAN:  Just so you're aware.

MR. TUCCILLO:  So you can ask questions today if you want.

MR. SAVERY:  **Well, he apparently doesn't even know this, and he hasn't been proposed as a class representative, he's been identified merely as**

---

[27] Id. at 146-47.

> **a representative of a subclass.** So when and if you decide to amend your pleadings to include him as a class representative, we'll have to deal with it at that point. But at this point in time, you know, he's not.
>
> MR. TUCCILLO: **Just for the record, we're putting you on notice that as of today our position is that he may be**….[28]

Esposito Dep. at 150-52 (emphasis added).

Where, as here, proposed class representatives are merely lending their names to a lawsuit for their counsel to pursue, class certification should be denied. See, e.g., Griffin v. GK Intelligent Sys., Inc., 196 F.R.D. 298, 302 (S.D. Tex. 2000) (denying class certification after finding that class representatives: "were solicited for this lawsuit and have taken little or no supervisory role over lead counsel. They do not participate in litigation decisions, do not receive regular cost/expense information, and they learn of activity in the case when they are copied on matters already completed. Although it is clear that both Griffin and Farrell would like to recover their investment, it is equally clear that they are lending their names to a purported class action solely at the suggestion of lead counsel … Plaintiffs bear the burden of proof on the adequacy of representation of the proposed class. Plaintiffs have failed to carry their burden.") (citation omitted); Rolex Employees Ret. Trust v. Mentor Graphics Corp. 136 F.R.D. 658, 666 (D. Or. 1991) (denying motion for class certification where the class representative "did not become involved in the case until after the basic groundwork had been laid. He contributed nothing to the drafting of the complaint."); Kelly v. Mid-America Racing Stables, Inc., 139 F.R.D. 405, 410 (W.D. Okla. 1990) ("While there is no question that plaintiffs' counsel are competent, there is substantial question that plaintiffs themselves understand much more than that they were involved in a bad business deal. Adequacy of representation of the proposed

---

[28] Plaintiffs' counsel went on to state that, even though they had not decided whether to offer Dr. Esposito as representative of the class, the deposition that was then almost over would be Defendants' only chance to question Dr. Esposito concerning his possible role as representative of the class. Esposito Dep. at 152.

class is a point on which plaintiffs bear the burden of proof, and they have failed to carry their burden.").

  **b.**  **Moving Plaintiffs' Lack Of Knowledge Of The Allegations In The Complaint Renders Them Unable To Take An Active Role In The Litigation.**

  "To satisfy Rule 23(a)(4), the named representative of a class must be in a position to 'check the otherwise unfettered discretion of counsel in prosecuting the suit,' not only with respect to the facts of the case but also with respect to the economic consequences of the suit." 136 F.R.D. at 666 (quoting Weisman v. Darneille, 78 F.R.D. 669, 671 (S.D.N.Y. 1978)).[29]  Thus, a motion for class certification should be denied where the proposed class representative is "unfamiliar with basic elements of the case, including what the allegations of the complaint are and which allegations of the complaint pertain to which defendants." Rolex, 136 F.R.D. at 666 (D. Or. 1991).  See also, Efros v. Nationwide Corp., 98 F.R.D. 703, 708 (S.D. Ohio 1983) (denying class certification where the court was "troubled by the plaintiff's glaring lack of familiarity with the facts of this litigation.")[30]  Here, Moving Plaintiffs' lack of knowledge

---

[29] See also, Kase v. Salomon Smith Barney, Inc., 218 F.R.D. 149, 159 (S.D. Tex. 2003) (denying a motion by investors to certify a class because, among other reasons, the investors had failed to demonstrate that they would actively monitor the decision of class counsel); Smyth v. Carter, 168 F.R.D. 28, 33 (W.D. Va. 1996) (denying motion for class certification where there was "some evidence of a lack of understanding of this case on the part of plaintiffs that cannot be compensated by the enthusiasm of their lawyers"); Kassover v. Computer Depot, Inc., 695 F. Supp. 1205, 1214 (D. Minn. 1987) ("Plaintiff's deposition in this case reveals that plaintiff is unfamiliar with several critical aspects of this litigation…. In addition, rather than competently controlling the course of the litigation, plaintiff has contented himself to rely entirely upon his attorney's direction.  **Plaintiff's abdication of his responsibility for direction of this action creates an unacceptable possibility of conflict of interest.  Therefore, the court concludes that Ronald Kassover would be an inadequate representative of the proposed class**.") (citation omitted) (emphasis added).

[30] Scott v. New York City Dist. Council of Carpenters Pension Plan, 224 F.R.D. 353, 357 (S.D.N.Y. 2004) (denying motion for class certification because the class representatives, lacking "familiarity with the facts and nature of their action, have thus turned over the prosecution and monitoring of their case to counsel, and are therefore inadequate class representatives whose role as remarked above has become essentially superfluous"); Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 615 (S.D. Ohio 2003) ("A court may deny class certification when class representatives have 'so little knowledge of and involvement in the class action that they would be unable or

relative to these proceedings and the basic allegations of their Complaint dooms their certification motion.

The Moving Plaintiffs' deposition testimony demonstrates their utter lack of knowledge concerning the allegations made on behalf of the class and subclass they hope to represent:

- The 226 paragraph Complaint mentions Biopure's BLA over 150 times, but Mr. Erickson testified that he does not know what a BLA is,[31] and Dr. Esposito testified that he had no understanding of what the term BLA referred to.[32]

- The alleged "complete response letter" is mentioned over 100 times in the Complaint, but Mr. Erickson testified he did not think he had heard of a "complete response letter" before.[33]

- Dr. Esposito testified he had never seen the alleged "complete response letter" or any of the communications between Biopure and the FDA that are the very basis for the claims in this case.[34] In fact, Dr. Esposito testified again and again that he had never

---

unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'") (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987)); Koenig v. Benson, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) ("[C]ertification has been denied when the plaintiff displays 'an alarming unfamiliarity with the suit.' Since Benzion Koenig has demonstrated a number of these deficiencies, the above authorities are controlling.") (citations omitted); White v. Enserch Corp., 78 F.R.D. 547, 549 (N.D. Tex. 1978) ("Plaintiff's almost total lack of knowledge as to any basis for this lawsuit and as to this civil action and his duties and responsibilities as to any class mandate that this civil action not be maintained as a class action.").

[31] Esposito Dep. at 140-41:

Question:    Do you know what a BLA is?

MR. LONGMAN:  Objection.

Answer:       Don't know.

Question:    Do you know what a biologics license application is?

MR. LONGMAN:  Objection.

Answer:       I don't know.

[32] Dr. Esposito was asked: "Have you heard the term 'biologics license application'?" and answered: "Not exactly that way, no." (Esposito Dep. at 105). Later in his deposition, Dr. Esposito was asked if "before you came here today, did you have an understanding of what the term BLA referred to?" Dr. Esposito answered that he had not. (Esposito Dep. at 116).

[33] Erickson Dep. at 184-86:

Question:    Have you ever heard the term "complete response letter" before?

Answer:       I don't believe so.

***

Question:    Well, do you have a view of what a complete response letter is in the context of FDA terminology?

Answer:       No.

[34] Esposito Dep. at 110.

seen any of the allegedly misleading statements that are identified in the Complaint (most of which are actually attached to the Complaint) -- the only documents in the case that he recalled ever seeing were the complaints, which he only "scanned" when he received them.[35]

- The Complaint describes the importance of the Prescription Drug User Fee Act ("PDUFA") to the Plaintiffs' claims in seven different paragraphs, but Dr. Esposito testified that he had never heard the term PDUFA before and Mr. Erickson erroneously testified that it was one of Biopure's products.[36]

- Neither Dr. Esposito nor Mr. Erickson knew what the term IND meant in the context of this case. Likewise, Mr. Erickson testified that he did not know what "indication" meant in the context of the FDA approval process.[37]

- Dr. Esposito testified that he did not know in what court this action was pending or even the name of this litigation.[38]

- The only defendants in this case whom the Complaint specifically alleges had actual knowledge of the clinical hold are the Company's CEO (Thomas Moore) and Director of Regulatory Affairs (Howard Richman). [39] However, Mr. Erickson testified that he did not know who the CEO or Director of Regulatory Affairs of Biopure were during the class period, and he did not know what role Howard

---

[35] Id. at 81 and 141.

[36] Esposito Dep. at 108. Erickson Dep. at 169-70:

| Question: | [Biopure's May 22, 2003 news release] mentions Prescription Drug User Fee Act, also referred to as PDUFA. Are you familiar with PDUFA at all? |
| Answer: | No, not completely. |
| Question: | Are you partially? |
| Answer: | I've read it, I've -- a little bit, but not -- it wasn't their main product. Hemopure was more what I was interested in. |
| Question:. | You read PDUFA or parts of it? |
| Answer: | I've read of it a little bit and that's it. I just passed over it because the Hemopure is what I was looking at. |

[37] Esposito Dep. at 106-07; Erickson 140-41.

[38] Esposito Dep. at 109:

| Question: | Do you know what the name of this case is, this litigation, the title of the case? |
| Answer: | The title of the case, no. |
| Question: | Do you know in what court the case is pending? |
| Answer: | No. |

[39] In denying the Defendants' Motion to Dismiss, the Court ruled that, for purposes of ruling on the Motion to Dismiss, that knowledge of the clinical hold could be imputed on all of the individual Defendants.

Richman had at Biopure.[40]

- Mr. Erickson thought the FDA's "hold" was on Biopure's entire application.[41]

Mr. Erickson also demonstrated that he <u>could</u> <u>not</u> competently monitor the decisions of class counsel because, among other reasons, he showed an utter lack of knowledge regarding the nature of much of the wrongdoing alleged in this case. For example, <u>Mr. Erickson testified that many of the allegedly misleading statements that are central and fundamental to the Complaint were not misleading at all</u>:

- The Complaint (¶ 71) alleges that Biopure's May 22, 2003 press release "was misleading," but Mr. Erickson testified that there was nothing false or misleading about this press release.[42]

- The Complaint (¶ 110) alleges that Biopure's "August 1, 2003 Press Release was false, deceptive and misleading to investors," but Mr. Erickson testified that there was nothing false or misleading about what was contained in that press release.[43]

- The Complaint alleges that Biopure's "August 21, 2003 Press Release was false and misleading to investors," but Mr. Erickson, even in response to his own attorney's clarification that he was being asked whether there was anything "false <u>or</u> misleading" in the press release testified that there was not and "I think it's fine."[44]

The inconsistency between Mr. Erickson's testimony and the allegations in the Complaint do not end there. Mr. Erickson also testified that he did not perceive anything to be corrective about Biopure's December 11, 2003 press release -- <u>i.e.</u>, there was no new information contained therein -- even though the Complaint (¶ 156) alleges that "[i]n the December 11, 2003 Press

---

[40] Erickson Dep at 147-48.

[41] Erickson Dep. at 143-44.

[42] Erickson Dep. at 173-74.

[43] <u>Id.</u> at 183.

[44] <u>Id.</u> at 188-89 (emphasis added).

Release, Biopure disclosed for the first time that the correspondence it had received from the FDA on July 30, 2003 (over four months prior) was a 'complete response letter.'"[45]

Dr. Esposito, for his part, testified that he had, as of the time of his deposition testimony, <u>never</u> <u>even</u> <u>seen</u>, much less bothered to consider for purposes of the claims in this case, <u>any</u> of the scores of allegedly fraudulent or misleading statements that are attacked in the Complaint.[46]

Moving Plaintiffs' knowledge of the facts alleged in the Complaint and the basic issues in this case is so lacking that they cannot possibly protect the interests of the class.   <u>See, e.g.</u>, <u>Butterworth v. Quick & Reilly, Inc.</u> 171 F.R.D. 319, 323 (M.D. Fla. 1997) (denying class certification after finding that "due to plaintiff's unfamiliarity with the facts and essential elements of the case, plaintiff is not able to adequately protect the interests of the class. Therefore, the plaintiff is not qualified to act in the capacity of class representative.").  It is clear that Moving Plaintiffs are merely lending their names "to a suit controlled entirely by the class attorney[s]."   <u>People United For Children, Inc. v. The City of New York</u>, 214 F.R.D. 252, 264 (S.D.N.Y. 2003) ("In examining whether a named plaintiff is suitable to fulfill the fiduciary obligations of a class representative, a court must decide whether the party has adequate knowledge of the case or 'whether the party is simply lending his name to a suit controlled entirely by the class attorney.'")

---

[45] <u>Id.</u> at 203-08.

[46] Esposito Dep. at 165-68.

### c.    Moving Plaintiffs Have Already Failed The Class By Failing To Diligently Go About Selecting Class Counsel And Negotiating A Fee Agreement With Counsel.

In deciding whether a proposed class representative will direct and control litigation as mandated by the PSLRA, courts consider how proposed class representatives went about selecting their counsel.[47]  In this case, it is clear that the Moving Plaintiffs never considered the interests of the class in selecting class counsel, a decision that involved hardly any investigation on their part whatsoever.  They only spoke to one attorney before deciding which counsel would represent the class.[48]  As for Dr. Esposito, he selected Mr. Longman, a "business associate or customer" of his broker, because he was "referred" to him by his broker.[49]

More importantly, even at this late juncture, the Moving Plaintiffs have failed to take the first important step of negotiating a fee agreement -- any fee agreement -- with counsel.  These Plaintiffs have thereby failed what courts have viewed as a litmus test for prima facie adequacy. "[O]ne of the best ways for a court to ensure that [a class representative] will fairly and adequately represent the interest of the class is to inquire whether the [class representative] has demonstrated a willingness and ability to select competent class counsel and to negotiate a

---

[47] See, e.g., In re Lucent Tech., Inc. Sec. Litig., 194 F.R.D. 137, 155 (D.N.J. 2000) ("The selection of counsel by lead plaintiff must be the product of deliberate and in depth evaluation, as well as of independent arm's length negotiations…. While proposed Lead Plaintiffs have provided the court with data attesting to the skill and experience of Proposed Lead Counsel, the skill and experience of counsel are only part of the equation which must be considered when granting a motion for lead counsel.  As discussed, there must also be independent, arm's-length negotiating between a lead plaintiff and the chosen lead counsel.  Subsumed within this requirement is the need for independent decision-making on the apart of a lead plaintiff in choosing lead counsel.") (emphasis added); In re Milestone Scientific Sec. Litig., 187 F.R.D. 165, 178 (D.N.J. 1999) ("The selection of counsel by a lead plaintiff also must be the product of independent, arms length negotiations… Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff.") (emphasis added).

[48] Erickson Dep. at 78-79; Esposito Dep. at 157-58.

[49] Esposito Dep. at 133-35.

reasonable retainer agreement with that counsel." In re Cendant Corp. Litig., 264 F.3d 201, 265-66 (3d Cir. 2001), cert. denied, 535 U.S. 929 (2002) (citations omitted) (emphasis added).[50]

Here, the Moving Plaintiffs have given class counsel free reign:

- There is no written fee agreement.[51]

- There is no oral fee agreement with any definitive terms.[52]

- In fact, except for the understanding that class counsel will get paid on contingency (at an unknown percentage of any hoped for recovery) there is no agreement about class counsel's compensation at all.[53]

The decision in In re Quintus Sec. Litig., 201 F.R.D. 475, 482 (N.D. Cal. 2001), is on point. There, the court held that a proposed lead plaintiff was not adequate to represent the class because he failed to negotiate a fee agreement with class counsel:

> Almost certainly, the best way for the court to assess a potential lead plaintiff's adequacy is to consider the manner in which he has retained counsel and negotiated an attorney's fee for the class . . . **a purported lead plaintiff that does not negotiate a reasonable fee arrangement with counsel cannot be deemed an adequate representative**.

Id. (citations omitted) (emphasis added). So too here, the Moving Plaintiffs have exerted no control whatsoever over their counsel's compensation.

---

[50] See also, e.g., In re Lucent Tech., Inc. Sec. Litig., 194 F.R.D. 138, 156 (D.N.J. 2000) (After noting that a "lead plaintiff owes a fiduciary duty to obtain the highest quality representation at the lowest price," the court found that "[i]n the instant matter, Proposed Lead Plaintiffs have provided no evidence or indication of the proposed fee arrangement, its terms, or discussions or proposals leading up to it. They have provided no indication as to how the selection of Proposed Lead Counsel was arrived at nor what considerations went into the decision. Significantly, there is no indication of whether other counsel were interviewed or even considered. This is troubling."); In re Milestone Scientific Sec. Litig., 187 F.R.D. at 178 ("Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff.").

[51] Erickson Dep. at 85; Esposito Dep. at 160.

[52] Erickson Dep. at 85.

[53] Mr. Erickson expects that class counsel would be compensated on a contingency basis, but does not know what percentage of a recovery to which class counsel would be entitled. Erickson Dep. at 86. Dr. Esposito assumed the contingency fee was one-third, but could not say for certain. Esposito Dep. at 164.

2.    **Mr. Erickson Lacks Standing To Represent Class Members Who Purchased Biopure After The August 1, 2003 Press Release And His Interests Are Antagonistic To These Class Members, Subjecting Him To Unique Defenses.**

Recently, the Supreme Court reiterated its longstanding holding that investors do not have standing to assert "holder" claims under the federal securities laws. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S. Ct. 1503, 1510 (2006). See also, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730-31 (1975) (a plaintiff cannot recover under Rule 10b-5 for losses on securities merely owned and not traded during the period of fraud). In the federal securities class action context, this holding confirms what courts have always held – a class representative does not have standing to represent investors damaged by misleading statements that occurred after the class representative's last purchase of stock. See, e.g., Adair v. Sorenson, 134 F.R.D. 13 (D. Mass. 1991) (holding that the class representative "lacks standing to assert a 10b-5 claim based on" a statement that occurred after his last purchase).

In a nutshell, the Complaint alleges two broad failures to disclose – the alleged failure to disclose the clinical hold in April 2003, and the alleged failure to disclose that the Company received a "complete response letter" on July 30, 2003. Mr. Erickson made all of his purchases of Biopure stock in May 2003, at least two months before Biopure allegedly failed to disclose that it had received a "complete response letter" from the FDA. Because he purchased before the Company's August 1, 2003 press release that allegedly failed to disclose receipt of the alleged "complete response letter," Mr. Erickson cannot claim that this failure to disclose caused his losses -- he did not purchase stock at a time when the stock price was alleged to have been artificially inflated as a result of this press release. This in itself makes Mr. Erickson inadequate to serve the interests of all investors who claim they were damaged by Biopure's failure to

disclose the "complete response letter" because he lacks standing to pursue their claims.[54]

In Adair v. Sorenson, 134 F.R.D. 13 (D. Mass. 1991), just as in this case, the plaintiff alleged that defendants disseminated materially false and misleading information which artificially inflated the price of the defendants' stock. In response to the plaintiff's motion for class certification, the defendants argued that the class representative lacked standing to pursue claims on behalf of the class for an allegedly misleading statement that occurred after the class representative's last purchase. Id. at 16. In response, the plaintiff argued that the company's announcements both before and after the plaintiff's purchases constituted a "common course of conduct" such that the class representative should be able to pursue claims on behalf of the class for misleading statements that occurred after his last purchase. Id. The court disagreed:

> A court must assess standing to sue based upon the standing of the named plaintiff and not upon the standing of unidentified class members [,and, the plaintiff's] standing, therefore, must be based upon the injury suffered by [plaintiff], not any injury suffered by unidentified class members, and the Court must limit the claim accordingly.

Id. (citing Warth v. Seldin, 422 U.S. 490, 502 (1975)). The court held that the class representative "lacks standing to assert a 10b-5 claim based on" the announcement that occurred after his last purchase, "and, therefore, cannot represent those class members who purchased after" his last purchase because he "cannot establish that he relied on events which occurred after he purchased his stock. Any injuries sustained by [the class representative] necessarily resulted from events occurring prior to his last purchase. . . ." Id. Courts in this district and others have

---

[54] See, e.g., In re Cornerstone Propane Partners Sec Litig., 2006 WL 1180267, *8 (N.D. Cal. May 3, 2006) (granting motion for class certification subject to amendment of the class definition to exclude anyone who sold their stock prior to the corrective disclosure and noting that "since corrective disclosure is alleged to have occurred only from July 2001 onwards, under Dura there can be no loss causation for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure, and thus these plaintiffs may not recover at all")

reached the same conclusion.[55]

Mr. Erickson's lack of standing need not be determined from legal principles alone -- his testimony plainly demonstrates his unwillingness or inability to adequately represent class members whose claims are premised on the alleged failure to disclose the July 30 "complete response letter." First, Mr. Erickson testified he did not think he had ever even heard of the term "complete response letter" before.[56] Then, Mr. Erickson testified that there was nothing misleading about Biopure's August 1, 2003 press release, a central focus of his counsel's Complaint.[57] Likewise, although the Complaint alleges that Biopure's "August 21, 2003 Press

---

[55] Konstantinakos v. FDIC, 719 F. Supp. 35, 38 (D. Mass. 1989) (granting motion to dismiss securities fraud action where "the complaint's allegation that plaintiff bought shares at several unspecified dates between June and December of 1987 is insufficient to satisfy the 'in connection with requirement,' [of Section 10(b) of the 1934 Securities Exchange Act] because neither the court nor the defendants have any way of knowing whether the purchases had ceased prior to release of the bank's statements."); In re General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1127 (D. Del. 1988) (dismissing securities fraud class action claims concerning alleged omissions that occurred after plaintiffs' last purchase because plaintiffs "have no standing to assert class claims based upon events after" their last purchase); Schwartz v. Novo Industri, A/S, 658 F. Supp. 795, 800 (S.D.N.Y. 1987) (granting motion to dismiss securities fraud class action and holding that plaintiff is not a "proper representative" of investors who purchased after an allegedly fraudulent statement).

[56] Erickson Dep. at 184-86:
> Question:   Have you ever heard the term "complete response letter" before?
> Answer:     I don't believe so.
> ***
> Question:   Well, do you have a view of what a complete response letter is in the context of FDA terminology?
> Answer:      No.

[57] Erickson Dep. at 183:

> Question:   In your view, is there anything false or misleading about what's contained in [Biopure's August 1, 2003 news release concerning the status of the BLA]?
> Answer:     No, at that point, no.
> Question:   Say that again?
> Answer:     No.
>             (Whereupon, the witness and his counsel conferred.)

Six weeks after his deposition, Mr. Erickson's counsel submitted an errata sheet for Mr. Erickson's testimony, changing the answer above to state that Mr. Erickson believes that the August 1, 2003 press release was misleading because it failed to disclose the clinical hold. The change is just further evidence of how the Moving Plaintiffs are simply pawns in a class action controlled by their counsel.

Release was misleading to investors," Mr. Erickson again testified there was nothing false or misleading about the press release.[58]  Next, when directed to the section of Biopure's December 11, 2003 press release stating that "[o]n July 30, 2003, the FDA sent Biopure a complete response letter…," which the Complaint alleges was a corrective disclosure by first revealing to the market that the FDA's letter was a complete response letter, Mr. Erickson testified that he did not know if there was anything new disclosed in that statement.[59]  Indeed, Mr. Erickson did not even think that the alleged December 11, 2003 corrective disclosure of the "complete response letter," revealed anything negative to the market.[60]

Given the fact that he did not purchase Biopure stock after the alleged "complete response letter," it is not surprising that Mr. Erickson would not find fault in the alleged failure to disclose it.  That is, Mr. Erickson's incentive is to maximize the significance of the failure to disclose the clinical hold (which allegedly inflated the stock price at the time of his purchases) and to minimize the significance of any alleged non-disclosures that occurred after his purchase (e.g., regarding the "complete response letter," which allegedly inflated the stock price at the time of other class members' purchases).  This incentive exists because Mr. Erickson and others similarly situated would stand to recover more in damages to the extent the decline in stock price

---

[58] Complaint at ¶ 117; Erickson Dep. at 188-89.  Once again, Mr. Erickson's counsel changed his testimony weeks after his deposition to say that the August 21, 2003 press release was misleading.

[59] Erickson Dep. at (207-08):

Question:    I'm asking you if there's something here printed on the page that the market never heard of before.

MR. LONGMAN:  If you know.

Answer:      No.

MR. LONGMAN:  No, you don't know, or no, the market never heard it before, just to be clear?

THE WITNESS:  No, I don't know.

[60] Erickson Dep. at 203-05.

at the end of the class period can be attributed to the alleged corrective disclosure of the clinical

hold, rather than to the alleged corrective disclosure of the "complete response letter".[61]  On this

basis, Mr. Erickson should not be allowed to represent a class that includes investors who

purchased Biopure after July 30, 2003 because his incentive is to take damages out of these

investors' pockets and put them into his own.  See Dierks v. Thompson, 414 F.2d 453, 456 (1st

Cir. 1969) ("diverse and potentially conflicting interests within the class are incompatible with

the maintenance of a true class action").[62]

Finally, Mr. Erickson testified that he intends to pursue a "holder" claim based on the

allegation that he would have sold Biopure at a higher price had he known of the Defendants'

alleged fraud.[63]  Mr. Erickson's decision to do so subjects him to unique defenses because Rule

10b-5 does not recognize holder claims.  See, e.g., Dabit, 126 S. Ct. at 1510; Blue Chip Stamps,

421 U.S. at 730-31; Adair v. Sorenson, 134 F.R.D. 13, 16 (D. Mass. 1991) ("To maintain a

---

[61] Plaintiffs' allegations concerning the timing of Biopure's corrective disclosures of the "complete response letter" and the clinical hold further evidence the contrast in Mr. Erickson's interests from those of  the rest of the class.  Plaintiffs allege that, on December 11, 2003, Biopure disclosed, for the "first time," the "complete response letter." (Complaint ¶ 156).  Then, Plaintiffs allege that Biopure disclosed the clinical hold on December 24, 2003. (Complaint ¶ 161).  Based on these allegations, Mr. Erickson's interests are antagonistic to class members who purchased Biopure after July 30, 2003 (after alleged non-disclosure of the "complete response letter") and sold their shares after December 11, 2003 (after alleged corrective disclosure of the "complete response letter") and before December 24, 2003 (after alleged corrective disclosure of the clinical hold) because any alleged harm these class members suffered ended with the December 11, 2003 disclosure.  Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627, 1632 (2005) (holding that plaintiffs must plead and prove that "the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover,'" and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events….").  Again, Mr. Erickson's only incentive is to maximize the significance of Biopure's stock decline as a result of the failure to disclose the clinical hold.  For class members who were not damaged by this alleged omission, Mr. Erickson cannot serve as an adequate class representative because he will not pursue allegations necessary for these class members to prove liability.

[62] See also, Advertising Specialty Nat'l Assoc. v. Federal Trade Comm'n, 238 F.2d 108, 119 (1st Cir. 1956) ("It is the unity of interest among members of the class which is controlling.  'In determining the question (of adequacy of representation) the court must consider (1) whether the interest of the named party is co-extensive with the interests of the other members of the class….'") (citation omitted).

[63] Erickson Dep. at 69-70.

private action for damages under Section 10(b) and Rule 10b-5, plaintiff must be a purchaser or seller of securities and must allege injuries resulting from reliance upon defendants' material misstatements or omissions.").

In order to satisfy the typicality requirement, a class representative "must be truly representational." Dierks, 414 F.2d at 456.  Given the timing of Mr. Erickson's purchases compared to the rest of the class, his refusal to further other class members' interests, and his intent to pursue a legally invalid claim, there can be no doubt that Mr. Erickson is not "truly representational" of the class and subclass he hopes to represent.[64]

### 3.    Dr. Esposito Is Inadequate Because Of His Utter Failure To Offer Credible Testimony Concerning His Trading History In Biopure.

"[I]f the named plaintiffs are evasive, untruthful, or lack credibility, this weighs heavily against them as adequate class representatives."  Smyth v. Carter, 168 F.R.D. 28, 33 (W.D. Va. 1996).[65]  Here, the record shows that Dr. Esposito suffers from the precise lack of credibility that courts have found to warrant denial of certification.

The record is replete with conflicting statements made by Dr. Esposito under oath concerning the most basic details of his ownership of Biopure stock.  Dr. Esposito testified at his

---

[64] Plaintiffs' counsel's inappropriate efforts to revise Mr. Erickson's testimony concerning which of the allegedly misleading statements are misleading and which of them are not does not dig Mr. Erickson out of the hole he put himself in.  The fact that Mr. Erickson needed his counsel to testify for him only shows that he cannot be expected to testify competently on behalf of the class at trial.

[65] See also, In re Sonus Networks Sec. Litig., 229 F.R.D. at 340-42 (D. Mass. 2005); Weinstein v. American Biomaterials Corp., 123 F.R.D. 442, 466 (S.D.N.Y. 1988) (denying class certification where the court found that, based on the class representative's deposition testimony, "while it is difficult to find as a positive fact that plaintiff has testified falsely or that he is not credible, I do find that his credibility is subject to serious question and to serious doubt"); Michaels v. Ambassador Group Inc., 110 F.R.D. 84, 91 (E.D.N.Y. 1986) (noting that "the Court should examine a class plaintiff's credibility and include it in the class certification calculus"); Amswiss Int'l Corp. v Heublein, Inc., 69 F.R.D. 663, 671 (N.D. Ga. 1975) (denying class certification and finding that "[c]lass action should be denied where it appears that the representative could not serve in a fiduciary capacity because of past misconduct, and where there is a strong indication that testimony by the class representative, as personified by its principal, might not be credible").

deposition that he first purchased Biopure on August 11, 2003 and that he had never held Biopure before that date.[66] Dr. Esposito explained in his testimony that he had spoken to his daughter and son-in-law, both practicing physicians, about Biopure approximately three to six months before his August 11, 2003 purchase and they told him that they thought Biopure "seemed like a very interesting product."[67] Thereafter, Dr. Esposito testified, he first spoke to his broker about Biopure in August 2003.[68] Indeed, Dr. Esposito testified that he "vividly" recalled that he brought Biopure to his broker's attention at that time.[69]

This testimony concerning Dr. Esposito's first purchase of Biopure directly conflicts with the certification Dr. Esposito signed under oath at the inception of the litigation. That certification states that Dr. Esposito sold 520 shares of Biopure on August 5, 2003, one week before his August 11, 2003 purchase. When questioned about the certification, Dr. Esposito testified that he had no recollection of this sale or his ownership of Biopure prior to the class period; he did not seek to recant his earlier testimony concerning the circumstances that he "vividly" recalled of his "first" purchase on August 11, 2003.[70] It is, perhaps, no surprise that Dr. Esposito's deposition testimony was not in line with his certification because, even though he signed the certification (to act as a Plaintiff in this litigation) "under penalty of perjury," he could not say at his deposition whether he even reviewed it before he signed it.[71]

---

[66] Esposito Dep. at 93-94.

[67] Esposito Dep. at 12-14.

[68] Erickson Dep. at 66-67.

[69] Esposito Dep. at 101.

[70] Esposito Dep. at 98-99.

[71] Esposito Dep. at 94-96 and 177-78. Dr. Esposito's certification reflecting his Biopure purchases and sales during the class period is located at App. Exh. I. Several weeks after his deposition, however, Dr. Esposito

Dr. Esposito's testimony also directly conflicts with his trading records obtained by third party subpoena.[72]  Those records show that Dr. Esposito purchased 520 shares of Biopure stock through his broker Nathan & Lewis Securities, Inc. on July 31, 2000 (purchase of 5000 shares) and September 17, 2001 (purchase of 20 shares).[73]  Those records also reflect that he sold these shares on August 5, 2003 and purchased a total of 1,200 Biopure shares on August 12 and August 21, 2003.  All of these transactions occurred through the very same broker.[74]

Finally, Dr. Esposito offered false testimony concerning his ultimate sale of Biopure stock.  Specifically, Dr. Esposito testified that he sold all his Biopure stock in January 2005 -- even though he continues to hold (as of May 31, 2006) all of the shares he purchased in August 2003:

> Question:  Did you sell your position in Biopure at any point?
>
> Answer:  Yes, I think I must have sold, I think that's what happened here, in January of '05.
>
> Question:  Sorry.  I didn't mean to interrupt you.
>
> Answer:  That's okay.  It was 1,200 shares, yes, at $.54.  I guess that's what happened then.
>
> Question:  Okay.  Why did you sell in January of '05?
>
> Answer:  I don't recall.  Again it must – we must have talked to Mr. Harris about it.  And this was in January of '05, this was after we learned about the problems that the company was having, the FDA problems, and I think

submitted an errata sheet to his deposition transcript stating that he did not purchase Biopure shares before August 5, 2003 and that he did not sell shares of Biopure on that date, directly in conflict with Dr. Esposito's signed certification.

[72] Because Plaintiff Esposito only produced a two page "Clearing Firm Client Account Profile" in response to Defendants' Request for Production of Documents which **did not** disclose his previous purchase and sale of Biopure stock, Defendants were forced to spend two weeks pursuing the details of Dr. Esposito's trade history by way of third-party subpoenas issued to multiple brokerage firms.

[73] Copies of Dr. Esposito's account statements showing his purchases of 520 shares of Biopure stock in July 2000 and September 2001 and his August 5, 2003 confirmation statement showing his sale of those shares are located at App. Exh. E and App. Exh. F, respectively.

[74] Copies of Dr. Esposito's August 2003 account statement showing his purchase of 1,200 shares of Biopure stock are located at App. Exh. J.

there was a FTC problem, too, as well, I don't remember, but it was something that was very, very detrimental we thought. December of – December was when that came out. It was after word came out that they were having really significant problems, so that's probably why we sold.

***

**Question: And to be clear, you don't own any Biopure stock today, right?**
**Answer:    Correct.**

Esposito Dep. at 128 and 132.  Contrary to this testimony, Dr. Esposito's account records

unequivocally show that <u>he</u> <u>still</u> <u>owns</u> <u>his</u> <u>Biopure</u> <u>stock</u>.[75]

   In itself, Dr. Esposito's false testimony renders him an inadequate, atypical class

representative.[76]   The fact that Dr. Esposito has no recollection of whether he verified the

---

[75] As of May 2006, which is the date of the last statement produced by Dr. Esposito's brokerage firm in response to Defendants' subpoena, Dr. Esposito still holds all of the shares of Biopure stock that he purchased during the class period.  A copy of Dr. Esposito's May  2006 account statement reflecting his split adjusted holdings of Biopure stock is located at App. Exh. H.

[76] <u>See, e.g.</u>, <u>Kline v. Wolf</u>, 702 F.2d 400, 401-03 (2d Cir. 1983) (where district court denied motion for class certification after it "found that **both plaintiffs were vulnerable to serious attacks upon their credibility, and were thus subject to unique defenses atypical of the class of purchasers** of Allied stock during the relevant period, which could 'divert attention from the substance of the basic claim' with the result that the 'remaining members of the class could be severely damaged by plaintiffs' representation of them'" the appellate court held that this decision was "fully supported by evidence and his denial of representation was proper.") (emphasis added); Buzoiu v. Risk Management Alternatives, Inc., 2004 WL 1505061, *6 (E.D. Pa. June 14, 2004) (where there were serious discrepancies between the class representative's testimony and an errata sheet submitted following an initial deposition, the court denied plaintiff's motion for class certification, finding that "[i]t is evident from the foregoing that [the class representative's] personal credibility is so open to question that it is likely to harm her case.  Counsel for [the defendant] would have ample ammunition for cross-examination…."); <u>Hively v. Northlake Food, Inc.</u> 191 F.R.D. 661, 669 (M.D. Fla. 2000) (denying class certification after finding that the class representative's "lack of trustworthiness, honesty, and credibility … would dominate this case, causing absent class members material prejudice."); <u>Kassover v. Computer Depot, Inc.</u>, 691 F. Supp. 1205, 1213, (D. Minn. 1987), <u>aff'd</u>, 902 F.2d 1571 (8th Cir. 1990) (denying motion for class certification and noting that "**[a] plaintiff subject to unique defenses, especially as to his credibility** is an inadequate class representative, in part, because he lacked familiarly with the suit, is an inadequate class representative"); <u>Lubin v. Sybedon Corp.</u> 688 F. Supp. 1425, 1462 (S.D. Cal. 1988) ("Lubin's unfamiliarity with the outlines of his suit is somewhat 'alarming,' so that the court cannot certify the proposed class in his name.  Lubin's deposition disclosed an inadequate knowledge of the circumstances underlying this suit, and it would be improper for the court to entrust Lubin with the burden of representing his fellow limited partners.") (emphasis added); <u>Koenig v. Benson</u>, 117 F.R.D. 330, 337-38 (E.D.N.Y. 1987) (finding that class representative was subject to unique defenses, in part, because he lacked credibility); <u>Wagner v. Lehman Bros. Kuhn Loeb Inc.</u>, 646 F. Supp. 643, 660-61 (N.D. Ill. 1986) (denying class certification after finding that the class representative's "credibility is at issue and is open to serious question" and holding that "**[w]here the proposed representative's credibility is subject to attack, unique defense problems are presented**.  A putative representative's credibility problem could well divert the jury's 'attention from the substance of the basic claim' and could severely damage '[t]he remaining class members.'") (quoting <u>Kline v. Wolf</u>, 88 F.R.D. 696 (S.D.N.Y. 1981), <u>aff'd</u>, 702 F.2d 400 (2d Cir. 1983)) (emphasis added)); <u>Darvin v. International Harvester Co.</u>, 610 F. Supp. 255, 256 (S.D.N.Y. 1985) ("**The Court finds that plaintiff would not be a suitable class representative** and would not adequately protect the interests of the class

accuracy of the certification he signed "under penalty of perjury" and that he subsequently signed an errata sheet to his deposition that directly conflicted with both the certification and his sworn testimony are also reasons to find that Dr. Esposito is not an individual who should be vested with the responsibility of serving as class representative.

The factual circumstances of this case are similar to those in In re Sonus Networks Sec. Litig., 229 F.R.D. 339, 348 (D. Mass. 2005), where now-Chief Judge Wolf decertified a class action on the grounds that the proposed class representative was inadequate, rendering his claims atypical of those of the putative class.  Specifically, the Court found one of the proffered class representatives was not qualified to serve in such capacity because, among other reasons, he filed a certification that stated that it included all of his Sonus stock transactions when it did not, and he did not recall in his deposition whether a schedule of his Sonus transactions was attached to his certification when he signed it and attested to its accuracy.  Id. at 342.

In this case, even though Dr. Esposito had ample time to prepare for his deposition, he could not testify truthfully about simple facts like when he first purchased Biopure stock and whether he continues to hold his Biopure stock.  If Dr. Esposito cannot even review his one page certification before his deposition or accurately verify his trading history after his deposition in order to offer truthful testimony concerning his three Biopure transactions during the class period,

---

because, *inter alia,* **there are unique defenses which defendants can assert against him, especially with respect to his credibility**, and because plaintiff has demonstrated a serious lack of familiarity with the suit.") (emphasis added); Cohen v. Laiti, 98 F.R.D. 581, 582-83 (E.D.N.Y. 1983) (denying class certification motion where class representative offered contradictory testimony in his deposition regarding how he learned of defendants' stock and why he decided to purchase it because his credibility would be "open to attack," making his claims "subject to unique defenses").

then under the same reasoning as in <u>Sonus</u> he can hardly be expected to vigorously and credibly pursue the interests of the class as a class representative.[77]

### 4. Dr. Esposito Cannot Adequately Represent The Interests Of Class Members Who No Longer Hold Their Biopure Stock.

As an investor who currently holds all of the Biopure stock that he purchased during the class period, Dr. Esposito cannot satisfy Rule 23(a)'s adequacy requirements because his interest in recovering damages from Biopure on behalf of the class is in conflict with the interest of class members who no longer hold Biopure stock. Some courts have called this conflict the "equity conflict."[78]   In <u>Seagate Tech. II Sec. Litig.</u>, 843 F. Supp. 1341 (N.D. Cal. 1994), the court explained that class members who continue to hold the stock have an interest that is antagonistic to other class members because they have an incentive to ensure that their current investment does not lose value as a result of the litigation (or at least that the loss in value as a result of the litigation does not exceed their recovery):

> The second form of conflict likely to arise in corporate dissemination cases stems from the dual interests held by some members of the plaintiff class. Specifically, those plaintiffs who still own shares of the relevant security at the date of suit have divided loyalties: on the one hand they hope for recovery for themselves; as equity holders in the relevant issuer, however, they also wish to minimize the overall liability of the company.

<u>Id.</u> at 1362.

---

[77] Some courts have found that a class representative's glaring lack of familiarity with the basic facts and allegations of a lawsuit reflects on the adequacy of class counsel. <u>See, e.g.</u>, <u>Krim v. pcOrder.com, Inc.</u>, 212 F.R.D. 329, 339 (W.D. Tex. 2002) (finding that class counsel was inadequate "where counsel failed to adequately prepare the Lead Plaintiffs for their depositions").

[78] <u>See</u>, <u>In re Clearly Canadian Sec. Litig.</u>, 875 F. Supp. 1410, 1422 (N.D. Cal. 1995) (" In [<u>Seagate</u>], the court required plaintiffs seeking class certification in a fraud-on–the-market securities action to provide evidence on the extent of seller-purchaser and **equity conflicts**. The court believes that such information is necessary to determine the adequacy of representation in fraud-on-the-market cases, as the court must do under Rule 23.") (citation omitted) (emphasis added).

In Seagate, the court refused to grant certification on the record before it and ordered an evidentiary hearing to assess the adequacy of the proposed class representatives. The court based its decision, in part, on the fact that plaintiffs had made no showing on the extent of the equity conflict. Just as Plaintiffs have the burden of proving all of the Rule 23(a) requirements, Moving Plaintiffs also have the burden of proving that the equity conflict does not render them inadequate to represent the class.[79] Moving Plaintiffs have failed to satisfy this burden.

**C.     Plaintiffs May Not End-Run The PSLRA'S Requirements For Determining The Most Adequate Lead Plaintiff By Offering Dr. Esposito As Representative For The Entire Class, For The First Time, Only After His Deposition Was Taken.**

The PSLRA has a specific procedure and requirements to be followed early in the litigation for the appointment of a lead plaintiff, or the plaintiff "most capable of adequately representing the interests of class members."[80] Plaintiffs' "amended" motion is nothing more than a blatant end-run around the PSLRA's adequacy requirements, which Dr. Esposito does not satisfy.

The PSLRA provides that the lead plaintiff shall be "the person or group of persons that":

(aa)     has either filed the complaint or made a motion in response to a notice…

(bb)     **in the determination of the court, has the largest financial interest in the relief sought by the class; and**

(cc)     **otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.**

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Mr. Erickson was one of seven plaintiffs (four of which were "groups" of individual purchasers of Biopure stock) who, in 2004, moved to be appointed lead plaintiff of the class. Dr.

---

[79] See, e.g., O'Neil v. Appel, 165 F.R.D. 479, 494-95 (W.D. Mich. 1996) (denying motion for class certification and finding that "[t]he Seagate court identified two major conflicts of interest that could serve to make class representatives inadequate").

[80] 15 U.S.C. § 78u-4(a)(3)(B)(i).

Esposito did not seek to be so appointed.  The Court, applying the above standard, appointed Mr. Erickson Lead Plaintiff on May 14, 2004.

On March 28, 2006, Plaintiffs filed the Complaint.  Consistent with the Court's lead-plaintiff determination, Lead Plaintiff Mr. Erickson was named as class representative and Dr. Esposito and others as representatives of the putative subclass.  Thereafter, on May 5, 2006, Plaintiffs moved for class certification – again, consistent with the Court's lead-plaintiff determination – asking that the court appoint Lead Plaintiff Mr. Erickson as representative of the entire class, and appoint Dr. Esposito as one of the representatives of the subclass.  On June 5, 2006, after paper discovery and the depositions of Mr. Erickson and Dr. Esposito, and without obtaining leave to amend either the Complaint or their certification motion, Plaintiffs filed an Amended Motion For Class Certification, naming both Mr. Erickson and Dr. Esposito as representatives of the entire class.  Plaintiffs' shifting sands approach to class certification reflects a strategy on their counsel's part of repositioning the named Plaintiffs in light of how well they stand up to discovery.  The approach is not only unfair, it undermines the PSLRA process that the court conducted for appointing the Lead Plaintiff in this case.

Dr. Esposito's Biopure investment is only a fraction of the investments made by each of the proposed lead plaintiffs that Mr. Erickson defeated earlier in this case.  In fact, in arguing that he should be appointed Lead Plaintiff, Mr. Erickson emphasized that each of these potential lead plaintiffs was not adequate to represent the class because their Biopure losses (which were all greater than Dr. Esposito's unrealized Biopure loss) were not significant enough.[81]

Not only is Dr. Esposito's Biopure investment far from the largest stake in the class, but,

---

[81] See Mr. Erickson's March 16, 2004 Opposition To The Motions of the "Biopure Group" And Other Movants Seeking To Be Appointed Lead Plaintiffs And For Appointment of Co-Lead Counsel.

based on his inability to testify truthfully regarding when he purchased and sold Biopure stock, it was not a significant investment even to him.  Dr. Esposito's relative lack of interest in the outcome of this litigation renders him unable to serve as an adequate class representative by monitoring, managing and controlling this litigation as required by the PSLRA.  Plaintiffs' attempt to name Dr. Esposito as representative on behalf of the entire class is little more than an end-run around the PSLRA's adequacy requirements, and should not be condoned by this Court.

**D.    The Putative Subclass Fails To Satisfy Rule 23 Because Dr.**
    **Esposito's Claims Are Not Typical Of Those Of The Putative Subclass.**

For the reasons stated above, Dr. Esposito will not fairly and adequately protect the interests of the class and subclass.  In addition, Dr. Esposito's claims are not even typical of the claims of the putative subclass because his purchases of Biopure stock were not "contemporaneous" with all of the alleged sales by Carl W. Rausch ("Mr. Rausch") and Biopure.

Section 20A of the Exchange Act states that:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, **contemporaneously** with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a) (emphasis added).

This court has held that a plaintiff's purchases must be on the "same day" as the insider's sale in order to meet the "contemporaneous" requirement.  See, In re Stratus Comp., Inc. Sec. Litig., 1992 WL 73555, *6 (D. Mass. Mar. 27, 1992).  In Stratus Computer, Judge Zobel held that a purchase by the plaintiff just one trading day after the defendant's sales did not give the plaintiff standing to bring a section 10(b) insider trading claim.  1992 WL 73555, at *6.  See also,

Backman v. Polaroid Corp. 540 F. Supp. 667, 670 (D. Mass. 1982) ("The purchases of Polaroid

stock by Anderson 4 days (2 trading days) after the Jurodin sale . . . [is] outside of the period of

insider trading; therefore, those plaintiffs lack standing to sue on their claims against Silver and

Jurodin.").  Indeed, as Judge Lindsay noted in Carney v. Cambridge Technology Partners, Inc.,

135 F. Supp. 2d 235, 257 n.10 (D. Mass. 2001), "case law in this circuit holds that an interval of

just two days between a plaintiff's purchase and sales by insiders is sufficient to deny the

plaintiff standing as a contemporaneous trader."  In Colby v. Hologic, Inc., 817 F. Supp. 204,

216 (D. Mass. 1993), Judge Young noted that "strong public policy considerations" underpin the

contemporaneous requirement, especially where, as here, the stock is actively traded, because the

window of time in which any investor "actively trades" with an insider "dissipates rapidly." Id.

at 216.[82]

---

[82]  As the court recognized in Buban v. O'Brien, No. C 94-0331 FMS, 1994 WL 324093, at *2 (N.D. Cal. June 22, 1994), "the purpose of the 'disclose or abstain' rule [of insider trading law] is to protect those who may have actually traded with insiders."  Accord Backman v. Polaroid, 540 F. Supp. at 670 (insider trading law protects only "investors who are actively trading with an insider").  Federal courts across the country now require same day trading or trading within a day of the defendant's sale.  The district court in In re Microstrategy, Inc. Securities Litigation, 115 F. Supp. 2d 620, 663 (E.D. Va. 2000) (rejecting even two-day gap between trades), explained the basis for this trend:

> [A]n evolution of the contemporaneity requirement to require a shorter temporal separation between the trades of investors and insiders is reasonable, if not inevitable, as the modern realities of the securities markets support an increasingly strict application of contemporaneity in order at once to satisfy the requirement's privity-substitute function and to guard against making the insider liable to all the world.  Specifically, as the temporal separation between the trades increases, the increasingly dynamic nature of the securities markets, when viewed in light of the trading activity of the securities involved and other circumstances in a particular case, correspondingly make it less likely that a purchaser traded with the insider and, therefore, suffered the disadvantage of trading with someone with superior access to information.  Thus, a court assessing the appropriate measure of contemporaneity in any given case should be cognizant of these considerations.

Accord Copland v. Grumet, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (contemporaneous means same day); In re AST Research Sec. Litig., 887 F. Supp. 231, 234 (C.D. Cal. 1995) ("The same day standard is the only reasonable standard given the way the stock market functions"); In re Aldus Sec. Litig., No. C92-885C, 1993 WL 121478, at *7 (W.D. Wash. Mar. 1, 1993) (adopting same day definition in light of high volume of stock traded). Accord  Copland v. Grumet, 88 F. Supp.2d 326, 338 (D.N.J. 1999) (same day trading required); In re Aldus Sec. Litig., 1993 WL 121478, at *7 (dismissing insider trading claims where no plaintiff traded on the same days as the defendants).

In their Amended Certification Motion, the Plaintiffs offer Dr. Esposito as the only representative of the putative subclass. The Complaint identifies fourteen sales by Mr. Rausch between April 15, 2003 and August 28, 2003, and numerous sales (some specifically identified and some not) by Biopure between April 16, 2003 and October 31, 2003. Of all the sales that are specifically identified, only one sale by Mr. Rausch occurred fewer than two trading days before a purchase by Dr. Esposito. Moreover, several of the alleged Rausch sales occurred after Dr. Esposito's last purchase of Biopure stock. Therefore, Dr. Esposito lacks standing to represent the subclass claims against Mr. Rausch for all but one of his sales. Moreover, based on the lack of any detail concerning the timing of several of Biopure's alleged sales, Dr. Esposito does not have standing to represent the subclass in its Section 20A claims against Biopure. Cf., In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 43 (D. Mass. 2003) ("The named plaintiffs' claims against the Institutional and Advisers funds are dismissed for lack of Article III standing and the named plaintiffs cannot represent investors who purchased shares in those funds.").

## III.    CONCLUSION

For these reasons, Defendants Biopure, Thomas A. Moore, Carl W. Rausch, Charles A. Sanders, J. Richard Crout, Ronald F. Richards and Howard P. Richman respectfully request that the Court deny Plaintiffs' Certification Motion.

Respectfully submitted,

**BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, CHARLES A. SANDERS, J. RICHARD CROUT, RONALD F. RICHARDS AND HOWARD P. RICHMAN**

By their attorneys,

/s/ Robert A. Buhlman_____
Robert A. Buhlman, BBO #554393
Donald J. Savery, BBO #564975
Michael D. Blanchard, BBO #636860
BINGHAM MCCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726

Dated: July 25, 2006                     (617) 951-8000


SEYFARTH SHAW, LLP

/s/ Christopher Robertson_____
Christopher Robertson (BBO# 642094)
Jodi D. Luster (BBO # 657853)
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028

*Attorney for Defendant Ronald F. Richards*


EDWARDS ANGELL PALMER & DODGE
LLP

/s/ Cathy A. Fleming_____
John D. Hughes (BBO# 243660)
John J. Tumilty (BBO # 560017)
Mary P. Cormier (BBO# 635756)
101 Federal Street
Boston, MA 02110
(617) 439-4444

Cathy A. Fleming (*pro hac vice*)
750 Lexington Avenue
New York, NY 10022
(212) 308-4411

*Attorneys for Defendant Howard P. Richman*

McDERMOTT WILL & EMERY, LLP

/s/ Edward P. Leibensperger
Edward P. Leibensperger (BBO# 292620)
Jeffrey S. Huang (BBO# 651854)
28 State Street
Boston, MA 02109
(617) 535-4000

*Attorneys for Defendant Thomas Moore*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was electronically served upon the attorney of record for each party on July 25, 2006.

/s/ Michael D. Blanchard
Michael D. Blanchard