# EXHIBIT A

Ronald W. Erickson



Page 1

1             UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3               Civil Action No. 03-12628-NG

4   ***********************************

5   IN RE:  BIOPURE CORPORATION

6   SECURITIES LITIGATION

7   ***********************************

8             DEPOSITION OF RONALD W. ERICKSON,

9   a witness called on behalf of the Defendants,

10   taken pursuant to the Federal Rules of Civil

11   Procedure, before Maureen O'Connor Pollard, RPR,

12   CLR, and Notary Public within and for the

13   Commonwealth of Massachusetts, at the offices of

14   Bingham McCutchen LLP, 150 Federal Street,

15   Boston, Massachusetts, on the 30th of May, 2006,

16   commencing at 1:09 o'clock p.m.

17

18

19

20

21

22

23

24

Ronald W. Erickson                                                                05/30/2006

Page 2

1   APPEARANCES:
2   FOR THE PLAINTIFFS:
3       BY:  HOWARD T. LONGMAN, ESQ.
4           STULL, STULL & BRODY
5           6 East 45th Street
6           New York, New York 10017
7           212-687-7230
8           and
9       BY:  MATTHEW L. TUCCILLO, ESQ.
10          SHAPIRO, HABER & URMY LLP
11          53 State Street
12          Boston, Massachusetts 02109
13          617-439-3939
14          mtuccillo@shulaw.com
15
16  FOR THE DEFENDANT HOWARD RICHMAN:
17      BY:  JOEY H. LEE, ESQ.
18          EDWARDS ANGELL PALMER & DODGE LLP
19          111 Huntington Avenue
20          Boston, Massachusetts 02199
21          617-239-0100
22          jlee@eapdlaw.com
23
24

Page 4

1   FOR THE DEFENDANT RONALD RICHARDS:
2       BY:  JODI D. LUSTER, ESQ.
3           SEYFARTH SHAW LLP
4           World Trade Center East
5           Two Seaport Lane, Suite 300
6           Boston, Massachusetts 02210-2028
7           617-946-4800
8           jluster@seyfarth.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1   FOR THE DEFENDANT BIOPURE AND CERTAIN OTHER
2   DEFENDANTS:
3       BY:  MICHAEL T. BLANCHARD, ESQ.
4           BINGHAM McCUTCHEN LLP
5           One State Street
6           Hartford, Connecticut 06103-3178
7           860-240-2945
8           michael.blanchard@bingham.com
9           and
10      BY:  JASON LANE, ESQ.
11          JENNIFER HOLDEN, ESQ.
12          BINGHAM McCUTCHEN LLP
13          150 Federal Street
14          Boston, Massachusetts 02110
15          617-951-8000
16
17  FOR THE DEFENDANT THOMAS MOORE:
18      BY:  JEFFREY S. HUANG, ESQ.
19          McDERMOTT, WILL & EMERY LLP
20          28 State Street
21          Boston, Massachusetts 02109-1775
22          617-535-4086
23          jhuang@mwe.com
24

Page 5

1                  INDEX
2   EXAMINATION                     PAGE
3   RONALD W. ERICKSON
4    BY MR. BLANCHARD                 9
5    BY MS. LUSTER                  208
6
7                 EXHIBITS
8   NO.    DESCRIPTION              PAGE
9   1    Certification, Bates stamped 26
10       through 29......................... 54
11  2    CitiGroup statement.............. 95
12  3    CitiGroup statement.............. 96
13  4    CitiGroup statement.............. 97
14  5    CitiGroup statement Bates stamped
15       30................................. 98
16  6    Financial Management Account
17       statement......................... 98
18  7    CitiGroup statement.............. 101
19  8    Fax, Bates stamped 5 through 7...... 101
20  9    Document Bates stamped 17.......... 102
21  10   Document Bates stamped 20.......... 103
22  11   Document Bates stamped 18.......... 103
23  12   CitiGroup statement.............. 105
24  13   Harris Group statement............. 106

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 6

1   14   One page document Bates stamped 25.. 108
2   15   Statement from Harris Group......... 109
3   16   Article from MSN Money.............. 113
4   17   Copies of articles.............. 117
5   18   Report from EmedSecurities.......... 118
6   19   Document titled Amex to Trade
7        Options on 8 Securities............ 118
8   20   News from AOL about Biopure......... 118
9   21   ...................................
10  22   Document Bates stamped 36 and 37.... 118
11  23   CBS MarketWatch report............. 118
12  24   Consolidated amended complaint...... 134
13  25   Second consolidated amended
14       complaint........................ 148
15  26   10-31-02 Biopure annual report...... 151
16  27   4-11-03 Form S-3 filed by Biopure... 153
17  28   Post-effective amendment number 1
18       to S-3............................ 164
19  29   Document titled Biopure Awards
20       Public Relations and Medical
21       Education Accounts in Support of
22       Hemopure.......................... 165
23  30   Copy of article.................... 166
24  31   Copy of earnings conference call.... 175

Page 7

1   32   Transcript of 5-30 conference call
2        for Biopure........................ 178
3   33   Press release...................... 179
4   34   Document........................... 182
5   35   Document........................... 186
6   36   8-21 conference call transcript..... 189
7   37   Prospectus for Biopure............. 191
8   38   Prospectus for Biopure............. 192
9   39   Biopure presentation by Thomas
10       Moore............................. 192
11  40   Biopure presentation by Thomas
12       Moore............................. 194
13  41   Two-page document................. 195
14  42   Transcript from 10-30-03
15       conference call................... 202
16  43   Copy of article................... 203
17
18
19
20
21
22
23
24

Page 8

```
1              P R O C E E D I N G S
2
3         RONALD W. ERICKSON,
4   having been identified by Massachusetts driver's
5   license, being first duly sworn, was examined
6   and testified as follows:
7         MR. BLANCHARD:  Perhaps we should
8   identify counsel for the record.
9         I'm Michael Blanchard, I'm with the
10  law firm of Bingham McCutchen representing
11  Biopure and certain other Defendants in this
12  action.
13        MR. LEE:  Joey Lee for Edwards Angell
14  Palmer & Dodge representing Howard Richman.
15        MS. HOLDEN:  Jennifer Holden for
16  Bingham McCutchen representing Biopure and
17  certain other Defendants.
18        MS. LUSTER:  Jodi Luster, Seyfarth
19  Shaw, representing Ronald Richards.
20        MR. LANE:  Jason Lane from Bingham
21  McCutchen representing Biopure and certain other
22  Defendants.
23        MR. HUANG:  Jeff Huang from McDermott,
24  Will & Emery on behalf of Thomas Moore.
```

Page 9

```
1         MR. TUCCILLO:  Matthew Tuccillo,
2   Shapiro, Haber & Urmy, on behalf of the
3   Plaintiffs.
4         MR. LONGMAN:  Howard Longman, Stull,
5   Stull & Brody, on behalf of the Plaintiffs.
6         DIRECT EXAMINATION
7         BY MR. BLANCHARD:
8    Q.   And your name, sir?
9    A.   Ronald W. Erickson.
10        MR. BLANCHARD:  Preliminaries, we'd
11  agreed prior to going on the record that we
12  would stipulate that all objections except to
13  the form of the question be reserved until
14  trial.  We agreed that we will waive the notary.
15  And we agreed that the witness would read and
16  sign the deposition.
17        Is that correct?
18        MR. LONGMAN:  That's correct.
19        BY MR. BLANCHARD:
20   Q.   Good morning.  My name is Michael
21  Blanchard, we met before we came on the record.
22        What's your current address, Mr.
23  Erickson?
24   A.   1903 Washington Street, East
```

LegaLink Boston, a Merrill Company
(617) 542-0039

Ronald W. Erickson

05/30/2006

Page 10

1  Bridgewater, Massachusetts, 02333.
2      Q.  How long have you lived there?
3      A.  Since 1986, twenty years.
4      Q.  Have you ever had your deposition
5  taken before?
6      A.  No.
7      Q.  Have you ever been at a deposition
8  before?
9      A.  No.
10     Q.  Just some preliminaries, these aren't
11  really questions, but by way of background
12  explanation as to how things work I'll be asking
13  you questions today, and you'll be answering
14  subject to your counsel's objections.
15         Any answers you give have to be oral
16  answers.  A nod of the head can't be picked up
17  by the court reporter, and, you know, uh-huhs
18  and things of that nature can't be picked up by
19  the court reporter, so some formalism is
20  required in the nature of your answer.
21         Is that clear?
22     A.  Yes.
23     Q.  If at any time you need a break today,
24  you're free to take one.  I would just ask that

Page 11

1  if the question is pending that you answer the
2  question before you take the break.
3      A.  No problem.
4      Q.  Just let me know if you need a break,
5  we'll take a break.
6      A.  Okay.
7      Q.  I'll ask you some questions about your
8  health, and they're not really to get into your
9  health but just to be sure you're capable of
10  testifying truthfully today.
11         Are you taking any medication right
12  now that would inhibit your ability to answer
13  questions to the best of your recollection?
14     A.  No.
15     Q.  Are you suffering from any illness
16  that would do the same?
17     A.  No.
18     Q.  Are you aware of anything that would
19  inhibit your ability to answer questions
20  truthfully today?
21     A.  No.
22     Q.  When were you born, sir?
23     A.  December 20th, 1949.
24     Q.  Are you married?

Page 12

1      A.  Yes.
2      Q.  Do you have children?
3      A.  Three.
4      Q.  Boys, girls?
5      A.  All boys.
6      Q.  All boys.  God bless you.
7         Are you in good health?
8      A.  Yes.
9      Q.  How old are your children?
10     A.  Nineteen -- twenty, to be twenty-one
11  in June, one is twenty-five, and the other is
12  twenty-nine.
13     Q.  Are any of your children stockbrokers?
14     A.  No.
15     Q.  Are any of them involved in the
16  securities industry in any way?
17     A.  No.
18     Q.  Your wife?
19     A.  No.
20     Q.  Are any of them analysts?
21     A.  No.
22     Q.  Asset advisors?
23     A.  No.
24     Q.  Traders?

Page 13

1      A.  No.
2      Q.  Do any of your children work in the
3  biotechnology industry?
4      A.  No.
5      Q.  What do they do?
6      A.  The oldest works for the
7  administration, for the dean at Mass School of
8  Pharmacy; middle son, ends up he's a teacher at
9  Brockton High School; and the youngest is a
10  junior at Suffolk University.
11     Q.  And your wife?
12     A.  She's an attorney at law, has her own
13  practice in elder law.
14     Q.  Does she practice in any way in
15  securities litigation?
16     A.  No, she doesn't.
17     Q.  Are you related in any way to any of
18  the lawyers in this case?
19     A.  No.
20     Q.  We can start with your education, your
21  educational background after high school.  Could
22  you just give me the chronology of your
23  education?
24     A.  Went to junior college after tearing

4 (Pages 10 to 13)

Page 14

1  my knee up, full scholarship in baseball. When
2  I went through that, went to work, went to
3  Suffolk University at night. Got out of there
4  in 1976, went through assortments of banking
5  schools, Brown University, UMass, gone through
6  the Society of Real Estate Appraisers, been in
7  mortgage banking for 34 years, and I can go on
8  and on.
9      Q.  Suffolk University, what was your
10 degree in?
11     A.  Business administration. I didn't get
12 the final degree, I think I went a course short.
13     Q.  And following Suffolk, what was the
14 next college you attended?
15     A.  That was Brown University and UMass,
16 those were for real estate degrees and savings
17 bank industry also.
18     Q.  Were they degrees or certificate
19 programs?
20     A.  Certificate programs.
21     Q.  Are you licensed to sell real estate?
22     A.  No.
23     Q.  Or were you licensed to sell real
24 estate?

Page 15

1      A.  Previously I could go ahead and sell
2  real estate. It's more to appraise property and
3  go ahead and analyze residential and commercial
4  real estate.
5      Q.  Any of the courses you take involve or
6  relate to securities?
7      A.  No.
8      Q.  Take courses in economics?
9      A.  Yes.
10     Q.  Any upper level courses in economics?
11     A.  Just in college, that's about it. No
12 masters degree or anything else.
13     Q.  Any graduate level education?
14     A.  Just in the appraisal process and so
15 forth, real estate.
16     Q.  What's the last degree or certificate
17 you've received?
18     A.  Probably in commercial real estate,
19 UMass, years ago.
20     Q.  Do you know approximately when that
21 was?
22     A.  That was probably 1982.
23     Q.  And have you taken any courses since
24 then?

Page 16

1      A.  Here and there, nothing of any sorts,
2  no.
3      Q.  You have taken some courses?
4      A.  Just through work as far as having to
5  go to different things as far as functions and
6  stuff like that.
7      Q.  So work related training?
8      A.  No courses. Yes.
9      Q.  Have you ever taught any courses?
10     A.  I've taught appraisal, I taught
11 mortgage banking. I would say that's about it.
12     Q.  Are you currently employed?
13     A.  Yes.
14     Q.  And who is your employer?
15     A.  Wells Fargo.
16     Q.  What do you do for Wells Fargo?
17     A.  I'm an area manager covering local
18 branches for them, do mortgage lending.
19     Q.  What's the substance of your work?
20     A.  Managing managers, going ahead
21 residential lending. So various going ahead and
22 managing a multitude of branches that go ahead,
23 and managers that produce residential mortgages.
24     Q.  What did you do before that position?

Page 17

1      A.  I was regional manager for American
2  Home Mortgage covering New England, covering
3  five vice-presidents, going ahead and covering
4  all of Massachusetts, Rhode Island, Connecticut,
5  Vermont, Maine.
6      Q.  How long were you there until?
7      A.  I was there fifteen months.
8      Q.  What year did you go to Wells Fargo?
9      A.  This year, started with them May 1st.
10     Q.  Prior to the, now I'm forgetting
11 the --
12     A.  Prior to that I was with Washington
13 Mutual from March of 1990 to October, 2004.
14     Q.  What did you do with Washington
15 Mutual?
16     A.  Ran the gamut from being a regional to
17 area manager covering Northeast, Midwest,
18 encompassing about eighteen regional managers.
19 Then when we got bought out, that was with Great
20 Western, got bought out by Washington Mutual
21 '97, got tired of travel, wanted to go ahead and
22 cut back and just take New England, and ran New
23 England until I ended up leaving them. Had
24 number one market share for seven straight

Ronald W. Erickson

Page 18

1   years.
2       Q.   Substantively what is it you're
3   managing?  What are the managers that you're
4   managing doing in these positions?
5       A.   They're running operations that
6   salespeople -- you go with processing,
7   origination, underwriting, operations.
8       Q.   All for mortgages?
9       A.   All for mortgages.
10      Q.   So you have some expertise in the
11  mortgage area?
12      A.   Yes.
13      Q.   Does your job involve securities in
14  any way?
15      A.   No.
16      Q.   On average, how many hours per week do
17  you work?
18      A.   It depends.  It could be anywhere from
19  40 to 60, I've worked 80 at times.  All depends
20  on how busy it is.
21      Q.   Do you hold any professional licenses
22  today?
23      A.   No.
24      Q.   Have you ever been a Plaintiff in

Page 19

1   another securities related lawsuit?
2       A.   No.
3       Q.   Have you ever been a Plaintiff in any
4   lawsuit?
5       A.   No.
6       Q.   Have you ever been a Defendant in any
7   lawsuit?
8       A.   No.
9       Q.   Have you ever been involved in a
10  criminal action?
11      A.   No.
12      Q.   Has your company ever been involved in
13  any litigation that you were involved in?
14      A.   None that I was involved in.  I don't
15  know what else they would be.
16      Q.   Have you ever been a witness in a
17  lawsuit?
18      A.   No, just a car accident, that's about
19  it.
20      Q.   You were a witness at a car accident?
21      A.   Yes.
22      Q.   Did you fill out a police report?
23      A.   Mm-hmm.
24      Q.   Have you ever had to give an affidavit

Page 20

1   in any legal proceeding?
2       A.   I just was on the witness stand as far
3   as showing what happened.
4       Q.   Oh, in a car accident?
5       A.   Explained what happened, yes.
6       Q.   When was that?
7       A.   I wasn't in the car.  A car almost hit
8   me and my friend.
9       Q.   When did that happen?
10      A.   Oh, probably 35 years ago.
11      Q.   Have you ever been arrested?
12      A.   No.
13      Q.   Have you ever been charged criminally?
14      A.   No.
15      Q.   Have you ever been the subject of an
16  investigation or a disciplinary proceeding by a
17  state licensing board?
18      A.   No.
19      Q.   Do you currently own stock?
20      A.   In what?
21      Q.   In any company.
22      A.   Yes.
23      Q.   When did you begin trading?
24          MR. LONGMAN:  Objection to the use of

Page 21

1   the word "trading."
2           BY MR. BLANCHARD:
3       Q.   When was your first purchase of
4   securities?  Put it that way.
5       A.   Probably through an employee purchase
6   program with Great Western Mortgage.  So
7   probably 1991, somewhere in there.
8       Q.   What were the securities that were
9   purchased, do you recall?
10      A.   Just Great Western stock.
11      Q.   When was the first time you purchased
12  securities other than an employer's securities?
13      A.   I dabbled here and there, very -- I
14  know like maybe probably about seven, eight
15  years, probably 1997, I'd say, Washington Mutual
16  took over and I went ahead and bought some --
17  probably '96, I think I bought some Marvel
18  stock.
19          MR. LONGMAN:  I just want to put
20  something on the record.
21          Mr. Erickson is going to testify and
22  is going to answer your questions about
23  purchasing of securities other than Biopure, but
24  that in no way waives his right to object to

6 (Pages 18 to 21)

Ronald W. Erickson

05/30/2006

Page 22

1 request for documents. That's all.
2        MR. BLANCHARD: Of course. Sure.
3        MR. LONGMAN: I just want to make that
4 clear.
5    A. My memory as far as dates or whatever
6 on that, but I remember doing it.
7        BY MR. BLANCHARD:
8    Q. You said roughly 1997 you dabbled?
9    A. '96, '97, somewhere in there, yes.
10   Q. And that was Marvel you said?
11   A. Yes.
12   Q. What's Marvel?
13   A. Marvel products, like the super
14 heroes, the company that has their trademark.
15   Q. Okay.
16   A. I don't have it anymore, but the --
17 made money, and got out of it.
18   Q. Did you at some point become -- well,
19 after Marvel, what did you purchase, do you
20 recall?
21   A. Really nothing. More so just Great
22 Western, Washington Mutual stock.
23   Q. At what point after Marvel did you
24 purchase stock other than Great Western or

Page 23

1 Washington Mutual?
2    A. Probably in -- I would say probably
3 right around the time that -- I'd say probably
4 2003, whatever, when my stock options were
5 coming up, and I ended up going ahead and had to
6 sell some or lose them, so that's when I ended
7 up doing.
8    Q. You had stock options in what company?
9    A. Washington Mutual.
10   Q. And they were going to expire in 2003?
11   A. Probably 2004.
12   Q. So you exercised the options at that
13 point?
14   A. Yes.
15   Q. Do you recall how many options were at
16 issue?
17   A. I don't recall how many in that sense.
18 It was probably -- I'm not sure.
19   Q. Do you remember, was there a strike
20 price?
21   A. I probably got probably -- I probably
22 got 300,000 out of it, whatever.
23   Q. When you say you "got 300,000 out of
24 it --"

Page 24

1    A. After going ahead and getting the
2 strike price and what the actual price --
3    Q. So you had 300,000 in your pocket
4 after?
5    A. Yes.
6    Q. And what did you do with that $300,000
7 related to securities?
8        MR. LONGMAN: This is approximately
9 $300,000?
10       THE WITNESS: Right.
11       Well, I went ahead and I looked at
12 what was on the Internet, and I went ahead and
13 researched different things, bought a large
14 amount of Biopure stock.
15       BY MR. BLANCHARD:
16   Q. Did you buy any other securities?
17   A. I bought a small amount, I'm not sure
18 exactly the time, just a couple of thousand
19 dollars worth or whatever of AVTX, which is
20 Advanced Technology, and Soyo, S-O-Y-O. I still
21 have those, small amounts.
22   Q. What does AVTX do?
23   A. It's a technology sound corporation
24 that ends up going ahead and they were

Page 25

1 innovative in developing another source of fuel
2 for vehicles for armed services, and dabbling in
3 other things.
4    Q. And what does Soyo do?
5    A. Soyo is more sort of a firm that's
6 trying to work up technology systems such as
7 going ahead and making computer components
8 that -- trying to get U.S. and China involved
9 and so forth. It's still going on, but they
10 really haven't caught on yet at this point.
11   Q. Have you purchased securities since
12 the time you bought Biopure, AVTX and Soyo?
13   A. No.
14   Q. So you've purchased no securities from
15 then until now?
16   A. Right.
17   Q. Okay. And do you continue to hold
18 AVTX?
19   A. I still have that, yes. I have 10,000
20 shares of that, which is probably worth about
21 $2,000, and Soyo, I have -- sorry, AVTX is
22 100,000 shares, which is about 2,000; Soyo I
23 have about 10,000 shares, which is probably
24 worth about 3,000.

7 (Pages 22 to 25)

Ronald W. Erickson                                                                              05/30/2006

Page 26

1    Q.   And those are the same holdings you
2   had at the time you purchased them?  You didn't
3   buy more shares or sell any of them?
4    A.   Right.
5    Q.   What were they valued at when you
6   purchased them?
7    A.   I think I spent probably $6,000, and
8   they're worth probably five now.
9    Q.   So just to wrap up and be complete,
10  other than securities from your employers, the
11  only securities you've ever purchased were
12  Marvel, Biopure, AVTX and Soyo?
13   A.   Yes.  Now, I did have also from an
14  employer, my previous one from American Home, I
15  had stock options there which I've just went
16  ahead and cashed in.
17   Q.   Okay.  How many brokerage accounts do
18  you currently hold?
19   A.   Just one with Citicorp, one out of New
20  York and one out of Seattle.
21   Q.   Both Citi?
22   A.   Yes.
23   Q.   Does that include joint accounts?
24   A.   Yes.

Page 27

1    Q.   Are these accounts discretionary, do
2   you know?
3    A.   In what way?
4    Q.   Does your broker make decisions to
5   trade on your behalf?
6    A.   No.  It's not really a brokerage
7   account, it's money there that if I want to go
8   ahead they'll commit the transaction or
9   whatever, but they're not on an ongoing basis.
10   Q.   So all transactions would be directed
11  by you only?
12   A.   Yes.
13   Q.   Have you ever invested in commodities?
14   A.   No.
15   Q.   Mutual funds?
16   A.   No.
17   Q.   Limited --
18   A.   Other than maybe my retirement or
19  something like that that might have been put
20  into mutual funds.
21   Q.   What's the nature of your retirement
22  fund?
23   A.   401K.
24   Q.   Is that held through work?

Page 28

1    A.   Yes.
2    Q.   Do you know what the value of that is
3   now?
4    A.   Yes.
5    Q.   And could you tell me approximately
6   what it is?
7        MR. LONGMAN:  I'm going to object to
8   that.  I think -- why do you need to know that?
9        MR. BLANCHARD:  I can ask it.  Unless
10  you have a privilege basis, I just ask for an
11  answer.
12       MR. LONGMAN:  Could I confer one
13  second?
14       MR. BLANCHARD:  Sure.
15       And I should say as well that we can
16  make any of this confidential if you'd like.  If
17  you'd like to confer, and this is a time where
18  even though the question is pending, go ahead.
19       MR. LONGMAN:  That's why I'm asking.
20       (Whereupon, the witness and his
21  counsel conferred.)
22       MR. LONGMAN:  Okay.  I'd like to mark
23  this part of the transcript confidential related
24  to the question.

Page 29

1        MR. BLANCHARD:  Sure.
2    A.   ████████████████████████████
3   ████████████████████████████████████████
4   ████████████████████████████████████████
5   ████████████████████████████████████████
6   ████████████████████████████████████████
7   ████████████████████████████████████████
8   ████████████████████████████████████████
9   ██████████████████
10       BY MR. BLANCHARD:
11   Q.   Have you ever invested in mortgage
12  backed securities?
13   A.   No.
14   Q.   Bonds?
15   A.   No.
16   Q.   Debentures?
17   A.   No.
18   Q.   Futures?
19   A.   No.
20   Q.   Have you ever done puts?
21   A.   No.
22   Q.   Calls?
23   A.   No.
24   Q.   Options?

8 (Pages 26 to 29)

Page 30

1    A.  No.
2    Q.  Warrants?
3    A.  No.
4        MR. LONGMAN:  Objection.
5        Other than exercising options as he
6   described earlier?
7        THE WITNESS:  I presume.
8        MR. LONGMAN:  That wasn't the intent
9   of your question?
10       MR. BLANCHARD:  That wasn't the intent
11  of my question.  That was a good clarification.
12  Thank you.
13       BY MR. BLANCHARD:
14   Q.  Short sales?
15   A.  No.
16   Q.  The 401Ks you hold, are they invested
17  in mutual funds?
18   A.  I don't know.  They'd have an
19  assortment.  Usually they'll give you a schedule
20  as far as they'll diversify it, so some of it
21  might be in mutual funds.
22   Q.  Do you direct the purchases in the
23  401K at all?
24   A.  I'll just go ahead and give them

Page 31

1   percentages as to what direction and go from
2   there.
3    Q.  Okay.
4    A.  I don't pay close attention to it,
5   unless it's going the other way.
6    Q.  Me, too.
7        Do you recognize that investments in
8   stocks issued by companies involve certain
9   risks?
10   A.  I do now.
11   Q.  Was there a time when you did not
12  believe that they involved risks?
13       MR. LONGMAN:  Objection.
14       But you can answer.  Objection, but go
15  ahead and answer.
16   A.  I believe if you did enough research
17  on certain things and everything was brought
18  across truthfully in the research that you were
19  looking at, that there was a good chance that
20  you could do well at the stocks as far as buying
21  and selling.  The issue is to the extent that
22  that's your responsibility, going ahead and take
23  it.
24       Whereas if it's not true or there's

Page 32

1   information that's not given, that you can rely
2   your judgment on, then that's a risk which I
3   don't feel I'm responsible for.
4        BY MR. BLANCHARD:
5    Q.  Do you believe that all companies are
6   equally risky assuming full disclosure of
7   information?
8    A.  No, not with the securities.  Usually
9   if they abide by the rules and the laws, then
10  most cases that it's not as risky as it is at
11  times.
12   Q.  I'm sorry.  I'll just try to get
13  clarification.
14       Do you believe that some companies are
15  riskier than other companies, even assuming that
16  they're all giving full disclosure?
17       MR. LONGMAN:  Would you mind just --
18  I'm having trouble, what do you mean by
19  "riskier"?
20       Do you understand what he means?
21   A.  I think, okay, that's why, okay, if
22  you're going to go into a commodity or something
23  else, or you're going to go ahead and take a
24  risk on buying a future, or going ahead and

Page 33

1   looking at something that's high risk like penny
2   stock or something like that, yes, you're taking
3   a risk on it.
4        I mean I knew that for short dollars
5   buying AVTX and Soyo, that was a small amount of
6   change for the risk that could be there.  But to
7   go ahead and look at it for Biopure, for
8   instance, I went into it as open, looking at all
9   the information, that I ended up going ahead and
10  catching on, and with that judgment call I felt
11  I made a good judgment call for the information
12  that I had.  And we'll go into that later.
13       But it's a situation that I felt that
14  was not a risky product at that time to go into
15  compared to any -- a lot of other things that
16  are risky.
17       BY MR. BLANCHARD:
18   Q.  What sorts of stocks would you
19  consider to be high risk?  When I talk about
20  "risk," to clarify I mean good chance of losing
21  your money.  Are there categories of stocks you
22  believe are risky?
23       MR. LONGMAN:  Objection.
24       I don't believe he said there were any

Page 34

1  that were high risk.
2        But you can answer.
3     A.  Stock that you can't get information
4  on, stock that is just somebody tells you to go
5  ahead and you should invest in this without
6  knowing what it's about, that's a risky
7  situation if you haven't done your homework on
8  it.  As far as you've got AAA, you've got AA,
9  it's a matter of what you want to go ahead and
10  take in your risk.
11    BY MR. BLANCHARD:
12    Q.  Do you believe that some companies,
13  even with full disclosure of all information,
14  their stock price might still decline?
15    A.  It can decline minimally, yes.
16    Q.  Could they lose significant value even
17  with full disclosure of information?
18    A.  I doubt it.
19    Q.  What about small companies; do you
20  know what a small cap company is, what's
21  referred to generally as a small cap company?
22    A.  What's a small cap company?
23    Q.  So a company with small
24  capitalization, meaning they don't have a lot of

Page 35

1  money in the market invested in them, a start-up
2  company.
3        Let's take an Internet start-up
4  company, for instance, would that be a riskier
5  investment than, say, IBM?
6     MR. LONGMAN:  You're talking about
7  Internet start-up versus a small cap company?
8     MR. BLANCHARD:  No, I'm sorry.  I'm
9  being terribly unclear.
10    MR. LONGMAN:  You used both terms, so
11  I just want to be clear.
12    A.  You know that IBM is a company that
13  you can invest in and not take too much of a
14  loss because it's going to bounce back or it's
15  going to stay stable, it doesn't have probably a
16  great risk of increasing your money, but if you
17  want to put your money into it you know it's
18  going to be somewhat stable and it's a good
19  holding pattern for you to go ahead and put it
20  into.
21        If you're going to go into another
22  smaller company that might be --
23    MR. LONGMAN:  This is not his
24  question, I don't think.

Page 36

1     MR. BLANCHARD:  I think he is
2  answering my question.  We can -- I'll try to
3  get some clarification.
4     BY MR. BLANCHARD:
5     Q.  But my question is; would investing in
6  IBM, assuming full disclosure, be any riskier
7  than investing in a small Internet start-up
8  company?
9     MR. LONGMAN:  Okay.
10    A.  It would be less risky.
11    BY MR. BLANCHARD:
12    Q.  Why would it be less risky?
13    A.  Because it has a sound background and
14  history, and it's a bigger corporation, so they
15  have to go ahead and divulge -- most of the
16  information that comes through is correct and
17  true.
18    Q.  And I guess by contrast; with a small
19  company, why would that be more risky?
20    A.  A smaller company, it all depends on
21  what the situation is, and as far as if they're
22  going to make it.  If you're going to hit
23  Internet or anything else, if you go ahead,
24  somebody like Biopure where they have more so

Page 37

1  backing, where they have a substitute for blood
2  that can last on the shelf a lot longer than
3  your normal blood or plasma or anything else,
4  and if the military has an interest in it in
5  going ahead and looking at it that way, and you
6  look at all backing and you look at everything
7  that's coming through, that has a sound future
8  in it if everything is true that's being said
9  about it, and that's more so there.  That I
10  didn't feel as a risky situation as to what it
11  turned out to be.  There's no comparison to that
12  to new Internet business or anything else,
13  start-up as looking for money in that sense.
14    Q.  So in your view, Biopure, assuming
15  full disclosure, would be comparable to an IBM
16  investment?
17    A.  I would say that the risk of down side
18  would be a little bit more, but not that great,
19  but the up side would even be better than IBM.
20    Q.  Do you monitor your investments
21  currently?
22    A.  Yes, periodically.
23    Q.  What sources do you rely on to monitor
24  your investments?

10 (Pages 34 to 37)

Page 38

1     A.   The Internet.
2     Q.   What on the Internet do you rely on?
3     A.   I go into where the stock is, what it
4  traded for that day.
5     Q.   Do you read anything other than the
6  stock price?
7     A.   I'll go into it if it went down or up,
8  I'll go into it to see if there's any news on
9  the stock itself.
10    Q.   Do you monitor news on the stocks
11  you're in otherwise, besides when there's a
12  change in the price?
13    A.   No.  The stock that I have right now,
14  it's Washington Mutual's or AVTX.  In that sense
15  I have no need to otherwise do that.
16    Q.   Do you read any of the financial
17  press?
18    A.   Yes.
19    Q.   Do you read -- what do you read?
20    MR. LONGMAN:  Today?  Today we're
21  talking about?
22    MR. BLANCHARD:  Sure, currently.
23    A.   I'll look at Wall Street Journal
24  occasionally, I'll go ahead and look what the

Page 39

1  stock market did, what it did that day.
2     BY MR. BLANCHARD:
3     Q.   Do you read any other financial press?
4     A.   No, not really.
5     Q.   In the past did you read financial
6  press?  "In the past" meaning from when you
7  bought Biopure forward.
8     A.   I read financial press, Finance Today,
9  when I was travelling around a lot I'd read that
10  on the plane, Wall Street Journal.  I'll go on
11  the Internet and go ahead and look up to see
12  what's going on with that product or whatever
13  else, the history of what's going on, look for
14  conference calls or anything else that might be
15  coming up.
16    Q.   Do you have subscriptions to any
17  financial magazines or newspapers?
18    A.   No.  You can find them anywhere.
19    Q.   You mentioned the Internet before.
20  What services do you use to monitor investments
21  on the Internet?
22    A.   AOL.
23    Q.   Do you go to Dow Jones Newswire?
24    A.   I'll go to different things, I'll look

Page 40

1  at financial end of what AOL gives me, I'll go
2  to bigcharts.com.
3     MR. LONGMAN:  He asked you if you go
4  to Dow Jones Newswire.
5     A.   No.
6     BY MR. BLANCHARD:
7     Q.   What sites do you go to on the
8  Internet to monitor your investments?
9     A.   I think I just told you.
10    Q.   Tell me again, please, just so I can
11  be sure.
12    A.   The financial part of aol.com and also
13  bigcharts.com.
14    Q.   Any others?
15    A.   Yahoo.com, Yahoo Finance.
16    Q.   Any others?
17    A.   No.
18    Q.   At the time you purchased Biopure, did
19  you go to the same sites?
20    A.   Yes.
21    Q.   Any others?
22    A.   No.
23    Q.   How often do you go to those sites?
24    A.   Then or now?

Page 41

1     Q.   Then.
2     A.   Then, quite often then.
3     Q.   How often is "quite often"?
4     A.   Probably every day or every other day.
5     Q.   And now?
6     A.   Now, probably twice a week.
7     Q.   Do you watch financial news on TV?
8     A.   Sometimes.
9     Q.   What shows do you watch?
10    A.   Just the Dow Jones news sometimes or
11  whatever else.  Very rarely.
12    Q.   At the time that you invested in
13  Biopure, did you watch financial news on TV?
14    A.   No, more so through the Internet.
15    Q.   Do you ever get information from Citi
16  about your stocks?
17    A.   No.
18    Q.   Any other brokerage firm?
19    A.   No.
20    Q.   Do you ever read analyst reports?
21    A.   I may have through the Internet.
22    Q.   When you purchased -- well, do you
23  discuss your securities purchases with anyone?
24    A.   No.  My wife, occasionally at times,

11 (Pages 38 to 41)

Ronald W. Erickson

Page 42

1  whatever. I don't make that many purchases
2  anymore.
3      Q.  Does she have input into whether or
4  not you purchase securities?
5      A.  Not really, no.
6      Q.  Did she have any input into whether
7  you purchased Biopure?
8      A.  Not at that time, no.
9      Q.  Did that change at some point?
10     A.  No, not really. It's just to the
11 point where that was drastic enough to the point
12 where going ahead that way, she knows that I'm
13 -- no.
14     Q.  Well, I'm confused. I'm sorry.
15         Did she start having an impact on your
16 decision-making with respect to Biopure at some
17 point?
18     A.  No.
19     Q.  Have you ever asked any lawyers other
20 than your wife for investment advice?
21     A.  No, and I don't ask her for investment
22 advice either.
23     Q.  Do you ask anyone, or have you ever
24 asked anyone for investment advice?

Page 43

1      A.  I've spoken to people as far as going
2  on investments, but never investment advice as
3  far as going ahead that way. If I call
4  CitiGroup or something like that, I'll ask them
5  on certain things or whatever else, we'll talk a
6  little bit. But other than that, no.
7      Q.  What would you ask of Citi with regard
8  to an investment decision?
9          MR. LONGMAN: Are we asking
10 hypothetically what he asked?
11         BY MR. BLANCHARD:
12     Q.  In the past, in the past what have you
13 asked of Citi?
14         MR. LONGMAN: Specifically what have
15 you asked, if you recall.
16     A.  Have they heard any news other than
17 what I've gotten off the Internet or whatever
18 about a certain stock or something like that.
19         BY MR. BLANCHARD:
20     Q.  Anything else?
21     A.  No.
22     Q.  Did you ask Citi about your investment
23 in Biopure?
24     A.  Yep.

Page 44

1      Q.  Do you recall what you asked?
2      A.  My estimate they -- I think that may
3  have said that they had no knowledge on the
4  negative end, that it was -- or so they looked
5  into it for me and said that they found, well,
6  more so of what I knew already as far as going
7  ahead and -- about the product, what it was
8  developed for, and the uses what it could do in
9  the future. But they didn't see any negative
10 down side on it in the sense of other than a
11 smaller company, they had a very good product
12 that they could bust loose on.
13     Q.  Do you recall who you spoke to at Citi
14 who told you those things?
15     A.  John Sorenson.
16     Q.  Who was he?
17     A.  He works at Citi.
18     Q.  Do you know what his position is
19 there?
20     A.  Not off the top of my head. I'd say
21 he's either -- he's a vice-president, I believe,
22 might be a senior VP.
23     Q.  Were you speaking with him in his work
24 capacity or as someone you know, just someone

Page 45

1  you know?
2      A.  Work capacity.
3      Q.  Do you know, where is he located?
4      A.  New York. He used to be at Smith
5  Barney, he used to be, and then went over to the
6  -- under the CitiGroup umbrella.
7      Q.  At the time you purchased Biopure, was
8  he with Smith Barney or Citi at that point?
9      A.  Probably both. It was Smith Barney
10 under Citi, CitiGroup, in that sense, I think, I
11 believe.
12     Q.  How did you meet John Sorenson?
13         Am I getting his name right, John
14 Sorenson?
15     A.  Yep.
16         I've never met him. I had -- I was
17 given his name through a boss of mine that I had
18 at Great Western when we were going --
19 consolidating some stock options. Everything
20 from my purchase with Washington Mutual prior to
21 that, went ahead, and he referred him over that
22 he'd be a person to go ahead and take the stock
23 options over and work that way.
24         So that's how -- because Smith Barney

12 (Pages 42 to 45)

Ronald W. Erickson                                                    05/30/2006

Page 46

1    was an affiliate kind of with Great Western at
2    the time, similar to what Harris Group was with
3    Washington Mutual later on.
4        Q.   Now, who is Harris Group again?
5        A.   Harris Group is a -- in Washington
6    Mutual you have a 401K.  Within that you cannot
7    purchase stock or sell stock unless you take a
8    portion of your money and put it over into
9    Harris Group and then utilizing them to be able
10   to do that.
11       Q.   Did you utilize Harris Group to
12   purchased Biopure stock?
13       A.   Yes.
14       Q.   Did you speak with anyone at Harris
15   Group at the time that you purchased Biopure
16   stock?
17       A.   No, I did not.
18       Q.   So John Sorenson is the only
19   individual you spoke to about Biopure at the
20   time of your purchase?
21       A.   Mm-hmm, other than what I got off the
22   Internet.
23       Q.   Do you recall what you asked John
24   Sorenson about Biopure?

Page 47

1        A.   I just asked him if he'd heard
2    anything else other than what I'd been getting
3    off the Internet and so forth, it's a local firm
4    out of Cambridge, Massachusetts.  And as far as
5    going ahead, I gave him the history on it, and
6    he said he'd do some research, see if there's
7    any negative feedback on it, and there wasn't.
8        Q.   Do you recall when that conversation
9    took place?
10       A.   Prior to me purchasing the stock.
11       Q.   So you gave him some information, if
12   I'm getting this straight?
13       A.   I said this is what I hear, what I've
14   read off the Internet about it, so forth.  At
15   that point in time went ahead and ended up just,
16   when I was doing the stock options, going ahead
17   and selling the stock options.  I said "well,
18   I'm looking to go ahead and do this, can you
19   check in to see if there's anything else other
20   than what I already know about Biopure?"
21       Q.   Do you recall what you told him about
22   what you had learned from the Internet regarding
23   Biopure?
24       A.   I believe I just told you that

Page 48

1    earlier.
2        Q.   I'm sorry.  I'm just trying to ask it
3    in the context of this discussion and break it
4    down a little bit.
5            And this isn't a question, it's a
6    statement, I don't mean to be repetitive, but
7    sometimes you'll give an answer that maybe is a
8    little general and I'll try and narrow it down.
9    So I'm not here to pester you about it.
10       A.   Okay.
11       Q.   So do you recall specifically what you
12   had told him about Biopure?
13       A.   That it was a company that was
14   developing a substitute for blood and plasma
15   that could last on the shelf without being
16   frozen or anything else, and it could go ahead
17   and be probably six times the time period, I'm
18   not sure about the time period, but it was quite
19   long, probably eighteen months or whatever it
20   lasts on the shelf, it might be longer, that the
21   military was interested in it, and utilizing it,
22   it was going under testing.  There was no
23   negative views that I saw at all in the testing
24   or anything else like this.  It was coming up

Page 49

1    for FDA approval, and there was nothing negative
2    on that at all as far as saying that it was
3    being halted or anything.  And I said it's
4    something, if I was going to invest into
5    something other than just for the sake of making
6    money, I wanted to invest in something that was
7    for good will, too.
8        Q.   At that point did he respond, or did
9    he say he'll get back to you?
10       A.   He said he'd check into it and see if
11   he came up with anything else other than what I
12   came -- found or saw.
13           And he came back and said "there's
14   nothing there that I can see that would be on a
15   negative note."  He said "it seems like they're
16   a good company to get into.  Knowing it's a
17   smaller company that you end up -- there's
18   always risk here and there, but from what it is,
19   there's no down side as far as any
20   notifications, anything that's in a negative
21   site" as far as what they've heard.
22       Q.   What do you mean by "notifications"?
23       A.   Say, for instance, that their testing
24   was inappropriate or anything like this, they

13 (Pages 46 to 49)

Ronald W. Erickson                                                    05/30/2006

Page 50

1  were putting a hold on anything, there was
2  nothing out there in that sense.  The only thing
3  that you could find was good news as far as the
4  product.
5     Q.  So when you decided to purchase
6  Biopure, you did your own research on the
7  Internet and you spoke with John Sorenson.
8        Did you do anything else before
9  purchasing Biopure stock?
10    A.  No.
11    Q.  And then based on your research and
12 that conversation with Mr. Sorenson, you
13 purchased Biopure stock?
14    A.  Yes.
15    Q.  Did you read any documents, prior to
16 your purchase of Biopure stock, did you read any
17 Biopure documents filed with the SEC, the
18 Securities & Exchange Commission?
19    A.  No, I didn't.
20    Q.  Do you recall reading any of Biopure's
21 press releases?
22    A.  I read some press releases as far as
23 what --
24        MR. LONGMAN:  Is this prior to his

Page 51

1  purchase?
2        MR. BLANCHARD:  Yes, all prior to the
3  purchase of Biopure.
4     A.  Mm-hmm.
5        BY MR. BLANCHARD:
6     Q.  You read some --
7     A.  What I got off the Internet were
8  probably some press releases.
9     Q.  Do you recall what else you got off
10 the Internet regarding Biopure before you
11 purchased it?
12    A.  I read where there was some
13 recommendation on the Internet going ahead and
14 stating eight different companies that were out
15 there, and had Biopure as one of them that was a
16 very good buy to go ahead, and what it did and
17 what the purpose of the -- function of its
18 product, everything.
19    Q.  Do you recall where on the Internet
20 you saw that?
21    A.  I think it was either -- one of the
22 financial things that I pulled up.
23    Q.  Do you have a copy of that?
24    A.  I believe it was -- I might have a

Page 52

1  copy of it.  It's filed away, I think,
2  somewhere.  I think I might have --
3        MR. LONGMAN:  We would have produced
4  it.
5        BY MR. BLANCHARD:
6     Q.  Do you keep a file on Biopure?
7     A.  I have a file that has Biopure stuff
8  in it.  I threw half of it out because when I
9  did take a bath in it I went ahead and ended
10 up -- went ahead and tossed half of it out.  So
11 I still do have --
12    Q.  When Biopure stock price dropped, you
13 threw out some of the file on Biopure, is that
14 correct?
15    A.  Yes.
16    Q.  Do you know, was that before or after
17 you became a Plaintiff in this litigation?
18    A.  That was before.
19        MR. LONGMAN:  Do you want to take a
20 break at some point?  We're okay.  Are you okay?
21        MR. BLANCHARD:  Actually now is
22 probably a good time for a minute if you want to
23 break.  I could use a minute.
24        MR. LONGMAN:  Okay.

Page 53

1        (Whereupon, a recess was taken from
2  2:02 p.m. to 2:17 p.m.)
3        BY MR. BLANCHARD:
4     Q.  We're back on the record.
5        Mr. Erickson, I think you mentioned
6  before you have two separate Citi accounts, is
7  that true?
8     A.  Yes.
9     Q.  One in Seattle, one in New York?
10    A.  Yes.
11    Q.  What stock -- is the same stock held
12 in both accounts?  Why do you have two?
13    A.  I have 3,300 shares in Washington
14 Mutual in Seattle with cash.  And then in
15 CitiGroup I have probably a small amount of
16 shares in Washington Mutual, I'm not sure how
17 many, probably, I don't know, a few hundred, and
18 then the rest in AVTX and Soyo and then cash.
19    Q.  I'm sorry, that's all in Seattle?
20    A.  No, that's in New York.
21    Q.  Okay.
22    A.  The only thing in Seattle is
23 Washington Mutual stock of 3,300 shares plus
24 cash.

14 (Pages 50 to 53)

Ronald W. Erickson

05/30/2006



Page 54

1    Q.   Thank you.
2         MR. LONGMAN:  The Biopure, it's in the
3    New York.
4    A.   That was in New York.
5         BY MR. BLANCHARD:
6    Q.   Biopure is in New York?
7    A.   Yes.
8    Q.   Did any of your family members ever
9    purchase Biopure stock?
10   A.   No.
11   Q.   When you first purchased Biopure
12   stock, did you think you'd ever be a Plaintiff
13   in a lawsuit against Biopure?
14   A.   No.
15        (Whereupon, Exhibit 1 was marked for
16        identification.)
17        BY MR. BLANCHARD:
18   Q.   The court reporter has just provided
19   you with a document marked Exhibit 1, it's got a
20   sticker on it and it says Exhibit 1.  That's how
21   we identify documents in these depositions by
22   their number.
23        Do you recognize this Exhibit 1 before
24   you?

Page 55

1    A.   I do.
2    Q.   What is it?
3    A.   It's my certification saying that I
4    had purchased Biopure stock.
5         MR. LONGMAN:  Can I just ask, can you
6    maybe read the Bates numbers?
7         MR. BLANCHARD:  Sure.
8         BY MR. BLANCHARD:
9    Q.   Actually you also notice in the bottom
10   right-hand corner sideways there's a little
11   marking indication there that says
12   "confidential, RWE 0026."
13   A.   Mm-hmm.
14   Q.   That's referred to as a Bates number.
15   A Bates number is a stamp that gets put on a
16   page when you're in litigation so people can
17   always refer to a document and know the same
18   exact -- know they'll deal with the same number.
19   This document has a Bates number range of 26
20   through 29 for the record.
21        And I'm sorry, so what is this
22   document again?
23   A.   It's my certification showing that I
24   bought Biopure.

Page 56

1    Q.   Is all the information in this
2    document true, to the best of your knowledge?
3    A.   Yes.
4    Q.   According to this Exhibit 1, your
5    first purchase of Biopure was on May 16th, 2003,
6    is that correct?
7    A.   Yes.
8    Q.   And you purchased Biopure shares again
9    on May 29th, 2003, correct?
10   A.   Right.  Yes.
11   Q.   And then again on May 30th, 2003,
12   correct?
13   A.   Correct.
14   Q.   Do you recall the total number of
15   shares that you purchased?
16   A.   Total as a group was, I believe,
17   75,000 shares.  There was 25, I believe, out of
18   -- that was what came -- okay.  Yes.  75,000.
19   Q.   And did you ever purchase any shares
20   of Biopure that were not reflected on this
21   Exhibit 1?
22   A.   No.
23   Q.   When did you -- excuse me.
24        Did you ever sell any shares of

Page 57

1    Biopure?
2    A.   Yes.
3    Q.   When?
4    A.   I can't remember.  I think, I believe
5    I have it in the records there I gave you.  I
6    don't own them anymore.  I sold them in 2004.
7    Q.   You sold all of your Biopure stock in
8    2004?
9    A.   (Nodding in the affirmative).
10   Q.   Do you recall when in 2004 you sold
11   it?
12   A.   No.  I believe I gave you those
13   records.  I don't remember.
14   Q.   Did you sell all your shares in one
15   day?
16   A.   I believe I tried to sell most of my
17   shares in one day.  In this I might have sold
18   separately the Harris Group and the CitiGroup at
19   different times.  I think I held the Harris
20   Group longer than I did on the CitiGroup.
21   Q.   Do you know how much longer you held
22   them?
23   A.   Not off the top of my head.  It might
24   have been three, four months.

15 (Pages 54 to 57)

Ronald W. Erickson                                                    05/30/2006

Page 58

1    Q.   Your first purchase of Biopure was on
2  May 16th, 2003.  When did you start looking at
3  Biopure as a potential investment?
4    A.   It was probably a month before that,
5  or it might have been two months before that.
6    Q.   When you sold your Biopure stock, did
7  you take a loss on the sales?
8    A.   Definitely.
9    Q.   Do you know approximately how much you
10  lost?
11    A.   I believe it was probably around
12  $250,000.
13    Q.   Could you describe for me your
14  relation to this litigation?
15    MR. LONGMAN:  Objection.  That's sort
16  of a vague question.
17    But if you can answer.
18    A.   As to --
19    BY MR. BLANCHARD:
20    Q.   You can answer it.
21    A.   What do you mean by my --
22    MR. LONGMAN:  Why don't you ask a more
23  specific question.
24    MR. BLANCHARD:  Well, I'll get an

Page 59

1  answer to that one first, and if he can't
2  understand it then I'll ask one.  Thank you.
3    MR. LONGMAN:  Do you understand the
4  question.
5    A.   You mean -- well, I'm lead Plaintiff.
6    BY MR. BLANCHARD:
7    Q.   Okay.
8    MR. LONGMAN:  What is your role?
9    A.   My role is to --
10    BY MR. BLANCHARD:
11    Q.   Actually I'm asking the questions, and
12  that's not the one I want to ask now, all right?
13    MR. LONGMAN:  It was just vague.
14    A.   I'm not sure what the question was.
15  If that's what you meant for what I answered,
16  fine.
17    BY MR. BLANCHARD:
18    Q.   That's fine.
19    If there's ever a point I ask a
20  question and you don't know what I asked, just
21  let me know and I'll clarify it.  I'm happy to
22  clarify any question.
23    A.   Could you clarify?
24    Q.   Yes.

Page 60

1    Are you aware that there's litigation
2  pending against Biopure?
3    A.   Pretty much so.
4    Q.   And your role is a lead Plaintiff in
5  that litigation, correct?
6    A.   Yes.
7    Q.   Who are the Defendants in that
8  lawsuit?
9    A.   I don't have the names off the top of
10  my head right at the moment.
11    Q.   Do you recall any of them other than
12  Biopure?
13    A.   If you read them to me, I would, yes.
14    Q.   Do you know what roles those
15  Defendants play in the litigation?
16    A.   Pretty much so.
17    Q.   What?
18    A.   They were the controlling entity of
19  the company as far as the point in time where I
20  had purchased stock with the company.
21    Q.   Are you aware that this is a class
22  action?
23    A.   Yes.
24    Q.   And what's your understanding of what

Page 61

1  a class action is?
2    A.   Well, it's more so as far as it's
3  litigation for a group of people against
4  something, a concern that more so hasn't been
5  abiding by the laws that govern them.
6    Q.   When did you decide to bring this, to
7  serve as a Plaintiff in this action?
8    A.   When I was going into the Internet
9  looking at things and I saw, read that there was
10  a class action suit being brought up and so
11  forth at that point in time.
12    Q.   Do you recall when that was?
13    A.   Not off the top of my head.  I believe
14  I was looking into it at that time, and that's
15  where I saw a few law firms that were taking
16  action, and that's when I ended up calling the
17  firm that Howard is at.
18    Q.   Can you approximate by quarter of
19  year, month of year?
20    A.   First quarter.
21    Q.   Of?
22    A.   Probably 2004.
23    Q.   Why did you decide to participate in
24  this action?

16 (Pages 58 to 61)

Page 62

1    A.   Because I had taken a healthy loss,
2  and I felt that I was misled through the whole
3  process as far as what was put in the press and
4  what was given on anything that I could check
5  into the company on.
6    Q.   Did you think of any alternatives or
7  consider any alternatives to bringing a lawsuit?
8    A.   I considered as far as going ahead and
9  going individually or as a group, class action,
10  yes.
11    Q.   Why did you ultimately decide to be
12  part of a class action?
13    A.   Because I felt that I was not the only
14  one that got hurt.  And as far as going ahead,
15  where I went into Biopure for not only to go
16  ahead and make a good deal of money off of my
17  investment, but also because I felt it was going
18  to offer something good to society as far as
19  going ahead and helping different areas in the
20  medical industry, and going into a class action
21  suit or myself, I can walk away from it getting
22  benefited myself and going ahead that way, but I
23  had taken a loss, I knew a lot of other people
24  did, and I felt that class action would be the

Page 63

1  best way to go ahead and get it satisfied and
2  help everybody that got a loss in that sense.
3    Q.   Do you know the size of the class?
4    A.   No, I don't.
5    Q.   Is there a class period?
6    A.   The size of the class, I think that's
7  -- my attorney's keeping abreast of things that
8  would be --
9    Q.   Do you know what a class period is?
10    A.   A class period?
11    Q.   Yes.
12    A.   Are you talking about the period of
13  time from when it's filed to the point in time
14  that it's approved and going ahead that way?
15    Q.   I'm asking; have you ever heard that
16  term "class period" before?
17    A.   No.  Unless you can give me some idea
18  of what you're talking about.  I know some other
19  terminology on it.
20    Q.   Well, who are members of the class
21  that's suing Biopure?
22    A.   The people who invested into Biopure
23  during the period of time that they went ahead
24  and -- well, let's say from probably April 9th

Page 64

1  to December 24th is the period where it was
2  taken, that whoever invested in that period and
3  did not make a gain, which I could have easily
4  gotten out of it that August and make a gain and
5  I did not, those people aren't going to be
6  affected as much if they made a profit out of it
7  and walked away.
8      The people that invested prior to
9  those dates, then they went in to the point
10  where you're going ahead into the time period
11  that I mentioned, within that period of time go
12  ahead, things were said that misled a lot of the
13  people that were purchasing at that point, and I
14  believe that's the group of people that are
15  covered under that.
16    Q.   Do you know what the possible damages
17  -- I'm sorry.
18      Do you know what damages are in terms
19  of this litigation?
20    MR. LONGMAN:  Did you say "damages"?
21    MR. BLANCHARD:  Yes.
22    BY MR. BLANCHARD:
23    Q.   I don't mean to ask you, it could
24  sound like a silly question, but are you

Page 65

1  familiar with the concept of damages?
2    A.   I know what damages I incurred.
3    Q.   So I think you have a sense.
4    A.   I have a sense of everybody else's
5  that went into the investment loss.
6    Q.   Define "damages," the damages you
7  incurred.
8    A.   Loss of money, loss of future, I'd say
9  stress.  There's a full category of things that
10  you could say.
11    Q.   And what damages are you seeking in
12  this litigation recovery for?
13    A.   Retribution for everyone within that.
14    Q.   What's the nature of that retribution?
15  What do you mean by "retribution"?
16    A.   To feel satisfied that -- recover some
17  damages for everyone --
18    Q.   Do you mean --
19    A.   -- that's effected.
20    Q.   Do you mean monetary damages?  Do you
21  mean payment of money?
22    A.   That can be part of it, yes.
23    Q.   What else could be a part of it?
24    A.   I'd say could be money, could be

17 (Pages 62 to 65)

Ronald W. Erickson

05/30/2006

Page 66

1 stock, could be -- not sure what else. I'd have
2 to talk to my attorneys on that.
3     Q.  Sure.
4         The value of the money in the stock
5 and whatever else that could be paid in
6 damages -- I guess I'll strike that and start
7 over.
8         For what injuries are you seeking
9 damages in this litigation?
10    A.  What injuries?
11    Q.  Yes.  You said earlier, I'm sorry --
12    A.  I'm not looking to --
13        MR. LONGMAN:  Let him finish talking
14 before you talk.
15        BY MR. BLANCHARD:
16    Q.  You said earlier that you lost money?
17    A.  Mm-hmm.
18    Q.  And then you said that there was
19 stress involved, you know, some pain and anguish
20 involved?
21        MR. LONGMAN:  I don't think those were
22 his words.
23        BY MR. BLANCHARD:
24    Q.  And those probably weren't your words,

Page 67

1 but you said something to that effect, and you
2 can rephrase it all you like because I'm not
3 trying to put words into your mouth.
4         But out of those -- I consider those
5 injuries, so when I say the word "injuries"
6 that's what I mean.
7     A.  Okay.
8     Q.  If I'm being vague, I'm sorry.
9         But for those injuries, out of those
10 injuries, you know, what are you seeking damages
11 for?
12        MR. LONGMAN:  I don't understand the
13 question.
14        BY MR. BLANCHARD:
15    Q.  Are you seeking to be paid money on
16 behalf of the class for your stress involved
17 with this litigation?
18    A.  Well, my loss and stress.
19    Q.  So your loss being your financial
20 loss, correct?
21    A.  Mm-hmm.
22    Q.  And the stress being --
23    A.  Of that loss, of the cause of the
24 loss.

Page 68

1     Q.  So you're seeking damages for the
2 stress as well?
3         MR. LONGMAN:  Objection.
4         He didn't say that.  That's not what
5 he said.
6         BY MR. BLANCHARD:
7     Q.  You can answer.
8         MR. LONGMAN:  Are you seeking damages
9 for the stress?
10    A.  The cause of the stress.
11        BY MR. BLANCHARD:
12    Q.  The cause of the stress is what you're
13 seeking damages for?
14    A.  More so I'm seeking monetarily
15 compensation for the loss that I was incurred.
16    Q.  How would we measure the loss you were
17 incurred?
18        MR. LONGMAN:  Objection.
19        BY MR. BLANCHARD:
20    Q.  How would you measure the loss you
21 incurred?
22        MR. LONGMAN:  Personally?
23        MR. BLANCHARD:  Yes.  I want to know
24 what he wants out of this litigation.  And so I

Page 69

1 know he's looking for money, and I want to know
2 what that money represents.
3         BY MR. BLANCHARD:
4     Q.  So if you had ten shares of Biopure
5 and they were worth ten bucks each when you
6 bought them, and then you had to sell them at
7 five bucks each, we'd say that you lost $50
8 there.  Are you seeking money in excess of that
9 $50?
10    A.  If it costs me $50 to purchase it
11 initially, you're asking if I'm asking for more
12 money?
13    Q.  Are you seeking more money?  I'm not
14 trying to interrupt, I'm trying to get to the
15 point.  I realize it's a fuzzy concept I'm
16 dealing with, but are you seeking damages for
17 anything other than your out of pocket loss?
18    A.  I'd rather concur with --
19        MR. LONGMAN:  I just want to say do
20 you know what he means by "out of pocket loss"
21 before you attempt to answer that question?
22    A.  My out of pocket loss would be the
23 difference between what I purchased the stock
24 for and what I sold the stock for.

18 (Pages 66 to 69)

Ronald W. Erickson

05/30/2006

Page 70

1       MR. LONGMAN:  Correct.
2       BY MR. BLANCHARD:
3    Q.  Okay.
4    A.  Now, the thing is also, I'm looking at
5  going ahead, and I purchased the stock for
6  approximately five point -- $5.70 a share, say,
7  it got up to eight and a quarter in August
8  because of everything that was said about it,
9  there was no negativity at all, no nothing, that
10 was going up.  If I had known what was there, I
11 would have sold the stock then and there and I
12 would have made a profit, and it would have been
13 a large profit, but I didn't because the fact
14 that I held on to it, and at that point.
15      So as far as my loss could be from
16 what I purchased it for along with the gain,
17 then along with what I had to sell it for.  So
18 there's two losses, if I want to go ahead and
19 look at it as far as going ahead and taking the
20 portion of loss of the $250,000 that I lost or
21 the $400,000 that I lost, so I can look at it in
22 two different ways.
23   Q.  Okay.  And apart from that loss that
24 you just described, would you be seeking money

Page 71

1  damages, money payment for any other loss you
2  incurred, like the stress?
3       MR. LONGMAN:  Asked and answered.  I
4  think he answered that question.  I think he
5  answered the question.
6    A.  Any additional, I don't -- I don't
7  foresee that.  I mean it's a matter of going
8  ahead with -- it comes down to a monetary loss
9  in that sense, whatever stress or anything else
10 losses which is minute to the amount of loss
11 that I took monetarily.
12      BY MR. BLANCHARD:
13   Q.  I get that, and I'm just trying to be
14 precise.
15      But are you seeking compensation for
16 anything in addition to that monetary loss?
17      MR. LONGMAN:  Can I just say I think
18 what you're asking is are you seeking damages
19 for pain and suffering or mental suffering?
20      MR. BLANCHARD:  However he describes
21 it, sure.
22      MR. LONGMAN:  Whatever you want to
23 call the stress.
24      THE WITNESS:  Okay.

Page 72

1       MR. LONGMAN:  But I think he answered
2  that.
3       But if you can answer it again.
4    A.  I think if I was I would have done it
5  personally, not through the class action suit.
6       MR. BLANCHARD: .
7    Q.  So the answer is no?
8    A.  Yes.
9    Q.  Yes, the answer is no?
10      MR. LONGMAN:  He answered the
11 question.  You can't --
12      MR. BLANCHARD:  I can when I don't
13 have an answer yet.
14      MR. LONGMAN:  He said no.
15      MR. BLANCHARD:  He said yes.
16      MR. LONGMAN:  No.
17      MR. BLANCHARD:  He said just yes.  I'm
18 not going to argue about what he said.
19      BY MR. BLANCHARD:
20   Q.  Are you not --
21   A.  Okay.  As far as that, I'll leave that
22 open.
23   Q.  Okay.  Now, what do you mean by "leave
24 that open"?  I'm not trying to --

Page 73

1       MR. TUCCILLO:  Mike, if I may --
2    A.  Monetarily, yes, I am, I mean that's
3  what I want to go after.
4       BY MR. BLANCHARD:
5    Q.  Okay.
6    A.  As far as anything above and beyond
7  that through pain and anguish, mental exhaustion
8  or whatever else you want to call it, I want to
9  leave that open, I don't want to close the door
10 on that.
11   Q.  Okay.  Are you leaving that open on
12 behalf of the class?
13   A.  Yes.
14   Q.  Okay.  I'm doing my best so that none
15 of that pain and anguish arises from this day,
16 okay?
17   A.  Okay.
18   Q.  We started on this before; do you know
19 what it means to be a class representative or a
20 lead Plaintiff?
21   A.  Yes.
22   Q.  What, in your words, what does it mean
23 to be a lead Plaintiff?
24   A.  Well, you take responsibility to go

19 (Pages 70 to 73)

Ronald W. Erickson                                                    05/30/2006

Page 74

1   ahead and monitor your attorneys as far as
2   representing the class, looking over, making
3   sure that as far as how things are going,
4   keeping in contact with them as far as any
5   changes that occur, I'd say that look to the
6   best fulfillment for the team rather than just
7   for the individual.
8       Q.   Anything else?
9       A.   I think that's enough.
10      Q.   Other than your attorneys, have you
11  discussed your role as a lead Plaintiff with
12  anyone?
13      A.   No.  Unless you want me to put it in
14  the news.
15      Q.   I don't want you to do anything.
16      A.   Okay.
17      Q.   Do you know what it is that a person
18  has to demonstrate to a Court to represent a
19  class?  Do you know what standard -- strike all
20  that.  That's hopelessly vague.  I'm sorry.
21       Are you aware of whether a class has
22  been certified in this action or not as of yet?
23      A.   I think it will be.
24      Q.   And I should back up.

Page 75

1        Are you aware of what class
2   certification means as a legal term?  I don't
3   mean to throw around legal terms.
4       A.   As far as you're talking about the
5   Court order to approve the classification?
6       Q.   That's what I'm referring to.
7       A.   Okay.  That hasn't been done yet.
8       Q.   Okay.  Are you aware of any of the
9   requirements that a Court has to find have been
10  met to certify a class?
11      A.   We're going through them right now.
12       MR. LONGMAN:  Object.
13       BY MR. BLANCHARD:
14      Q.   Are you aware of them?
15       MR. LONGMAN:  Objection.  I think this
16  calls for a legal conclusion.
17       I'll let you answer the question.
18      A.   Yes.
19       BY MR. BLANCHARD:
20      Q.   And what are they?
21      A.   As far as going ahead with my
22  responsibility to go ahead and monitor as far as
23  every episode that goes on with the class, going
24  ahead and making sure that everything is

Page 76

1   followed, that my attorneys go ahead and make me
2   known as to what is going on, going ahead and
3   certifying as far as that once the class is
4   certified as far as what they're bringing about,
5   any changes that occur, anything else, they let
6   me know.  We go over them, we discuss, and any
7   changes that may occur that I say that this
8   would be better for the class or not, go ahead
9   and discuss that.
10       I take myself out as an individual and
11  look at as a group, and that's, well, in a vague
12  nutshell.
13      Q.   Who are your attorneys in this action?
14      A.   Two people that represent the firms
15  that are on my left, Howard and Matthew.
16      Q.   Okay.  And when did you first meet
17  your attorneys, or their law firms?
18      A.   Well, meet by talking or in person?
19       MR. LONGMAN:  Do you mean --
20       BY MR. BLANCHARD:
21      Q.   What's your first contact?  When was
22  your first contact with either firm?
23      A.   That was with Howard when I seen his
24  firm on the Internet as far as going a class

Page 77

1   action, and I went ahead and I contacted.  I
2   wanted a firm that was based in New York that
3   could cover the whole country in that sense.
4   And that way, I'd say, the first quarter of 2004
5   which we had mentioned earlier.
6       Q.   So sometime in that first quarter of
7   2004, you had considered suing Biopure, correct?
8       MR. LONGMAN:  Objection.
9        That's not what he said.  He said he
10  contacted his lawyers.
11       MR. BLANCHARD:  I'm asking him.
12       MR. LONGMAN:  Ask it as a question
13  rather than if he had already said it, that's
14  the way -- if you don't mind.
15       MR. BLANCHARD:  I asked it as a
16  question.  I don't want to argue about it.
17      A.   Before you asked the situation was
18  that I contacted them.
19        As far as when I contemplated going
20  class action suit, did I go ahead and
21  contemplate going personally, and yes, I did
22  contemplate before, as I said earlier.  But I
23  decided to go class action suit in this case,
24  and that's when I got back to Howard and said

Page 78

1  "yes, I'd be glad to go in the class action
2  suit, and I want to be lead Plaintiff."
3      Q.   Before you had any conversation with
4  Howard, it sounds to me like you were
5  considering suing Biopure, and you looked on the
6  Internet about doing that, is that correct?
7      A.   I looked on the Internet as far as
8  seeing that there were class action firms that
9  were going to go ahead and put in for a class
10  action suit.  At that point in time I was going
11  ahead and contemplating as to which direction I
12  was going to go in.
13      Q.   And that was in the first quarter of
14  2004?
15      A.   Yes, when the information was coming
16  out.
17      Q.   And what other law firms did you look
18  at on the Internet besides Mr. Longman?
19          MR. LONGMAN:  Objection.
20          There was no testimony he looked at
21  any other law firms.
22      A.   There were probably three or four on
23  the Internet.  I'm not positive, but I ended up
24  going ahead and just calling there.  I did not

Page 79

1  contact any others.
2          BY MR. BLANCHARD:
3      Q.   Do you recall who those law firms
4  were?
5      A.   No, I don't.
6      Q.   And so what did you see on Mr.
7  Longman's law firm that made you call them?
8      A.   I wanted somebody from New York that
9  was recognized over the country.  If I was going
10  to go in the class action suit, it wasn't going
11  to just be somebody from Boston that just knew
12  this locale and probably would have maybe -- be
13  slighted considering it was a Cambridge
14  operation, where New York, they're going to look
15  at the whole.
16          So when I contacted them, they were
17  very receptive and seemed to know like they had
18  their act on straight, so I stayed right with
19  that.
20      Q.   Do you recall what you saw on the
21  Internet site the first time you logged on
22  there?
23      A.   I think it was just notification
24  saying that there was evidence enough to go

Page 80

1  ahead and start class action proceedings, that a
2  couple of law firms that had decided to and go
3  forward, they felt it was worthwhile to get into
4  that.  So that's mainly -- I couldn't really
5  give you the definitive things that I read.
6          MR. LONGMAN:  Just read that last
7  question back?
8          (Whereupon, the reporter read back the
9  pending question.)
10          BY MR. BLANCHARD:
11      Q.   Actually that Internet site was what
12  site, do you recall?
13      A.   I don't recall.  It could have been
14  AOL Financial, could have been bigcharts.com,
15  not sure.  It could have been just going into
16  AOL and seeing as far as if the notification
17  came up there under the financial bracket.
18      Q.   So I guess you heard generally
19  somewhere on the Internet that there might be a
20  class action against Biopure, is that correct?
21      A.   Mm-hmm.
22          MR. LONGMAN:  Object to that.
23      A.   It could have.  I'm not sure which it
24  was, so yes.

Page 81

1          BY MR. BLANCHARD:
2      Q.   So what I want to know is; the first
3  time, did you log on to your attorney's law firm
4  site and learn about a possible action against
5  Biopure?
6      A.   No.  I logged on to a site, I logged
7  on to the financial end and saw the information.
8  I didn't know anything of Howard and his firm to
9  log on to their site.
10      Q.   Okay.  At some point did you?
11          MR. LONGMAN:  Did he what?
12          BY MR. BLANCHARD:
13      Q.   Know anything about Howard and his
14  firm to log on to his site?
15      A.   No.
16      Q.   Did you ever log on to his firm's
17  site?
18      A.   No.
19      Q.   How did you learn that your attorney's
20  firm would be involved in an action against
21  Biopure?
22      A.   Because that was on the Internet when
23  I went into the regular site, it gave certain
24  law firms that were going to go ahead and

21 (Pages 78 to 81)

Page 82

1 file --
2     Q.  Okay.
3     A.  -- for class action.
4     Q.  Do you recall whether it said they
5 were going to file or they had already filed?
6     A.  They were in the motion to file.
7     Q.  What did you do then?
8     A.  I determined that I was going to call
9 the firm in New York, which was Howard's, and
10 that's what I did.  I called them, went ahead
11 and ended up speaking with him.
12     MR. LONGMAN:  Well, I just want to at
13 this point just caution you not to disclose
14 anything about the substance of our
15 conversation --
16     THE WITNESS:  Right.
17     MR. LONGMAN:  -- as it may be governed
18 by the attorney/client privilege.  Bearing that
19 in mind, go ahead.
20     A.  I just spent some time talking with
21 him saying that I had invested into Biopure, I'm
22 reading up onto this.  So said I'd be interested
23 in --
24     MR. LONGMAN:  I'm going to object.

Page 83

1 I'm going to direct you not to disclose anything
2 that you said to me or that I said to you --
3     THE WITNESS:  Okay.
4     MR. LONGMAN:  -- during any of our
5 conversations.
6     A.  So within that discussion --
7     MR. LONGMAN:  What was the question
8 again?  Can you read the question?
9     (Whereupon, the reporter read back the
10 pending question.)
11     MR. LONGMAN:  Called his lawyer and it
12 has to stop there.  He said he contacted his
13 attorney.
14     A.  Made a decision to go.
15     BY MR. BLANCHARD:
16     Q.  Okay.  Did you contact any other law
17 firms?
18     A.  No.
19     Q.  How long did you talk that first time?
20     A.  I don't know.
21     Q.  Was anyone else present?
22     A.  Not that I was aware of.
23     Q.  Have you discussed this case with any
24 other lawyer?

Page 84

1     A.  No, other than my wife.
2     MR. TUCCILLO:  I'm sorry.  Did your
3 last question mean other than our firms, any
4 other lawyer than what?
5     MR. BLANCHARD:  My question was just
6 directed generally to did he discuss the
7 litigation with anyone --
8     THE WITNESS:  Outside of my attorneys.
9     MR. BLANCHARD:  Yes, any lawyers
10 outside of his attorneys.
11     MR. TUCCILLO:  Okay.
12     BY MR. BLANCHARD:
13     Q.  Are your attorneys being compensated
14 for their work in this litigation?
15     A.  No, other than satisfaction of the
16 class action.
17     Q.  They're going to receive no
18 compensation?
19     MR. LONGMAN:  That wasn't what you
20 asked.  You said are they being compensated now.
21     MR. BLANCHARD:  I did.  I said are
22 they being compensated for their work in this
23 litigation.
24     A.  Right now, no.

Page 85

1     BY MR. BLANCHARD:
2     Q.  Right now.
3     And will they in the future?
4     A.  All depends.
5     Q.  What does it depend on?
6     A.  If we win the class action, then they
7 will.
8     Q.  And is there a written agreement
9 addressing their compensation?
10     A.  As far as -- no.
11     Q.  There's no written agreement?
12     A.  No.
13     Q.  Is there an oral agreement addressing
14 how much they will be paid in the event there's
15 a recovery in this suit?
16     A.  How much they'll be paid, no.
17     Q.  Is there an oral agreement addressing
18 in any nature their compensation in the event
19 there's a recovery in the suit?
20     A.  Yes.
21     Q.  What is that agreement?
22     MR. LONGMAN:  This is actually -- this
23 is a privileged communication.  Without waiving
24 the privilege, I'm going to allow you to answer

22 (Pages 82 to 85)

Ronald W. Erickson

05/30/2006

Page 86

1  the question narrowly as it's stated.
2        Read the question back, please.
3        (Whereupon, the reporter read back the
4  pending question.)
5        A.  The agreement is that if the class
6  action is proved and satisfied, then that --
7  their compensation would be recommendation of
8  the Court to decide as to what their
9  compensation would be.
10       BY MR. BLANCHARD:
11       Q.  Are you familiar with the term
12 contingency fee?
13       A.  Yes.
14       Q.  Are your lawyers being -- if they're
15 to be paid, they'll be paid on a contingency fee
16 in this action?
17       A.  Yes.
18       Q.  Is there a percentage that's agreed
19 upon?
20       A.  No.
21       Q.  So --
22       A.  As I said, that would be determined by
23 the Court.
24       Q.  Okay.  In your view, what would be a

Page 87

1  fair percentage for the attorneys to be paid if
2  there's a recovery in this case?
3        A.  I can't answer that.
4        Q.  Why can't you answer that?
5        A.  Because I'm, at this point in time,
6  I'm not sure what would be fair.
7        Q.  Have you done any investigation as to
8  what might be a fair fee?
9        A.  Yes.
10       Q.  What was the nature of that
11 investigation?
12       A.  Seeing previous cases and so forth as
13 to what a normal fee would be in that regard,
14 and they range from anywhere from twenty percent
15 to 33 percent.
16       Q.  Do you think a fee over 33 percent
17 could be fair in this case?
18       A.  No.  But I think that's not a question
19 that should be asked at this point in time
20 because they're out of question -- well, go
21 ahead.
22       Q.  Do you think a fee of 33 percent would
23 be fair?
24       A.  As I said earlier, I'm not sure at

Page 88

1  this point in time.
2        Q.  But you know that a fee over 33
3  percent would be unfair?
4        A.  Yes.
5        MR. LONGMAN:  Objection.
6        A.  I mean, of course, as far as --
7        MR. LONGMAN:  There's no question.
8        A.  Go ahead.
9        BY MR. BLANCHARD:
10       Q.  Would the attorneys under the oral
11 agreement be paid anything other than a
12 percentage of a recovery?  In other words, would
13 they be paid for their expenses in this
14 litigation at all?
15       MR. LONGMAN:  Objection to the form of
16 the question.
17       MR. BLANCHARD:  I'll object to the
18 form of my own question.
19       BY MR. BLANCHARD:
20       Q.  Who will be responsible, you or your
21 attorneys, for paying costs associated with the
22 pursuit of this litigation?  For instance, your
23 attorney flew in from New York, I suppose.
24 Who's paying for that plane ride?

Page 89

1        A.  You did?
2        All depends on the satisfaction of the
3  case.
4        Q.  How so does it depend?
5        A.  Well, give me another question.
6        Q.  Well, you're telling me that I'm being
7  unclear?
8        A.  Yes.
9        Q.  All right.
10       A.  I don't want to answer with a run-on
11 sentence, as you know.
12       Q.  In the event that there's no recovery,
13 say you lose, who is paying for your attorney's
14 plane ride?
15       A.  I might pay a portion of it.
16       Q.  You said you might.  What will
17 determine whether you will or not?
18       A.  I think the outcome of everything.
19       Q.  Okay.  If the outcome is that there's
20 no recovery, you lose; who pays?
21       MR. LONGMAN:  Well, that was your
22 question, if we lose.  You said -- the question
23 was if we are not successful who is paying for
24 your plane ride, he said a portion of it.

23 (Pages 86 to 89)

Page 90

```
1        MR. BLANCHARD:  Really.
2        MR. LONGMAN:  That was your question,
3   now you're adding another.
4        MR. BLANCHARD:  He said "might," and I
5   really don't want editorializing anymore.
6        A.   I'll pay a portion of it.
7        BY MR. BLANCHARD:
8        Q.   You will pay a portion of it.
9             Is there an agreement as to how much
10  you'll pay?
11       A.   No.
12       Q.   How will it be determined how much?
13       A.   We'll have to discuss that.
14       Q.   Okay.  It's left to be determined?
15       A.   Yes.
16       Q.   Do you have any obligations, if
17  there's a class certified, do you have any
18  obligations to class members?
19       A.   Yes.
20       Q.   What are those obligations?
21       A.   Make sure that I've fulfilled the best
22  duties and compensation for the class as a
23  whole.
24       Q.   I'll break that down into two parts of
```

Page 91

```
1   your answer.
2             Okay.  The first thing you talked
3   about was best duties or duties to the class as
4   a whole.  What does that mean?
5        A.   As far as that I've done, accomplished
6   as much research as possible as far as making
7   sure that we're satisfied in a way that benefits
8   the group as a whole.
9        Q.   And the second part of your answer
10  related to compensation, I think.  What did you
11  mean by that?
12       A.   Making sure that the group as a whole
13  is compensated the best possible amount that we
14  could get.
15       Q.   Does the amount that the attorneys are
16  paid on behalf of Plaintiffs in this litigation
17  affect your duties to class members?
18       MR. LONGMAN:  Objection.
19            You can answer.
20       A.   It could.
21       BY MR. BLANCHARD:
22       Q.   How could it?
23       A.   Well, as we said earlier, as far as
24  the percentage going ahead, say the attorneys
```

Page 92

```
1   take 25 percent rather than 30 percent, that's
2   five more percent that goes to the class.
3        MR. BLANCHARD:  Can I take five
4   minutes?
5        MR. LONGMAN:  Sure.
6        (Whereupon, a recess was taken from
7   3:04 p.m. to 3:19 p.m.)
8        BY MR. BLANCHARD:
9        Q.   One question going back, I forgot to
10  ask, when you initially purchased shares of
11  Biopure and you had a conversation with Mr.
12  Sorenson, do you recall that conversation we
13  had?
14       A.   Yes.
15       Q.   And did you rely at all on the
16  information that Mr. Sorenson provided to you?
17       A.   He didn't really --
18       MR. LONGMAN:  Objection.
19       A.   -- provide me any information other
20  than what I already had gotten.
21       BY MR. BLANCHARD:
22       Q.   By him confirming, would that be a
23  correct word to say?  Would it be appropriate to
24  say he confirmed what you thought about the
```

Page 93

```
1   stock, or did he add to your knowledge?
2        MR. LONGMAN:  Just one question at a
3   time.
4        BY MR. BLANCHARD:
5        Q.   Or did he add to your knowledge?
6        MR. LONGMAN:  Well, ask one at a time.
7   Did he confirm what you said.
8        MR. BLANCHARD:  That's well taken.
9        MR. LONGMAN:  It's the same question.
10  Okay.
11       A.   "Confirm" may not be the right word.
12  It's to the point of going ahead, he didn't come
13  up with anything negative within anything that
14  he found.  He found just about what I had come
15  up with, now confirming -- saying confirming.
16  He wasn't in the decision making.
17       BY MR. BLANCHARD:
18       Q.   Let's get away from my word of
19  confirming.
20       MR. LONGMAN:  He's still --
21       MR. BLANCHARD:  I'm sorry, I didn't
22  mean to interrupt.
23       A.   I made the decision to buy the stock
24  at the time on all the information that I had.
```

24 (Pages 90 to 93)

Ronald W. Erickson                                                                    05/30/2006

Page 94

1  I was asking more so if there was any negative
2  influence or anything out there in the
3  marketplace that would show otherwise, and there
4  wasn't.
5        BY MR. BLANCHARD:
6     Q.  Now, would you have bought the stock
7  if he told you something different?
8        MR. LONGMAN:  Objection.
9     A.  No.
10       MR. LONGMAN:  I'm going to object
11  because that's a hypothetical question as to
12  what he would or wouldn't have done.
13       If you can answer that without
14  speculating completely as to what you would or
15  wouldn't have done.
16    A.  I mean I would put some blinders on
17  that as far as going ahead and saying that if he
18  came up with -- I'm hearing that there's some
19  issues here as far as impropriety, then I would
20  be reluctant to go forward.
21       BY MR. BLANCHARD:
22    Q.  Why did you ask him to begin with?
23    A.  Because he's based in New York, he
24  knows what the market is, if there's anything,

Page 95

1  usually they'll hear something sometimes ahead
2  of time, what might be good, what might not be.
3  I don't perceive to -- I'm looking on the
4  Internet, whatever research I've done and
5  everything else, I always have an open ear to go
6  ahead and see if there's anything else, if
7  there's a negative point of view or a positive
8  one.  And that's why I'll listen.
9     Q.  And you didn't hear anything negative,
10  so you went ahead and purchased the stock?
11       MR. LONGMAN:  Asked and answered.
12    A.  Yes.
13       (Whereupon, Exhibit 2 was marked for
14       identification.)
15       BY MR. BLANCHARD:
16    Q.  Do you recognize this document with a
17  Bates labelled 1 through 4?
18    A.  Yes.
19    Q.  Yes?
20    A.  Yes.
21    Q.  What is it?
22    A.  It's a statement from CitiGroup on my
23  account from New York.
24    Q.  And it's dated April 28th through May

Page 96

1  31st, 2003, correct?
2     A.  Yes.
3     Q.  There's nothing reflecting a
4  transaction or a holding in Biopure in this
5  statement, is there?
6        MR. LONGMAN:  I'd like to say
7  something at this point.
8        It's possible we redacted something
9  that had to do with Biopure which we hadn't
10  intended to do.
11       MR. BLANCHARD:  Do you know what you
12  think that is?
13       MR. LONGMAN:  I think given --
14  actually maybe not.  I'm not sure actually.
15       MR. BLANCHARD:  I'm not sure either,
16  that's why I'm asking.  I just don't know.
17       MR. LONGMAN:  Okay.
18       MR. BLANCHARD:  Can we agree that
19  you'll check?
20       MR. LONGMAN:  I'll double check.
21       MR. BLANCHARD:  Okay.
22       (Whereupon, Exhibit 3 was marked for
23       identification.)
24       BY MR. BLANCHARD:

Page 97

1     Q.  Do you have Exhibit Number 3 before
2  you?
3     A.  Yes.
4     Q.  Do you recognize Exhibit Number 3?
5     A.  Yes.
6     Q.  And what is it?
7     A.  It's a June statement from CitiGroup
8  in New York.
9     Q.  June, 2003, correct?
10    A.  Yes.
11    Q.  Bates numbers 8 through 9, correct?
12    A.  Yes.
13    Q.  And this account statements reflects
14  holding 50,000 shares of Biopure, correct?
15    A.  Correct.
16       (Whereupon, Exhibit 4 was marked for
17       identification.)
18       BY MR. BLANCHARD:
19    Q.  Do you have Exhibit Number 4 before
20  you?
21    A.  Yes.
22    Q.  And that's Bates numbered 10 through
23  11, correct?
24    A.  Correct.

25 (Pages 94 to 97)

Page 98

1    Q.   This is a CitiGroup account statement
2    from July 28th to August 31st, 2003?
3    A.   Yes.
4    Q.   And it also reflects 50,000 shares of
5    Biopure, correct?
6    A.   Correct.
7        (Whereupon, Exhibit 5 was marked for
8        identification.)
9        BY MR. BLANCHARD:
10   Q.   Do you have Exhibit Number 5 in front
11   of you?
12   A.   Yes.
13   Q.   This is Bates labeled, it's page 30,
14   and it's a page -- it's page five of six from
15   the Financial Management Account 2003 year end
16   summary from CitiGroup, correct?
17   A.   Correct.
18   Q.   And it reflects purchases of Biopure
19   on May 29th, 2003, correct?
20   A.   Correct.  And May 30th.
21   Q.   Sorry.  And May 30th as well.  You're
22   right.  Thank you.
23       (Whereupon, Exhibit 6 was marked for
24       identification.)

Page 99

1        BY MR. BLANCHARD:
2    Q.   And you have Exhibit Number 6 in front
3    of you?
4    A.   Yes.
5    Q.   And that's a Financial Management
6    Account statement from CitiGroup from January
7    1st to January 31st, 2004, correct?
8    A.   Correct.
9    Q.   Now, this is your account, correct?
10   A.   Correct.
11   Q.   And it indicates that you sold 20,000
12   shares of Biopure on January 16th, 2004,
13   correct?
14   A.   Incorrect.
15       Well, yes, January 16th, 2004, yes.
16   Q.   And there's also a section called
17   "open orders."  Do you see that?
18   A.   Yep.  Yes.
19   Q.   Could you tell me what that section
20   refers to?
21   A.   The remaining 30,000 to be sold.
22   Q.   Okay.  And it indicates, it says on
23   the left-hand side "sell, January 13th, '04,"
24   and then it indicates it's Biopure Corp., and

Page 100

1    then the exchange it says "OTC," I take it to
2    mean over the counter, is that correct?
3    A.   I'm not positive.  That's probably the
4    case.
5    Q.   There's an order price of $1.50 and a
6    current price of $1.86, and special instructions
7    say "stop," correct?
8    A.   Correct.
9    Q.   What does all that mean?
10   A.   That would mean that, to -- probably
11   the current price was $1.86, to hold it, if it
12   goes down any more to sell at $1.50 minimum.
13   Q.   So at some point did you give
14   instructions to CitiGroup to sell 20,000 shares
15   of Biopure?  I'll make that a little more clear.
16       So you gave instructions, or you
17   caused Biopure shares to be sold, 20,000 shares
18   of Biopure to be sold on January 16th, '04,
19   correct?
20   A.   Correct.
21   Q.   And then you also had given
22   instructions, it appears from this statement,
23   Exhibit Number 6, on January 13th, 2004 to sell
24   the remaining 30,000 shares of Biopure if the

Page 101

1    price got down to $1.50?
2    A.   Correct.
3    Q.   Do you recall -- strike that.
4        (Whereupon, Exhibit 7 was marked for
5        identification.)
6        BY MR. BLANCHARD:
7    Q.   Do you have Exhibit 7 before you?
8    A.   Yes.
9    Q.   And this is Bates labeled 13 through
10   16?
11   A.   Yes.
12   Q.   And this is another CitiGroup
13   statement from February 1st to February 29th,
14   2004?
15   A.   Yes.
16   Q.   This statement on Bates page fifteen,
17   it's page three of four of the document it
18   itself, indicates that on February 27th, 2004
19   you sold 30,000 shares of Biopure at $1.46?
20   A.   Correct.
21       (Whereupon, Exhibit 8 was marked for
22       identification.)
23       BY MR. BLANCHARD:
24   Q.   Do you have Exhibit 8 before you?

26 (Pages 98 to 101)