Ronald W. Erickson

05/30/2006

Page 102

1    A.   Yes.
2    Q.   Do you recognize it?
3    A.   Yes.
4    Q.   Could you tell me what it is?  Bates
5  labeled 5 through 7.
6    A.   It's a fax that was sent to me on the
7  day after I purchased Biopure stock.
8    Q.   And that fax is from CitiGroup?
9    A.   Yes.
10   Q.   Why did you get this?
11   A.   Because when you get statements it's
12 after the fact usually, so I wanted confirmation
13 when they did it and so forth, so that's what
14 they faxed over to me.
15        (Whereupon, Exhibit 9 was marked for
16        identification.)
17        BY MR. BLANCHARD:
18   Q.   Do you have Exhibit 9 before you?
19   A.   Yes.
20   Q.   Bates labeled 17?
21   A.   Yes.
22   Q.   And what's this?
23   A.   This is the -- on the previous, I
24 think it was, was it 6 -- on the 30,000 shares

Page 103

1  to sell at $1.50 if it goes down to there, this
2  was just probably an addition to that.  It says
3  "we entered your order to sell 30,000 at a price
4  of $1.50.  Good till cancelled."
5        (Whereupon, Exhibit 10 was marked for
6        identification.)
7        BY MR. BLANCHARD:
8    Q.   Do you have Exhibit 10 before you?
9    A.   Yes.
10   Q.   Do you recognize it?
11   A.   Yes.
12   Q.   And what is it?
13   A.   That's the sale of similar to what was
14 on the previous page of the 20,000 shares at
15 $1.85.
16   Q.   So this is Bates labeled 20, and this
17 is a confirmation that you sold the other 20,000
18 on January 16th, 2004, correct?
19   A.   Correct.
20   Q.   Okay.
21        (Whereupon, Exhibit 11 was marked for
22        identification.)
23        BY MR. BLANCHARD:
24   Q.   Do you have 11 before you, Exhibit 11

Page 104

1  before you?
2    A.   Yes.
3    Q.   Do you recognize it?
4    A.   Yes.
5    Q.   What is it?
6    A.   That's similar to the other page on 9
7  which had the 30,000 shares, sell price at
8  $1.50.
9    Q.   It says February -- it's Bates labeled
10 18, correct, on the bottom right-hand side?
11   A.   Yes.
12   Q.   And it's a statement for your account,
13 correct?  Or it's a confirmation for your
14 account?
15   A.   Right.
16   Q.   And it indicates "February 24th we
17 cancelled your good until cancelled order to
18 sell 30,000 at a price of," it looks like $1.50,
19 1.5, correct?
20   A.   Yes.
21   Q.   Can you explain what that information
22 reflects?
23   A.   Well, if you --
24        (Witness reviewing documents.)

Page 105

1    A.   It reflects on Exhibit 7 showing that
2  the $1.50 was cancelled, because on 2-27 it was
3  sold for $1.46.
4        BY MR. BLANCHARD:
5    Q.   I guess my confusion is, and part of
6  this copy is cut off, but it says something
7  about, it looks like on February 24th "we
8  cancelled your good till cancelled order"?
9    A.   Mm-hmm.
10   Q.   And then the shares were sold on
11 February 27th?
12   A.   Yes.
13   Q.   So did you give another order
14 following the 24th?
15   A.   No.  They were trying to sell them at
16 that time, going ahead.  What it was, they went
17 ahead at the $1.50, it went below that, so they
18 were saying that "okay, we can't get $1.50, go
19 ahead," and I said "well, sell them," so they
20 got it sold on the 27th.
21   Q.   I understand.  Thanks.
22        (Whereupon, Exhibit 12 was marked for
23        identification.)
24        BY MR. BLANCHARD:

27 (Pages 102 to 105)

Ronald W. Erickson                                                          05/30/2006

1    Q.  Do you have Exhibit 12 before you?
2    A.  Yes.
3    Q.  And it's a CitiGroup statement for
4  your account, correct?
5    A.  Yes.
6    Q.  Or a page of it.
7       It's Bates page 19, correct?
8    A.  Yes.
9    Q.  Also dated -- or dated February 27th,
10  2004, correct?
11   A.  Yes.
12   Q.  And this is after all of your Biopure
13  stock held with CitiGroup was sold, is that
14  correct?
15   A.  Yes.
16      (Whereupon, Exhibit 13 was marked for
17      identification.)
18      BY MR. BLANCHARD:
19   Q.  Do you have Exhibit 13 in front of
20  you?
21   A.  Yes.
22   Q.  And what's Exhibit 13?
23   A.  That's a statement from Harris Group.
24   Q.  It's related --

1    A.  Or Harris Direct.
2    Q.  It's related to your account, correct?
3    A.  Yes.
4    Q.  Bates labeled 21 through 25, correct?
5    A.  Yes.
6    Q.  The second page of this statement
7  Bates labeled 22 indicates 25,000 shares of
8  Biopure common stock, correct?
9    A.  Correct.
10   Q.  And the third page indicates that you
11  purchased those shares on the 16th, correct?
12   A.  Correct.
13   Q.  Do you recall the total number of
14  shares you held with Harris in Biopure?
15   A.  It's right there, 25.
16   Q.  Thank you.
17   A.  Thousand, that is.
18   Q.  On the last page of the document, it's
19  a printout that indicates there's 25,000 shares,
20  another 45,000, and another 5,000.
21   A.  That was me pulling off on my computer
22  my personal financial stuff as far as Biopure.
23  It was just a category of what I pulled up.
24   Q.  So this last page isn't a part of the

1  Harris?
2    A.  No, has nothing to do with Harris.
3  That's total thing that I just did, I pull it up
4  on August 1st on there to see what the price was
5  on that, and it showed the Harris 25,000, the 45
6  and the five were Citicorp.
7    Q.  Okay.  Got you.
8       So I guess I'd note that Bates
9  labelled 25 was incorrectly attached to Exhibit
10  Number 13.  It's not really part of it.
11   A.  Do you want to make it 14 and separate
12  it?
13      MR. BLANCHARD:  Actually the witness
14  has a good idea.  Let's do that.
15      (Whereupon, Exhibit 14 was marked for
16      identification.)
17      BY MR. BLANCHARD:
18   Q.  And then before you is that Exhibit 14
19  that you just suggested we take apart.  Thank
20  you.
21   A.  Yes.
22   Q.  Okay.  So this is a computer printout
23  that you did yourself?
24   A.  Yes.

1    Q.  Where did you go on-line to print this
2  out?
3    A.  I can go into AOL on-line and go ahead
4  into my financial end and go into personal and
5  go ahead and put anything in there at that
6  point.
7    Q.  So you have an account with AOL that
8  stores this information?
9    A.  No, no, no.  It goes ahead, it's not
10  an account with it, it's a portion that you can
11  go into and just keep it going.  You can put
12  anything in there that you want to go ahead and
13  keep track of, stock or anything else and go
14  ahead.  So I had -- I kept track of my Biopure
15  in that.
16   Q.  Okay.  And so this is part of your
17  personal records?
18   A.  Right.  It can be stuff that you don't
19  purchase, you can go ahead and have stuff that
20  you have purchased, there's no requirement, you
21  put a price in there, call, sell, hypothetical.
22   Q.  Okay.
23      (Whereupon, Exhibit 15 was marked for
24      identification.)

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 110

1        BY MR. BLANCHARD:
2        Q.   Do you have Exhibit 15 before you?
3        A.   Yes.
4        Q.   And what is Exhibit 15?
5        A.   That's a statement from Harris Group.
6        Q.   And it's Bates labeled 31 and 32,
7    correct?
8        A.   Correct.
9        Q.   And I'm sorry, I'm looking for the
10   date on it, but I'm not seeing the date that
11   this statement was issued.
12       A.   5-16, it states the settlement date of
13   5-21, the trade date of 5-16, if you look in the
14   corner here.
15       Q.   Right, right.
16       A.   Now, that's the -- this is just an
17   update from the other Harris Group thing that
18   you saw previously on Exhibit 13 just showing
19   you the Biopure price and then the principal.
20       Q.   I'm not sure what date the account --
21   or this statement was issued.  I don't think
22   it's reflected on this document, but that's
23   fine.
24       A.   I don't see a date other than the

Page 111

1    settlement date, which might be the date of the
2    document.
3        Q.   Okay.  We could take a break for a
4    minute and I'll try --
5        A.   It concurs with your 13, if you take a
6    look at that, I believe.  If you go back there
7    where it has the -- I think it's all 5-21, it
8    just says the process date, doesn't have the
9    date.  It's probably just the May confirmation
10   on it, the May statement.
11       Q.   Okay.
12       A.   It just backs up the Exhibit 13.
13       Q.   I just want to ask, we'll take a
14   break, but during the break could you just
15   review Exhibits 2 through 15, and I simply want
16   to be sure that these are all statements -- they
17   are your account statements, so just
18   authenticate that they were your account
19   statements?
20       MR. LONGMAN:  You want him to go
21   through each one of those?
22       A.   My account statements?
23       BY MR. BLANCHARD:
24       Q.   All I want to know, I just want to

Page 112

1    know that these are, in fact, documents from
2    your files on --
3        A.   Yes, they are.
4        Q.   You can tell me that right now?
5        A.   Yes.
6        MR. TUCCILLO:  They're not all
7    accounts.
8        MR. LONGMAN:  Exhibit 14, AOL.
9        MR. BLANCHARD:  Good point.
10       BY MR. BLANCHARD:
11       Q.   But they are all your files?
12       A.   Yes.
13       MR. BLANCHARD:  Let's take a break for
14   a moment.
15       MR. LONGMAN:  There's another one in
16   here, Exhibit 8 is not an account statement per
17   se.
18       MR. BLANCHARD:  Right.
19       A.   It's a fax, but it's related to my
20   account only.  And as far as what I pulled up on
21   the makeshift thing that I do, that's mainly on
22   my account, that's nothing else.
23       (Whereupon, a recess was taken from
24       3:49 p.m. to 3:56 p.m.)

Page 113

1        (Whereupon, Exhibit 16 was marked for
2        identification.)
3        BY MR. BLANCHARD:
4        Q.   Do you have Exhibit 16 before you?
5        A.   Yes.
6        Q.   Can you identify it?
7        A.   Yes.
8        Q.   What is it, please?
9        A.   It's papers that I pulled off of
10   Internet, I guess it was MSN Money, that they
11   would go ahead and show on the page, AOL has it,
12   so it pulls up anything financial, it had it on
13   Biopure, so I'd ended up pulling it off,
14   printing it out, and that was on May 11th, 2003.
15       Q.   Okay.
16       A.   And it was in regards to March 25th,
17   2003, Newswire.
18       Q.   Was this part of your own research
19   before you purchased Biopure?
20       A.   Yes.
21       Q.   By the way, how did you first hear
22   about Biopure?
23       A.   I went in, as I said before
24   previously, I went into the Internet when I knew

LegaLink Boston, a Merrill Company
(617) 542-0039

Ronald W. Erickson

05/30/2006

Page 114

1  I was going to go ahead and sell some stock
2  options and so forth, I went ahead and ended up
3  starting to look at some different things as far
4  as what I'd do with it. And so then I ended up
5  going ahead and going into stock, and I ended up
6  going up -- there was a thing on AOL on eight
7  top stocks to go ahead and look at that would be
8  a good purchase. Biopure was one of them.
9      It had a caption in there and I went
10 ahead into it and looked it up, and saw it was a
11 company in Cambridge, and close by, and did the
12 research on it.
13     Q.  So did you read this document at the
14 time?
15     A.  Yes.
16     Q.  Was there anything about -- was there
17 any information contained therein that motivated
18 you to purchase Biopure securities?
19         MR. LONGMAN:  In this document right
20 here?
21         MR. BLANCHARD:  Yes.
22     A.  In this document. Well, first of all,
23 that they raised $13,000,000 through sale of
24 common stock, so there might have been quite a

Page 115

1  few people that were researching and interested
2  in the stock at the time as far as where it
3  would go. So it was one of the things. This
4  was not the driving force of it, but it was one
5  that I had looked up on.
6         BY MR. BLANCHARD:
7      Q.  Was there any information about the
8  company other than their issuing 13,000,000 in
9  stock that motivated you to purchase Biopure
10 securities?
11         MR. LONGMAN:  I'm going to object to
12 the form of the question. "Motivated you to
13 purchase," it's vague.
14         BY MR. BLANCHARD:
15     Q.  Influenced your decision.
16     A.  I would say it was a piece of what was
17 there as far as going ahead, and had approval in
18 South Africa, I mean whatever, you know, it's to
19 the point at that time I read the article and
20 looked into it more.
21         As far as the Defense Department, I
22 mean that's what was a big influence, as far as
23 them being interested in it.
24     Q.  And are you referring to something in

Page 116

1  this document when you talk about the Defense
2  Department? You can just point the page out to
3  me if you'd like.
4      A.  You can go to page two of three, this
5  content of "this press release does not
6  necessarily reflect the position or policy of
7  the government or the Department of Defense, and
8  no official endorsement should be inferred.
9  Statements in this press release are not
10 strictly historical, at that point, but actual
11 results may differ from those projected in the
12 forwarding looking statements."
13         The thing is other than that, then
14 everything else that showed as far as the
15 Hemopure in South Africa, they had -- I checked
16 into that as far as going ahead, and it was
17 approved in South Africa, treatment and
18 everything else for adults, searching for
19 patients that are anemic or for the purpose of
20 eliminating reducing allogenic, etcetera. So
21 that's what I checked into and looked into it.
22 It was one of the many --
23         MR. TUCCILLO:  Perhaps he ought to
24 read the whole thing. It's several pages long,

Page 117

1  and he looked at it obviously three years ago,
2  so I don't know --
3         MR. BLANCHARD:  If the witness feels
4  like he needs to read the thing, then let me
5  know what motivated or didn't motivate his
6  decision.
7      A.  This didn't motivate me. This is a
8  portion of, piecemeal of what I went ahead and
9  researched on it to go ahead that way.
10         If you're trying to narrow it down to
11 this document or this piece, whatever you want
12 to call it, this was minute compared to what I
13 looked at or researched to make a decision.
14         (Whereupon, Exhibit 17 was marked for
15         identification.)
16         MR. LONGMAN:  If you're going to ask
17 some questions on the documents, just give him
18 time to read the whole document.
19         MR. BLANCHARD:  Oh, sure.
20         MR. LONGMAN:  This is several
21 articles, by the way.
22         MR. BLANCHARD:  They're attached
23 together.
24         MR. LONGMAN:  Yes.

LegaLink Boston, a Merrill Company
(617) 542-0039

Ronald W. Erickson                                                                    05/30/2006

Page 118

1    MR. BLANCHARD:  That's fine.
2    (Whereupon, Exhibit 18 through 23 were
3    marked for identification.)
4    (Off the record discussion.)
5    BY MR. BLANCHARD:
6    Q.   You have a number of exhibits before
7    you numbered 18 through 23 --
8    A.   Actually 16 because you gave me this
9    one earlier on that.
10   Q.   You're right.
11   A.   I mean you have -- I was reading
12   content --
13   MR. LONGMAN:  Wait, do me a favor,
14   don't say anything.
15   BY MR. BLANCHARD:
16   Q.   Exclusive of 16, I have a number of
17   exhibits before you, Exhibits 17 through 23,
18   correct?
19   A.   Correct.
20   Q.   And please take a moment to review
21   them, and my question is; are any of those
22   exhibits, do any of those exhibits predate your
23   purchase of Biopure securities?
24   MR. LONGMAN:  Well, I would just like

Page 119

1    to make an objection.  If the date on the
2    article is before his purchase, then they
3    predated, if they don't they don't.
4    BY MR. BLANCHARD:
5    Q.   Let's go through one by one.
6    MR. LONGMAN:  I don't know what's even
7    in here.
8    BY MR. BLANCHARD:
9    Q.   Exhibit 17 --
10   A.   No.
11   Q.   Exhibit 17 is what?  Could you
12   identify it for me, please?
13   A.   October 30th, 2003 ThinkEquity.
14   Q.   Correct.
15   MR. TUCCILLO:  There's actually a
16   couple.
17   A.   And that's after --
18   MR. LONGMAN:  There's another article,
19   as a matter of fact two, at least two more.
20   BY MR. BLANCHARD:
21   Q.   There's a couple appended to it,
22   correct?  There's an AOL News that is the fourth
23   page of that exhibit, correct?
24   A.   And if that's October 30th, then

Page 120

1    that's -- and October 31st is an OTC.
2    Q.   Just so we're clear, and that one we
3    just referred to is Bates labeled 64?
4    A.   Yes.
5    Q.   And then Bates label 65 is Overlooked
6    Stocks, correct?
7    A.   Okay.  No, it's OTC First Alert,
8    Overlooked Stocks, yes.
9    Q.   Bates labeled 65, correct?
10   A.   Yes.
11   Q.   And that is dated 10-31-03, correct?
12   A.   Yes.
13   Q.   And then there's a fax cover sheet
14   that probably shouldn't be appended there
15   following it.
16       Exhibit 18 is a report from
17   EmedSecurities, correct?
18   A.   Yes.
19   Q.   Bates labeled 53 through 60, correct?
20   A.   Yes.
21   Q.   All right.  Do you see a date on this
22   particular exhibit for when it was issued?
23   A.   No.  It was closed -- stating that
24   financial data is closed as of January 7th,

Page 121

1    2004.
2    Q.   Do you recall reading this document?
3    A.   I don't really --
4    MR. LONGMAN:  Take a moment to look it
5    over.
6    (Witness reviewing document.)
7    A.   I believe I did.
8    BY MR. BLANCHARD:
9    Q.   Okay.  You didn't read this before you
10   purchased Biopure securities, did you?
11   MR. LONGMAN:  You said you did what?
12   BY MR. BLANCHARD:
13   Q.   Read it.
14   A.   Read it.
15       As far as --
16   Q.   I'm not trying to trip you up.
17   A.   No, I don't --
18   Q.   If you look at the third page, there's
19   a discussion of information about things
20   happening in 2004, so it must have come out --
21   I'm just trying to establish that the date was
22   sometime in 2004?
23   A.   Right.
24   Q.   Okay.  And then Exhibit Number 19, can

31 (Pages 118 to 121)

Ronald W. Erickson

05/30/2006

Page 122

1  you identify Exhibit Number 19?
2      A.  It's the "Amex To Trade Options on
3  Eight Securities."
4      Q.  Did you read this document?
5      A.  Yes, I did.
6      Q.  Approximately when did you read it?
7      A.  That was in -- it was dated June 10th
8  and June 11th, so it was somewhere right around
9  there, either -- right in that period.
10     Q.  Okay.
11     A.  I pulled it off.
12     Q.  I think earlier in your testimony you
13  mentioned an article about eight stocks to buy.
14  Is this the article you were talking about
15  before?
16     A.  Yes.
17     Q.  Okay.  This article post-dates or
18  comes after your purchase of Biopure securities,
19  correct?
20     A.  Yes.
21     Q.  Okay.  So you couldn't have read this
22  until after you had already purchased Biopure
23  securities, correct?
24     A.  Correct.  This is one of them, one

Page 123

1  after in the sense that's when I went ahead and
2  I purchased them.  As far as going ahead for
3  that point, I went ahead and it went up, as far
4  as the stock was going up, and that's where in a
5  sense I had bought it for $5.70, and it ended up
6  this came out as far as go ahead and saying this
7  is one of the top stocks to look at and
8  purchase.  I had seen other information going
9  ahead that way also off AOL, but this is from
10  Amex, the charge card, Amex.
11         As far as what -- I ended up taking
12  information on this, too, to go ahead and
13  showing that it was a solid operation as far as
14  that stock goes.
15     Q.  Okay.
16     A.  That's when it went up and kept on
17  going up that June, July and August.
18         MR. LONGMAN:  Can I note there's also
19  appended to this document two other pages which
20  are not necessarily related to the first part?
21  They have --
22         MR. BLANCHARD:  Maybe the witness
23  could tell.
24     A.  I don't have that one, no.

Page 124

1         MR. BLANCHARD:  I think they're
2  appended to yours only, I apologize.
3         MR. LONGMAN:  This is not part of the
4  exhibit?
5         MR. BLANCHARD:  No.  I think those are
6  just repeat copies that got into yours, they're
7  just copies of the third page.
8      A.  That would show the stock went up to
9  6.80.
10         MR. LONGMAN:  There's no question.
11  That's not part of Exhibit 19.
12         MR. BLANCHARD:  No.
13         Can we go off the record for a second?
14         (Off the record discussion.)
15         BY MR. BLANCHARD:
16     Q.  Exhibit 19 is Bates page 45 through
17  47, correct?
18     A.  Correct.
19     Q.  Okay.  At the bottom of each page it
20  says "Tuesday, July 8th, 2003, America On-Line
21  Re 1919," correct?
22     A.  On the bottom of the page?
23     Q.  Underneath the little line.
24     A.  Yes.  Okay.  Yes.

Page 125

1      Q.  And it says that on all three pages,
2  correct?
3      A.  Correct.
4      Q.  And it lists a date July 8th, 2003,
5  correct?
6      A.  Correct.
7      Q.  Would that be the date that you pulled
8  this off-line?
9      A.  Yes.
10     Q.  Okay.  Exhibit 20, do you have Exhibit
11  20 before you?
12     A.  Yes.
13     Q.  Do you recognize it?
14     A.  Yes.
15     Q.  Okay.  It's looks like some news about
16  Biopure, correct?
17     A.  Mm-hmm.
18     Q.  The indication at the bottom of the
19  page again is July 8th, 2003, America On-Line,
20  correct?
21     A.  Yes.
22     Q.  So you looked at this in July of 2003?
23     A.  Correct.
24     Q.  Okay.  And then Exhibit 21, Bates

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 126

1  labeled 39 through 40, is a CBS MarketWatch
2  article, correct?
3      A.  Yes.
4      Q.  And it appears it was printed on
5  August 1st, 2003 from the bottom, very bottom
6  line, correct?
7      A.  Yes.
8      Q.  Okay.  Exhibit 22 is Bates labeled 36
9  through 37, correct?
10     A.  Yes.
11     Q.  And it appears from the bottom it was
12  printed August 14th, 2003, correct?
13     A.  Correct.
14     Q.  And would that be the date that you
15  had read it, August 14th, 2003?
16     A.  That would probably be the date that I
17  read it.
18     Q.  This is a document that's produced
19  from your files, correct?
20     A.  Yes.
21     Q.  Exhibit 23 is Bates labeled 42 to 43,
22  correct?
23     A.  Yes.
24     Q.  And it's a CBS MarketWatch report,

Page 127

1  correct?
2      A.  Correct.
3      Q.  Again it appears from the bottom that
4  it was printed out on August 1st, '03, correct?
5      A.  Correct.
6      Q.  This was produced from your files,
7  correct?
8      A.  I believe so.
9      Q.  Of Exhibits 17 through 23, none of
10  them predate your purchases in Biopure
11  securities, right?
12     A.  Right.
13     Q.  Okay.  Did you have any documents in
14  your files other than Exhibit 16?  Maybe you
15  should look at Exhibit 16 again, I'm sorry.
16     A.  Okay.  I did, but --
17     Q.  I think let me just restate my
18  question.
19         You have Exhibit 16 before you?
20     A.  Mm-hmm.
21     Q.  Did you have any other documents in
22  your files regarding Biopure other than Exhibit
23  16 which predate your purchase in Biopure
24  securities?

Page 128

1      A.  I did have some, yes.
2      Q.  Okay.  Do you have them any longer?
3      A.  No, I don't.
4      Q.  And you threw those out at some point?
5      A.  Yes.
6      Q.  And when did you throw those out?
7          MR. LONGMAN:  Asked and answered.
8      A.  I'm not sure.  They were thrown out by
9  accident with a bunch of other tax information
10  that I had for probably 2003 when I had done
11  taxes, and it ended up going ahead and getting
12  thrown out in the rubbish.
13         BY MR. BLANCHARD:
14     Q.  Okay.
15     A.  Because I had filed for -- where I did
16  the stock options and everything else, and I
17  ended up needing all the information for tax,
18  and that's what I had with it, and they got
19  tossed.
20     Q.  Okay.  Is it fair to say that Exhibit
21  16 is the only document that you had in your
22  files or you have in your files --
23     A.  Remaining.
24     Q.  -- remaining which predated your

Page 129

1  purchase of Biopure securities which relates to
2  Biopure?
3      A.  At this point in time, yes.
4          MR. BLANCHARD:  Can we go off the
5  record for a second?
6          (Off the record discussion.)
7          BY MR. BLANCHARD:
8      Q.  I apologize the way I asked the
9  question, maybe we got to a quick response.
10         You did have account statements, of
11  course, regarding Biopure?
12     A.  Yes.
13     Q.  But nothing predating your purchase of
14  Biopure other than this Exhibit 16 is in your
15  files?
16     A.  Correct.
17         MR. TUCCILLO:  And the account
18  statements.
19         MR. LONGMAN:  That relate to Biopure.
20         MR. BLANCHARD:  He wouldn't have an
21  account statement --
22         MR. LONGMAN:  Before he bought the
23  stock, right.
24         MR. TUCCILLO:  He has some account

LegaLink Boston, a Merrill Company
(617) 542-0039

Ronald W. Erickson

05/30/2006

Page 130

1  statements which predate his subsequent
2  purchases.  He purchased over time.
3       MR. BLANCHARD:  But he has no account
4  statement relating to Biopure before he bought
5  Biopure, right?  It would be impossible.
6       MR. TUCCILLO:  Yes, but some of his
7  account statements predate some of his
8  purchases.
9       MR. BLANCHARD:  Let's go off the
10 record a second.
11      (Off the record discussion.)
12      MR. LONGMAN:  Instead of trying to get
13 him to tie down, I mean the documents speak for
14 themselves, and he's told you that this is all
15 he has, and all he had except for what he may
16 have thrown out at some point.
17      MR. BLANCHARD:  I'm just clarifying
18 that.
19      MR. LONGMAN:  So now you're asking for
20 his recollection of what he has, whereas the
21 best evidence of that is really what's here.
22      MR. BLANCHARD:  Well taken.  Thank
23 you.
24      BY MR. BLANCHARD:

Page 131

1       Q.   When you ultimately sold your Biopure
2  stock in your Citi account, you sold 20,000 on
3  January 16th, we've established that, correct,
4  and then there was another order to sell when it
5  hits $1.50 for another 30,000 shares, correct?
6       A.   Correct.
7       Q.   Why did you split?  Why didn't you
8  sell it all in one batch?
9       A.   Because at that point in time I was
10 hoping that something would come about and
11 possibly the stock would stay steady and I could
12 end up getting my money back, whatever.  But I
13 knew that if it was continuing to go down, then
14 that wasn't the case.  So I had to go ahead and
15 bite the bullet and take my losses.
16      Q.   When did you sell the stock in your
17 Harris account?
18      A.   That was probably about a month later.
19      Q.   Your last shares in your Citi account
20 were sold on February 27th, so your Harris
21 Biopure stock was sold end of March?
22      A.   Probably, somewhere there.
23      Q.   Do you have any documents reflecting
24 that?

Page 132

1       A.   No.  I was trying to find them, and I
2  haven't been able to locate them.
3       Q.   Would you be able to obtain them from
4  Harris?
5       A.   No, because what -- Harris Group does
6  not work with Washington Mutual anymore, they
7  work with somebody else on that, I think it's
8  Fidelity or whatever, and they don't have the
9  records on it.
10      Q.   Why did you wait another month to sell
11 your Biopure stock that was held with Harris?
12      A.   Because I guess it was the last
13 25,000, it wasn't completely directly out of
14 pocket, and being optimistic, hoping that it
15 might turn around, which we saw there wasn't.
16      Q.   And at that point you had already
17 decided to sue Biopure, correct?
18      A.   Yes.
19      MR. LONGMAN:  At what point are we
20 talking about, in March, 2003?
21      MR. BLANCHARD:  Correct.
22      MR. TUCCILLO:  '04.
23      MR. LONGMAN:  March, 2004?
24      MR. BLANCHARD:  Yes.

Page 133

1       MR. LONGMAN:  Okay.
2       BY MR. BLANCHARD:
3       Q.   Are you aware that there's a complaint
4  filed in this action against Biopure?
5       MR. LONGMAN:  Objection.
6       BY MR. BLANCHARD:
7       Q.   When I say "complaint," I'm referring
8  to a legal document that is the lawsuit against
9  Biopure.  I just want to get a term out there.
10      Are you aware of a complaint filed
11 against Biopure in this action?
12      A.   When you say by "complaint against
13 Biopure in this action," you mean the class
14 action?
15      Q.   Yes, yes.
16      A.   I presume yes, in that sense.
17      Q.   Do you recall ever reading a
18 complaint?
19      A.   I've read most of the information that
20 I've received from my attorneys and going ahead
21 that way, yes.
22      Q.   Okay.
23      MR. BLANCHARD:  This will be marked as
24 Exhibit 24.

34 (Pages 130 to 133)

Page 134

```
1        (Whereupon, Exhibit 24 was marked for
2    identification.)
3        MR. LONGMAN:  Consolidated amended
4    complaint.
5        BY MR. BLANCHARD:
6    Q.  Do you have Exhibit 24 in front of
7    you?
8    A.  Yes.
9    Q.  Have you --
10       MR. LONGMAN:  Hold on one second.
11   There's stuff on the end of this thing.
12       MR. BLANCHARD:  That's the exhibit.
13       MR. LONGMAN:  These are all the
14   exhibits.  Okay.
15       BY MR. BLANCHARD:
16   Q.  Do you have Exhibit 24 before you?
17   A.  Yes.
18   Q.  And have you ever seen it before?
19   A.  Yes.
20   Q.  What is it?
21   A.  It's the amended, consolidated amended
22   complaint against Biopure Securities Litigation.
23   Q.  Have you ever read it?
24   A.  Yes.
```

Page 135

```
1    Q.  When did you read it?
2    A.  I'm not exactly sure.  I got a copy of
3    it prior to being filed, and I'm not sure what
4    the date was at that time, sometime in -- I'm
5    not positive as to the date I read it.
6    Q.  Did you participate in drafting this
7    document?
8        MR. LONGMAN:  Objection.
9    A.  I didn't draft -- I'm not a legal
10   entity, so I didn't draft the document.
11       BY MR. BLANCHARD:
12   Q.  What are the nature of the claims
13   brought against Biopure in this action?
14   A.  More so they violated the securities,
15   is more so there's certain parameters that a
16   company has to go by laid down by the Securities
17   Administration, and at that point they had not,
18   so they went ahead and ended up -- that was the
19   more so the filing of the class actions, it's
20   information had not been divulged.
21   Q.  Why did Biopure in your view violate
22   the securities laws?
23   A.  I don't --
24       MR. LONGMAN:  I'm going to object.  I
```

Page 136

```
1    think you mean to say how did they, why is --
2        MR. BLANCHARD:  You're absolutely
3    correct.
4    A.  If I could tell that, I would have
5    known a lot more.
6        MR. LONGMAN:  And also I think that
7    how they violated it calls for a legal
8    conclusion.
9        But to the extent it doesn't, you can
10   answer that question.
11   A.  Okay.
12       MR. LONGMAN:  But that's a good
13   question.
14   A.  They had information that they did not
15   divulge, at the point in time people were
16   purchasing the stock or having the ability to
17   sell the stock ahead of time in that sense from
18   where they were put on hold by the, I believe,
19   the FDA, and at that point in time they did not
20   divulge any information on that.  And that was
21   during the period that the stock was rising in
22   price from anywhere from almost $5.70 up to
23   eight and a quarter.  And if they had divulged
24   that information, it would have been a
```

Page 137

```
1    completely different scene at that time.
2        BY MR. BLANCHARD:
3    Q.  Let's break that down.
4        What was the information that they did
5    not divulge in your view?
6        MR. LONGMAN:  Asked and answered.
7        THE WITNESS:  Pardon?
8        MR. LONGMAN:  I thought you answered
9    that question.  But you can answer it again.
10   A.  I thought I did, too.
11       But as far as going ahead, they were
12   put on hold as far as going ahead with the FDA.
13   They had over 200 questions in their application
14   that they had to answer, they did not go ahead,
15   and they made it seem that everything was fine
16   and it was following through, and it wasn't.
17       BY MR. BLANCHARD:
18   Q.  What does it mean to be put on hold by
19   the FDA?
20   A.  They would not get approved at all
21   until they ended up going ahead and answering,
22   following through on all the 220 questions, I
23   think it was at that point.
24   Q.  At what point were they put on hold by
```

Ronald W. Erickson

05/30/2006

Page 138

1  the FDA in your view?
2    A.  My view, I think it was the end of
3  March, beginning of April of 2003, and they were
4  coming up in June.
5    Q.  And were all those 200 some odd
6  questions you mentioned pending at that time?
7    MR. LONGMAN: Objection.
8    A.  I believe they filed their report and
9  came back with those questions, which should
10  have been answered to begin with.
11    BY MR. BLANCHARD:
12    Q.  Who is "they" in your answer?
13    A.  Biopure.
14    Q.  Biopure filed their report, you said?
15    A.  I believe so.
16    Q.  And what was -- filed it with who?
17    A.  FDA.
18    Q.  And what was the nature of that
19  report?
20    A.  The nature of the report is to go
21  ahead and get it approved by the FDA on their
22  product.
23    Q.  Let's just back up and get some
24  background about Biopure.

Page 139

1    We know that Biopure produces
2  Hemopure, and that's something like a blood
3  substitute, right?
4    A.  Mm-hmm.
5    Q.  What is it that Biopure has to do to
6  get FDA approval of Hemopure?
7    MR. LONGMAN: I'm going to object.
8    This is way beyond, you're asking
9  for --
10    A.  I'm not an expert.
11    MR. LONGMAN: That is really a
12  question for an expert. I'll let the witness
13  answer to the extent he has knowledge about it.
14  Obviously that's beyond the realm of a layman.
15    But if you can answer that to the
16  extent you can, go ahead.
17    A.  I'd really rather not, because I'm not
18  an authority on it.
19    BY MR. BLANCHARD:
20    Q.  You know that Biopure has to receive
21  FDA approval, correct?
22    A.  Yes.
23    Q.  And they have to receive FDA approval
24  for Hemopure, correct?

Page 140

1    A.  Yes.
2    Q.  Okay. And Biopure submitted some form
3  of application with the FDA to receive approval
4  for Hemopure?
5    A.  To the best of my knowledge.
6    Q.  Do you know what the term "indication"
7  means regarding FDA approval process?
8    MR. LONGMAN: Objection.
9    A.  What does it mean?
10    BY MR. BLANCHARD:
11    Q.  Yes. Do you know?
12    A.  I'm asking you what does it mean.
13    Q.  No. If your answer is you don't know,
14  then that's fine.
15    A.  Okay.
16    Q.  Is your answer that you don't know?
17    A.  I'm not sure what you mean by that,
18  "indication."
19    Q.  Do you know what an IND is?
20    MR. LONGMAN: Objection.
21    A.  I don't know.
22    BY MR. BLANCHARD:
23    Q.  Do you know what a BLA is?
24    MR. LONGMAN: Objection.

Page 141

1    A.  Don't know.
2    BY MR. BLANCHARD:
3    Q.  Do you know what a biologics license
4  application is?
5    MR. LONGMAN: Objection.
6    A.  I don't know.
7    BY MR. BLANCHARD:
8    Q.  Are you aware that Biopure had
9  submitted by 2003 a biologics license
10  application for approval of Hemopure in an
11  orthopedic surgery setting?
12    MR. LONGMAN: Was he aware now sitting
13  here today, or is he aware in 2003?
14    MR. BLANCHARD: Was he aware then.
15    A.  That they applied for an application
16  or license?
17    BY MR. BLANCHARD:
18    Q.  That they had submitted a biologics
19  license application.
20    MR. LONGMAN: He just said he doesn't
21  know what the term means.
22    A.  I don't know.
23    MR. LONGMAN: Maybe you could explain
24  what you mean by that term if you're going to

LegaLink Boston, a Merrill Company
(617) 542-0039

Ronald W. Erickson                                                          05/30/2006

Page 142

1   ask that question.
2        MR. BLANCHARD: That's fair enough.
3        BY MR. BLANCHARD:
4        Q.  Are you aware that Biopure was seeking
5   FDA approval in orthopedic surgery -- I'm sorry.
6        Were you aware at the time you
7   purchased Biopure securities that Biopure was
8   seeking FDA approval to use Hemopure in
9   orthopedic surgery?
10       A.  Yes.
11       Q.  Were you aware that they were seeking
12  FDA approval in any other setting?
13       A.  I'm not sure.
14       Q.  Are you aware today whether Biopure is
15  seeking FDA approval in any other setting?
16       MR. LONGMAN: Objection.
17       A.  At this point in time, I'm not sure.
18  I haven't looked into it since I sold the stock.
19       BY MR. BLANCHARD:
20       Q.  Are you aware of whether Biopure ever,
21  since the time they were seeking approval for
22  orthopedic surgery, are you aware of whether
23  they ever sought FDA approval to use Hemopure in
24  any setting other than orthopedic surgery?

Page 143

1        A.  I was aware of the fact in a
2   conference call that I went on that there was a
3   case where a daughter that was thirteen years
4   old, and the father tried everything, and ended
5   up using Biopure to go ahead and cure her
6   cancer, and went through thirteen transfusions
7   at that point in time to go ahead, and her color
8   changed drastically, but it was saving her life,
9   that's it.
10       So I mean there were other things,
11  that I forgot more than what I could remember at
12  this point in time, but I knew there were other
13  alternatives to that other than just orthopedic.
14       Q.  You mentioned before something about a
15  hold.
16       A.  Mm-hmm.
17       Q.  What is a hold, or the hold that you
18  were referring to earlier in your testimony?
19       A.  Going ahead and getting approval from
20  the FDA.
21       Q.  What was put on hold exactly, do you
22  know?
23       A.  Their application.
24       Q.  Their entire application?

Page 144

1        A.  Their -- from what I gathered it was
2   their entire application on hold until they go
3   ahead and get the approvals.  As far as how they
4   researched and how they had their issues, I
5   don't know specifically if there was an approval
6   on one sector of it and another and a hold on a
7   portion.  I was assuming that it was the whole
8   application that was put on hold until they go
9   ahead.
10       I don't know the process, if they
11  approve a portion of the application and then
12  you have to follow through on other sectors of
13  it.  I'm not up on the FDA approval process.
14       Q.  Can you tell me who Thomas Moore is?
15       A.  He's one of the entities that we filed
16  against, and he's one of the controlling
17  entities in the company.
18       Q.  What do you mean by "entity"?
19       A.  Okay.  He's one of the -- when I look
20  at a company I look at the people who have
21  control, and he's one of them.
22       Q.  Okay.  I got you.
23       What about Abdu Alayash?
24       MR. LONGMAN: Who?

Page 145

1        BY MR. BLANCHARD:
2        Q.  Abdu Alayash?
3        A.  That doesn't sound familiar.
4        Q.  Are you familiar with Charles Sanders?
5        A.  I believe he's on there also.
6        Q.  Who is he?
7        A.  He's -- I'd have to look up the names
8   to see on that.  Do you have, that doesn't sound
9   -- Sanders?
10       Q.  Yes, Sanders.
11       A.  I'd have to look at the information.
12       Q.  Are you familiar with J. Richard
13  Crout?
14       A.  Yes.
15       Q.  And who is J. Richard Crout?
16       A.  He's one of the controlling people of
17  the company.
18       Q.  Is he a Defendant in this action?
19       A.  No.
20       Q.  Is Charles Sanders a Defendant in the
21  action?
22       A.  I believe so, yes.
23       Q.  Is Thomas Moore a Defendant in the
24  action?

37 (Pages 142 to 145)

Ronald W. Erickson

05/30/2006

Page 146

1    A.  Yes.
2    Q.  Is John Esposito a Defendant in the
3  action?
4        MR. LONGMAN:  Objection.
5    A.  Esposito, no, I don't believe so.
6        BY MR. BLANCHARD:
7    Q.  Is Carl Rausch a Defendant in the
8  action?
9    A.  Yes.
10    Q.  Ronald Richards?
11    A.  Yes.
12    Q.  What about Howard Richman?
13    A.  Yes.  Sanders, I don't believe, I
14  don't believe he is.  That doesn't -- that's --
15  I'm vague there.
16        MR. LONGMAN:  You already answered
17  that.
18        BY MR. BLANCHARD:
19    Q.  Do you recall whether or not Charles
20  Sanders is a Defendant in the action?  It sounds
21  like you're going back and forth there.  If you
22  don't recall, that's fine.
23    A.  I don't recall.
24    Q.  Okay.  Do you know what role Thomas

Page 147

1  Moore played at the company at the time, during
2  2003?
3    A.  I believe he was a director.
4    Q.  Did he have any other role at the
5  company?
6    A.  I don't really -- I'm trying to -- I'm
7  confusing.  He might have, I'm not -- I can't
8  think right now.
9    Q.  How about Howard Richman, do you
10  recall what his role was at the company during
11  the time?
12    A.  I don't recall.
13    Q.  Carl Rausch, do you recall his role at
14  the time during 2003?
15    A.  I'd rather say the same thing there,
16  because going ahead I'd have to see the list of
17  them.
18    Q.  So you don't --
19    A.  I didn't memorize them or look at them
20  in that sense.  I just saw that they were
21  principals.
22    Q.  Do you know who the chief executive
23  officer of the company was during 2003?
24    A.  I don't remember.

Page 148

1    Q.  What about the director of regulatory
2  affairs?
3    A.  I don't remember.
4        (Whereupon, Exhibit 25 was marked for
5  identification.)
6        BY MR. BLANCHARD:
7    Q.  Do you have Exhibit 25 in front of
8  you?
9    A.  Yes.
10    Q.  Can you identify it?
11    A.  It's the second consolidated amended
12  complaint.
13    Q.  Have you ever read this document?
14    A.  Yes.
15    Q.  Do you recall approximately when you
16  read it?
17    A.  No, I don't.
18    Q.  Do you know how the second
19  consolidated amended complaint differs from the
20  consolidated amended complaint?  Do you know how
21  Exhibit 24 differs from Exhibit 25?
22    A.  I believe it has some additional
23  information that was added that came up that
24  they didn't know about in the first one.

Page 149

1    Q.  Who is "they"?
2    A.  Okay, my attorneys.
3    Q.  Okay.
4    A.  And I guess the public.
5    Q.  Do you know the nature of that
6  additional information?
7    A.  I think it came out of the securities
8  hearing or the FDA as far as what came out of
9  the -- at that point in time, as far as the
10  information that -- the filings in the
11  securities.
12    Q.  It came out of filings -- I'm sorry.
13    A.  When the Securities & Exchange
14  Commission went ahead --
15        (Whereupon, the reporter read back the
16  above questions and answers.)
17        BY MR. BLANCHARD:
18    Q.  Where did the additional information
19  come from again?
20    A.  Probably from the Judicial District
21  Court as far as that.  So I mean as far as the
22  Securities & Exchange filings.
23    Q.  Do you know which court this action is
24  pending in?

38 (Pages 146 to 149)

Ronald W. Erickson                                                              05/30/2006

Page 150

1    A.   Federal.
2    Q.   Do you know what jurisdiction or what
3  state?
4    A.   It would be Massachusetts.
5    Q.   Did you participate in any of the new
6  information -- you know, forgive me, it's
7  getting late.
8         Did you participate in selecting what
9  new information was put into the second amended
10  complaint, Exhibit 25?
11    A.   I was --
12         MR. LONGMAN:  I just want to advise
13  you not to disclose any communications you had
14  with your lawyer, either you speaking to your
15  lawyers or your lawyers speaking to you.  With
16  that advice, you can answer the question without
17  violating that privilege.
18    A.   I was shown the information, and I
19  agreed upon it.
20         BY MR. BLANCHARD:
21    Q.   Could you turn to page 74 of Exhibit
22  25?  Are you there?
23    A.   Mm-hmm.
24    Q.   Yes?

Page 151

1    A.   Yes.
2    Q.   There's a chart at the bottom, and it
3  shows the date that shares were sold by Rausch,
4  correct?
5    A.   Correct.
6    Q.   And the dates listed are 4-15-03,
7  6-5-03, 6-24-03, 6-25, 26, 27 and 6-30-03, 8-5,
8  8-6, 8-7, 8-8, 8-12 and 8-13 and 8-28-03,
9  correct?
10    A.   Correct.
11    Q.   Now, you didn't purchase any shares on
12  any of those dates, did you?
13    A.   No, just the dates that you have.
14    Q.   Right.
15         MR. BLANCHARD:  Do you want to take a
16  break?  Take a break.
17         (Whereupon, a recess was taken from
18         4:54 p.m. to 5:54 p.m.)
19         MR. BLANCHARD:
20         (Whereupon, Exhibit 26 was marked for
21         identification.)
22         BY MR. BLANCHARD:
23    Q.   We're back on the record.
24         Have you ever seen Exhibit 26 before?

Page 152

1    A.   Did I see what?  What was the
2  question?
3    Q.   Exhibit 26 before.
4    A.   Yes.
5    Q.   Can you tell me what it is?
6    A.   It's the Biopure annual report for
7  October 31st, 2002.
8    Q.   Is there anything false or misleading
9  in this report, or is there anything you claim
10  to be false and misleading in this report?
11         MR. LONGMAN:  Objection.
12    A.   I don't know.  I saw it, browsed
13  through it, but --
14         MR. LONGMAN:  Do you want him to read
15  the document?
16    A.   I don't remember at this point in
17  time.
18         BY MR. BLANCHARD:
19    Q.   You don't remember at this point in
20  time?
21    A.   Right.  I mean back then when I looked
22  at it thoroughly and so forth.
23    Q.   When did you first see it?
24    A.   I got a copy of it probably January of

Page 153

1  2003, I believe, something like that, January,
2  February.
3    Q.   Where did you get a copy of it from?
4    A.   I had went ahead and looked it up on
5  the Internet.
6    Q.   Do you recall whether you read it?
7    A.   If I did, it was just browsing through
8  it quickly.
9         MR. LONGMAN:  Do you want him to look
10  through it now to see if there's anything
11  misleading?
12         MR. BLANCHARD:  No.
13         MR. LONGMAN:  It's a 54 page document.
14         MR. LONGMAN:  Do you want him to?
15         MR. LONGMAN:  It's your deposition,
16  you asked him the question.
17         MR. BLANCHARD:  I did.  He answered
18  it.
19         MR. LONGMAN:  He can't remember.
20         (Whereupon, Exhibit 27 was marked for
21         identification.)
22         BY MR. BLANCHARD:
23    Q.   Do you have Exhibit 27 in front of
24  you?

39 (Pages 150 to 153)

Ronald W. Erickson                                                    05/30/2006

Page 154

1          (Witness reviewing document.)
2          BY MR. BLANCHARD:
3          Q.   I'm sorry, I didn't hear if you
4    answered.  Do you have Exhibit 27 before you?
5          A.   Yes.
6          Q.   Have you ever seen Exhibit 27 before?
7          MR. LONGMAN:  I'd like you to give him
8    some time to review the document.
9          MR. BLANCHARD:  Sure.
10         BY MR. BLANCHARD:
11         Q.   Take some time to review it.  I'm
12   sorry.
13         (Witness reviewing document.)
14         A.   I don't remember seeing this.  I mean
15   the print is pretty shrunk.
16         BY MR. BLANCHARD:
17         Q.   It's, if you -- I'm sorry, if you turn
18   to the second page it indicates it's a Form S-3
19   filed by Biopure, I think on April 11th, 2003?
20         MR. LONGMAN:  It says it's a
21   post-effective amendment number two to a Form
22   S-3.
23         MR. BLANCHARD:  That's correct.
24         BY MR. BLANCHARD:

Page 155

1          Q.   As filed with the Securities &
2    Exchange Commission on April 11th, 2003.
3          Do you recall reading this document
4    maybe in another form ever?
5          A.   Maybe in another form.  I don't recall
6    this one.
7          Q.   If I could direct your attention to
8    page five.
9          A.   Okay.
10         Q.   There's a paragraph with the heading
11   "if we fail to obtain FDA approval we cannot
12   market Hemopure in the United States."
13         Would you take a moment and just read
14   that paragraph that follows that sentence?
15         A.   Right here.
16         MR. LONGMAN:  No, right here
17   (indicating).
18         (Witness reviewing document.)
19         A.   Okay.
20         BY MR. BLANCHARD:
21         Q.   Do you recall ever reading that
22   language before?
23         A.   I believe I've seen it.
24         Q.   When?

Page 156

1          A.   I'm not sure exactly when.
2          MR. LONGMAN:  I want to object.
3          When you say "this language," are you
4    referring to --
5          MR. BLANCHARD:  To the paragraph that
6    he just read.
7          MR. LONGMAN:  The entire paragraph?
8          MR. BLANCHARD:  Yes.
9          MR. LONGMAN:  When you answer that,
10   you've seen the entire paragraph.
11         A.   No, I haven't seen the whole
12   paragraph.  I knew that they were going for FDA
13   approval and so forth, as far as I haven't seen
14   that.
15         BY MR. BLANCHARD:
16         Q.   Is there anything -- I'm sorry, I
17   didn't mean to interrupt you.  Go ahead and
18   finish.
19         A.   As far as going ahead, refusal to
20   grant marketing authorizations or trials, are
21   expensive and time consuming, I didn't see that.
22         Q.   Read for me where you believe -- why
23   don't you tell me what portions of it you
24   believe you have seen before.

Page 157

1          A.   "Filed for an application for approval
2    of the FDA and application to acceptance review
3    October 1st, 2002.  I believe that our completed
4    pivotal phase three clinical trials are
5    consistent with the FDA's most recent guidance
6    and design efficient --" is that supposed to be
7    efficiency?
8          Q.   Efficacy.
9          A.   "-- and safety end points required for
10   approval of product such as Hemopure for use in
11   surgical indications."
12         MR. LONGMAN:  Is this -- I think he's
13   asked you what parts have you seen.
14         A.   Oh, that I've seen written.  I don't
15   know if I've seen it in this.
16         MR. LONGMAN:  Everything you just read
17   from the beginning of the paragraph until
18   indications?
19         A.   Without the beginning of the
20   paragraph, we filed for application, they filed
21   for application in that sense.
22         MR. LONGMAN:  Not the first sentence?
23         THE WITNESS:  No.
24         BY MR. BLANCHARD:

40 (Pages 154 to 157)

Ronald W. Erickson

05/30/2006

Page 158

1     Q.   Is that it from that paragraph?
2          MR. LONGMAN:  Have you seen any of the
3     other?
4          THE WITNESS:  No.
5          BY MR. BLANCHARD:
6     Q.   Okay.  Is there anything that you view
7     as false or misleading about the sentences you
8     just read?
9          MR. LONGMAN:  Objection.
10    A.   No, not for what I just read.
11         BY MR. BLANCHARD:
12    Q.   Do you believe that --
13    A.   I mean it's --
14         BY MR. BLANCHARD:
15    Q.   Do you believe --
16         MR. LONGMAN:  Are you through with
17    your answer?
18         THE WITNESS:  Yes.
19         BY MR. BLANCHARD:
20    Q.   Do you believe that the company should
21    have said anything that it didn't in here in
22    light of what it did say in those sentences you
23    just read?
24    A.   Yes.  I think when the trials were put

Page 159

1     on hold in April, in that sense, they led it to
2     believe that they were not -- that they were
3     just normal function, and everything was going
4     to be smooth.  I was not aware of that at that
5     point.
6          So as far as what I read just from the
7     second sentence to probably the second and third
8     sentence there or whatever, I mean I've read
9     that elsewhere, fine, the bottom portion I have
10    not.
11         MR. LONGMAN:  I don't know if you're
12    responding to a question.
13         Can you read his question back?
14         (Whereupon, the reporter read back the
15    pending question.)
16         MR. LONGMAN:  Okay.  And then you
17    answered, I think.
18         MR. BLANCHARD:  Can I hear the answer
19    back?
20         (Whereupon, the reporter read back the
21    above answer.)
22         BY MR. BLANCHARD:
23    Q.   When you said the trials were put on
24    hold, do you know why the trials were put on

Page 160

1     hold?
2     A.   I would say, you know, I didn't go
3     in-depth into it, I would say that for the
4     trials they were having problems with the
5     trials, with the patients and everything, and
6     that's why they were probably put on hold by the
7     FDA.
8     Q.   Was it more than one trial that was
9     put on hold?
10    A.   It was clinical trials that were put
11    on hold.
12    Q.   Was it more than one?
13    A.   Yes.  Well, I mean if you're going to
14    go ahead, one clinical trial or further clinical
15    trials, what are you saying?  They have to do
16    more than one trial, it's not just one patient
17    or so.
18    Q.   Okay.  Right.  I mean it could be more
19    patients, but what's your understanding of what
20    a clinical trial is?
21    A.   I mean if you're going to go ahead and
22    say clinical trial, which encompasses a lot of
23    patients, then yes, it's one clinical trial for
24    the Hemopure.

Page 161

1     Q.   Okay.  Do you know, was that clinical
2     trial, did it involve a particular use for
3     Hemopure?
4     A.   It was for more so the orthopedic part
5     as far as doing, I mean like knee replacements
6     or anything like that, or in service to go ahead
7     and end up having damage with joints where they
8     need to go ahead and have a blood supply where
9     there was a lot of loss of blood or something
10    like that, that's what they'd use it for, my
11    understanding.
12    Q.   And that clinical trial was put on
13    hold?
14    A.   To the best of my knowledge, yes.
15    Q.   Pardon me if I already asked this, I
16    don't know if I asked it exactly the same, but
17    do you know why FDA put a clinical trial on
18    hold?
19         MR. LONGMAN:  He just answered the
20    question.
21    A.   Because they thought it wasn't
22    working.
23         BY MR. BLANCHARD:
24    Q.   Okay.  Did FDA communicate anything

41 (Pages 158 to 161)

Page 162

1  specific about the clinical trial?
2        MR. LONGMAN:  I just want to point --
3     A.  I think the patients were, the
4  patients were at risk.  That's probably why they
5  put it on hold.
6        BY MR. BLANCHARD:
7     Q.  Okay.
8     A.  They weren't having a lot of success
9  with it was my understanding.
10    Q.  Okay.  So you -- when you say that's
11 probably why they put it on hold, I just
12 question whether you're speculating or telling
13 me if you know from some source.
14       MR. LONGMAN:  He gave you an answer.
15 You can ask him the basis.
16    A.  I don't have definitive --
17       MR. LONGMAN:  Wait, I talk, then you
18 talk.
19       You asked him a question, he gave you
20 an answer, and now you say I don't know if
21 you're speculating.  Where does that come from?
22       MR. BLANCHARD:  The raising of your
23 tone is noted for the record, I don't appreciate
24 it.

Page 163

1        It comes from the ambiguity of the
2  answer.
3        MR. LONGMAN:  I raised my tone?
4        MR. BLANCHARD:  Yes, you did.  And I
5  don't appreciate it.  Thank you.
6        I will do my best, it is getting late
7  in the day, to ask the clearest questions
8  possible.  If my question isn't clear, then
9  please make an objection, but otherwise please
10 just limit your statements to objections.
11       MR. LONGMAN:  Okay.  Was your
12 testimony speculation, is that what you're
13 asking him?
14       MR. BLANCHARD:  I was asking if he was
15 speculating as to whether or not --
16    A.  It was my interpretation of what I've
17 heard as far as read on the Internet and in the
18 claims that were made.
19       BY MR. BLANCHARD:
20    Q.  At what point did you learn that a
21 clinical trial was put on hold?
22    A.  I would say not for -- not for quite a
23 while.  I think it was probably, it was later,
24 third or fourth quarter, 2003.

Page 164

1     Q.  Can you be more specific as to when it
2  was?  Third or fourth quarter is a six month
3  period.
4     A.  Well, I knew it wasn't, and I knew it
5  wasn't in -- I knew it wasn't up until August
6  because August -- remember the stock going up
7  quite a bit, September, October, somewhere in
8  there, October, November, December, somewhere in
9  there that I ended up hearing about it.
10    Q.  Okay.  Do you recall how you heard
11 that a clinical trial was put on hold?
12    A.  I started reading information on it
13 through either the Internet or whatever.  I
14 didn't -- I didn't get anything from the company
15 saying that, that I can remember.
16       (Whereupon, Exhibit 28 was marked for
17 identification.)
18       BY MR. BLANCHARD:
19    Q.  Do you have Exhibit 28 in front of
20 you?
21       (Witness reviewing document.)
22       BY MR. BLANCHARD:
23    Q.  Do you have Exhibit 28 in front of
24 you?  I'm sorry.

Page 165

1     A.  Yes.
2     Q.  It is a post-effective amendment
3  number one to Form S-3 registration statement
4  under the Securities Act of 1933 filed with the
5  SEC on April 16th, 2003 by Biopure, correct?
6  I'm just reading that off the first page.
7     A.  Yes.
8     Q.  Do you recall ever reading this
9  document, maybe not in exactly this form?
10       MR. LONGMAN:  You're going to have to
11 give him a minute to look at the document.
12       MR. BLANCHARD:  Sure.  Yes.
13       BY MR. BLANCHARD:
14    Q.  When I ask that question, I'm sorry, I
15 mean for you to look it over.
16       (Witness reviewing document.)
17    A.  I don't honestly remember.
18       BY MR. BLANCHARD:
19    Q.  Okay.
20       (Whereupon, Exhibit 29 was marked for
21 identification.)
22       BY MR. BLANCHARD:
23    Q.  Do you have Exhibit 29 in front of
24 you?

42 (Pages 162 to 165)

Page 166

1    A.   Yes.
2    Q.   Actually I'm sorry, I marked the wrong
3  one.  Can we give you a new 29 and make that 30?
4        (Whereupon, Exhibit 30 was marked for
5        identification.)
6        MR. LONGMAN:  What did you just hand
7  me, 29 or 30?
8        MR. BLANCHARD:  The April 1st should
9  be 29, and May should be 30.
10       BY MR. BLANCHARD:
11   Q.   I'll make sure we're on the same page,
12  I'm sorry for the confusion.
13       Do you have Exhibit 29 before you?
14   A.   Yes.
15   Q.   And is Exhibit 29 a document entitled
16  "Biopure Awards Public Relations and Medical
17  Education Accounts in Support of Hemopure"?
18   A.   Yes.
19   Q.   Have you ever read Exhibit 29 before,
20  or any part of it?
21   A.   I might have.
22   Q.   Do you recall when you would have, you
23  might have read it?
24       MR. LONGMAN:  That would be

Page 167

1  speculation, if he might have.  I'm not sure if
2  he read it or not.
3        MR. BLANCHARD:  I'm asking when he
4  might have read it, if he might have read it
5  when might he have read it.
6    A.   Around the time it was released.
7        BY MR. BLANCHARD:
8    Q.   Okay.  But you don't know whether or
9  not you read it?
10   A.   I mean I might have read something
11  similar or I might have read this, one or --
12       MR. TUCCILLO:  Mike, for the record,
13  the 5-26-06 is the access date that you printed
14  it, right?
15       MR. BLANCHARD:  Yes.
16       MR. TUCCILLO:  That's obviously not
17  part of what you're asking if he read it, this
18  is something you printed out?
19       MR. BLANCHARD:  Yes, in substance, in
20  substance.
21       BY MR. BLANCHARD:
22   Q.   If we can turn to Exhibit 30.  And if
23  we've got the right Exhibit 30 it should be
24  "Biopure Announces 2003 Second Quarter Financial

Page 168

1  Results"?
2    A.   Yes.
3    Q.   Take a moment to review that document,
4  please.
5        (Witness reviewing document.)
6    A.   Okay.
7        BY MR. BLANCHARD:
8    Q.   Is there anything in Exhibit 30 that
9  you contend is false or misleading?
10   A.   Not that I can --
11       MR. LONGMAN:  Take your time to look
12  through it.
13       (Witness reviewing document.)
14   A.   Okay.  So this release was done in May
15  22nd, 2003, correct?
16       BY MR. BLANCHARD:
17   A.   Correct.  That's what's indicated on
18  the first page at the top.
19       (Witness reviewing document.)
20   A.   On the second paragraph where it's
21  bull's eyed and it says "based on FDA
22  performance goals and guidelines, the
23  prescription drug," it says "Biopure is hopeful
24  that in mid 2003 the FDA will complete its

Page 169

1  review and act on Biopure's biological license
2  application."
3        It doesn't say -- it leads you to
4  believe that everything is fine at that point in
5  time, that they didn't put a hold on any of the
6  clinical trials at all or anything.  I'd say
7  that that is misleading in that sense to me for
8  not going ahead and at least having something in
9  there in regard -- they lead it to believe that
10  it's going to be -- they're going to complete
11  their review by 2003 when they've already done a
12  portion of the review and already put a hold on
13  the clinical trials.
14   Q.   And --
15   A.   And this is in May, and they did that
16  in April.
17   Q.   It mentions Prescription Drug User Fee
18  Act, also referred to as PDUFA.
19       Are you familiar with PDUFA at all?
20   A.   No, not completely.
21   Q.   Are you partially?
22   A.   I've read it, I've -- a little bit,
23  but not -- it wasn't their main product.
24  Hemopure was more what I was interested in.

Page 170

1    Q.   You read PDUFA or parts of it?
2    A.   I've read of it a little bit and
3 that's it.  I just passed over it because the
4 Hemopure is what I was looking at.
5    Q.   Do you know when the FDA completed its
6 review of Biopure's biologics license
7 application?
8    A.   No, I don't remember.
9    Q.   Do you remember what year?  Do you
10 remember if they did at all?
11        MR. LONGMAN:  Objection.  I was going
12 to say no foundation for the question.
13        BY MR. BLANCHARD:
14    Q.   Do you know whether they completed
15 their review of the BLA, biologics license
16 application, at all?
17    A.   For Hemopure?
18    Q.   Let me just re-ask it.
19        Do you know whether the FDA completed
20 their review or its review of the biologics
21 license application for Hemopure for Biopure at
22 all?
23        MR. LONGMAN:  I think he testified
24 earlier he wasn't sure what biologics

Page 171

1 application was.
2        MR. BLANCHARD:  Please let him answer.
3        MR. LONGMAN:  Do you want an answer to
4 the question or do you want to confuse the
5 witness?
6        MR. BLANCHARD:  Are you going to
7 testify, or are you going to let him answer?
8        MR. LONGMAN:  No, I want to get clear
9 answers, and we're going to walk out of here if
10 you insist on trying to muddy the record.
11        He testified earlier today he did not
12 know what a biological license, so ask it in a
13 way that's comprehensible.
14        BY MR. BLANCHARD:
15    Q.   Based on what you just read to me that
16 you contend is false and misleading in this
17 application and you sued my client for which
18 refers to a biologics license --
19    A.   That refers --
20    Q.   Please just let me finish the
21 question.
22    A.   Okay.
23    Q.   -- which refers to a biologics license
24 application, do you know whether FDA ever

Page 172

1 completed its review of that biologics license
2 application?
3        And if my question is asking something
4 that you don't understand, then please tell me.
5        MR. LONGMAN:  Objection.
6    A.   Okay.  I don't understand.  As far as
7 the Prescription Drug User Fee Act, the PDUFA, I
8 might have that confused with the Hemopure in
9 that sense.  And if it's got nothing to do with
10 the Hemopure, then that's different from what I
11 was thinking.
12        MR. LONGMAN:  He's asking you a
13 question.  Repeat the --
14    A.   I'm not sure what -- I don't
15 understand the question.
16        MR. LONGMAN:  Can you repeat the
17 question?
18        (Whereupon, the reporter read back the
19 pending question.)
20        MR. LONGMAN:  Do you understand the
21 question?
22    A.   Have they fulfilled on the
23 application?
24        BY MR. BLANCHARD:

Page 173

1    Q.   I'm sorry, what did you say?
2    A.   Okay, what was --
3    Q.   Have they what?  I just misheard.
4    A.   I'm not sure what you're getting at.
5    Q.   Let's just back up and take it from
6 the beginning.
7        You indicated that, I thought you
8 indicated, tell me if I'm wrong, that based on
9 FDA performance, goals and guidelines in the
10 PDUFA "Biopure is hopeful that mid-2003 the FDA
11 will complete its review and act on Biopure's
12 biologics license application, BLA, to market
13 Hemopure in the United States for treatment of
14 acutely anemic adult patients undergoing
15 orthopedic surgery."  And I believe you
16 indicated that that statement was false or
17 misleading because there was a clinical hold.
18    A.   No, I was incorrect on that.
19    Q.   Okay.  I apologize for the whole line
20 of questioning.
21        So is there anything in that statement
22 that is false or misleading in your view?
23        MR. LONGMAN:  He's answered this
24 question before.

44 (Pages 170 to 173)

Page 174

1    MR. BLANCHARD: He just told me --
2    MR. LONGMAN: Now you're trying --
3    MR. HUANG: He just changed his
4  response.
5    MR. BLANCHARD: He changed his
6  response.
7    A.  That has to do with in a sense for
8  acute anemic adult patients, and that was the
9  portion where I was -- I read over quickly, and
10  go ahead. So there's a difference there. So
11  I'd say no, as far as I'm not aware of any at
12  this point on this.
13    MR. LONGMAN: On what?
14    THE WITNESS: As far as this document.
15    MR. LONGMAN: I don't understand what
16  your answer is.
17    MR. BLANCHARD: I don't either, I'm
18  sorry.
19    A.  Okay. Ask the question again.
20    BY MR. BLANCHARD:
21    Q.  Is there anything false or misleading
22  in that sentence that we've just been reading?
23    A.  Not that I can see.
24    Q.  Now, you've testified earlier that

Page 175

1  you're aware that Biopure has submitted an
2  application for FDA approval of Hemopure,
3  correct?
4    A.  Mm-hmm.
5    Q.  That application was pending in 2003,
6  correct?
7    A.  Yes.
8    Q.  Are you aware of whether the FDA ever
9  completed its review of that application?
10    MR. LONGMAN: Objection.
11    A.  I don't believe they have. I don't
12  believe they've answered the 200 some odd
13  questions, to the best of my knowledge, to go
14  ahead and have the review finished. I think
15  they either put it on hold or denied it, because
16  they have not gone ahead and answered all the
17  questions.
18    BY MR. BLANCHARD:
19    Q.  Okay.
20    (Whereupon, Exhibit 31 was marked for
21    identification.)
22    BY MR. BLANCHARD:
23    Q.  Do you have Exhibit 31 in front of
24  you?

Page 176

1    A.  Yes.
2    Q.  It's labeled on the first page "Final
3  Transcript CCBN Street Events, Event Transcript,
4  BPUR or Biopure Q-2, 2003, Corporation Earnings
5  Conference Call, May 22nd, 2003."
6    In substance is that correct, that's
7  what it is?
8    A.  Yes.
9    Q.  Okay. This appears to be a transcript
10  of a conference call that the company had May
11  22nd, correct?
12    A.  It appears to be.
13    Q.  Okay. You mentioned that you had
14  listened in on a Biopure call at some point.
15  Was this the call you listened to?
16    A.  I'm not sure if this was the one I
17  listened to. I'd have to read through it to
18  find out.
19    Q.  Do you recall when --
20    MR. LONGMAN: Let him -- do you need
21  to read through it to find out?
22    A.  I'm not sure if this was the one, or I
23  mean I listened to a couple.
24    BY MR. BLANCHARD:

Page 177

1    Q.  Okay.
2    MR. LONGMAN: If by reading through
3  it, can you find out if this was the one?
4    THE WITNESS: I might be able to.
5    MR. LONGMAN: Read through it.
6    BY MR. BLANCHARD:
7    Q.  Go right ahead and read through it.
8    (Witness reviewing document.)
9    A.  I might have listened to this, because
10  there's some segments here that I remember.
11    BY MR. BLANCHARD:
12    Q.  What segments?
13    A.  Either I read it or I went ahead and
14  ended up listening to it or whatever.
15    Q.  Okay. I guess just to figure out how
16  relevant it is, did you read it, you know, in
17  2003 or sometime after, or did you --
18    A.  I'd say it was in 2003.
19    Q.  Okay. After, you know, reviewing this
20  briefly I recognize, the segments that you
21  recognize, what are they?
22    A.  Well, as far as going ahead in the
23  first paragraph, that portion. As far as the
24  third paragraph.

45 (Pages 174 to 177)

Page 178

1    Q.  I'm sorry, if you could identify the
2  paragraph, just read me the first couple words?
3    A.  First paragraph, "at this call last
4  quarter I was asked to give a rough estimate on
5  how much we would ship in this quarter, and I
6  estimated between one and eight quarters, and in
7  two, and a quarter million."
8        Then the third paragraph, "last
9  quarter I also indicated that we anticipated
10  additional military support beyond then the then
11  4.9 million that had been appropriated."
12        Those two.
13    Q.  Is there anything false or misleading
14  in your view in any of those statements?
15    A.  No.
16        (Whereupon, Exhibit 32 was marked for
17  identification.)
18    BY MR. BLANCHARD:
19    Q.  You have Exhibit 32 in front of you?
20    A.  Yes.
21    Q.  And it's a transcript of a May 30th
22  conference call, correct, for Biopure?
23    A.  That's what it says.
24    Q.  If you could take a moment to review

Page 179

1  the document, I'll ask you a few questions.
2        (Witness reviewing document.)
3    A.  Okay.
4    BY MR. BLANCHARD:
5    Q.  Do you recall whether you listened in
6  on this investor call?
7    A.  I think I might have missed this one.
8    Q.  You might have missed it?
9    A.  Yes.
10        (Whereupon, Exhibit 33 was marked for
11  identification.)
12    BY MR. BLANCHARD:
13    Q.  Do you have Exhibit 33 before you?
14    A.  Yes.
15    Q.  And that is a press release, correct?
16    A.  It looks that way, yes.
17    Q.  It's titled "U.S. FDA Finalizes
18  Response Date For Biopure's Marketing
19  Application of Hemopure," correct?
20    A.  Mm-hmm.
21    Q.  Do you recall whether you've ever seen
22  this document before?  Please take all the time
23  you need to review it.
24        (Witness reviewing document.)

Page 180

1    A.  I think I might have missed this with
2  the conference call.  It was the same day as
3  this talking about the same day.  I might have
4  read this later on.
5    BY MR. BLANCHARD:
6    Q.  Okay.
7    A.  Other than the May 30th.
8    Q.  Do you recall ever learning that the
9  FDA took an extension on the amount of time it
10  was going to take to review the Biopure
11  application for approval of Hemopure during
12  2003?
13    A.  I remember them filing, that they were
14  filing for an extension or whatever, something
15  like that.
16    Q.  I don't --
17    MR. LONGMAN:  Let him finish.
18    A.  Biopure was going for a filing an
19  extension for the application.
20    BY MR. BLANCHARD:
21    Q.  Are you --
22    A.  Is that what you were asking?
23    Q.  Well, okay.  If you're done with your
24  answer, I just don't want to interrupt.  Are you

Page 181

1  done?
2    A.  Mm-hmm.
3    Q.  When you say they were filing for an
4  extension, who was filing for an extension?
5    A.  Biopure was.
6    Q.  And they sought an extension of the
7  amount of time for FDA to complete its review of
8  the application?
9    A.  I believe so.
10    Q.  Do you know whether Biopure's request
11  for an extension was ever granted?
12    A.  I don't know.
13    Q.  Do you know if the amount of time the
14  FDA was going to take to review Biopure's
15  application for approval of Hemopure -- wow,
16  it's getting late, I'm sorry.  Can you read back
17  -- I'll try to ask the question again, I lost it
18  in midstream.
19        Do you know whether the FDA ever
20  extended the time that it was going to take to
21  review, to complete its review of Biopure's
22  application of Hemopure?
23    MR. LONGMAN:  Isn't that what you
24  just --

46 (Pages 178 to 181)

Ronald W. Erickson

Page 182

1    MR. BLANCHARD: Maybe it is, but I'm
2  not sure.
3    A. And I -- I'm not sure.
4    BY MR. BLANCHARD:
5    Q. Okay. Great. Thank you. I
6  apologize.
7    (Off the record discussion.)
8    (Whereupon, Exhibit 34 was marked for
9    identification.)
10    BY MR. BLANCHARD:
11    Q. Do you have Exhibit 34 before you?
12    A. Yes.
13    Q. Take a moment and review it, please.
14    (Witness reviewing document.)
15    A. Okay.
16    BY MR. BLANCHARD:
17    Q. You've reviewed it?
18    A. Most of it.
19    Q. Let me know when you're ready, I'm
20  sorry.
21    (Witness reviewing document.)
22    A. Okay.
23    BY MR. BLANCHARD:
24    Q. Okay. Have you ever seen Exhibit 34

Page 183

1  before?
2    A. I believe I have.
3    Q. Do you recall when you saw it?
4    A. I would have seen it in probably
5  somewhere in August, 2003.
6    Q. Did you read it?
7    A. Yes.
8    Q. In your view, is there anything false
9  or misleading about what's contained in Exhibit
10  34?
11    A. No, at that point, no.
12    Q. Say that again?
13    A. No.
14    (Whereupon, the witness and his
15  counsel conferred.)
16    MR. BLANCHARD: Does counsel need to
17  take a break with the witness? Do you need to
18  take a break?
19    MR. LONGMAN: There's no question
20  pending, is there?
21    MR. BLANCHARD: No, but if you want to
22  take a break, take a break.
23    (Whereupon, the witness and his
24  counsel conferred.)

Page 184

1    BY MR. BLANCHARD:
2    Q. Have you ever heard the term "complete
3  response letter" before?
4    A. I don't believe so.
5    Q. So that term doesn't have any
6  significance for you?
7    A. Well, complete response letter as far
8  as divulging everything that I had? I mean --
9    Q. It's not really a fair question to ask
10  you what the significance is if you never really
11  heard it before. I'm just making sure that when
12  someone says "complete response letter" it
13  doesn't mean anything particular to you.
14    MR. LONGMAN: You mean in the context
15  of an FDA? I mean --
16    MR. BLANCHARD: Sure, in any context.
17    MR. LONGMAN: Any complete response
18  letter in the world? You have to put it in
19  context.
20    BY MR. BLANCHARD:
21    Q. Well, in the context of FDA
22  regulations, have you ever heard the term
23  "complete response letter"?
24    A. I might have. I mean as far as going

Page 185

1  ahead with the terminology, might have. But I
2  mean as far as going ahead, I have probably a
3  different view of what it is than what you do or
4  whatever else.
5    Q. Well, do you have a view of what a
6  complete response letter is in the context of
7  FDA terminology?
8    A. No.
9    Q. Have you ever heard the term complete
10  response letter in connection with this
11  litigation?
12    A. I might have. I'm trying to -- it's
13  been a long day, I'm going ahead and kind of
14  trying to remember, it's a little cloudy.
15    Q. Understood.
16    But you're not sure?
17    A. Right.
18    Q. And the term doesn't carry any
19  significance for you in the context of this
20  litigation?
21    MR. LONGMAN: I think he just answered
22  that.
23    A. I mean in the context, I mean what
24  comes to mind, okay, in a sense as far as to me

47 (Pages 182 to 185)

Ronald W. Erickson

05/30/2006

Page 186

1  would be in July when they had the 200 questions
2  that they had to answer, I assume that that
3  would be what would be sent out, and that's what
4  they'd have to do to go ahead and complete it.
5  But I don't know if that's what you're getting
6  at or what, so I'm saying that I'm kind of brain
7  dead right at the moment.
8      BY MR. BLANCHARD:
9      Q.  I get you.  I'm just trying to get
10  whatever your understanding of a complete
11  response letter is both in the FDA context and
12  this litigation, what your understanding is, and
13  I think you've answered both those.
14     MR. LONGMAN:  Okay.  Do you want to
15  take a break?  Are you tired?
16     THE WITNESS:  I'm okay.  I'll be more
17  tired if we take a break and come back.
18     (Whereupon, Exhibit 35 was marked for
19     identification.)
20     BY MR. BLANCHARD:
21     Q.  Do you have Exhibit 35 in front of
22  you?
23     A.  Yes.
24     Q.  Please take all the time you need to

Page 187

1  review it.
2      (Witness reviewing document.)
3      A.  Okay.
4      BY MR. BLANCHARD:
5      Q.  You've had time to review it?
6      A.  Yes.
7      Q.  Exhibit 35.  Have you ever seen it
8  before?
9      MR. LONGMAN:  What did you say?
10     BY MR. BLANCHARD:
11     Q.  Have you ever seen it before, Exhibit
12  35?
13     A.  I believe so.
14     Q.  I'm sorry, did you say I don't believe
15  so?
16     A.  I believe so.
17     Q.  You believe so.
18     Do you recall when you've seen it?
19     A.  It would have been in August sometime.
20     Q.  Did you read it?
21     I'm sorry, when you say August,
22  August, 2003?
23     A.  Yes.
24     Q.  Did you read it at that time?

Page 188

1      A.  I believe so.
2      Q.  Is there anything in Exhibit 35 that
3  you believe is false or misleading?
4      A.  No.  I'd say that's -- recent
5  corporate events is more so that ended up --
6  that I remember in that paragraph and so forth.
7  As far as, yes, I'd say that just more so
8  stating what they came out with at that point in
9  time.
10     Q.  Is there anything in that recent
11  corporate events paragraph that you believe is
12  false or misleading?
13     A.  I think they're stating it at that
14  point in time where they didn't have the -- you
15  know, up until then as far as they didn't
16  divulge what -- no, I'd say that's fine.
17     I'm sorry, that just got a little
18  jumbled on me there.
19     A.  Yes, I'm jumbling.
20     MR. TUCCILLO:  Could you read back his
21  answer, please?
22     (Whereupon, the reporter read back the
23  above answer.)
24     BY MR. BLANCHARD:

Page 189

1      Q.  Go ahead.
2      MR. LONGMAN:  He's asking you if
3  there's anything false or misleading.
4      A.  No, I think it's fine.
5      BY MR. BLANCHARD:
6      Q.  Okay.  Thank you.
7      MR. LONGMAN:  Can we take a short
8  break?
9      MR. BLANCHARD:  Sure.
10     (Whereupon, a recess was taken from
11  6:52 p.m. to 7:03 p.m.)
12     BY MR. BLANCHARD:
13     Q.  I'm sorry, I didn't give you the
14  August 21st conference call yet, did I?  No, I
15  did not.
16     (Whereupon, Exhibit 36 was marked for
17     identification.)
18     BY MR. BLANCHARD:
19     Q.  Do you have Exhibit 36 in front of
20  you?
21     A.  Yes.
22     Q.  If you could take a moment to review
23  it, please.
24     (Witness reviewing document.)

48 (Pages 186 to 189)

Ronald W. Erickson                                                    05/30/2006

Page 190

1    A.  Okay.
2        BY MR. BLANCHARD:
3    Q.  You've had an opportunity to review
4  it?
5    A.  Somewhat, yes.
6    Q.  It appears to be a transcript of an
7  investor conference call on August 21st, 2003,
8  correct?
9    A.  Mm-hmm, yes.
10   Q.  Do you recall whether you listened in
11 to that call?
12   A.  I don't recall.
13   Q.  And does the review of this document
14 refresh your memory at all?
15   A.  No, it doesn't, as far as -- I mean
16 any of the information right now, it's getting
17 late in the day, and I'm not really -- as far as
18 being able to read all this information as
19 quickly as needed, in that sense, but none of it
20 is giving -- I mean it's -- it may have some
21 true statements in it, but in the sense it still
22 does not go ahead and --
23       MR. LONGMAN:  That's not what he asked
24 you.

Page 191

1        MR. BLANCHARD:  I agree.
2        MR. LONGMAN:  What's the question
3  pending?  Listen to the question he's asking
4  you.
5        (Whereupon, the reporter read back the
6  above questions and answers.)
7        MR. LONGMAN:  Does it refresh your
8  recollection?
9        THE WITNESS:  No.
10       BY MR. BLANCHARD:
11   Q.  Did you speak with your attorney
12 during the break?
13   A.  Yes, I did.  Is that a problem?
14   Q.  No, not at all?
15       (Whereupon, Exhibit 37 was marked for
16       identification.)
17       BY MR. BLANCHARD:
18   Q.  Do you have Exhibit 37 in front of
19 you?
20   A.  Yes.
21   Q.  Okay.  I'm not going to ask you to
22 review this whole document.
23   A.  Thank you.
24   Q.  I'm only going to ask you whether or

Page 192

1  not you have a recollection of seeing a
2  prospectus for Biopure during September of 2003.
3    A.  I might have.  Right now I don't
4  recollect.
5    Q.  Okay.  And do you have any independent
6  recollection of seeing this particular document?
7    A.  I might have.  I don't recollect.
8        (Whereupon, Exhibit 38 was marked for
9        identification.)
10       BY MR. BLANCHARD:
11   Q.  Do you have Exhibit 38 before you?
12   A.  Yes.
13   Q.  This also is a prospectus from 2003,
14 September 15th, a few days after the Exhibit 37
15 which was September 12th.
16       Again I'm not going to ask you to
17 review the whole document, but do you have a
18 recollection of seeing this document?
19   A.  I might have.  I don't recollect
20 honestly.
21   Q.  Okay.
22       (Whereupon, Exhibit 39 was marked for
23       identification.)
24       BY MR. BLANCHARD:

Page 193

1    Q.  Do you have Exhibit 39 in front of
2  you?
3    A.  I do.
4    Q.  Just reviewing the top of the first
5  page, it's a Biopure presentation by Tom Moore
6  to UBS Global Life Sciences Conference, New
7  York, New York, September 25th, 2003.  Correct?
8    A.  Yes.
9    Q.  Do you recall hearing about this
10 conference in any way?
11   A.  I believe I did.
12   Q.  Were you a participant at all?
13       (Witness reviewing document.)
14   A.  No, I don't believe so.
15       BY MR. BLANCHARD:
16   Q.  How do you recall hearing about it?
17   A.  I think I read up on it afterwards.
18   Q.  Have you ever read this document,
19 recognizing that you haven't reviewed the entire
20 thing right here?
21   A.  Right.  I might have.  But I remember
22 the conference in that sense, so I must have
23 read something after.
24   Q.  What do you remember hearing about the

49 (Pages 190 to 193)

Ronald W. Erickson

Page 194

1   conference?
2       A.  I think it was just talking about the
3   -- I think the military was -- it's becoming --
4   getting very vague on it right now, but it was
5   more so just talking about Biopure and the
6   hemoglobin and as far as going ahead.  From what
7   I remember of it talking about the importance of
8   how it would affect -- be useful in the
9   military.  But I mean that may not be the same
10  conference.
11      MR. BLANCHARD:  Could you read my
12  question back, please?
13      (Whereupon, the reporter read back the
14  pending question.)
15      A.  I'm sorry, I'm getting tired.
16      BY MR. BLANCHARD:
17      Q.  Don't apologize.  Not at all.  It's
18  hard when you get a late start like this.
19      (Whereupon, Exhibit 40 was marked for
20  identification.)
21      A.  I'd say I don't remember.
22      BY MR. BLANCHARD:
23      Q.  Do you have Exhibit 40 before you?
24      A.  Yes.

Page 195

1       Q.  And Exhibit 40 titled Biopure
2   Presentation by Thomas Moore, CEO of ThinkEquity
3   Partners, Growth Conference, San Francisco,
4   California at the Omni Hotel, Wednesday,
5   September 17th, 2003.  Correct?  That's the
6   document?
7       A.  Yes.
8       Q.  Do you recall anything about
9   ThinkEquity Partners Growth Conference?
10      A.  No.
11      Q.  And I take it you don't recall ever
12  seeing this document before?
13      A.  No.
14      (Whereupon, Exhibit 41 was marked for
15  identification.)
16      BY MR. BLANCHARD:
17      Q.  Do you have Exhibit 41 in front of
18  you?
19      A.  Yes.
20      Q.  Please take a moment and review it.
21  I'll ask you some questions about this.  It's
22  only two pages.
23      (Witness reviewing document.)
24      A.  Okay.

Page 196

1       BY MR. BLANCHARD:
2       Q.  Do you recall ever reading this
3   document, besides right now?
4       A.  I might have.  I don't recall it
5   completely.
6       Q.  This is a press release from Biopure
7   on October 30th, 2003, correct?
8       A.  Yes.
9       Q.  The first paragraph reads "Biopure
10  Corporation today announced its plan to respond
11  by June 30th, 2004 to the Food & Drug
12  Administration questions regarding its biologics
13  license application for Hemopure.  The company's
14  adjusted its operating plan to reduce expenses
15  and conserve cash while it completes its written
16  response to the FDA."
17      Did I fairly read that?
18      A.  That's what it says here.
19      Q.  Does that paragraph communicate
20  anything -- let me back up.
21      Is there any information in that
22  paragraph that you believe should have been
23  revealed earlier than October 30th, 2003?
24      A.  If it's talking in regards to the 200

Page 197

1   or 220 questions that needed to be answered that
2   came up in July, yes, it should have been
3   brought up a lot sooner.
4       Q.  I'm saying -- sorry, go ahead.
5       A.  If that's what it's -- if those are
6   the questions they're talking about.
7       Q.  Does it at all refer to those
8   questions you just mentioned?
9       MR. LONGMAN:  Objection.  It refers to
10  what it refers to.
11      MR. BLANCHARD:  The objection is
12  noted.
13      A.  What was that?
14      MR. BLANCHARD:  You don't need to
15  testify for the witness.
16      BY MR. BLANCHARD:
17      Q.  Do you need the question read back, or
18  do you want me to rephrase it?
19      A.  I'm not sure what was said.
20      Q.  Just lawyers objecting with each
21  other.
22      A.  Okay.
23      Q.  Does that first paragraph refer to
24  those questions from back in July that you were

50 (Pages 194 to 197)

Page 198

1  talking about?
2      A.  I'm not sure.  I'm saying if it does,
3  I said it's true what I said before as far as it
4  doesn't -- it's not referring -- it should have
5  been, the 220 questions, it should have been
6  referred to back in July when it was presented
7  rather than October like you're saying.
8      Q.  Is there anything else that should be
9  included here?
10     A.  Well, I think they should have -- I
11 mean through all this dialogue they should have
12 mentioned about the trials being put on hold,
13 and there's been nothing about that as far as
14 any in this, there hasn't been in anything else.
15 So I mean it's kind of like they're saying
16 what -- but it seems to be like avoiding it.
17     Q.  Is there anything contained -- well,
18 actually, you didn't sell any stock until at
19 least January 16th of 2004, correct?
20     A.  If that's what it is, yes.
21     Q.  I mean you didn't sell any Biopure
22 stock until January of 2004, correct?
23     A.  Whatever my records show.
24     Q.  Now, do you recall hearing anything

Page 199

1  about this press release at the time it was
2  issued?
3          MR. LONGMAN:  Didn't you ask that
4  question before?
5          MR. BLANCHARD:  Not just like that.
6          MR. LONGMAN:  You said was he familiar
7  with it, and he said --
8          MR. BLANCHARD:  I'm not going to argue
9  about it.
10         MR. LONGMAN:  He said he wasn't
11 familiar.  Didn't you say -- go ahead, answer
12 the question.  I think he said he wasn't
13 familiar with it.
14         MR. BLANCHARD:  Counsel's testimony is
15 noted.
16         MR. LONGMAN:  You can't ask a question
17 and assume that the question was answered based
18 on --
19         MR. HUANG:  He said he might not have
20 read it, and this is a different question.
21         MR. TUCCILLO:  And he said he didn't
22 recall.
23     A.  I don't recall.
24         MR. BLANCHARD:  What was the question

Page 200

1  again?
2          (Whereupon, the reporter read back the
3  pending question.)
4          MR. LONGMAN:  My objection was he
5  didn't recall reading it, so now you're asking
6  him if he recalled it at this time.  I mean it's
7  a non-sequitur.
8          BY MR. BLANCHARD:
9      Q.  Viewing this press release today, do
10 you view anything about this press release to be
11 negative concerning Biopure?
12     A.  Well, I'd say there's questions in
13 regards to the FDA, that's a negative there that
14 they weren't approved already, and I'd say that
15 there's questions in the application.  So in
16 essence that's a negative in itself.  But as I
17 read it now --
18         BY MR. BLANCHARD:
19     Q.  I'm sorry, are you done?
20         There's questions regarding FDA that's
21 a negative, is that what you said?
22     A.  I'm saying there's questions that have
23 to be answered regarding the FDA application,
24 I'm saying if they haven't been, here it is

Page 201

1  October, and if they haven't answered them
2  already, then isn't that a negative?
3      Q.  Okay.
4          MR. LONGMAN:  I'm going to object to
5  those questions.
6          BY MR. BLANCHARD:
7      Q.  In your view, is there anything else
8  negative about this press release or the
9  information contained in the press release?
10         MR. LONGMAN:  Do you understand the
11 question?
12     A.  Is there anything else in here that's
13 negative about the press release.
14         MR. LONGMAN:  When you say "negative,"
15 what do you mean?
16         MR. BLANCHARD:  Not positive, not
17 good, not good news, bad news.
18         BY MR. BLANCHARD:
19     Q.  Is there anything here that's bad news
20 for a Biopure investor?
21         MR. LONGMAN:  As he sits here reading
22 it today?
23         MR. BLANCHARD:  As he sits here
24 reading it today.

51 (Pages 198 to 201)

Ronald W. Erickson

05/30/2006

Page 202

1   A.  Knowing what I know, yes, this is all
2   negative because it doesn't have all the facts.
3       BY MR. BLANCHARD:
4   Q.  For what's stated, not what you think
5   is or should be stated here, but what's stated
6   in the press release, is there anything that's
7   bad news for the Biopure investor?
8   A.  Yes, because it's leaving out
9   information.
10  Q.  Other than leaving out information, is
11  there anything that's bad news in this press
12  release for a Biopure investor?
13  A.  No.
14      (Whereupon, Exhibit 42 was marked for
15      identification.)
16      BY MR. BLANCHARD:
17  Q.  Do you have Exhibit 42 in front of
18  you?
19  A.  Yes.
20  Q.  And Exhibit 42 appears to be a
21  transcript from October 30th, 2003, is that
22  correct?
23  A.  Appears to be.
24  Q.  Do you recall listening in to any

Page 203

1   conference call of Biopure on or around October
2   30th, 2003?
3   A.  I might have.
4   Q.  But you don't have any specific
5   recollection that you did or not?
6   A.  No.
7       (Whereupon, Exhibit 43 was marked for
8       identification.)
9       BY MR. BLANCHARD:
10  Q.  Do you have Exhibit 43 in front of
11  you?
12  A.  Yes.
13  Q.  It's Biopure -- it's entitled Biopure
14  Announces 2003 Fourth Quarter and Year End
15  Financial Results."  Correct?
16  A.  Yes.
17  Q.  Did you read this?  Have you ever read
18  this before today?
19  A.  Honestly I can't recollect right at
20  the moment.
21  Q.  If you could turn to page two of the
22  document.  At the bottom of that page it says
23  "other developments," and the first sentence
24  reads "on July 30th, 2003, the FDA sent Biopure

Page 204

1   a complete response letter responding to the
2   company's BLA to market Hemopure in the United
3   States for the treatment of acutely anemic adult
4   patients undergoing orthopedic surgery and for
5   the elimination or reduction of red blood cell
6   transfusions in these patients."
7       Did I read that correctly?
8   A.  Yes.
9   Q.  Is there anything in that sentence
10  that you view as bad news for the Biopure
11  investor?
12  A.  I'll have to read it over again.
13      (Witness reviewing document.)
14  A.  All you read is that first sentence,
15  and it really doesn't -- it just says that they
16  sent a response for that, that's all it's
17  stating.
18      BY MR. BLANCHARD:
19  Q.  The question is; is there anything
20  about that that you view as bad news for the
21  Biopure investor?
22      MR. TUCCILLO:  That single sentence?
23      MR. BLANCHARD:  Yes.
24  A.  You're saying the first sentence

Page 205

1   there?
2       BY MR. BLANCHARD:
3   Q.  Yes.
4   A.  It's not positive or negative.  I mean
5   it's just a sentence.  It doesn't even state
6   anything -- a fact other than going ahead and
7   saying that they reviewed.
8   Q.  So I take it the answer is no?
9   A.  No.  I mean if you want to read down
10  further, I don't know as far as what else it
11  says there.
12      MR. LONGMAN:  Why don't you read the
13  whole paragraph.
14      BY MR. BLANCHARD:
15  Q.  Actually no, I don't at this point --
16      MR. LONGMAN:  You'd rather take the
17  statements out of context?  Okay.
18      MR. BLANCHARD:  Counsel's sarcasm is
19  noted.  I'll get back to it.
20      MR. LONGMAN:  Go ahead.
21  A.  Okay.  I'd like to read the rest of --
22      BY MR. BLANCHARD:
23  Q.  Wait.  If I could just finish my line
24  of questioning.

52 (Pages 202 to 205)

Ronald W. Erickson

Page 206

1    A.  Okay.  Well, then, I retract my answer
2  then, because I say that that's an unfair
3  question on something that it's like reading a
4  portion out of there in that sense, and you're
5  asking a question that a sentence doesn't have
6  any validity.
7        MR. LONGMAN:  Okay.  Just -- he'll ask
8  questions, you answer them.
9    A.  Go ahead.
10        BY MR. BLANCHARD:
11    Q.  Is there anything in that first
12  sentence that wasn't disclosed to the market
13  before?
14        MR. LONGMAN:  As of the date of this?
15        MR. BLANCHARD:  Yes, as of December
16  11th.
17        (Witness reviewing document.)
18        MR. LONGMAN:  Do you understand the
19  question?
20    A.  It does not, it does not say what the
21  complete response is or was.
22        BY MR. BLANCHARD:
23    Q.  I'm sorry.  My question; is there any
24  information contained in that first statement

Page 207

1  that appears, you know, here for the first time
2  -- let me retract that and I'll re-ask it.
3        Is there anything, any information
4  contained in that first sentence of the
5  paragraph under "other developments" that in
6  your mind had not been disclosed previously,
7  previous to this press release, Exhibit Number
8  43?
9    A.  It doesn't give you the outcome, it
10  doesn't give you what the statement was, so to
11  me it's negative because it doesn't go any
12  further in telling you what the response was
13  from the FDA.  It's telling you get a response
14  from the FDA, but it does not say what the
15  response was.
16    Q.  I think I'm not making my question
17  clear.  I'm sorry, it is getting late in the
18  day.
19        I'm not asking you what's missing
20  here.  I'm asking you if there's something here
21  printed on the page that the market never heard
22  of before.
23        MR. LONGMAN:  If you know.
24    A.  No.

Page 208

1        MR. LONGMAN:  No, you don't know, or
2  no, the market never heard it before, just to be
3  clear?
4        THE WITNESS:  No, I don't know.
5        MR. BLANCHARD:  I need to take just
6  like five minutes to confer with counsel, and I
7  can wrap up probably within five minutes.
8        MR. LONGMAN:  Okay.
9        (Whereupon, a recess was taken from
10  7:36 p.m. to 7:45 p.m.)
11        MR. BLANCHARD:  Back on the record.
12  I have nothing further.
13        BY MS. LUSTER:
14    Q.  Good evening, Mr. Erickson, my name is
15  Jodi Luster, and I represent Ronald Richards in
16  this matter.
17        I know it's late, and I'm going to be
18  brief.  I will remind you that you are still
19  under oath, so I just ask that to the best of
20  your ability you answer my questions accurately,
21  truthfully and thoroughly, and I don't have
22  many.
23        During the class period between April
24  9th, 2003 and December 24th, 2003, do you recall

Page 209

1  reviewing any financial information or
2  statements of Biopure?
3        MR. TUCCILLO:  I'm sorry, can you read
4  that back?
5        MS. LUSTER:  I can repeat it.
6        BY MS. LUSTER:
7    Q.  During the class period between April
8  9th, 2003 and December 24th of 2003, do you
9  recall reading any of Biopure's financial
10  information or statements?
11        MR. TUCCILLO:  Thanks.
12    A.  I saw the statements and so forth,
13  yes.
14        BY MS. LUSTER:
15    Q.  Could you be a little bit more
16  specific what you recall reviewing?
17    A.  The statement -- well, it's more so
18  any of the statements at that -- I guess I'd be
19  very vague if I went ahead and said anything to
20  it, but I didn't see anything that -- there was
21  nothing in there mentioning as far as going
22  ahead with the clinical stuff being on hold, or
23  the end of July with the questions in that sense
24  on the FDA.

53 (Pages 206 to 209)

Ronald W. Erickson

05/30/2006

Page 210

1    But as far as more so the financial
2  stuff, as far as going ahead and saying what --
3  how they were getting money coming into the
4  company, and then that they had taken losses,
5  but they ended up going ahead, and with those
6  they improved over the previous year.
7    Q.  Okay.  And do you recall, and I don't
8  mean to be repetitive, I just want to be
9  specific, when I say financial statement or
10  financial information, balance sheets, you know,
11  numbers, revenue forecasts, etcetera, do you
12  recall reviewing any of that?
13    A.  Not completely, just some of the
14  information in here that we had today as far as,
15  you know, quarterly review or something like
16  that.
17    Q.  And --
18    MR. LONGMAN:  He pointed to the
19  documents.
20    BY MS. LUSTER:
21    Q.  I was just going to clarify, to the
22  exhibits.
23    And as a follow-up, do you recall
24  reviewing any public filings filed by Biopure

Page 211

1  with the SEC?
2    A.  Nothing other than in the documents
3  that were in our action.
4    Q.  And I'm sorry, what do you mean by
5  documents in your action?
6    A.  Sorry, long day.
7    Q.  That's okay.
8    A.  No, as far as going ahead and seeing
9  what the filings were for that, no, I hadn't,
10  other than what I've got from my attorneys and
11  reviewed.
12    Q.  And I would like to just go back, and
13  I don't have a copy in front of me, it's Exhibit
14  27, it's the S-3.
15    And you have Exhibit 27 in front of
16  you?
17    A.  Yes.
18    Q.  Okay.  I'm certainly not going to ask
19  you to read it.
20    A.  Thank you.
21    Q.  But do you recall earlier you were
22  questioned by counsel whether or not you had
23  recognized this document, which is the Biopure
24  April 11th, 2003 S-3, and I believe your

Page 212

1  testimony was yes, that you did recollect this
2  document, that you were familiar with it?  This
3  was before counsel had read you a portion of it.
4    MR. LONGMAN:  I'm not sure about that.
5    A.  I'm not sure if I said I don't
6  recollect or whatever something like this.  But
7  anything in this kind of format, writing, it's
8  very new to me as far as anything else I've
9  seen.  It's either in bigger print or something
10  like that.
11    BY MS. LUSTER:
12    Q.  So before today, had you -- do you
13  recognize this document, or have you read --
14  remember reading this document before today?
15    A.  I'm not positive on that, sorry.
16    Q.  Okay.  That's fine.
17    Throughout your testimony today you've
18  testified to information, statements made by
19  Biopure that you believe to be false and
20  misleading, is that correct?
21    A.  Yes.
22    Q.  And that information and statements
23  concerned what, generally?
24    A.  It concerns not letting the public

Page 213

1  know as far as the clinical trials being put on
2  hold in April by the FDA, and also the 200, 220
3  questions that needed to be answered that came
4  out in July as far as -- I mean that's quite a
5  few to go ahead and get an approval and so
6  forth, and through that whole period of time I
7  felt that we were being misled, myself and
8  anybody that was purchasing the stock or had
9  purchased it at that point in time without that
10  information.
11    Q.  And none of those alleged false or
12  misleading statements that you're talking about
13  related to, pertained or concerned any of the
14  financial information or statements of Biopure,
15  is that correct?
16    A.  I don't know.  Would you repeat that
17  question?
18    Q.  Sure.
19    The information and statements that
20  you just testified about as what you believe was
21  false and misleading, allegedly misstated as
22  false and misleading, doesn't relate to any
23  financial statements of Biopure?
24    A.  Well --

54 (Pages 210 to 213)

Page 214

1    MR. LONGMAN: Wait a minute. I want
2  to object to the question as being vague and
3  ambiguous.
4    MS. LUSTER: Okay.
5    MR. TUCCILLO: He said he never read
6  this.
7    MS. LUSTER: I'm going to object that
8  he did, and it's on the record that he did
9  review --
10    MR. LONGMAN: He didn't refer to
11  specific statements. You keep referring to
12  statements.
13    BY MS. LUSTER:
14    Q.  Financial information, I'm sorry if
15  that's not clear.
16    MR. LONGMAN: Would you do me a favor,
17  ask the question one more time?
18    MS. LUSTER: Absolutely.
19    BY MS. LUSTER:
20    Q.  I'd asked you before about today
21  through your testimony what information you
22  thought was false and misleading or inaccurate,
23  is that correct?
24    A.  Yes.

Page 215

1    Q.  And you just testified what -- or
2  summarized what you thought was inaccurate or
3  misleading, what the information referred to?
4    A.  Right.
5    Q.  And my question to you was; none of
6  the information that you allegedly believe is
7  inaccurate or false or misleading relates to
8  Biopure's, the company's, financial information?
9    A.  Well --
10    Q.  Is that correct?
11    A.  Yes, it does.
12    Q.  And how does it relate to the
13  financial information?
14    A.  It relates as to going ahead and
15  having somebody purchase stock as far as without
16  that information it looks like everything's fine
17  and the company's going forward, whereas -- so
18  in essence that's going to affect the financial
19  factors of the company as far as people
20  purchasing the stock and everything and the
21  stock going up.
22    If the facts came up at the point in
23  time that they were, that would possibly go
24  ahead and diminish the amount of buyers that

Page 216

1  would be there, which would in turn affect the
2  amount of stock that's being sold and the dollar
3  amount that it's being sold for. So the
4  financial statements would have been affected.
5    Q.  Were you finishing, or that was the
6  end?
7    A.  It would have been affected
8  negatively.
9    Q.  Okay.
10    A.  Other than what they were showing.
11    Q.  The financial statements that you
12  testified before that you had reviewed during
13  the class period, the actual numbers --
14    A.  If you're reviewing financial
15  statements with the information that the public
16  knows at that point in time and it looks like
17  it's all positive, no matter what the financial
18  statements show, it shows a better picture than
19  if it had the negative functions that were not
20  told to the public.
21    Q.  So are you testifying today that
22  Biopure's financial information was inaccurate?
23    A.  I'm saying that --
24    MR. LONGMAN: Objection.

Page 217

1    A.  -- would have been affected by if the
2  actual truth came out of the withholding stuff.
3  The financial statements could be correct as to
4  what they showed at that point in time, but I'm
5  saying as far as with the information, it's not
6  divulged out there, keep the financial
7  statements the same. If it was divulged out
8  there, I'm saying that would have been more so
9  not enhancing the financial statements, it would
10  have diminished them.
11    BY MS. LUSTER:
12    Q.  I'll ask one more time just because
13  I'm trying to understand, not to confuse you,
14  and just so I understand today.
15    Are you testifying that you believe
16  that the financial statements and information,
17  if I'm not clear, like balance sheets, etcetera,
18  information that's released in the exhibits that
19  you've seen was inaccurate at the time that it
20  was issued?
21    A.  I don't know.
22    MR. LONGMAN: Objection.
23    MS. LUSTER: I'm sorry, was that an
24  objection?

55 (Pages 214 to 217)

Ronald W. Erickson



Page 218

1    MR. LONGMAN: Objection. You're
2  asking the same question.
3    A.  I don't know if they were or not. But
4  what I'm saying is it does what I testified
5  earlier on would influence those financial
6  statements in a negative way.
7    BY MS. LUSTER:
8    Q.  Okay. And I just have a few more
9  questions.
10    Can you go back to Exhibit 25, please,
11  which is the second consolidated amended
12  complaint?
13    I believe you testified before, and I
14  don't want to put words in your mouth, that you
15  have reviewed this complaint?
16    A.  Yes.
17    Q.  Do you recall anything in this
18  complaint stating that Biopure's financial
19  statements or information is inaccurate?
20    A.  No.
21    MS. LUSTER:  Thank you. That's all I
22  have. Thank you very much.
23    THE WITNESS:  Okay.
24    MR. TUCCILLO:  Could you read the last

Page 220

1  we responded fully and completely to any
2  document requests that sought information
3  relative to this lawsuit, relevant to this
4  lawsuit or is likely to lead to admissible
5  evidence in this lawsuit, and we informed you
6  that we did not intend to produce him again
7  after today. This was your opportunity.
8    MR. BLANCHARD:  Right. We have that
9  agreement to disagree.
10    MR. LONGMAN:  Okay.
11    MR. BLANCHARD:  Done? Thank you very
12  much.
13    (Whereupon, the deposition was
14    concluded at 8:01 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 219

1  answer?
2    (Whereupon, the reporter read back the
3  above question and answer.)
4    MR. TUCCILLO:  Is there anyone else?
5    MR. HUANG:  No questions.
6    MR. BLANCHARD:  We're going to take
7  two minutes.
8    (Whereupon, a recess was taken from
9  7:57 p.m. to 8:00 p.m.)
10    MR. LONGMAN:  We have no further
11  questions. We have no questions at all of the
12  witness.
13    And he's appeared, and we don't intend
14  to produce him again.
15    MR. BLANCHARD:  Okay. The only thing
16  I'd say --
17    MR. LONGMAN:  I want that to be clear.
18    MR. BLANCHARD:  The only thing I'd say
19  is on the record I believe we expressed that we
20  believe the deposition will be suspended in the
21  event we get further documents in response to
22  our document request, because there are
23  outstanding issues about those documents.
24    MR. LONGMAN:  Okay. We believe that

Page 221

1    ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4    ERRATA SHEET DISTRIBUTION INFORMATION
5    The original of the Errata Sheet has
6  been delivered to Matthew L. Tuccillo, Esquire.
7    When the Errata Sheet has been
8  completed by the deponent and signed, a copy
9  thereof should be delivered to each party of
10  record and the ORIGINAL forwarded to Michael D.
11  Blanchard, Esquire, to whom the original
12  deposition transcript was delivered.
13    INSTRUCTIONS TO DEPONENT
14    After reading this volume of your
15  deposition, please indicate any corrections or
16  changes to your testimony and the reasons
17  therefor on the Errata Sheet supplied to you and
18  sign it. DO NOT make marks or notations on the
19  transcript volume itself. Add additional sheets
20  if necessary. Please refer to the above
21  instructions for Errata Sheet distribution
22  information.
23
24

Ronald W. Erickson

Page 222

1    ATTACH TO DEPOSITION OF RONALD W. ERICKSON
2    CASE:  Biopure Corporation Securities
3    DATE TAKEN:  5-30-06
4         ERRATA SHEET
5    Please refer to page 221 for errata sheet
6    instructions and distribution instructions.
7    PAGE    LINE    CHANGE        REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15        I have read the foregoing transcript
16   of my deposition and except for any corrections
17   or changes noted above, I hereby subscribe to
18   the transcript as an accurate record of the
19   statements made by me.
20
21        Executed this____day of_____, 2006.
22
23        _____
24        RONALD W. ERICKSON

Page 223

1    COMMONWEALTH OF MASSACHUSETTS )
2    SUFFOLK, SS.                  )
3
4         I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
5    and Notary Public in and for the Commonwealth of
6    Massachusetts, do certify that on the 30th day
7    of May, 2006, at 1:09 o'clock, the person
8    above-named was duly sworn to testify to the
9    truth of their knowledge, and examined, and such
10   examination reduced to typewriting under my
11   direction, and is a true record of the testimony
12   given by the witness.  I further certify that I
13   am neither attorney, related or employed by any
14   of the parties to this action, and that I am not
15   a relative or employee of any attorney employed
16   by the parties hereto, or financially interested
17   in the action.
18        In witness whereof, I have hereunto
19   set my hand this 31st day of May, 2006.
20
21        _____
22        REGISTERED PROFESSIONAL REPORTER
23
24

LegaLink Boston, a Merrill Company
(617) 542-0039