# EXHIBIT B

John G. Esposito, Jr.

05/31/2006

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3              Civil Action No. 03-12628-NG

4    ***********************************

5    IN RE:  BIOPURE CORPORATION

6    SECURITIES LITIGATION

7    ***********************************

8              DEPOSITION OF JOHN G. ESPOSITO,

9    JR., a witness called on behalf of the

10   Defendants, taken pursuant to the Federal Rules

11   of Civil Procedure, before Maureen O'Connor

12   Pollard, RPR, CLR, and Notary Public within and

13   for the Commonwealth of Massachusetts, at the

14   offices of Bingham McCutchen LLP, 150 Federal

15   Street, Boston, Massachusetts, on the 31st of

16   May, 2006, commencing at 11:06 o'clock a.m.

17

18

19

20                                    .

21

22

23

24

Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
3      BY:  HOWARD T. LONGMAN, ESQ.
4      STULL, STULL & BRODY
5      6 East 45th Street
6      New York, New York 10017
7      212-687-7230
8      and
9      BY:  MATTHEW L. TUCCILLO, ESQ.
10     SHAPIRO, HABER & URMY LLP
11     53 State Street
12     Boston, Massachusetts 02109
13     617-439-3939
14     mtuccillo@shulaw.com
15
16 FOR DEFENDANT BIOPURE AND OTHER DEFENDANTS:
17     BY:  DONALD J. SAVERY ESQ.
18     JASON LANE, ESQ.
19     JENNIFER HOLDEN, ESQ.
20     BINGHAM McCUTCHEN LLP
21     150 Federal Street
22     Boston, Massachusetts 02110
23     617-951-8000
24     don.savery@bingham.com

Page 3

1  FOR THE DEFENDANT HOWARD RICHMAN:
2      BY:  JOEY H. LEE, ESQ.
3      EDWARDS ANGELL PALMER & DODGE LLP
4      111 Huntington Avenue
5      Boston, Massachusetts 02199
6      617-239-0100
7      jlee@eapdlaw.com
8  FOR THE DEFENDANT THOMAS MOORE:
9      BY:  JEFFREY S. HUANG, ESQ.
10     McDERMOTT, WILL & EMERY LLP
11     28 State Street
12     Boston, Massachusetts 02109-1775
13     617-535-4086
14     jhuang@mwe.com
15
16 FOR THE DEFENDANT RONALD RICHARDS:
17     BY:  JODI D. LUSTER, ESQ.
18     SEYFARTH SHAW LLP
19     World Trade Center East
20     Two Seaport Lane, Suite 300
21     Boston, Massachusetts 02210-2028
22     617-946-4800
23     jluster@seyfarth.com
24

Page 4

1                    INDEX
2  EXAMINATION                    PAGE
3  JOHN G. ESPOSITO, JR.
4      BY MR. SAVERY                 5
5      BY MR. HUANG                 169
6      BY MR. SAVERY                171
7      BY MR. LONGMAN               173
8      BY MR. SAVERY                176
9
10                   EXHIBITS
11 NO.    DESCRIPTION             PAGE
12 44   Biopure's first set of requests
13      for documents...................... 78
14 45   Plaintiff's response and
15      objections to Biopure's first set
16      of requests for production of
17      documents........................... 86
18 46   Account statement.................. 90
19 47   Certification....................... 93
20 48   Complaint.......................... 137
21
22   **EXHIBITS RETAINED BY ATTORNEY SAVERY**
23
24

Page 5

1          P R O C E E D I N G S
2
3          JOHN G. ESPOSITO, JR.,
4  having been identified by New York driver's
5  license, being first duly sworn, was examined
6  and testified as follows:
7          DIRECT EXAMINATION
8          BY MR. SAVERY:
9      Q.  Sir, could you please state your full
10 name for the record, spelling your last name?
11     A.  John G. Esposito, Jr.,
12 E-S-P-O-S-I-T-O.
13     Q.  Okay.  And it's Dr. Esposito?
14     A.  Yes.
15     Q.  What's your current home address, sir?
16     A.  55 Flower Hill Road, Huntington, New
17 York.
18     Q.  Just by way of sort of preliminary
19 matters, have you ever had your deposition taken
20 before?
21     A.  No.
22     Q.  Okay.  I'm sure your lawyers have
23 spoken to you a little bit about the process,
24 but it's going to be a series of questions put

2 (Pages 2 to 5)

John G. Esposito, Jr.                                                                05/31/2006

Page 6

1  to you which you can answer.
2      A.  Mm-hmm.
3      Q.  We have a court reporter here, so I
4  ask you to do a couple things.  The first is to
5  wait until I'm done with my question before you
6  start to answer.
7      A.  Right.
8      Q.  And I'll do the same thing for you.
9  I'll let you finish your answer before I start
10  my next question.
11         The second thing is because we have a
12  court reporter here, we need to be sure that all
13  of our responses to questions are verbal, using
14  words rather than nodding or that type of thing.
15      A.  Yes.
16      Q.  Or mm-hmm.
17      A.  Yes.
18      Q.  If you don't understand any of my
19  questions, just let me know and I'll do my best
20  to rephrase it for you.  Okay?
21      A.  Okay.
22      Q.  If you go ahead and answer a question
23  that I've asked without letting me know that you
24  don't understand it, I'll assume that you've

Page 7

1  understood the question.  Okay?
2      A.  Okay.
3      Q.  If you need to take a break at any
4  point, just let me know and we can do that.
5         Are you taking any medications that
6  would prevent you from hearing, understanding or
7  responding to any of my questions?
8      A.  No.
9      Q.  Is there any other reason why you
10  can't provide truthful testimony today?
11      A.  No.
12      Q.  What's your date of birth, sir?
13      A.  September 23rd, 1941.
14      Q.  Are you married?
15      A.  Yes.
16      Q.  Do you have children?
17      A.  Yes.
18      Q.  How many?
19      A.  Two.
20      Q.  How old are they?
21      A.  My son is thirty-six, oh my God, and
22  my daughter is thirty-five.  Where did it go?
23      Q.  What's your wife's name?
24      A.  Orene, O-R-E-N-E.

Page 8

1      Q.  And your kids' names?
2      A.  John, III and Susan Elizabeth.
3      Q.  And I ask these questions merely for
4  reason of the class certification motion that's
5  now pending.
6         Are you in reasonably good health?
7      A.  Yes.
8      Q.  Are you currently taking any
9  prescription or nonprescription drugs?
10      A.  Yes.
11      Q.  What are you taking?
12      A.  Mild anti-hypertensive agent called
13  Toprol, and Lipitor for cholesterol so I can
14  continue to eat pasta.
15      Q.  And how are those conditions that
16  you're treating with?
17      A.  Perfectly fine.
18      Q.  Are either your spouse or either of
19  your children employed in the securities
20  industry?
21      A.  No.
22      Q.  Have they ever been?
23      A.  No.
24      Q.  Does any member of your immediate

Page 9

1  family hold any securities brokerage licenses?
2      A.  No.
3      Q.  Are any members of your family, apart
4  from yourself, in the medical field?
5      A.  Yes.
6      Q.  Who?
7      A.  My daughter.
8      Q.  And that's your daughter Susan is her
9  name?
10      A.  Mm-hmm.  And her husband, I don't know
11  if that counts.
12      Q.  Okay.  What is Susan's full name?
13      A.  Susan Elizabeth Braverman is her new
14  last name.
15      Q.  When you say "new," was she recently
16  married?
17      A.  Three years ago.
18      Q.  And where is she employed?
19      A.  At St. Catherine's Hospital in
20  Baltimore, Maryland.
21      Q.  And what is her profession?
22      A.  Emergency room physician.
23      Q.  Prior to being employed at St.
24  Catherine's, was she employed in another

3 (Pages 6 to 9)

John G. Esposito, Jr.

05/31/2006

Page 10

1 hospital?
2    A.  She was trained at Johns Hopkins in
3 Baltimore.
4    Q.  Do you know when she started at Johns
5 Hopkins?
6    A.  Maybe six years ago, and was there for
7 three, and then has been at St. Catherine's for
8 three, something around there.
9    Q.  So approximately 2000 to 2003 at
10 Hopkins?
11    A.  Yes.
12    Q.  Then 2003 to present at St. Cat's?
13    A.  Yes.
14    Q.  Okay.  And you mentioned that she's
15 married to a physician?
16    A.  Yes.
17    Q.  What is his name?
18    A.  Peter Braverman.
19    Q.  And where is he employed?
20    A.  He's employed at Johns Hopkins,
21 although he stopped and he's at another private
22 hospital now.  I'm not really sure what the name
23 of the new private hospital is.  He still
24 teaches at Johns Hopkins, however.

Page 11

1    Q.  What's his discipline in medicine?
2    A.  Internal medicine.
3    Q.  And do you know for how long he's been
4 at Hopkins, if he's still there?
5    A.  That's a tough one.  A while, because
6 he went to medical school there as well, so it's
7 probably about a dozen years.
8    Q.  Okay.  Is he around the same age as
9 your daughter?
10    A.  He's a little older.  He's about
11 thirty-eight.
12    Q.  Okay.  Are you aware whether your
13 daughter Susan has any knowledge concerning
14 Biopure?
15    A.  She had, I would call hearsay
16 knowledge, because I believe they had heard of
17 the product when they were at Hopkins.
18    Q.  You say "they had heard," is that she
19 and her husband?
20    A.  Yes.
21    Q.  And what did she or her husband tell
22 you regarding Biopure?
23    A.  Just that it seemed like a very
24 interesting product, it's the first blood

Page 12

1 substitute that was able to carry oxygen, which
2 was significant.
3    Q.  And you may have answered this in
4 part, but bear with me; do you know what the
5 basis for their knowledge was of Biopure or its
6 product?
7    A.  I really don't.  Just the fact that
8 they were there and they had heard about it.
9    Q.  Okay.  Do you know whether they had
10 any firsthand involvement with Biopure's
11 product?
12    A.  They did not.
13    Q.  Do you know whether they had any
14 communications with Biopure, its employees?
15    A.  They did not, that I know.
16    Q.  And when did you first speak to them
17 about Biopure?
18    A.  Probably about six months before I
19 invested in it.
20    Q.  And can you give us an approximate
21 date?
22    A.  Well, I invested around August 11th,
23 so six months before that, about three to six
24 months before that.

Page 13

1    Q.  Sorry, of which year?
2    A.  Of '03.
3    Q.  Okay.  So your best recollection is
4 that you spoke to them concerning Biopure
5 approximately in the, say, February to June time
6 frame of '03?
7    A.  Yes.
8    Q.  Did you have more than one
9 conversation with them about Biopure?
10    A.  If so, maybe two.  Nothing really
11 in-depth.
12    Q.  Okay.
13    A.  One or two.
14    Q.  Okay.  And would you say you had one
15 or two conversations with them concerning
16 Biopure before you invested?
17    A.  Yes.
18    Q.  Apart from what you've already
19 testified to, is there anything else you
20 remember them telling you concerning Biopure?
21    A.  No.
22    Q.  Okay.  Did you, did they provide you
23 -- withdraw that, please.
24        Did they provide you with any

4 (Pages 10 to 13)

John G. Esposito, Jr.

Page 14

1  documents concerning Biopure?
2      A.  No.
3      Q.  And just be sure to let me finish the
4  question before you answer.
5      A.  Right.
6      Q.  Since your discussions with them in
7  advance of your first purchase of Biopure, have
8  you had any additional discussions with them
9  concerning Biopure?
10     A.  Again maybe briefly concerning just
11  how the stock was doing essentially.
12     Q.  What do you recall from those
13  discussions?
14     A.  They really didn't have much further
15  knowledge actually, they didn't know what was
16  happening.
17     Q.  Okay.  By the time you first purchased
18  Biopure, did you understand either your daughter
19  or your son-in-law to have any continuing
20  interaction with Biopure or its products?
21     A.  There was none.
22        MR. LONGMAN:  Objection.
23        That's not the testimony.
24        MR. SAVERY:  I understand.  I'll

Page 15

1  withdraw the question.
2        BY MR. SAVERY:
3      Q.  Apart from those first discussions
4  between three and six months prior to your first
5  purchase of Biopure, did you have any additional
6  communications with them concerning Biopure
7  before you went and made your first purchase?
8      A.  No.
9      Q.  Okay.  Switching gears a little bit,
10  aside from the context of this case, have you
11  had any contact with a lawyer named Matt
12  Tuccillo, who is seated two slots down from you
13  here?
14     A.  No.
15     Q.  Anyone from his law firm?
16     A.  No.
17     Q.  How about Mr. Longman?
18     A.  No.
19     Q.  Anyone from his law firm?
20     A.  No.
21     Q.  David Pastor?
22     A.  No.
23     Q.  Anyone from the Gilman & Pastor firm?
24     A.  No.

Page 16

1      Q.  Have you ever spoken at any point in
2  time with an individual named Ronald Erickson?
3      A.  No.
4      Q.  Stuart Gottlieb?
5      A.  No.
6      Q.  Emily Bittman?
7      A.  No.
8      Q.  I'd like to focus a little bit on your
9  education and background for a few minutes.
10        Can you sort of walk us through your
11  education starting with your graduation from
12  high school?
13     A.  Was it the 1800s?  Now, it was 1959, I
14  went to Fordham University pre-med.  I then went
15  to NYU Dental School, received the DDS degree in
16  1966.  Then I did four years of full-time
17  training in oral and maxillofacial surgery,
18  including Newark City Hospital.  Those days we
19  rotated around, I spent a year here in Boston at
20  BU and Harvard, and then the final two years was
21  at the New York VA Hospital, and Roosevelt's
22  Hospital in Manhattan.
23     Q.  And when did you finish up that last
24  year?

Page 17

1      A.  1970.
2      Q.  And just jumping back to Fordham, you
3  mentioned you were a pre-med major, is that
4  correct?
5      A.  Yes.
6      Q.  When did you graduate from Fordham?
7      A.  I didn't.  I skipped the senior year,
8  went only three years.
9      Q.  Okay.  So did you ultimately receive a
10  formal BS degree?
11     A.  No.
12     Q.  Have you ever taken a course in
13  accounting?
14     A.  Accounting?
15     Q.  Yes.
16     A.  Unfortunately not.
17     Q.  How about business administration?
18     A.  No.
19     Q.  Tax?
20     A.  No.
21     Q.  Investing in securities?
22     A.  Possibly.
23     Q.  Okay.  When you say "possibly," could
24  you explain that?

5 (Pages 14 to 17)

John G. Esposito, Jr.                                                                    05/31/2006

Page 18

1    A.  Well, when we have meetings, you know,
2  dental meetings and the like and society
3  meetings, occasionally they'll have people speak
4  in the -- along the lines of business and
5  investing and retirement and things of that
6  sort.  Nothing formal, though.
7    Q.  Can you give us sort of a general
8  description of the things they cover in those
9  programs?
10    A.  I really couldn't.  It's been a while.
11    Q.  Do they focus on personal investing?
12    A.  Not really, no.  Mostly general
13  knowledge of how to handle the finances of your
14  office, of your business.
15    Q.  Okay.  Does -- or did any of these
16  programs touch on investing in the market?
17    A.  No.
18    Q.  Okay.  More focused on business
19  administration, is that fair?
20    A.  Yes.
21    Q.  When was the last of these programs
22  that you attended?
23    A.  Quite a while.  Maybe eight, ten years
24  ago.

Page 19

1    Q.  So is it fair to say you have no
2  education or training in securities analysis?
3    A.  Yes.
4    Q.  You're currently practicing as a
5  dentist?
6    A.  Yes.  Oral surgeon.
7    Q.  And do you do business under a formal
8  practice name?
9    A.  I do business as Dr. John Esposito.  I
10  do have a sub-business, so to speak, it's called
11  DCNY, Dental Consulting of New York, where I do
12  consulting work, and I have an additional office
13  that I do that in occasionally, and that's in
14  Manhattan.  But I mainly do what we call
15  independent medical exams.  Are you familiar
16  with that?
17    Q.  Yes.
18    A.  Okay.  And review charts for insurance
19  companies and the like, or anyone who wants a
20  consultation concerning usually injury to the
21  jaws and face.
22    Q.  Okay.  Have you been retained in
23  connection with DCNY for purposes of litigation?
24    A.  Yes.

Page 20

1    Q.  But you've never had the opportunity
2  to testify at a deposition before?
3    A.  No, I don't -- I was only hired as an
4  expert, just rare, maybe three times, four times
5  in the last ten years.
6    Q.  Okay.
7    MR. LONGMAN:  Three, four times?
8    THE WITNESS:  As an expert.
9    MR. LONGMAN:  Retained as an expert?
10    THE WITNESS:  Yes.
11    BY MR. SAVERY:
12    Q.  And on those three or four occasions
13  where you were retained as an expert, were you
14  retained by the Plaintiff in litigation or the
15  defense side?
16    A.  The defense on -- majority of the time
17  the insurance company that was the Defendant
18  hired me.  On one or two occasions I was
19  retained by the Plaintiff, Plaintiff's attorney.
20    Q.  In connection with either of your
21  businesses, that is your dental practice or
22  DCNY, do you employ an accountant?
23    A.  Yes.
24    Q.  Do you have one in each of your

Page 21

1  businesses?
2    A.  No, just my personal account takes
3  care of it.
4    Q.  So your personal account does the
5  business accounting for both of these
6  businesses?
7    A.  Yes, because they're really both.
8  DCNY is really embraced by my general practice,
9  just I named it so that people can know that I
10  do consulting.
11    Q.  On average, how many hours would you
12  say you spend in work at either of these
13  businesses?
14    A.  I'm full-time in the oral surgery
15  component, which now is about three and a half,
16  four days a week, and I might spend one day
17  every three weeks with the consulting.
18    Q.  And the oral surgery component, is the
19  surgery typically done at your office, or are
20  you doing it at hospitals?
21    A.  It's both, but mostly in the office.
22    Q.  Are you able to say, as we sit here
23  today, how far out you're scheduling surgeries
24  for in your dental practice?

6 (Pages 18 to 21)

John G. Esposito, Jr.                                                                    05/31/2006

Page 22

1    A.   It's not that really long.  Maybe two
2   weeks.
3    Q.   You hold some professional licenses, I
4   assume?
5    A.   Yes.
6    Q.   Can you tell me what licenses you
7   hold?
8    A.   The license, the only license that
9   actually is formal is the DDS degree, of course,
10   and the licenses to practice dentistry in the
11   State of New York.  And that's really about the
12   only, now that I think of it, the only formal
13   license.
14    Q.   When did you first obtain that
15   license?
16    A.   1966.
17    Q.   And have you held it continuously?
18    A.   Yes.
19    Q.   Have you ever been a Plaintiff in a
20   lawsuit before?
21    A.   No.
22    Q.   Ever been a Defendant in a lawsuit?
23    A.   No.
24    Q.   Has any business or corporation with

Page 23

1   which you've been affiliated at any point in
2   time been involved in litigation?
3    A.   No, not that I know of.
4    Q.   Have you ever been the target of an
5   investigation by a Grand Jury?
6    A.   No.
7    Q.   Ever been arrested or charged
8   criminally?
9    A.   No.  But a lot of John Espositos have,
10   they're not related to me.  It seems to be a
11   popular name in that group.
12    MR. SAVERY:  Off the record.
13    (Off the record discussion.)
14    BY MR. SAVERY:
15    Q.   When did you first learn that your
16   deposition had been requested?
17    A.   Here?
18    Q.   Yes.
19    A.   The deposition here.  Maybe a month
20   ago was the most recent when you communicated
21   with me about that.
22    MR. LONGMAN:  Can you read the
23   question?
24    A.   When did I learn that there was going

Page 24

1   to be a deposition.
2    BY MR. SAVERY:
3    Q.   Just for purposes of putting this on
4   the record, when I ask you a question I need you
5   to testify from your own knowledge.
6    A.   Okay.
7    Q.   Okay.  If you'd like it read back, we
8   can read it back.
9    (Whereupon, the reporter read back the
10   requested question.)
11    MR. LONGMAN:  To the best of your
12   knowledge.
13    A.   Approximately a month ago.
14    BY MR. SAVERY:
15    Q.   After learning that, did you reference
16   any documents to help you prepare for the
17   deposition?
18    A.   I requested to see them again because
19   I don't -- I didn't have them in my personal
20   space.  We had moved recently, so any documents
21   that I may have saved, which probably I wouldn't
22   have saved it anyway, I lost.  So I did request
23   to see the documents, the complaints.
24    Q.   Okay.

Page 25

1    A.   Just for brief review.
2    Q.   Let me just spend a minute on that.
3    A.   Sure.
4    Q.   You say you lost documents.  Can you
5   explain that?
6    A.   Well, there were -- when I first
7   agreed to be a Plaintiff I received three
8   documents in order, I don't know the number, one
9   was the original, and then an abbreviated one,
10   and then a second amended one, and I didn't have
11   much recall of those anyway.  And that must have
12   been about, I guess, two years ago when I first
13   agreed to be a Plaintiff.
14    And then subsequent to that, December
15   of '05, I moved my residence, so if I had saved
16   them I no longer had them.
17    Q.   Okay.  And when you say you "no longer
18   had them," would they have been discarded when
19   you moved your residence?
20    A.   Probably, yes.
21    Q.   Okay.  And do you know whether any of
22   your investment records were discarded when you
23   moved your residence?
24    A.   My investment records are mostly kept

7 (Pages 22 to 25)

John G. Esposito, Jr.

Page 26

1  by my broker.  I don't really keep a whole lot
2  of that.
3         Concerning like the buys and sells
4  stuff?
5     Q.  Correct.
6     A.  Yes.
7     Q.  So are you aware of any investment
8  records that you had prior to your move that you
9  no longer have?
10    A.  No.
11    Q.  And just on the residence issue, what
12  was your prior home address?
13    A.  20 Pine Hollow Lane, and that was in
14  Greenlawn, New York.
15    Q.  And you moved in December of '05?
16    A.  Yes.
17    Q.  Okay.  So back to the initial question
18  then.  I asked whether you went and reviewed any
19  documents once you found out you were going to
20  be deposed, and just to sort of recap your
21  testimony you explained that you went and
22  requested some because what you had had might
23  have been discarded.
24         What ultimately did you see and

Page 27

1  review?
2     A.  Three complaints, as I remember.
3  Again, I'm got really good at remembering these
4  things.  But there was an original one with my
5  name on it, and then there was an abbreviated
6  one, and then a third was the thickest one, was
7  the amended one, I think it was called.
8     Q.  Okay.  And we'll actually get to those
9  a little later.
10    A.  Okay.
11    Q.  Apart from those three complaints, did
12  you review any other documents to prepare for
13  your deposition?
14    A.  No.
15    Q.  Do you have any handwritten notes
16  regarding this case?
17    A.  I had some handwritten notes
18  originally when we discussed the germane points
19  of the documents.
20    Q.  And do you --
21    A.  Dates and the like.
22    Q.  Do you still have those notes?
23    A.  Yes.
24    Q.  And when you say "we discussed,"

Page 28

1  what's reflected in those notes?  I don't want
2  to know the content of them, but there's
3  communications with your lawyer?
4     A.  Yes.
5     Q.  Apart from notes reflecting your
6  communications with your lawyer, do you have any
7  other handwritten notes concerning Biopure?
8     A.  No.
9     Q.  Did you meet in advance of this
10  deposition with your lawyers?
11    A.  Yes.
12    Q.  To prepare for this deposition?
13    A.  Yes.
14    Q.  How many times?
15    A.  Twice.
16    Q.  When did you meet?
17    A.  Last week for about an hour in my
18  office, I don't remember the day actually,
19  Friday, Friday morning.  And then just this
20  morning for about another hour.
21    Q.  And when you met last week for an
22  hour, who did you meet with?
23    A.  Mr. Longman.
24    Q.  Okay.  Anyone else there for the

Page 29

1  meeting?
2     A.  No.
3     Q.  How about this morning, who did you
4  meet with?
5     A.  These two gentlemen (indicating).
6     Q.  Okay.  Anyone else there?
7     A.  No.
8     Q.  Were you shown any documents during
9  your two meetings?
10    A.  Just reviewed those same documents,
11  that's all.  No new ones.
12    Q.  When you say "those same," are you
13  talking about the three complaints?
14    A.  Yes.
15    Q.  You weren't shown any other documents
16  apart from those three complaints during your
17  meetings with Mr. Longman?
18    A.  No.
19    Q.  Sorry, just a reminder again, please
20  try to wait until the end of the question.
21    A.  I thought I did.
22    Q.  It's a natural tendency, and sometimes
23  I'm not clear perhaps when I'm ending.
24         Did you discuss your deposition with

8 (Pages 26 to 29)

John G. Esposito, Jr.                                                                05/31/2006

Page 30

1  anyone other than your lawyers?
2      A.  No.
3      Q.  Okay.  Switching gears a little bit,
4  do you currently own any stocks or bonds?
5      A.  Yes.
6      Q.  Can you give us a sort of general
7  description of what your holdings are right now?
8      MR. LONGMAN:  Before you do that, I
9  just want to make it clear that Mr. Esposito
10  will answer the questions on some of his other
11  investments other than Biopure, but it's in no
12  way a waiver of his right to object with respect
13  to producing documents or to answer
14  interrogatory answers as he has done --
15      MR. SAVERY:  Okay.
16      MR. LONGMAN:  -- previously.
17      MR. SAVERY:  I think you know what our
18  position is on that issue, so we're all
19  reserving all of our rights.
20      MR. LONGMAN:  I just want to make it
21  clear.
22      MR. SAVERY:  Also a note to the record
23  that there is a protective order in the case,
24  and you can designate whatever you feel is

Page 31

1  necessary to designate.
2      MR. LONGMAN:  Okay.
3      A.  Shall I answer now?
4      BY MR. SAVERY:
5      Q.  Do you need it re-read?
6      A.  No.
7      Just my holdings in stocks and bonds
8  is mainly in bonds, they're mainly tax-free
9  instruments, and a very small amount of stocks
10  which I usually -- which I invest in with Mr.
11  Bernie Harris, my broker, and mainly with funds
12  that are in my IRA account.  So it's really not
13  that major; smaller amount.
14      Q.  Okay.  If you can sort of break it
15  down by total investments then, your tax-free
16  instrument investments, what would you say the
17  value of those investments is?
18      MR. LONGMAN:  I'm going to ask that
19  this portion of the transcript be designated as
20  confidential.
21      BY MR. SAVERY:
22      Q.  You're free to answer.
23      A.  ███████████████████████
24  ███████████████████████

Page 32

1      Q.  Okay.  Just so I'm clear then, are you
2  holding your tax-free instruments through an
3  investment account that you maintain somewhere?
4      A.  Yes.
5      Q.  Okay.  Why don't we start this way.
6      What investment accounts do you
7  currently have?
8      A.  Merrill, Lynch is holding my bonds.
9  And Bernie Harris, unfortunately I can't give
10  you the name of the company, he just switched,
11  he's taking care of my IRS accounts.
12      Q.  Is it Walnut?
13      A.  Yes.
14      Q.  I'm going to jump back to these
15  accounts in a minute.
16      Since the year 2000, have you had any
17  other investment accounts, brokerage accounts,
18  anything of that sort other than the Merrill,
19  Lynch and the Bernie Harris?
20      A.  Merrill, Lynch was a different
21  company, they switched from Advest to Merrill,
22  Lynch, they switched from one account to the
23  other.  But it's the same account, same funds
24  were in that account.

Page 33

1      Q.  Okay.  Apart from that then?
2      A.  No.
3      Q.  Okay.  So since, say, 2000, you've had
4  -- what was an Advest account became a Merrill,
5  Lynch account, and at the same time you've
6  maintained an IRA account through Bernie
7  Harris's firm?
8      A.  Yes.
9      Oh, I did forget one, but I've
10  divested most of it, USAA.  I also had a mutual
11  fund with USAA, which was initially ██████
12      Q.  And you say you divested?
13      A.  Yes.  I had to use some money for real
14  estate.
15      Q.  Okay.  When was that USAA account
16  opened, do you recall?
17      A.  Maybe two years ago, not long, between
18  a year and two years ago.
19      Q.  Okay.  Would you say it's as far back
20  as 2003?
21      A.  I can't be sure.  I'd have to look
22  that up.
23      Q.  And it was in a municipal bond fund?
24      A.  Yes, they put you in a couple

9 (Pages 30 to 33)

John G. Esposito, Jr.

05/31/2006

1  different things, about four different
2  instruments.
3       Q.  And is USAA the firm?
4       A.  Yes.  USAA is a wonderful company, I
5  have all my insurance with them.  If you are a
6  commissioned officer in the Armed Forces this
7  company will provide you with many services, and
8  they're pretty -- they have a grade track
9  record.  And rather recently they came, I think
10  they came into this market fund stuff.  Mostly
11  it's homeowners and car insurance and things of
12  that sort.
13       Q.  Okay.  So you had been using them for
14  insurance?
15       A.  Yes.
16       Q.  And then you opened up a municipal
17  bond fund account?
18       A.  Mm-hmm.
19       Q.  Okay.  And you say your initial
20  investment was approximately ███████
21       A.  Yes.
22       Q.  And you divested at some point over
23  the last year or so?
24       A.  Yes.  Now it's down to maybe twenty.

1       Q.  Going back to your Merrill, Lynch
2  account which had been an Advest account.  When
3  did you open that account?
4       A.  I can't remember.  A long time ago.  I
5  want to say a dozen years ago maybe.
6       Q.  Do you know if that's a standard
7  brokerage account?
8       A.  I'm not sure what that means.
9       Q.  Okay.  Do you know what a brokerage
10  account is?
11       A.  No, not sure.
12       Q.  Okay.  Do you know if you would be
13  able to invest in individual stocks through your
14  Merrill, Lynch account?
15       A.  I don't have those types of funds, I
16  don't want that, so I don't -- I don't know if I
17  could, but I don't, and I have not.
18       Q.  Okay.  Do you have a broker at
19  Merrill, Lynch who you deal with regarding your
20  account?
21       A.  Yes.
22       Q.  What's his or her name?
23       A.  Siracusa.
24       Q.  Are you able to spell that?

1       A.  I'm going to have to do it by sound, I
2  think it's like S-I-R-A-C-U-S-A, or
3  S-I-R-C-U-S-A.
4       Q.  Do you know where his office is?
5       A.  I have his information at home.  I do
6  not.
7       Q.  Do you have any account records
8  relative to the Merrill, Lynch account?
9       A.  Yes.
10       Q.  Going back for how long?
11       A.  The Merrill, Lynch?  That's pretty
12  recent actually.  Maybe six months.
13       Q.  Okay.  And how about the Advest
14  account?
15       A.  Yes, maybe five years before.
16       Q.  Did you have a different broker or
17  individual you dealt with when you were at
18  Advest?
19       A.  Yes.
20       Q.  Who was that?
21       A.  Rosato, Kenneth Rosato, R-O-S-A-T-O.
22       Q.  Do you know which office of Advest he
23  was employed at?
24       A.  No.  I don't think he's in the

1  business anymore actually.
2       Q.  And just to confirm, that Advest
3  account which later became a Merrill, Lynch
4  account was used exclusively for investing in
5  bonds?
6       A.  Yes.
7       Q.  Any bond funds?
8       A.  Yes, that's what they were, I believe,
9  yes, bond funds.
10       Q.  Okay.
11       A.  Tax-free bond funds.
12       Q.  Okay.  So do you understand that it
13  was a mutual fund account?
14       A.  I have to plead ignorance, because I
15  really don't remember the labels.  It was
16  explained to me before I invested in it, but one
17  was Putnam and one was -- there were about three
18  or four of them, names, and they've been pretty
19  consistent.
20       Q.  Okay.  Do you know whether you ever
21  invested in an individual bond, actually
22  purchased a bond?
23       A.  No.
24       Q.  Is that to say you don't know?

10 (Pages 34 to 37)

Page 38

1      A.   I don't believe I did.
2      Q.   Okay. And your understanding is that
3   when you say you invested in bonds you really
4   invested in mutual funds that held bonds?
5      A.   Yes.
6      Q.   Okay. Turning now to the IRA account.
7      A.   Yes.
8      Q.   When was that opened?
9      A.   Maybe twenty years ago.
10     Q.   And were you dealing with Mr. Harris
11  then?
12     A.   I believe so, from the beginning.
13     Q.   Do you maintain records regarding your
14  IRA account?
15     A.   Mr. Harris has them.
16     Q.   Do you have any at your house?
17     A.   No.
18     Q.   Have you ever kept any records
19  regarding your IRA account?
20     A.   No.
21     Q.   Why not?
22     A.   Well, we just had reviews. It's --
23  you know, he'll, as brokers do, he'll call when
24  he thinks something should be changed or if he

Page 39

1   has some opinion about something new and we'll
2   discuss it, and I give him the okay, and he'll
3   execute the trade. It's not that frequent. He
4   knows that I'm really not a frequent trader.
5      Q.   And in that account -- I'll withdraw
6   the question.
7           Have you invested in mutual funds
8   through that account?
9      A.   No.
10     Q.   You use it exclusively for investing
11  in individual securities?
12     A.   I'm going to say if not yes, 90
13  percent or 95 percent yes.
14     Q.   Okay. So there may be a one off
15  situation where you invested in a mutual fund?
16     A.   At his -- with his opinion.
17     Q.   Can you describe for us how you
18  monitor your investments?
19     A.   The municipal, the funds, the Merrill,
20  Lynch, which is now Merrill, Lynch is monthly,
21  we get -- we get our documents monthly. And
22  it's been pretty unchanged for all the years,
23  the amount of revenue that it gives off.
24          The other is just a review with the

Page 40

1   broker occasionally, nothing really very formal.
2      Q.   Okay. So regarding the Merrill, Lynch
3   account, you say you get documents monthly. Do
4   you read those?
5      A.   Yes.
6      Q.   And are they account statements?
7      A.   Yes.
8      Q.   And regarding your other account, do
9   you receive any written reports concerning that
10  account?
11     A.   No, only if something is sold.
12     Q.   Do you get annual or semi-annual
13  portfolio reports from Mr. Harris?
14     A.   No. With the way this questioning is
15  going, I'm going to yell at Mr. Harris for
16  myself being such an idiot.
17          But no, I don't. I really must admit
18  that we're very lacks in that regard. It's
19  really just a really more informal, because I
20  know about how much we've got in it and I know
21  what it's doing essentially, and it's not really
22  very formal or very intelligent.
23     Q.   Have you ever heard the term
24  "discretionary account"?

Page 41

1      A.   I believe, yes, I've heard the term.
2   I've forgotten what exactly, how it applies.
3   You give the broker the right to do most
4   everything, is that what the deal is?
5      Q.   That's generally my understanding.
6      A.   Yes.
7      Q.   Is your account with Mr. Harris a
8   discretionary account?
9      A.   No.
10     Q.   Has he ever had authority from you to
11  conduct trading without you approving each
12  trade?
13     A.   No.
14     Q.   So is it fair to say you ultimately
15  make the investment decision regarding the
16  securities you buy and sell --
17     A.   Yes.
18     Q.   -- in that account?
19          Okay. Just in the interest of
20  completeness here, you talked about what your
21  practice is for monitoring your accounts
22  currently. Was that the same practice that was
23  in place in, say, 2002, 2003?
24     A.   Yes.

11 (Pages 38 to 41)

Page 42

1    Q.  Okay.  Nothing has changed on that
2  front in terms of frequency of reports you get?
3    A.  Right.
4    Q.  Do you monitor the securities markets
5  in general?
6    A.  No.
7    Q.  When did you first start investing in
8  individual stocks?
9    A.  Probably about fifteen or twenty years
10  ago, but very little, which it continues to be
11  that way.
12    Q.  Are you able to estimate how many
13  companies you've invested in through individual
14  stocks since you first started investing?
15    A.  No, I couldn't tell you.
16    Q.  Would you say it's over twenty?
17    A.  Yes, that might be a good guess.
18        MR. LONGMAN:  Don't guess.
19        BY MR. SAVERY:
20    Q.  No one wants you to guess.
21    A.  Then I can't.
22    Q.  That's fine.
23        Are you able to sort of estimate for
24  us how frequently you buy and sell stocks in

Page 43

1  that Harris account?
2    A.  It's infrequent.  Maybe once or twice
3  a year.
4    Q.  Has there ever been a year that's gone
5  by where you haven't bought or sold in that
6  Harris account?
7    A.  Yes.
8    Q.  How many stocks do you own in that
9  account now?
10    A.  I'd have to guess.
11    Q.  Okay.  I'll withdraw that question in
12  case there's any ambiguity.
13        Do you know how many companies you're
14  invested in now?
15    A.  I do not.
16    Q.  Are you able to estimate if it's more
17  than, say, three?
18    A.  It is more than three.
19    Q.  On average since, say, 2000, can you
20  estimate for us how many companies you've been
21  invested in at any given time?
22    A.  Approximately eight.
23    Q.  Okay.  And is your best estimate that
24  that's sort of the approximate range of where

Page 44

1  you are now?
2    A.  Yes.
3    Q.  And was that the same range that was
4  in place in, say, 2003?
5    A.  Yes.
6    Q.  Is there an average size to the
7  position you'll acquire when you buy a new stock
8  in that account, a dollar value?
9    A.  Actually not, because we've had some
10  years where we've had a rather heavy position in
11  one or two companies.  One that I remember
12  vividly was Merck, because I really liked that
13  company, and we had a large portion of the money
14  in there.  We also have a very small amount,
15  maybe one or two companies that are outside of
16  my IRA money, but still handled by Mr. Harris.
17    Q.  Okay.
18    A.  Which I don't know if I made that
19  clear.
20    Q.  That's fine.  We can explore it now.
21        Do you have more than one account,
22  then, through Mr. Harris's firm?
23    A.  Yes, because I think he labels one,
24  the main is the IRA, and a very small portion is

Page 45

1  outside the IRA.
2    Q.  Okay.  And do you still have that
3  separate account with Mr. Harris?
4    A.  Yes.
5    Q.  You mentioned earlier that, correct me
6  if I'm wrong, your total investments through Mr.
7  Harris currently are approximately ██████.
8    A.  Yes.
9    Q.  Does that include that separate
10  account?
11    A.  Yes.
12    Q.  Okay.  In 2003, what was that number?
13    A.  Approximately the same.
14    Q.  Is that separate account used for any
15  specific purpose in terms of your investments?
16    A.  No.
17    Q.  Okay.  So you couldn't equally invest
18  in one account as in the other?
19    A.  Yes.  In other words, if we had -- if
20  we've used up the -- or we don't have any more
21  contributions that year for the IRA, and we had
22  a little extra, and he would call and say "well,
23  if you have a little extra I would suggest you
24  might want to try this," and we'll do that.

John G. Esposito, Jr.

Page 46

1    Q.  Let me jump back then to testimony you
2  gave regarding some larger positions that you've
3  held.
4        You mentioned Merck as one of them?
5    A.  Right.
6    Q.  Do you remember when that was?
7    A.  I think we started with Merck about
8  twelve years ago, and then we sold when Merck
9  started to have troubles.  I don't remember
10  when.
11    Q.  A few years back?
12    A.  Yes.
13    Q.  Okay.  Apart from Merck, any other
14  companies come to mind in terms of companies --
15    A.  That was the biggest, the biggest, you
16  know, sort of position that we took was with
17  that particular company.  I don't know why, it
18  just happened to be -- I don't remember the
19  reasoning.
20    Q.  Any other companies, though, come to
21  mind in terms of those that you've held a larger
22  position in?
23    A.  No.
24    Q.  Are you able to characterize what your

Page 47

1  overall investment strategy is?
2    A.  No.
3    Q.  Okay.  Is it for long-term gain?
4    A.  Yes.  It's for -- to head toward
5  retirement.  I have -- net worth-wise much of it
6  is real estate, is in real estate, so that's --
7  the stocks I kind of -- admitting ignorance will
8  keep that at a minimum, and I feel comfortable
9  with the -- with that amount of municipal, of,
10  you know, tax-free.  So it's for income, it's to
11  produce income, hopefully toward retirement.
12    Q.  Okay.  And when you say "to produce
13  income," are you using that income now, or are
14  you reinvesting it in those accounts?
15    A.  I think it's both right now, both.
16    Q.  So are you withdrawing any of the
17  income that's being generated?
18    A.  Yes, from Merrill, Lynch only, not the
19  IRA.
20    Q.  Okay.  And what do you use that money
21  for?
22    A.  I can't say.  It's not much, it's
23  maybe about $1,700 a month, but it's tax-free,
24  so it's either reinvested or it's used for other

Page 48

1  things.
2    Q.  Okay.  Just a few questions regarding
3  your real estate investments.
4        In what states do you hold real
5  estate?
6    A.  No, just mainly it's my home, and my
7  office is a condominium that I own, and of
8  course the practice has some worth, too.
9    Q.  Apart from that, you have no other
10  real estate investments?
11    A.  Right.
12        I just thought of something, I did
13  co-sign for my son, does that count?  He owns
14  some town homes in North Carolina where he
15  lives, but it's essentially his, it's just that
16  I cosigned for mortgages, but it's not mine,
17  it's his.
18    Q.  Okay.  Thanks.  I appreciate that.
19        Apart from the accounts that you've
20  already identified, that is the Advest/Merrill,
21  Lynch account, the two Harris accounts --
22    A.  Right.
23    Q.  -- and the USAA account --
24    A.  Right.

Page 49

1    Q.  -- have you had any other investment
2  accounts, say, since the year 2000?
3    A.  No.
4    Q.  Have you ever invested in commodities?
5    A.  No.
6    Q.  Mortgage backed securities?
7    A.  No.
8    Q.  Have you ever bought options?
9    A.  No.
10    Q.  Futures?
11    A.  No.
12    Q.  Have you ever done a put or a call?
13    A.  No.  You haven't got the right guy.
14    Q.  Okay.  No short sales then?
15    A.  No.
16    Q.  Any margin purchases?
17    A.  No.
18    Q.  What was the value of your investment
19  portfolio in 2003, approximately?
20    A.  It was probably the same as it is now.
21    Q.  About ██████████
22    A.  Yes.
23        MR. LONGMAN:  Mark this part
24  confidential.

13 (Pages 46 to 49)

Page 50

1    MR. SAVERY:  Do you want to take a few
2  minute break?
3    MR. LONGMAN:  It's okay with us.
4    (Whereupon, a recess was taken from
5    11:53 a.m. to 12:05 p.m.)
6  BY MR. SAVERY:
7    Q.  You mentioned, Dr. Esposito, that at
8  least as part of your investment strategy was
9  the goal of generating income?
10    A.  Yes.
11    Q.  Would you say that that was your
12  entire investment strategy, or did you have
13  other goals in investing?
14    A.  No, that was part of the strategy,
15  which was mainly the bond part.  The other part
16  would be for inflation or increasing the worth.
17    Q.  Growth would you say?
18    A.  Growth, yes.
19    Q.  So is it fair to say that your
20  Merrill, Lynch account was focused on generating
21  income?
22    A.  Yes.
23    Q.  Whereas your Walnut or Harris account
24  was focused on growth?

Page 51

1    A.  Yes.
2    Q.  And what do you perceive to be the
3  ultimate use of the assets you have invested in
4  the Walnut or Harris accounts?
5    MR. LONGMAN:  Objection.
6    You can answer.
7    A.  The ultimate use is when I start to
8  take out from the IRA, there's an inflated
9  amount of money; in other words, the money has
10  increased in value or the stocks have increased
11  in value so that I can take out for more years
12  in the retirement years.
13  BY MR. SAVERY:
14    Q.  Do you have an expectation now as to
15  -- strike that.
16    Have you started withdrawing from the
17  IRA account?
18    A.  No.
19    Q.  Do you have an expectation of when you
20  will?
21    A.  Maybe four years from now.
22    Q.  So in approximately 2010?
23    A.  Yes.
24    Q.  And was that your understanding back

Page 52

1  in 2003?
2    A.  I didn't put much thought in it, you
3  know, specifically.
4    Q.  Okay.  But did you have a general
5  understanding that you'd be withdrawing those
6  funds at some point, say, in the ten years, the
7  next ten years?
8    A.  Yes.
9    Q.  Do you recognize that investments in
10  stocks issued by individual companies involves
11  certain risks?
12    A.  Yes.
13    Q.  And as compared with, say, investing
14  in bonds or mutual funds that invest in bonds,
15  would you say investing in individual stocks is
16  more risky?
17    A.  Yes.
18    Q.  Are some companies riskier than
19  others, in your view?
20    A.  Yes.
21    Q.  Are companies like Biopure in your
22  view riskier or less risky than the average
23  public company?
24    MR. LONGMAN:  Objection to the term

Page 53

1  "like Biopure," what that means.  What does that
2  mean?
3    BY MR. SAVERY:
4    Q.  You can answer the question.
5    A.  The same, it's an unknown, it's
6  somewhat of an unknown.
7    Q.  Okay.  If you compare investing in
8  Biopure with investing in Merck, would you have
9  a sense as to which is the more risky
10  investment?
11    A.  Biopure would be more risky.
12    Q.  And why is that?
13    A.  It's a newer, younger company.
14    Q.  Do you recognize that a company's
15  revenues may vary quarter to quarter?
16    A.  Yes.
17    Q.  And do you recognize that the amount
18  of a company's revenues will hinge on a variety
19  of market forces beyond its control?
20    A.  Beyond its control?  I'm not sure.
21    MR. LONGMAN:  He's not an expert in
22  this area.  What are you asking him?
23    MR. SAVERY:  Do you have an objection?
24    MR. LONGMAN:  I'll object to the form

14 (Pages 50 to 53)

Page 54

1  of the question.
2       MR. SAVERY:  Okay.
3       BY MR. SAVERY:
4    Q.  You can answer if you're able.
5    A.  I don't know.
6    Q.  Okay.  Do you recognize that a
7  company's ability to generate revenue may depend
8  on some factors beyond the company's control;
9  for instance, regulatory approval of a product
10 that the company is looking to manufacture?
11   A.  Yes.
12   Q.  Okay.  And it's fair to say that you
13 were aware of that in 2003?
14   A.  Yes.
15   Q.  Have you ever bought or sold a stock
16 to achieve a tax benefit?
17   A.  Tax benefit.
18       MR. LONGMAN:  Do you understand the
19 question?
20   A.  I'm not sure.  Maybe you could help me
21 by explaining.
22       BY MR. SAVERY:
23   Q.  Gladly.  Sure.
24       For instance, taking a loss on an

Page 55

1  investment that you have for purposes of
2  generating a tax benefit.
3    A.  No.
4    Q.  Okay.  Which, I guess if I understand
5  your accounts correctly in terms of your Harris
6  accounts, most of those assets were in an IRA,
7  so that really wouldn't be an issue for you at
8  this point?
9    A.  Right.
10   Q.  You mentioned --
11       MR. LONGMAN:  That was a question and
12 an answer, I guess.
13       MR. SAVERY:  That was, right.
14   A.  A statement.
15       BY MR. SAVERY:
16   Q.  A statement, correct.
17       You mentioned you'd invested in Merck.
18 Any other companies in the pharmaceutical
19 industry that you've invested in?
20   A.  Pfizer.
21   Q.  Any others?
22   A.  No.
23   Q.  When were you invested in Pfizer?
24   A.  After Merck, sometime after.  I think

Page 56

1  maybe six years ago.
2    Q.  Okay.
3       MR. LONGMAN:  When did he make his
4  initial investment, is that the question?
5    A.  I think about six years ago.
6       BY MR. SAVERY:
7    Q.  And when did you sell?
8    A.  Maybe three years after.
9    Q.  Okay.  And you don't continue to hold
10 any Pfizer?
11   A.  I don't believe so.  Again, I'm not
12 sure.
13   Q.  Okay.  And can you remind me, what's
14 your recollection as to when you were invested
15 in Merck, what period of time?
16   A.  That was longer ago, approximately
17 twelve years ago.
18   Q.  Okay.  Until, say, approximately six
19 years ago?
20   A.  Yes.
21   Q.  Apart from Biopure, any other
22 investments in the medical field generally?
23   A.  I don't believe so.
24   Q.  Can you describe some of the other

Page 57

1  types of companies that you've been invested in
2  through your Harris accounts?
3    A.  Very varied.  There's not a pattern,
4  no pattern.
5    Q.  Do you look to diversify your
6  investments that are in that account?
7    A.  Well, one would think that's logical,
8  and I really -- if Mr. Harris presents something
9  to me that seems like it might be a good
10 company, that would be probably more important
11 than my diversification because it's such a
12 small amount anyway.
13   Q.  Do you know whether any of the
14 companies you've been invested in, apart from
15 Biopure, have been involved in securities
16 litigation?
17   A.  I don't.
18       MR. LONGMAN:  I'm going to object.
19 "Securities litigation" is a very, very broad
20 term.  Did you mean class action securities
21 litigation?
22       MR. SAVERY:  I think he's fine.
23       MR. LONGMAN:  He's not aware.
24       BY MR. SAVERY:

15 (Pages 54 to 57)

Page 58

1    Q.  Do you read any financial or business
2  publications on a regular basis?
3    A.  No.
4    Q.  Did you as of 2003?
5    A.  No.
6    Q.  I'll throw a couple names out there
7  just to sort of for instance.
8        Wall Street Journal?
9    A.  Rarely.
10   Q.  Baron's?
11   A.  Worse.
12   Q.  Fortune?
13   A.  No.  That's why I'm in the shape I'm
14  in.
15   Q.  Money Magazine?
16   A.  Very rare.
17   Q.  So nothing along those lines?
18   A.  No.
19   Q.  Do you do any investing on-line?
20   A.  No.
21   Q.  Have you ever?
22   A.  No.
23   Q.  Have you ever used the Internet to do
24  research regarding your investments?

Page 59

1    A.  I occasionally, when I know I have a
2  stock and I could just search it to see if
3  something was going on, but that's rare because
4  I don't really know what I'm looking at.
5    Q.  Okay.  In those instances where you've
6  done something along those lines, what was it
7  that you were looking for?
8    A.  Actually I was just trying to
9  experiment with the Internet and see what it
10  would do, what you can derive from it, and I
11  didn't -- it wasn't that helpful to me so I
12  stopped doing it.  I don't even remember.
13   Q.  Okay.  Do you recall whether you were
14  looking for merely stock price, or were you
15  looking for some substantive information about
16  the company?
17   A.  Graphs, things of that sort.
18   Q.  Okay.  Did you ever do any of that
19  type of research regarding Biopure?
20   A.  No.
21   Q.  Do you regularly watch any financial
22  news programs on television?
23   A.  No.
24   Q.  Where do you get stock price

Page 60

1  information generally, to the extent you get it?
2    A.  Just from the broker.
3    Q.  Okay.  Do you ever check the newspaper
4  to see how your stocks are doing?
5    A.  No.  I used to do that with Merck
6  because that was the only stock that I held for
7  a long period of time, so I followed that, in
8  quotes, and that was about the only one.
9    Q.  But nothing, say, in the 2003 range?
10   A.  No.
11   Q.  Before investing in a given company,
12  have you ever tried to track down information on
13  your own regarding a company?
14   A.  Not really.
15   Q.  Have you ever contacted an issuing
16  company, and by that the company you're looking
17  to invest in --
18   A.  No.
19   Q.  -- for any publications?
20   A.  No.  I'm sorry, I thought your
21  question was over.  No.
22   Q.  Prior to making an investment
23  decision, that is a decision whether to buy or
24  sell a stock, let's say, have you ever

Page 61

1  referenced any SEC filings regarding a company?
2    A.  No.
3    Q.  Any analyst reports?
4    A.  No.
5    Q.  Any financial reports or annual
6  reports of the company?
7    A.  No.  I rely really on the broker.  I
8  mean we'll discuss these things by phone, but I
9  don't really go and pursue them.
10   Q.  Okay.
11       MR. LONGMAN:  This is in general?
12       THE WITNESS:  Yes.
13       BY MR. SAVERY:
14   Q.  I mean do you ever recall an instance
15  where you actually looked at written information
16  regarding the company you were going to be
17  investing in?
18   A.  I don't recall, no.
19   Q.  Do you maintain any files concerning
20  -- withdraw that.
21       Do you maintain any files regarding
22  any of the companies that you've invested in?
23   A.  Just the reports of the bond funds,
24  the monthly reports, that's all.

16 (Pages 58 to 61)

John G. Esposito, Jr.                                                      05/31/2006

---

Page 62

1    Q.   Okay.  Apart from that, though, with
2   respect to companies that you've invested in
3   with respect to individual stocks, do you
4   maintain any files relative to those companies?
5    A.   No.
6    Q.   You mentioned that you rely quite a
7   bit on the advice of your broker.
8    A.   Mm-hmm.
9    Q.   I'd like to focus for a minute on your
10  Merrill, Lynch account.
11       Do you rely on your broker's advice
12  relative to that account?
13   A.   Yes, but it hasn't really been
14  necessary.  We've been stable for so long, it's
15  been such a long, long history of the same
16  instruments that we've used, my family and
17  myself, that we -- it's really very little.
18   Q.   Have you over the last few years
19  bought or sold any holdings in that Merrill,
20  Lynch account?
21   A.   No.
22   Q.   Relative to the Harris account then,
23  you're relying principally on the advice of Mr.
24  Harris with respect to investment decisions you

---

Page 63

1   make in that account?
2    A.   Yes, I take his advice.
3    Q.   How did you come to do business with
4   Mr. Harris?
5    A.   I believe he was in the same office as
6   my accountant, that's how we met.  Again a very
7   long time ago.
8    Q.   What's your accountant's name?
9    A.   Joseph Tocci, T-O-C-C-I.
10   Q.   Is he still your accountant?
11   A.   Yes.
12   Q.   Do you have, would you say, a social
13  relationship with Mr. Harris, or is it purely
14  professional?
15   A.   That's purely professional.
16   Q.   And can you remind me how long you've
17  been doing business with him?
18   A.   I would say twenty years.
19   Q.   Can you estimate currently how
20  frequently you speak with him?
21   A.   Twice a month.
22   Q.   Do you speak with him on a regular
23  basis, or is it sort of as needed as issues come
24  up?

---

Page 64

1    A.   As needed.
2    Q.   Can you give me an example of what an
3   as needed conversation might be?
4    A.   Well, he'll call if he feels that we
5   have a holding that is becoming weak and he
6   feels that we should sell, and we'll put
7   money -- we won't reinvest it immediately, so
8   he'll try to protect us if he feels that a
9   company is not looking good, and the opposite,
10  if he sees something.
11       And every year we have a new
12  contribution, of course, the IRA contribution,
13  and we have to deal with that and decide where
14  to put it.
15   Q.   Okay.  Do you typically adhere to Mr.
16  Harris's advice?
17       MR. LONGMAN:  Asked and answered.
18   A.   Not always.
19       BY MR. SAVERY:
20   Q.   So there are instances where he's
21  recommended that you buy a stock and you haven't
22  bought?
23   A.   Right.  Yes.
24   Q.   Okay.  And the same may be said about

---

Page 65

1   selling a stock?
2    A.   Yes.
3    Q.   Have there been instances where you've
4   contacted him to discuss a stock that you're
5   interested in investing in?
6    A.   Yes.
7    Q.   Can you give me some examples?
8    A.   One was Biopure.
9    Q.   Any others?
10   A.   There were some where I might have
11  heard something that I found interesting.  And
12  I don't remember the names of the companies.  And
13  then he'll do some research for me, and then
14  we'll discuss it again and we'll decide if --
15  I'll decide if I want to invest.  I can't
16  remember the specific names, though.
17   Q.   Okay.
18   A.   Again not a lot, and they're small
19  things.
20   Q.   When did you first discuss Biopure
21  with Mr. Harris?
22   A.   In August of '03.
23   Q.   And you contacted him to discuss
24  Biopure?

---

17 (Pages 62 to 65)

John G. Esposito, Jr.                                                              05/31/2006

Page 66

1    A.   Yes.
2    Q.   And why did you contact him?
3    A.   Because I had heard about Biopure
4  from, I think, the papers and from my daughter
5  and her husband, my daughter and son-in-law.
6    Q.   Okay.  And we've already been through
7  what your daughter and son-in-law had discussed
8  with you regarding Biopure.
9    A.   Right.
10   Q.   Apart from that, you just mentioned
11 that you'd heard about Biopure from the papers?
12   A.   I think I must have read something,
13 some kind of a -- I don't remember that, though,
14 I just do remember discussing it with my
15 daughter and son-in-law.
16   Q.   When you say you must have read
17 something, why do you say that?
18   A.   It seems to be in my recollection.
19 I'm not really sure.
20   Q.   Okay.  So fair to say you can't say
21 one way or the other whether you read anything
22 regarding Biopure before you contacted Mr.
23 Harris to discuss it?
24   A.   Correct.

Page 67

1    Q.   Okay.  So, similarly, is it fair to
2  say that you can't testify one way or the other
3  as to whether you relied on anything in writing
4  regarding Biopure at the time you decided to
5  first buy the stock?
6         MR. LONGMAN:  Objection.
7    A.   Correct.
8         BY MR. SAVERY:
9    Q.   Now, when you contacted Mr. Harris in
10 August, 2003 to first discuss Biopure, what did
11 you say to him?
12   A.   That I wanted to buy.
13   Q.   Did you tell him why you wanted to
14 buy?
15   A.   Yes.
16   Q.   What did you say?
17   A.   That my -- again I discussed with him
18 the conversations I had with my daughter and
19 son-in-law, and thought that medically speaking
20 it seemed like a very potentially good product.
21   Q.   And why did it seem like a good
22 product to you at the time?
23   A.   Well, because I know that it's a
24 difficult task to get blood, enough blood for

Page 68

1  transfusions in an emergency situation, and
2  before this all we had access to was plasma
3  expanders they're called, liquids that will
4  expand the amount of liquid you've got flowing,
5  but it cannot replace blood because it cannot
6  carry oxygen.  This seemed to be the first
7  product that could do that, and that seemed to
8  be a real significant innovation.
9    Q.   You mentioned that -- withdraw that.
10        Have you had experience with plasmic
11 expanders?
12   A.   Yes.
13   Q.   In the course of your practice?
14   A.   Yes, mostly in my training where you
15 have to take care of more trauma.
16   Q.   Have you been involved in blood
17 transfusions relative to the surgeries you
18 conduct?
19   A.   Yes, rare.
20   Q.   When would they be required generally?
21   A.   Generally if a patient has a blood
22 disorder and they require oral surgery, one can
23 expect that it could conceivably be necessary to
24 have blood on hand.  In the maxillofacial area

Page 69

1  there really isn't much hemorrhage that we
2  really deal with, so it's rare that we need to
3  go beyond what is ever available as far as whole
4  blood, and that's the goal standard of
5  transfusion obviously.
6    Q.   Do you keep a store of blood at your
7  facility?
8    A.   No.
9    Q.   So in instances where you've been
10 required to be involved in blood transfusions,
11 is that in a surgical setting in a hospital?
12   A.   Yes.
13   Q.   Would a product like Biopure's
14 Hemopure -- withdraw that.
15        Are you familiar with the product
16 Hemopure?
17   A.   Yes.
18   Q.   Would a product such as Hemopure be
19 helpful to you in your practice?
20   A.   Not to me, for the same reason that I
21 just alluded to, because it's rare that we would
22 have the need for a massive amount of blood
23 replacement.
24        But it's apparent that in cases where

18 (Pages 66 to 69)

John G. Esposito, Jr.

Page 70

1    there's major surgery involved or where there's
2    a major trauma involved it would be obviously
3    very helpful.
4        Q.   And why would it be helpful?
5        A.   It eliminates the search for whole
6    blood, especially nowadays with the disease
7    entities that we know can be carried in blood,
8    it would be extremely helpful.
9        Q.   Okay. Okay. So going back to your
10   conversation then with Mr. Harris in August,
11   2003, you testified that you had discussed with
12   him the fact that you had talked about Biopure
13   with your son-in-law and your daughter?
14       A.   Yes.
15       Q.   And that it seemed like a good
16   product.
17            Was there anything else you said to
18   him in the context of that discussion concerning
19   Biopure?
20       A.   I asked him to research it.
21       Q.   Did Harris tell you during that
22   conversation that he had heard of the company
23   Biopure?
24       A.   I don't remember if it was in the

Page 71

1    initial conversation, I don't remember. He
2    subsequently did find out about it.
3        Q.   Okay. But at least during that first
4    conversation, then, is it fair to say that
5    Harris didn't have anything to offer you
6    substantively on Biopure?
7        A.   Correct.
8        Q.   The idea at the conclusion of that
9    first conversation was that Mr. Harris was going
10   to go and do some research?
11       A.   Yes.
12       Q.   And do you know whether he did go and
13   do research?
14       A.   Yes.
15       Q.   Did he get back to you?
16       A.   Yes.
17       Q.   How long after your first
18   conversation?
19       A.   Maybe several days. That's our usual
20   give and take.
21       Q.   Okay. He called you?
22       A.   Yes.
23       Q.   And what did he say during that
24   conversation?

Page 72

1        A.   He said it was promising, the company,
2    it was used already in veterinary medicine, and
3    that trials were ongoing, and he felt optimistic
4    about it.
5        Q.   Anything else that you recall?
6        A.   No.
7        Q.   You said "trials were ongoing." Do
8    you have an understanding of what that means?
9        A.   Yes.
10       Q.   What is that?
11       A.   Human trials, trials in humans to gain
12   approval for the drug or medicine to be used.
13       Q.   Okay. And so what you were told by
14   Harris is that as of August, 2003, human trials
15   were ongoing?
16       A.   Yes.
17       Q.   Okay. Did Harris tell you what the
18   source of his information was?
19       A.   I don't recall.
20       Q.   Did he mention to you whether he
21   contacted the company?
22       A.   I don't recall.
23       Q.   Are you aware of any instance where
24   Harris contacted a company for purposes of

Page 73

1    researching the company relative to your
2    potential investment?
3        A.   Not for me specially, but I believe he
4    does contact companies. It's his business, so
5    he does.
6        Q.   Okay. But you can't say one way or
7    the other what information he referenced for
8    purposes of following up on Biopure?
9        A.   Correct.
10       Q.   Okay. Did you make a decision during
11   that second conversation to invest in Biopure?
12       A.   Yes.
13       Q.   Is it fair to say that you had already
14   decided to invest in Biopure before that
15   conversation?
16       A.   Again, our give and take has been if
17   either of us have an idea we mull it over, and
18   then we decide thereafter.
19       Q.   Okay. And did you give him permission
20   to execute an order for you during that second
21   conversation?
22       A.   Yes.
23       Q.   And what did you tell him to do
24   specifically?

19 (Pages 70 to 73)

John G. Esposito, Jr.

05/31/2006

Page 74

1    A.   To purchase the amount of shares.  I
2  don't remember the amount of shares at that
3  time.
4    Q.   Where was the money to come from to
5  purchase those shares?
6    A.   Personal money.  I don't remember if
7  that was the IRA account or the other.  If it
8  were the IRA account, the money would be already
9  there.  I think it was in the other, the smaller
10  account.  So it was personal money, my own.
11    Q.   Okay.  So now did you have to write a
12  check to make that purchase?
13    A.   Yes.
14    Q.   And how did that work in terms of
15  logistics.  Did you have to give him a check
16  before the order went in, or was he able to --
17    A.   I think he's able to do it before I
18  send him a check.
19    Q.   Okay.  And do you have an
20  understanding as to whether an order was placed
21  that day?
22    A.   I can't remember that far back.
23    Q.   Do you receive any confirmation,
24  written or verbal, that a trade has been made in

Page 75

1  your account after it's been done?
2    A.   Just verbal.  He'll let me know that
3  it's been done.
4    Q.   Okay.
5    A.   He keeps most of the, again the
6  records, like I said.
7    Q.   So, for instance, relative to this
8  first trade in Biopure, did he call you up after
9  the trade has been done, or would that just be
10  something you'd address whenever you spoke next?
11    A.   Probably something we addressed when
12  we spoke next.
13    Q.   Just bear with me for a minute.
14      You mentioned another broker or
15  account manager that you deal with is a Mr.
16  Siracusa?
17    A.   Yes.
18    Q.   How frequently did you communicate
19  with Mr. Siracusa?
20    A.   Infrequently.
21    Q.   Can you give me a sense how many times
22  a year?
23    A.   I've only spoken to him twice, because
24  he's the new one.

Page 76

1    Q.   So then going back to Kenneth Rosato?
2    A.   Twice a year.
3    Q.   What's generally the purpose of those?
4    A.   Just an update on the -- those funds.
5    Q.   Was there a broker or an individual at
6  USAA who you would be in contact with relative
7  to your account?
8    A.   No.
9    Q.   How was it that you made that
10  investment?
11    A.   I called USAA, because I have such
12  confidence in that company, because I didn't
13  want to put more in that Merrill, Lynch account.
14  So I had the other, from the real estate I had
15  the other amount of money that I wanted to put
16  in some sort of bond funds or municipal bond
17  funds, so I wanted to -- and other friends of
18  mine had used them with great success, so I
19  just -- you just call them, they have the
20  financial people on board to speak to you, and
21  you come up with a plan where they present it
22  and you gave them money.
23    Q.   There was no single broker who you
24  were in contact with?

Page 77

1    A.   No.
2    Q.   And why was it that you didn't want to
3  invest that money through Merrill, Lynch?
4    A.   I wasn't with Merrill, Lynch at the
5  time, first of all.
6      Secondly, I just wanted to be more
7  diverse, and I had -- I really liked that
8  company.
9    Q.   Apart from the complaints in this case
10  and apart from account statements -- I'm going
11  to withdraw that.
12      Apart from the complaints in this
13  case, have you ever possessed any documents
14  regarding Biopure?
15    A.   No.
16      MR. SAVERY:  Can you mark this as the
17  next exhibit, please?
18      I think yesterday, Howard, we had
19  Exhibits 1 through 43 marked.  Are you fine if
20  we just continue with that numbering, or would
21  you like us to start with a new number?  Does it
22  matter to you?
23      MR. LONGMAN:  Personally I prefer, you
24  know, the name of the witness on the document so

20 (Pages 74 to 77)

John G. Esposito, Jr.                                                    05/31/2006

Page 78

1    it's easier. Since you didn't put his name on
2    it yesterday, and I guess we didn't, I guess it
3    makes sense just to continue in this case.
4         MR. SAVERY: That's the first thing I
5    looked at, too.
6         So we'll mark this the next exhibit.
7         (Whereupon, Exhibit 44 was marked for
8    identification.)
9         BY MR. SAVERY:
10        Q. I'm showing you now, sir, what's been
11   marked as 44, and take as much time as you need
12   to look at it.
13        My question for you once you've had
14   the chance to look at it will be; have you ever
15   seen this document before?
16        A. Yes.
17        MR. SAVERY: Okay. And I note for the
18   record that the title of this document is
19   "Defendant Biopure Corporation's first set of
20   requests for production of documents regarding
21   class certification issues."
22        BY MR. SAVERY:
23        Q. You have a specific memory of seeing
24   this document before?

Page 79

1         A. No, I just have a memory of a document
2    like this. It seems like it was the first one
3    of the -- is this part of the complaint
4    document?
5         Q. This isn't a complaint.
6         A. No, it's not the complaint. It's
7    another one. No, I don't know what --
8         Q. If you flip to page five, there's a
9    heading there that says "documents to be
10   produced"?
11        A. Right.
12        Q. And I'll represent to you that this is
13   a request made by Biopure through your counsel
14   to the Plaintiffs in this case to produce
15   certain documents, and those documents that have
16   been requested are listed starting on page five.
17        A. Okay.
18        Q. Does that at all refresh your memory
19   as to whether you've seen this document?
20        A. I don't think I've seen this
21   particular document.
22        Q. Okay. Do you recall ever seeing a
23   list of documents that other parties in this
24   case have requested?

Page 80

1         A. The only documents I recall seeing are
2    the -- actually the three complaints.
3    Everything starts to meld in to look alike.
4         MR. LONGMAN: And the one you signed?
5         THE WITNESS: Yes.
6         BY MR. SAVERY:
7         Q. Did you at any point search for
8    documents relating to your investments in
9    Biopure?
10        A. No.
11        Q. Okay. Were you ever asked to search
12   any of your records for documents relating to
13   Biopure?
14        A. Just when I signed on for -- to be a
15   Plaintiff I was asked to come up with any
16   documents that I had, and I just had the ones
17   that Mr. Harris had just approving the buy.
18        MR. LONGMAN: Maybe this is taken out
19   of context. In other words, you're asking if
20   your attorney, meaning me, spoke to you, and it
21   would have been relatively recently regarding
22   producing documents.
23        A. Right. That's what I mean.
24        MR. SAVERY: That wasn't what I asked.

Page 81

1    I didn't limit it to relatively recently, to any
2    point in time. I'll take care of the questions.
3    I understand you're trying to clarify.
4         MR. LONGMAN: I don't want the witness
5    to be confused. I think the witness may be out
6    of context.
7         MR. SAVERY: You can state an
8    objection if you want.
9         BY MR. SAVERY:
10        Q. I'll repeat the question.
11        At any point in time, have you been
12   asked to search for documents regarding your
13   investment in Biopure?
14        A. Yes. Recently.
15        MR. SAVERY: Okay. I'm going to
16   object to the testimony of Mr. Longman.
17        MR. LONGMAN: I'm not trying to put
18   words in your mouth.
19        MR. SAVERY: That's precisely what you
20   were trying to do. There was no other reason
21   for it.
22        MR. LONGMAN: Because I don't think he
23   understood the question.
24        BY MR. SAVERY:

21 (Pages 78 to 81)

Page 82

1    Q.  Okay.  When were you asked to search
2  for documents?
3    A.  When I agreed to be a Plaintiff, when
4  I signed on to be a Plaintiff, I was asked to
5  look for documents concerning the buy of the
6  stock.
7    Q.  When you say when you were "asked to
8  sign on as a Plaintiff," when was that?
9    A.  Well, when I had contacted Mr.
10  Longman, and that must have been two years ago.
11  And then I was not aware what was going to --
12  what was happening, and then more recently than
13  that, maybe a few months ago --
14    Q.  Yes, okay.  And hands are being raised
15  here because I don't want you to disclose to me
16  the substance of your conversations with Mr.
17  Longman.
18      MR. LONGMAN:  In other words, anything
19  that you said to me or I said to you, I want you
20  to be able to answer the question regarding the
21  search for documents, but any specifics of your
22  conversation don't disclose in this response to
23  Mr. --
24      BY MR. SAVERY:

Page 83

1    Q.  You mentioned that you had been
2  requested at some point to do a search for
3  documents very early on and then more recently?
4    A.  Right.
5    Q.  My question for you now was; how
6  recently was it that you were asked?
7    A.  The most recent was maybe three weeks
8  ago.
9    Q.  And what did you do after receiving
10  that request?
11    A.  I knew that I had none, and I referred
12  Mr. Longman to the broker.  The only documents
13  that we had were the proof that we bought stock.
14    Q.  Did you discuss with your broker the
15  fact that Mr. Longman would be in touch with
16  you?
17    A.  Yes.
18    Q.  And when was that?  Around three weeks
19  ago?
20    A.  Yes.
21    Q.  Okay.  And have you discussed with
22  your broker his communications with Mr. Longman
23  since then?
24    A.  No.

Page 84

1    Q.  Okay.  Are you aware whether your
2  broker has produced any documents to Mr.
3  Longman?
4    A.  Yes.
5    Q.  What documents has the broker
6  produced?
7    A.  Just the documents that allude to my
8  buy.
9    Q.  Okay.  Is that -- we'll get to it in a
10  minute.
11      But is that the two-page document that
12  shows the transaction history?
13    A.  That's it.
14    Q.  When you spoke to your broker after
15  talking to Longman regarding the search for
16  documents --
17      MR. LONGMAN:  Mr. Longman.
18      MR. SAVERY:  Sorry.
19      BY MR. SAVERY:
20    Q.  -- Mr. Longman regarding the search
21  for documents, what did you tell the broker?
22  What did you say to him?
23    A.  Ask me again?  When?  After Mr.
24  Longman asked me and I asked the broker?

Page 85

1    Q.  No, sorry.  I'll clarify it.
2    A.  Okay.
3    Q.  Actually that is correct.
4    A.  Okay.
5    Q.  When you contacted the broker in the
6  last three or four weeks --
7    A.  Right.
8    Q.  -- concerning a search for
9  documents --
10    A.  Right.
11    Q.  -- you testified that you told him Mr.
12  Longman would be in touch with him?
13    A.  Yes.
14    Q.  What else did you say to him during
15  that conversation?
16    A.  Just to cooperate and give him what he
17  needs, whatever we have.
18    Q.  Did you tell him what Mr. Longman
19  would be looking for?
20    A.  I said "I believe it's for the proof
21  of the buy of the stocks of Biopure."
22    Q.  Okay.
23    A.  Yes.
24    Q.  So you communicated to your broker

22 (Pages 82 to 85)

John G. Esposito, Jr.

Page 86

```
 1   something along the lines of "Mr. Longman is
 2   looking for information or documents concerning
 3   my purchase or sale of Biopure"?
 4        A.   Yes.
 5             MR. LONGMAN:  Just -- objection.
 6             BY MR. SAVERY:
 7        Q.   Okay.  Did you communicate that Mr.
 8   Longman was looking for anything else aside from
 9   information or documents relating to Biopure?
10             MR. LONGMAN:  Objection.  Asked and
11   answered.
12        A.   No.
13             BY MR. SAVERY:
14        Q.   Okay.
15             (Whereupon, Exhibit 45 was marked for
16             identification.)
17             BY MR. SAVERY:
18        Q.   And this document, just for purposes
19   of the record, is a document titled "Plaintiff's
20   Response and Objections to Defendant Biopure
21   Corporation's First Set of Requests For the
22   Production of Documents Regarding Class
23   Certification Issues."
24             And take as long as you need to look
```

Page 87

```
 1   through it, but my first question for you, Dr.
 2   Esposito, is whether you've seen this document
 3   before.
 4             (Witness reviewing document.)
 5        A.   I don't believe I've seen this
 6   document.
 7             BY MR. SAVERY:
 8        Q.   Okay.  I'm going to ask just a couple
 9   questions regarding some documents that relate
10   to Biopure.
11             Apart from the two-page document that
12   was produced in this case which you referred to
13   a little earlier --
14        A.   Right.
15        Q.   -- have there been any other documents
16   concerning Biopure, apart from your notes with
17   your counsel, handwritten notes that you have in
18   your possession?
19        A.   No.
20        Q.   Have there been any documents that,
21   apart from the complaints in the case concerning
22   Biopure, that you did have in your possession
23   prior to -- was it November or December of 2005
24   when you moved?
```

Page 88

```
 1        A.   Did I have them before?  I may have
 2   had the same documents, the complaints.  I
 3   remember seeing them before.
 4        Q.   Okay.  But apart from the complaints?
 5        A.   No.
 6        Q.   Anything else concerning Biopure?
 7        A.   No.  The only -- I said the recent one
 8   was the -- I remember the complaints and that
 9   thing that, what do you call it, interrogatory?
10        Q.   Okay.  An interrogatory answer?
11        A.   That.
12        Q.   Okay.  But apart from that, you have
13   no recollection of ever possessing any other
14   documents relating to Biopure?
15        A.   Correct.
16        Q.   Okay.
17             MR. SAVERY:  Off the record.
18             (Off the record discussion.)
19             BY MR. SAVERY:
20        Q.   Okay.  Just a follow-up couple
21   questions here in light of the last line that I
22   asked.
23             Is it correct then, sir, that you have
24   never possessed any press releases regarding
```

Page 89

```
 1   Biopure?
 2        A.   Correct.
 3        Q.   Any analyst reports regarding Biopure?
 4             MR. LONGMAN:  I'm going to object.
 5        A.   Correct.
 6             MR. LONGMAN:  He's already testified
 7   he has nothing else.
 8             BY MR. SAVERY:
 9        Q.   Any annual reports regarding Biopure?
10             MR. LONGMAN:  Objection.
11        A.   Correct.
12             BY MR. SAVERY:
13        Q.   SEC filings regarding Biopure?
14             MR. LONGMAN:  Same objection.
15        A.   Correct.
16             BY MR. SAVERY:
17        Q.   And is it also fair to say, sir, that
18   you never relied on any of those types of
19   documents when you purchased your shares of
20   Biopure?
21             MR. LONGMAN:  I'm going to object to
22   that to the extent it calls for a legal
23   conclusion since the word "rely" is a legal
24   term.
```

23 (Pages 86 to 89)