John G. Esposito, Jr.



Page 90

1    But you can answer the question.
2    A.   Correct.
3        BY MR. SAVERY:
4    Q.   Okay.
5        (Whereupon, Exhibit 46 was marked for
6        identification.)
7        BY MR. SAVERY:
8    Q.   Okay. I'm showing you, sir, now
9    what's been marked Exhibit 46. Have you seen
10   this document before?
11   A.   Yes.
12   Q.   And what is it?
13   A.   It's the account, my buying of the
14   stocks for me by Mr. Harris.
15       (Witness reviewing document.)
16       BY MR. SAVERY:
17   Q.   And were you aware this document was
18   produced in this litigation?
19   A.   I beg your pardon?
20   Q.   Were you aware that your lawyers
21   produced this document to the Defendants in this
22   litigation?
23   A.   Yes.
24   Q.   Is this a document you provided to

Page 91

1    your lawyers?
2    A.   Through Mr. Harris.
3        MR. LONGMAN:  Asked and answered.
4        BY MR. SAVERY:
5    Q.   If you look at Exhibit 46 and turn it
6    sideways, you see a fax line?
7    A.   Up here (indicating)?
8    Q.   Yes.
9    A.   Yes.
10   Q.   The number on the right looks like
11   "912-125-81," and I can't read the last digits.
12   Are you seeing that as well?
13   A.   Yes.
14   Q.   Is that your fax number, can you tell?
15   A.   No, it's not.
16   Q.   All right. So this isn't a document
17   that you obtained yourself from Mr. Harris?
18   A.   Correct.
19   Q.   Okay. Your understanding is it was
20   sent directly from Harris to Mr. Longman?
21   A.   Correct.
22   Q.   Okay.
23       MR. LONGMAN:  For the record, it's not
24   mine either.

Page 92

1        BY MR. SAVERY:
2    Q.   Did you provide any documents to Mr.
3    Longman at any point in time concerning your
4    accounts, any of your investments?
5    A.   No.
6        MR. LONGMAN:  Other than this document
7    obviously.
8    A.   I think you said other, right.
9        MR. SAVERY:  He just said he didn't
10   produce that to you.
11       MR. LONGMAN:  He caused it to be
12   produced. He told the broker to cooperate and
13   give it to me.
14       BY MR. SAVERY:
15   Q.   Do you know whether you caused anyone
16   else to produce any documents to your lawyers in
17   this case?
18   A.   No.
19   Q.   Just bear with me for a minute,
20   please.
21   A.   No problem.
22       (Pause.)
23       BY MR. SAVERY:
24   Q.   Okay. When was your first purchase of

Page 93

1    Biopure stock? What was the date?
2    A.   August of '03, August 11th.
3    Q.   And prior to August 11th of 2003, you
4    never held any shares of Biopure?
5    A.   Correct.
6        MR. LONGMAN:  The document shows the
7    12th, by the way.
8    A.   12th.
9        BY MR. SAVERY:
10   Q.   Okay. I'm going to show you now
11   another document.
12       (Whereupon, Exhibit 47 was marked for
13       identification.)
14       BY MR. SAVERY:
15   Q.   I'm showing you now what's been marked
16   Exhibit 47. Have you seen this document before?
17   A.   Yes.
18   Q.   Do you know who prepared this
19   document?
20   A.   I believe it was Mr. Longman.
21   Q.   Okay. Is that your signature at the
22   bottom of this document?
23   A.   Yes.
24   Q.   And did you sign this document under

24 (Pages 90 to 93)

John G. Esposito, Jr.

Page 94

1 the penalty of perjury, paragraph eight?
2    A.  Yes.
3    Q.  Okay.  Did you read the document
4 before you signed it?
5    A.  I would assume that I did.
6    Q.  Okay.  Do you have any recollection of
7 reading it before you signed it?
8    A.  I can't -- when was this dated,
9 January of '04?  I don't really recall
10 completely.  That's a long time ago.
11    Q.  Did you review the document for its
12 accuracy before you signed it?
13       MR. LONGMAN:  Objection.
14    He just said he doesn't recall.
15       MR. SAVERY:  I don't want any more
16 speaking objections on the record, okay?  If you
17 have an objection you can state it.
18       MR. LONGMAN:  I don't want any more
19 repetitive questions.
20       MR. SAVERY:  If you have an
21 objection --
22       MR. LONGMAN:  You don't make
23 objectionable questions and I won't make
24 objectionable answers.

Page 95

1       MR. SAVERY:  If you have an objection
2 you can state it on the record pursuant to Rule
3 30D, okay?  I don't want any suggestive
4 objections, it's improper, and I think you know
5 that well enough.  I want an answer from the
6 witness, please, without the coaching.
7       MR. LONGMAN:  I don't understand that
8 to be coaching in any way, shape or form, but I
9 object to the characterization.
10    A.  Repeat the question, please.
11       (Whereupon, the reporter read back the
12 pending question.)
13    A.  I can only say I presume I did.  It
14 was in January of '04.
15       BY MR. SAVERY:
16    Q.  Okay.
17    A.  It would seem to me that just the
18 dates and the shares, that's pretty apparent, so
19 I'm sure that's what I would -- I had seen.
20    Q.  Okay.  Focusing on paragraph four, do
21 you see that there are a number of transactions
22 listed there?
23    A.  Yes.
24    Q.  Three of them?

Page 96

1    A.  Mm-hmm.
2    Q.  Was that typed in when you saw this
3 document and signed it?
4       MR. LONGMAN:  Do you have another copy
5 of this, by the way?
6       MR. SAVERY:  Yes, I do (handing).
7    A.  I could only assume that it was.
8       BY MR. SAVERY:
9    Q.  Okay.  You can't say for sure one way
10 or the other?
11    A.  No, it's been two years -- over a year
12 certainly.
13       MR. LONGMAN:  Would you read that
14 question back?
15       (Whereupon, the reporter read back the
16 above question and answer.)
17       BY MR. SAVERY:
18    Q.  Do you see this third item here?
19    A.  Yes.
20    Q.  It says "August 5th, '03, sale, 520
21 shares, price per share $7.50."  And just for
22 completeness, let's just read the introduction
23 to that list in paragraph four, "to the best of
24 my current knowledge, I purchased the following

Page 97

1 shares of Biopure during the class period
2 referenced in the complaint:" and then as we
3 said the third item listed is August 5th, '03, a
4 sale, 520 shares, $7.50.
5       Do you see that?
6    A.  Yes.
7    Q.  Is that correct?
8    A.  I can't tell you, I don't really know.
9 I presume it was.  If I had signed it and I
10 reviewed it at the time, then I must have
11 conferred with Mr. Harris, and I presume that
12 it's correct.
13    Q.  Do you have a recollection of
14 conferring with Mr. Harris regarding paragraph
15 four before signing this?
16    A.  No.
17    Q.  Okay.  Did you refer to any documents
18 before you signed this?
19    A.  I really don't have any recall with
20 this particular thing.
21    Q.  Okay.  In fact, you wouldn't have had
22 any documents on hand regarding your account at
23 the time you signed this, is that right?
24    A.  Right.

25 (Pages 94 to 97)

John G. Esposito, Jr.

05/31/2006

Page 98

1    Q.   And as you sit here, you cannot say
2    one way or the other whether you sold shares of
3    Biopure on August 5th, 2003?
4    A.   No.
5    Q.   Okay.  And you can't say one way or
6    the other whether you purchased Biopure prior to
7    August 5th, 2003, is that fair?
8    A.   Correct.  My recall was everything was
9    done in August, so I don't -- this is -- I don't
10   recall this.  Why wouldn't he have that in my --
11       MR. LONGMAN:  Don't.
12       THE WITNESS:  I'm sorry, I'm talking
13   to myself.
14       BY MR. SAVERY:
15   Q.   Is this transaction here that's
16   listed, this third one, the sale of Biopure
17   shares on August 5th, 2003, is this something
18   that you're complaining about in this action?
19       MR. LONGMAN:  Objection.  Vague and
20   ambiguous.
21   A.   I would say no.
22       BY MR. SAVERY:
23   Q.   Okay.
24   A.   Because, first of all, I don't have

Page 99

1    the recall of the sale, and no, that would not
2    be in the complaint, it would be the purchasing.
3    Q.   Okay.  Regarding the August 12th
4    purchase of Biopure shares, and again I'll refer
5    back to Exhibit 46, do you see on page two of
6    this exhibit it looks like there are two entries
7    in this list relating to a purchase on August
8    12th.
9        Do you see that?
10   A.   Yes.
11   Q.   What I'd like to focus on is the word
12   "solicited."  Do you see that after "Biopure
13   Corp. Class A" the word "solicited" appears?
14   A.   Yes.
15   Q.   Do you have an understanding of what
16   that word means?
17   A.   No.
18   Q.   Okay.  But it's your recollection that
19   Mr. Harris didn't contact you to recommend that
20   you buy Biopure?
21       MR. LONGMAN:  Objection.  Asked and
22   answered.
23   A.   I contacted him first, is that what
24   you mean?

Page 100

1        BY MR. SAVERY:
2    Q.   Right.
3    A.   Right.
4    Q.   Before you purchased Biopure, did Mr.
5    Harris actually recommend that you buy it?
6        MR. LONGMAN:  Objection.  Asked and
7    answered.
8    A.   No.
9        BY MR. SAVERY:
10   Q.   Okay.
11   A.   The reason why I remember that vividly
12   is because it's rare that I bring something to
13   him, so the two were that I remember were Merck
14   and this that I brought to him, because again
15   I'm not that interested or involved with it.
16   Q.   Do you know what the price of the
17   Biopure shares was that you bought on August
18   12th?
19   A.   It says $7.01 per share.
20   Q.   I'd like to turn to Exhibit 46.  Do
21   you see what the purchase price is in that
22   exhibit?
23   A.   Yes.
24   Q.   Can you tell me what it was?

Page 101

1    A.   $7.01.
2    Q.   For how many shares?
3    A.   Quantity, I think it was 100 shares.
4    Q.   Okay.  And how many did you buy on the
5    12th?
6    A.   Apparently I bought 600 in all, 500 on
7    the top and 100 on the bottom.
8    Q.   And what was the price of the 500?
9    A.   $700 -- I mean $7 a share.
10   Q.   $7 per share?
11   A.   Mm-hmm.
12   Q.   And again turning to Exhibit 47 then,
13   your certification.
14   A.   Yes.
15   Q.   Am I correct the certification says
16   you purchased on August 12th, 2003 600 shares at
17   $7.01?
18   A.   Yes.
19   Q.   But in truth it was $7.01 for 100 of
20   the shares and $7.00 even for 500, is that
21   right?
22       MR. LONGMAN:  According to this
23   document.
24   A.   Apparently.

26 (Pages 98 to 101)

John G. Esposito, Jr.

05/31/2006

Page 102

1        BY MR. SAVERY:
2        Q.  Did you take any steps to verify the
3    accuracy of the information in this document
4    before you signed it, sir?
5        A.  I can't recall.
6        Q.  Okay.  Do you know where this
7    information in paragraph four came from?
8        A.  I have no idea.
9        Q.  You didn't type it in, right?
10       A.  No.
11       Q.  Did you think it was important for you
12   to verify the accuracy of the information that
13   was contained in the document that you were
14   signing under penalty of perjury?
15       MR. LONGMAN:  Objection.  Objection.
16       A.  I'm sure I assumed that Mr. Harris
17   did, you know, I just -- when I do these things,
18   when I look at these things, like this report,
19   why would I think there's -- it's not accurate?
20   You know, I wouldn't even think that way.  Same
21   with the numbers here.
22       BY MR. SAVERY:
23       Q.  You were referring first to, I just
24   want to for purposes of the record, to Exhibit

Page 103

1    46?
2        A.  46.
3        So on 47, which I don't even recall
4    this form at all, I must have had the same
5    mindset concerning numbers of shares bought and
6    sold, I just assumed that it was from Mr.
7    Harris, and he would have the accurate.  I
8    wouldn't have any other way to check it.
9        Q.  Okay.  Do you know whether your
10   lawyers had contacted Mr. Harris prior to, say,
11   the last three or four weeks?
12       A.  No.
13       MR. LONGMAN:  I'm sorry, what three or
14   four weeks?
15       MR. SAVERY:  He had testified earlier
16   that at some point in the last three or four
17   weeks he contacted Mr. Harris to let him know
18   that you were going to be speaking with him.
19       BY MR. SAVERY:
20       Q.  Prior to that, do you have any
21   knowledge that your lawyers contacted Mr.
22   Harris?
23       A.  No.
24       MR. LONGMAN:  Asked and answered.

Page 104

1        BY MR. SAVERY:
2        Q.  Do you have any knowledge that Mr.
3    Harris gave your lawyers any documents prior to,
4    say, the last month?
5        MR. LONGMAN:  Object.
6        A.  No, I have no knowledge.
7        BY MR. SAVERY:
8        Q.  Okay.  As of August 12th, did you have
9    any understanding of Biopure's effort to secure
10   FDA approval from Hemopure?
11       A.  As of August 12th, it was my
12   understanding that they were in the midst of
13   trials to get FDA approval, yes.
14       Q.  Have you ever heard the term "BLA"?
15       A.  No.
16       Q.  Okay.  Have you heard the term
17   "biologics license application"?
18       A.  Not exactly that way, no.
19       Q.  Okay.  Did you understand there was
20   some application that was pending with the FDA
21   regarding this product?
22       A.  Yes.
23       Q.  What was your understanding relative
24   to that as of August 12th?

Page 105

1        A.  My understanding was that the company
2    was involved in ongoing trials to apply for FDA
3    approval for the drug in general.
4        Q.  Do you have an understanding of,
5    general understanding of how the approval
6    process works?
7        A.  Not really, no.  A series of trials,
8    and the FDA will eventually approve or
9    disapprove.
10       Q.  Did you have a sense as of August
11   12th, 2003 when it was that the FDA was expected
12   to approve or disapprove of Hemopure?
13       A.  No.
14       Q.  Had you as of August 12th, 2003 heard
15   the term "IND"?
16       A.  IND?
17       Q.  Yes.
18       A.  There's a term like that in my
19   practice, I don't know -- I don't know what
20   you're referring to.
21       Q.  Have you --
22       A.  It's called incision and drainage.
23       Q.  Okay.  That's not it fortunately.
24       Even as you sit here today, relative

27 (Pages 102 to 105)

John G. Esposito, Jr.

05/31/2006

Page 106

1  to this case, are you aware of the term IND?
2      A.  No.
3      Q.  Who is Carl Rausch?
4      A.  He is one of the principals of the
5  company, I believe he was the technical head.
6      Q.  Okay.  Do you have any other
7  understanding of his role at Biopure?
8      A.  No, just that he was one of the
9  principals.
10     Q.  Okay.  And when you say "principals,"
11  what do you mean by "principals"?
12     A.  High ranking, high ranking
13  involvement.
14     Q.  Is he a Defendant in this case?
15     A.  Yes.
16     Q.  How about Ronald Richards?
17     A.  Yes.
18     Q.  Is he a Defendant in this case?
19     A.  Yes.
20     Q.  Is he associated with Biopure, or was
21  he at the time of the underlying conduct?
22     A.  I understand that he was, yes.
23     Q.  And what was his role at Biopure?
24     A.  I believe CFO.

Page 107

1      Q.  Have you heard the name Howard
2  Richman?
3      A.  Yes.
4      Q.  Is he associated with Biopure, or was
5  he?
6      A.  Richman was -- yes, I believe he was
7  on the board of directors.
8      Q.  Any other role relative to Biopure?
9      A.  I don't -- I don't know.
10     Q.  Have you heard of C. Everett Koop?
11     A.  Koop, yes.
12     Q.  Who was he?
13     A.  He was the past Secretary of Health.
14     Q.  Does he have any connection with
15  Biopure?
16     A.  I have no idea.
17     Q.  Have you heard of Thomas Moore?
18     A.  Yes.
19     Q.  Who was he?
20     A.  He was again a higher ranking official
21  at Biopure.  I don't know if he was CEO or
22  president.
23     Q.  Have you heard the term "PDUFA"?
24     A.  No.

Page 108

1      Q.  Do you know what the name of this case
2  is, this litigation, the title of the case?
3      A.  The title of the case, no.
4      Q.  Do you know in what court the case is
5  pending?
6      A.  No.
7      Q.  Okay.  In what state?
8      A.  Massachusetts, I believe.
9      Q.  What is a class period?
10     A.  It is the period of time where the
11  Plaintiffs have purchased stock.
12     Q.  Okay.  And what is the class period in
13  this case?
14     A.  From April, I think April 9th of '03
15  to December 24th.
16     Q.  Okay.  Have you heard the term
17  "complete response letter"?
18     A.  Yes.
19     Q.  What's a complete response letter?
20     A.  That's when the FDA will send a final
21  notice with their concerns to a company.  In
22  this case I could further answer that.
23     Q.  Sure.
24     A.  I think it was in July they sent one

Page 109

1  to Biopure with, I think, 200 questions that
2  they needed to be answered where they had
3  concerns.
4      Q.  Okay.  Have you ever seen the complete
5  response letter?
6      A.  No.
7      Q.  The document that you assert is a
8  complete response letter?
9      A.  No, I have not.
10     Q.  Have you seen any written documents in
11  the form of correspondence between Biopure and
12  FDA?
13     A.  Between Biopure and FDA?  I don't
14  believe so.
15     Q.  Who is Stuart Gottlieb?
16     A.  He's one of the Plaintiffs.
17     Q.  Have you heard the term "clinical
18  hold"?
19     A.  Yes.
20     Q.  What's a clinical hold?
21     A.  I believe it means that the company is
22  no longer able to conduct any further clinical
23  trials of the drug.
24     Q.  Okay.  Does that term have any

LegaLink Boston, a Merrill Company
(617) 542-0039

John G. Esposito, Jr.                                                          05/31/2006

Page 110

1   significance in this case?
2       A.   Yes.
3       Q.   And what's the significance?
4       A.   I believe they were told, this is
5   after the fact I know this, I found this
6   allegedly out, they were told in July to put a
7   hold on further testing.
8       Q.   Okay.  Further testing of what?
9       A.   Of Biopure -- of Hemopure.
10      Q.   For any certain application?
11      A.   Just for the clinical trials is what I
12  gather, and it was a result of the concerns they
13  had of -- from previous trials, that apparently
14  the orthopedic trials that they reviewed, they
15  had many concerns, so they put a hold on any
16  further clinical trials in the trauma arena.
17      Q.   Okay.  Who is the lead Plaintiff in
18  this case?
19      A.   Erickson.
20      Q.   Are you claiming that you were damaged
21  as a result of your, or harmed in any way as a
22  result of your purchase of Biopure stock on
23  August 12th?
24      A.   Yes.

Page 111

1       Q.   How were you harmed or damaged?
2       A.   Well, I feel that it was -- I bought
3   the stock at an inflated price because of
4   nondisclosure of the company, not to me
5   personally because I have no knowledge of the
6   stuff, but because of their actions, they did
7   not tell the market, and consequently the market
8   value was high.
9       Q.   What did they not tell the market?
10      A.   That they had a hold on the clinical
11  trials as early as April, and then in July they
12  had that very disastrous letter concerning the
13  200 or so, I find out later, concerns that the
14  FDA had.  These are very negative things that
15  I'm sure -- I'm assuming would have impacted on
16  the value of the stock.
17      Q.   Just bear with me for a minute.
18      A.   Sure.
19           MR. SAVERY:  Actually we've been going
20  for a little over an hour now.
21           Off the record.
22           (Off the record discussion.)
23           (Whereupon, a luncheon recess was
24           taken from 1:16 p.m. to 1:54 p.m.)

Page 112

1           BY MR. SAVERY:
2       Q.   You mentioned, Dr. Esposito, when you
3   testified earlier today that the USAA company
4   had a special program for officers who had
5   served in the Armed services, something along
6   those lines?
7       A.   Yes.
8       Q.   Do you have a military background?
9       A.   Yes.
10      Q.   When did you serve in the military?
11      A.   Six years of Reserves, I was a major,
12  retired major, United States Army Reserves.
13      Q.   When did you serve?
14      A.   '60 -- oh my God, let's say, '68 to
15  '74.
16      Q.   Were you on active duty for any
17  period?
18      A.   Two weeks a year.
19      Q.   Any overseas service?
20      A.   No.
21      Q.   Why don't you just walk us through
22  very quickly what your employment history has
23  been since you obtained your dentist's license.
24  We sort of jumped from you finishing your

Page 113

1   medical school and becoming licensed to what
2   you're doing today.  To the extent there's any
3   gap there that you didn't cover in your
4   testimony, if you could fill that.
5       A.   No.  From 1970, which was after my
6   training was complete, to the present it's the
7   exact same of private practice at 555 Larkfield
8   Road, teach at Stony Brook, DCNY business, and
9   chief of oral surgery at the Huntington
10  Hospital.  That was sixteen years of that time.
11  But that's all ancillary, the main thing is the
12  private practice at 555 Larkfield Road, 36
13  years.
14      Q.   In what city?
15      A.   East Northport, Long Island.
16      Q.   And the DCNY business, when did that
17  business start, start up?
18      A.   About eight years ago.
19      Q.   And you keep an address in Manhattan
20  as well for DCNY?
21      A.   I just sublet a place for the
22  convenience of the people who I have to examine.
23      Q.   What's the address there?
24      A.   30 Central Park South.

29 (Pages 110 to 113)

John G. Esposito, Jr.                                                                                          05/31/2006

Page 114

1    Q.   You mentioned you also teach at Stony
2    Brook?
3    A.   Yes.
4    Q.   For how long have you taught at Stony
5    Brook?
6    A.   Twenty-one years.
7    Q.   What do you teach?
8    A.   Oral surgery.
9    Q.   Are you an adjunct faculty member?
10   A.   Clinical professor, right.
11   Q.   Any other employment since 1970 apart
12   from what you've testified to?
13   A.   I'm a consultant for the State of New
14   York for OPD, Office of Professional Discipline.
15   Q.   Can you explain what that position is?
16   A.   Well, when there's a complaint against
17   a doctor, they need consultants like us to
18   review the claims and the complaints and testify
19   if necessary.
20   Q.   Have you ever testified in that
21   context?
22   A.   Yes.
23   Q.   How many times?
24   A.   Twice.  But I made -- I got many

Page 115

1    reports.  You can fill out the reports and it
2    doesn't really have to go to testimony.
3    Q.   And is that testimony before an
4    administrative panel?
5    A.   Yes.
6    Q.   Okay.  And you testified in each of
7    those two instances as an expert?
8    A.   Yes, as a consultant for the state.
9    Q.   What is your Social Security Number?
10   A.   ████████████
11   MR. LONGMAN:  Object.
12   I want to mark that as confidential.
13   I don't know why you need to know that.
14   BY MR. SAVERY:
15   Q.   Okay.  And just to clarify one of my
16   earlier questions regarding some of the terms
17   that we reviewed, BLA was one of the terms that
18   I'd asked you about.
19   And before you came here today, did
20   you have an understanding of what the term BLA
21   referred to?
22   A.   No.
23   Q.   As of your first purchase of Biopure
24   stock in August of 2003, were you aware that

Page 116

1    Biopure was not a profitable company?
2    MR. LONGMAN:  Objection.
3    A.   Yes, I think.
4    MR. LONGMAN:  No foundation.
5    BY MR. SAVERY:
6    Q.   Were you aware as to whether it had
7    operated at a profit?
8    A.   I believe I was, I was aware of that
9    after Mr. Harris looked into the company, and we
10   discussed it, and he said yes, it was the level
11   that they were at then, but again it's all
12   pending the hopefully successful FDA approval.
13   Q.   Okay.  So Mr. Harris had informed you
14   at least by August 12th that Biopure was not at
15   that point in time operating in a profit?
16   A.   Right.
17   Q.   And were you aware at that point in
18   time that the Hemopure product had not yet
19   received FDA approval?
20   A.   Correct.
21   Q.   Did you know at that point in time
22   whether Biopure was generating any sales
23   revenues?
24   A.   I did not know.

Page 117

1    Q.   I think you -- sorry.
2    A.   I seem to recall he said something
3    about veterinary, I don't really remember
4    completely, but some vague memory of a
5    veterinary market for it.
6    Q.   Okay.  And was it your understanding
7    at that point, is it your recollection that
8    there was a veterinary product that was being
9    sold by Biopure at that point?
10   A.   I believe so.
11   Q.   Okay.  But notwithstanding the
12   possibility that they were marketing a product
13   in the veterinary market, they were still
14   operating at a loss; that was your
15   understanding?
16   A.   Correct.
17   Q.   Okay.  I think you may have testified
18   earlier, if so I apologize, you understood that
19   Biopure was a risky investment as of August
20   12th?
21   MR. LONGMAN:  Objection.
22   That wasn't his testimony before.
23   A.   Could I answer?
24   BY MR. SAVERY:

30 (Pages 114 to 117)

Page 118

1     Q.   Yes.  Sure.
2     A.   You asked me if it was more risky than
3   Merck, and I said yes.
4     Q.   Okay.
5     A.   That was the context of what I
6   thought.
7     Q.   Did you consider it to be one of your
8   more risky investments?
9     A.   No, I've had some -- although just
10  playing with stock.  No, I've had more that I
11  thought were more risky, not many, because I
12  don't invest that much.
13    Q.   Can you give me an example of a stock
14  that you've invested in that was more risky?
15    A.   Stocks that are very cheap, penny
16  stocks.  One, the most recent one is named
17  Schram, I believe, and a friend said this
18  company has possibilities in the tech market,
19  and it was like, you know, $.50 a share or
20  something like that, so that I consider just a
21  crap shoot, and I don't do that very frequently.
22    Q.   Okay.  Have there been other penny
23  stocks you've invested in?
24    A.   Maybe one other, which I don't

Page 119

1   remember.
2     Q.   Okay.  Apart from the penny stocks,
3   have there been any stocks that you consider to
4   be more risky than Biopure that you invested in?
5     A.   I don't recall.
6     Q.   Turning back to Exhibit 46 in front of
7   you, turn to the second page, there's a
8   reference to a buy on August 21st.
9          Do you see that?
10    A.   Yes.
11    Q.   Did you, in fact, purchase 600 more
12  shares on August 21st?
13    A.   Yes.
14    Q.   And at that point the price was $8.22?
15    A.   Yes.
16    Q.   So in the nine days since you had
17  purchased your first shares, the stock had risen
18  over a dollar, is that right?
19    A.   Yes.
20    Q.   You were aware, it's fair to say, that
21  there were fluctuations in the price of Biopure
22  stock?
23    A.   Yes.
24    Q.   Did you make this purchase through Mr.

Page 120

1   Harris?
2     A.   Yes.
3     Q.   And how did that purchase come about?
4     A.   Again just verbally, phone call, and
5   then mail a check, that kind of thing.
6     Q.   Who first came up with the idea of an
7   additional --
8     A.   I did.
9     Q.   -- position?
10         And why did you decide you wanted to
11  buy?
12    A.   I thought I wanted to be in a position
13  of about around that figure, nine, 10,000, but I
14  decided to do a little bit conservatively first,
15  half first and then see what happened.  And then
16  sure enough, in a week or so the stock went up,
17  so I thought well, gee, this would be warranted,
18  so I purchased more.
19    Q.   Okay.
20    A.   And that was as much as I wanted to
21  purchase.
22    Q.   Okay.  So when you first bought on
23  August 12th, you had in mind that you'd possibly
24  go up to the $9,000 range?

Page 121

1     A.   Right.  And apparently I must have
2   again, because if the other thing was correct, I
3   must have had prior experience of a buy and a
4   sell according to this thing here in early
5   August, so that might have been --
6          MR. LONGMAN:  Could I hear his
7   question again?
8          (Whereupon, the reporter read back the
9   pending question.)
10    A.   The answer is yes.
11         BY MR. SAVERY:
12    Q.   Okay.  And you mentioned in your
13  answer, your prior answer to that, that's the
14  sale that's reflected in your certification,
15  right?
16    A.   Yes.
17    Q.   But again as you sit here, you have no
18  recollection of that sale, correct?
19    A.   Right.
20    Q.   And you have no recollection of
21  holding Biopure prior to August 12th?
22    A.   Correct.
23    Q.   And you can't say as you sit here if
24  you did hold prior to August 12th when you

31 (Pages 118 to 121)

John G. Esposito, Jr.

Page 122

1 bought?
2     A.  Correct.
3     Q.  Okay.  Now, between your purchase of
4 Biopure stock on August 12th and your next
5 purchase on August 21st, did you receive any
6 information from any sources regarding Biopure?
7     A.  Just when I -- we checked with Mr.
8 Harris he said -- he quoted a price, that it had
9 gone up, and that's when I decided to buy more.
10     Q.  Okay.  So was that your first
11 conversation with Mr. Harris regarding Biopure
12 after you had bought on August 12th?
13     A.  Yes.
14     Q.  Okay.  And was that conversation then
15 on August 21st, is that when you would have
16 spoken to him?
17     A.  Yes, probably.
18     Q.  Okay.  So just to be clear, you didn't
19 talk to Harris regarding Biopure between the
20 12th and the 21st?
21     A.  I can't remember exactly, but I would
22 guess yes, that is correct.  Because that's when
23 I bought it.  So classically if we discuss it
24 and I'm impressed by the results, I would order

Page 123

1 it at that time.
2     Q.  So just to be clear, there's no
3 recollection of any interim report coming in?
4     A.  Right.
5     Q.  And did you check the market price of
6 Biopure between the 12th and when you next spoke
7 to Harris regarding Biopure?
8     A.  Yes, that's why -- yes.  The fact that
9 it went up from seven to eight?
10     Q.  Yes, sorry.
11         Just so it's clear, did you yourself
12 go and try to look up the market price or did
13 you -- was it not until you spoke to Harris?
14     A.  That I could do --
15     MR. LONGMAN:  Mr. Harris.
16     A.  Mr. Harris, yes, I could look it up on
17 the computer and find that it was going up, and
18 that's probably what prompted my call.
19     BY MR. SAVERY:
20     Q.  Okay.  So as you sit here, do you
21 recall that you monitored the price of Biopure
22 stock after you first bought it on the 12th?
23     A.  I can't exactly recall.  It was either
24 one way or the other I found out, either from

Page 124

1 on-line, the Internet, or Mr. Harris, and
2 ultimately Mr. Harris, and that's when I decided
3 to buy more.
4     Q.  When you spoke to Mr. Harris prior to
5 your second purchase, what did he say to you
6 regarding Biopure, if anything?
7     MR. LONGMAN:  Asked and answered.
8         Answer it again.
9     A.  Just that it went up.
10     BY MR. SAVERY:
11     Q.  Anything else?
12     A.  No, he didn't have any further
13 information other than the prior information
14 from before I bought the first on the 12th.  He
15 didn't add anything.
16     Q.  Okay.  Fine.
17         And did you comment to him regarding
18 Biopure during your conversation, apart from the
19 fact that you wanted to buy more?
20     A.  Just that it seemed like it was on the
21 rise, so I thought that, well, yes, maybe this
22 is a good stock, because again we were still
23 quite impressed by the potential.
24     Q.  Okay.  And again to be clear, before

Page 125

1 you bought your second holding in Biopure from
2 the time you bought your first, that period of
3 time now, you didn't go out and do any of your
4 own research?
5     A.  No.
6     MR. LONGMAN:  Objection.  It is clear
7 already.
8     MR. SAVERY:  If you have an objection,
9 state it.  I'm not here to answer your
10 questions.
11     MR. LONGMAN:  Then stop repeating the
12 same questions.  We want to get out of here, we
13 don't want to stay here for repetitive
14 questions.
15     MR. SAVERY:  Fine.
16         Did I get an answer to that question?
17         (Whereupon, the reporter read back the
18 above answer.)
19     BY MR. SAVERY:
20     Q.  As of August 21st, was your
21 understanding, regarding the status of Biopure's
22 effort to obtain FDA approval, was your
23 understanding the same as what the status was as
24 of August 12th when you first bought?

32 (Pages 122 to 125)

John G. Esposito, Jr.                                                                                                  05/31/2006

Page 126

1    A.   Yes.
2    Q.   Okay.  Turning to the first page of
3  this document -- strike that.
4       Before I jump to it, to the extent
5  there had been a prior purchase of Biopure,
6  would it have been done through Harris?
7    A.   Yes.
8       MR. LONGMAN:  Objection.
9       There's no testimony that there was a
10 prior purchase.  You said "to the extent," so
11 that's not an accurate question.
12      MR. SAVERY:  Okay.  So are you making
13 an objection, is that what you're doing?
14      MR. LONGMAN:  Yes.
15      MR. SAVERY:  Okay.
16      BY MR. SAVERY:
17   Q.   Page one of Exhibit 46, it refers to,
18 down at the bottom here, a sale of Biopure
19 stock?
20      MR. TUCCILLO:  Where are you?
21      MR. SAVERY:  I'm on Exhibit 46, first
22 page.
23   A.   The bottom line, I see the numbers.  I
24 don't see where it says sale.

Page 127

1       BY MR. SAVERY:
2    Q.   Okay.  Well, why don't we take it
3  another way.
4       Did you sell your position in Biopure
5  at any point?
6    A.   Yes, I think I must have sold, I think
7  that's what happened here, in January of '05.
8    Q.   Sorry.  I didn't mean to interrupt
9  you.
10   A.   That's okay.
11      It was 1,200 shares, yes, at $.54.  I
12 guess that's what happened then.
13   Q.   Okay.  Why did you sell in January of
14 '05?
15   A.   I don't recall.  Again it must -- we
16 must have talked to Mr. Harris about it.  And
17 this was in January of '05, this was after we
18 learned about the problems that the company was
19 having, the FDA problems, and I think there was
20 a FTC problem, too, as well, I don't remember,
21 but it was something that was very, very
22 detrimental we thought.  December of -- December
23 was when that came out.
24      It was after word came out that they

Page 128

1  were having really significant problems, so
2  that's probably why we sold.
3    Q.   Okay.  And did Mr. Harris recommend to
4  you that you sell at that point?
5    A.   We must have had a conversation, and
6  we must have agreed eventually.
7    Q.   But you don't recall one way or the
8  other who brought it up?
9    A.   No.
10   Q.   Did you sell at that point to take a
11 tax benefit from the loss?
12   A.   I don't recall.  If we had a gain,
13 that would have been applied to the gain,
14 correct?  I don't remember if I had a gain or
15 not.
16      MR. LONGMAN:  You're referring to
17 other securities, a gain?
18      THE WITNESS:  Mm-hmm.
19      BY MR. SAVERY:
20   Q.   Now, are you claiming in this case
21 that you were harmed as a result of that sale of
22 Biopure stock?
23   A.   Yes.
24   Q.   Okay.  Can you explain what your

Page 129

1  position is on that point?
2    A.   Well, the position is the same, it is
3  that I feel that the prices that were seen in
4  the market when I bought the $9,000 worth of
5  stock were as a result of the company's not
6  disclosing very significant information that was
7  very detrimental to the company and would have
8  lowered the value of the stock.  That's how I
9  feel that we were harmed.  We bought a stock at
10 an inflated price because of the lack of
11 information.
12   Q.   Okay.  And was all of the loss that
13 you suffered from the time you purchased to the
14 time you sold this price -- sorry.  Withdraw
15 that question.
16      Is it your position in this case that
17 all of the loss that you suffered from the time
18 you purchased your shares in Biopure to the time
19 you sold them recoverable as damages in this
20 case?
21      MR. LONGMAN:  Objection.
22      Can you read that back.
23      (Whereupon, the reporter read back the
24 pending question.)

33 (Pages 126 to 129)

John G. Esposito, Jr.                                                                                          05/31/2006

Page 130

1        MR. LONGMAN: I object to the form of
2    that question.
3        Do you understand the question?
4        A. I think I do. Do I feel that I
5    deserve to get reimbursed for this?
6        BY MR. SAVERY:
7        Q. Yes.
8        A. I think yes, I do, because if it were
9    common knowledge, I mean if they had disclosed
10   this, that stock would have gone down, it would
11   have tanked way before I bought it.
12       Q. But do you feel you're entitled to be
13   compensated for the difference between the $7.00
14   and the $8.22 on the one hand, your purchase
15   prices, and the $.54 on the other hand, your
16   sale price?
17       A. Yes.
18       Q. The entirety of it?
19       A. Yes, because what if -- if that were
20   known and the stock went down to $.54 in April
21   or July when they got all this bad news, I
22   wouldn't have bought it for eight bucks.
23       Q. And do you think that that's the
24   actual value of the stock, $.54 as of April or

Page 131

1    July?
2        MR. LONGMAN: Objection. Not an
3    expert.
4        A. Oh, I have no idea.
5        BY MR. SAVERY:
6        Q. After you sold your Biopure shares in
7    January of '05, did you purchase any additional
8    positions in Biopure?
9        A. I don't believe so, no.
10       Q. And to be clear, you don't own any
11   Biopure stock today, right?
12       A. Correct.
13       Q. Do you know whether your daughter or
14   son-in-law ever purchased Biopure?
15       A. I don't believe they did. I'm not
16   sure. They were in training at the time, so I
17   don't think they had the money.
18       Q. Any other family members?
19       A. No.
20       Q. Did you ever participate in any
21   conference calls regarding Biopure stock?
22       A. No.
23       MR. TUCCILLO: You mean aside from his
24   calls with Harris, right?

Page 132

1        MR. LONGMAN: He said conference
2    calls.
3        MR. SAVERY: Investor calls.
4        A. No.
5        BY MR. SAVERY:
6        Q. When did you first consider bringing a
7    lawsuit against Biopure?
8        A. When I spoke to Mr. Harris, and that
9    was in -- when did the stock start to tank? It
10   was after December of '03, and he said there was
11   a problem with it, and he had found out, or
12   that's when they disclosed the fact there was a
13   problem with the FDA and the holds that they put
14   on the company. And I asked him if there's any
15   recourse, because it seemed like it was not fair
16   that this was not disclosed, and he -- that's
17   when he referred me to Mr. Longman.
18       Q. Sorry, that was in late 2003?
19       A. Yes.
20       Q. Okay. Do you recall what the stock
21   price of Biopure was at around that time?
22       A. No. It might have been later than
23   '03, I don't quite know the timing of that. It
24   might have been a little later. I can't be

Page 133

1    sure. But I remember what happened, and I
2    remember saying "oh, my gosh, the darn thing is
3    going down" and I was so disappointed, and
4    that's when I discussed it with Mr. Harris.
5        Q. Okay. And so you raised the issue
6    with Mr. Harris?
7        A. Yes.
8        Q. Did Mr. Harris talk to you prior to
9    that conversation about any concerns relating to
10   Biopure?
11       A. I don't remember.
12       Q. Do you remember having any discussions
13   with anyone regarding Biopure before that
14   conversation with Mr. Harris after your last
15   purchase on August 21st?
16       A. No, I don't.
17       Q. And had you done any independent
18   research, read any articles, anything along
19   those lines regarding Biopure during that same
20   period, that is August 21st until the time of
21   this conversation with Mr. Harris?
22       A. No.
23       Q. What did Mr. Harris tell you about Mr.
24   Longman?

34 (Pages 130 to 133)

John G. Esposito, Jr.

Page 134

1    A.   That his firm specializes in class
2  action suits to recover some of your losses.
3    Q.   Did Harris, Mr. Harris mention whether
4  any suits had been filed relative to Biopure to
5  that point?
6    A.   He did not, no.
7    Q.   Did he tell you whether he personally
8  knew Mr. Longman?
9    A.   Yes, he did.
10    Q.   And what did he say?
11    A.   He said he did know him.
12    Q.   Did he tell you how he knew him?
13    A.   Customer, I think, or business
14  associate or customer.
15    Q.   What else did he tell you, if
16  anything, regarding Mr. Longman?
17    A.   That's it.
18    Q.   What else did Mr. Harris tell you
19  during that conversation regarding Biopure, if
20  anything?
21    A.   He had no -- he just -- we had spoken
22  about the problems that it had, and that was
23  essentially the end of the conversation.
24    Q.   Okay.  And just so I'm clear, when you

Page 135

1  say "we had spoken about the problems," is that
2  during that same conversation, or along the line
3  did you have other conversations with him?
4    A.   It was probably the same conversation,
5  although he may -- well, I mean it could have
6  been one or several phone calls concerning the
7  problems with the company, and then the final
8  conversation concerned Mr. Longman.
9    Q.   Okay.  Do you recall anything else
10  that Mr. Harris told you during any of those
11  conversations other than what you've already
12  testified to?
13    A.   No, I don't know.
14    Q.   Okay.  Do you recall anything else
15  that you said to Mr. Harris during any of those
16  conversations other than what you've testified
17  to?
18    A.   No.
19    Q.   After you spoke to Mr. Harris, what
20  did you do next relative to Biopure?
21    A.   I contacted Mr. Longman.
22    Q.   Did you consider selling your Biopure
23  position at that point?
24    A.   I really didn't know what to do,

Page 136

1  because I didn't know how serious the problems
2  were.  And then apparently I decided in January
3  that they were beyond hope, and that's when we
4  sold whatever we had left.
5    Q.   Okay.  That's January a year later,
6  though?
7    A.   Yes.
8    Q.   Did you discuss Biopure prior to
9  initiating a lawsuit here with anyone else other
10  than Mr. Harris and Mr. Longman?
11    A.   No.
12      MR. LONGMAN:  Objection.
13      There are numerous discussions he had
14  regarding Biopure before he initiated the
15  lawsuit.
16      THE WITNESS:  He said other than you
17  and Harris.
18      BY MR. SAVERY:
19    Q.   Anything else?
20      MR. LONGMAN:  No.  I just want to
21  point out that the question was overbroad.
22      MR. SAVERY:  Okay.  The word objection
23  would suffice, I think, rather than your
24  testimony.

Page 137

1      MR. LONGMAN:  It would, but apparently
2  you keep making the same --
3      MR. SAVERY:  I don't want any more
4  testimony from you, okay, Mr. Longman?
5      MR. LONGMAN:  Okay.  I don't want any
6  more objectionable questions.
7      MR. SAVERY:  You're going to get
8  objectionable questions, and it's your role to
9  object to them, period, all right?  It's not
10  your role to testify.
11      (Whereupon, Exhibit 48 was marked for
12  identification.)
13      MR. LONGMAN:  I think this is already
14  an exhibit, isn't it?
15      MR. TUCCILLO:  No.
16      BY MR. SAVERY:
17    Q.   I'm showing you now, sir, what's been
18  marked Exhibit 48, and you can take as much time
19  as you need to look at it.
20      My first question is, whenever you're
21  ready, have you seen it before?
22      (Witness reviewing document.)
23    A.   Yes, I believe this is the first of
24  the documents that I received.

35 (Pages 134 to 137)

John G. Esposito, Jr.                                                    05/31/2006

Page 138

1      BY MR. SAVERY:
2      Q.  Can you be more specific?
3      A.  Concerning the suit that was from Mr.
4   Longman.
5      Q.  Okay.  And when did you first see this
6   document?
7      MR. LONGMAN:  I just want to raise an
8   objection.  There's some additional markings on
9   this document which I haven't seen before.
10     MR. SAVERY:  Okay.  That's noted.
11     BY MR. SAVERY:
12     Q.  Apart from some markings on this first
13  page here, this document at least perhaps in
14  another form you have seen before, is that
15  right?
16     A.  Yes.
17     Q.  When did you first see this document
18  or a similar document?
19     A.  It was approximately two years ago,
20  this whole thing started, it was -- yes, about
21  two years ago, I don't remember exactly.
22     Q.  You understand this is a complaint
23  that was filed in court?
24     A.  Yes.

Page 139

1      Q.  Okay.  And it was filed in a case
2   titled John G. Esposito, Jr. versus Biopure
3   Corporation and other Defendants?
4      A.  Yes.
5      Q.  Did you see this document in draft
6   form before it was finalized?
7      A.  I don't believe so.
8      Q.  So is it your understanding the first
9   time you saw a copy of this document was after
10  it was filed with the Court?
11     MR. LONGMAN:  Objection.  That's not
12  what he said.  Objection.
13     MR. SAVERY:  Your objection is noted.
14  Okay.
15     BY MR. SAVERY:
16     Q.  I want an answer to the question,
17  please.
18     A.  What was the question again?
19     (Whereupon, the reporter read back the
20  pending question.)
21     A.  If this is a document that is produced
22  after the filing, I presume that's correct.
23     BY MR. SAVERY:
24     Q.  Okay.  Are you able to say one way or

Page 140

1   the other whether you saw this class action
2   complaint, not necessarily this copy of it, but
3   this class action complaint before a complaint
4   was filed in the Esposito versus Biopure action?
5      A.  I can't say.  I don't remember.
6      Q.  When you first received a copy of this
7   document, did you read it?
8      A.  Yes, scanned it, right.
9      Q.  Okay.
10     A.  That was again a while ago.
11     Q.  All right.  Did you scan it or did you
12  read it?
13     A.  Well, I read it.
14     Q.  Did you read it word for word, or no?
15     A.  I probably did at one -- when I
16  received it.
17     Q.  Okay.  You say you probably did.  Are
18  you able to say with certainty one way or the
19  other?
20     A.  No.
21     Q.  Okay.  If you turn to page 25, it's
22  the very last page, sorry, I believe it is, do
23  you see the date there?
24     A.  January 6th, '04.

Page 141

1      Q.  Prior to January 6th, '04, had you met
2   Mr. Longman?
3      A.  Met him?  No.
4      Q.  Okay.  You'd spoken to him on the
5   phone?
6      A.  Yes.
7      Q.  Do you know how many times?
8      A.  Not many.  Once or twice.
9      Q.  Okay.  Had you met any other lawyers
10  from his firm?
11     A.  No.
12     Q.  Had you spoken to any other lawyers
13  from his firm on the phone?
14     A.  No.
15     Q.  Had you met anyone from Gilman &
16  Pastor?
17     A.  No.
18     Q.  Had you spoken to anyone from Gilman &
19  Pastor?
20     A.  No.
21     Q.  What's the class period that's alleged
22  in the action that you instituted, this first
23  action?
24     A.  That was -- the class period was April

36 (Pages 138 to 141)

John G. Esposito, Jr.                                                                05/31/2006

Page 142

1   9th to December 24th.
2      Q.   Okay.  And who was identified in this
3   initial action as the class representative?
4      MR. LONGMAN:  Objection.  Objection.
5      A.   I was one of them.
6      BY MR. SAVERY:
7      Q.   Okay.  Were there more than one?
8      A.   I really -- I assume there was.  I
9   don't really know.
10     MR. LONGMAN:  I object to that
11  question.  It's an erroneous question.
12     BY MR. SAVERY:
13     Q.   I'm showing you now what was marked
14  yesterday as Exhibit 24 (handing).  Take as much
15  time as you need to look at it.
16     The first question is; have you seen
17  it before?
18     A.   Yes.
19     Q.   What is it?
20     A.   That's the second complaint document
21  that I had received, the consolidated amended
22  complaint.  And I believe the only difference --
23  it was explained to me, that's why this other
24  one was also explained before I even read it by

Page 143

1   Mr. Longman, so I knew the gist of it, and I
2   believe the gist of this is they changed some
3   dates.
4      Q.   Did you see a copy of this document
5   before it was filed with the Court?
6      A.   I can't -- I don't really know --
7      Q.   Okay.
8      A.   -- the timing of filing and all.
9      Q.   Do you know why this consolidated
10  amended complaint was prepared?
11     A.   No.
12     Q.   Do you know why the name of the case
13  changed from Esposito versus Biopure to In Re
14  Biopure Securities Litigation?
15     A.   No.  I assume that it was because they
16  had identified more Plaintiffs.
17     Q.   Who was the lead Plaintiff in this
18  complaint?
19     A.   Ron Erickson.
20     Q.   Did you apply to be appointed lead
21  Plaintiff?
22     A.   No.
23     Q.   What is a sub-class?
24     A.   A sub-class, well, in regard to this I

Page 144

1   can tell you what my sub-class is, is the fact
2   that I also contemporaneously bought when one of
3   the principals sold.  So I'm not only in the big
4   class of people who lost money, but I'm also in
5   the sub-class of those who again
6   contemporaneously bought while somebody else
7   sold in the company.
8      Q.   Okay.  So is it your position in this
9   litigation that you bought on the same day that
10  someone from the company sold?
11     A.   Yes.
12     Q.   Who was it that sold on that day?
13     A.   Rausch.  Is that how you pronounce it?
14     Q.   Rausch?
15     A.   Rausch, yes.
16     Q.   Was that on one of the two days that
17  we'd identified when you bought?
18     A.   I believe so, yes.
19     Q.   But not on the other?
20     A.   I'm not sure.  I'd have to look at the
21  documents.
22     Q.   Can you tell me why that is --
23  withdraw that.
24     Is that an independent basis for a

Page 145

1   claim in this case?
2      MR. LONGMAN:  Objection.  Calls for a
3   legal conclusion.
4      A.   I have no idea.
5      BY MR. SAVERY:
6      Q.   Okay.  Why is there a sub-class?
7      MR. LONGMAN:  Objection.  Calls for a
8   legal conclusion.
9      A.   I really don't know.  I'm not familiar
10  with it.  It seems to me that two things were
11  wrong then; one, the principals did not
12  disclose, and two, they sold while other people
13  were in the midst of purchasing, so it's like a
14  double kind of whammy, if you will.
15     BY MR. SAVERY:
16     Q.   Okay.  And part two in that analysis
17  is the focus of the sub-class, is that correct?
18     A.   I presume, yes.  I don't know if
19  that's the legal, obviously I don't know that.
20     Q.   Have you heard of the term "motion to
21  dismiss"?
22     A.   Yes.
23     Q.   Was a motion to dismiss filed relative
24  to Exhibit 24?

37 (Pages 142 to 145)

Page 146

1    A.   I have no idea.
2    Q.   Are you aware whether a motion to
3  dismiss was filed in this case?
4    A.   No.
5    Q.   Showing you now what's been marked
6  Exhibit 25 (handing).  Again take as much time
7  as you need.
8        My first question is; have you seen
9  that document before?
10   A.   Yes, that's the third and final one
11 that I've seen --
12   Q.   Okay.  And this is --
13   A.   -- of those.
14   Q.   I didn't mean to interrupt.
15   A.   Of these, the only other document was
16 the answers to those questions.
17   Q.   And this document is titled "second
18 consolidated amended complaint"?
19   A.   Yes.
20   Q.   When did you first see this document?
21   A.   I can't -- I'm not sure.  I know I saw
22 it recently, when I asked to get the documents
23 again so I could just look at them, that was
24 recent, that was about three weeks ago when Mr.

Page 147

1  Longman sent all of them to me.
2        Before that, I don't remember if I got
3  all three at once, the two years ago or whenever
4  this all started, or I don't know if there was
5  any time lapse between -- obviously this was the
6  last one that was drawn up, so it must have been
7  a time lapse between first and second and the
8  third.  I can't tell which or what.
9    Q.   Okay.  If you look at the date on the
10 top of Exhibit 25, you see a reference there
11 "filed, March 28th, 2006"?
12   A.   Okay.  This must have been a much more
13 recent one.  That's what I'm saying.
14   Q.   Now, do you recall getting, prior to
15 the last month or so, whenever it was that you
16 asked Mr. Longman to send you some documents, do
17 you recall receiving any versions of a
18 complaint, say in the previous three months?
19   A.   Of this one?
20   Q.   Yes.
21   A.   I recall all three of them, the
22 recent, when he mailed them recently.  Before
23 that I can't tell you.  I know I had something,
24 but I can't say exactly what, the two years ago.

Page 148

1    Q.   Okay.
2    A.   Obviously this one was done more
3  recently.  This is the last one.
4    Q.   Right.
5        What's your best recollection as to
6  when you first saw this document?
7    A.   Three weeks ago.
8    Q.   Okay.
9        MR. LONGMAN:  As to when you first saw
10 it, was that the question?
11       MR. SAVERY:  That was the question.
12       BY MR. SAVERY:
13   Q.   Why was this version of the complaint
14 prepared?
15   A.   Again, it had something to do, I
16 believe, with some dates.  I don't really
17 remember.  It was again legal matters that get a
18 little bit confused when you have all these
19 documents, so I don't really remember.  I just
20 remember the gist.
21   Q.   Okay.  And am I correct that you are a
22 representative of the sub-class?
23   A.   Yes.
24   Q.   Are there any other representatives of

Page 149

1  the sub-class?
2    A.   I don't know if these other folks are
3  representatives of the sub-class.  I know that
4  they're representatives of the class, Erickson
5  being the lead Plaintiff.  I don't know about
6  Gottlieb and Bittman.  I think they may have
7  been.  I don't know --
8    Q.   Okay.
9    A.   -- who's who.
10   Q.   Are you a representative of the class
11 as well, or merely with the sub-class?
12   A.   I believe the sub-class, but possibly
13 the class as well.  I'm not sure about that.
14 That's again a legal thing.
15       MR. TUCCILLO:  Just one second.
16       (Pause.)
17       MR. LONGMAN:  I just wanted to say
18 something for the record in-between.
19       MR. SAVERY:  Okay.  I don't want
20 anything on the record.  If you have an
21 objection, you can put it on.
22       MR. TUCCILLO:  It's for your benefit.
23       MR. LONGMAN:  It's for your benefit,
24 and I have the right to put something on the

38 (Pages 146 to 149)

Page 150

```
 1   record.
 2         MR. SAVERY:  Okay.
 3         MR. LONGMAN:  It's possible that Dr.
 4   Esposito will also be -- is also a proposed
 5   representative of the class as well as the
 6   sub-class.  We may amend our motion.
 7         MR. TUCCILLO:  Just so you know.
 8         MR. LONGMAN:  Just so you're aware.
 9         MR. TUCCILLO:  So you can ask
10   questions today if you want.
11         MR. SAVERY:  Well, he apparently
12   doesn't even know this, and he hasn't been
13   proposed as a class representative, he's been
14   identified merely as a representative of a
15   sub-class.  So when and if you decide to amend
16   your pleadings to include him as a class
17   representative, we'll have to deal with it at
18   that point.  But at this point in time, you
19   know, he's not.
20         MR. TUCCILLO:  Just for the record,
21   we're putting you on notice that as of today our
22   position is that he may be, and if you want to
23   ask any questions appropriate to his being a
24   class representative, we're not going to raise
```

Page 151

```
 1   objections unmasked you doing so, and we'll
 2   handle it as if you were asking questions about
 3   the sub-class, that's fine.  You can feel free
 4   to pursue that today.
 5         MR. SAVERY:  Okay.  On the other hand,
 6   I reserve the right.
 7         MR. TUCCILLO:  We would not agree to
 8   produce him again simply on the basis that he is
 9   a class representative if we amend it in the
10   near future when we're telling you today we may
11   very well do so.
12         MR. SAVERY:  I'm going to object to
13   this.
14         MR. TUCCILLO:  That's fine.
15         MR. SAVERY:  Because it's clearly
16   improper.  He is here as a representative of the
17   sub-class, you presented him in the complaint,
18   in every version of the complaint and in your
19   motion papers as a representative of the
20   sub-class.  We've got an opposition due in fewer
21   than 30 days, I think, or it might be exactly 30
22   days.  So to the extent you're going to amend
23   your papers and propose him as a representative
24   of the class, first of all putting aside any
```

Page 152

```
 1   objections to the entire exercise of doing so,
 2   we're reserving all rights to recall him at that
 3   point.
 4         MR. TUCCILLO:  Understood.
 5         BY MR. SAVERY:
 6      Q.  Dr. Esposito, did you have any role in
 7   deciding what claims were to be made in any
 8   version of the complaint that you've seen?
 9      A.  No.
10      Q.  Okay.  Did you have any role in
11   deciding what individuals were to be named as
12   Defendants in any version of the complaint
13   you've seen?
14         MR. LONGMAN:  I'm going to object.
15   It's vague.
16         Go ahead.
17      A.  No.
18         BY MR. SAVERY:
19      Q.  Are you aware that there is a separate
20   claim in the complaint for insider trading?
21      A.  No.
22      Q.  Do you know what insider trading is?
23         MR. LONGMAN:  Objection.  Insider
24   trading --
```

Page 153

```
 1         MR. SAVERY:  What's the objection?
 2         MR. TUCCILLO:  It's a legal
 3   conclusion.
 4         MR. LONGMAN:  You don't want me to
 5   talk?
 6         MR. SAVERY:  A legal conclusion?
 7         MR. TUCCILLO:  He's allowed to say
 8   objection.  You can't get upset about that.
 9         MR. LONGMAN:  You can't win.
10      A.  Does insider trading mean -- does that
11   refer to the fact that they sold stock while we
12   were buying, is that the whole deal?
13         BY MR. SAVERY:
14      Q.  Respectfully, I can't answer
15   questions.  It's my question to you; are you
16   aware that there's a separate count in the
17   complaint for insider trading?
18      A.  Can I tell you what I think with an
19   explanation?  If that indeed means that they
20   were selling while we were buying, yes, I was
21   aware of that.  I'm not quite sure if that was
22   what that insider trading remark referred to.
23      Q.  Okay.  Just so I have it clear, you do
24   have an understanding that there is a claim in
```

Page 154

1  the complaint that addresses the fact that
2  Rausch and perhaps others at Biopure sold at the
3  same time you and other shareholders purchased?
4      A.  Yes.  That's the basis of the
5  sub-class.
6      Q.  Okay.
7      A.  As I understand it.
8      Q.  Okay.  And what are the damages that
9  you're seeking relative to that claim?
10         MR. LONGMAN:  Objection.  Calls for a
11  legal conclusion.
12      A.  I feel that again, if one would know
13  not only if they disclose the bad stuff that was
14  happening with the FDA, I call it bad stuff, but
15  I also knew that the principals were beginning
16  to unload their stock, I think that that would
17  also impact on what we felt was the value of the
18  stock.
19         BY MR. SAVERY:
20      Q.  Okay.  Just in terms of the two
21  purchases that we've talked about today, are you
22  able to tell me in dollars how much you feel
23  you're entitled to as a result of this, I'll
24  call it insider trading, okay?

Page 155

1      A.  Okay.
2         MR. LONGMAN:  Objection.
3      A.  Admittedly arbitrarily I would think
4  from that value of the $8.00 value down to the
5  final $.50 value that I had to -- that I was
6  forced to accept or did accept.
7         BY MR. SAVERY:
8      Q.  Okay.  And apart from the allegations
9  concerning this trading by Rausch and others and
10  the purchases of Biopure stock by shareholders,
11  apart from that set of allegations, are you
12  aware that the complaint also alleges fraud in
13  the sale of securities?
14      A.  Fraud in the sale?
15         MR. LONGMAN:  Objection.
16      A.  I don't --
17         MR. LONGMAN:  That's not true.
18      A.  I don't know what that -- no.
19         BY MR. SAVERY:
20      Q.  Have you ever heard of -- withdraw.
21         Are you aware that you're making
22  claims in this case concerning
23  misrepresentations or omissions in connection
24  with the purchase or sale of securities?

Page 156

1      A.  Yes.
2      Q.  And just in terms of your own
3  purchases of Biopure stock, what do you feel is
4  the damage you've suffered as a result of that
5  conduct?
6      A.  The same as I've said, the amount that
7  I lost per se.
8         MR. LONGMAN:  Asked and answered.
9      A.  From the seven, $8.00 range down to --
10  that was, you know, it's not a big, it's
11  whatever it was, 8,000, $9,000.
12         BY MR. SAVERY:
13      Q.  Down to the $.54 when you sold?
14      A.  Right.
15      Q.  Okay.  Did you discuss the possibility
16  of filing suit before you filed your first
17  complaint with any other shareholder of Biopure?
18      A.  No.
19      Q.  Since filing suit, have you spoken
20  with any other Biopure shareholder?
21      A.  No.
22      Q.  Apart from Mr. Longman, did you talk
23  to any other lawyers regarding a possible suit
24  against Biopure?

Page 157

1      A.  No, just today.
2      Q.  Yes, going back in time, though.
3      A.  No.
4         MR. LONGMAN:  Pointing to Mr.
5  Tuccillo.
6      I'm sorry.
7         BY MR. SAVERY:
8      Q.  How many times have you spoken with
9  Mr. Longman?
10      A.  Total?
11      Q.  Yes.
12         MR. LONGMAN:  Objection.
13      A.  Six.
14         BY MR. SAVERY:
15      Q.  And two of those were today and last
16  Friday?
17      A.  Yes.
18      Q.  Prior to that, when did you last have
19  any contact with Mr. Longman?
20      A.  Prior to these last recent two,
21  yesterday and today?  About three or so months
22  ago when this all began in earnest.
23      Q.  Prior to then, when had you last
24  spoken with Mr. Longman?

LegaLink Boston, a Merrill Company
(617) 542-0039

John G. Esposito, Jr.

Page 158

1    A.   When Harris referred me to him a
2  couple years before that.
3    Q.   Why did you decide to bring your
4  claims in a class action?
5    A.   I really felt that what they did was
6  not really right, to tell you the truth.  I
7  really felt that it was kind of misleading --
8  not misleading, it was really, by omission it
9  was really not playing fair.  The fact that
10  those two significant events were withheld, and
11  the fact that they were selling while other
12  people were buying, I thought that was really
13  not fair for those principals to do.
14    Q.   Are you familiar at all with the
15  requirements for bringing a suit as a class
16  action?
17    A.   No.
18        MR. LONGMAN:  Objection.
19        BY MR. SAVERY:
20    Q.   Do you have an understanding as to
21  what it means to be a representative of a class
22  or a sub-class?
23    A.   Yes.
24    Q.   What does it mean?

Page 159

1    A.   My job is to oversee, although it's of
2  course as a layman, what happens legally, what
3  the lawyers are doing, and to let -- make sure
4  that the rest of the class knows what's
5  happening through them, and participate in any
6  like decisions, if there's an offer or something
7  of that sort.
8    Q.   Okay.  And are you willing to testify
9  at trial if the case goes to trial?
10    A.   Yes.
11    Q.   Do you have a fee agreement with Mr.
12  Longman's firm?
13    A.   No.
14    Q.   Do you have any written agreement at
15  all with Mr. Longman?
16    A.   No.  He just mentioned that --
17        MR. LONGMAN:  Objection.  I'm going to
18  object to disclosing attorney/client
19  communications.
20        THE WITNESS:  Okay.
21        MR. LONGMAN:  I want you to be able to
22  answer the question as to whether there's an
23  agreement or not, but I don't want you to
24  disclose our communications.

Page 160

1        MR. TUCCILLO:  Can you read the last
2  question and answer?
3        (Whereupon, the reporter read back the
4  above question and answer.)
5        BY MR. SAVERY:
6    Q.   Apart from any written agreement, do
7  you have any verbal agreement regarding your
8  engagement of Mr. Longman as your attorney?
9    A.   My expenses.
10    Q.   What is the agreement relative to your
11  expenses?
12    A.   Travelling, travelling expenses to
13  get -- schlep from New York to here.
14    Q.   I'm wondering what the agreement is
15  relative to those expenses.
16    A.   That he would reimburse those
17  expenses.
18    Q.   Okay.  Have you paid any money to any
19  lawyers representing you in this case?
20    A.   No.
21    Q.   Have you agreed to pay any costs for
22  bringing this action?
23    A.   Yes.  But as I understand it, if
24  there's -- there's a contingency fee, of course,

Page 161

1  that the lawyers get.  If they lose I would be
2  responsible for my percentage of their fee,
3  which is going to be relatively small since I'm
4  a small shareholder.
5    Q.   When you say you'd be responsible for
6  your percentage of the fees, is that the
7  attorney fees?
8    A.   Yes.
9        MR. LONGMAN:  Objection.
10        BY MR. SAVERY:
11    Q.   What about expenses?
12    A.   What expenses?
13    Q.   To the extent there are any additional
14  expenses such as you flying up here.
15    A.   Oh, oh, I don't know the exact nature
16  of the -- you know, those numbers.
17    Q.   Do you know who's responsible for
18  paying those expenses?
19    A.   The expenses of?
20    Q.   For instance, flying up here, or any
21  travel the lawyers have to do.
22    A.   My expenses now I was told would be
23  reimbursed by the -- because that becomes their
24  expenses.  Now, if there's a -- if they lose the

41 (Pages 158 to 161)

John G. Esposito, Jr.                                                    05/31/2006

1   case, we all have to pay them, reimburse them.
2   My portion would be commensurate with the
3   percentage of stock that I have.
4       Q.  Okay.  So it's your understanding,
5   then, that all holders of Biopure stock who fall
6   within the class in this case would be
7   responsible for --
8       A.  Yes, if they're in the suit, yes.
9       Q.  Sorry, so I can finish the question.
10      -- would be responsible for
11  compensating Mr. Longman's firm for his fees and
12  expenses?
13          MR. LONGMAN:  Objection.
14      A.  Yes.
15          BY MR. SAVERY:
16      Q.  You mentioned the term "contingency
17  fee."
18      A.  Right.
19      Q.  What is a contingency fee?
20      A.  It means that the attorney gets paid,
21  upon winning a case he gets paid a percentage of
22  what is won of the settlement or whatever.
23      Q.  Okay.  Do you have an understanding of
24  what the contingency fee percentage is for your

1   engagement of Mr. Longman?
2       A.  My -- I may have assumed this, that
3   it's a third.  So I really can't say.
4       Q.  Has anyone promised you a certain
5   amount of money if the case settles?
6       A.  Certain amount of money?  No.
7       Q.  Has anyone suggested to you that you
8   will recover more than any of the other class
9   members in this case on a percentage basis?
10      A.  No, but that's a damn good idea.
11      Q.  But it hasn't been suggested?
12      A.  No.
13      Q.  Okay.  Just for the benefit of
14  counsel.
15      A.  Do you want to change lawyers?
16      Q.  I don't think you want to do that.
17          MR. LONGMAN:  Do you want to take a
18  quick break?
19          MR. SAVERY:  Sure.
20          (Whereupon, a recess was taken from
21  2:52 p.m. to 3:08 p.m.)
22          BY MR. SAVERY:
23      Q.  Dr. Esposito, I'm going to be going
24  through a number of documents that were marked

1   at yesterday's deposition, showing them to you
2   and just asking you one or two questions about
3   each.
4           Showing you now what's been marked
5   Exhibit 26 (handing).  And with respect to any
6   of these, take as much time as you need to look
7   through them.
8           My first question concerning each is
9   going to be; have you seen this document before?
10      A.  No.
11      Q.  Okay.  That's all for that one.
12          Next one, 27 (handing).
13      A.  I haven't seen this one either.
14      Q.  Okay.  That's Exhibit 27?  Yes, that's
15  Exhibit 27?
16      A.  Yes.  I'm sorry.
17      Q.  I'm showing you now what's been marked
18  as 28 (handing).  And for each of these what I'm
19  wondering is if you've seen that specific
20  document or one that's in a similar form.
21      A.  Yes, I understand that it's either
22  this or something like it.
23      Q.  Similar, it could have been in a
24  different form.

1       A.  The answer is no to this one as well.
2       Q.  Okay.  I show you the next document.
3   It's been marked Exhibit 29 (handing).  Have you
4   seen this before today?
5       A.  No.
6       Q.  Okay.  The next document, Exhibit 30
7   (handing).  Have you seen that document before?
8       A.  No.
9       Q.  Okay.  I'm showing you now what's been
10  marked Exhibit 31 (handing).  Have you seen that
11  document before?
12      A.  No.
13      Q.  Showing you what's been marked Exhibit
14  32 (handing).  Have you seen that document
15  before?
16      A.  No.
17      Q.  Showing you what's been marked Exhibit
18  33 (handing).  Have you seen that document
19  before?
20      A.  No.
21      Q.  Showing you what's been marked Exhibit
22  34 (handing).  Have you seen that document
23  before?
24      A.  No.

42 (Pages 162 to 165)

John G. Esposito, Jr.                                                    05/31/2006

Page 166

1    Q.  I'm showing you what's been marked
2  Exhibit 35 (handing).  Have you seen that
3  document before?
4    A.  No.
5    Q.  I'm showing you what's been marked
6  Exhibit 36 (handing).  Have you seen that
7  document before?
8    A.  No.
9    Q.  I'm showing you what's been marked
10  Exhibit 37 (handing).  Have you seen that
11  document before?
12    A.  No.
13    Q.  I'm showing you what's been marked
14  Exhibit 38 (handing).  Have you seen that
15  document before?
16    A.  No.
17    Q.  I'm showing you what's been marked
18  Exhibit 39 (handing).  Have you seen that
19  document before?
20    A.  No.
21    Q.  Showing you what's been marked Exhibit
22  40 (handing).  Have you seen that document
23  before?
24    A.  No.

Page 167

1    Q.  Showing you what's been marked Exhibit
2  41 (handing).  Have you seen that document
3  before?
4    A.  No.
5    Q.  Showing you Exhibit 42 (handing).
6  Have you seen that document before?
7    A.  No.
8    Q.  Showing you Exhibit 43 (handing).
9  Have you seen that document before?
10    A.  No.
11    Q.  Okay.
12    MR. SAVERY:  At this point I'm going
13  to suspend my questioning.  And to the extent
14  there is any further production of documents
15  relative to this case, we reserve the right to
16  continue questions after that further production
17  of documents, or in light of what we -- and
18  there have been letters back and forth from
19  counsel about what Defendants perceive to be a
20  deficiency in response to Defendants' discovery
21  requests, but with that I'll complete my
22  questioning for the time.
23    MR. TUCCILLO:  Just for the record,
24  we're reserving all rights as well.  The witness

Page 168

1  does not intend to appear again for a class
2  certification deposition.  As we stated before,
3  it's possible that he'll be put forward as a
4  representative of the class as well as the
5  sub-class, obviously you haven't written your
6  opposition about him in either capacity before
7  today's deposition, feel free to ask any
8  additional questions you want today relative to
9  his potential use as a class representative.  If
10  we do amend the papers, it will be imminently,
11  but you're free to ask any and all questions you
12  want today about either capacity.  We're not
13  going to produce him again for such questioning.
14    MR. SAVERY:  Okay.  Well, I object to
15  the concept that you may or may not be changing
16  your designation as to class representative and
17  therefore I have to go about questioning this
18  witness relative to a capacity that he may or
19  may not be serving in the future.
20    So we're reserving all rights to
21  re-open questioning to the extent that you
22  decide to refile a motion or to put him forward
23  as a representative of the class.
24    MR. LONGMAN:  And we're also not

Page 169

1  producing him again if more documents -- our
2  position is that we've complied with your
3  document request.
4    MR. SAVERY:  Okay.  We're reserving
5  all rights.
6    BY MR. HUANG:
7    Q.  With that said, Dr. Esposito, I have a
8  few questions.  This is going to take less than
9  five minutes.
10    Is it fair to characterize your prior
11  testimony -- is it fair to say that your prior
12  testimony is that during the time at which you
13  and other class members were purchasing Biopure
14  securities there were others that were selling
15  them who you contend were principals of Biopure
16  Corporation?
17    A.  Yes.
18    Q.  And what is the basis of your
19  understanding that there were principals that
20  were selling Biopure securities?
21    MR. LONGMAN:  Objection.
22    Go ahead.
23    A.  It was revealed to me in the lawyer's
24  production of the complaints, and the dates, I

43 (Pages 166 to 169)

Page 170

1  believe by Mr. Rausch, were the same dates as I
2  bought.
3      Q.  Were there any documents that you
4  reviewed that forms that basis, the basis of
5  your understanding, other than the complaint you
6  just mentioned?
7      A.  No.
8      Q.  Were there any people or individuals
9  you spoke to that formed the basis of your
10  conclusion?
11      A.  Just my attorney.
12      Q.  Do you contend that Mr. Moore was one
13  of the principals who sold stock during the
14  class period?
15      A.  I only -- referable to my buy, just
16  Mr. Rausch.
17      Q.  Okay.  Just to clarify, prior to
18  having reviewed the complaint, you were not
19  aware of any of these allegations concerning the
20  sale of Biopure securities by principals of
21  Biopure while you were in the process of
22  purchasing them, is that correct?
23      MR. LONGMAN:  Objection.
24      A.  Correct.

Page 171

1      MR. HUANG:  I have nothing else.
2      MR. SAVERY:  Unless you wanted to --
3  do you have anything you wanted to add?
4      MR. LONGMAN:  I have one or two
5  follow-up questions -- not follow-up.
6      MR. TUCCILLO:  Was there anybody else?
7      MR. SAVERY:  I wanted to follow up on
8  that, since you're going to go --
9      MR. TUCCILLO:  Go ahead.
10      BY MR. SAVERY:
11      Q.  You just mentioned that it was, as far
12  as you're aware, Mr. Rausch who sold his Biopure
13  stock commensurate with your purchase of Biopure
14  stock, correct?
15      MR. TUCCILLO:  Did you say was sold?
16  I'm sorry, I thought you said Mr. Rausch was
17  sold.
18      MR. SAVERY:  I can restate the
19  question if there's any confusion.
20      BY MR. SAVERY:
21      Q.  You testified just a few minutes ago
22  that it was Mr. Rausch who sold his Biopure
23  stock commensurate with your purchase of Biopure
24  stock at least on one occasion?

Page 172

1      A.  Yes.
2      MR. LONGMAN:  Objection.
3      BY MR. SAVERY:
4      Q.  Is there any other officer of Biopure
5  who you contend wrongfully sold his stock at the
6  time of a purchase by any other member of the
7  sub-class?
8      A.  That I can't answer.  I can only
9  answer for my purchase.  I didn't review all of
10  them.
11      Q.  Okay.
12      A.  I believe the contention was that that
13  was true, but I can't document that.
14      Q.  Okay.  So for purposes of the claims
15  of the sub-class, do their claims concern the
16  sales by more individuals than simply Mr.
17  Rausch?
18      A.  I believe they do.
19      Q.  Okay.  And do their claims also
20  concern the sale of Biopure stock by Biopure
21  itself?
22      A.  The company, yes, I believe.
23      Q.  All right.  And is it your position
24  that you purchased contemporaneously with the

Page 173

1  sale of Biopure stock by Biopure?
2      A.  No.
3      MR. SAVERY:  That's all I have subject
4  to my earlier statements and reservations.
5      MR. LONGMAN:  I have a couple
6  questions.
7      CROSS EXAMINATION
8      BY MR. LONGMAN:
9      Q.  Dr. Esposito, earlier Mr. Savery
10  showed you a document marked as Exhibit 48 which
11  was the complaint filed on your behalf in this
12  action.  And if you notice, this document has
13  various markings of the court on it, and he
14  asked you if you had seen a document, this
15  document or one similar to it prior to the time
16  a complaint -- prior to the time it was filed.
17      I also want to show you Exhibit 47,
18  which is your certification, and item one in
19  which you state "I have reviewed the complaint
20  being filed on my behalf and on behalf of others
21  similarly situated against Biopure and certain
22  of its officers and authorize its filing or a
23  filing of a substantially similar complaint on
24  my behalf."

44 (Pages 170 to 173)

John G. Esposito, Jr.

Page 174

1    Did you sign this certification saying
2  that?
3    A.  Yes.
4    MR. SAVERY:  Objection to form.
5    Sorry, just leave enough time for me
6  to interpose an objection before you answer.
7    A.  Okay.
8    BY MR. LONGMAN:
9    Q.  Okay.  Does this refresh your
10  recollection that you may have seen a document
11  in some form similar to this, it may have looked
12  differently than the one with all the markings
13  on it, prior to the time it was filed?
14    MR. SAVERY:  Objection.
15    A.  Yes, because again, I said before,
16  this is the original one that I received a long
17  time ago.  I just remember it, and the fact that
18  my name was on it.  The markings I can't -- I
19  don't remember.
20    BY MR. LONGMAN:
21    Q.  Okay.  But you did -- this refreshes
22  your recollection that at the time you signed
23  your certification, which was prior to the time
24  it was filed, you saw this complaint?

Page 175

1    MR. SAVERY:  Objection.
2    A.  Yes.  That's what it says.
3    MR. LONGMAN:
4    Q.  Okay.
5    A.  Again I can't even recall this thing
6  at all.
7    Q.  Okay.  One other thing I want to
8  reference.
9    You testified earlier that Mr. Savery
10  was asking you some questions about expenses,
11  and you testified in the event that we were
12  unsuccessful in this litigation that you would
13  reimburse us for attorney fees.
14    Do you know the difference between
15  fees and expenses?
16    A.  Yes, the expenses is what we're
17  responsible for.  The fee, that's the
18  contingency fee?
19    Q.  Right.
20    A.  That's what you folks get if you win,
21  right?
22    Q.  Correct.
23    And if we were unsuccessful, we would
24  simply not get a fee, is that correct?

Page 176

1    MR. SAVERY:  Objection.
2    A.  Right, you just have to --
3    MR. LONGMAN:
4    Q.  Is that correct?
5    A.  Yes, you get your expenses, we're
6  responsible for that.
7    Q.  And when you said "fees," did you
8  actually mean that you were responsible for some
9  of our expenses in the event we were
10  unsuccessful?
11    MR. SAVERY:  Objection.  Leading.
12    BY MR. LONGMAN:
13    Q.  Is that correct?
14    A.  Yes.
15    MR. LONGMAN:  Okay.  No further
16  questions.
17    REDIRECT EXAMINATION
18    BY MR. SAVERY:
19    Q.  Just relative to Exhibit 47, which is
20  your certification, the first paragraph states
21  "I have reviewed the complaint being filed on my
22  behalf."
23    Am I correct that you don't have a
24  recollection one way or the other whether you

Page 177

1  actually reviewed the complaint prior to signing
2  this document?
3    A.  That's true.
4    MR. SAVERY:  Okay.  Nothing further
5  subject to my earlier reservations.
6    MR. HUANG:  I just want the record to
7  be clear that all parties that aren't being
8  represented by Mr. Savery and Bingham McCutchen
9  also join in the reservation of all rights to
10  recall Dr. Esposito if he produces further
11  documents or if they amend their designation of
12  him as sub-class representative.
13    MR. TUCCILLO:  And our position is the
14  same relative to all defense counsel as it was
15  stated earlier with respect to Mr. Savery.
16    MR. SAVERY:  Okay.  That's it.
17    (Whereupon, the deposition was
18    concluded at 3:21 p.m.)
19
20
21
22
23
24

45 (Pages 174 to 177)

John G. Esposito, Jr.

05/31/2006

Page 178

1    ERRATA SHEET DISTRIBUTION INFORMATION
2    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4        ERRATA SHEET DISTRIBUTION INFORMATION
5        The original of the Errata Sheet has
6    been delivered to Matthew L. Tuccillo, Esquire.
7        When the Errata Sheet has been
8    completed by the deponent and signed, a copy
9    thereof should be delivered to each party of
10   record and the ORIGINAL forwarded to Donald J.
11   Savery, Esquire, to whom the original deposition
12   transcript was delivered.
13       INSTRUCTIONS TO DEPONENT
14       After reading this volume of your
15   deposition, please indicate any corrections or
16   changes to your testimony and the reasons
17   therefor on the Errata Sheet supplied to you and
18   sign it.  DO NOT make marks or notations on the
19   transcript volume itself.  Add additional sheets
20   if necessary.  Please refer to the above
21   instructions for Errata Sheet distribution
22   information.
23
24

Page 180

1    COMMONWEALTH OF MASSACHUSETTS )
2    SUFFOLK, SS.          )
3
4        I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
5    and Notary Public in and for the Commonwealth of
6    Massachusetts, do certify that on the 31st day
7    of May, 2006, at 11:06 o'clock, the person
8    above-named was duly sworn to testify to the
9    truth of their knowledge, and examined, and such
10   examination reduced to typewriting under my
11   direction, and is a true record of the testimony
12   given by the witness.  I further certify that I
13   am neither attorney, related or employed by any
14   of the parties to this action, and that I am not
15   a relative or employee of any attorney employed
16   by the parties hereto, or financially interested
17   in the action.
18       In witness whereof, I have hereunto
19   set my hand this 31st day of May, 2006.
20
21   _____
22       REGISTERED PROFESSIONAL REPORTER
23
24

Page 179

1    ATTACH TO DEPOSITION OF JOHN G. ESPOSITO, JR.
2    CASE:  Biopure Corp Securities Litigation
3    DATE TAKEN: 5-31-06
4        ERRATA SHEET
5    Please refer to page 178 for errata sheet
6    instructions and distribution instructions.
7    PAGE    LINE    CHANGE      REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15       I have read the foregoing transcript
16   of my deposition and except for any corrections
17   or changes noted above, I hereby subscribe to
18   the transcript as an accurate record of the
19   statements made by me.
20
21       Executed this____day of_____, 2006.
22
23       _____
24       JOHN G. ESPOSITO, JR.

46 (Pages 178 to 180)