**3**



Not Reported in F.Supp.2d                                                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

▶

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
      United States District Court,E.D. Pennsylvania.
Eugenia BUZOIU, on behalf of herself and all others
                    similarly situated
                             v.
       RISK MANAGEMENT ALTERNATIVES, INC.
                    **No. Civ.A. 03-3579.**

                    Filed June 11, 2003.
                    June 14, 2004.

represented by David A. Searles, Donovan Searles, LLC, Phila, PA, Lead Attorney, Attorney to be Noticed, for Eugena Buzoiu, on Behalf of Herself and All Others Similarly Situated, Plaintiff.
represented by Frank R. Emmerich, Jr., Conrad O'Brien, Gellman & Rohn, PC, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, Joy Harmon Sperling, Pitney, Hardin, Knipp & Szuch, Florham Park, NJ, Lead Attorney, Attorney to be Noticed, Lisa Martinez Wolmart, Rhonda L. Rivera, Pitney Hardin Kipp & Szuch LLP, Morristown, NJ, Lead Attorney, Attorney to be Noticed, for Risk Management Alternatives, Inc., Defendant.

                    *ORDER AND OPINION*
HART, Magistrate J.

                    I. *Introduction*

**\*1** In this action, Buzoiu claims that a debt collection letter she received from Risk Management Alternatives, Inc., ("RMA"), violated the Federal Debt Collection Practices Act, 15 USC § 1692 *et seq.* ("FDCPA").

Buzoiu has now moved for class certification. RMA has filed a cross-motion in opposition to Buzoiu's motion for class certification, and to strike the class allegations. On May 26, 2004, I heard argument from both sides as to whether issues surrounding Buzoiu's credibility should prevent her from acting as a class representative. Now, for the reasons set forth below, I will deny Buzoiu's motion, and grant RMA's.

             II. *Factual and Procedural Background*

                    A. *RMA's Letter*

Allegedly, Buzoiu defaulted on a consumer loan made to her by Household Bank (SB), N.A. ("Household Bank"). Household Bank employed RMA to collect the debt. RMA sent Buzoiu a letter, dated April 7, 2003, which stated, in relevant part:

                        *Settlement*

At this time we are authorized to make a generous settlement offer to you.

| | |
|---|---|
| You actually owe: | $753.86 |
| Settlement Amount: | $376.93 |
| Amount must be received by: | 04-20-03 |

In order to take advantage of this offer, send your check or money order, made payable to Risk Management Alternatives, Inc., no later than the date shown immediately above.
If you do not take advantage of this offer, we will proceed with our normal collection efforts.

Amended Class Action Complaint, at Exhibit A to the Complaint.

Buzoiu alleged in her complaint that she spoke to an RMA representative over the telephone after April 20, 2003, and was offered the same settlement amount. *Id.* at ¶ 16. Thus, Buzoiu asserted, the letter violated the FDCPA by threatening her with action which RMA did not intend to take. *Id.* at ¶ 15.

While RMA records produced in discovery support Buzoiu's claim that she called RMA after April 20, 2003 (the records show two calls on May 28, 2003), these records contradict her claim that she was offered the same deal as the one set forth in the letter. According to RMA's records, an RMA representative told Buzoiu that she would have to pay $454.99 and $449.77 to settle two debts managed by RMA. Affidavit of Joy Sperling,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

attached as Exhibit 4 to RMA's Motion. During the second telephone call, placed less than an hour after the first, Buzoiu asked whether she would receive a "settlement in full" letter if she, in fact, paid the settlement in full. *Id.* She was told that she would. *Id.* The record of this pone call does not mention a settlement amount.

If RMA's records are accurate, Buzoiu would not be able to show that the letter in question was deceptive as to the deadline, since, indeed, the deal set forth in the letter was *not* available after April 20, 2003.

B. *Buzoiu's First Deposition*

At her deposition, Buzoiu did not seem at all sure about the timing and contents of her call or calls to RMA. She testified:
**\*2** Q. Do you recall when it was that you called RMA?
...
A. Right after I got the letter, a few days, probably.
Q. Do you recall having a call with RMA sometime in May, the end of May of 2003? This letter is dated April 7th of 2003.
A. Probably. I don't remember.
Q. Do you remember whether you called RMA on one occasion or more than one occasion?
A. I think it was just once.
Q. And you think that call was shortly after you got the April 7 letter?
A. Yes.

Transcript of January 13, 2004, Deposition at page 28. It is significant that, if Buzoiu only called RMA once, and it was before April 20, she would not be able to prove the letter was deceptive in any respect as she cannot show what deal was actually available from RMA after April 20.

Buzoiu also testified that she did not know whom she spoke to at RMA: "I don't usually get names. I'm bad at this. I can't get names ." *Id.* at page 25. She said she was not familiar with the names Tim Bright, or Crystal. *Id.* at 33.

Buzoiu then testified that she did not remember what she was told on the phone:
Q. Did the person with whom you spoke tell you that the money had to be paid by April 20?
A. Yes.
Q. Did he tell you how much would be due if it wasn't paid by April 20?
A. I don't remember what he said.
...

Q. Did you ask the individual or gentleman who you spoke with whether if you didn't pay the amount in the letter you would owe more money?
A. Did I ask?
Q. Yes. Did you ask him if I don't pay the amount in the letter by April 20, will I owe more money? Did you discuss that with him at all?
A. I don't remember.

*Id.* at pages 29, 35.

Later, Buzoiu was asked: "Did he confirm for you that if you paid the 376.93 that the debt would be paid in full?" She replied: "He said ... yeah, he said if I pay this, like, right now everything will be okay or something, but I don't remember exactly the words. I can't remember the words or the conversation exactly." *Id.* at page 43.

Still later, Buzoiu reiterated her testimony on this subject:
Q. Do you recall if you got [the letter] before April 20, which is the date it says the amount must be received by?
A. I probably did.
Q. Do you recall if you called RMA before April 20?
A. Probably. I can't recall.
...
Q. When you spoke to the gentleman at RMA, do you recall whether or not the April 20 date for payment had passed or you still were able to make the payment?
A. Was before the 20th.
Q. That you spoke to him?
A. I think, yeah.
Q. Did you discuss with the RMA representative any number other than the numbers in the letter?
A. No.
Q. Did the RMA representative say anything to you as to what amount would be due if it was not paid after April 20?
A. No.
Q. You didn't discuss that with him?
A. No.
Q. Did you ask the RMA representative how much you would have to pay if you didn't pay by April 20, if there would be a new amount due?
**\*3** A. No, I don't remember asking him that.

*Id.* at 61-63. She then said: "Like I said, it was a short discussion, and I don't remember exactly what that was. If it had been a week ago I probably would remember." *Id.* at 63.

Buzoiu was also asked: "Did you have any other discussions with anybody else at RMA regarding settlement of your account with Household at any point in time?" *Id.* at 64. She replied: "No." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 3
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Finally, RMA's attorney asked: "Do you remember anything else, sitting here today, about your discussion with this gentleman from RMA? ... Anything else other than what you've testified to here today." *Id.* Buzoiu responded: "That's it." *Id.*

Based on all of the above testimony, RMA would have prevailed on a motion for summary judgment. However, Buzoiu soon changed her testimony.

### C. *The Errata Sheet*

On February 3, 2004, Buzoiu's attorney submitted an errata sheet to the reporter who had transcribed the deposition. It did not note typographical errors, but, rather, made significant substantive changes to Buzoiu's testimony, including the following:
Replace answer with: I think I made two calls to RMA.
Deponent recalls she made two calls to RMA after April 20, 2003
Deponent recalls that her conversations with the RMA representatives were after April 20.
Deponent recalls she spoke to a Crystal and to a Tim Bright when she called RMA.
Deponent recalls that the RMA representative told her she could pay the lesser settlement amount after April 20.
Deponent does not recall exactly when she received the letter. She recalls that it was brought to her by her estranged husband.
Deponent recalls that the RMA representative told her that the settlement offer was still good after April 20.

Errata Sheet, attached to RMA's Cross-Motion as Exhibit 6.

### D. *Buzoiu's Second Deposition*

After reviewing the errata sheet, RMA re-deposed Buzoiu on March 2, 2004. This second deposition, however, raised more questions than it answered. Buzoiu could not cogently explain why her post-deposition recall of the facts was so much clearer, and differed so much, from her testimony at the first deposition.

Initially, Buzoiu testified that she remembered the names of the people with whom she spoke at RMA after reviewing papers she received from her lawyer: "When I got the paper from [my attorney] and I talked to him about it, then I started to remember who exactly it was." Transcript of Tuesday, March 2, 2004, at 84. She also said:
Q. Why did you review [your complaint]?

A. Why did I review it? Because I just remembered that something wasn't right that we discussed at the deposition.
Q. What did you remember wasn't right when you discussed it?
A. The first people I talked to on the phone. I remembered, it just came to my mind that I talked to three different people in the same day.
Q. What caused you to remember that?
**\*4** A. Excuse me?
Q. Why did you remember that?
A. Why did I remember that?
Q. Yes.
A. Because I just remembered.

*Id.* at 82-83.

Only five pages later in the same deposition, Buzoiu retreated from her position that "the paper from [my attorney]" triggered her memory. She gave a different version of how she came to remember the names of Crystal and Tim:
Q. It came to me right after the deposition because we talked, we kept talking here about it, right? Then later on and on it just came to my mind.
Q. Did it come to you on the way home in the car or did it come to you a couple days later?
A. No, kind of right that day, yeah.
Q. So it came to you then before you got any documents from [your attorney]?
A. Yeah.

*Id.* at 88.

Similarly, Buzoiu first testified that reviewing RMA's notes, disclosed in discovery, "affected her recollection" as to the fact that she spoke with two people, and not one. *Id.* at 93. She then testified: "I remembered on my own anyway." *Id.* She said: "It just came to my mind." Q. "Before you got the notes?" A: "Yeah." *Id.* at 95.

Next, Buzoiu attempted to reconcile her prior damaging testimony that she had called RMA only a few days after receiving its April 7 letter, with her statement on the errata sheet that she did not call RMA until May. To accomplish this reconciliation, Buzoiu recited a factual scenario to which she had not even alluded in her first deposition, and which on its face, defies common sense. She testified that the letter was mistakenly delivered by the post office to her estranged husband at a different address than the one in the letter itself. By the time he gave it to her, the April 20 date had passed:
Q. Do you remember that the two calls were made a month later than the letter on that day?
A. Yeah. I remember because I got the letter late. It was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                              Page 4
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

misplaced by the post office or something.
Q. When did you get the letter?
A. Much later, like, in May, right before I called them sometime. I don't remember when.
Q. So you remember now that you got the letter in May?
A. Yes.
Q. Was your address as of April 7, Apartment L-11, 831 Cedar Avenue, Bensalem, Pennsylvania?
A. Yes. [This is the address set forth on the top of the letter Buzoiu undisputedly received from RMA.]
...
A. The letter didn't come to me, actually. By mistake it went to my husband's because we separated.
Q. What was your husband's address at the time of April or May, 2003?
A. 9236 Wooden Bridge Road.
Q. In what town?
A. Philadelphia.
...
Q. What you're telling me now is that the letter went to your husband?
A. Yeah, I just remembered. That came to my mind.
...
Q. Did you have any other mail that you remember in April or May or June of 2003 that went to your husband's address in Philadelphia instead of your address in Bensalem?
A. Not that he told me.

**\*5** *Id.* at 96-99.

Finally, there is a distinct lack of clarity about how Buzoiu conveyed her new recollections to her attorney. Asked whether she read through the transcript of her first deposition, Buzoiu answered: "I don't know if I read every page because I'm really busy at night at home with my son." *Id.* at 104. A few moments later, however, she said: "Yeah, I did read." *Id.* at 105. "You read every page?" "Yeah." *Id.*

This exchange then transpired:
Q. Did you write down that page and that question that you needed to change the answer?
A. I didn't-no, I didn't write nothing down because I had it in my mind. I didn't need to write them down.
Q. Did you send to [your attorney] any sort of list of the pages and changes you wanted to make?
A. Yeah, I guess-wait a minute. I don't remember that exactly. I think I did, but I don't remember.
Q. You think you wrote a note with the changes on them?
A. Like a list, yeah.
...
Q. Did you write down the page where you wanted to make changes and what changes you wanted?
...

A. Yeah, I think I did write what number is the line, the question.... Because it had to be changed, yeah. It would be easier to look at.
...
Q. You prepared a list of the changes, correct?
A. Yeah, and I sent it to [my attorney].
Q. Did you keep a copy of it?
A. No.

*Id.* at 106-109.

When RMA requested a copy of the list, Buzoiu's attorney told RMA's counsel that he did not have it and had no recollection of ever having seen it.

### III. *Legal Principles*

The prerequisites for class certification, as set forth in the applicable Federal Rule are that:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pr. 23(a). The burden is on the defendant to show that the plaintiff's representation will be inadequate. *Lewis v. Curtis,* 671 F.2d 779, 788-89 (3d Cir.), *cert. denied* 459 U.S. 880 (1982).

As part of the inquiry into whether a class representative will fairly and adequately represent the interests of the class, courts have considered whether the plaintiff is credible. *Savino v. Computer Credit, Inc.,* 164 F.3d 81, (2d Cir.1998); *Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981), *vacated on other grounds* 458 U.S. 1105 (1982). Courts have denied class certification where putative class representatives "are so lacking in credibility that they are likely to harm their case." *People United For Children., Inc. v. City of New York,* 214 F.R.D. 252, 263-264 (S.D.N.Y.2003); *Cromer Finance, Ltd. v. Berger,* 205 F.R.D. 113, 124 (S.D.N.Y.2001); *In re Frontier Insurance Group, Inc. Sec. Litigation,* 172 F.R.D.31, 47 (E.D.N.Y.1997).

**\*6** In *Savino,* the plaintiff first brought a FDCPA case similar to this one, based on an August 28, 1995, letter he received from a debt collection agency which he claimed did not contain the required validation notice. The agency claimed it sent him an earlier, August 14, 1995, letter which did contain the required notice. At first, Savino denied receiving the August 14 letter. However, he subsequently amended his complaint to allege that he had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:03-cv-12628-NG    Document 146-4    Filed 07/25/2006    Page 6 of 7

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

received the first letter, and that it suffered from a different defect. His cause of action no longer relied at all upon the August 28 letter.

When Savino moved for class certification, the District Court denied his motion on the basis that he was an inadequate representative. The Court of Appeals for the Second Circuit affirmed the District Court's decision, stating: "The fact that Savino offered differing accounts about the letters that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial." 164 F.3d at 87. Ironically, Savino had prevailed on his individual claim. However, the Court of Appeals found that this did not render him an adequate class representative.

The *Savino* case is to be contrasted with a situation where alleged problems with a plaintiff's credibility do not affect questions related to the defendant's liability. In that case, denial of the motion for certification is not warranted. *See* Saddle Rock Partners, Ltd. v. Hiatt, 96CIV.9474(SHS), 2000 WL 1182793 (S.D.N.Y. Aug. 21, 2000).

Although consideration of this issue, (and consequently the written authority), seems to be strangely limited to the Second Circuit, I am not aware of any contrary Third Circuit policy which would prevent me from adopting this pragmatic approach.

IV. *Discussion*

It is evident from the foregoing that Buzoiu's personal credibility is so open to question that it is likely to harm her case. Counsel for RMA would have ample ammunition for cross-examination if she chose to attack Buzoiu's truthfulness as to when she received the letter, how many phone calls she made to RMA, when she made them, what was said to her during the phone calls, and, finally, how the errata sheet was produced. At the hearing before me, counsel for RMA stated her intention to use all of this ammunition at trial.

This is not a case such as *Saddle Rock,* where the alleged inconsistencies in the plaintiff's testimony have little to do with the merits of the case. Here, the letter at issue is actionable *only* if the representations therein are false, i.e., if it is proved that RMA offered Buzoiu the same settlement as set forth in the letter *after* the asserted drop-dead date of April 20, 2003. Therefore, the timing and content of Buzoiu's conversations with RMA representatives are crucial to the case. These are the very issues on which her credibility is most subject to attack.

Counsel for Buzoiu has argued that her weakness in the English language (Buzoiu emigrated from Rumania in 1983), combined with harassment by RMA's counsel, created the confusion that led to the inconsistencies in Buzoiu's deposition testimony. However, I have quoted extensively from both deposition transcripts to show that this does not appear to have been the case. In all relevant portions of her depositions, Buzoiu appeared to understand the questions put to her, and to be formulating fluent English responses. In fact, at her second deposition, Buzoiu denied being confused by any of the questions she was asked at her prior deposition. Transcript of March 2, 2004, at page 75.

**\*7** Buzoiu's counsel has also pointed out that a class representative cannot be called inadequate simply because she does not understand the legal underpinnings of the action. He points to Surowitz v. Hilton Hotels, 383 U.S. 363 (1966), a shareholders derivative action, in which it became clear that the named plaintiff, an elderly Polish immigrant who worked for many years as a seamstress: "did not understand the complaint at all, that she could not explain the statements made in the complaint, that she had a very small degree of knowledge as to what the lawsuit was about, that she did not know any of the defendants by name, that she did not know the nature of their alleged misconduct, and in fact that in signing the verification she had merely relied on what her son-in-law had explained to her about the facts in the case." 383 U.S. at 366. The lower court dismissed the action on the basis that Mrs. Surowitz's verification was a nullity.

Nevertheless, the Supreme Court held that Mrs. Surowitz was an adequate class representative, largely because the basis for the action had been thoroughly researched by her son-in-law, a graduate of Harvard Law School, and the possessor of a master's degree in economics from Columbia University, who worked as a professional investment advisor and "wore a Phi Beta Kappa key." Id. at 368. Justice Black wrote: "It is difficult to believe that anyone could be shocked or harmed in any way when, in the light of all these circumstances, Mrs. Surowitz verified the complaint, not on the basis of her own knowledge and understanding, but in the faith that her son-in-law had correctly advised her either that the statements in the complaint were true or to the best of his knowledge he believed them to be true." Id. at 370-371.

Buzoiu's argument that lack of sophistication or knowledge on the part of a plaintiff is not a basis for questioning her adequacy as a class representative, is, therefore, correct. *See Newburgh on Class Actions* 4th Ed., Vol. 1, § 3.34 ("Ignorance of Facts or Legal Theories No Bar"). However, the principle is simply inapposite here. Buzoiu is not required to understand the legal underpinnings of her case, but she must at least be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)  
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

fairly believable as to the facts themselves. Thus, Buzoiu could not be found inadequate because she did not understand *why* it was important that she called RMA after April 20, and that it offered to settle with her for $376.93, but she can be found inadequate if she is not believable about the facts of when she called or what she was told.

It is important to focus on the fact that this is not a summary judgment motion. Issues of fact may exist which a jury might resolve in favor of Buzoiu in her individual action. However, that is not the standard by which Buzoiu's adequacy as a class representative is assessed. Because it is apparent that Buzoiu cannot fairly and adequately represent the interests of a class, her motion for class certification will be denied.

***8** For the reasons set forth above, I now enter the following:

*ORDER*

AND NOW, this 10 day of June, 2004, upon consideration of Plaintiff's Motion for Class Certification, docketed as Document # 4, Defendant's Cross-Motion to Strike Class Allegations and Reply to Opposition to Class Certification, docketed as Document # 28, Plaintiff's Response to Defendants' Cross-Motion, docketed as Document # 38, and the testimony of counsel in open court, it is hereby ORDERED that Plaintiff's Motion for Class Certification is DENIED; and it is further

ORDERED that Defendant's Cross-Motion to Strike Class Allegations is GRANTED.

E.D.Pa.,2004.  
Buzoiu v. Risk Management Alternatives, Inc.  
Not Reported in F.Supp.2d, 2004 WL 1505061 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:03cv03579 (Docket) (Jun. 11, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.