# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

------------------------------------------------------------

|  |  |  |
|---|---|---|
| IN RE BIOPURE CORPORATION SECURITIES LITIGATION | : : : : : | Civ. No. 03-12628-NG |

------------------------------------------------------------

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
## AMENDED MOTION FOR CLASS CERTIFICATION (DOCKET NO. 131)

Plaintiff Dr. John G. Esposito, Jr. And
Lead Plaintiff Ronald W. Erickson

By their attorneys,

**SHAPIRO HABER & URMY LLP**
Edward F. Haber BBO # 215620
Matthew L. Tuccillo BBO # 643336
53 State Street
Boston, MA 02109
(617) 439-3939

**STULL, STULL & BRODY**
Jules Brody (*pro hac vice*)
Howard T. Longman (*pro hac vice*)
6 East 45th Street
New York, New York 10017
(212) 687-7230

**STULL, STULL & BRODY**
Timothy J. Burke (*pro hac vice*)
10940 Wilshire Blvd., Suite 2300
Los Angeles, CA 90024
(310) 209-2468

**Co-Lead Counsel For
Lead Plaintiff and The Class**

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Proposed Class and Sub-Class Representative Dr. John G. Esposito, Jr. . . . . . . 3

    B.  Lead Plaintiff and Proposed Class Representative Ronald Erickson . . . . . . . . . . 9

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Plaintiffs' Burden for Obtaining Class Certification. . . . . . . . . . . . . . . . . . . . 12

    B.  Rule 23 is Satisfied Because Dr. Esposito and Mr. Erickson Have Claims
        Typical of the Putative Class (and in Dr. Esposito's Case, the Sub-Class
        as Well), Whose Interests They Will Fairly and Adequately Represent. . . . . . . 13

        1.  Dr. Esposito and Mr. Erickson Are Adequate Class Representatives
            under the Governing *Andrews* Test, Inasmuch as They Have Taken an
            Active Role Regarding This Litigation, Are Knowledgeable About Its
            Subject Matter, and Diligently Selected Competent Counsel. . . . . . . . . 14

            a.  Dr. Esposito and Mr. Erickson Have Played an Appropriate
                Role in Overseeing the Conduct of this Litigation and, Thus,
                are Adequate Class Representatives. . . . . . . . . . . . . . . . . . . . 15

            b.  Dr. Esposito and Mr. Erickson Have Demonstrated An
                Exceptional Knowledge of the Allegations in the Complaint,
                and, as Such, They are More Than Adequate to Serve as
                Class Representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            c.  Dr. Esposito and Mr. Erickson Made an Informed Decision
                Regarding Their Choice of Counsel and the Contingent Fee
                Basis Upon which Their Counsel Will Be Compensated in this
                Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.  Mr. Erickson Has Standing to Represent Class Members Who
            Purchased Biopure Stock after the August 1, 2003 Press Release,
            His Interests Are Aligned with Theirs, He is not Subject to Any
            Unique Defenses, and He Otherwise Satisfies Rule 23. . . . . . . . . . . . 27

3.  Dr. Esposito Is a More Than Adequate Class Representative, Despite Minor Lapses of Memory Regarding His Biopure Trading History. . . . 31

4.  That Dr. Esposito Still Holds Biopure Stock Purchased During The Class Period Does Not Render Him An Inadequate Class Representative And Defendants' Reliance Upon *Seagate*, A Decision Uniformly Rejected By The Federal Courts, Is Utterly Misplaced. . . . . 36

C.  Dr. Esposito Need Not Have Been Appointed PSLRA Lead Plaintiff to Now Serve as a Class Representative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D.  Dr. Esposito's Claims Are Typical Of Those Of The Putative Sub-Class, Which Satisfies Rule 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## **TABLE OF AUTHORITIES**

Cases                                                                                           Page No.

*Abelson v. Strong*, 1987 WL 15872 (D. Mass. July 30, 1987) . . . . . . . . . . . . . . . . . . . . . 3, 30

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124
(1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12-14, 17, 19, 20, 22, 23, 26

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . 15, 16

*Berger v. Compaq Computer Corp.*, 279 F.3d 313 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . 16

*Califano v. Yamasaki*, 442 U.S. 682 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Castillo v. Envoy Corp.*, 206 F.R.D. 464 (M.D. Tenn. 2002) . . . . . . . . . . . . . . . . . . . . . . 36

*Copeland v. Grumet*, 88 F. Supp. 2d 326 (D.N.J. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . 28, 29

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fulco v. Cablevision, Inc.*, 1990 WL 120688 (D. Mass. 1990) . . . . . . . . . . . . . . . . . . . . 16, 20

*Gariety v. Grant Thornton LLP*, 368 F.3d 356 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 37

*Grace v. Perception Technology Corp.*, 128 F.R.D. 165 (D. Mass. 1989) . . . . . . . . . . . . . . . . 12

*Greebel v. FTP Software*, 939 F. Supp. 57 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . 16

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hevesi v. Citigroup, Inc.*, 366 F.3d 70 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26, 27

*In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . 25

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . 14

*In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 687 (N.D. Georgia 2002) . . . . . . . . . . . . . . . . 16

*In re Transkaryotic Therapies, Inc. Sec. Litig.*, 2005 WL 3178162
(D. Mass. Nov. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17-19, 20, 26

*In re: BankAmerica Corp. Sec. Litig.*, 95 F. Supp. 2d 1044 (E.D. Mo. 2000) . . . . . . . . . . . . . . 15

*In re: Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . 26, 27, 38

*In re: Daimler Chrysler AG Securities Litig.*, 216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . 36

*In re: Diagnostics Sec. Litig.*, 599 F. Supp. 447 (N.D. Cal. 1984) . . . . . . . . . . . . . . . . . . . . . . . 3

*In re: Enron Corp. Securities, Derivative, and ERISA Litig.*, 258 F. Supp. 2d 576
(S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*In re: Frontier Ins. Group Securities Litig.*, 172 F.R.D. 31 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . 35

*In re: Honeywell Int'l, Inc. Securities Litig.*, 211 F.R.D. 255 (D.N.J. 2002) . . . . . . . . . . . . . . 36

*In re: Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476 (S.D.N.Y. 2002) . . . . . . . . . . . 37

*In re: IPO Securities Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re: Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) . . . . . 17, 20

*In re: One Bancorp Sec. Litig.*, 136 F.R.D. 526 (D. Me. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re: Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) . . . . . . . 17

*In re: Quintus Sec. Litigation*, 201 F.R.D. 475 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . 26, 27

*In re: Sepracor, Inc. Securities Litig.*, 233 F.R.D. 52 (D. Mass. 2005) . . . . . . . . . . . . . . . 34, 35

*In re: Tyco Int'l Ltd.*, 2006 WL 2349338 (D.N.H. Aug. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . 19

*Kinney v. Metro Global Media, Inc.*, No. 99-579, 2002 WL 31015604
(D.R.I. Aug. 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20, 29

*Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987) . . . . . . . . . . . . . . . . . . . . . 30

*Mack v. Suffolk County*, 191 F.R.D. 16 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*McKenna v. First Horizon Home Loan Corp.*, 429 F. Supp. 2d 291 (D. Mass. 2006) . . . . . . . . 13

*McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304 (D. Mass. 2004) . . . . . . . . . . . . . . . 13, 14

*Opiela v. Bruck*, 139 F.R.D. 257 (D. Mass. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) . . . . . . . . . . . . . . 12, 13

*Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, 1996 WL 739170
(W.D. Mich. Sept. 27, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Priest v. Zayre Corp.*, 118 F.R.D. 552 (D. Mass. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204 (D.R.I. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Seagate Tech II Securities Litig.*, 843 F. Supp. 1341 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . 36

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Swack v. Credit Suisse First Boston*, 230 F.R.D. 250 (D. Mass. 2005) . . . . . . . . . . 13, 14, 18, 19

*Tolan v. Computervision Corp.*, 696 F. Supp. 771 (D. Mass. 1988) . . . . . . . . . . . . . . . . . . . . 35

*Upton v. McKerrow*, 887 F. Supp. 1573 (N.D. Ga. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) . . . . . . . . . . . . . . . . . 12

<u>Federal Rules</u>                                                                          <u>Page No.</u>

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>Other Authorities</u>                                                                       <u>Page No.</u>

Newberg on Class Actions §22.32 (2d ed. 1985 and 1986 Supp.) . . . . . . . . . . . . . . . . . . . . . 20

<u>Statutes</u>                                                                                 <u>Page No.</u>

Securities and Exchange Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Securities and Exchange Act of 1934, as amended by the Private Securities
Litigation Reform Act of 1995, 15 U.S.C. §78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. §78u . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

vi

## Preliminary Statement

Plaintiffs' respectfully submit this Reply Brief ("Reply") in Support of Their Amended Motion for Class Certification (Docket No. 131) in response to Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion For Class Certification (Docket No. 144)("Defendants' Opposition"), a 40-page, 82-footnote tome whose length and kitchen-sink approach belie both a striking lack of applicable legal citation and a pervasive disregard for the great majority of the deposition testimony of the Plaintiffs Esposito and Erickson.

Legally, Defendants have argued at length about the purported inadequacy and atypicality of both Dr. Esposito and Mr. Erickson, the proposed Class (and, in the case of Dr. Esposito, Sub-Class) representatives - **without ever citing or applying the applicable and governing standards** established within the First Circuit for Fed. R. Civ. P. 23 adequacy and typicality.  For instance, one need only glance at the "Table of Authorities" of Defendants' Opposition to see that it has <u>entirely avoided</u> any citation to the First Circuit's decision in *Andrews v. Bechtel Power Corp.*, 780 F.2d 124 (1st Cir. 1985), which sets forth the governing two-part test for Rule 23 adequacy in this Circuit.  In fact, huge swaths of Defendants' Opposition avoid citation to <u>any</u> precedent from within the First Circuit.  For example, Argument Section B.1 of Defendants' Opposition, entitled "Moving Plaintiffs Have Vested Counsel With Unfettered Control Of This Litigation And Are Accordingly Inadequate As A Matter Of Law" (including all of subparts B.1.a., B.1.b., and B.1.c.), which is 11 pages long and contains nearly 30 footnotes, cites (without discussion) to just a <u>single</u>, inapposite case from within the First Circuit.

Factually, recognizing that an honest portrayal of the record would inevitably lead this Court to conclude that the proposed Class should be certified with Dr. Esposito and Mr. Erickson

1

as its representatives, Defendants have carved up the deposition transcripts of Dr. Esposito and Mr. Erickson so as to present only isolated excerpts in purported support for their far-flung arguments against Class certification. More often than not, Defendants cited such excerpts entirely out of context and in a thoroughly misleading fashion, for example by removing an answer's temporal context or by quoting a single answer that appears to raise some purported testimonial inaccuracy while omitting the witness's contemporaneous, follow-up remedial testimony.

On some level, these machinations by Defendants are understandable, given the unenviable position from which they must argue against Class certification. Dr. Esposito was deposed for over four hours, while Mr. Erickson's deposition stretched to about seven hours. As discussed in great detail *infra*, their transcripts, spanning 177 pages and 220 pages respectively, on the whole clearly and repeatedly demonstrate their sincerity, dedication, knowledge, oversight and attentiveness regarding this litigation. Under all applicable standards, they are in every respect adequate and typical plaintiffs who will make outstanding Class representatives.

This Court should reject Defendants' attempts to discredit the proposed Class representatives, Dr. Esposito and Mr. Erickson, who have volunteered to represent thousands of absent Class members victimized by Defendants' violations of the federal securities laws. In rendering its decision, this Court should bear in mind Defendants' true motives in arguing against certification. After all, as Judge Skinner aptly noted:

> There is an irony inherent in defendants' attempts to protect absent class members when their real hope is to deny plaintiffs any recovery. ... A court, recognizing this irony, must be suspicious of defendants' efforts to protect unnamed plaintiffs when that protection will, as a practical matter, leave them without a remedy.

*Abelson v. Strong*, 1987 WL 15872, *2 (D. Mass. July 30, 1987)(internal citations omitted)

*citing, inter alia, In re: Diagnostics Sec. Litig.*, 599 F. Supp. 447, 450-451 (N.D. Cal.

1984)(comparing defendants' concern to that of a fox respecting the safety of a chicken coop).

I.    **BACKGROUND**

    A.    **Proposed Class and Sub-Class Representative Dr. John G. Esposito, Jr.**

In arguing against Dr. Esposito's serving as a representative of the Class and the Sub-

Class in this litigation, Defendants have focused solely on extremely narrow excerpts of his

deposition testimony comprising the rare moments where his memory failed him.  Defendants

have simply ignored Dr. Esposito's <u>lengthy</u>, remarkably accurate testimony concerning all of the

following: the nature and core allegations of this litigation, Biopure and Hemopure, the FDA

approval process for Hemopure, the Complete Response Letter and clinical hold, the Class

Period, the insider trading Count and the Sub-Class, and his role as a proposed representative.

Instead, Defendants assert that Dr. Esposito is an unfit representative simply because he was

unable to remember *every* detail about which he was asked.  Defendants have particularly

focused on Dr. Esposito's minor confusion with regards to his transactions history, which in any

event is now established by documentary evidence.  Simply put, Dr. Esposito need not have a

photographic memory to represent the Class and the Sub-Class, and, as discussed below, he has

more than sufficiently demonstrated his adequacy and typicality to do so.

Dr. Esposito has served as the Chief of Oral Surgery at Huntington Hospital for sixteen

years and has taught as a clinical professor of oral surgery at Stony Brook University for twenty-

one years.  *See* Esposito Dep. at 16, 113-114.  He has served as a consultant for the State of New

York, Office of Professional Discipline, and in that capacity has reviewed complaints made

against dentists in that state. *Id.* at 114. He is also a retired Major in the United States Army Reserves, having served his country in uniform for six years. *Id.* at 112.

Dr. Esposito purchased a total of 1200 shares of Biopure stock during the Class Period: 500 shares on August 12, 2003 at a price of $7.00 per share; 100 shares on August 12, 2003 at a price of $7.01 per share; and 600 shares on August 21, 2003 at a price of $8.22 per share. *See* Dep. Exh. 46 (attached hereto as Exh. 1) at 2. He paid a total of $9,133.00 for the stock, exclusive of trading commissions and fees. *Id.* He bought these Biopure shares with funds from his IRA account, from which he plans on withdrawing funds for his retirement as early as 2010. *See* Esposito Dep. at 51. He still owns these shares.[1]

Dr. Esposito is in every way a "typical" investor in Biopure, no more or less sophisticated than the average person who purchased stock during the Class Period.[2] He has never been a plaintiff in a lawsuit before. *See* Esposito Dep. at 22.

Dr. Esposito testified forthrightly, truthfully and to the best of his memory at his deposition. He testified that he understood that Biopure would be a riskier investment than Merck, because it was "a newer, younger company," but that it would not be as risky as so-called "penny stocks." *See* Esposito Dep. at 53, 118. He testified that although Biopure was marketing a product in the veterinary market, it was still operating at a loss as of August 12, 2003. *Id.* at 116-117. He also testified that the price of Biopure stock fluctuated. *Id.* at 119.

---

[1] His 1200 shares were converted into 200 shares in a one to six reverse split of Biopure stock on May 27, 2005.

[2] He has never invested in commodities, mortgage-backed securities, options, futures, puts, or calls. *Id.* at 49. He has never sold short or made margin purchases. *Id.* He has never taken a loss on a stock investment to generate a tax benefit. *Id.* at 55. He mainly invests in bonds and tax-free instruments, with a "very small amount of stocks." *Id.* at 31. Dr. Esposito rarely, if ever, reads any financial or business publications, he does not regularly watch any financial news programs on television, and he has never invested online. *Id.* at 58-59.

Dr. Esposito testified at length about Hemopure's function and its appeal as a blood substitute product. For example:

> Question:    And why did it seem like a good product to you at the time?
> Answer:      Well, because I know that it's a difficult task to get blood, enough blood for transfusions in an emergency situation, and before this all we had access to was plasma expanders they're called, liquids that will expand the amount of liquid you've got flowing, but it cannot replace blood because it cannot carry oxygen. This seemed to be the first product that could do that, and that seemed to be a real significant innovation.

*Id.* at 67-68. *See also Id.* at 69-70 (Hemopure "would be obviously very helpful" "in cases where there's a major surgery or...a major trauma" because "it eliminates the search for whole blood" and could avoid "disease entities that we know can be carried in blood").

Dr. Esposito also testified in great detail about the FDA approval process for Hemopure and the role of clinical trials in that approval process. For instance, Dr. Esposito testified accurately that human clinical trials were a step in the process of gaining FDA approval for a drug or medicine. *Id.* at 71-72. He further testified that Biopure was engaging in such trials as part of the FDA approval process for Hemopure. *Id.* at 104-105.

Dr. Esposito accurately testified about the FDA's Complete Response Letter as follows:

> Question:    Have you heard the term "complete response letter"?
> Answer:      Yes.
> Question:    What's a complete response letter?
> Answer:      That's when the FDA will send a final notice with their concerns to a company. In this case I could further answer that.
> Question:    Sure.
> Answer:      I think it was in July they sent one to Biopure with, I think, 200 questions that they needed to be answered where they had concerns.

Esposito Dep. at 108-109.

Dr. Esposito's testimony also reflects his accurate understanding of an FDA "clinical

hold" generally and he explained with perfect clarity the significance of the clinical hold which

the FDA had placed on clinical trials of Hemopure, as follows:

| | |
|---|---|
| Question: | Have you heard the term "clinical hold"? |
| Answer: | Yes. |
| Question: | What's a clinical hold? |
| Answer: | I believe it means that the company is no longer able to conduct any further clinical trials of the drug. |
| Question: | Okay.  Does that term have any significance in this case? |
| Answer: | Yes. |
| Question: | And what's the significance? |
| Answer: | I believe they were told, this is after the fact I know this, I found this allegedly out, they were told in July to put a hold on further testing. |
| Question: | Further testing of what? |
| Answer: | Of Biopure -- of Hemopure. |
| Question: | For any certain application? |
| Answer: | Just for the clinical trials is what I gather, and it was a result of the concerns they had of -- from previous trials, that apparently the orthopedic trials that they reviewed, they had many concerns, so they put a hold on any further clinical trials in the trauma arena. |

*Id.* at 109-110.

Perhaps most importantly, Dr. Esposito has demonstrated an outstanding command of the

subject matter and aims of this litigation.  He testified as to his well-founded motivations for

bringing a class action lawsuit against Biopure, due to the Defendants' failure to disclose the

FDA's clinical hold and the transmission by the FDA of the Complete Response Letter:

| | |
|---|---|
| Question: | Why did you decide to bring your claims in a class action? |
| Answer: | I really felt that what they did was not really right, to tell you the truth.  I really felt that it was kind of misleading – not misleading, it was really, by omission it was really not playing fair.  The fact that those two significant events were withheld, and the fact that they were selling while other people were buying, I thought that was really not fair for those principals to do. |

Esposito Dep. at 158.

Dr. Esposito accurately identified the Class Period as extending "from April, I think April

6

9th of '03 to December 24th." *Id.* at 108. He also testified that the Complaint raises claims relating to misrepresentations or omissions in connection with the sale of securities. *Id.* at 155.

Regarding his role as a proposed Sub-Class representative for the Section 20A insider trading claim, Dr. Esposito's testimony demonstrates that he understands what insider trading is; that the Complaint in this action contains a separate Count for insider trading; and that the Sub-Class is based upon that Count. *See* Esposito Dep. at 153-154. He correctly identified Defendants Rausch and Biopure as the Defendants who sold contemporaneously with purchases within the Class Period, *id.* at 144, 172, and he testified as to the nature of the Sub-Class and his role as its representative, as follows:

| Question: | What is a sub-class? |
|---|---|
| Answer: | A sub-class, well, in regard to this I can tell you what my sub-class is, is the fact that I also contemporaneously bought when one of the principals sold. So I'm not only in the big class of people who lost money, but I'm also in the sub-class of those who again contemporaneously bought while somebody else sold in the company. |

*Id.* at 143-144.

| Question: | Why is there a sub-class? |
|---|---|
| Answer: | It seems to me that two things were wrong then; one, the principals did not disclose, and two, they sold while other people were in the midst of purchasing, so it's like a double kind of whammy, if you will. |

*Id.* at 145.

| Question: | Do you have an understanding as to what it means to be a representative of a class of a sub-class? |
|---|---|
| Answer: | Yes. |
| Question: | What does it mean? |
| Answer: | My job is to oversee, although it's of course as a layman, what happens legally, what the lawyers are doing, and to let -- make sure that the rest of the class knows what's happening through them, and participate in any like decisions, if there's an offer or something of that sort. |

7

*Id.* at 158-159. Dr. Esposito also testified accurately that he might be proposed as a representative of the Class, *id.* at 149, which indeed happened when Plaintiffs filed their Amended Class Certification Motion (Docket No. 131).[3]

Finally, in terms of keeping abreast of the litigation and playing an active role in its conduct, Dr. Esposito testified that he reviewed every one of the three complaints that were filed in this litigation. *See* Esposito Dep. at 137 and 140 (regarding Dep. Exh. 48), 142-143 (regarding Dep. Exh. 24), 146-147 (regarding Dep. Exh. 25). He testified as to the identities of the individual Defendants and their roles at Biopure. *Id.* at 106-107. He also correctly identified Stuart Gottlieb as one of the Plaintiffs, *Id.* at 108, and Ronald Erickson as the Lead Plaintiff. *Id.* at 110, 143.[4] He testified as to his understanding of a contingency fee in general and as it pertains to this litigation, *id.* at 162, that he knew this action is pending in court in Massachusetts, *id.* at 108, and that he is willing to testify at trial. *Id.* at 159.

---

[3] Dr. Esposito also testified in detail as to the damages he seeks to recover in this litigation, as follows:

| | |
|---|---|
| Question: | Are you claiming that you were damaged as a result of your, or harmed in any way as a result of your purchase of Biopure stock on August 12th? |
| Answer: | Yes. |
| Question: | How were you harmed or damaged? |
| Answer: | Well, I feel that it was -- I bought the stock at an inflated price because of nondisclosure of the company, not to me personally because I have no knowledge of the stuff, but because of their actions, they did not tell the market, and consequently the market value was high. |
| Question: | What did they not tell the market? |
| Answer: | That they had a hold on the clinical trials as early as April, and then in July they had that very disastrous letter concerning the 200 or so, I find out later, concerns that the FDA had. These are very negative things that I'm sure -- I'm assuming would have impacted on the value of the stock. |

Esposito Dep. at 110-111. *See also Id.* at 128-129.

[4] It is worth noting that not only did Dr. Esposito correctly identify the other Plaintiffs in this litigation, he did so under 'pop quiz' like circumstances, at points during the deposition where defense counsel was in the midst of discussing wholly unrelated topics before suddenly and without context asking about the identity of a Plaintiff. *See, e.g.*, Esposito Dep. at 110-111.

8

### B.     Lead Plaintiff and Proposed Class Representative Ronald Erickson

Mr. Erickson is also an adequate and typical representative of the Class.  Mr. Erickson is

56 years old and married with three sons, ages 20, 25, and 29.  *See* Erickson Dep. at 11-13.  His

wife is an attorney with her own elder law practice.  *Id.* at 13.  His family has lived in the same

home in East Bridgewater, Massachusetts, for the last 20 years.  *Id.* at 9-10.

Mr. Erickson is an area manager for Wells Fargo, in charge of mortgage lending, *id.* at 16,

having worked in mortgage banking for the last 34 years.  *Id.* at 14.  In 2003, after exercising

some employee stock options, Mr Erickson looked for stocks in which to invest.  *Id.* at 23-24.[5]

His research indicated that Biopure was a local company that manufactured a "a substitute for

blood that can last on the shelf a lot longer than [] normal blood or plasma or anything else[.]"

*Id.* at 37.  He learned that the United States military was interested in this product.  *Id.*

Concerning FDA approval, he knew Biopure's Hemopure was coming up for approval, but that

there was no negative information concerning the testing results.  *Id.* at 48-49.  He decided to buy

"a large amount" of Biopure stock, about 75,000 shares in total.  *Id.* at 24.  *See also* Erickson

Plaintiff Certification, Exh. D to Defendants' Opposition (setting forth shares).

After Defendants' wrongdoing was disclosed, and Biopure shares plummeted, Mr.

Erickson learned via the Internet that securities fraud lawsuits were being filed against the

Defendants.  *See* Erickson Dep. at 61, 76-78.  He himself had lost approximately $250,000

investing in Biopure, a loss which represented roughly thirty percent (30%) of his total

investments, *id.* at 27-29, 58.

---

[5]  Like Dr. Esposito, Mr. Erickson has never sold short or invested in mortgage-backed securities, options (aside from his employee stock options), futures, puts, or calls.  *Id.* at 23, 29-30.

9

Though undecided as to whether he should file an individual lawsuit or join in a class action, *id.* at 62, he began searching for legal representation in the first quarter of 2004, seeking a firm based in New York that was "recognized over the country" and had the ability to "cover the whole country." *Id.* at 61, 76-79. He identified three or four law firms on the Internet, and selected Plaintiffs' co-lead counsel in this action (Stull, Stull & Brody) to represent him, after contacting them by telephone. *Id.* at 78-79. He investigated and determined that a reasonable contingent fee for his counsel would be twenty percent (20%) to thirty-three percent (33%). *Id.* at 87. He entered into an oral agreement with counsel, whereby their compensation in this litigation is on a contingency basis dependent on its outcome, with the final amount to be determined by the court. *Id.* at 85-87. He then decided to seek to serve as Lead Plaintiff in this action. *Id.* at 61, 76-78.

Mr. Erickson is not litigious. Prior to this case, he has never sued anyone. *See* Erickson Dep. at 18-19. He has never been sued. *Id.* His sole prior involvement with the court system was as a witness related to a car accident 35 years ago. *Id.* at 19-20. Other than in this case, he has never had his deposition taken before. *Id.* at 10, 19-20.

Mr. Erickson fully understands his role as Lead Plaintiff of this litigation, which he described at his deposition as follows:

> Question:  What, in your words, does it mean to be a Lead Plaintiff?
> Answer:    Well, you take responsibility to go ahead and monitor your
>            attorneys as far as representing the class, looking over, making sure
>            that as far as how things are going, keeping in contact with them as
>            far as any changes that occur, I'd say look to the best fulfillment
>            for the team rather than just for the individual.

Erickson Dep. at 73-74.

As Lead Plaintiff, he has been fulfilling his duties to monitor and discuss the case with

his attorneys, and he will continue to do so as a Class Representative. *Id.* at 73-76. He has

participated in discovery, including by answering interrogatories, producing documents, and

appearing for his deposition on May 30, 2006. He received a draft of the Consolidated Amended

Complaint ("CAC") prior to it being filed, which he reviewed, *id.* at 134-135, and he reviewed a

copy of the Second Consolidated Amended Complaint ("SCAC"). *Id.* at 148. He explained the

differences between the different complaints in this action. *Id.* at 148-149. He testified

accurately that the Court has not yet entered a class certification order. *Id.* at 74-75.

Substantively, Mr. Erickson demonstrated a solid command of the core allegations of this

litigation. For instance:

| | |
|---|---|
| Question: | Throughout your testimony today you've testified to information, statements made by Biopure that you believe to be false and misleading, is that correct? |
| Answer: | Yes. |
| Question: | And that information and statements concerned what, generally? |
| Answer: | It concerns not letting the public know as far as the clinical trials being put on hold in April by the FDA, and also the 200, 220 questions that needed to be answered that came out in July as far as -- I mean that's quite a few to go ahead and get an approval and so forth, and through that whole period of time I felt that we were being misled, myself and anybody that was purchasing the stock or had purchased it at that point in time without that information. |

Erickson Dep. at 212-213. In addition to knowing the factual bases for the complaint, Mr.

Erickson also correctly testified that the Class Period was from April 9, 2003 to December 24,

2003, and as to the composition of the Class. *Id.* at 63-64. He demonstrated that he knew

Biopure needed FDA approval to sell Hemopure. *Id.* at 139-140. He testified that Biopure and

its control people were Defendants. *Id.* at 60, 144-147.

11

## II.     ARGUMENT

### A.     Plaintiffs' Burden for Obtaining Class Certification.

"District courts have broad discretion concerning issues of class certification." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985) *citing, inter alia, Califano v. Yamasaki*, 442 U.S. 682, 703 (1979). "Unless the district court operated under an erroneous rule of law, we will not reverse a grant or denial of class certification except for 'abuse of discretion.'" *Id.* at 130 *citing, inter alia, Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-101 (1981).

The present case is a securities class action alleging fraud on the market. It is well-established that "suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment and that Rule 23 of the Federal Rules of Civil Procedure has been liberally construed to effectuate that end." *Kinney v. Metro Global Media, Inc.*, No. 99-579, 2002 WL 31015604 at *2 (D.R.I. Aug. 22, 2002), *citing Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)(cases alleging fraud on the market are particularly well-suited for Class treatment).

To prevail on a class certification motion, Plaintiffs must demonstrate that all four Fed. R. Civ. P. 23(a) prerequisites are met and that the case fits into one of the Fed. R. Civ. P. 23(b) categories, with the plaintiff's allegations taken as true and any doubts resolved in favor of certification, particularly in the early stages of the litigation.[6] *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 24-25 (D. Mass. 2003) *citing Mack v. Suffolk County*, 191 F.R.D. 16, 22 (D.

---

[6] Defendants only challenge the sufficiency of Dr. Esposito and Mr. Erickson based upon purported problems with Rule 23(a)(3) typicality and Rule 23(a)(4) adequacy requirements. Accordingly, the other Rule 23 prerequisites will not be discussed at length herein.

Mass. 2000). A decision on class certification does not involve an examination of the merits of

the underlying dispute, but rather serves the more limited purpose of determining whether a class

action is the most appropriate mode of adjudication. *Payne*, 216 F.R.D. at 24 *citing Eisen v.*

*Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). Under these standards, as discussed *infra*,

Plaintiffs have more than met their burden and the Class and Sub-Class should be certified.

> **B.     Rule 23 is Satisfied Because Dr. Esposito and Mr. Erickson Have Claims Typical of the Putative Class (and in Dr. Esposito's Case, the Sub-Class as Well), Whose Interests They Will Fairly and Adequately Represent.**

The First Circuit has consistently interpreted the Rule 23(a)(4) "adequacy" prerequisite to

entail a two-part test, whereby:

> [T]he moving party must show first that the interests of the representative party
> will not conflict with the interests of the class members, and second, that counsel
> chosen by the representative party is qualified, experienced and able to vigorously
> conduct the proposed litigation.

*Andrews*, 780 F.2d at 130.[7] *See also Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 265

(D. Mass. 2005) (same); *Payne*, 216 F.R.D. at 26 (same); *In re Transkaryotic Therapies, Inc.*

*Sec. Litig.*, 2005 WL 3178162 at *4 (D. Mass. Nov. 28, 2005)(same).[8]

The "central inquiry" regarding Rule 23(a)(3) "typicality" is whether the proposed Class

representatives' claims "have the same essential characteristics" as those of other Class members.

*McKenna v. First Horizon Home Loan Corp.*, 429 F. Supp. 2d 291, 307 (D. Mass. 2006) *citing*

---

[7] As previously noted, the Defendants, in their 40-page brief, fail to even acknowledge the existence of the First Circuit's controlling *Andrews* decision.

[8] Defendants' Opposition does not argue anywhere in its text that Plaintiffs' counsel is not "qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews*, 280 F.2d at 130. Accordingly, this Reply will assume that satisfaction of the second prong of the two-part *Andrews* "adequacy" test is unchallenged and that no discussion is required herein.

*McLaughlin v. Liberty Mut. Ins. Co.,* 224 F.R.D. 304, 310 (D. Mass. 2004).  Thus,

> [P]laintiffs need not show substantial identity between their claims and those of absent class members, but need only show that their claims arise from the same course of conduct that gave rise to the claims of the absent members.

*McLaughlin*, 224 F.R.D. at 310.  *See also Swack*, 230 F.R.D. at 260 (typicality established when injuries of proposed representatives and those underlying class claims arise from same events or course of conduct and are based on same legal theory); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D. Mass. 2005)(typicality analysis "focuses less on the relative strengths of the named and unnamed plaintiffs' case than on the similarity of the legal and remedial theories behind their claims").  "To establish typicality regarding reliance in a case brought under the fraud-on-the-market theory, the putative class representative must establish that she relied upon the integrity of the market in purchasing the securities at issue." *In re Transkaryotic*, 2005 WL 3178162 at *3.

      1.      **Dr. Esposito and Mr. Erickson Are Adequate Class Representatives under the Governing *Andrews* Test, Inasmuch as They Have Taken an Active Role Regarding This Litigation, Are Knowledgeable About Its Subject Matter, and Diligently Selected Competent Counsel.**

Defendants have argued that Dr. Esposito and Mr. Erickson are "nothing more than pawns" of their counsel, who actually "control" this litigation. *See* Defendants' Opposition at 12. This characterization is simply unreconcilable with the lengthy deposition testimony of both Dr. Esposito and Mr. Erickson, which clearly establish the adequacy of both to serve as Class representatives.

Furthermore, in support of this argument, Defendants' lone citation to a decision from within the First Circuit, *In re: Sonus Networks Sec. Litig.*, 229 F.R.D. 339, 342 (D. Mass. 2005) is utterly misplaced. *See* Defendants' Opposition at 12. There, the court considered an untimely

motion to intervene brought by the Milberg Weiss law firm to substitute a new class representative after its original representative withdrew when the court learned of his criminal past involving the sale of crack cocaine and resisting arrest. 229 F.R.D. at 340-344. Noting a slew of improprieties by the plaintiffs' firm - Milberg Weiss - in the action (including, *inter alia*, failing to timely disclose the plaintiff's criminal past and impermissible conflicts of interest that may not have been discussed with clients and a client's testimony that he did not believe he could ask his lawyers to identify and verify as reliable the sources for the complaint), *id.* at 342-343, the court also noted Milberg Weiss' "dominance" over prior litigations. *Id.* at 347 *citing In re: BankAmerica Corp. Sec. Litig.*, 95 F. Supp. 2d 1044, 1050 (E.D. Mo. 2000). On these facts, the court sternly rebuked Milberg Weiss and denied the motion to intervene. <u>Nothing</u> in the record of this litigation even remotely resembles the outrageous set of facts in *Sonus*.

> **a.    Dr. Esposito and Mr. Erickson Have Played an Appropriate Role in Overseeing the Conduct of this Litigation and, Thus, are Adequate Class Representatives.**

Defendants, relying upon discredited authority from outside the First Circuit, have argued that Dr. Esposito and Mr. Erickson have completely abdicated their roles as proposed Class representatives, effectively leaving the litigation on 'auto-pilot' and turning a blind eye toward the conduct of Plaintiffs' counsel. *See* Defendants' Opposition at 12-16. This characterization could not be further from the truth. In reality, as demonstrated below, Dr. Esposito and Mr. Erickson have played an active role in the conduct of this litigation, which demonstrates their adequacy to serve as Class representatives under the applicable standards within this Circuit.

Defendants have urged this court to adopt the heightened adequacy requirement concerning the role of proposed class representatives as outlined in *Berger v. Compaq Computer*

15

*Corp.*, 257 F.3d 475, 479-484 (5th Cir. 2001)(stating, immediately after the language quoted in

the Defendants' Opposition, "In this way the PSLRA raises the standard adequacy threshold." *Id.*

at 483.)  *See* Defendants' Opposition at 12-13.  Yet, not only has such a heightened adequacy

standard been roundly rejected by the federal courts,[9] even the Fifth Circuit itself, in denying a

petition for rehearing *en banc* of *Berger*, backpedaled from that view of the PSLRA's effect on

Rule 23(a)(4).  *See Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313-14 (5th Cir. 2002).[10]

As discussed *supra*, the First Circuit applies a simple two-part test in analyzing the

23(a)(4) "adequacy" prerequisite, whereby plaintiffs seeking certification must show: (1) that

"the interests of the representative party will not conflict with the interests of the class members"

---

[9]  For example,

> This court is not persuaded that it should follow the original opinion in *Berger* ... **The fact that
> the proposed Class Representatives are allowing their counsel to prosecute the case
> demonstrates the exercise of good judgment and not the abdication of their obligations** as
> class representatives.

*In re Theragenics Corp. Secs. Litig.*, 205 F.R.D. 687, 696 (N.D. Georgia 2002)(emphasis added)(noting the well-established legal standard for adequacy of class representation inquires into the adequacy of counsel and does not require any particular degree of individual involvement by named plaintiffs). *See also Fulco v. Cablevision, Inc.*, 1990 WL 120688, *3 (D. Mass. 1990)("Reliance on counsel for the development of legal issues is to be expected.") The Ninth Circuit similarly rejected *Berger's* heightened adequacy requirement, observing that "The Fifth Circuit cites no authority for its assertions, either in its opinion or in its order denying rehearing." *In re Cavanaugh*, 306 F.3d 726, 737 (9th Cir. 2002)(not only did the PSLRA did <u>not</u> change the requirements of Rule 23, it actually incorporated Rule 23 explicitly into 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) and enacted language identical to Rule 23's typicality and adequacy requirements in 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II), *id.* at 739). *See also Greebel v. FTP Software*, 939 F. Supp. 57, 60-61 (D. Mass. 1996)(citing PSLRA legislative history and stating its provisions "are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class." *Id.* at 61.).

[10]  Specifically, the Fifth Circuit stated in its order denying a rehearing *en banc*:

> We have **not**...created an additional requirement under rule 23(a)(4) that, after completing the
> process of selecting the lead plaintiff and lead counsel, a court may grant class certification only if
> the putative class representative possesses a certain level of experience, expertise, wealth or
> intellect, or a level of knowledge and understanding of the issues beyond that required for our long-
> established standards for Rule 23 adequacy of class representatives.

*Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313-14 (5th Cir. 2002)(emphasis added).

16

and (2) "that counsel chosen by the representative party is qualified, experienced and able to

vigorously conduct the proposed litigation." *See, e.g., Andrews*, 780 F.2d at 130. In applying that

test, courts within the First Circuit will certainly examine the roles played by the proposed class

representatives; however, that examination is conducted with recognition that a high degree of

reliance on counsel's expertise is both necessary and appropriate in complex actions, such as

securities fraud lawsuits.

For instance, the facts and decision rendered in *In re: Transkaryotic Therapies, Inc. Sec.

Litig.*, 2005 WL 3178162 (D. Mass. Nov. 28, 2005) are directly on point. There, as here, the

defendants did not dispute the competency of plaintiffs' counsel, conceding the second prong of

the two-part *Andrews* test for adequacy. *Id.* at *4. There, as here, the defendants instead focused

on the first *Andrews* prong, attacking the lead plaintiffs/proposed class representatives by

"assailing" their "alleged lack of control over the instant litigation, neglect to communicate with

other members of the class, failure to negotiate a specific fee arrangement with counsel and

general lack of understanding regarding the claims." *Id.* In considering these arguments, Judge

Zobel summarized the governing legal standards for adequacy as follows:

> **In complex action such as this one, named plaintiffs are not required to have
> expert knowledge of all details of the case, ... and a great deal of reliance on
> the expertise of counsel is to be expected ...**

*Id.* at *4 (internal citations omitted)(emphasis added) *quoting, inter alia, In re: Lupron*

*Marketing and Sales Practices Litig.*, 228 F.R.D. 75, 90 (D. Mass. 2005) *and In re: Pharm.*

*Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005).

Applying this standard, Judge Zobel, in *In re: Transkaryotic*, found that both of the

proposed class representatives were adequate. One proposed representative had "sufficiently

identified the range of responsibilities owed by a class representative," had "read much of the documentation provided to him for review by counsel," and "recognized class communication as a duty of the class representative." *Id.* The other had "reviewed the litigation documents, albeit primarily the night before his deposition," described his role as of the class certification stage as "giving deposition testimony and monitoring counsel," and had "demonstrated an understanding of the duties owed by a lead plaintiff and an intent to carry these out responsibly." *Id.* On that record - similar to the facts at bar in which the proposed Class representatives display at least as much, if not more, of an understanding of their roles and an involvement in the litigation - the court rejected defendants' arguments of inadequacy as "not persuasive" and certified the class. *Id.* at *4-*5. *See also Swack*, 230 F.R.D. at 267 (rejecting arguments against class representative adequacy due to a failure to control the litigation where the record demonstrates active involvement in the litigation, appropriate understanding of the claims, and a reasonable and informed selection of counsel).

Here, Defendants' arguments against Dr. Esposito's adequacy completely ignore the depth of his substantive knowledge of the core allegations in this litigation, his understanding of the Class and Sub-Class claims, and his spot-on description of his role as a Representative Plaintiff – all of which underscore both the alignment of his interests with those of Class members and the active role that he has played in this litigation. Dr. Esposito perhaps best demonstrated his adequacy when he testified that he filed a class action suit because it was "not fair" to investors for Biopure and its principals to withhold information about the Complete Response Letter and the clinical hold while they themselves sold stock. *See* Esposito Dep. at 158. His actions to date demonstrate not only his active role on the litigation, but also his

18

superior command of its factual underpinnings and core claims. He is, in every sense of the word, an "adequate" representative of the Class and the Sub-Class.

Likewise, Mr. Erickson has demonstrated himself to be an adequate Class representative. He has made a reasonable and informed choice of counsel, by searching for a New York-based firm with the ability to "cover the whole country," identifying three or four firms as possibilities, and choosing his current counsel after speaking with them by telephone. *See* Erickson Dep. at 78-79. He fully understands his role as Lead Plaintiff, which in his words means he must "look to the best fulfillment for the team rather than just for the individual." *Id.* at 73-74. As Lead Plaintiff, he has monitored and discussed the case with his attorneys. *Id.* at 73-76. He has participated in discovery, by answering interrogatories, producing documents, and appearing for deposition on May 30, 2006. He has also read the operative complaints in this litigation and demonstrated substantive knowledge about their core allegations.

These are just the sort of facts upon which courts within the First Circuit have found proposed class representatives to be adequate under the two-part *Andrews* test, have found their role in the conduct of the litigation to be appropriate, and have found their involvement in litigation decisions to be sufficient. *See, e.g., In re: Transkaryotic*, 2005 WL 3178162 at *4-*5; *Swack*, 230 F.R.D. 250, 265; *In re: Tyco Int'l Ltd.*, 2006 WL 2349338, *4-*5 (D.N.H. Aug. 15, 2006)(plaintiffs who understood their role as class representatives and the "basics" of the litigation, identified the class period and defendants, skimmed documents provided by counsel, consulted with counsel, were available for deposition, and were willing to testify at trial were adequate class representatives). Thus, the Court should reject Defendants' claims that Dr. Esposito and Mr. Erickson are inadequate Class representatives due to a purported lack of

involvement or abdication of duty in the case.

        **b.**      **Dr. Esposito and Mr. Erickson Have Demonstrated An Exceptional Knowledge of the Allegations in the Complaint, and, as Such, They are More Than Adequate to Serve as Class Representatives.**

Ignoring completely the two-part *Andrews* test for adequacy articulated by the First Circuit, Defendants have argued that Dr. Esposito's and Mr. Erickson's "lack of knowledge" about this litigation and its core allegations "dooms" class certification. *See* Defendants' Opposition at 16-20. In fact, the courts within the First Circuit, applying the controlling *Andrews* test, have consistently rejected "adequacy" arguments like those proffered here regarding the sufficiency of knowledge by proposed class representatives.

"[I]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance...are rarely appropriate." *Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204, 216 (D.R.I. 2005) *quoting Kinney*, 2002 WL 31015604 at *5. "In complex actions such as this one, named plaintiffs are not required to have expert knowledge of all details of the case, ... and a great deal of reliance on the expertise of counsel is to be expected." *In re Transkaryotic*, 2005 WL 3178162 at *4 *quoting In re: Lupron*, 228 F.R.D. at 90; *Kinney*, 2002 WL 21015604 at *5. "Even sophisticated investors cannot be expected to recite the legal nuances of an action for securities fraud, but must rely greatly on counsel. *Fulco*, 1990 WL 120688 at *2 *citing* 4 Newberg on Class Actions §22.32 (2d ed. 1985 and 1986 Supp.)(citing numerous cases). Simply put, as discussed below, Dr. Esposito and Mr. Erickson more than satisfy the controlling standards concerning their knowledge of the allegations in this litigation and, as such, are adequate to serve as Class representatives.

In an attempt to portray him as an unfit representative, Defendants have focused on the

few instances during which Dr. Esposito's memory failed him during his deposition. In actuality, his deposition testimony demonstrated a superior knowledge of the core allegations of the litigation. He testified (not surprisingly, given his extensive professional medical background, discussed *supra*) at length about Biopure, *see* Esposito Dep. at 53, 116-119, Hemopure, *id.* at 67-70, and the FDA approval process for Hemopure. *Id.* at 71-72, 104-105. He identified the individual Defendants and their roles at Biopure, *id.* at 106-107, Stuart Gottlieb as a Plaintiff, *id.* at 108, and Ronald Erickson as the Lead Plaintiff. *Id.* at 110, 143. Dr. Esposito accurately defined a complete response letter as FDA's "final notice with their concerns to a company," and he correctly stated that Biopure's contained "200 questions that...needed to be answered... ." *Id.* at 108-109. He testified that Biopure was informed of the FDA's clinical hold on Hemopure testing in trauma patients, which was based on the FDA's safety concerns that arose during previous orthopedic trials. *Id.* at 109-110. Notably, he testified that Defendants' failure to disclose the Complete Response Letter and the clinical hold motivated him to file a class action lawsuit because that nondisclosure was "not fair" to investors. *Id.* at 158.

Mr. Erickson has also shown himself to be knowledgeable about the allegations in this litigation and likewise adequate to represent the Class. Mr. Erickson testified extensively about Biopure, Hemopure, military interest in Hemopure, and the FDA approval process for Hemopure - knowledge which he gained in part from Internet research prior to his purchase of Biopure stock. *See* Erickson Dep. at 37, 48-49, 139-140. He testified accurately as to the role and duties he has performed as Lead Plaintiff in the litigation. *Id.* at 73-76. He has reviewed the complaints in this litigation and testified as to the differences between them. *Id.* at 134-135, 148-149. He testified that the false and misleading statements by Biopure at issue in this litigation "concern[]

not letting the public know as far as the clinical trials being put on hold in April by the FDA, and also the 200, 220 questions that needed to be answered that came out in July." *Id.* at 212-213. He correctly identified the Class Period as extending from April 9, 2003 to December 24, 2003, and Class members as those who invested in the company's stock during that time. *Id.* at 63-64. He also correctly identified Biopure and its control people as Defendants. *Id.* at 60, 144-147.

Dr. Esposito's and Mr. Erickson's testimony, as outlined *supra*, clearly meets the standards established by the First Circuit in *Andrews* and as applied by the courts in this circuit. Nonetheless, it is necessary to specifically address a few of Defendants' legal and factual arguments so as to rectify their misleading use of transcript excerpts or their misreading of (or avoidance altogether of) the relevant law.

First, it is necessary to highlight for the Court that Defendants have relied upon the frequent use of misleading quotes, stripped of all context, to paint a picture that Dr. Esposito and Mr. Erickson somehow lack sufficient knowledge to adequately represent the case.[11] These arguments should be rejected, not only due to their misleading nature, but more importantly

---

[11] For instance, Defendants make great hay that Mr. Erickson purportedly had not heard the term "complete response letter" before, even though it is mentioned in the Complaint "over 100 times." *See* Defendants' Opposition at 17 and n.33. Strikingly, Defendants have based this argument on a truncated quotation of Mr. Erickson's transcript. In fact, **on the very pages quoted by Defendants**, Mr. Erickson's testimony demonstrates that he did understand, substantively, what was the complete response letter received by Biopure:

|  |  |
|---|---|
| Question: | And the term [complete response letter] doesn't carry any significance for you in the context of this litigation?<br>* * * |
| Answer: | I mean in the context, I mean what comes to mind, okay, in a sense as far as to me would be in July when they had the 200 questions that they had to answer, I assume that that would be what would be sent out, and that's what they'd have to do to go ahead and complete it... |

*See* Erickson Dep. at 185-186. Similarly, Defendants have highlighted that Mr. Erickson thought the Prescription Drug User Fee Act (PDUFA) was a product of Biopure. *See* Defendants' Opposition at 18 and n.36. Again, a few moments later, without consultation with counsel, Mr. Erickson realized his mistake and clearly stated on the record that he had confused PDUFA with Hemopure. *See* Erickson Dep. at 172.

because they are directly refuted by the detailed testimony of Dr. Esposito and Mr. Erickson discussed *supra*, which as explained herein, more than satisfy the governing *Andrews* two-part adequacy test and the interpretative case law - all of which Defendants completely ignore.

Second, Defendants have argued that Dr. Esposito never saw the documents alleged to contain the Defendants' fraudulent and misleading statements (*see* Defendants' Opposition at 20 and n.46) and that Mr. Erickson testified that certain of these documents were not misleading (*id.* at 19-20 and 25-28 and n.40-45), thus rendering both inadequate to represent the Class. These arguments are likewise supported by Defendants' rather striking mischaracterization of the proposed Class representatives' testimony, for instance Mr. Erickson's testimony concerning the

May 22, 2003 Press Release [12] and the August 1, 2003 Press Release.[13]  More importantly,

though, the arguments are groundless as a matter of law.  Plaintiffs have moved for class

certification under Rules 23(a) and (b)(3), asserting that common questions of law and fact

---

[12] Defendants have argued that Mr. Erickson "testified that there was nothing false or misleading about this press release."  *See* Defendants' Opposition at 19 and n.42.  However, Mr. Erickson actually testified as follows:

| | |
|---|---|
| Question: | Is there anything in Exhibit 30 [May 22, 2003 Press Release] that you contend is false or misleading? |
| | *** |
| Answer: | On the second paragraph where it's bull's eyed and it says "based on FDA performance goals and guidelines, the prescription drug," it says "Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biological license application."  It doesn't say -- it leads you to believe that everything is fine at that point in time, that they didn't put a hold on any of the clinical trials at all or anything. I'd say that is misleading in that sense to me for not going ahead and at least having something in there in regard -- they lead it to believe that it's going to be -- they're going to complete their review by 2003 when they've already done a portion of the review and already put a hold on the clinical trials. |
| Question: | And - - |
| Answer: | And this is in May, and they did that in April. |

*See* Erickson Dep. at 168-169.  Under subsequent questioning, when counsel for Biopure reread the same *sentence* of the May 22, 2003 press release to which Mr. Erickson was originally referring, and indicates in his question that it referred to "acute anemic adult patients undergoing orthopedic surgery," Mr. Erickson did testify that he no longer believed that the *sentence* was misleading. *Id.* at 173.  However, **he is never asked about any other statements in the May 22, 2003 Press Release**.  For Defendants to now claim that he stated that the *entire* press release did not contain any misleading statements, based upon this testimony concerning a single sentence, is a gross distortion of the facts.

[13] Defendants have also argued that Mr. Erickson testified that there is nothing false or misleading in the August 1, 2003 Press Release at issue in this litigation. *See* Defendants' Opposition at 19 and n.44.  In doing so, Defendants have again misleadingly quoted his testimony, morphing his thoughts about the press release in August 2003 (when he originally saw it) into his thoughts about it on the day of his deposition.  The full testimony, not quoted by Defendants, is as follows:

| | |
|---|---|
| Question: | Okay.  Have you ever seen Exhibit 34 [August 1, 2003 Press Release] before? |
| Answer: | I believe I have. |
| Question: | Do you recall when you saw it? |
| Answer: | **I would have seen it in probably somewhere in August, 2003.** |
| Question: | Did you read it? |
| Answer: | Yes. |
| Question: | In your view, is there anything false or misleading about what's contained in Exhibit 34? |
| Answer: | **No, at that point, no.** |

*See* Erickson Dep. at 182-183 (emphasis added).

24

predominate. Under the Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the 'fraud-on-the-market' theory "obviates the need for a plaintiff to demonstrate individualized reliance on a defendant's misstatement by permitting a class-wide rebuttable presumption of reliance, thereby enabling a securities fraud class action to meet Rule 23(b)(3)'s commonality requirement." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 3 (1st Cir. 2005).[14] As such, irrespective of whether Dr. Esposito or Mr. Erickson saw any particular document, or what they thought about it if they did see it, they are entitled to a rebuttable presumption of reliance on the integrity of the market price, which assuming an efficient market, will have reflected Defendants' false and misleading statements as alleged in the SCAC.

For all of these reasons, Defendants' arguments that Dr. Esposito and Mr. Erickson are inadequate because of some deficiency in their substantive knowledge of the case should be rejected, and both should be certified as Class representatives.

      **c.**    **Dr. Esposito and Mr. Erickson Made an Informed Decision Regarding Their Choice of Counsel and the Contingent Fee Basis Upon which Their Counsel Will Be Compensated in this Litigation.**

Defendants have argued that the way in which Mr. Erickson and Dr. Esposito chose their counsel, in particular the degree to which they formalized a fee agreement with counsel, indicates

---

[14] Under *Basic*,

> Since investors who purchase or sell stock do so in reliance on "the integrity of the market price," ... they indirectly rely on such misstatements because they purchase or sell stock at a price which necessarily reflects that misrepresentation. Under the fraud-on-the-market theory, "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."

*In re PolyMedica*, 432 F.3d at 7 (internal citations omitted) *quoting Basic*, 458 U.S. at 242-243 *and citing Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1218 (1st Cir. 1996)(noting in fraud-on-the-market cases, "the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased").

that they are inadequate to serve as Class representatives. *See* Defendants' Opposition at 21-22.

Defendants' argument is neither supported by the facts nor the law. This precise argument was

rejected by the Court in *In re: Transkaryotic*, where the Court said:

> No dispute has been raised about the competency of lead plaintiffs' counsel, and
> their proficiency has been evident throughout these proceedings. Instead,
> defendants pursue the first [*Andrews*] prong by assailing [lead plaintiff/proposed
> class representatives'] alleged lack of control over the instant litigation,...*failure to
> negotiate a specific fee agreement with counsel* and general lack of understanding
> regarding the claims.

2005 WL 3178162 at *4 (emphasis added). After rejecting these arguments - based in part on the

testimony of the proposed class representatives which demonstrated that they understood their

duties in the litigation, one of which was "monitoring counsel" - the court found that all Rule 23

requirements were met and certified the class. *Id.*

Ignoring decisions in this Court, Defendants cite to inapplicable decisions of other courts

concerning the appointment of Lead Plaintiff under the PSLRA, *not* the Rule 23 issue of class

certification. *See* Defendants' Opposition at 21-22. Simply put, these cases are inapposite and

ought not be factored into the Court's Rule 23 analysis. Worse, the two cases primarily relied

upon by Defendants - *In re: Quintus Sec. Litigation*, 201 F.R.D. 475 (N.D. Cal. 2001) and *In re:

Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001), *cert. denied*, 535 U.S. 929 (2002) - are

also legally infirm, with the <u>precise passages</u> quoted by Defendants having been rejected by the

Ninth Circuit.[15]

---

[15] It is quite troubling that the Defendants cited to the district court decision in *In re: Quintus*, without
advising this court that the Ninth Circuit had granted mandamus and **vacated** the district court's order upon which
the Defendants rely. *See In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002). In doing so, the Ninth Circuit stated, "**We
are unpersuaded by the district court's...view that a plaintiff's adequacy under Rule 23 can be judged by how
advantageous an attorney's fee deal he manages to negotiate.**" *Id.* at 733 (emphasis added)(noting, *id.* at 733-
734, that "a lead plaintiff's retainer agreement is far from the final word on what counsel will actually get paid" and
that "actual fees paid will be subject to close judicial scrutiny based on counsel's actual work done and results

Additionally, Defendants' arguments are factually baseless. Mr. Erickson, the Lead

Plaintiff, has testified at length about his efforts to identify and retain suitable counsel and to

determine counsel's compensation. Mr. Erickson began searching for legal representation in the

first quarter of 2004, seeking a New York-based firm "recognized over the country" that could

"cover the whole country." *See* Erickson Dep. at 61, 76-79. He identified three or four law firms

on the Internet, and chose Plaintiffs' counsel in this action (Stull, Stull & Brody) to represent him

after contacting them by telephone. *Id.* at 78-79. He investigated attorney's fees and determined

that a reasonable contingent fee in this litigation would be between twenty percent (20%) and

thirty-three percent (33%). *Id.* at 87. He then orally agreed with counsel that their compensation

in this litigation would be on a contingency basis, with the final amount to be determined by the

court. *Id.* at 85-87. Dr. Esposito also testified as to his understanding of a contingency fee in

general and as it pertains to this litigation. *See* Esposito Dep. at 162-163.

> ### 2.    Mr. Erickson Has Standing to Represent Class Members Who Purchased Biopure Stock after the August 1, 2003 Press Release, His Interests Are Aligned with Theirs, He is not Subject to Any Unique Defenses, and He Otherwise Satisfies Rule 23.

Defendants argue that the *timing* of Mr. Erickson's purchases of Biopure stock within the

Class Period - all in May 2003 - precludes him from representing Class members harmed by

---

achieved" so "an adequate plaintiff could rationally be less concerned with negotiating an advantageous fee...and more concerned with securing...the lawyer that he believes is likely to obtain an excellent result").

The Defendants' reliance upon *In re: Cendant* is also eviscerated by the Ninth Circuit's decision in *In re Cavanaugh*, where it observes that: "The Third Circuit in *Cendant* waves a bouquet in the general direction of the district court's opinion below [i.e. *In re: Quintus*]...seemingly supporting a more aggressive role for district courts in selecting as lead plaintiff the party who negotiates the best deal with his lawyer, but this is entirely dicta." *Id.* The Ninth Circuit then indicates that the "more relevant" portion of the *In re: Cendant* decision was the language stressing that the critical inquiry at the lead plaintiff stage did <u>not</u> focus on the parameters or desirability of the fee agreement negotiated by the would-be lead plaintiff. *Id.*

Defendants' failure to disclose Biopure's receipt of the Complete Response Letter in July 2003. *See* Defendants' Opposition at 23-28.    Two points bear emphasis at the outset.    First, Defendants level this charge against only Mr. Erickson, <u>not</u> against Dr. Esposito; thus, Defendants <u>do not dispute</u> that Dr. Esposito's purchases of Biopure stock enable him to represent the **entire** Class. Second, Defendants apparently concede that Mr. Erickson can sue on behalf of investors injured by the Defendants' failure to disclose the FDA's clinical hold, which was implemented in April 2003 (before his Biopure stock purchases).    That said, Defendants' argument should be rejected *in toto* for the following reasons.

Legally, Defendants' hodge-podge of arguments concerning both Mr. Erickson's purported lack of standing and his purported insufficiency under Rule 23 (which, despite Defendants' treatment, are actually two separate legal points) have been addressed, and rejected, by numerous district courts from within the First Circuit and elsewhere.    This Court should follow their sound reasoning and likewise reject Defendants' arguments here.

<u>Regarding standing</u>, Judge Young's opinion in *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13-14 (D. Mass. 2004) is instructive and persuasive.    There, defendants argued that the lead plaintiff and proposed class representative lacked standing to challenge alleged misstatements made after the date on which he purchased the stock at issue, on the basis that such later statements "could not possibly have inflated" his purchase price. *Id.* at 13.    Judge Young rejected this argument, noting that "numerous courts" had found class representatives to have standing to assert §10(b) claims arising from statements made after their stock purchase "as long as the statements allegedly were made in furtherance of <u>a common course of conduct</u>." *Id.* at 14 (emphasis added)(citing cases).    In doing so, Judge Young reasoned, "Otherwise, 'only someone

who bought on the last day of the class period would be able to bring an action based on allegations such as those in the complaint, either on her own behalf or on behalf of the entire class.'" *Id.*[16]

Regarding Rule 23, Defendants claim that because Mr. Erickson made all of his Biopure stock purchases in May 2003, he is not typical of, and an inadequate representative of, class members who purchased thereafter.[17] As demonstrated below, Plaintiffs' SCAC alleges a common course of conduct by Defendants in deceiving the investing public through a series of misleading statements as to core material facts. The courts have uniformly held, in the face of allegations of a common course of conduct involving a series of misleading statements, that a class representative who purchased within the class period can represent all class members, including those who purchased after the class representative.[18] [19]

---

[16] *See also Upton v. McKerrow*, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995)(stating "Numerous courts have stated that class representatives do have standing to assert claims under §10(b) which arise from statements made after the class representative purchased shares as long as the statements allegedly were made in furtherance of a common scheme to defraud" and citing district court opinions from the 2nd, 3rd, 9th, and 10th Circuits); *Kinney*, 170 F. Supp. 2d at 181(rejecting similar arguments and stating "Class representatives have standing to assert claims on behalf of the whole class over lengthy class periods, even when the information available to the class changes during the course of the class period.").

[17] Defendants' argument that Mr. Erickson testified about his purported intention to pursue a "holder" claim and, as such, is subject to unique defenses ought likewise to be rejected. Mr. Erickson never once referred to a "holder claim." More importantly, the claims in this litigation and the relief sought thereunder are set forth in the SCAC; establishing the proper measure of damages is a matter for expert opinion at a later stage of the litigation.

[18] *See, e.g., Priest v. Zayre Corp.*, 118 F.R.D. 552, 557 (D. Mass. 1988)(upholding class period spanning release of many documents in"common course of conduct" and holding that "Plaintiff's proof of his own claim will necessarily involve proof of claims by subsequent purchasers. Plaintiff has an incentive to prove later events, having alleged a common course of conduct, and his lawyer has an incentive to prove claims on behalf of subsequent purchasers"); *Kinney*, 170 F. Supp. 2d at 181 ("class representatives may represent later purchasers on claims arising from alleged misstatements made after their purchase...if...made in furtherance of a 'common course' of conduct to defraud"); *In re: One Bancorp Sec. Litig.*, 136 F.R.D. 526, 531 (D. Me. 1991)(finding typicality where a "scheme or common course of conduct" is alleged and stating "Even if there have been some partial corrective disclosures, each named Plaintiff will have an interest in proving that Defendants engaged in a scheme, throughout the class period, to artificially inflate the [stock] price"); *Opiela v. Bruck*, 139 F.R.D. 257, 260 (D. Mass. 1990)(holding plaintiff may represent class members who purchased before or after him if "same series of misstatements or the same course of conduct by defendants forms the basis of recovery for all class members" and stating that "existing 'differences in

Defendants have ignored that the SCAC explicitly alleges a <u>common course of conduct</u> "throughout the Class Period" (*see, e.g., id.* at ¶51) whereby Defendants hid from the public FDA's repeated expressions of safety concerns regarding Hemopure (concerns which, over time, led to the clinical hold and the Complete Response Letter) and obfuscated the true status of Biopure's application for FDA approval of Hemopure as affected by those safety concerns, through a <u>series of misleading statements</u> to investors which fraudulently hid from the investing public that the Hemopure application was first in severe jeopardy and, later, had effectively been rejected by the FDA. The SCAC explains the motive for this common course of conduct - simply put, the do-or-die need for Biopure to manipulate its public perception so as to continue to have access to the infusions of investor capital needed to keep it afloat.[20]  The SCAC also specifies the major misstatements made by Defendants <u>throughout the Class Period</u> in furtherance of this common course of conduct, including, *inter alia*: (1) the failure to disclose the FDA's clinical hold on Hemopure testing and the safety concerns regarding which prompted it; (2) the failure to disclose the receipt and substance of the Complete Responses letter; and (3) the

---

claims due to varying purchase dates do not defeat plaintiffs' showing of typicality under Rule 23(a)(3)"); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 311-312 (D. Mass. 1987)(following district court opinions from the 2nd, 3rd, 4th, and 8th Circuits in other Rule 23(b)(3) fraud-on-the-market cases and holding that "earlier purchasers can properly represent later purchasers" when the basis of the claim is an alleged common course of conduct).

[19]  Defendants' arguments as to Mr. Erickson's "incentives" apparently seek to challenge his Rule 23 sufficiency on the basis of a purported conflict of interest between him and other Class members who purchased Biopure stock on other (i.e. later) dates. This argument has also been routinely rejected by the courts. *See, e.g., Priest*, 118 F.R.D. at 556 (stating, with emphasis original, "Such differences in purchase timing have overwhelmingly been found *not* to raise a conflict among class members.") *quoting Abelson v. Strong*, 197 WL 15872 (D. Mass. 1987).

[20]  The SCAC alleges that Biopure's misstatements in furtherance of its common course of conduct managed to artificially boost its stock price (*id.* at ¶¶112, 114, 123) while permitting it to raise millions of dollars in the equity markets <u>throughout</u> the Class Period (*id.* at ¶¶59, 65, 68-69, 90, 93, 95, 97, 124, 128-129, 170-180), both before and after Mr. Erickson's purchase of Biopure shares.

failure to convey the true status of the application for FDA approval of Hemopure.[21]  As a matter

of fact and law, Erickson fully meets the typicality and adequacy requirements of Rule 23.

> **3.**    **Dr. Esposito Is a More Than Adequate Class Representative, Despite Minor Lapses of Memory Regarding His Biopure Trading History.**

Dr. Esposito's claims in this action, and his eligibility to represent the Class and the Sub-

Class, are based solely upon his purchases of Biopure stock within the Class Period, on August

12 and 21, 2003.  He also engaged in three additional transactions in Biopure stock: two

purchases years before the beginning of this Class Period – a July 31, 2000 purchase of 500

shares and a September 17, 2001 purchase of 20 shares – and an August 5, 2003 sale of those 520

shares.  *See* Defendants' Opposition at 5-6 and Exhs. E and F thereto.  Defendants make great

hay of Dr. Esposito's confusion about these transactions and about his current Biopure holdings,

---

[21]  The SCAC alleges a series of misstatements, in furtherance of Biopure's common course of conduct as described herein, regarding, *inter alia*, the failure to disclose FDA's clinical hold on Hemopure and the safety concerns underlying it (*id.* at ¶¶11, 44, 46-50, 53-56, 60-64, 66, 67, 70-75, 77-81, 83-85, 91, 92, 96, 98-99, 104-105, 108-110, 116-118, 120-122, 125-126, 131-132, 135-137, 140-142, 147, 150); the failure to disclose the Complete Response Letter (*id.* at ¶¶11, 98-111, 113, 116-118, 120-122, 125-129, 131-132, 137, 142, 147, 150); and the failure to convey the true status of the application for FDA approval of Hemopure (*id.* at ¶¶44, 56-57, 61-63, 66, 70-75, 79-81, 83-85, 87, 91, 94, 96, 99, 100-103, 105-107, 108-110, 111, 116-118, 120-122, 125-126, 131-132, 137, 142, 147, 150).  The SCAC alleges that these misstatements were made <u>throughout</u> the Class Period (both before and after the dates of Mr. Erickson's purchases of Biopure stock) in a variety of fora, including, *inter alia*, press releases, investor conference calls, and SEC filings.  The SCAC further sets forth detailed allegations regarding Defendants' scienter in executing their common course of conduct.  *Id.* at ¶¶185-195.

It is important to note that within this common course of conduct, there is not a hard-and-fast distinction, as Defendants have argued, between one undisclosed item (i.e. the clinical hold) and another (i.e. the Complete Response Letter).  Some misstatements are misleading due to a failure over time to disclose <u>both</u> the clinical hold and the Complete Response Letter, for instance the "If we fail to obtain FDA approval" statement discussed in SCAC ¶54, which is misleadingly repeated <u>throughout</u> the Class Period in registration statements filed with the SEC.  *See* SCAC at ¶¶53-56, 189-190.  Moreover, Defendants in previous court filings **have conceded** the substantial overlap between the clinical hold and the Complete Response Letter.  *See, e.g.*, Plaintiffs' Post-Argument Supplemental Submission In Support of Plaintiffs' Motion to Amend Complaint (Docket No. 105)(explaining that Defendants' Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment (Docket No. 90 in the SEC action) stated that the July 30, 2003 Trauma Clinical Trials Letter and the Complete Response Letter, as those terms are defined in SCAC ¶98, which were both received by Biopure on July 30, 2003, were in Defendants' words "**virtually identical**" in their content, primarily setting forth the FDA's 220 or so questions/concerns regarding Hemopure).

when in actuality his confusion is quite easily explained and does not impact at all his adequacy as a representative of the Class and the Sub-Class.

Dr. Esposito testified that, using funds from his IRA account, he has invested in about eight companies since 2000, one of which was Biopure. *See* Esposito Dep. at 43. He testified that he does not personally possess records of transactions made in his IRA account and that, instead, he relies on his broker, Mr. Berney Harris, with whom he speaks on a "not that frequent" basis, to keep such records. *Id.* at 38-39. He further testified that he does not receive annual or semi-annual portfolio reports from his broker regarding his IRA account. *Id.* at 40.

Therefore, Dr. Esposito had to refer his counsel to his broker for documents responsive to Defendants' discovery requests in this litigation. *Id.* at 83-86. In doing so, he asked his broker to produce documents "concerning my purchase or sale of Biopure" or words to that effect. *Id.* at 86. In response, his broker produced to his counsel, who in turn produced to Defendants, <u>only</u> the two-page document marked as Dep. Exh. 46 at Dr. Esposito's deposition. *Id.* at 84, 90-92; Exh. 1 hereto. That document, the <u>only</u> one concerning Biopure transactions shown to Dr. Esposito during his deposition, shows <u>only</u> his purchases on August 12 and 21, 2003, as well as *what appears to be a sale* of 1200 shares of Biopure at $0.54 on January 14, 2005. *Id.* It does <u>not</u> reflect his sale of 520 shares on August 5, 2003 or his prior purchases of those shares years earlier, in July 2000 and September 2001. *Id.* Documents reflecting those transactions (Exhs. E and F to Defendants' Opposition) were produced by third parties after Dr. Esposito's deposition.

At his deposition, Dr. Esposito testified that he did not specifically recall having sold Biopure stock on August 5, 2003 or having bought Biopure stock prior to that date. Regarding the August 5, 2003 sale (which was accurately listed on his PSLRA Certification [Exh. I to

Defendants' Opposition] as a transaction in Biopure "during the class period...in the complaint")[22], he testified, "If I had signed it and I reviewed it at the time, then I must have conferred with [his broker], and I presume that it's correct." *See* Esposito Dep. at 96-97. As to the prior purchases, he testified that the August 5, 2003 sale signified that he "must have had prior experience of a buy" which would have been made through his broker. *Id.* at 121, 126.[23]

At his deposition, Dr. Esposito was shown only one document reflecting his transactions in Biopure stock – Dep. Exh. 46 [which is Exh. 1 hereto]. He did not have the benefit of other documents, subsequently produced by third parties. Dr. Esposito's reliance on only Dep. Exh. 46 led him to commit just <u>two</u> mistakes about his Biopure transaction history, which together form the basis of nearly <u>every</u> one of Defendants' arguments against his adequacy as a Class representative. First, Dr. Esposito mistakenly testified at his deposition that he sold all 1200 of his Biopure shares at $.054 per share on January 14, 2005, based upon Dep. Exh. 46 - **which appears to reflect such a sale**. In fact, he still holds those shares (which are now 200 in number due to Biopure's May 27, 2005, one for six reverse split) as reflected on Exh. H to Defendants' Opposition, which was produced by a third party after the deposition. Second, relying upon Dep.

---

[22]  The purchases in July 2000 and September 2001 would not have been listed in his PSLRA certification, which reflects only transactions "during the Class Period..." pursuant to Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4. *See* Exh. I to Defendants' Opposition.

[23]  It should be noted that Dr. Esposito's broker, Mr. Harris, has apparently switched brokerage firms <u>at least four times</u>, likely leading to some of the confusion which Mr. Harris apparently encountered in producing responsive documents. These transitions are evidenced by the brokerage statements pertaining to Dr. Esposito's transactions in Biopure. First, Dr. Esposito's purchase of Biopure shares in July 2000 is reflected on a statement from BJ Harris Company which is part of Exh. E to Defendants' Opposition. Second, his purchase of Biopure shares in September 2001 is shown on a statement from Nathan & Lewis Securities, Inc., which is the other part of Exh. E to Defendants' Opposition. Third, his purchases of Biopure shares on August 12 and 21, 2003 are reflected on Dep. Exh. 46 [which is Exh. 1 hereto], a statement from Walnut Street Securities, Inc. Fourth, his holdings of 200 Biopure shares, as of May 31, 2006, are reflected on a statement from American Portfolios Financial Services, Inc., which is Exh. H to Defendants' Opposition.

33

Exh. 46 (which does not reflect holdings in Biopure stock predating August 5, 2003 or a sale on

that date), he submitted an errata sheet mistakenly stating that he did not buy Biopure shares

prior to August 5, 2003 and did not sell them that day.[24]  In fact, he purchased 520 shares in July

2000 and September 2001, which he sold on August 5, 2003.  While regrettable, these two errors

were the product of faulty memory and incomplete and confusing documents.  They are in no

way indicative of any bad faith on Dr. Esposito's part and do not bear on his actual credibility as

a witness.  He testified as we expect all witnesses to testify – to the best of their knowledge and

memory.[25]

    This Court's decision in *In re: Sepracor, Inc. Securities Litig.*, 233 F.R.D. 52 (D. Mass.

2005) is most instructive here.  There, the Defendants argued that "credibility issues" arising

from two key mistakes by the proposed class representative rendered him unfit to serve in that

capacity.  *Id.* at 56.  First, the proposed class representative had, "in his certification...set forth

only a single class period transaction in [Defendant] securities, while omitting **nine** class period

transactions."  *Id.* (emphasis added).  Second, the proposed class representative had answered an

interrogatory "falsely by stating that he had never been a party to any other lawsuit" when, in

actuality, as "admitted upon deposition," he had been a defendant in two prior suits.  *Id.*

    Faced with those factual misstatements by the proposed class representative - which

although of limited significance were of far greater magnitude than those discussed here - which

---

[24]  This errata was one of those challenged by Defendants in their Motion to Strike Errata Sheets (Docket No. 141).  As discussed in Plaintiffs' opposition thereto, filed contemporaneously herewith, that errata has been withdrawn.

[25]  It should also be noted that there was no possible reason for Dr. Esposito to inaccurately describe his purchases and sales of Biopure stock.  The fact that he bought Biopure stock twice before the Class Period began, and sold those shares during the Class Period, has no bearing whatsoever on his claims at bar or his eligibility to serve as a representative of the Class and Sub-Class.  The Defendants do not argue to the contrary.

34

defendants argued impugned his credibility and adequacy to represent the class, this Court (J.

Lasker) granted class certification and approved the proposed class representative in question to

represent a class of equity purchasers. *Id.* at 57. The Court's sound reasoning is instructive:

> [Defendants'] argument that [proposed class representative's] credibility is
> seriously impaired by these inconsistencies is a considerable exaggeration. [The
> proposed representative] does not suffer from the type of credibility issues that
> merit denial of class certification. The two prior suits that [he] failed to disclose
> were both dismissed without any finding of liability or wrongdoing by him. The
> information that [he] omitted in his certification was later provided in response to
> [Defendants'] written discovery requests. ... Questions of credibility which do not
> affect a plaintiff's ability to represent the class or to pursue the merits of the cause
> of action routinely fail to defeat certification. *See Tolan v. Computervision Corp.*,
> 696 F. Supp. 771, 780 (D. Mass. 1988); *In re: Frontier Ins. Group Securities
> Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997). [The proposed representative's]
> interests are not antagonistic to those of the class as a whole. In sum, [Defendant]
> has failed to establish that [he] is not qualified to represent the class of equity
> purchasers.

*In re: Sepracor, Inc.*, 233 F.R.D. at 56-57 (some internal citations omitted) *citing, inter alia, In

re: IPO Securities Litig.*, 227 F.R.D. 65, 98 (S.D.N.Y. 2004) ("there is no evidence that...the

conduct here was the result of bad faith or an attempt to deceive defendants or the court...none of

the inconsistencies or omissions complained of by defendants, such as failing to disclose certain

specific transactions, affects the merits of the class representatives' manipulation claims.").

The Court should likewise find that Dr. Esposito's unintentional mistakes concerning his

trading history in Biopure stock do not disqualify him as a Class representative. Here, as in *In

re: Sepracor*, Defendants obtained accurate information concerning Dr. Esposito's trading

history through documentary discovery. Here too, Dr. Esposito's actions in no way demonstrate

any bad faith or, as Defendants' allege, an inability to oversee the litigation. To the contrary, as

detailed, *supra*, Dr. Esposito's testimony demonstrates that he has an excellent command of the

subject matter of this litigation and is maintaining an appropriately watchful eye over its conduct.

**4.    That Dr. Esposito Still Holds Biopure Stock Purchased During The Class Period Does Not Render Him An Inadequate Class Representative And Defendants' Reliance Upon *Seagate*, A Decision Uniformly Rejected By The Federal Courts, Is Utterly Misplaced.**

Defendants argue that because Dr. Esposito still holds shares of Biopure stock purchased

during the Class Period, he cannot satisfy Rule 23(a)'s adequacy requirement due to a so-called

"equity conflict" between himself and Class members who no longer hold their Biopure stock.

*See* Defendants' Opposition at 33-34. Defendants base their argument exclusively on the

decision in *Seagate Tech II Securities Litig.*, 843 F. Supp. 1341 (N.D. Cal. 1994). *Id. Seagate*

and its rationale have been uniformly rejected by the "overwhelming majority" of federal

courts.[26] This Court should likewise reject the flawed *Seagate* decision. That Dr. Esposito still

owns shares in Biopure stock in no way renders him an inadequate Class representative and no

conflict exists between his interests in this litigation and those of the Class and the Sub-Class he

seeks to represent.

**C.    Dr. Esposito Need Not Have Been Appointed PSLRA Lead Plaintiff to Now Serve as a Class Representative.**

Citing <u>no case law whatsoever</u>, Defendants argue that for Dr. Esposito to serve as a Class

representative, he must first have been appointed as a PSLRA lead plaintiff. This novel

interpretation of the PSLRA should be swiftly rejected by this Court. Not only would such an

---

[26] *See, e.g., In re: Honeywell Int'l, Inc. Securities Litig.*, 211 F.R.D. 255, 261-262 (D.N.J. 2002)(the *Seagate* approach "has been rejected by an overwhelming majority of courts...and its reasoning is ultimately not compelling" and citing cases); *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 472 n.10 (M.D. Tenn. 2002)(joining "the majority of courts" to criticize the approach in *Seagate* and citing cases); *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, 1996 WL 739170, *6 n.5 (W.D. Mich. Sept. 27, 1996)(stating "This court will join the majority of courts which have rejected the analysis set forth in *Seagate*" and citing cases); *In re: Daimler Chrysler AG Securities Litig.*, 216 F.R.D. 291, 297 (D. Del. 2003)(stating "the rationale of the *Seagate* decision has been repeatedly rejected by the courts in this Circuit" and citing cases).

outcome be unsound policy, the simple reality is that courts commonly certify non-lead plaintiffs to represent securities fraud classes or sub-classes.[27]  Defendants' argument should be rejected.

**D.    Dr. Esposito's Claims Are Typical Of Those Of The Putative Sub-Class, Which Satisfies Rule 23.**

Defendants have argued that Dr. Esposito's claims are not typical of those of the putative Section 20A Sub-Class he seeks to represent, because his purchases of Biopure stock were not "contemporaneous" with those of Defendants Rausch and Biopure.  Defendants' argument almost entirely ignores the fact that Dr. Esposito purchased 600 shares of Biopure stock on August 12, 2003 - - **the same day** on which Defendant Rausch sold 10,000 shares!  *See* Exh. 1; SCAC ¶¶ 75, 184.  While Defendants apparently concede that Dr. Esposito has standing to sue with regards to this sale, they nonetheless argue that Dr. Esposito's claims are atypical of those of the Sub-Class.  For the following reasons, Defendants are mistaken.

First, as courts have recognized, there is no hard and fast standard as to what constitutes "contemporaneous" under §20A.  Many federal courts have construed the §20A contemporaneity requirement far more liberally than the courts upon which Defendants rely.  For example:

> §20A does not define the word "contemporaneous" and there is no clear agreement about how long a period between the trade by the defendant and the purchase by the plaintiff is permissible.  Different courts have found that "contemporaneity" requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to "the entire period while relevant and nonpublic information remained undisclosed."

*In re: Enron Corp. Securities, Derivative, and ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex.

---

[27]  *See, e.g., Gariety v. Grant Thornton LLP*, 368 F.3d 356, 371 (4th Cir. 2004)(affirming district court ruling permitting a non-lead plaintiff to act as a class representative under Rule 23(a)(4)); *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 (2d Cir. 2003)("the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class"); *In re: Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 485 (S.D.N.Y. 2002)("A lead plaintiff is not synonymous a class representative, and in the ordinary course of litigation the class representative will not appear on the scene until long after the lead plaintiff.").

2003)(extensively listing cases requiring trades "on the same day," cases requiring trades only "within a few days of each other," and cases requiring trades merely "during the entire period of nondisclosure of material nonpublic information" and concluding that "this court finds that two or three days, certainly less than a week, constitute a reasonable to measure the contemporaneity of a defendant's and a plaintiff's trades under §20A").

Second, Defendants have essentially argued, without citation, that one or more of the named representatives of a §20A sub-class needs to have purchased on *each and every* date on which a §20A defendant sold shares in order for all of that defendant's class-period stock sales to be encompassed within the insider trading claim. *See* Defendants' Opposition at 38. This is simply not the law. The courts have found it to be sufficient for class certification purposes that a representative plaintiff purchased shares on at least <u>one</u> of the dates on which a §20A defendant sold shares. *See, e.g.*, *In re: Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. July 27, 1999)(allegation that at least one class representative traded on at least one of the days that the defendant traded satisfied the §20A contemporaneity requirement) *cited in In re: Enron*, 258 F. Supp. 2d at 600 n.18 *and cited in Copeland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999).

Under these standards, the analysis with regards to Defendant Rausch is quite easy. Dr. Esposito purchased 600 shares of Biopure stock on August 12, 2003, the very same date on which Defendant Rausch sold 10,000 shares of Biopure stock. Under <u>any</u> standard, this purchase was "contemporaneous" with Rausch's sale. Since Dr. Esposito purchased contemporaneously with at least one of Rausch's Class-period sales, he has standing to pursue the §20A claim on behalf of the Sub-Class concerning all such sales. *See, e.g.*, *In re: Cendant*, 60 F. Supp. 2d 354 *cited in In re: Enron*, 258 F. Supp. 2d at 600 n.18 *and cited in Copeland*, 88 F. Supp. 2d at 338.

With regards to Biopure, Biopure sold 50,500 shares on August 5, 2003; 55,000 shares on August 6, 2003; 120,000 shares on August 7, 2003; 50,000 shares on August 8, 2003; and 24,500 shares on August 11, 2003.[28]  Dr. Esposito purchased 600 shares on August 12, 2003, within <u>one day</u> of Biopure's sale of 24,500 shares and within several days of its sale of 275,500 additional shares.  Under any standards, even those urged by Defendants, Dr. Esposito also purchased contemporaneously with Biopure and he has standing to represent the Sub-Class in its §20A claim against Biopure.

## III.    CONCLUSION

For all the reasons set forth herein, this Court should grant Plaintiffs' Amended Motion for Class Certification (Docket No. 131) and certify the Class and Sub-Class as set forth therein, with Dr. Esposito and Mr. Erickson as the representatives of the Class and Dr. Esposito as the representative of the Sub-Class.

---

[28]  The dates and amounts of Biopure's sales of its stock are set forth in Defendant Biopure Corporation's Answers and Objections to Plaintiffs' First Set of Interrogatories Concerning Class Certification, served on Plaintiffs on September 25, 2006.

Dated: September 29, 2006

Respectfully submitted,

**SHAPIRO HABER & URMY LLP**

**/s/ Edward F. Haber**

Edward F. Haber BBO # 215620
Matthew L. Tuccillo BBO # 643336
53 State Street
Boston, MA 02109
(617) 439-3939

**STULL, STULL & BRODY**

Jules Brody (*pro hac vice*)
Howard T. Longman (*pro hac vice*)
6 East 45th Street
New York, New York 10017
(212) 687-7230

**STULL, STULL & BRODY**

Timothy Burke (*pro hac vice*)
10940 Wilshire Blvd., Suite 2300
Los Angeles, CA 90024
(310) 209-2468

**Co-Lead Counsel For**
**Lead Plaintiff and The Class**

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants on the 29th day of September, 2006.

**/s/ Edward F. Haber**

Edward F. Haber