## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BIOPURE CORPORATION SECURITIES LITIGATION | CIVIL ACTION NO. 03-12628-NG |

)
)
)
)
)

### JOINT DECLARATION OF CO-LEAD COUNSEL IN SUPPORT OF FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Howard T. Longman and Edward F. Haber, hereby jointly declare as follows:

1.      Our firms, Stull, Stull & Brody ("Stull Stull") and Shapiro, Haber & Urmy ("Shapiro Haber"), are Lead counsel for Lead Plaintiff and Class Representative Ronald B. Erickson and for Class Representative Dr. John G. Esposito, Jr. (collectively, the "Class Representatives" or "Plaintiffs") and the Class defined below. We submit this Joint Declaration in Support of: (i) the proposed settlement (the "Settlement") of this litigation consisting of payment by defendants of a total of $10 million in cash, plus interest earned thereon (the "Gross Settlement Fund"); (ii) the proposed Plan of Allocation (the "Plan of Allocation"); and (iii) the application of Plaintiffs' Counsel for an award of attorneys fees and reimbursement of expenses to be paid from the Gross Settlement Fund. As Co-Lead Counsel, our firms have directed and participated in all aspects of this litigation, and we are personally familiar with the facts set forth in this declaration.

2.      We respectfully submit that this Court should approve the Settlement that was achieved after more than three years of hard-fought litigation on a purely contingent basis, which included extensive motion practice, including among other things, Defendants' several attempts, and Plaintiffs' oppositions thereto, to dismiss this litigation, to withhold documents, and to defeat class

certification. Plaintiffs achieved the Settlement notwithstanding these and other substantial contested issues.

3.     Although Co-Lead Counsel believe that this case was and is a very strong case on the merits, we were faced with the reality of having to continue to litigate this case, potentially through trial and appeals, thereby substantially wasting and diminishing the amount of funds available from Biopure's remaining Director's and Officer's Liability insurance coverage ("D&O coverage") to be used to fund any recovery, since these were "wasting" policies funding Defendants' defense of this action and the action commenced by the Securities Exchange Commission ("SEC").[1] The Company itself has very limited financial resources with which to fund any settlement or judgement by Plaintiffs, insofar as it has always operated at a loss and been reliant upon the capital markets to fund ongoing operations.

4.     This Joint Declaration sets forth the nature of the claims asserted, the legal services provided by Co-Lead Counsel, and the principal proceedings to date and Settlement negotiations; demonstrates why the Settlement and Plan of Allocation are fair and in the best interests of the Class; and explains why the application of Co-Lead Counsel for attorneys' fees of 33 1/3% of the Gross Settlement Fund, for reimbursement of Co-Lead Counsel's expenses, and for reimbursement of the Class Representatives' lost wages, is reasonable and should be approved by the Court.

## I.     PRELIMINARY STATEMENT

5.     This case was carefully investigated and has been vigorously litigated since its commencement. In preparing the complaints they have filed in this action, Co-Lead Counsel

---

[1] The SEC proceeding is entitled Securities Exchange Commission v. Biopure Corporation, Inc., 05 CA 11853 -PBS (the "SEC" Action).

reviewed and analyzed voluminous publicly-filed documents and press releases concerning Biopure, consulted with a medical expert in the field of federal Food and Drug Administration ("FDA") licensing, and consulted with experts on estimating class wide damages in securities cases.  In addition, Co-Lead Counsel have reviewed transcripts of testimony in the SEC proceeding and analyzed over 40,000 pages of documents from the SEC proceeding which the Court ordered be produced in this case, all of which provided further detailed factual information concerning the alleged false or misleading statements by Defendants relating to Biopure's primary product Hemopure, an oxygen therapeutic, along with other allegations of wrongdoing, as described in the Second Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Second Amended Complaint" or "SCAC") filed by Plaintiffs on March 28, 2006.

6.     While motion practice was occurring, the parties engaged in a comprehensive mediation in New York in September 2005, before the Honorable Layn Phillips, United States District Court Judge (Ret.) for the Western District of Oklahoma.  During this mediation, the parties met face-to-face, made presentations regarding the claims and defenses thereto, and engaged in negotiations regarding possible settlement terms.  Although the mediation with Judge Phillips failed to result in a settlement, the Parties continued to discuss the possibility of settlement and engaged in another mediation in Boston on October 11, 2006, conducted by Professor Eric Green.  Following the mediation with Professor Green, the Parties continued to negotiate the terms of a potential settlement and ultimately reached the Settlement discussed herein.

7.     The proposed $10 million all-cash Settlement is a notable achievement derived from the substantial efforts of Co-Lead Counsel, who zealously litigated this case.  The Settlement is an excellent result based on numerous impediments to recovery, the legal hurdles and risks involved

in proving liability and damages, and the further risk, delay and expense facing Plaintiffs and the Class if they continued to litigate against the Defendants, whose ability to fund any settlement would have been further diminished due to the wasting nature of Biopure's D&O insurance coverage. Class Representatives and the Defendants do not agree on the average amount of damages per share that would be recoverable if Plaintiffs were to have prevailed on each claim asserted, nor that Plaintiffs would have prevailed at all.  In light of such adamant opposition, a recovery of $10 million in cash, plus interest from the date the fund was established, derived solely from Lead Counsel's efforts,  represents a highly successful result, particularly given the inability of the corporate defendant Biopure to pay any recovery outside of its D&O policy limits.

8.     Furthermore, as described more in paragraphs 30 & 31 below, the Settlement represents a far higher percentage of the actual (estimated) damages suffered by the Class than the median settlement in securities class actions that were brought after the passage of the Public Securities Litigation Reform Act of 1995 (the "PSLRA").

9.     The Settlement was negotiated on all sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses.  The Settlement confers substantial and immediate benefit to the Class while eliminating the risk of little or no recovery at trial.  Co-Lead Counsel respectfully submit that under these circumstances, the Settlement is in the best interests of the Class and should be approved as fair, reasonable and adequate.  The Court should also approve the Plan of Allocation of settlement proceeds and award attorneys' fees in the amount of 33 1/3 % of the Gross Settlement Fund, plus reimbursement of expenses incurred in the prosecution of this litigation in the amount of $135,642.04, which have been advanced by Co-Lead Counsel in connection with this litigation, as a result of Co-Lead

Counsel's considerable efforts in creating this substantial and extraordinary benefit on behalf of the Class.

10.     The Class appears to overwhelmingly approve the Settlement.  Pursuant to the Court's Order Of Preliminary Approval, a Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Settlement Notice") was mailed to over 17,000 potential Class Members.  Additionally, a Summary Notice of Settlement was published in *The Wall Street Journal* on July 16, 2007 (the "Summary Notice")**.**  The Summary Notice apprised Class Members of their right to object to the Settlement, to the Plan of Allocation, to Co-Lead Counsel's application for attorneys' fees of 33 1/3% of the Gross Settlement Fund and reimbursement of expenses of up to $175,000, and to the Class Representatives' application for reimbursement of costs and lost wages up to a total of $15,000.  The time to file objections to the proposed Settlements expired on September 11, 2007.  As of the filing of this Declaration, <u>there have been no objections from any Class Member to the Settlement, to the Plan of Allocation or to counsel's request for an award of attorneys' fees and expenses</u>.

11.     Co-Lead Counsel have litigated this case for almost four years on a wholly contingent basis.  The fee application for 33 1/3% of the total recovery and interest earned thereon (the Gross Settlement Fund) is fair, reasonable, and adequate and warrants Court approval.  This fee request is well within the range of fees typically awarded in actions of this type and is justified in light of the benefits obtained, the substantial risks undertaken, the precarious financial condition of Biopure, and the quality, nature and extent of the services rendered, as more fully set forth in Plaintiffs' Counsel's Memorandum of Law In Support of Request For An Award of Attorneys' Fees and Reimbursement of Expenses, submitted herewith.

12.     In sum, the Settlement is the product of hard-fought litigation and protracted arm's-length negotiation, and it takes into consideration the risks specific to this case and these Defendants.  Co-Lead Counsel respectfully submit that under these circumstances the Settlement is in the best interest of the Class and should be approved as fair, reasonable and adequate.

13.     The following sets forth the principle proceedings in this matter and the major legal services provided by Lead Counsel, the negotiations of the Settlement, the terms of the Settlement, why the Settlement and the Plan of Allocation are fair and in the best interests of the Class, and the reasonableness of Lead Counsel's fee and expense reimbursement request, the request for reimbursement of costs, and the request for reimbursement of lost wages to the Class Representatives.

## II.     STATEMENT OF FACTS

14.     This litigation was brought as a federal securities class action by the Plaintiffs against Biopure Corporation ("Biopure" or the "Company") and Biopure's past or present officers and/or directors, Thomas A. Moore, Carl W. Rausch, Ronald Richards and Howard P. Richman, J. Richard Crout and Charles A. Sanders (the "Individual Defendants") on behalf of a class (the "Class")[2] consisting of all persons or entities who acquired the common stock of Biopure during the period April 9, 2003 through December 24, 2003, inclusive (the "Class Period").  At all relevant times, Biopure was a publicly traded company headquartered in Cambridge, Massachusetts that developed, manufacturered and marketed oxygen therapeutics, for both human and veterinary use, designed to

---

[2]  Excluded from the Class are the Defendants in this Action; members of the immediate family (parents, siblings and children) of each of the individual Defendants; the officers, directors, parents, subsidiaries and affiliates of Biopure; any person, firm, trust, corporation, or other entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors in interest, or assigns of any excluded person.

serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. Its stock is traded on NASDAQ.

15.    Biopure has developed and now manufactures two biologic products: Hemopure – 250 (bovine), or HBOC-201 – for human use, and Oxyglobin – hemoglobin glutamer – 200 (bovine), or HBOC-301 – for veterinary use. Oxyglobin is approved for use in the United States for administration to dogs. Hemopure is not approved for *any* human use in the United States.

16.    On July 31, 2002, Biopure submitted a biologic license application ("BLA") to the U.S. Food and Drug Administration ("FDA") seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery (the "Hemopure BLA"). In March 2003, Biopure notified the FDA of its intent to perform Phase III clinical trials of Hemopure on human trauma victims in hospitals (the "Trauma Clinical Trials").

17.    Plaintiffs allege in the SCAC that, during the Class Period, Defendants made numerous public statements regarding Biopure, Hemopure, the Hemopure BLA, and Biopure's proposed Trauma Clinical Trials. The statements disseminated to the public by the Defendants were false or materially misleading principally because Defendants concealed communications to Biopure from the FDA, beginning in April 2003, in which the FDA placed a clinical hold on the Trauma Clinical Trials for Hemopure, due to safety concerns based upon the data submitted in support of the Hemopure BLA, on or about April 9, 2003.

18.    Plaintiffs further allege in the SCAC that on or about July 30, 2003, the FDA transmitted two long, detailed letters to Biopure conveying still further negative developments with respect to Biopure's efforts at gaining regulatory approval of Hemopure. In sum, these letters, one the FDA's Final Response Letter and the other a letter regarding the FDA's refusal to lift its clinical

trial hold, spelled the death knell for any hope of the FDA approving the use of Hemopure. Nonetheless, in a press release a day or so later, on August 1, 2003, Biopure made additional positive statements about its prospects.

19.     The Class Period begins on April 9, 2003, when Biopure first learned of FDA's clinical hold on the Trauma Clinical Trials, due to the FDA's safety concerns about Hemopure. The Class Period ends on December 24, 2003, when Biopure issued a Press Release disclosing the clinical hold and the Defendants' receipt of Wells Notices from the SEC which advised Defendants that the SEC's staff had preliminarily determined to recommend civil proceedings against them, because, during the time period relevant to this litigation: (i) they had made deceptive statements regarding Biopure, Hemopure, the Hemopure BLA, and the Trauma Clinical Trials and (ii) they had not disclosed that in April 2003 the FDA had expressed safety concerns about Biopure which led to the imposition by FDA of a clinical hold on the Trauma Clinical Trials.

20.     During the Class Period, Biopure's stock price traded as high as $7.30 per share. On October 30, 2003, it declined from an opening of $5.00 per share to close at $3.68 per share as a result of a partial curative disclosure by Biopure on that date. It declined further, to close at $2.43 per share on the first trading day after the Class Period.

## III.    PLAINTIFFS' PROSECUTION OF THE CASE

### A.    The Filing of the Securities Litigation and Appointment of Lead Plaintiffs

21.     On December 30, 2003, the first of several actions were filed against Biopure and certain of its officers and directors alleging violations of the federal securities laws. After extensive briefing by various lead plaintiff contestants, the class actions were consolidated pursuant to an Order of this Court, entered on May 14, 2004, and in which this Court appointed Ronald Erickson

as the Lead Plaintiff in this action and appointed our firms as Co-Lead counsel.

**B.     The Complaints and Motion Practice**

22.     On July 23, 2004, after the actions were consolidated and Lead Plaintiff and Co-Lead Counsel appointed, the Class Representatives and other named Plaintiffs filed the Consolidated Amended Class Action Complaint ("CAC") alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, and Section 20A of the Exchange Act.

23.     On October 6, 2004, the Defendants filed motions to dismiss the CAC. On December 7, 2004, the Plaintiffs filed an opposition to Defendants' motions to dismiss the CAC. On January 24, 2005, the Defendants, filed their reply memorandum. On January 5, 2006 the Plaintiffs filed a motion for leave to file a Second Consolidated Amended Complaint ("SCAC") that raised the same legal claims as were set forth in the CAC, but supported them with additional factual allegations which had recently come to light through the SEC's legal proceedings, and also filed a motion to partially lift the PSLRA's automatic stay of discovery with respect to documents that Defendants had already produced in the SEC Action. On January 23, 2006, the Defendants filed oppositions to both of Plaintiffs' motions.

24.     On February 2, 2006, this Court heard oral arguments from all parties related to the pending motions. On March 28, 2006, the Court issued an Order (the "March 28 Order") which, among other things, denied the Defendants' motions to dismiss and sustained the Plaintiffs' SCAC, with respect to which leave to file was granted. In addition, the Court held that the SCAC sufficiently pled *scienter* with respect to the knowledge of the FDA's clinical hold and sufficiently alleged materiality with respect to the Defendants' statements concealing the FDA's clinical hold.

25.     On April 21, 2006, the Defendants filed a motion for reconsideration of the March 28 Order which was later withdrawn on May 4, 2006. On that same date, the Defendants filed a motion for a protective order seeking to avoid producing the documents which Biopure had produced to the SEC. On May 26, 2006 the Court denied the Defendants' motion for protective order and ordered the Defendants to produce the disputed documents.

26.     The parties also engaged in motion practice with respect to class certification. On June 5, 2006, the Class Representatives filed an amended motion for class certification, which the Defendants opposed. After producing documents, each Class Representative appeared for his deposition by Defendants. The Defendants also subpoenaed records from third party financial services providers. In addition, Defendants also sought additional discovery of other plaintiffs, who were not proposed as class representatives, as well as additional materials from the Class Representatives. Plaintiffs opposed these efforts by filing a motion for a protective order. In addition to filing a motion to compel, the Defendants filed a motion to strike the deposition errata sheets of the Class Representatives, which the Plaintiffs opposed. The parties reached this Settlement of this action while the amended class motion and the related discovery motions were pending before this Court.

C.     **The Parties Engage In Mediation and Plaintiffs Reach Agreements With the Settling Defendants**

27.     During September 2005, the parties participated in a formal mediation in New York with the assistance of the Honorable Layn Phillips. The parties prepared and exchanged comprehensive mediation briefs and expended substantial efforts in connection with this mediation. While some progress was made during this mediation session, the parties' positions remained far apart.

28.     In the months following this initial mediation session, the parties continued to discuss the possibility of settlement, while Co-Lead Counsel continued to aggressively litigate this action. Another mediation session, conducted by Professor Eric Green, did not take place until October 11, 2006. By this time, the amount of remaining unexhausted D&O coverage had been reduced significantly by defense fees and expenses for the instant litigation as well as the SEC Action. At the second mediation session, the parties were still unable to bridge the gap between the Plaintiffs' demand and the Defendants' offer, although it had narrowed. Following the October 2006 mediation, the parties continued to negotiate the terms of a potential settlement with the assistance of Professor Green and ultimately, the parties reached the proposed Settlement described herein.

29.     Co-Lead Counsel firmly believe that the compromise embodied in the Settlement represents an excellent recovery for the Class. The proposed $10 million all-cash plus interest Settlement will provide Class Members a benefit now and without the risks posed by continued litigation, including the risk of either no recovery at all or of a severe reduction in remaining D&O coverage to fund a recovery. This latter risk was particularly critical given both the extremely limited ability of the corporate Defendant Biopure to fund a recovery and the very real threat that Biopure would be unable to avoid bankruptcy. Had Biopure entered bankruptcy, it was believed by Co-Lead Counsel that other significant issues would have arisen regarding whether the D&O coverage was or was not an asset of the bankrupt estate, thus potentially stalling any settlement or judgment indefinitely.

30.     Plaintiffs had retained damage experts to estimate class wide damages in this case. This expert performed an analysis measuring estimated class-wide damages for Class members who held Biopure stock on the two relevant price drops on disclosures by the Company, on October 30,

2003 and on December 24, 2003. Under this analysis, class-wide damages were estimated to be between $42,158,000 and $50,183,000. Thus the settlement amount here of $10 million represents between 19.93% and 23.72% of the total estimated damages during the Class Period.

31.    According to a study by Cornerstone Research entitled "Securities Class Action Settlement 2006 Review and Analysis" by Laura E. Simmons and Ellen M. Ryan (a copy of this report is annexed as Exhibit A hereto), for settlements of less than $50 million, the median settlement as a percentage of estimated damages through year end 2006[3] was 10.5%; for 2006, the figure was 8.8%. For all settlements regardless of size, the median settlement was 3.6% of estimated damages for all years through year end 2006 and 2.4% for 2006 alone. Thus, in comparison, the instant Settlement, achieving in broad terms well over twice the cumulative average of comparable class actions, is an outstanding result for the Class

## IV.    MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

32.    In its Order dated May 23, 2007, the Court set a schedule for publishing the Summary Notice in *The Wall Street Journal* and for mailing the Settlement Notice and the Proof of Claim and Release ("Proof of Claim") to Class Members who could be identified with reasonable effort.

33.    Submitted herewith is the Declaration of Michael Rosenbaum of Berdon Claims Administration LLC, the Claims Administrator, regarding: (i) mailing of the Settlement Notice and the Proof of Claim and (ii) publication of the Summary Notice, which attests that over 17,000 copies of the Settlement Notice have been mailed to Class members and potential Class members. The Summary Notice was published in *The Wall Street Journal* on July 16, 2007.

---

[3] The sample includes 827 class actions settled between 1996 and 2006 and includes cases filed after the passage of the PSLRA.

34.     The Settlement Notice states that objections to any aspect of the Settlement, the Plan of Allocation, or the application for attorneys' fees and reimbursement of expenses were to be filed by September 11, 2007.  To date, no such objection by any Class Member has been received by Co-Lead Counsel or been filed with the Court.

## V.     FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENTS

### A.     The Settlement Was Fairly and Aggressively Negotiated By Counsel

35.      As set forth above, the terms of the Settlement were negotiated by the parties at arm's-length.  The Settlement was reached only after extensive, multiple, protracted settlement negotiations, with the substantial assistance of Judge Layn Phillips and Professor Eric Green. Consistent with the parties' hard-fought and aggressive litigation of this action, Co-Lead Counsel spent considerable hours investigating the allegations of wrongdoing and litigating Plaintiffs' claims, while at the same time pursuing settlement discussions.

### B.     Defendants Denial of Wrongdoing and Liability Placed the Outcome of the Class Action in Significant Doubt

36.     Even though the Class Representatives have survived Defendants' motion to dismiss, have briefed the issue of class certification, and believe their claims are strong, they recognize and acknowledge the expense and additional delay that would be necessitated by continued proceedings necessary to prosecute this action against the Defendants through trial and appeals.  Co-Lead Counsel have also taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as this Action.  Co-Lead Counsel are also mindful of the inherent problems of proof under, and possible defenses to, the securities law violations asserted in the Action. Further, Co-Lead Counsel also considered the ability to pay issues arising from the financial circumstances of Biopure, which has never been profitable and which relies upon the capital markets

to fund ongoing operations, and the ability to fund a settlement or satisfy a verdict from remaining D&O insurance proceeds, which were being expended, according to Defendants, at an average rate of $500,000 per month at various points in this litigation for defense fees and expenses in connection with this action and the SEC Action.

37.    Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Class Representatives in this Action.  Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them arising out of any conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action.  Defendants have also denied and continue to deny that this action is maintainable as a class action, and, *inter alia*, the allegations that Class Representatives or the Class have suffered damages, that the price of Biopure common stock was artificially inflated by reasons of alleged misrepresentations, non-disclosures or otherwise, and that the Class Representatives or the Class were harmed by the conduct alleged in the SCAC.

38.    The determination of damages is a complicated and uncertain process, typically involving conflicting expert opinions.  Factors which would be considered in the determination of damages include, among others: (i) whether any of the alleged misrepresentations caused the price of Biopure stock to be artificially inflated during the Class Period, (ii) whether the disclosures of truth regarding any alleged misrepresentations were related to the drop in the price of Biopure stock during or after the Class Period, (iii) the appropriate economic model for determining the amount by which Biopure stock was artificially inflated (if at all) during the Class Period, (iv) the effect of various market forces influencing the trading price of Biopure stock at various times during the Class Period, and (v) the extent to which external factors, such as general market and industry

conditions, influenced the trading price of Biopure stock during the Class Period.

**C.    The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

39.    Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable.  As outlined above, the Settlement is the product of arm's-length negotiations lasting over a year between adversaries with significant experience in securities class action litigation.

40.    Co-Lead Counsel strongly believe that the Settlement represents an excellent resolution for the Class under the circumstances.  Defendants, who likewise have vigorously litigated this action since its inception, agree.  Thus, as outlined above, the Settlement is fair, reasonable, and adequate in all respects and should be approved by the Court.

41.    Furthermore, copies of the Settlement Notice have been mailed to over 17,000 potential Class Members.  The date for objection has passed, and Co-Lead Counsel are not aware of any Class Member objections to the Settlement or to the Plan of Allocation.

**VI.    THE PLAN OF ALLOCATION**

42.    Pursuant to the Summary Notice and as set forth in the Settlement Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a proper Proof of Claim form.  As provided in the Stipulation, after deducting all appropriate taxes, administrative costs,  attorneys' fees and reimbursement of expenses and lost wages for the Class Representatives, the Settlement Fund (the "Net Settlement Fund") shall be distributed among Class Members who submit valid Proof of Claim forms ("Authorized Claimants").  The Proposed Plan of Allocation was carefully crafted to provide a return not only to Class members who held their shares to the end of the Class Period, but also to Class members who sold their shares after October 30,

15

2003, at which time the Defendants made a partial curative disclosure about the alleged wrongdoing and Biopure's stock reacted by dropping significantly.  Furthermore, based on recent U.S. Supreme Court precedent, see Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627, 1632 (2005), Class members who sold their Biopure shares before October 30, 2003, or purchased their shares after October 30, 2003 and sold them before the end of the Class Period, are allocated no recognized loss.

43.    The proposed Plan of Allocation provides:

a.    To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's Recognized Loss. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total Recognized Loss of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage that each Authorized Claimant's Recognized Loss bears to the total of the Recognized Losses of all Authorized Claimants.  No cash payment will be made on a claim where the potential distribution amount is ten dollars ($10.00) or less.  An Authorized Claimant's "Recognized Loss" shall be calculated as follows:

(a)    For the shares of Biopure common stock purchased during the period from April 9, 2003 through October 30, 2003, inclusive, and:

(i) sold prior to the close of trading on October 30, 2003, the Recognized Loss shall be zero; or

(ii) sold during the period from October 31, 2003 through December 24, 2003, inclusive, the Recognized Loss shall be the difference between the purchase price and the sale price; or

(iii) held at the close of trading on December 24, 2003, the Recognized Loss

shall be the difference between the purchase price and $2.43 per share (the market price at the close

of trading on December 26, 2003, the first business day after the end of the Class Period).

        (b)     For the shares of Biopure common stock purchased during the period from

October 31, 2003 through December 24, 2003, inclusive, and:

        (i) sold prior to the close of trading on December 24, 2003, the Recognized

Loss shall be zero; or

        (ii) held at the close of trading on December 24, 2003, the Recognized Loss

shall be the difference between the purchase price and $2.43 per share (the market price at the close

of trading on December 26, 2003, the first business day after the end of the Class Period).

## VII.   FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

44.    Despite working on this matter for almost four years, Co-Lead Counsel have not

received <u>any</u> payment for their services in prosecuting this litigation, nor have they been reimbursed

for their out-of-pocket expenses incurred.  The Notice provides that Lead Plaintiffs' counsel may

apply for an award of attorneys' fees equal to 33 1/3% of the Gross Settlement Fund, plus

reimbursement of out-of-pocket expenses of up to $175,000, which were incurred in the litigation,

plus interest thereon.  The requested fee award of 33 1/3% of the Gross Settlement Fund is well

within the range of fees awarded by courts in this District and throughout the country.

45.    Co-Lead Counsel achieved this excellent result for the Class, embodied in the

Settlement, at great risk and substantial expense to themselves.  Unwavering in dedication to the

interests of the Class, Co-Lead Counsel invested all time and resources necessary to bring this

litigation to a successful conclusion.  To date, Co-Lead Counsel's compensation for the services

rendered has always been wholly contingent.  The requested fee is reasonable based not only on the

quality of Lead Counsel's work and the substantial benefit obtained for the Class, but also based on the substantial risks undertaken by Co-Lead counsel in litigating this action on a contingent basis for so many years.

46.    Co-Lead Counsel's compensation for the services rendered was wholly contingent on their success.  Demonstrating Co-Lead Counsel's tremendous commitment to this litigation, the hours and expenses incurred in the prosecution of the litigation are set forth in the accompanying separate declarations from Co-Lead Counsel.

47.    Due to the nature of a contingent practice in the area of securities litigation, where cases are predominantly "big cases" lasting several years, not only do firms have to pay regular overhead, but they also have to advance the expenses of the litigation, all while deriving no contemporaneous recompense from their work prosecuting the action.  With a considerable lag time necessary for such cases to conclude, typically measured in years and not months, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis by its clients or by insurance coverage.

48.    The foregoing does not even take into consideration the substantial risks borne by contingent counsel of obtaining no recovery, and therefore no compensation and cost reimbursement, at all.  As discussed above, from the outset, this litigation presented a number of unique risks and uncertainties which could have prevented any recovery whatsoever.  It is wrong to assume that a law firm handling complex contingent litigation such as this action always, or even usually, wins.  Tens of thousands of hours have been expanded in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

49.    There are numerous instances in which plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, have received no compensation whatsoever due to a negative outcome at trial or on appeal.  It is only the knowledge by defendants and their counsel that the leading members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and if necessary go to trial, that permits meaningful settlements to be reached in actions such as this one.

50.    In addition, there have been many hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar nonetheless produced no fee for counsel after years of unpaid toil.

51.    Co-Lead Counsel have submitted separate declarations setting forth the amounts of the expenses incurred over the course of the litigation.  These declarations are filed herewith.

## VIII.  CONCLUSION

52.    For the reasons set forth above and in the accompanying documents, which include Plaintiffs' Memorandum of Law in Support of Their Motion For Final Approval of The Proposed Class Action Settlement and Plaintiffs' Counsel's Memorandum of Law in Support of Request For An Award of Attorneys' Fees and Reimbursement of Expenses, we respectfully submit that: (a) the Settlement is fair, reasonable and adequate and should be finally approved; (b) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (c) the application for attorneys' fees of 33 1/3% of the Gross Settlement Fund, and reimbursement of expenses in the total amount of $135,642.04 is

reasonable and should be granted, and (d) the application of the Class Representatives for reimbursement for their costs and lost wages is likewise reasonable and should also be granted.

We declare under penalty of perjury that the foregoing is true and correct.  Executed on September 17, 2007.

**/s/ Howard T. Longman**　　　　**/s/ Edward F. Haber**　　　　
Howard T. Longman　　　　　　Edward F. Haber

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as nonregistered participants on the 17th day of September, 2007.

**/s/ Edward F. Haber**
Edward F. Haber