Biopure.2006Settlements1.txt

cornerstone research

Securities Class
Action Settlements

2006 Review and Analysis

Laura E Simmons

Ellen M. Ryan

Cornerstone Research specializes in assisting attorneys with the
complex business issues encountered in litigation and regulatory
proceedings. Our staff and experts possess distinctive
skills and experience in using economic, financial, accounting,
and marketing research to analyze the issues of a case and
develop effective testimony. We provide objective, state-of-the-
art analysis that has earned us a reputation for excellence and
effectiveness.

We maintain a close relationship with many leading faculty and
industry experts throughout the country and, through them,
have access to even broader networks of expertise.

Essays such as this one are purposely brief, often summarizing
published works or other research by Cornerstone Research
consultants and affiliated experts. The views expressed are
solely those of the authors, who are responsible for the contents
of this essay, and do not necessarily represent the views
of Cornerstone Research.

Additional information about our research on securities class
action filings and settlements can be found at securities.cornerstone.com.
Information regarding Cornerstone Research consulting services
is available through our Boston, Los Angeles, Menlo Park, New
York, San Francisco, and Washington, D.C. offices as well as
from www.cornerstone.com.

Cornerstone Research

Securities Class Action Settlements: 2006 Review and Analysis

Like 2005, 2006 proved to be another record-breaking year for securities case
settlements.
First, the year included the approval of the largest securities case settlement to
date—the $6.6 billion partial settlement in the Enron Corporation matter—bringing
the
total settlement fund to $7.1 billion.1 Even excluding the Enron settlement,
however,
the total value of cases settled during the year exceeded all previous years,
reaching an
unprecedented $10.6 billion. In addition, while median settlement amounts changed
little, average settlement amounts in 2006 increased almost five-fold to reach their
highest
levels to date.2

Biopure.2006Settlements1.txt

This monograph discusses these and other findings in further detail, updating our prior reports on settlements of cases filed after passage of the Private Securities
Litigation Reform Act (Reform Act). Our sample includes 827 class actions settled between
1996 through 2006.3 Cases are limited to those including allegations of fraudulent inflation in the price of a corporation's common stock. These cases are identified from
Institutional Shareholder Services' Securities Class Action Services (SCAS).

As shown in Figure 1, 2006 far surpassed all previous years in terms of the total value of cases settled. The increase in the total value of cases settled in 2006 was due
to an increase in the average settlement size, rather than an increase in the number of
cases settled.4

For purposes of our research, the designated settlement year corresponds to the year

in which the hearing to approve the settlement was held. Cases that include multiple

settlements are reflected in the year of the latest partial settlement.5

TOTAL SETTLEMENT DOLLARS BY YEAR

Dollars in Millions

$43,696$1,775$4,856$1,948$2,779$2,489$3,264$9,423$17,162All Years1996 - 19992000200120022003200420052006
Enron Corp. $7.1 billion Settlement as of Year-End 2006
WorldCom, Inc. $6.2 billion Settlement as of Year-End 2005
Cendant Corp. $3.1 billion Common Stockholder Class SettlementSettlement dollars adjusted for inflation; 2006 dollar equivalent figures shown.
N = 827N = 109N = 90N = 95N = 111N = 94N = 111N = 122N = 95
Figure 1



Cornerstone Research



The increase in settlement amounts occurred primarily in very large cases, with the median settlement increasing only slightly from $6.7 million for previous post-Reform
Act years to $7.0 million in 2006. The median represents the point at which half the data
points are greater and half are smaller (i.e., the midpoint).

The extraordinary result for the average settlement in 2006 is driven in part by the

presence of four settlements in excess of $1 billion, not including the Enron settlement.
However, even without these mammoth settlements, the average settlement in 2006 equal to $45 million is an all-time high and more than twice the average for all post-
Reform Act settlements through 2005.

SETTLEMENT SUMMARY STATISTICS

2006Post-Reform Act
SettlementsThrough 2005Minimum$0.3 million$0.1 millionMedian$7.0 million$6.7

Biopure.2006Settlements1.txt

millionAverage$106.6 million$22.6 millionMaximum$2.7 billion$0.6 billionTotal Amount$10.0 billion$16.5 billionSettlement dollars adjusted for inflation; 2006 dollar equivalent figures shown.
Statistics exclude the Enron Corporation settlement totaling $7.1 billion as of year-
end 2006, the WorldCom, Inc. settlement totaling $6.2 billion as of year-end 2005, and the Cendant Corporation settlement of $3.1 billion in 2000. Including these cases, the average and total values are $180.6 million and $17.2 billion, respectively, for 2006 and $36.2 million and $26.5 billion, respectively, for all post-
Reform Act cases through 2005.
Figure 2



Figure 3 shows that in spite of the dramatic increase in very large settlements, over
60% of all settlements continue to settle for less than $10 million (roughly the same
proportion as in prior years).

The five settlements in excess of $1 billion in 2006 were part of a larger group of fourteen cases that settled for amounts of $100 million or more, far exceeding the previous
records of seven and nine settlements in 2004 and 2005, respectively. The average market capitalization decline associated with these so-called "mega-settlements" was in
excess of $40 billion.



DISTRIBUTION OF SETTLEMENT AMOUNTS

Dollars in Millions

0%
10%
20%
30%
40%
50%
LessThan$1$1-$4.9$5-$9.9$10-$19.9$20-$29.9$30-$39.9$40-$49.9$50-$59.9$60-$69.9$70-$79.9$80-$89.9$90-$99.9$100-$149.9$150-$199.9$200-$249.9$250-$299.9$300or Greater
Through Year-End 2005
2006As a % ofSettled Cases
Figure 3



For purposes of our research, we apply a highly simplified approach to estimate damages, adopted with certain modifications, from a methodology historically used by

plaintiffs.6 In particular, our method makes no attempt to link shareholder losses to
allegations included in the complaint. Accordingly, the "damage" amounts presented in
this research are not intended to be indicative of actual damages borne by shareholders.
However, by applying a consistent method in our computation of "estimated damages" we can examine trends in these amounts.

The increase in average "estimated damages" for cases settled in 2006 is consistent with a prediction discussed in our 2004 report, which forecasted that increases in

Biopure.2006Settlements1.txt

"estimated damages" would occur when cases filed in 2003 and 2004 were settled. Over
40% of cases settled in 2006 were filed in either 2003 or 2004. Part of the increase in
"estimated damages" is due to an increase in the average length of the class period. The
average class period in 2006 was 1.9 years, compared to only 1.3 years for all prior post-
Reform Act years.

The discrepancy between the magnitude of the median and average statistics arises
from a relatively small number of cases for which "estimated damages" are quite large.
There were eighteen settlements in 2006 with "estimated damages" in excess of $5 billion,
and half of those were in excess of $10 billion.

MEDIAN AND AVERAGE "ESTIMATED DAMAGES" BY YEAR

Dollars in Millions

$348$566$596$1,059$1,905$2,391$6,328$147$346$211$347$356$357$174$159$1,9661996 - 19992000200120022003200420052006
Median Plaintiff-Style Damages
Average Plaintiff-Style DamagesN = 109N = 93N = 63N = 29N = 14N = 89N = 94"Estimated Damages" adjusted for inflation; 2006 dollar equivalent figures shown.
N = 110N = 121N = 93
Figure 4

Impact of Dura Pharmaceuticals Decision on Damage Estimates

As reported in our prior-year monograph, on April 19, 2005, the Supreme Court reached a unanimous
landmark decision in Dura Pharmaceuticals v. Broudo (Dura) ruling that plaintiffs must
show a causal link between the alleged misrepresentations and the subsequent actual losses suffered by
plaintiffs. Thus, plaintiffs must show that any losses for which they claim damages were caused by the
alleged fraud, as opposed to intervening factors. As we previously noted, the decision in the Dura
litigation clearly calls into question typical plaintiff-style damage methodologies that seek to measure
recoverable damages as the simple difference between alleged inflation at the time of purchase and
alleged inflation at the date of sale, without fully considering whether any changes in inflation were
caused by information about the alleged fraud. Moreover, under the Dura decision, plaintiffs who sell
their securities before information about the alleged fraud reaches the market do not suffer a recoverable
loss.

Continuing a trend that began in earlier years but likely furthered by last year's Dura decision, the
once prevalent "index-backward" approach to calculating damages (described on page 4 and footnote
6) is now rarely utilized by plaintiffs. As a result, damage calculations applied in

Biopure.2006Settlements1.txt

research that are based
on the index-backward approach are increasingly imprecise proxies for potential damages claimed
by plaintiffs. Thus, in our current year research we have explored supplemental measures to represent
plaintiff-style damages. Using our settlement prediction model described further on page 18, we find
that, for recent years, the inclusion of variables that measure the impact of the stock price decline at the
end of the class period (in addition to our traditional measure of "estimated damages") enhance our
ability to predict settlements.

However, our regression analysis also reveals that our traditional measure of "estimated damages"
still demonstrates the highest correlation with settlement amounts, as compared to measures that are
based on the decline at the end of the class period.7 Therefore, the charts in this report that present
settlements in relation to "estimated damages," are based on the traditional "index-backward"
based method.



While median "estimated damages" have remained relatively constant over the last
few years, settlements as a percentage of "estimated damages" of 2.4% were lower
in 2006 as compared to all prior years, as well as lower than the 3.1% we previously

reported for 2005.

As we have noted in our prior reports, settlements as a percentage of "estimated damages" generally decrease as damages increase, although not always true for the very
largest cases. This pattern of declining settlements as a proportion of "estimated damages"
as "estimated damages" increase, combined with the fact that average "estimated damages" increased in 2006, may explain in part the lower settlements as a percentage
of "estimated damages"for 2006.

It is also possible that the Dura decision has led to lower proportionate settlements,
as a result of a decrease in damages claimed by plaintiffs. Since the method used to calculate
"estimated damages" for purposes of the chart below is the same as in prior years
(as previously discussed), this could contribute to the lower settlements as a percentage
of "estimated damages" observed overall for 2006.



MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES"

BY DAMAGE RANGE

Dollars in Millions

3.6%
5.2%
3.3%
1.8%

```
                              Biopure.2006Settlements1.txt
1.1%
0.7%
2.4%
8.8%
4.8%
2.2%
1.1%
0.7%
1.6%
10.5%
Total SampleLess than
$50$50 – $125$126 – $500$501 – $1,000$1,001 – $5,000Greater than
$5,000
Through Year-End 2005
2006N = 723N = 93N = 146N = 12N = 132N = 17N = 235N = 22N = 80N = 9N = 99N = 15N =
31N = 18
Figure 5
```

In prior years we have presented median settlements as a percentage of "Maximum Dollar Loss" (MDL), representing the dollar value decrease in the market capitalization of the defendant firm from the trading day on which the defendant firm's market capitalization reached its maximum during the class period to the trading day immediately following the end of the class period. As previously discussed in this monograph, however, under the Dura decision, plaintiffs who sell their securities before information about the alleged fraud reaches the market do not suffer a recoverable loss, which in some cases will make the decline from the peak stock price less relevant. Therefore, this year we present settlements in relation to the decline in the market capitalization of the defendant firm from the trading day immediately preceding the end of the class period to the trading day immediately following the end of the class period, referred to as

"Disclosure Dollar Loss" (DDL).

This measure is not intended to represent an estimate of damages, as it makes no attempt to isolate movements in the defendant's stock price that are unrelated to case allegations. Nor does this measure capture additional stock price declines during the alleged class period that may affect some purchasers' potential damages claims. Further, this measure does not apply a trading model to estimate the number of shares damaged.8

Settlements as a percentage of DDL generally decline as DDL increases (similar to the trend observed with "estimated damages"). However, as shown for 2006, overall, this pattern does not hold for very large cases, which is a function of the unusually large settlements described on page 2. Nevertheless, the difference between very small cases and large cases is considerable, with cases involving DDLs of less than $25 million settling for almost 50% of their decline in market capitalization at the end of the class period.

Biopure.2006Settlements1.txt

MEDIAN SETTLEMENTS AS A PERCENTAGE OF

DISCLOSURE DOLLAR LOSSES (DDL) BY DDL RANGE

Dollars in Millions

8.8%
38.5%
10.1%
5.5%
3.9%
1.8%
8.7%
46.5%
9.1%
2.2%3.0%3.5%
Total SampleLess than
$25$25 – $100$101 – $250$251 – $500Greater than
$500Through Year-End 2005
2006N = 182N = 22N = 186N = 24N = 126N = 13N = 67N = 7N = 108N = 23N = 669N = 89
Figure 6


Accounting issues continue to be included in the allegations of over 55% of all
cases. Furthermore, these cases continue to settle for a significantly higher percentage of
"estimated damages" relative to cases not involving accounting allegations.

At roughly 35% of all 2006 settlements, the proportion of cases involving a restatement
of the financial statements declined from 2005 but remained higher than earlier
post-Reform Act years.

Accountants have been named in less than 20% of all post-Reform Act settlements
through 2006; however, cases involving an accountant as a named defendant continue to
settle for the highest percentage of "estimated damages."


MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES"

AND ACCOUNTING ALLEGATIONS

1996–2006

3.9%
4.8%
5.1%
3.2%3.2%3.3%
N = 468GAAPAllegationsNoGAAPAllegationsAccountantNamedNoAccountantNamedRestatementNoRestatementN = 145865=N843=N176=N842=N
Figure 7


Consistent with prior years, approximately 20% of all post-Reform Act settlements
involve Section 11 and/or 12(a)(2) claims. Median settlements as a percentage of
"estimated

Biopure.2006Settlements1.txt

damages" are higher for these cases, compared to cases without these allegations.
In cases involving an underwriter as a named defendant, settlements as a percentage of
"estimated damages" are even higher.

There is substantial overlap between the inclusion of an underwriter as a named
defendant and the presence of Section 11 or 12(a)(2) claims. However, underwriters are
named in less than 15% of all cases. When applying multiple regression analysis to control
for the presence of an underwriter defendant and other factors, Section 11 and/or 12(a)(2)
claims are not associated with a statistically significant increase in settlement amounts.

MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES"

AND SHARE ISSUANCE ALLEGATIONS

1996–2006



4.2%
5.5%
3.3%3.3%
N = 163Section 11 and/or
12(a)(2) ClaimsNoSection 11 and/or
12(a)(2) ClaimsUnderwriterNamedNoUnderwriterNamed617=N001=N356=N
Figure 8



In earlier years there were claims that institutions rarely served as lead plaintiffs,
despite the intent of Congress to increase their participation with the passage of the
Reform Act. However, in recent years, there has clearly been a marked increase in the
percentage of cases with institutional investors serving as lead plaintiffs. In fact, institutions
served as lead plaintiff in over 50% of all settlements in 2006.

Overall, cases involving institutional investors as lead plaintiffs have significantly
higher settlement amounts. As we have previously noted, this does not necessarily
indicate a causal effect on settlement outcomes due to institutions' involvement, as it is
possible that institutions choose to participate in cases with stronger merits. In addition,
part of the cause for higher settlements in these cases is due to the fact that institutions
tend to participate in larger cases. However, even controlling for "estimated damages"
(i.e., case size), as well as other factors that affect settlement amounts (such as the
nature of the allegations), the presence of an institutional investor is associated with a
statistically significant increase in settlement size. (See page 18 for a complete list of the
control variables considered in testing the effect of institutional lead plaintiffs).

Biopure.2006Settlements1.txt

MEDIAN SETTLEMENT AMOUNTS AND INSTITUTIONAL INVESTORS

BY YEAR

Dollars in Millions

$7.3 $9.0 $10.3 $14.3 $38.5 $15.0 $9.0 $5.7 $4.6 $4.2 $4.9 $5.5 $4.6 $5.7 $4.3 $5.8 1996 – 1999 2000 2001 2002 2003 2004 2005 2006
Institutional Investor as Lead Plaintiff
No Institutional Investor as Lead Plaintiff N = 29 N = 80 N = 30 N = 60 N = 26 N = 69 N = 35 N = 76 N = 27 N = 67 N = 23 N = 88 N = 45 N = 76 N = 51 N = 44
Figure 9

The table below lists the institutions appearing most frequently as lead plaintiffs

for post-Reform Act cases settled during 1996–2006. As shown, there are three public

pension funds and two union pension funds that have served as a lead plaintiff in four
or more post-Reform Act cases. Consistent with the fact that institutions tend to get
involved with larger cases, the median settlement amount for cases settled by these plaintiffs
is substantially higher than for the sample of post-Reform Act cases as a whole.

At least some of the institutions appearing below have served as a lead plaintiff in

cases with filing dates as early as 1996. However, consistent with the general trend in
institutional lead plaintiffs, the two most active institutions (Teachers Retirement System
of Louisiana and Local 144 Nursing Home Pension Fund), have increased the frequency
of their involvement in more recent years.

In our prior-year report we surmised that the large settlements obtained in 2005 by
institutions choosing to pursue individual claims against WorldCom and its underwriters
rather than participate in the class action settlement might be the beginning of a trend
of an increase in "opt-out" plaintiffs. While it isn't clear yet how significant this trend
will become, cases with opt-out plaintiffs have continued, and debates about recovery
rates for plaintiffs choosing to opt out of class action settlements versus those that
participate as class members have been widely covered in the press.

TOP FIVE INSTITUTIONAL INVESTOR LEAD PLAINTIFFS

BY NUMBER OF CASES

Dollars in Millions

Lead Plaintiff Number of Cases Total Settlement Funds Median Settlement Average Settlement Teachers' Retirement System of Louisiana 9 $590.5 $30.0 $65.6 Local 144 Nursing Home Pension Fund 6 $316.2 $42.5 $52.7 Plumbers & Pipefitters National Pension

Biopure.2006Settlements1.txt
Fund5$378.0$99.3$75.6Louisiana School Employees Retirement System4$379.8$57.6$94.9Louisiana State Employees Retirement System4$360.3$28.6$90.1
Figure 10

The number of cases involving companion derivative actions has been increasing
in recent years. Over 45% of cases settled in 2006 were accompanied by the filing of

a derivative action. For purposes of our study, a derivative action, generally a case filed
against the officers and/or directors on behalf of the issuer corporation, must have

allegations similar to the class action in nature and time period in order to be considered
an accompanying action.9

Derivative cases are often resolved with changes to the issuer's corporate governance
practices and little or no cash payment—this is true despite the overall increase in corporate
controls introduced after passage of the Sarbanes-Oxley Act in 2002. While the settlement
of a derivative action does not necessarily result in a cash payment, settlement amounts
for class actions accompanied by derivative cases are significantly higher than for cases
not involving derivative actions. However, settlements as a percentage of "estimated

damages" are slightly lower than for cases without accompanying derivative actions.

Derivative actions tend to be associated with larger class action cases (as measured

by "estimated damages" and the assets of the issuer defendant), as well as class actions
involving accounting allegations, SEC actions, and institutional investor lead plaintiffs. It
is likely that these circumstances attract the accompanying derivative actions, leading to
the higher settlements observed in the class actions.

The prevalence of derivative actions varies by jurisdiction. In addition, we are aware
of assertions that more substantive derivative cases are typically filed in Delaware. Thus,
we have investigated whether the association that we find between accompanying derivative
cases and higher class action settlements is driven by cases filed in Delaware. Using a
regression analysis to control for other determinants of class action settlements, we find
that derivative cases filed in states other than Delaware are also associated with statistically
significant higher settlements.

MEDIAN SETTLEMENTS AND DERIVATIVE ACTIONS

1996–2006

Dollars in Millions

$13.8$5.13.2%
3.6%

Biopure.2006Settlements1.txt
N = 187N = 629Median SettlementsMedian Settlements as a % of "Estimated Damages"
N = 187N = 629With Derivative ActionWith No Derivative ActionWith Derivative ActionWith No Derivative Action
Figure 11

Figure 12 reports settlements classified by whether the case was accompanied by
a corresponding filing by the SEC of a litigation release or administrative proceeding.
Over 20% of all post-Reform Act settlements have involved such SEC actions. As
shown, these cases are associated with significantly higher settlement amounts, as well as
higher settlements as a percentage of "estimated damages."

With increasing frequency in recent years, class action settlements have been
accompanied by settlements with the SEC. Below are cases from our sample for which
settlements have been reached with the SEC in related actions. The majority of such
settlements occurred in 2004 through 2006.10


$11.0$5.54.1%
3.4%
N = 178N = 638Median SettlementsSEC ActionNo SEC ActionMedian Settlements as a % of "Estimated Damages"
SEC ActionNo SEC ActionN = 178N = 638
MEDIAN SETTLEMENTS AND SEC ACTIONS

1996–2006

Dollars in Millions

Figure 12

CASES WITH ACCOMPANYING SEC SETTLEMENTS

Dollars in Millions

Settlement Fund inSettlement Fund innoitcAssalCdetaleRnoitcACESesaC1.651,6$0.057$.cnI,moCdlroWComputer Associates International, Inc.$225.0$128.6Bristol-Myers Squibb Company$150.0$485.02.715$0.52$.cnI,seigolonhceTtnecuL8.78$0.01$.cnI,seigolonhceT2iGemstar-TV Guide International, Inc.$10.0$92.58.9$8.9$.cnI,snoitacinummoCenOraelC4.64$3.5$.cnI,seigolonhceTlainnetneC5.59$0.9$.cnIerotsemoH8.5$2.2$.cnI,xamoZ1.8$5.1$.cnI,seitlaicepStnemerusaeM
Figure 13


 Over 35% of the issuer firms in our sample filed for bankruptcy or had their
stock delisted from a major exchange before the class action settlement hearing date.
Settlement amounts for these cases are lower than for cases in which the defendant
firms do not exhibit these signs of distress.

Cases involving distressed firms are substantially smaller in terms of "estimated damages,"
which helps to explain why settlements as a percentage of "estimated damages"
for these cases are approximately the same as for non-distressed firms. When other

Biopure.2006Settlements1.txt

factors
that affect settlement amounts are considered in addition to "estimated damages,"
the fact that the defendant firm is distressed is associated with a statistically significant
decrease in settlement size.

$6.8$5.33.5%3.6%
N = 294N = 522Median SettlementsMedian Settlements as a % of
"Estimated Damages"
N = 294N = 522DistressedFirmNon-DistressedFirmDistressedFirmNon-DistressedFirm
MEDIAN SETTLEMENTS AND DISTRESSED FIRMS

1996–2006

Dollars in Millions

Figure 14


The percentage of settlements involving non-cash components (e.g., stock or warrants) continued to decline for the seventh straight year to 5% in 2006. Non-cash

components represented more than 60% of the total settlement value for the few cases

that included these components in 2006. In eighteen cases in our sample of all post-Reform Act settlements, non-cash components comprise in excess of 75% of the settlement fund

The inclusion of non-cash components in the settlement fund is associated with a statistically significant increase in total settlement value, even when controlling for other
factors such as "estimated damages" and the nature of the allegations.

SETTLEMENT FUNDS WITH NON-CASH COMPONENTS

BY YEAR

19%
16%14%
9%8%7%
5%
49%49%
45%
60%
65%
43%
40%
62%
28%
1996 - 19992000200120022003200420052006
% of Settlements with Non-Cash Components
Median % of Total Settlement Value from Non-Cash Components
Figure 15


In prior years we have reported that the law firm of Milberg Weiss Bershad Hynes & Lerach LLP was involved as lead or co-lead plaintiff counsel in roughly 50% of all post-
Reform Act settlements.11 Effective May 1, 2004, the firm separated to become Milberg

Biopure.2006Settlements1.txt

Weiss Bershad & Schulman LLP (Milberg Weiss) and Lerach Coughlin Stoia & Robbins LLP (Lerach Coughlin).

The individual firms of Milberg Weiss and Lerach Coughlin continued to dominate as lead plaintiff counsel in terms of the proportion of settlements in which they were
involved in 2006. However, while in prior years we found a significant positive relationship
between Milberg Weiss or Lerach Coughlin serving as lead plaintiff counsel and settlement outcomes (even after controlling for the effect of other factors that affect
settlements), the current year analysis does not indicate the continuance of such a relationship.
It is too early to determine if this change is related to the criminal indictments that faced the Milberg Weiss firm.

SETTLEMENTS BY PLAINTIFF ATTORNEY

5002dnE-raeYhguorhT6002Plaintiff Law Firm% of
Settled CasesMedian Settlementas a % ofEstimated Damages% of SettlementsMedian Settlementas a % ofEstimated
Damages%9.3%7%1.5%13snibboR&namduRrelleGaiotSnilhguoChcareL%5.1%7%5.1%32namluhcS&dahsreBssieWgrebliMPredecessor
Firm:%9.3%83hcareL&senyHdahsreBssieWgrebliM%0.2%9%8.1%21yaworraB&nirffihcS%5.3%6%7.5%9namssorG&regreBztiwotiLnietsnreB%7.3%6%2.3%6ydraGyebbA%8.3%5%7.0%6ztihsfiL&drahbeiLnietsnreB%3.7%2%0.6%5ffoduR&worahcuSnotabaL%7.2%2%7.3%4lloT&dlefsuaHnietsliMnehoC%6.3%8%1.4eugatnoM&regreB%1.3%1%6.1%4eiruL&ssieW--%4.4%3PLLhkeraP&rednaxelAnamruoYPredecessor Firm:%4.3%5--namruoY&ssieW%9.1%3%2.1%3zreH&nameerFreldAnietsnedlaHfloW
Figure 16

As shown below, settlements continue to occur most frequently in the Ninth Circuit, namely the federal district courts in California, followed by the Second Circuit, reflecting
the very active southern district of New York.

There is substantial variation between circuits in the number and size of settlements.
However, case jurisdiction is often correlated with other factors such as industry sector
(e.g., the concentration of the technology sector in the Ninth Circuit). With the exception
of the second circuit, when controlling for the effects of "estimated damages" and other important determinants of settlement amounts, court circuits are not significant
in explaining settlement size. Settlements are higher in the second circuit, controlling for
other factors.

SETTLEMENTS BY COURT CIRCUIT

Dollars in Millions

No. of CasesCourtCircuit2006ThroughYear-End 20052006ThroughYear-End 20051545$7.0$5.7220110$9.4$5.731166$3.5$6.44223$557.5$7.05660$41.0$5.56436$21.2$10.67538$7.5$7.38325$3.2$9.0926180$6.4$6.610331$1.2$7.011677$7.5$4.5DC11$4.5$32.5State131$1.9$4.0Total93723$7.0$6.0Median Settlement
Figure 17

Biopure.2006Settlements1.txt

Cornerstone Research Settlement Prediction Model

Characteristics of securities cases that may affect settlement outcomes are often correlated with
each other, as noted in the discussion of the charts presented in this monograph. The use of regression
analysis allows for the examination of the effects of these factors simultaneously. Accordingly, as part of
our ongoing research on securities class action settlements, we have applied regression analysis to study
the determinants of settlement outcomes. Analysis performed on our sample of post-Reform Act cases
settled through December 2006 reveals that variables that are important determinants of settlement
amounts include the following: 12, 13

• Simplified plaintiff-style "estimated damages"

• Disclosure Dollar Losses (DDL)

• Most recently reported total assets of the defendant firm

• The number of entries on the lead case docket

• Indicator for whether a restatement of the financial statements, announced during or at the end
of the class period, is involved (or, alternatively, whether GAAP violations are alleged)

• Indicator for whether a corresponding SEC action against the issuer or other defendants is
involved

• Indicator for whether an accountant is a named co-defendant

• Indicator for whether an underwriter is a named co-defendant

• Indicator for whether a corresponding derivative action is filed

• Indicator for the year in which the settlement occurred

• Indicator for whether an institution is involved as lead or co-lead plaintiff

• Indicator for whether the firm filed for bankruptcy or was delisted prior to settlement

• Indicator for whether non-cash components, such as stock or warrants, comprise a portion of
the settlement fund

• Indicator for whether there are securities other than common stock alleged to be damaged

• Indicator for whether the case was filed in the Second Circuit

Settlements are higher when "estimated damages," defendant asset size, or the number of docket
entries are higher. Settlements are also higher with the presence of any of the following variables: a
restatement or GAAP violation, a corresponding SEC action, an accountant named as co-defendant, an
underwriter named as co-defendant, a corresponding derivative action, an institution

Biopure.2006Settlements1.txt

involved as lead
plaintiff, case filed in 1998, a non-cash component to the settlement, case filed in the Second Circuit, or
securities other than common stock are alleged to be damaged. Settlements are lower if the settlement
occurred in 2002 or later, or if the issuer firm filed for bankruptcy or was delisted prior to the settlement.
Over 65% of the variation in settlement amounts can be explained by these variables.

Our clients are often interested in obtaining estimates of expected settlement amounts in securities
cases. Accordingly, from the regression analysis described above, we have developed a prediction
model that can be used to estimate expected settlement amounts for post-Reform Act cases. Settlement
estimates based on our model are available to Cornerstone Research clients.


Although average settlement sizes have been increasing in the last few years, 2006 stands out from prior years by the sheer magnitude of the increase that occurred.

Average "estimated damages" also increased dramatically in 2006, contributing to a decline from prior years in overall settlements as a percentage of "estimated damages."

Other interesting findings include that institutions served as a lead plaintiff in over
50% of all cases settled in 2006 and that over 45% of cases settled in 2006 were accompanied
by the filing of a derivative action.

Sample and Data Sources

The sample of cases discussed in this monograph was identified from Institutional Shareholder Services' Securities Class Action Services (SCAS). Our database is limited
to cases alleging fraudulent inflation in the price of a corporation's common stock (i.e.,
excluding cases filed only by bondholders, preferred stockholders, etc. and excluding
cases alleging fraudulent stock price depression). Inclusion in our sample is also limited
to cases alleging Rule 10b-5, Section 11 and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria were imposed to ensure data availability and to provide a relatively homogeneous set of cases with respect to the
nature of the allegations.

In addition to the SCAS, data sources include Factiva, Bloomberg, the Center for Research in Security Prices at the University of Chicago, Standard & Poor's Compustat,
court filings and dockets, SEC registrant filings, SEC litigation releases and administrative
proceedings, LEXIS-NEXIS, and the public press.


concluding remarks


Includes amounts settled in prior years. Settlement amounts announced in 2006 that have settlement

Biopure.2006Settlements1.txt

hearing dates in 2007 are not included.

Comparison to prior years also excludes the Cendant Corporation settlement in 2000 and the
WorldCom settlement in 2005.

For all figures involving "estimated damages" ten settlements are excluded due to a lack of available
stock price data, and the WorldCom settlement is excluded since the majority of the amounts settled in
the case relate to liability associated with bond offerings (and our research does not compute damages
related to securities other than common stock).

The small number of settlements in the early years following passage of the Reform Act reflects the
fact that overall, securities cases typically settle almost three years after they are filed (and our sample is
limited to cases filed after December 22, 1995).

Movements of partial settlements between years can cause differences in amounts reported for prior
years from those presented in earlier publications. For a settlement to be included in a more recent year,
the subsequent partial settlement must be at least 50% of the original settlement.

 Our simplified plaintiff-style model is applied to common stock only. For all cases involving Rule 10b-5
claims, damages are determined from a market-adjusted backward value line. For cases involving only
Section 11 and/or 12(a)(2) claims, damages are determined from a model that caps per-share damages
at the offering price. A volume reduction of 50% for shares traded on Nasdaq and 20% for shares listed
on NYSE or AMEX is used. Finally, no adjustments for institutions, insiders, or short sellers are made
to the float.

This may be due to the fact that in cases in which there are multiple alleged corrective disclosures,
measures that focus on the stock price decline at the end of the class period will not capture the total
inflation alleged by plaintiffs.

We present DDL information in Figure 6 to provide a benchmark for the convenience of our readers
since the measure is simple to compute and does not require application of a trading model.

Accompanying derivative actions are identified primarily through a search of the public press and review
of court dockets and SEC filings.

Table does not include preliminary settlements (i.e., settlements that have been announced but not yet
approved).

Determination of involvement as lead or co-lead counsel is based upon reporting by the SCAS.

The settlement model does not capture the effect of non-public or non-measurable factors that influence
settlement outcomes. These factors include the relative merits of the case, as well

Biopure.2006Settlements1.txt

as limits of
available insurance.

Due to the presence of extreme observations in the data, logarithmic transformations are applied
to settlement amounts, "estimated damages," the defendant's total assets, and the number of docket
entries.

endnotes



ABOUT THE AUTHORS

Laura E. Simmons

Ph.D., University of North Carolina at Chapel Hill

M.B.A., University of Houston

B.B.A., University of Texas at Austin

Laura Simmons is a principal in the Washington, DC office and has over fifteen years

of experience in accounting practice and economics consulting. She is a certified public
accountant and specializes in accounting issues arising in complex commercial litigation,
including securities, breach of contract, and intellectual property matters. Her experience
in securities litigation has involved analysis of damage and liability issues for both equity
and fixed income securities. She has served as a testifying expert in cases involving accounting
analyses and research on securities lawsuits.

Dr. Simmons's research on pre-and post-Reform Act securities litigation settlements
has been published in a number of reports and is frequently cited in the public press and
legal journals. She has spoken at various conferences and appeared as a guest on CNBC
addressing the topic of securities case settlements. From 1986 to 1991, she was an accountant
with Price Waterhouse.

Ellen M. Ryan

M.B.A. in International Management,

American Graduate School of International Management

B.A., Saint Mary's College

Ellen Ryan is a manager in the Boston office of Cornerstone Research. She has
consulted on economic and financial issues in a wide variety of cases including securities
class action lawsuits, financial institution breach of contract matters, and antitrust
litigation. Ms. Ryan also has supported testifying witnesses in corporate governance

and breach of fiduciary duty matters. Prior to joining Cornerstone Research, Ms. Ryan

Biopure.2006Settlements1.txt

worked for Salomon Brothers in New York and Tokyo.

CORNERSTONE RESEARCH PUBLICATIONS

Securities Class Action Case Filings 2006: A Year in Review

Demystifying Financial Derivatives
René M. Stulz

Estimating Damages in Patent Infringement Cases: An Economic Perspective

Michael C. Keeley

Securities Class Action Litigation in First Quarter 1998

Joseph A. Grundfest, Michael A. Perino, Paul Lomio, Erika V. Wayne, and Rilla Reynolds

Securities Reform: Implications for Damages

William H. Beaver, James K. Malernee, and Cynthia L. Zollinger

Market Maker Activity on Nasdaq: Implications for Trading Volume

John F. Gould and Allan W. Kleidon

Stock Trading Behavior and Damage Estimation in Securities Cases

William H. Beaver, James K. Malernee, and Michael C. Keeley

The Corporate Veil: When Is a Subsidiary Separate and Distinct From Its Parent?

Ben C. Ball, Jr., Matthew S. Miller, and Christine S. Nelson

Estimating Damages in Securities Fraud Cases

William H. Beaver and James K. Malernee

Bank Charter Values and Risk Taking

Michael C. Keeley

CORNERSTONE RESEARCH OFFICES

Boston

699 Boylston Street, 5th Floor

Boston, MA 02116-2836

617.927.3000

Los Angeles

633 West Fifth Street, 10th Floor

Los Angeles, CA 90071-3509

213.553.2500

Menlo Park

Biopure.2006Settlements1.txt

1000 El Camino Real, Suite 250

Menlo Park, CA 94025-4327

650.853.1660

New York

599 Lexington Avenue, 43rd Floor

New York, NY 10022-7642

212.605.5000

San Francisco

353 Sacramento Street, 19th Floor

San Francisco, CA 94111-3656

415.229.8100

Washington

1875 K Street, N.W., Suite 600

Washington, DC 20006

202.912.8900

www.cornerstone.com

securities.cornerstone.com

© 2007 by Cornerstone Research. All Rights Reserved.

Cornerstone Research is a registered service mark of

Cornerstone Research, Inc. C logo and design is a

registered trademark of Cornerstone Research, Inc.